E-FILED
Wednesday, 02 April, 2014  10:44:27 AM
Clerk, U.S. District Court, ILCD

KINSER v. CBS CORP., Case No. 94-2282

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

              Plaintiffs,         Docket No. 94-2282

   vs.                 Urbana, Illinois
                         January 9, 2014
                         9:30 a.m.

CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

              Defendant.


JURY TRIAL -- Day 2
(Testimony of Arthur Leonard Frank)

BEFORE THE HONORABLE HAROLD A. BAKER
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:    ROBERT G. McCOY, ESQUIRE
                      Cascino Vaughan Law Offices, Ltd.
                      220 South Ashland Avenue
                      Chicago, Illinois 60607
                      312-944-0600

For the Defendant:    SANDRA GIANNONE EZELL, ESQUIRE
                      Bowman and Brooke, LLP
                      901 East Byrd Street, Suite 1650
                      Richmond, Virginia 23219
                      804-649-8200

                      PAULA M. BURLISON, ESQUIRE
                      Bowman and Brooke, LLP
                      1441 Main Street, Suite 1200
                      Columbia, South Carolina 29201
                      803-726-7420

                      JACOB DANIEL SAWYER, ESQUIRE
                      Foley & Mansfield, PLLP
                      55 West Monroe, Suite 3430
                      Chicago, Illinois 60603
                      312-254-3800

KINSER v. CBS CORP., Case No. 94-2282

I N D E X

Page

WITNESS ON BEHALF OF THE PLAINTIFFS:

ARTHUR LEONARD FRANK

Direct Examination by Mr. McCoy ..............   6

Cross-Examination by Ms. Ezell ............... 112

Redirect Examination by Mr. McCoy ............ 174

KINSER v. CBS CORP., Case No. 94-2282

```
 1                    (In open court; 9:39 a.m.)

 2              THE COURT:  Okay.  George, bring the jurors,

 3      please.

 4              COURT SECURITY OFFICER:  Yes, Your Honor.

 5                    (Brief pause in proceedings.)

 6                    (Jury present, 9:41 a.m.)

 7              THE COURT:  Good morning, jurors.  Thank you

 8      for being here.

 9              Just a couple of comments and things I want to

10      say to you before we begin with the evidence in the case.

11                    (Court sound system powering on.)

12              THE COURT:  Thank you, Jessi.  I'll sit back

13      now.

14              With the weather and the way it is, don't be

15      worried if you're going to be a little late.  We'll wait

16      for you.  We will understand.  We won't scold you.  You

17      know, use your sense; don't drive too fast or whatever.

18              The other thing is that -- let me talk to you a

19      little bit about the kind of evidence you're going to

20      hear today.  There are going to be video depositions, and

21      a video deposition is evidence in the case; and it's the

22      same thing as if the witness was personally present, and,

23      and it's, it's for efficiency and economy that, that they

24      do it by video.  Somebody can't be here or -- at any

25      rate, but it's evidence in the case.  It's not entitled
```

KINSER v. CBS CORP., Case No. 94-2282

1   to greater or less weight because it's by video, and you

2   are to judge the testimony the same way you judge the

3   testimony of any other witnesses if they were present.

4           Those are the two main things that I wanted to

5   say to you.  And I'll, I'll say some other things as we

6   go along.

7           I'm still hoarse; I'm sorry.  I'll be like my

8   colleague, McCuskey, who tells the jurors all his

9   physical ills.  I had an esophageal stricture that

10  developed; and, well, they stretched it.  And as a

11  result, when they put that fire hose down your throat,

12  you know, to do the examination, you end up hoarse; and

13  it will go away after a little while.

14          Okay.  What do you need?

15          DEPUTY CLERK:  Does anybody want a notebook to

16  take notes?  Can I see hands?

17          THE COURT:  Oh, yeah.  Hey, thanks, Jessi.

18          Now, you can take notes.  The lawyers take

19  notes.  I take notes.  You can take notes.

20          Let me say this:  Don't get so engrossed in

21  taking notes that you forget to watch the witness.  A lot

22  of communication is by expression, inflection, and so

23  forth.  And so, you know, keep one eye on the witness

24  when you're taking notes.

25          And if you don't want to take notes, you don't

KINSER v. CBS CORP., Case No. 94-2282

1  have to.  Your recollection of the evidence is equivalent

2  to notes.  You can consult with your fellow jurors at the

3  time you deliberate; and you may find that they're able

4  to help you, or you're able to help them as far as

5  recollection is concerned.

6          Anyhow, we'll give you these notebooks, and

7  you'll write your name on it and leave it in the jury

8  room when you go home.  Nobody will go in there -- except

9  maybe the custodian to clean things up, but he won't

10  touch anything; and -- anyhow, the notes themselves, of

11  course, are not evidence.  And you'll get this in your

12  instructions, too, at the end.  And it's -- your

13  recollection of the evidence is what counts.

14          MS. EZELL:  Your Honor, may we approach

15  briefly?

16          THE COURT:  Yes, Ms. Ezell.

17          And you've got your microphone on?

18          MS. EZELL:  In a minute I will.

19          Yes.  I have my microphone on now, sir.

20          THE COURT:  Okay.  I hear you.

21          Oh, you want to come to the sidebar?

22          MS. EZELL:  Is that all right?

23          THE COURT:  That's fine with me.

24              (Brief pause in proceedings; Court and

25              counsel confer at the sidebar.)

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Counsel advises me -- thank you --
2     that I misapprehend.  They're going to have a live
3     witness first and then the video.
4          And the other thing that I've been asked to
5     mention to you is:  If you have questions, jurors are
6     permitted to, to suggest to the Court questions.  Write
7     out the question.  Give it to the court security officer
8     or to the courtroom deputy, and I will look at it and see
9     if I think it's a proper question to put, and discuss it
10    with counsel.  So, that doesn't happen very often, I
11    might say; but once in a while, a juror does want,
12    want -- gets a question, and sometimes they're helpful.
13          All right.  Everybody set now?  Got your books?
14          You ready, counsel?
15          MS. EZELL:  Yes.
16          MR. McCOY:  Yes, Judge.
17          THE COURT:  Evidence for the plaintiff.
18          MR. McCOY:  Yes.  Our first witness is both
19    live and in person.  I'll call Dr. Arthur Frank, Judge.
20          THE COURT:  Yes, come up.
21          ARTHUR LEONARD FRANK, sworn, 9:47 a.m.,
22              DIRECT EXAMINATION BY MR. McCOY:
23      Q    Okay.  Let's begin, Doctor, by introducing
24    yourself to our jurors and give us your last name --
25    spell it -- and your full name.

KINSER v. CBS CORP., Case No. 94-2282

1      A      My name is Arthur Leonard Frank, F-r-a-n-k; and

2   good morning, ladies and gentlemen of the jury.

3      Q      And what's your current position, Dr. Frank?

4      A      I currently serve as a professor of public

5   health and chair of the Department of Environmental and

6   Occupational Health at the Drexel University School of

7   Public Health in Philadelphia.

8            At that institution, I'm also a professor of

9   medicine in the College of Medicine and also have a

10  position as professor of civil, architectural, and

11  environmental engineering at our College of Engineering.

12  Now, I'm not an engineer, but I do a lot of environmental

13  work with our engineering colleagues, so they gave me an

14  appointment in their department.

15     Q      Occupational medicine, can you give us a brief

16  description of what that profession is?

17     A      Occupational medicine, which is part of the

18  field of preventive medicine, looks at exposures at the

19  workplace and in the general environment and tries to

20  first study what diseases can develop from such

21  exposures; and, secondly, because it is part of

22  preventive medicine, the real goal of occupational

23  medicine is to prevent future disease, so prevention is

24  first and foremost.

25            And what characterizes preventive medicine and

KINSER v. CBS CORP., Case No. 94-2282

1    occupational medicine more than any other field of

2    medicine is we study what takes place in groups of

3    people, as well as what takes place in individuals, who

4    may have certain exposures.

5        Q    And at the request of my law firm, have you

6    reviewed certain materials concerning Mr. Kinser's work?

7        A    Yes, I have.

8        Q    And his medical history?

9        A    Yes, sir.

10       Q    Okay.  And we'll get to those later.

11            But let's start a little bit more about

12   yourself, your background; and what I'd like you to do is

13   to tell, tell us the training and education you had that

14   ultimately led to your current position.

15       A    After graduating from college, I entered

16   medical school in 1968.  I had the privilege of being in

17   the first class at a brand new school then.  It was the

18   Mount Sinai School of Medicine in New York.  That was

19   fortuitous because I met the head of the environmental

20   sciences laboratory, a Dr. Irving Selikoff, who, by the

21   time I met him in 1968 and started working with him, was

22   already recognized as a world expert in the area of

23   asbestos and asbestos disease.  I started working with

24   him as a first-year student.

25            Four years after entering, I graduated in 1972

```
 1   with my medical degree, my M.D.  I stayed on at the Mount

 2   Sinai Hospital for my first year of training in internal

 3   medicine.  That would be general adult medicine.  I did

 4   that at Mount Sinai.

 5           And at the end of my first year of training

 6   after medical school, I left to become a commissioned

 7   officer in the United States Public Health Service.  My

 8   active duty was spent at the National Cancer Institute,

 9   specifically at the Lung Cancer Branch; and the research

10   that I did there over the two years I was on active duty

11   at that time was looking at the effects of asbestos on

12   respiratory tissue, the tissue of our lungs and upper

13   airways, and how asbestos interacts with that.

14           I did that between 1973 and 1975, at which

15   point I returned to Mount Sinai; and over the next two

16   years, I finished my internal medicine training -- again,

17   general adult medicine.  I did my clinical training in

18   occupational medicine.

19           And when I was a medical student, I had also

20   started study for a Ph.D. degree, a second doctoral

21   degree, and that was also awarded to me in 1977, looking

22   at the biological effects of asbestos on respiratory

23   tissues.

24           So all of my formal training -- first in

25   medical school, two residencies, board certification in
```

KINSER v. CBS CORP., Case No. 94-2282

1    those two fields, and a Ph.D. -- was finished in 1977.

2              I stayed at Mount Sinai for six years on the

3    faculty, starting as an instructor, leaving after six

4    years as an associate professor, and then carried on with

5    an academic career ever since then.

6         Q    Have you had training in the field of

7    toxicology?

8         A    I have.

9              Certainly, one of the areas we have to study in

10   occupational medicine is toxicology.  One could

11   characterize my Ph.D. in a number of ways -- experimental

12   pathology, experimental toxicology -- so I have some

13   knowledge about toxicology.

14             At my next position after Mount Sinai, when I

15   was professor of preventive medicine and environmental

16   health and chair of the department at the University of

17   Kentucky Medical School, I also had an appointment to the

18   graduate school as a professor of toxicology; taught

19   toxicology students.  But I don't characterize myself as

20   a toxicologist.

21             Similarly, for example, I do epidemiological

22   research; but at our school, for example, we have a whole

23   department of epidemiologists.  I'm not in that

24   department.  And so while I know something about

25   epidemiology and do that kind of work, I don't call

KINSER v. CBS CORP., Case No. 94-2282

1  myself an epidemiologist.

2       Q    What do these areas like toxicology and

3  epidemiology have to do with the concerns in this case

4  about Mr. Kinser's asbestos exposures?

5       A    Well, understanding both toxicology --

6       Q    And I should say his asbestos and smoking

7  exposures.

8       A    -- and his condition and anybody exposed to

9  those materials --

10      Q    I'm sorry to interrupt you.  Go ahead.

11      A    Oh, that's fine.

12           Toxicology tells you -- it actually goes back

13  to the 1400s when a gentleman by the name of Paracelsus

14  made a very simple statement.  He said the dose is in --

15  is -- "The dose explains the poison."  So there are

16  certain things that at very low doses are hazardous or

17  poisonous.  There are other things that you can have a

18  lot of exposure to, and the dose makes the poison.

19           For example, water.  We all need water.  It's

20  part of our life requirements.  But if you get it in the

21  wrong place -- like, you get water down your lungs

22  instead of in your tummy -- it all of a sudden becomes a

23  poison or a toxin and literally can kill you by drowning.

24           So that's what toxicology is about,

25  understanding the hazards of certain materials and where

KINSER v. CBS CORP., Case No. 94-2282

1    they go, how much is there, and what ability do they have

2    at low levels or high levels to cause disease.

3           Similarly, epidemiology is the study of the

4    natural history and development of disease.  If you're

5    exposed to Substance A, do you get Disease B?  We study

6    that by the use of epidemiological techniques.  We also

7    use epidemiology for the development of treatments for

8    patients.  We know that Drug A is better than Drug B

9    because we studied them in groups of people and can

10   discern which one is better than the other.

11          So those are basic skill sets, basic tools that

12   we use to understand what happens in general in

13   populations and then can apply those principles to what

14   happens to individual patients that we may see, or

15   individuals whose cases we're asked to look at.

16       Q    Do you hold any board certifications in the

17   field of medicine?

18       A    I do.

19          I have two board certifications.  That means

20   I'm considered a specialist in those fields.  I have

21   board certification in internal medicine.  I took that

22   first exam in 1977, the same year that I took my two

23   residencies and finished writing my Ph.D.; didn't study

24   enough; didn't pass it the first time; passed it the

25   following year; the following year, took my occupational

KINSER v. CBS CORP., Case No. 94-2282

1   boards; passed those.  That's never been an impediment.

2             Subsequently, I've been asked to write

3   questions for the board examinations for licensure of

4   physicians.  I mean, we have 900,000 doctors in this

5   country, and about 500 of us are asked to write licensure

6   questions for people; and I've been asked to do that and

7   had seven years with the National Board of Medical

8   Examiners to write such questions.

9             So I hold two board certifications, as well as

10  my training, and two doctoral degrees.

11     Q    You said your positions have been all in the

12  field of academia, mostly.  Have you had any clinical

13  patient care in addition to that?

14     A    Oh, absolutely.

15     Q    Can you describe that one for, just for us?

16     A    My clinical patient care now is less because

17  I'm at a school of public health rather than full time at

18  a medical school, but my whole career I've seen patients.

19             I still do clinically related research.  I have

20  a project going on in Texas, for example, at a nuclear

21  facility where we look at former workers and look at

22  their current health and then are asked to judge if there

23  are any prior exposures that they had.  And they had

24  many.  We believe, from the list of chemicals that they

25  used, that they had up to 14,000 different products to

KINSER v. CBS CORP., Case No. 94-2282

1   which they were exposed.  And so we have to make some

2   judgment:  Do any of these individuals who have a current

3   disease -- is that a result of their prior exposures?

4   That's the kind of research I'm doing in one setting.

5           I still do some asbestos-related research.

6   I've been doing asbestos-related research continuously

7   for the last 45 years.

8           But I've always seen patients.  I have, as,

9   through my appointment in the College of Medicine, have

10  clinical privileges to see patients.  I don't see many

11  anymore, maybe one or two a year.  But I get calls from

12  my colleagues and do a lot of consultations over the

13  phone about patient exposures that my colleagues have

14  less familiarity with than I do.

15          But I've always, during my career, seen

16  patients and at times have run medical departments for

17  companies.

18      Q    You mentioned having done research in the area

19  of asbestos disease.  Can you give us a description of

20  that?

21      A    Sure.  The research --

22      Q    You said 45 years' worth, so keep --

23      A    -- I mean, I'm going to, I'm going to condense

24  it.

25          MS. EZELL:  Excuse me, Your Honor.  May we have

KINSER v. CBS CORP., Case No. 94-2282

1    an answer to the question?  Mr. McCoy has now interrupted

2    the witness twice, and -- while he was answering a

3    question.

4           MR. McCOY:  I understand, Judge.  I'll, I'll

5    not interrupt.

6           THE COURT:  Okay.  Proceed.

7           MR. McCOY:  Okay.

8    BY MR. McCOY:

9       Q    The question is:  Can you give us a description

10   of your history of research in the field of asbestos

11   disease?

12      A    To, to simply condense it, I've done research

13   at, at many different levels.  As I shared with you, I

14   have a Ph.D.  That was looking at the effects of asbestos

15   on tissue cultures -- that is, growing cells -- on organ

16   cultures -- growing parts of animals, keeping them alive

17   artificially -- whole animal studies.  That's one aspect

18   of the kinds of asbestos research that I've done.

19           Then, starting when I was a medical student

20   with Dr. Selikoff and continuing to the present time, we

21   look at groups of individuals among the different types

22   of trades that we've looked at.  And this is not a

23   comprehensive list, but just some examples.  He did a lot

24   of work with insulators, so we did work with insulators.

25   I've worked with sheet metal workers, plumbers and

KINSER v. CBS CORP., Case No. 94-2282

1    pipefitters, shipyard workers, elevator installers.

2           Currently, I have a project going with a

3    colleague in Sri Lanka -- a little country south of

4    India, a little island nation -- looking at workers who

5    make asbestos-containing construction materials, asbestos

6    cement materials.

7           I've done work in China for over 20 years,

8    looking at three asbestos factories over there and

9    asbestos-related disease.

10          So I've done this, really, all my life,

11   everything from individual cells up to populations of

12   people.

13      Q    I'm just going to hand you Exhibit Number 67,

14   and is that a copy of your curriculum vitae?

15      A    Yes, it is.

16      Q    Okay.  Now -- and that's what you've been

17   describing for everybody?

18      A    Yes.

19      Q    Okay.  So, let me go to another question now.

20   You mentioned Dr. Selikoff, when you got to Mount Sinai

21   in '68 and started your medical training, was already

22   world-recognized in the field of asbestos.  Why did you

23   say that?

24      A    Well, one has to look at his contributions to

25   the field.  Dr. Selikoff was a pulmonary physician.  He

KINSER v. CBS CORP., Case No. 94-2282

1  did chest diseases.  He actually did some early work on

2  tuberculosis and helped develop some of the early anti-TB

3  drugs.

4          But he was working in a little community in New

5  Jersey -- in Paterson, New Jersey -- and started seeing

6  men with abnormal x-rays and quickly realized that they

7  were all working at the local asbestos factory in

8  Paterson.  He was on the faculty at Mount Sinai, ended up

9  giving up his private practice, moving full time into

10 academics, and started researching the effects of

11 asbestos on individuals.

12         He started publishing on that in the late

13 1950s/early 1960s.

14         In 1964, he organized an international

15 conference in New York City; had scientists from all over

16 the world come.  He started presenting his findings, and

17 others presented theirs.  The first of these three

18 international conferences that he organized was held, as

19 I said, in 1964.

20         In 1968, the same year I started working with

21 him, he published a landmark paper on the interaction of

22 asbestos and smoking; and so by the time I got to work

23 with him, he was already recognized as, as this world

24 authority who brought together scientists from all over

25 to look at the hazards of asbestos and study them more.

KINSER v. CBS CORP., Case No. 94-2282

1          It was not a new topic, asbestos disease.  It

2   goes back to the late 1800s.  But he did more to

3   publicize and expand the research on asbestos than any

4   other physician that I'm aware of.

5          Q    Have you done research about the combination of

6   exposures to both asbestos and tobacco?

7          A    Yes.  That was part of the ongoing work that we

8   did with Dr. Selikoff.  I've published on that subject.

9   Certainly, every population that we looked at, of the

10  ones that I mentioned and others, we would always get a

11  smoking history; and then we would look at the

12  interaction of smoking and asbestos.

13          He published, really, a landmark paper in 1968

14  on the interaction of smoking and asbestos.  It was

15  published in the journal JAMA, the Journal of the

16  American Medical Association, the most widely read

17  scientific journal in the United States.

18          When JAMA looked back over the 20th century,

19  they picked out -- and it's a weekly journal; they

20  publish dozens of articles every week.  So you can

21  imagine:  In the course of a hundred years, they've

22  published thousands and thousands of articles.  They

23  looked back over the 20th century and pulled out the

24  hundred most important articles that they'd published;

25  and that paper was pulled out as one of those, showing

KINSER v. CBS CORP., Case No. 94-2282

1    that you can get lung cancer from smoking.  You can get

2    lung cancer from asbestos.  But if you put the two

3    together, you get far more than you get from either one

4    of those by themselves.

5              And so there was data on that as early as 1968,

6    and then I've published on that subsequently myself.

7        Q    All right.  And have you -- you said you

8    published yourself on this?

9        A    Yes.

10       Q    Okay.  I'm going to give you two exhibits

11   here -- get my reading glasses on here.  Okay.  We'll

12   take them in this order.

13             MS. EZELL:  May we have the number, please?

14             MR. McCOY:  These are Exhibits 619 -- yes,

15   thank you for reminding me on that, Sandra.

16   BY MR. McCOY:

17       Q    619 is the first exhibit, and do you recognize

18   that one?

19       A    I do.

20       Q    Okay.

21       A    619 is an article published in the second of

22   the three symposia that Dr. Selikoff organized about

23   asbestos hazards.  It was the one in 1979.  I presented

24   there, and the title of this paper that was published in

25   that symposium was "Public Health Significance of

1   Smoking--Asbestos Interactions."

2       Q    Okay.  I'm going to, maybe, pause one moment

3   and try to get this -- it didn't pick up clearly on the

4   ELMO over here.

5           DEPUTY CLERK:  Judge, it hasn't been admitted

6   to the jury.  Can I publish it?

7           THE COURT:  Has it been admitted on the record?

8           (No response.)

9           THE COURT:  Has it been admitted on the record?

10          MR. McCOY:  Judge, this is -- no.  It's, it's

11  an 803(18).

12          THE COURT:  Let's get it admitted before you

13  publish it.  Okay.

14          MR. McCOY:  We're just publishing this under

15  803(18), so --

16          THE COURT:  You're doing what?

17          MR. McCOY:  We're just publishing this under

18  803(18) for -- we're not actually going to offer this for

19  anything other than just to, what we're showing right

20  now.

21          Maybe I should clarify this --

22          THE COURT:  There's no objection to that, Ms.

23  Ezell?

24          MS. EZELL:  Yes, there is, Your Honor.  It's

25  not -- as I understand, it's not admitted.

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  I mean, if it's not admitted in

2    evidence, it should not be presented to the jury.

3          MR. McCOY:  All right.  I'll ask, I'll ask then

4    for the admission of this under 80-- for purposes of

5    803(18).

6          THE COURT:  Any objection?

7          MS. EZELL:  Yes, Your Honor.  It's not --

8          THE COURT:  It's a -- we've discussed this,

9    haven't we?

10          MS. EZELL:  Yes, we have.  It's that the

11    witness would discuss it, but that it wouldn't be

12    published or provided to the jury was my understanding of

13    the rule.

14          THE COURT:  Well, they're not going to carry it

15    from the bar, for one thing.  But, you know, he can

16    discuss it as the basis of his opinions, I suppose.

17          MR. McCOY:  Yes.  That's it.

18          THE COURT:  All right.  You may proceed.  It's

19    overruled.

20          MR. McCOY:  Okay.  All right.  I'll go ahead

21    and get this up on the screen.

22          DEPUTY CLERK:  I can't show it to the jury, can

23    I?

24          THE COURT:  I said:  Go ahead and publish it.

25          DEPUTY CLERK:  Sorry.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            THE COURT:  That's all right.  You're doing
 2    your job, too.
 3    BY MR. McCOY:
 4        Q    All right.  So this is what you were
 5    describing, and you're the author on this article -- or
 6    this, this actually is a, is not a, is not a published
 7    article.  What is this?
 8        A    It is a contribution to the Annals of the New
 9    York Academy of Sciences.  They published about 6- or
10    700 pages from a multi-day conference on asbestos.
11        Q    Right.  So this is, this is -- you said New
12    York Academy?
13        A    Academy of Sciences.
14        Q    Okay.  Tell us what that was.  And this is from
15    1979, right?
16        A    Well, the New York Academy of Sciences is the
17    largest scientific organization in the world.  There are
18    members all over the world.  Even though it says "New
19    York," it's an international group.  They hold scientific
20    conferences on a regular basis.
21            This was the second of the three international
22    conferences that Dr. Selikoff organized and at which I
23    spoke and then subsequently wrote up this piece.
24        Q    Okay.  And we'll discuss more about the actual
25    issues in this case, but that was 1979; and can you tell
```

KINSER v. CBS CORP., Case No. 94-2282

1    us what other positions that you've held besides the one

2    you currently have at Drexel?

3         A    Yes.  Well, when we were talking about my

4    commission in the Public Health Service, I actually --

5    even though I was on active duty in '73 to '75 -- held

6    that commission as an officer for 37 years and, when I

7    left a few years ago, had the equivalent rank of a Navy

8    captain or an Army Colonel.

9              I did a little bit of active duty in the 1990s

10   with NIOSH, the National Institute of Occupational Safety

11   and Health; but most of that time it was a reserve

12   commission.

13             My academic appointments -- when I left Mount

14   Sinai, for eleven years I was professor of preventive

15   medicine and environmental health and chair of the

16   department at the University of Kentucky College of

17   Medicine.

18             For the eight years following that, I was vice

19   president for medical education, professor of

20   occupational and environmental medicine, and professor of

21   cell biology and environmental sciences at one of the

22   University of Texas medical campuses in Tyler, Texas.

23             And then for the last twelve years, I've now

24   been at my position in Drexel.

25        Q    Besides the one arti-- the one publication we

KINSER v. CBS CORP., Case No. 94-2282

1    just showed from the New York Academy of Sciences, have

2    you had other contributions to the literature concerning

3    asbestos or smoking?

4         A    Yes.  Mostly, with regard to asbestos, a little

5    bit with smoking, both with regard to asbestos and other

6    issues.

7              If one looks at my curriculum vitae, which is a

8    fancy word for my resume, I have -- I'm getting close to

9    about 200 publications, between book chapters, articles,

10   and, and peer-reviewed published abstracts.  And about

11   half of them have something to do with asbestos; the

12   other half, on a variety of other subjects.

13             So the half related to asbestos, many of them

14   discuss the interaction with smoking.  There's at least

15   one other paper that specifically addresses that.  One of

16   the other papers that doesn't address asbestos was a

17   paper I did many years ago with a health economist,

18   looking at the issue of:  If you raise taxes on

19   cigarettes, fewer cigarettes would be sold, which we

20   thought was a good thing, which -- here we are, several

21   decades later -- has come to pass as taxes keep getting

22   raised and smoking rates keep going down.

23        Q    What's it mean to have a peer-reviewed

24   publication?

25        A    A peer-reviewed publication means that other

1    scientists working on behalf of that journal review the

2    article and deem it suitable for publication.  I, myself,

3    do peer review.  I've been on the editorial board or as a

4    peer reviewer for, over my career, probably three dozen

5    different journals.  Some I'm still on the editorial

6    board of.  They're listed in my curriculum vitae.

7              So I regularly get articles to review, and then

8    I make a judgment:  Do I think it's appropriate to

9    publish or not?

10             And then -- with very, very few exceptions, all

11   of my articles have been peer-reviewed.  The two or three

12   that haven't have been articles where somebody has

13   specifically asked me to write the article and then has

14   published it; and I don't think that they ever went

15   through peer review, but that represents, maybe, three or

16   four out of over 70 publications.  All the rest have been

17   peer-reviewed, as have the book chapters and the

18   published abstracts.

19        Q    I also give you Exhibit 618.  And can you

20   describe that briefly for us?

21        A    This is an article from a journal called

22   "Cancer Detection and Prevention."  It's a paper I wrote

23   and was published in 1986, entitled "Asbestos as an Air

24   Pollutant and Synergism With Smoking," and it again

25   addresses the issue of asbestos as a cancer-causing

KINSER v. CBS CORP., Case No. 94-2282

1    substance and the special interaction it has with

2    cigarette smoke.

3           MR. McCOY:  Judge, I'll also offer this one for

4    admission under 803(18), Exhibit 618.

5           MS. EZELL:  Same objection, Your Honor.

6           THE COURT:  Same objection?  All right.  It's,

7    it's admitted.  It will not be carried from the bar.

8    It's a part of his background and basis of his expertise.

9    BY MR. McCOY:

10          Q    This is the publication that you just described

11   for us, Dr. Frank?

12          A    Yes, sir.

13          Q    And at this time, you were at University of

14   Kentucky?

15          A    Correct.  I'd left Mount Sinai.  I'd spent

16   between 1983 and 1994 at the University of Kentucky, and

17   this was written and published in 1986.

18          Q    And what was the reason or purpose for this

19   publication, from your, your perspective?

20          A    I had given a, a presentation on this subject

21   at a scientific meeting in Vienna a couple of years

22   before this, and the editor of this journal who had heard

23   that publication -- or heard that presentation asked me

24   to write it up as a, a contribution to the journal that

25   he was editor of, Cancer Detection and Prevention, so

KINSER v. CBS CORP., Case No. 94-2282

1    that's why I did this.

2        Q    Have you served on or been asked to be a member

3    of any government panels --

4        A    Yes, I have.

5        Q    -- relating to asbestos, or asbestos to

6    smoking?

7        A    Yes, I have.

8        Q    Go ahead and describe those for us.

9        A    There have been a number of organizations where

10   I've been asked to serve as an advisor.  This is both at

11   the federal level, at the state level, and even now at a

12   very local level in Philadelphia.

13           Over the years, I've been an advisor and have

14   served on government panels regarding asbestos and many

15   other things for NIOSH, the National Institute for

16   Occupational Safety and Health.  I both was on the grants

17   review committee.  That's a group that judges the

18   suitability of proposals for research grants; finished my

19   time there as the chair of that group.

20           I've also served on advisory groups for OSHA,

21   the Occupational Safety and Health Administration,

22   regarding asbestos and other things; for example, what

23   ongoing examinations need to be done for people with

24   various exposures at workplaces, what ongoing medical

25   evaluations should they have.  That's one of the things

1    that I did.

2            I've served as an advisor to the Environmental

3    Protection Agency on asbestos and other topics.

4            At the state level, I've been an advisor, when

5    I was in Kentucky, to the Department of Labor.

6    Currently, I'm an advisor to the Department of Health in

7    Pennsylvania on an environmental health tracking grant.

8    The Department of Environmental Protection, I serve on

9    the Environmental Justice Advisory Board.  I've been the

10   chair of that for the last five or six years.  We look at

11   a wide variety of issues, including that of asbestos.

12           And, currently, the mayor of Philadelphia has

13   appointed me to the Air Pollution Control Board.  So of

14   all the committees that I've ever been on of a government

15   nature, it's the only one where, when we take a vote, it

16   becomes the law.  The others have all been advisory.

17           I've also served on two occasions on the Board

18   of Scientific Counselors.  That's the highest level

19   advisory body.  Once was to the director of NIOSH,

20   including being appointed by her at the time to the

21   asbestos and man-made fibers subcommittee of that board.

22   And then I've also been on the Board of Scientific

23   Counselors of the National Center for Environmental

24   Health and ATSDR, the Agency for Toxic Substances and

25   Disease Registry.  That's part of the CDC, the Centers

KINSER v. CBS CORP., Case No. 94-2282

1    for Disease Control, in Atlanta.

2              So that's the type of government service that

3    I've given over the years.

4         Q    Have you worked for companies?

5         A    Yes, I have.

6         Q    Okay.  Can you give us a couple examples?

7         A    Sure.  From time to time, one gets asked to do

8    consultations.  It started when I was back in New York as

9    a, as a young physician; would be consulting with various

10   companies.

11             But in a more major way, when I moved to

12   Kentucky, Toyota opened their first automobile plant, for

13   example, in the United States, in Georgetown.  That was

14   about 25 minutes from the university.  They asked me to

15   serve as a medical advisor.  I was actually serving as

16   their first acting corporate medical director for the

17   plant; helped write their hiring policy; did hiring

18   exams, and did periodic exams of their workers.

19             Similarly, a coal company in eastern Kentucky

20   came to me, asked if I would set up a medical department

21   for a thousand of their miners of six mines that they

22   ran.  We did the first general screening of that

23   population.  That had never been done before.  And we ran

24   a medical clinic for the coal company, looking after

25   these thousand miners.

KINSER v. CBS CORP., Case No. 94-2282

1        And even now, from time to time, I get asked by

2  various companies and other organizations to, to serve as

3  a consultant.

4        Q    Have you worked for unions?

5        A    I've worked for unions.  I've been a consultant

6  to unions about various health hazards.  Asbestos has

7  been one of the things that I've been asked about and,

8  and have worked with various unions and have spoken at

9  union meetings about.  So, yes, I've done work with

10 unions as well.

11       Q    What examples are there, the unions that you

12 worked for?

13       A    Well, I've done some work, certainly, with the

14 Asbestos Workers Union, with the Heavy Equipment

15 Operators when I was at Kentucky; did some work with

16 someone from Plumbers and Pipefitters Union; did some

17 work with and gave a talk to some workers who were

18 elevator installers.

19       Elevators have some parts with asbestos, and

20 also elevator shafts sometimes get sprayed with asbestos,

21 so they have exposures as well.

22       Q    Have you worked on other cases in the court, or

23 lawsuits where my firm has been involved?

24       A    With your firm and many other firms.  I've been

25 doing medical-legal work like this for about 35 years

KINSER v. CBS CORP., Case No. 94-2282

1    now.  I started when I was a young physician on staff at

2    Mount Sinai, was -- when I was, finished my training and

3    a year or so later got involved after seeing a patient

4    with asbestosis; got asked then to start testifying, and

5    have been doing cases like this ever since then.

6        Q    And what is the compensation system for your

7    work in the, on the courtroom lawsuits?

8        A    Well, when I first started doing this work

9    35 years ago, without making any comments about how

10   anybody else does their work, I decided, since there is

11   often a lot of concern about professionally paid

12   witnesses, that I would never personally accept any of

13   the money; and in 35 years -- in 35 years of testifying,

14   have never personally kept any of the money that has been

15   generated by my medical-legal work.

16           I've been a department head at three

17   universities for over 30 years now.  Every penny that

18   I've ever earned for my universities -- all of it has

19   gone to my universities.  Right now, for example, as head

20   of the department at Drexel, I hire extra faculty, extra

21   secretaries.  I pay for research assistants for my junior

22   faculty so they can advance their careers.

23           And I've also used that money over the years --

24   I've done a lot of international work, been to many

25   countries, mostly talking about asbestos -- some other

KINSER v. CBS CORP., Case No. 94-2282

 1    topics as well -- and so I've traveled quite extensively,

 2    using these funds to educate colleagues, literally around

 3    the world, about the hazards of asbestos and to work with

 4    them about setting up either research programs or seeing

 5    what they can do about cutting down on asbestos disease

 6    in their own countries.

 7            But, personally, in 35 years, I've not put as

 8    much as a nickel of any of this money in my own pocket.

 9        Q    I brought a red pen and a black pen today.

10    Would you be able to help illustrate some information on

11    the question of what is asbestos and how it gets into the

12    lung on this board for us?

13        A    I think so, yes, if I'm allowed to do so by

14    Your Honor.

15            THE COURT:  Will you give Dr. Frank one of

16    those microphones, Jessi?

17            DEPUTY CLERK:  Absolutely.

18            THE COURT:  You may step down.

19            THE WITNESS:  Thank you, sir.

20            THE COURT:  And we're going to equip you with a

21    microphone on your lapel that will broadcast.

22                (Brief pause in proceedings; witness is

23                 relocating at easel in front of the jury.)

24            MR. McCOY:  Maybe we should do it over here so

25    the judge can see better.  Let's do that.

KINSER v. CBS CORP., Case No. 94-2282

```
1              THE COURT:  No.  It's all right.  I can see
2    fine.
3              MS. EZELL:  Your Honor, may I relocate?
4              THE COURT:  Of course you may.
5              MS. EZELL:  May I just pull a chair over there?
6    Will that be okay?
7              THE COURT:  We'll give you a chair over here.
8              MS. EZELL:  Oh, thank you.
9    BY MR. McCOY:
10       Q    My first question to you is if you can explain
11   to us what, what is asbestos and how it gets into the
12   lung.
13       A    Well, first, let's, let's address the subject
14   of:  What is asbestos?
15             Asbestos is a commercial term.  It's not a
16   mineralogical or scientific term.  It refers to six
17   naturally occurring minerals.  What do I mean by
18   "naturally occurring"?  They're not made in a factory.
19   They're found in nature.  They're part of ores.  They're
20   processed, and then the fibers are used to make other
21   products.
22             They come in two varieties.  There's a group
23   called the amphiboles; and five of the six are those
24   so-called amphiboles.  They are characterized as being
25   sort of straight and needle-like.  Each one is chemically
```

KINSER v. CBS CORP., Case No. 94-2282

1  different from the others.  There's a very pretty blue

2  one called crocidolite.  There's a brownish one called

3  amosite.  But the important thing is:  Those are the only

4  two that have been commercially important.  The other

5  three have not really been commercially important.

6          The most important commercial one is the

7  so-called serpentine variety; and the reason it's called

8  "serpentine" is because, if you look at the fibers,

9  they're wavy, either worm-like or snake-like in

10  appearance under the microscope.  So it has a different

11  characteristic, and structurally it's different.

12          The one variety of serpentine is called

13  chrysotile; and about 95 percent of all the asbestos

14  used, both in the United States and around the world, has

15  been of the chrysotile variety.

16          That said, as Mr. McCoy asked me:  How did this

17  get into the lungs?  We can talk about that.  But all of

18  the problems that are related to asbestos can come from

19  any one of these six fibers, so there's no real

20  difference in what diseases you can get.

21          The second question that he put to me -- I

22  trust everybody can see.

23              (Brief pause in proceedings.)

24      A    I'm not a great artist.  But these are the

25  lungs in the center of your chest.  Essentially, you have

KINSER v. CBS CORP., Case No. 94-2282

1    the heart, and you have the nose and the mouth where you

2    breathe in.

3            Asbestos fibers are small.  They're

4    microscopic.  You can see large fibers of asbestos as you

5    find them in the rock; but when they're processed and as

6    they're used in products, they're microscopic.  And I'm

7    sure there's some in the air of this courtroom.  There's

8    certainly some out on the streets as we all walk around.

9    We all get exposed to very, very small -- but

10   definitive -- amounts of asbestos.

11           We have many defense mechanisms to keep foreign

12   materials out of our lungs.  It starts with the hairs in

13   our nose.  So large chunks of things, the hairs in your

14   nose filter it out.  You'll hear people at work, in dusty

15   environments, that at the end of the day they'll blow

16   their nose and blow out, you know, coal dust or other

17   things that they may be working with.  So some of it gets

18   taken, taken out there.

19           In the upper airway, we have little hair-like

20   cells that push things out of the lung; and we have mucus

21   that we all produce that is sticky, traps foreign

22   materials -- be it an asbestos fiber, a coal dust, a

23   bacteria, virus -- pushes it out of the lungs.  We

24   swallow it, get rid of it out of our body that way.

25           All of that said, some of the asbestos ends up

KINSER v. CBS CORP., Case No. 94-2282

1    getting down into the lungs.

2              Now, what is the lung, really?  The lung is a

3    structure that we have whose main function is to take

4    oxygen in, transfer it into our blood, let the body

5    function by using the oxygen, and blowing off waste gas,

6    carbon dioxide.  So to do that, there are billions --

7    billions, literally -- of little air sacs.

8              And think of your kitchen sponge.  You have all

9    those little holes in the kitchen sponge that holds

10   water.  The lung is a sponge that holds air.

11             And so the fibers can get down.  They can get

12   down into the airways that get smaller and smaller.  They

13   can get down into the alveoli, into those structures, and

14   then can do damage in the lung.  And we'll talk about

15   that in a moment.

16             There's also another structure that is related

17   to exposure to asbestos, and that's a lining that is

18   called the "pleura."  If you took that kitchen sponge and

19   wrapped a piece of Saran Wrap around it, just as a sort

20   of covering, it's what goes on with the lungs.  We have

21   this spongy air sac, and then we wrap a piece of thin

22   tissue around it; and then there's another piece of that

23   tissue on the opposite side along the inside of our rib

24   cage, and that allows the lungs to expand and contract

25   and, and allows us to breathe with a little bit of fluid

KINSER v. CBS CORP., Case No. 94-2282

1   in there.  So that structure, this wrapper, is called the

2   pleura.

3           Now, what can happen when the asbestos gets in

4   the lungs is that it can cause two kinds of disease.

5           (Brief pause in proceedings.)

6     A    The two kinds of disease are what we call

7   "nonmalignant" -- not being cancer -- or it can cause

8   cancer.  There's a couple of issues that are pretty minor

9   that we won't really talk about.

10           But the two effects on the lung and the pleura

11   that we are most concerned about is the disease

12   asbestosis, and that can be defined differently by

13   different doctors.  But, basically, it means a scarring.

14   And it always -- always -- refers to a scarring in the

15   lung, usually at the base of the lung; and over time, if

16   it continues to get worse, works its way up.  Other

17   dusts, like coal dusts, start at the top and work their

18   way down.  So there are differences that we've learned

19   about in studying this.  So it's scar tissue.

20           You can also have scarring of the pleura.  And

21   when I say "scarring," again, it's not that foreign a

22   concept.  If you ever cut yourself with a knife in the

23   kitchen, or get a bad paper cut, you get a little scab on

24   your skin; and it sits there for a few days, falls off,

25   leaves you with nice, normal skin underneath.

KINSER v. CBS CORP., Case No. 94-2282

1          That scar tissue, that crusty tissue that you

2    got, is a scar; but it's not permanent.  The trouble is:

3    When you get scarring in the lungs, or scarring in the

4    pleura, that is permanent; and it's the same tissue.

5    It's exactly the same cells, creating the same kind of

6    scar tissue, but it's a different part of the body and

7    becomes permanent, not like on your skin where you're

8    left with normal skin.

9          So once you develop pleural plaques, or

10   "pleural thickening," which is how these are described,

11   sometimes they get calcium deposits in there, so they're

12   called "calcified plaques," or scarring in the lungs.

13   That collectively can be called "asbestosis."

14        Q    What's the pleura?

15        A    It's this lining tissue around the outside of

16   the lung.

17          The other set of diseases that you get from

18   asbestos are a variety of cancers.  The most important

19   one, the one that we see the most of in populations

20   exposed to asbestos, is lung cancer.  So it's a cancer

21   that occurs in the lung; and, again, if you would look at

22   my CV -- and you may not be able to do that -- but among

23   the many articles that I've written, not only about

24   asbestos, but about other things that cause lung cancer,

25   you'll see that there are a couple of dozen things that

KINSER v. CBS CORP., Case No. 94-2282

1  are easily recognized as causing lung cancer:  arsenic,

2  isopropyl oil, radiation exposure -- the list goes on.

3          But two of the things that are clearly well

4  known to cause lung cancer are exposure to asbestos and

5  cigarette smoking.

6          There are other cancers that you get from

7  asbestos, and they're not really the subject of the case

8  that we have today; but there's a condition called a

9  "mesothelioma," and that's a cancer --

10          MS. EZELL:  Objection, Your Honor.  I'm sorry,

11  relevance.  The witness is now testifying about something

12  that has nothing to do with this case.

13          THE COURT:  It -- it's a general description of

14  the effects of asbestos.  He may proceed.  Overruled.

15      A    This same pleural tissue that may become

16  scarred can also develop a cancer, and that's called a

17  "mesothelioma."  And it is so tightly related to exposure

18  to asbestos it has a special term called a "signal

19  tumor."  There are certain substances that are so tightly

20  linked to certain kinds of cancers that, you know, they

21  go together like ham and eggs or salt and pepper, and so

22  mesotheliomas and, and asbestos is that kind of

23  relationship.

24          You can also get them in your abdominal cavity

25  because you have the same kind of tissue, and the

KINSER v. CBS CORP., Case No. 94-2282

1    asbestos does get into the abdominal cavity, and also the

2    lining around the heart.  But that's much less common.

3              But you also get various gastrointestinal tract

4    cancers, kidney cancers, laryngeal cancers and, in women,

5    ovarian cancers, all of which have been related to

6    exposure to asbestos.

7              So not only do you worry about lung cancer, but

8    you worry about these other cancers; and in at least one

9    construction-related group -- that of insulators that

10   we've studied -- at the end of the day, 50 percent of

11   them --

12             MS. EZELL:  I'm sorry.  I'm sorry, Your Honor.

13   May we approach and be heard on this?

14             THE COURT:  Approaching doesn't do any good in

15   this courtroom --

16             MS. EZELL:  Okay.

17             THE COURT:  -- because of the acoustics.

18             MS. EZELL:  Then objection.  Now he's talking

19   about insulators.  Mr. Kinser was a pipefitter.

20             THE COURT:  I understand that.  He's -- this is

21   a generic description of asbestos and its effects and

22   relates to his expertise and ability to offer opinions.

23             MS. EZELL:  Okay.  So for the record, it's a

24   403 objection as it relates to the --

25             THE COURT:  That's overruled.

KINSER v. CBS CORP., Case No. 94-2282

```
 1          MS. EZELL:  Thank you, Your Honor.
 2      A    I just wanted to say that among insulators --
 3  which is the highest exposed group and gets more disease
 4  than other groups with lesser exposure but, nevertheless,
 5  significant exposure like pipefitters, like sheet metal
 6  workers, like shipyard workers -- but in insulators, half
 7  of them, if you look at death certificates, die of an
 8  asbestos-related disease, one of these many diseases,
 9  including asbestosis, which can be deadly.  About 10
10  percent of them die just from advanced scarring in the
11  lung.
12      Q    What is the term about -- do you need to
13  illustrate it further on this?
14      A    Not on this.
15      Q    Okay.
16      A    But what's the term?
17      Q    I was -- I'll let you go ahead and finish.  You
18  want to look at the illustrations of asbestos getting
19  into the lung?
20      A    That's done.
21      Q    Okay.  All right.  So the next, the next
22  question I had was the, about the dose-response
23  relationship.  Is that something --
24          THE COURT:  Keep your voice up, Mr. McCoy.  I
25  know you're just speaking to Dr. Frank; but, you know, --
```

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  How's this?

2          THE COURT:  -- the rest of us want to hear.

3          MR. McCOY:  Does this work?

4          DEPUTY CLERK:  It does.

5          MR. McCOY:  I'm going the wrong direction.  I

6    apologize.

7          So the next question I had is about the dose

8    and relationship.

9          THE COURT:  Okay.  Loud and clear.

10   BY MR. McCOY:

11        Q    Is that something you're familiar with, then,

12   Dr. Frank?

13        A    Yes, I am.

14        Q    Okay.  And can you explain that to us with the

15   illustration?

16        A    Pretty much everything that we're exposed to

17   that can give us disease, the likelihood of getting

18   disease -- it goes back to what Paracelsus said, "The

19   dose makes the poison" -- is that the greater the

20   exposure, the greater the dose, the more likely you are

21   to get a biological response.

22          We're in flu season.  If somebody coughs on you

23   once, maybe you'll get the flu.  If they cough on you ten

24   times, you're much more likely to get the flu.  The dose

25   was greater.

KINSER v. CBS CORP., Case No. 94-2282

1           There's only one absolutely safe level of

2    exposure to asbestos.  That's zero.  Now, I've already

3    told you that it's a naturally occurring material.  It's

4    been used in the past -- no longer -- but in the past in

5    as many as 3- or 4,000 different products so that we all

6    have a little bit of asbestos in us.  But our doses are

7    down here somewhere, very small doses.

8           What happens is that as the dose increases,

9    disease increases.  Now, I've also written a "threshold,"

10   "cancer," and "asbestosis."

11          To get these scarring changes that we've talked

12   about, either the pleural plaquing or the parenchymal

13   asbestosis, without giving you a number, since nobody's

14   ever agreed on that number, but everybody agrees in

15   principle that it takes relatively a lot of asbestos to

16   give you the scarring.  You don't just get scarring from

17   incidental exposure.  Nobody ever gets asbestosis from

18   breathing what's in the general air.  But if you ask me,

19   "How much asbestos does it take to get cancer?", that's a

20   lot less.

21          So one of the things we know -- some people

22   don't believe this; but one of the things that most of us

23   believe is that you can get cancer without having

24   asbestosis, be it lung cancer.  Nobody disagrees that you

25   can't get mesothelioma, for example, without asbestosis.

KINSER v. CBS CORP., Case No. 94-2282

1    There's some controversy about getting lung cancer, but

2    the data tells us that you can get cancer without having

3    the scarring.

4              The other logical question you might put to me

5    is:  Well, how much asbestos does it take to cause

6    cancer?  I told you the only safe dose was zero.

7              For the disease mesothelioma, it takes very

8    little.  How little?  One day.  We actually have animal

9    data and a few human cases where the only known exposure

10   was one day, and both animals and humans have gotten

11   mesotheliomas.

12             For lung cancer, we don't have any cases with

13   only one day, but one of the groups that we looked at

14   with Dr. Selikoff -- remember, I said he started his work

15   in Paterson, New Jersey.  It was a factory that made

16   asbestos products.  It made one product.  It made it

17   primarily during the second World War, that factory for

18   the Navy.  It contained asbestos.  It was insulation

19   materials, pipe insulation.

20             And when we looked at that population -- and

21   that was part of the group that I studied with him,

22   starting as a medical student -- if you took people that

23   worked for one month, less than one month -- so one or

24   two weeks, but a month or less -- a doubling of the risk

25   of lung cancer, with one month of exposure.

KINSER v. CBS CORP., Case No. 94-2282

1          And by the time people worked there for two

2     years, they had a seven times increased risk of getting

3     lung cancer.

4          So we don't have this one day of exposure.  We

5     do in animals, not in humans.  One day will give you lung

6     cancer in animals, but we have no human cases.  But we

7     know that a month or less doubles your risk of getting

8     lung cancer from exposure to asbestos.

9          So this is what we mean by "dose-response."  As

10    the does goes up, the biological response goes up.

11         Q    Do we need to use the illustrations anymore, or

12    are you finished?

13         A    Only if you're going to ask me about latency.

14         Q    Okay.  That was my next question, was exactly

15    that.  What is -- what does "latency" mean?

16         A    "Latency" means:  When are you exposed, and

17    when do you get disease?  What's the time period between

18    exposure and disease?

19         If it's the flu season, three or four days

20    later, you'll come down with the flu.  The latency's on

21    the order of a few days.

22         For asbestos diseases, the latency generally,

23    for all of the diseases we've talked about, is on the

24    order of ten years.  Occasionally, you will see a cancer

25    earlier than that.  I've worked in some countries like

KINSER v. CBS CORP., Case No. 94-2282

1    India where they have very high exposures, and they've

2    reported very short periods of exposure before they got

3    disease.  But, in general, if you look at the populations

4    we've studied in the United States, at about ten years,

5    you start seeing lung cancers, mesotheliomas, and these

6    other cancers; and you start seeing the scarring in the

7    lungs, either the lining of the lung or the lung itself,

8    or both.

9            So this concept of latency is:  When are you

10   exposed, and when do you expect to see disease?

11           The other thing about latency, with regard to

12   asbestos:  The risk lasts forever.  There are certain

13   cancer-causing agents, like cigarette smoke.  We know

14   that if you give up smoking, over time your risk of

15   getting lung cancer goes down.  And if you're off

16   cigarettes long enough, the data says you're essentially

17   no different than somebody who was never a smoker.  Now,

18   that may take long, three decades or more; but it does

19   say that your risk goes down.

20           There's no evidence that if you stop exposure

21   to asbestos that your risk goes away.  It stays there.

22   And I've seen disease in 70-year-olds, 80-year-olds,

23   90-year-olds, and probably a couple of 100-year-olds who

24   hadn't been exposed for 20, 30, 40 years; but the

25   asbestos gets in their body and stays there and keeps

KINSER v. CBS CORP., Case No. 94-2282

1   them at risk for disease.

2          And so no matter how old you get, if you've had

3   a significant exposure to asbestos, you're still going to

4   be at risk for developing disease.

5      Q    Thank you on the chart.  I'll let you go back

6   to your seat and --

7      A    Thank you.  I'll give you your pens back.

8          (Witness is resuming the witness stand.)

9      Q    Dr. Frank, what does the term "individual

10  susceptibility" mean?

11     A    The term "individual susceptibility" means:

12  Not everybody who's going to get exposed is going to get

13  disease.  For some substances -- like cigarette smoke --

14  if I did some advanced genetic testing on certain people,

15  I can predict who is more likely to develop disease.

16         For example, we know that when you take all

17  cigarette smokers, only about 10 percent of them will

18  ever get lung cancer; 90 percent don't.  And we know that

19  there's a certain metabolic pathway that transforms some

20  of the cancer-causing agents in cigarettes -- and there

21  are many of them -- in such a way that makes those people

22  more likely to develop lung cancer.  So that is a genetic

23  basis for that.

24         We also know that, depending on the status of

25  your immune system -- maybe on the status of your diet;

KINSER v. CBS CORP., Case No. 94-2282

1   other factors -- not everybody gets disease.  I told you

2   that half of insulators die of an asbestos disease, but

3   half don't.

4           We know, for example, that if you take a group

5   of insulators, after 30 years, 94 percent of them will

6   have asbestosis; 6 percent do not.  If I knew what

7   protected those 6 percent, I'd, I'd love to have sort of

8   a preventive measure I could share with the other

9   94 percent.  We just don't know what that is.

10          So "individual susceptibility" means that some

11  people are more likely to get disease.  The problem is

12  that you never know ahead of time who's more or who's

13  less likely, and so you have to end up protecting

14  everybody.

15      Q   Have you personally observed the construction

16  work conditions in powerhouses or similar industrial

17  settings?

18      A   Yes.  As an occupational physician, I've been

19  in all kinds of workplaces.  I've been in powerhouses,

20  steel mills, shipyards.  I could go on and on.  So, yes,

21  I've seen work being done, or have been in facilities

22  where asbestos has been used, including powerhouses.

23      Q   Have you been involved with the investigation

24  of asbestos-related disease in a, in a situation where

25  there was power generation?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    Can you tell us about that, briefly?

3    A    Well, one of the groups that we studied a

4  number of years ago were TVA workers.  They were, they

5  were working on power plants, or a particular power

6  plant, for the Tennessee Valley Authority; and we did a

7  survey among those workers, looking for asbestos disease

8  and, and certainly did find it among various trades in

9  workers working in that kind of facility and, without

10 doing large epidemiological studies, have certainly seen

11 individual workers who have worked in powerhouses.

12        And even the literature talks about

13 asbestos-related disease.  There's a very famous study

14 from Paris.  Somebody reported five cases of

15 mesotheliomas from Paris, all of them in powerhouse

16 workers.

17        So, certainly, we know that asbestos is a

18 substance in powerhouses and that it can cause a variety

19 of asbestos-related diseases.

20   Q    Have you prepared today to testify to the

21 occupational health, preventive medicine, and medical

22 concerns about construction workers in powerhouses and

23 similar industrial environments in the 1960s and 1970s?

24   A    Yes, sir.

25   Q    And in that period of time -- 1960s, '70s, and

KINSER v. CBS CORP., Case No. 94-2282

1   even in the early '80s -- was asbestos a concern of

2   occupational medicine for powerhouse workers?

3       A    Absolutely.  I mean, asbestos has been a

4   concern for more than a hundred years, in general.  And

5   this, this -- one of his papers that Dr. Selikoff wrote

6   in 1964, where he said:  Asbestos is not a respecter of

7   trade.  It doesn't matter what your, your specific trade

8   or job category is.  If you're exposed to asbestos, you

9   are at risk for developing disease.

10          So powerhouse workers, construction trades,

11  shipyard workers -- any kind of worker with exposure to

12  asbestos would be at risk.

13      Q    What about smoking?  Was that a concern of

14  occupational medicine in that time period for the persons

15  who are doing the construction work at powerhouses?

16      A    Yes.  Tobacco, as a health hazard, pretty much

17  was appreciated beginning in the early '50s.  I don't

18  know if you've been reading the newspapers the last

19  couple days.  Yesterday there was some, some notice.  It

20  was the 50th anniversary of the first Surgeon General's

21  report on the hazards of smoking.  That was 1964.  But

22  that was based upon the previous 10 or 12 or 15 years of

23  research that had showed that smoking was a hazard.

24          And so certainly, as a preventive medicine

25  doctor, even if one works at workplaces, you would like

KINSER v. CBS CORP., Case No. 94-2282

1  to see people not smoke; and many companies have set up

2  anti-smoking campaigns among their workers.

3      Q    Has statistical data been obtained, put

4  together, about the number of persons in a group, such as

5  the powerhouse construction workers, that would be

6  pertinent for their smoking histories?

7      A    Sure.  If you look at the rate of smoking --

8  and maybe even more importantly, the rate of giving up

9  smoking -- if you look at the data, not only from the

10 United States but elsewhere in the world, different

11 groups of people smoke at different rates.  Men, for

12 example, traditionally smoked a lot more than women.

13 Unfortunately now, at least in America, as many women

14 smoke as men.

15      But we know that if you talk about construction

16 workers, powerhouse workers -- blue collar kinds of

17 workers that were out there doing their work every day --

18 somewhere around 70 or 80 percent of them were likely to

19 be cigarette smokers.  It was just part of what was done.

20      If you went to other groups of individuals, you

21 would find less rates of smoking.

22      We also know that if you can get people to give

23 up smoking, their risk of developing lung cancer goes

24 down over time, as we've already spoken about.  If you

25 can get somebody to give it up long enough, their risk

KINSER v. CBS CORP., Case No. 94-2282

1  goes back to almost that of a nonsmoker.

2      Q    I'm going to hand you Exhibit Number 621.  Is

3  that the type of data that you've been talking about on

4  smoking statistics that were collected?

5      A    Yes, sir.

6      Q    Okay.  And what -- does that give us data as of

7  a particular time-frame reference in the '60s and '70s

8  period?

9      A    Yes, it does.  It says the estimates and

10  percentage of current regular smokers among adults by

11  highest level of educational attainment; so, yes.

12      Q    And what, what statistics in there would be

13  pertinent to this question of the construction workers in

14  a powerhouse environment in the '60s and '70s, early

15  '80s?

16      A    Well, taking all high school graduates, over 50

17  percent of people were smokers in '64.  By '75, it was

18  down to about 45/46 percent.  And then blue collar

19  workers:  In 1976, over 50 percent of them were still

20  cigarette smokers among males, and it would have been

21  higher earlier than that.

22          MR. McCOY:  Your Honor, I don't know at what

23  point you want to take a break on this, but this is a

24  good --

25          THE COURT:  I think it would be a nice idea.

KINSER v. CBS CORP., Case No. 94-2282

```
 1    I've been thinking about that myself.  Take the jury out,
 2    please.  We'll be out for ten minutes or so.  I think
 3    they have rolls and coffee, or they used to.  Do you
 4    still afford that?
 5              DEPUTY CLERK:  Sure do.
 6              THE COURT:  Okay.
 7                  (Jury absent, 10:51 a.m.)
 8              THE COURT:  You may step down, Doctor, during
 9    the recess.
10              THE WITNESS:  Thank you, Your Honor.
11              THE COURT:  We'll be in recess for ten minutes,
12    folks.
13                  (Recess, 10:52 a.m. to 11:16 a.m.)
14              THE COURT:  All right.  Mr. McCoy, you may
15    proceed on.
16    BY MR. McCOY:
17         Q    Did you work with my office to prepare a
18    timeline of some matters that you consider important to
19    this question about exposures to asbestos and cigarette
20    smoking for the power plant construction workers in the
21    '60s, '70s, and early '80s?
22         A    Yes, sir; yes, sir.
23         Q    I'm going to go ahead and start this
24    presentation then.  Jessica, we'll go to the computer.
25    Thanks.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              Okay.  So, the first item on here is -- this is
 2    basically the topic we're going to be talking about,
 3    right?
 4         A    Yes, sir.
 5         Q    Okay.  So let's go to our next -- jump
 6    through -- and these are the statistics that you had just
 7    referenced; is that right?
 8         A    Yes, sir.  Before we, just before we had our
 9    break.
10         Q    Okay.  This is the 56.8 percent of the high
11    school graduates smoking, for the males.
12              Okay.  And let's go to the next.
13              So, the first entry here we have on this
14    timeline, it says -- bullet point -- "Multiple Toxic
15    Effects -- 1900."  What's the significance of that?
16         A    Well, it's just that we know that workers in
17    certain trades will have exposure to more than one toxic
18    substance.  So you can have a variety of exposures, some
19    of which affect the same organs; some of which may affect
20    different organs.  But you can have multiple toxic
21    exposures, and that's been known for a very long time.
22         Q    And what's the significance of the date "1900"
23    on there?
24         A    Certainly by then you would have found
25    literature on this subject.  One of the things that I've
```

KINSER v. CBS CORP., Case No. 94-2282

1   done over the years is collect old medical books and, in

2   the field of occupational health and preventive medicine.

3   And, for example, there's a book I have from the 1890s

4   from the railroad industry where they talk about multiple

5   exposures that railroad workers might get, for example.

6        Q    And when you look at multiple exposures, from

7   an occupational standpoint, do you look at the combined

8   effects as well as the individual effects?

9        A    We have learned to look at the combined effects

10  of those two exposures, or multiple exposures.  Yes, sir.

11       Q    Now, the next timeline entry, bullet point,

12  says "Asbestos Health Risks."  So what's the significance

13  of this entry on this timeline here?

14       A    Well, very simply put, the knowledge we've

15  learned about the hazards of asbestos is not new.  It

16  goes back into the 1890s.  The literature about asbestos

17  hazards has been building up and up over the years.  I've

18  never kept track.  I'm sure I've read thousands and

19  thousands of articles because of my interest in the

20  historical background that there are old bits of

21  literature -- actually the Romans, two thousand years ago

22  now -- about hazards of asbestos.

23            But the modern data goes back to the late 1890s

24  in Great Britain; and then there were earlier studies

25  coining the term "asbestosis," for example, in 1924,

KINSER v. CBS CORP., Case No. 94-2282

1   Dr. Cooke in Great Britain; first suggestion that

2   asbestos caused lung cancer, 1935; and so forth.

3        Q    You picked out one article in particular to

4   share today, right?

5        A    I did.

6        Q    Okay.  And I've given you Exhibit 503; is that

7   the one you picked out?

8        A    Yes, sir.

9        Q    Okay.  What's that article?

10       A    It's a document -- I'll just read.  It's a long

11   title.  It's called "Report on Effects of Asbestos Dust

12   on the Lungs and Dust Suppression in the Asbestos

13   Industry."  It was written by Dr. Merewether, and

14   Mr. Price was an industrial engineer.  It was published

15   in Great Britain by His Majesty's Stationery Office.  And

16   what's important about this is that was published in

17   1930.

18             And very simply put, it said:  Men get

19   disease -- women get disease -- if they're exposed to

20   asbestos.  Different products will cause asbestos-related

21   disease.  And mind you, we're not even talking about

22   cancer.  The first suggestion of that didn't even come

23   for a few years later and wasn't documented in the

24   literature until the 1940s as being a clear relationship.

25   So they're just talking about disease in general from

KINSER v. CBS CORP., Case No. 94-2282

1   asbestos, the scarring and things that we've talked

2   about.

3          They go on, however, because it's not only a

4   physician but an industrial hygienist, to say you need to

5   cut down on exposures.  First of all, you need to educate

6   workers about hazards that they have in the workplace so

7   that they can help protect themselves.  Workers have not

8   always been well educated about exposures that they have.

9          Then it says you need to provide good

10  ventilation so you cut down on the exposure; and as early

11  as 1930, they said if you can't have good ventilation,

12  you need to put workers in respirators.

13         So all of -- the modern concept of industrial

14  hygiene, all of the things that we talk about today are

15  not new.  They're as old as at least 1930, and there are

16  actually other papers earlier than that about exposure

17  hazards.  But this is just such a classic paper; it's the

18  one that I picked out.

19     Q    The next slide here has another bullet point

20  now called "Smoking Health Risks."  And what's, what's

21  the significance of this, in this timeline?

22     A    It's important because we're dealing here in

23  the case of Mr. Kinser with someone who smoked as well as

24  was exposed to asbestos, and the health hazards of

25  cigarettes are really something that we've known about

KINSER v. CBS CORP., Case No. 94-2282

1    for 60 or more years.  The definitive data showing that

2    smoking was a health hazard began to accumulate in the

3    early 1950s; and as I testified already, in 1964, we had

4    the first Surgeon General's report.  So we've started

5    building up data about the hazards of smoking as well.

6        Q    And about when did the warnings start appearing

7    on the cigarette packages?

8        A    It was sometime in the mid-1960s that we

9    started getting warnings on cigarette packages.

10       Q    Is cigarette smoking addictive, Dr. Frank?

11       A    Unfortunately, yes.  That's one of the problems

12   of people who smoke.  As much as they would like to give

13   it up -- Mark Twain once said, "Oh, giving up smoking is

14   easy; I've done it a thousand times" -- it's hard to give

15   up cigarettes for some people because it is addictive.

16            Some people have said -- I think it's in the

17   Surgeon General's, one of the Surgeon General's

18   reports -- that nicotine is more addictive than heroin.

19   That's a whole other issue.

20            But we're not dealing with something that a lot

21   of people have a choice over.  I mean, obviously they

22   have a choice to smoke or not, but some people find it

23   very hard to give it up.  I'll leave it at that.

24       Q    Well, you know, people talk about addiction,

25   but what's the -- is there a scientific basis for it?

KINSER v. CBS CORP., Case No. 94-2282

1      A      Oh, absolutely.  I mean, it, it is not only the

2    nicotine that's in there, but the flavor enhancers and

3    other things -- there's a whole lot of literature now

4    that's come out on the actions of the tobacco industry

5    and how they looked to get people to begin smoking and

6    then to stay smoking by manipulation of the chemicals in

7    cigarettes so that it stays addictive.

8      Q      The next timeline entry is about -- actually,

9    that was the one we were just on.

10            The next one is added now, bullet point.  It's

11   called the "Multiple-Factor Effect."  What's the

12   significance of that?

13     A      That goes back to the paper we talked about,

14   Dr. Selikoff's paper in 1968.  The reason that was so

15   important is because he showed for the first time that

16   multiple factors that could cause cancer -- the risk was

17   not additive.  It was multiplied.

18            Very simply put:  If you don't smoke and if you

19   don't work with asbestos, you have a certain risk of

20   getting lung cancer.  It's very low, but there is a risk.

21   People do get it without those exposures, and that risk

22   we'll take at one.

23            If you take the average individual exposed to

24   asbestos, the risk is five times; you take the average

25   one-pack-a-day smoker, their risk is ten times.

KINSER v. CBS CORP., Case No. 94-2282

1           Now, if you're a two-pack-a-day smoker, it's

2     greater.  If you're a half-a-pack-a-day smoker, it's

3     less; depends again.  It's the dose-response curve.  How

4     much you smoke does give you a greater or lesser risk of

5     getting lung cancer.

6           But if you take someone who's exposed to

7     asbestos and smokes cigarettes -- this five and this

8     ten -- that's where we have the good data.  The risk is

9     not additive.  It's not 15.  It's multiplied.  That's why

10    we call it a "multiple-factor effect."  It's a

11    multiplicative rate, and it's over 50 times the rate of

12    that initial person who didn't smoke, who didn't work

13    with asbestos.  So it's not five plus ten, but five times

14    ten in terms of one's risks.

15          So that's the paper that Dr. Selikoff published

16    the first time, which many papers since then have shown

17    to be accurate in other populations, sometimes with a

18    little bit of variation.  Sometimes it's said to be

19    supra-additive.  Sometimes it's said to be

20    multiplicative.  But if you put the two together, it's

21    not just the individual risks, but having both of them

22    increases it enormously.

23    Q    I'm going to give you three exhibits here:

24    572, 461, and 496.

25          (Brief pause in proceedings.)

KINSER v. CBS CORP., Case No. 94-2282

1           THE COURT:  All right.  You may proceed, Mr.

2    McCoy.

3    BY MR. McCOY:

4        Q    Dr. Frank, the, the three publications that

5    I've provided you copies of there, are those ones that

6    you've selected in connection with this topic about

7    multiple-factor effect?

8        A    Yes, sir.

9        Q    Okay.  And you, you've described for us the

10   1968 publication?

11       A    Right.  That's the first one here.  This is

12   from JAMA, the Journal of the American Medical

13   Association; and the title is "Asbestos Exposure,

14   Smoking, and Neoplasia," meaning cancer.

15       Q    Is there any particular part of that article

16   that you would want to call the jury's attention to by

17   highlighting?

18       A    Well, I'll let you be the judge on it.  Yeah.

19       Q    You don't have to have anything other than what

20   you said?

21       A    I don't think so.

22       Q    Okay.

23       A    This is the paper that -- in fact, the very

24   original paper didn't talk about the multiple-factor

25   effect of being 50 times.  It actually talked about it

KINSER v. CBS CORP., Case No. 94-2282

1    being 90 times.  With additional data, it came down to 50

2    times; but the, the principle was still made.  But that's

3    what this original paper addressed.

4         Q    Okay.  And the next article out of that group

5    of three, what, what exhibit number is that, and what is

6    it?

7         A    It's Exhibit 461, again a paper by Dr. Selikoff

8    with a couple of his colleagues, called "Asbestos

9    Exposure, Cigarette Smoking, and Death Rates."  This is

10   1979 from that New York Academy of Sciences conference,

11   attended by people from all over the world.  It talks

12   about the various diseases, the ones we talked about with

13   you this morning that asbestos can give you; and it also

14   now talks about this multiplicative rate of about 50.

15        Q    Okay.  And this -- are we not on yet?

16             DEPUTY CLERK:  I turned it off because it's not

17   admitted yet, sir.

18             MR. McCOY:  Okay, sure.

19             Judge, I will ask for the admission of that

20   under 803(18).

21             THE COURT:  Numbers don't help me.

22             MR. McCOY:  Okay.  It's Exhibit 461.

23             THE COURT:  No.  I'm talking about 803(18).

24             MR. McCOY:  Yeah.

25             THE COURT:  I'm not a numbers guy.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            MR. McCOY:  Okay.  We just asked for the
 2    admission of this --
 3            THE COURT:  I know it's an exception to the
 4    hearsay rule.
 5            MR. McCOY:  Right.
 6            THE COURT:  But which one?
 7            MR. McCOY:  Right.  The one about:  are not
 8    going back to the, with them in the jury room.
 9            THE COURT:  Yeah.
10            MR. McCOY:  Okay.
11            THE COURT:  Well, that's one he relied on --
12            MR. McCOY:  Right.
13            THE COURT:  -- for part of the foundation of
14    his opinion.
15            You may proceed.
16    BY MR. McCOY:
17       Q    All right.  So on Exhibit 461, this was
18    published in what year, did you say?
19       A    1979.  It was part of that conference.
20       Q    And is there any particular portion of this
21    that, that you would want to call to the jury's attention
22    to that --
23       A    I think I've described it already.  It's,
24    again, the multiple-factor effect, about 50 times.
25       Q    Okay.
```

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  Could we go back to the computer,

2     Jessica.

3     BY MR. McCOY:

4          Q    Okay.  What we've put up here, Dr. Frank, is

5     this picture we're talking about, the multiple-factor

6     effect.

7          A    Yes.  That is, in fact, the numbers that we

8     talked about.  Five, ten, fifty.

9          Q    And then this data was 1979.  Following that

10    data, what further publication is there that you have

11    there?

12         A    We have a third publication that I selected.

13    It was from this year -- or this past year, 2013, four

14    authors, three of whom I worked with, two of which were

15    actually my residents when I was running the program at

16    Mount Sinai.  We all did a lot of asbestos work there,

17    and these are my colleagues that still have been doing

18    it.

19         It's called "Asbestos, Asbestosis, Smoking, and

20    Lung Cancer."  And, again, it updates the same union

21    group that Dr. Selikoff was looking at that created the

22    earlier data.  And here it talks about a number of

23    issues.  First of all, that the term they use is

24    "supra-additive" when you have smoking and asbestos

25    exposure.  It talks about quitting smoking.  And it said

KINSER v. CBS CORP., Case No. 94-2282

1    that in this group, at the end of ten years, if you've

2    given up cigarettes, you've halved your risk of lung

3    cancer.  And if you gave it up for 30 years, it's

4    essentially that of a nonsmoker, just as I testified to

5    you earlier today.

6              And it also points out that asbestos by itself,

7    without asbestosis, is a risk factor for the development

8    of lung cancer.

9        Q    Does Dr. -- this is Dr. Markowitz, right?

10       A    Yes.

11       Q    Okay.  Does he find the same increased risk

12   from the asbestos and tobacco as Dr. Hammond and Selikoff

13   did in '79?

14       A    Not exactly the same.  He finds an increase

15   when you put the numbers together, but the number is a

16   little bit different.

17       Q    What, what --

18       A    It's a little bit less than what they found,

19   and one of the reasons for that -- you're looking at the

20   same group of individuals, so the people who were being

21   studied in 1979, when they were publishing in 2013 -- so

22   we're talking about more than 30 years later.  A lot of

23   the early people who are more likely, going back to

24   individual susceptibility, more likely to have developed

25   lung cancer probably got it and died out of the

KINSER v. CBS CORP., Case No. 94-2282

1    population.

2           So the group that's left, which we call sort of

3    a survivor population, while they still have an excess of

4    lung cancer, it's not as great.  That's probably the

5    explanation for that.

6           Q    Is --

7           A    But one -- the first of their conclusions, if

8    you look at the article, asbestos increases lung cancer

9    mortality among nonsmokers, so asbestos by itself causes

10   excess lung cancer, which we knew.

11          Q    Does breathing more asbestos increase the

12   synergistic effect with tobacco?

13          A    It does.  I mean, that goes back to the

14   dose-response curve; and, similarly, the more you smoke

15   increases the synergistic risk.

16          Q    I think we can go ahead and shut, shut this one

17   down, Jessica.  Thank you.

18          So at the request of my law firm, you have

19   reviewed some of the medical records of Larry Kinser,

20   right?

21          A    I did.

22          Q    And you also prepared a report --

23          A    I did.

24          Q    -- in advance?

25          A    I believe it was actually two reports.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            MS. EZELL:  Your Honor, I'm not sure why he's
 2    giving him his report.  Is it to refresh his
 3    recollection?  I'm not sure what the question is.
 4            THE COURT:  I don't know that there is a
 5    question.
 6            MR. McCOY:  Right.
 7            MS. EZELL:  Okay.
 8            MR. McCOY:  I was going -- I was going to hand
 9    him his report.
10            THE COURT:  Would you tell us why you're going
11    to give him his own report?
12            MR. McCOY:  Well, just in case he has a
13    question about it.  It's up to him.  But I'm not going to
14    be publishing this report.
15            THE COURT:  I'm confident that Dr. Frank, if he
16    has a question, will ask you.
17            MR. McCOY:  Okay.
18            MS. EZELL:  I believe he might actually have a
19    copy in front of him, Your Honor.
20            THE WITNESS:  I --
21            THE COURT:  You've got your own?
22            THE WITNESS:  I have my own copy.  Yes, sir.
23            MR. McCOY:  All right.  We'll just hold this
24    off, so --
25            MS. EZELL:  And -- excuse me, Your Honor -- to
```

KINSER v. CBS CORP., Case No. 94-2282

1  the extent the witness is using his report to refresh his

2  recollection, can we note that for the record and the

3  jury because --

4           THE COURT:  I don't know that he's even used

5  it.

6           MS. EZELL:  Well, I'm observing that he's

7  reading it right now, --

8           THE COURT:  Oh.

9           MS. EZELL:  -- so I want to make sure we're

10 clear on what's happening.

11          THE COURT:  Dr. Frank, are you looking at your

12 report?

13          THE WITNESS:  I am, as I have on a number of

14 other occasions.

15          THE COURT:  Yeah.  I mean --

16          THE WITNESS:  I have it here.  I just verified

17 that it was my report.

18          THE COURT:  Yeah, okay.

19          I've been watching him, too, Ms. Ezell, and he

20 hasn't been reading from it.

21          MS. EZELL:  I hadn't seen him do anything until

22 that very moment.

23          THE COURT:  He's not been reading.  That's for

24 certain.

25          MR. McCOY:  Okay.  We're ready to move on with

1    the evidence here.

2    BY MR. McCOY:

3        Q    All right.  Dr. Frank, have you been asked to

4    determine your opinion as to the cause of Mr. Kinser's

5    lung cancer?

6        A    Yes, sir.

7        Q    And what is your opinion on that?

8        A    My opinion is that Mr. Larry Kinser developed

9    an adenocarcinoma of the lung, one type of common lung

10   cancer, due to his prior exposures to asbestos in

11   combination with his prior habit of cigarette smoking.

12       Q    And how do you go about, Dr. Frank -- first,

13   let me ask you this.  What's the word "attribution" mean

14   when you talk about cause of diseases?

15       A    It means:  Can you state that something caused

16   something else?  Can you attribute it to it?  Can you say

17   that the two are related?

18       Q    So how would you go about, as a medical

19   professional in occupational medicine, attributing the

20   cause of lung cancer in a person who has exposure to both

21   asbestos and tobacco?  What do you look at?

22       A    I look at a lot of things.  Let me try to go

23   through, briefly, the thought process.  You first ask:

24   What exposures do I have a history of, of substances that

25   I know cause lung cancer?

KINSER v. CBS CORP., Case No. 94-2282

1          As I shared with you earlier, I've written

2     about this.  There are a couple of dozen things that I've

3     written about.  So in this person's past history, what

4     exposures have they had?

5          The other question has to do with latency.  Did

6     they have the exposure far enough in the past that the

7     latency would be appropriate?  If someone was diagnosed

8     with lung cancer on Monday and their first exposure to

9     cigarettes or asbestos was the Friday before, that's not

10    long enough to give it to them.  So the question is:

11    When did they have their exposure to the cancer-causing

12    agents?

13         If you have multiple agents, there is no way

14    that I know scientifically you can say which one

15    contributed what.  Now, in legal settings, that may be a

16    question that is, is asked.  But as a doctor and as a

17    scientist and a professional who studied these issues, I

18    have no scientific basis to say it was this; it was that;

19    separate.  I have to say that it was the two together.

20    There's certain characteristics that allow one to make

21    some judgments, not the kind that I have to make.  I have

22    to say that it was the two together that did it.

23         But we know that Mr. Kinser was not a

24    particularly heavy smoker; but, nevertheless, I think

25    cigarettes had a role.

KINSER v. CBS CORP., Case No. 94-2282

1          We know that he had given up cigarette smoking;

2    I believe it was 16 years before he got his lung cancer.

3    So his risk from the cigarettes had come down; but it

4    wasn't yet 30 years, so it wasn't back to that of a

5    nonsmoker.  But we know from Dr. Markowitz's paper that

6    after ten years it would be half; and another six years,

7    it would be even less in terms of his risks from just the

8    cigarettes.

9          We also know that he had considerable --

10   decades of exposure to asbestos in multiple settings

11   and -- whereas, cigarette smoke is metabolized and no

12   longer stays in the lung -- asbestos, once you've been

13   exposed, some of it -- you'll clear some of it out over

14   time, but some of it will stay in the lung forever.

15        Q    From the records you looked at, what, what did

16   you discern to be Mr. Kinser's smoking history?

17        A    My recollection is that for about 35 years,

18   stopping in 1984, he smoked half a pack of cigarettes a

19   day, maybe less.  I understand he'll be testifying.  He

20   can speak to his own smoking history, but that's roughly

21   what I know:  half a pack a day for about 35 years.

22        MR. McCOY:  Jessica, we can go back to the

23   computer one more time.  Sorry to keep flipping back and

24   forth.

25        DEPUTY CLERK:  We're fine.

KINSER v. CBS CORP., Case No. 94-2282

```
1   BY MR. McCOY:
2       Q    Okay.  We've put up here a picture of some
3   portion of the lung, right, Dr. Frank?
4       A    Yes.  That actually looks to be the, a portion
5   of the lung cut away.  And what you see there is this
6   white scar tissue.  That's not normal.  That's the
7   so-called pleural plaques in the disease.  Pulmonary
8   asbestos was just what we're talking about.
9       Q    So this is a representative picture of the
10  pleural plaques?
11      A    Yes.
12      Q    Okay.
13      A    Some people have this amount.  Some people have
14  more.  Some have less.  But this is what it would look
15  like if you opened up somebody's body; and as I said,
16  sometimes these become calcified.  These are not
17  necessarily calcified, but calcium deposits can occur in
18  some of them as well.
19      Q    In the medical records of Mr. Kinser, are there
20  any reported findings about these pleural plaques?
21      A    Many, many such records and documentations of
22  bilateral pleural plaques.
23           Now, can other things besides asbestos give you
24  pleural plaques?  The short answer is yes.  They're very
25  uncommon.  The most common cause of pleural plaques is
```

KINSER v. CBS CORP., Case No. 94-2282

1  asbestos.  And to have them bilateral -- I've never seen

2  a case of bilateral plaques -- and the records say he has

3  it bilaterally, on both sides -- from anything other than

4  asbestos, except for one other dust that, on a much

5  smaller percentage of individuals, causes plaques; and

6  that's asbestos-free talc.  But other than that, you're

7  not going to get bilateral plaques; and, you know, I

8  would say 99 percent of cases of bilateral plaques is

9  from asbestos.

10     Q    What's your basis for attributing the asbestos

11  exposure as one of the causes of Mr. Kinser's lung

12  cancer?

13     A    There's several bases for that.  First of all,

14  we know that asbestos causes lung cancer.  That's what

15  the scientific literature going back 60/70 years tells

16  us.

17         Secondly, he had exposure to asbestos in his

18  trade as a pipefitter.  I've studied many pipefitters and

19  seen their records; know that they have a lot of exposure

20  to asbestos.  Again, he and others can't speak to me

21  definitively what exactly his exposure was.  But as a

22  group, he, he and his mates would have had exposure to

23  asbestos.

24         We have a latency that goes back far enough to

25  say there was enough time for cancer to develop.

KINSER v. CBS CORP., Case No. 94-2282

1          And we have evidence of that exposure in the

2   medical records that he has a nonmalignant disease

3   related to asbestos.  And if you remember my

4   dose-response curve, to get the scarring, you need more

5   exposure than you do for the cancer.  So that is what

6   allows me to say that, in part, his asbestos exposure,

7   along with his cigarettes, was the cause of his lung

8   cancer.

9        Q    Dr. Frank, have you selected some articles that

10  bear on this topic of the presence of pleural plaques and

11  attributing those to the causes of asbestos disease?

12       A    Yes.

13       Q    Okay.  And I'm going to hand you now

14  Exhibits 441, 428, and 412.

15       A    Thank you.

16       Q    Are those articles that you've selected on this

17  topic?

18       A    Yes, sir.

19       Q    Okay.  And what I'd like you to do is to start

20  first with 441, or I'll let you pick the order in which

21  you want to talk about those.

22       A    Well, --

23       Q    But why are these significant in terms of

24  attributing asbestos as the cause of the lung cancer when

25  you have pleural plaques?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Because it's not just Arthur Frank sitting here

2   telling you this, but scientists going back as far back

3   as 1979 -- and there's actually references a bit

4   earlier -- saying that if you have evidence of pleural

5   plaques, it is a predictor of the greater likelihood of

6   developing lung cancer.

7            The first of these papers, 441, is a paper from

8   Dr. Edge from England.  He studied shipyard workers, and

9   this paper was published in that same New York Academy of

10  Sciences monograph, that document; and it says "Incidence

11  of Bronchial Carcinoma in Shipyard Workers with Pleural

12  Plaques" -- and without going through the details, it

13  simply says:  If you have evidence of plaques, you are

14  more likely to get lung cancer than if you don't have

15  plaques.  In 1979, plaques are a predictor of lung

16  cancer.

17           The next paper by Dr. Cullen, John Balmes, and

18  others -- Mark's an old friend.  John Balmes is one of my

19  residents when I was a senior resident.  I know John very

20  well.  He and a number of other people published the

21  "Predictors of Lung Cancer among Asbestos-exposed Men in

22  the Beta-Carotene and Retinol Efficacy Trial."

23           What that simply says is somebody looked at the

24  role of a particular vitamin -- in this case,

25  Vitamin A -- as a preventive measure for the development

KINSER v. CBS CORP., Case No. 94-2282

1  of lung cancer.  It turned out, unfortunately, it didn't

2  work.  It's not a preventive measure for lung cancer.

3        But they looked at a variety of issues and,

4  again, simply put, the key point about this -- the reason

5  I selected this article -- is that it says:  If you have

6  plaques, you're more likely to get lung cancer.  This is

7  what they looked at, and they looked at other factors as

8  well.  But pleural plaques, by themselves, was a positive

9  predictor of those individuals getting lung cancer.

10        And the last of these, again -- a paper that

11  includes Dr. McLarty, who I've published with; Dr. Balmes

12  again -- this is called the "American College of Chest

13  Physicians Consensus Statement on the Respiratory Health

14  Effects of Asbestos."  This was published in 2009.

15        I apologize.  The previous paper was 2005.

16        And these are consensus statements as to what

17  this group believed accurately represented the biology of

18  asbestos and facts that were known from the literature.

19  And, basically, there are several important points of

20  this paper:  That, first of all, you don't even have to

21  have asbestosis; but if you've had a sufficient exposure

22  to asbestos, that is enough to say that the two are

23  related.

24        It says if you, yourself, don't have asbestos

25  but other workers like you, co-workers, have asbestos,

KINSER v. CBS CORP., Case No. 94-2282

1    that implies that you work in a group that is at an

2    excess risk of lung cancer.

3           They even agree that workers who have had

4    significant asbestos exposure but who do not have

5    asbestosis are at an increased risk of bronchogenic

6    carcinoma.

7           And it also talks here about pleural plaques;

8    and it says that workers with pleural plaques are at an

9    increased risk of mesothelioma, "one of the other cancers

10   that we have."  So having a plaque is a predictor of an

11   increased risk of getting cancer from asbestos.

12          MS. EZELL:  Objection, Your Honor.  Move to

13   strike.  The witness said that this, pleural plaques, is

14   an indicator of mesothelioma, one of the other cancers

15   which we have.  We have no mesothelioma in this case, and

16   I would move to strike that portion of his answer.

17          THE COURT:  Do you -- did you indicate, Dr.

18   Frank, that mesothelioma was, was a question in this

19   case?

20          THE WITNESS:  It is only a question in -- we

21   haven't indicated it yet; but we are going to indicate

22   that Mr. Kinser is at increased risk for the rest of his

23   life of developing a mesothelioma, but we haven't

24   addressed that yet.

25          THE COURT:  All right.  Finish it up and I'll,

KINSER v. CBS CORP., Case No. 94-2282

1    I'll rule on your objection at that point.

2           MS. EZELL:  Well, then, I would add:  It calls

3    for speculation about some disease that hasn't manifested

4    and could occur, according to this doctor, to anyone in

5    this room.

6           THE COURT:  I don't think the fact that it

7    hasn't manifested is, is preventing him from talking

8    about what might occur.  Overruled.  You may proceed.

9    BY MR. McCOY:

10      Q    Dr. Frank, do you want me to highlight any of

11   the portions you've marked for the jury?

12      A    I don't think so.  Thank you.

13      Q    I've got copies.

14           All right.  If you need to on these articles,

15   let me know; I will.

16           And, briefly, do you have a background that, in

17   studying the characteristics of asbestos fibers, such as

18   how far they would travel in the air?

19      A    Yes.  I mean, that's part of my understanding

20   about exposure to asbestos.

21      Q    What's a bystander exposure?

22      A    There are multiple kinds of exposures with

23   regard to asbestos.  There are some people who directly

24   work with asbestos, and we call that direct handling of

25   asbestos.

KINSER v. CBS CORP., Case No. 94-2282

1          We have people who work near others who work

2    with asbestos.  They may be doing a job that they're not

3    working with asbestos, but somebody nearby is; and we

4    call that a bystander.

5          And Mr. McCoy asked me, you know:  Do I know

6    about how far asbestos fibers can travel?  Yes.

7    Measurements in various workplaces have shown that they

8    can travel, you know, 60 feet.  One study even shows that

9    something that's no longer allowed in this country -- the

10   spraying of asbestos -- measurements have been taken

11   showing that sprayed asbestos can travel 300 miles, so we

12   know that it spreads out from the source where it's being

13   worked with.

14          The other exposures -- and we're not dealing

15   with that here in the case of Mr. Kinser -- is what we

16   call "household exposure," where somebody brings

17   contaminated clothing into the home, and then family

18   members get exposed.

19          And we even have something called "neighborhood

20   exposure."  You can live, let's say, within half a mile

21   of an asbestos-using facility and still get asbestos

22   disease, even though you never work with it; you're not

23   in a workplace where it's being used.  That's been well

24   documented.

25          So there's these different kinds of exposure,

KINSER v. CBS CORP., Case No. 94-2282

1   and we use these terms.  So a bystander is someone who's

2   in a workplace where others are working with it, and

3   you're in the vicinity when that occurs.

4        Q    Are asbestos fibers, all of them, visible when

5   they're released into the air?

6        A    No.  Most of them, in fact, are not visible.

7   The only time you generally will see asbestos fibers or

8   dust which contains asbestos fibers is when it's a huge

9   amount.  I've had workers describe to me having snowball

10  fights with asbestos, and you see it in the air.

11            Or if you've ever been home on a day when the

12  sunlight streams through your window and you see a little

13  bit of dust in the air, that's -- the technical name for

14  that is called the Tyndall effect, T-y-n-d-a-l [sic],

15  Tyndall effect, and that can occur in the workplace.  So

16  sometimes when the lighting is right, you can see this

17  dust in the air; but, generally, you'll never see

18  asbestos fibers.

19       Q    What's been reported in the scientific

20  literature, the medical literature, about these

21  situations involving bystanders -- or the more remote,

22  like the neighborhood exposures?

23       A    When those groups have been studied -- going

24  back to 1960 was the first real description of both

25  neighborhood and family exposure; and then bystander

KINSER v. CBS CORP., Case No. 94-2282

1   exposure's been well described -- we know that disease

2   can occur in those populations.

3           In fact, with regard to asbestos, as far back

4   as 1918, it was written in certain industrial hygiene

5   papers that workers should change their clothes before

6   they go home so as not to expose their family to asbestos

7   that they would carry home.  So this concept has been

8   appreciated for a very long time.

9       Q   And when you talk about secondhand smoke, Dr.

10  Frank, do you agree that that can be a cause of lung

11  cancer?

12      A   Yes, it can.

13      Q   And would that be a part of the synergistic

14  effect --

15      A   Yes.

16      Q   -- with asbestos?

17      A   The body doesn't know that the smoke is

18  firsthand or secondhand if you're breathing in, you know,

19  the cancer-causing aspects of cigarette smoke.  And there

20  are differences between direct smoking and secondhand

21  smoke.  The characteristics are somewhat different.

22          But, again, some of the colleagues that I

23  worked with back at Mount Sinai were among those that

24  showed that secondhand smoke, as well as direct smoking,

25  could give rise to lung cancer.

1      Q    Now, I'd like you to assume some evidence that

2   we're going to be presenting in this case, and I'd like

3   you to assume first that Mr. Kinser had about a 20-year

4   history, during the years 1965 to 1985, during which he

5   was personally either removing asbestos insulation pipe

6   or block or that he was personally removing or installing

7   asbestos-containing gasket materials.

8           I'd also like you to assume, number two, that

9   he was also working during that time period as a

10  bystander in industrial settings where others were doing

11  that same kind of work.

12          And I'd also like you to assume that Mr. Kinser

13  had the smoking history that you had talked about of

14  about less than -- a half a pack a day or less over the

15  period 1949 to 1984; and he had also some secondhand

16  smoke from other situations.

17          Finally, assume Mr. Kinser has developed a lung

18  cancer in 2000, as medical records show.

19          Taking all those assumptions into account, do

20  you have an opinion as to the cause of Larry Kinser's

21  lung cancer with respect to those situations?

22          MS. EZELL:  Objection as to the improper

23  hypothetical of being vague as to time, location, what

24  plants we're talking about, and as being compound in its

25  multiplicity of assumptions.

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Overruled.

2          You may -- do you have an opinion?  That's the

3   question.

4          THE WITNESS:  I do have an opinion, Your Honor.

5   BY MR. McCOY:

6      Q    And what is your opinion, Dr. Frank?

7      A    My opinion, held with a reasonable degree of

8   medical certainty, is that Mr. Kinser developed his

9   adenocarcinoma of the lung caused by his exposures to

10  asbestos in combination with his cigarette smoking

11  exposures, both from his direct smoking and his

12  secondhand smoke.

13     Q    All right.  Now, I want to narrow down the

14  assumptions I'm going to ask you for a moment to the Zion

15  powerhouse.  Okay?  I want you to assume, first, that Mr.

16  Kinser worked for about four months at the Zion nuclear

17  powerhouse in 1974.

18          I also want you to assume that he personally

19  removed asbestos pipe insulation and gaskets, and that

20  created dust.

21          I also want you to assume that he worked within

22  about 100 feet, or closer -- sometimes a little

23  farther -- from others who were doing the same kind of

24  work, removing asbestos pipe, block insulation, gaskets,

25  and also asbestos turbine blankets; and that was also

1   creating dust.  Okay?

2           Now, finally, I want you to assume that about

3   30 percent or more of the days on his job was when there

4   was some of this removal of insulation or gasket

5   materials taking place.

6           Taking into account those assumptions, do you

7   have an opinion, to a reasonable degree of scientific and

8   medical certainty, about whether the work on the turbine

9   system insulation -- combined with the, Mr. Kinser's

10  asbestos exposures at other places and his tobacco

11  exposure -- are part of the synergistic cause of Mr.

12  Kinser's lung cancer?

13      A    Yes.  I have an opinion, and my opinion would

14  be:  Since it is the cumulative exposure to asbestos from

15  any and all sources that make up one's total exposure,

16  any exposures he had at the Zion plant, along with his

17  other exposures and the cigarettes, would all have

18  contributed to his developing his lung cancer.

19      Q    And, finally, I want to ask a narrower question

20  here on this.  Let's say Mr. Kinser's work only involved

21  the removal of about 20 gaskets on large piping, ranging

22  from about four inches up to ten inches in diameter; and

23  he was using a scraper or file or wire brush to do that.

24          Do you have an opinion, to a reasonable degree

25  of scientific and medical certainty, about whether that

KINSER v. CBS CORP., Case No. 94-2282

1   work would have been a cause of his lung cancer?

2       A    Yes.  I have an opinion; and, again, it is the

3   cumulative exposure from any sources, and the action of

4   removing gasket material with a wire brush or a scraper

5   will create asbestos-containing dust and, therefore, was

6   part of his overall exposure that contributed to his lung

7   cancer.

8       Q    Can you actually separate out and assign

9   percentages to what job or day would be the

10  relative-percentage cause of the causation here?

11      A    There is no scientific basis that allows me to

12  do that.  One has to say it was the cumulative exposure

13  and that all exposures contribute.  I have no scientific

14  basis to make attribution to any given day, nor do I have

15  a knowledge of what the exposures specifically were on

16  that day.

17           The only way somebody could do that is if every

18  day Mr. Kinser was at work somebody was measuring his

19  day-by-day exposure to asbestos to say he got 1 percent

20  here, 3 percent there, 2 percent here.  We don't have

21  that.  So you have to say, obviously, it contributed.

22      Q    Mr. Kinser has not had lung cancer since his

23  lung removal operation in, and chemotherapy treatment in

24  2000.  Does that mean he's forever cured of the lung

25  cancer?

1      A     It is very likely, given the now 14 years -- or

2   almost 14 years -- that he could be considered cured.  It

3   is unusual; less than 20 percent of people with lung

4   cancer get cured.  But some people do get cured.  But

5   that doesn't mean that he's not at risk for further

6   disease.

7      Q     What do you mean "not at risk for further

8   disease"?

9      A     One of the things that we know about

10  individuals exposed to asbestos:  Not only do they get

11  cancer in excess numbers, but they get multiple cancers

12  in excess numbers.  Again, work that Dr. Selikoff did

13  showed that you're much more likely to develop multiple

14  primary cancers -- that's individual separate cancers --

15  if you've been exposed to asbestos, compared to people in

16  the general population.

17         So I would like to think that, after 14 years,

18  we could consider Mr. Kinser cured from his lung cancer.

19         That said, he will be at an increased risk of

20  developing another asbestos-related cancer as long as

21  he's alive, a second lung cancer -- we've seen those in

22  people -- a mesothelioma, a gastrointestinal cancer, a

23  laryngeal cancer, whatever -- because the asbestos that

24  he was exposed to, some of that is still in his body.  So

25  he will be at an increased risk, though I would like to

KINSER v. CBS CORP., Case No. 94-2282

1  consider him cured from his 2000 lung cancer.

2      Q    What type of care and treatment medically would

3  Mr. Kinser need in the future, based on this risk of

4  potential disease?

5      A    Well, given Mr. Kinser's age and his medical

6  records, he's being treated for a number of ongoing

7  medical conditions.  He's got gout.  He's got other kinds

8  of things that he's being looked after for.  As I look at

9  that list of diseases that his doctors are caring for him

10  for, that's part of his normal care.

11         But because of his asbestos exposure and the

12  fact that he has nonmalignant changes on his x-rays, he

13  needs to have special attention paid to him because of

14  that.  So he's lost part of his lung, so we need to do

15  some things that we might not otherwise do in people and

16  measure his pulmonary function, breathing tests.

17         He needs to have periodic evaluations for the

18  development of a second lung cancer or mesothelioma or GI

19  tract tumor.

20         So, you know, if he was my patient -- and I'm

21  sure his doctors are looking after him this way -- I

22  would be having him come in just because of his asbestos

23  and doing certain tests that I will do, or I would be

24  doing for, you know, as long as he would be my patient

25  and still be alive, in addition to his regular medical

KINSER v. CBS CORP., Case No. 94-2282

1   care.

2       Q    What kind of care and treatment would Mr.

3   Kinser need if he developed a second lung cancer?

4       A    Again, he would need, if his lungs could stand

5   it, a second surgery; or he would need chemotherapy or

6   radiation therapy -- again, whatever the treatment would

7   be -- depending on the location, size, and cell type of

8   lung cancer that he might develop.

9       Q    Have you had an opportunity to look at medical

10  records that show the history of other health conditions

11  that Mr. Kinser had?

12      A    Yes, I have.

13      Q    Okay.  And in reviewing the conditions that

14  he's had, what would you say as far as whether those

15  conditions are correctable or treatable?

16      A    They all appear to be treatable conditions.

17  There's nothing of an immediate life-threatening nature

18  of all of the other diagnoses that he carries.  You know,

19  given someone of his age, it's not surprising he has

20  multiple other health problems.  But he's also a man

21  who's missing part of his lung; and for the reasons I

22  just gave, I would be checking him frequently for the

23  development of other asbestos-related disease or the

24  progression of the disease that he currently has.

25      Q    Mr. Kinser's had some cardiovascular problems?

KINSER v. CBS CORP., Case No. 94-2282

1      A     By and large, they appear to be treatable.

2      Q     Has he had any procedures performed to correct

3  cardiovascular problems?

4      A     Yes.  He's had a carotid endarterectomy.  They

5  cleaned out the carotid vessels.  He's got a pacemaker, I

6  believe.  So he's gotten care for his other medical

7  problems.

8      Q     Is there anything about the carotid artery

9  surgery that would appear to say it did not get

10  corrected?

11      A     No.

12      Q     Is the asbestosis one of the conditions that's

13  listed for Mr. Kinser?

14      A     Yes, it is.  And that is not a treatable or

15  correctable condition.  There's no drugs to treat

16  asbestosis.  He will, he will always have that, and

17  there's no treatment you can give him for it.

18      Q     If the life expectancy charts -- well, let me

19  ask one other question about asbestosis.  Can that, can

20  that condition change over time?  Does it get better or

21  become worse or what?

22      A     It never gets better.  It can get worse.  And

23  in reviewing Mr. Kinser's medical records over time, it

24  does appear that in looking at his records his has

25  progressed over time.  I can't speak for certain if it

KINSER v. CBS CORP., Case No. 94-2282

1   will progress in the future or how bad it will get; but

2   there is evidence from years ago that he had a certain

3   amount of disease, which has progressed over time to

4   where we are today.

5       Q    Does, does that have any impact, the

6   asbestosis, on breathing conditions?

7       A    It does.  It makes it harder to breathe.  And

8   if his lung scarring gets worse, it will be harder for

9   him to breathe.

10      Q    If the life expectancy chart showed that Mr.

11  Kinser had about eight years left to live at his age,

12  would you have any reason to believe that those charts of

13  normal expected -- expectancy would be different from Mr.

14  Kinser?

15      A    No.  I mean, that would be for someone of his

16  age.  Again, I don't do these kind of life table

17  analyses.  But, generally, if you make it to his age,

18  which is roughly about 80 years, you would expect a

19  certain number of years; and eight sounds to be a

20  reasonable number.

21          Over that time, he will require a lot of

22  medical attention and care to see that he doesn't develop

23  another disease.  And, of course, I can't predict what

24  will happen to him, but that seems like a reasonable

25  number.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Okay.  Based on his medical records, would you

2    think it would change from what was the normal number?

3    A    Given that, you know, all of his conditions are

4    treatable and under control, other than the fact that you

5    can't treat asbestosis, I don't see why that shouldn't

6    happen.  But, again, you know, something could occur

7    tomorrow, next week, a year from now, three years from

8    now.  I can't predict that.  But he's certainly at an

9    increased risk for other diseases, which should -- could

10   shorten his life span.

11           MR. McCOY:  Judge, I might have another

12   30 minutes to finish this up.

13           THE COURT:  Really?

14           MR. McCOY:  About 30, --

15           THE COURT:  Okay.

16           MR. McCOY:  -- 30 minutes.

17           THE COURT:  Jurors, how much time do you need

18   for lunch?  45 minutes?

19           Let's aim at 45 minutes because I'm thinking a

20   half hour of him, cross-examination, and then you've got

21   a video and so forth.

22           Can you be back in 45 minutes?  You can get a

23   sandwich across the way in Lincoln Square, I think.

24   Okay.  45 minutes.

25           Don't discuss the case among yourselves or with

KINSER v. CBS CORP., Case No. 94-2282

1  anyone else while you're gone.  Don't let anybody talk to

2  you about the case.  If anybody tries to talk to you

3  about the case, you've got to tell me about that right

4  away.  Okay.  Go ahead.

5              (Jury absent, 12:17 p.m.)

6              THE COURT:  We'll be in recess till 1:00.  You

7  may step down.

8              (Recess, 12:17 p.m. to 1:17 p.m.)

9              THE COURT:  We've had a technical difficulty

10  which we had to overcome.  I'm sorry.  I said we'd start

11  at 1:00 and now it's 1:20.

12              All right.  Ask another question, Mr. McCoy.

13              And, Jessica, would you come back to your post.

14  Thank you.

15              DEPUTY CLERK:  Sorry, sir.

16  BY MR. McCOY:

17      Q    Dr. Frank, is asbestosis the same disease as

18  lung cancer?

19      A    It is not.  One is a benign disease, and it is

20  not a cancer.  And lung cancer is a malignant disease;

21  i.e., it is a cancer.

22      Q    Do they grow and develop in the same way?

23      A    No.  They are very different processes.  Very

24  different cells in the lung are involved.  One is scar

25  tissue being laid down.  The other is a basic cell of a

KINSER v. CBS CORP., Case No. 94-2282

1    lung that gets its nucleus mutated in a way that becomes

2    a cancer, uncontrolled cell growth.

3        Q    Can the, just the term "asbestosis" have

4    different meanings to different physicians?

5        A    Yes.

6        Q    And what might be the differences?

7        A    If one looks at the historical use of that

8    term, to some physicians, it only means the scarring in

9    the lung itself.  Everybody agrees that that represents

10   asbestosis.

11        The differences come up with:  Does the

12   scarring in the pleura count as asbestosis?  And there

13   are several schools of thought about that -- well, two

14   schools.  Some who include it, some who do not.

15        But, essentially, the scarring is of the same

16   cells laying down the same scar tissue, but the terms are

17   used somewhat differently by different physicians.

18        Q    Did some of Mr. Kinser's physicians call his

19   nonmalignant asbestos condition "asbestosis"?

20        A    Yes.  There are evidences in the medical record

21   where his doctors say that he has asbestosis.

22        MR. McCOY:  These are, these are agreed upon,

23   Judge, to show.

24        THE COURT:  Go, go.  As I've said -- as long as

25   you've agreed and there's no objection, you may just

```
 1   proceed.
 2           MS. EZELL:  No.  But as to the medical records,
 3   there's no objections, Your Honor.
 4           THE COURT:  Very well.
 5           (Brief pause in proceedings.)
 6   BY MR. McCOY:
 7       Q    Did you identify within the medical records of
 8   Mr. Kinser, then, some that said asbestosis?
 9       A    Yes.
10       Q    Is this an example of one of those?
11       A    Yes, it is.
12       Q    Okay.  And what is this medical record?
13       A    This is an operative summary when he was
14   operated on for his lung cancer in 2000.
15       Q    Okay.
16       A    Date of surgery:  9/1 of 2000.
17       Q    What was it that I -- can we zoom in on this a
18   little bit?  Okay.
19           And that, that's the indication then of this
20   treating physician calling it asbestosis?
21       A    Correct.
22       Q    I'm going to the second page here of this
23   report, and it shows that it was prepared on September 1,
24   2000.  This is for the lung surgery, right?
25       A    Yes.  Dr. Palmer was the surgeon who did the
```

KINSER v. CBS CORP., Case No. 94-2282

1    operation.

2        Q    And here, this statement right here?

3        A    Yes.

4        Q    Okay.  So what, what is his basis in his

5    operative report for being able to say because of the

6    asbestosis?

7        A    Well, you'd have to ask him what his basis is.

8    What I read there is that when he opened Mr. Kinser's

9    chest and looked both at his lung tissue and the lining

10   around the lung, he found evidence of scarring in both

11   and referred to "asbestosis," referring to the lung

12   itself; and he uses the word and "benign fibrous

13   plaquing," which is the plaques or the scarring in the

14   lining tissue of the pleura.

15       Q    So he found both?

16       A    Yes.

17       Q    Okay.

18       A    Looking at the tissue on the operating table.

19       Q    Okay.

20            Another agreed medical record.  This is also

21   one of the ones you identified, dated 10/31/2003.  And

22   what is this one?

23       A    This is a CT scan of the chest.  "CT" is a much

24   more modern radiographic technique, looking at the chest

25   as -- a chest x-ray which is, you know, two-dimensional

KINSER v. CBS CORP., Case No. 94-2282

1   and a static picture; the CT looks through many layers of

2   the chest, sort of cutting it in slices and looking at

3   each one, going through the chest.

4        Q    Is this the report from the physician who

5   actually read the, the CT chest?

6        A    Yes.  Dr. Patel apparently was one of Mr.

7   Kinser's treating doctors.

8        Q    Okay.  And in here it indicates "extensive

9   calcified pleural plaques bilaterally, indicating

10  asbestosis."

11       A    Right.  So he uses a terminology that some

12  physicians use, that calcified -- well, pleural plaques,

13  which in this case happened to be calcified as well.  As

14  I mentioned, sometimes they're calcified; sometimes not.

15  He uses the term "asbestosis."  That was his training.

16       Q    This is Exhibit 625, also from Mr. Kinser's

17  medical records.  This one says "CT of Thorax with IV

18  Contrast."  What procedure is that?

19       A    It's, again, a CT scan, but they give a dye to

20  allow you to better differentiate between the different

21  kinds of tissue that are there.

22       Q    Okay.  And this was Dr. Nash reporting on this

23  one on June 13, 2007.

24       A    A different radiologist, yes.

25       Q    Dr. Nash reports, "Increased markings are noted

KINSER v. CBS CORP., Case No. 94-2282

1   in the right base consistent with scarring."

2          What's the significance of those findings to

3   you based on your experience in this area?

4      A    "Scarring" is the classic change that you get

5   from asbestosis in the parenchyma of the lung.  You may

6   be able to see it pathologically under the microscope

7   before you see it radiologically.

8          We have the surgical report from 2000 where the

9   doctor was looking at the lung.  We have Dr. Patel's

10  report that he saw only calcified plaques.  But this is

11  later; so this may represent, in fact, progression of

12  disease in Mr. Kinser's lungs, that he's now showing up

13  with scarring that he didn't have before.

14     Q    And it's my -- I understand you're not a, a "B"

15  reader, but are you qualified to interpret these kinds of

16  findings based on your education?

17     A    Oh, certainly.  And just to clarify for the

18  jury -- you don't know what a "B" reader is.  A "B"

19  reader is someone who takes an examination given by

20  NIOSH, National Institute for Occupational Safety and

21  Health, as to their qualifications of reading x-rays.

22         I took that exam once in 1983; and about half

23  the doctors, like myself, don't pass that exam.  I didn't

24  pass it.  I've never taken it again.

25         I've read x-rays.  I teach the system that's

KINSER v. CBS CORP., Case No. 94-2282

1  used for the "B" reader.  Ironically, the very room that

2  I took it in in Morgantown, West Virginia, they invited

3  me to give grand rounds on asbestos.  I've published in

4  the peer-reviewed literature on the reading of x-rays.

5  But I am not a qualified "B" reader.  I've had a lot of

6  experience reading chest x-rays for asbestos, but the

7  exam covered things that I hadn't seen a lot of.  I'd

8  only just moved to Kentucky, covered coal workers'

9  pneumoconiosis, silicosis, other diseases.  So I'm not a

10  "B" reader.  I took the exam once; didn't pass; decided

11  that was not a credential I needed.

12      Nevertheless, I'm trained as a physician.  I'm

13  interested in occupational lung disease.  I can certainly

14  read and understand radiology reports like this.

15      Q   And in Mr. Kinser's case, you're not actually

16  doing any of the reading of any reports, or any images

17  yourself; you're relying on what's reported by the other

18  physicians, right?

19      A   Well, I'm relying on what they describe, and

20  then I'm making my own judgment about what I think it

21  represents.

22      Q   Okay.  So in this case, what's the significance

23  of "right base consistent with scarring"?

24      A   Is that now there was evidence of scarring in

25  the lung which hadn't been there previously.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  And what's scarring have to do with any

2  asbestos disease?

3      A    Well, asbestosis is characterized by scarring

4  in the lung when we have no other known exposure that I'm

5  aware of that would have scarred that part of Mr.

6  Kinser's lung.

7      Q    Okay.  Now, one other medical record that you

8  had identified here for us.  Okay.  This is a -- at the

9  bottom -- this is a Dr. Neigut in July of 2011.

10     A    All right.  So we're now four years past the

11  last document.  Again, we had a CT scan of the lung, and

12  the other highlighted area says, "Minimal linear scarring

13  or subsegmental atelectasis is noted at both lung bases.

14  The linear densities are stable at the lung bases

15  favoring scarring."

16          So what we now have is a progression from

17  2000 -- some places in the 2000 -- Dr. Patel's report --

18  of only the calcified plaques.  Then another doctor reads

19  an x-ray -- or CT, in 2007, sees scarring at the right

20  base.  It's now 2011.  We see scarring as an evidence of

21  change in both bases.

22          And, again, I'm not aware of any exposures that

23  Mr. Kinser would have had that would have led to these

24  findings.

25     Q    Other --

KINSER v. CBS CORP., Case No. 94-2282

1        A    Other than his asbestos.

2        Q    What -- is there any significance to this being

3    in the lung base rather -- that's the bottom, right?

4        A    Right.  And that's where the changes of

5    asbestos characteristically start, whereas other dusts --

6    like coal dust or silicas -- start at the top of the lung

7    and work their way down.  Plus, they're rounded, and you

8    would have it -- instead of linear scarring, you'd have

9    rounded opacities.

10            So, again, just by looking at a film, you don't

11   know what caused it.  So the radiologist doesn't call

12   this asbestosis.  Well, Dr. Patel did because he saw the

13   calcified pleural plaques because that's -- as, again, I

14   said, bilateral changes almost always -- 99 percent of

15   the time -- come from asbestos, so he could do that.  But

16   this doctor, in only seeing linear scarring -- there's

17   many things that will do that.  He doesn't know Mr.

18   Kinser's exposure history.  So he, as a radiologist,

19   describes what he sees.

20            I take that description, plus what I know of

21   Mr. Kinser's history, and I feel that that allows me to

22   say that he has, more likely than not, asbestosis because

23   I have no other explanation for it.

24       Q    If, if one of Mr. Kinser's physicians believed

25   in the year 2007 when he saw Mr. Kinser last that Mr.

KINSER v. CBS CORP., Case No. 94-2282

1   Kinser did not have asbestosis, does that mean that Mr.

2   Kinser is never going to have that disease?

3        A    No, it doesn't.

4        Q    Why -- why is that?

5        A    Because it's a disease that can progress, even

6   with no further exposure; and just in reading these three

7   x-ray reports -- nothing in the lung, just the lining,

8   then one side of the lung, and then both sides of the

9   lung -- there's that evidence of progression in these

10  x-rays.

11       Q    Is there anything unusual that these scarring

12  signs of asbestosis would show up on these imaging

13  radiology studies after Mr. Kinser was no longer exposed

14  to asbestos?

15       A    No.  Because, again, people develop asbestosis

16  who may have been exposed for a relatively short period

17  of time, a year or two.  The disease doesn't begin to

18  even show until ten years later.  You don't have to have

19  exposure over ten years for it to develop.  So you can

20  have exposure, have a perfectly normal x-ray for many,

21  many years; and then it shows up later.

22            In his case, even though he may have had

23  exposure in the '60s, '70s, and '80s, the fact that it

24  shows up as changes in the parenchyma now -- he certainly

25  had changes in the pleura earlier -- is not out of the

KINSER v. CBS CORP., Case No. 94-2282

1  norm of what you could see in an individual who's had

2  prior exposure to asbestos.

3      Q    Are the findings of a scarring or fibrosis in

4  the lungs of Mr. Kinser related in any way to his

5  smoking?

6      A    No.  There's a few people who write in the

7  literature that smoking can give you scarring in the

8  lungs.  I was trained not to believe that.  If you read

9  the basic textbooks on radiologic changes, which I've

10  done, they never talk about scarring from cigarettes.

11          And then I actually did a study when I was at

12  the University of Texas with some colleagues there.  We

13  took x-rays of people exposed to asbestos, people who

14  smoked, people who didn't smoke.  We had somebody collect

15  these x-rays without telling us the history of those

16  people.  We mixed all the x-rays up.  We had three of us

17  read those x-rays.  And when we did the analysis

18  afterwards, the only people that ever got scarring in

19  their lungs were people that had had prior exposure to

20  asbestos.

21          Not everybody who was exposed to asbestos had

22  scarring, but nobody who didn't smoke had scarring; and

23  there was no evidence that smoking gave rise to scarring.

24  So not only does the literature tell us that, but I've

25  done a study that leads me to conclude that cigarette

KINSER v. CBS CORP., Case No. 94-2282

1   smoking can't give you this kind of scarring.

2       Q    Is -- changing the subjects again for a little.

3   Is asbestosis, a diagnosis of that, necessary before

4   there can be some synergistic effect between the tobacco

5   and asbestos exposures?

6       A    No.  And we talked about some of the papers

7   earlier that speak to that.  There is a bit of a

8   controversy.  There are a few doctors that believe you

9   have to have asbestosis to get, to be able to say that

10   asbestos caused lung cancer.  Most of us don't believe

11   that.

12         I showed you the dose-response curve where you

13   can get cancer with very short exposures that would never

14   be enough to give you asbestosis and get an elevated risk

15   of lung cancer.

16         But there are some people who believe that.

17   I'd like to think that they're just a lot more

18   conservative in their diagnosing because when they see

19   asbestosis they can be absolutely sure that asbestos

20   caused it.  If they don't see asbestosis, you know,

21   whereas some of these documents, such as the American

22   College of Chest Physicians, say, you know, a history of

23   sufficient exposure is enough to link it even without

24   asbestosis, I think they're just being very conservative.

25         But most people wouldn't agree with them, and

KINSER v. CBS CORP., Case No. 94-2282

1    certainly this consensus document doesn't.  And I

2    personally don't believe you need underlying asbestosis.

3         Q    Did you identify some references on this

4    literature about asbestosis not being needed as a

5    diagnosis before a lung cancer could be related to

6    asbestos?

7         A    Yes, I have.

8         Q    Okay.

9         A    This is an issue that has come up in other

10   settings, so I'm aware of some of that literature.  Yes,

11   sir.

12        Q    All right.  I'm going to give you these

13   exhibits -- 412, 428, 461, 496, 619 -- and I'd like you

14   just to identify those briefly for the record and --

15        A    Okay.  Well, 412 we've already talked about.

16        Q    Just identify --

17        A    Oh.

18        Q    -- title, author, and date.

19             MS. EZELL:  And the exhibit number.  Can I have

20   that, too, please?

21             MR. McCOY:  Yes.

22        A    412, "American College of Chest Physicians

23   Consensus Statement on the Respiratory Health Effects of

24   Asbestos," by Banks, et al.

25             Exhibit 428, the paper by Cullen, C-u-l-l-e-n,

KINSER v. CBS CORP., Case No. 94-2282

1  which we've already talked about in another setting.

2          461, "Asbestos Exposure, Cigarette Smoking, and

3  Death Rates," by Hammond, Selikoff and Seidman,

4  S-e-i-d-m-a-n, which we've talked about in other

5  contexts.

6          The Markowitz paper, Number 496, "Asbestos,

7  Asbestosis, Smoking, and Lung Cancer," from 2013.

8          The American Thoracic Society Official

9  Statement, "Diagnosis and Initial Management of

10  Nonmalignant Diseases Related to Asbestos."  This doesn't

11  have a document number on it.

12      Q    That should be Exhibit 404.  I'll --

13      A    I'll swap you.

14      Q    -- switch you a copy with the number on it.

15      A    And then my own paper, Number 619, "Public

16  Health Significance of Smoking--Asbestos Interactions."

17      Q    Let me add that one right there.

18      A    And Dr. Selikoff's paper, 572, "Asbestos

19  Exposure, Smoking, and Neoplasia," the one that gave us

20  the multiple-factor effect that we talked about earlier.

21          MR. McCOY:  Sam, we need a copy of 428 for

22  these.

23          THE WITNESS:  Here.  I've got two if you want

24  to give that to counsel.

25          MR. McCOY:  That's probably why you don't have

KINSER v. CBS CORP., Case No. 94-2282

1    one.  I apologize for that.

2             MS. EZELL:  I got one.

3             THE WITNESS:  Oh, you've got one?

4             MS. EZELL:  Thank you, Mr. McCoy.

5    BY MR. McCOY:

6         Q    Dr. Frank, are these all publications that you

7    consider reliable in your field of occupational medicine?

8         A    Yes.

9         Q    Okay.  And what, what does this literature

10   establish in terms of this question of whether you need a

11   diagnosis of asbestosis to attribute lung cancer to the

12   exposures?

13        A    What these papers speak to -- and they're not

14   the totality of the writings on this subject; there are

15   certainly articles that one could find that say

16   otherwise.  But all of these articles -- that I find

17   authoritative and reliable, are in large part written by

18   people I know and have worked with -- go to the prospect

19   of not needing asbestosis to say that asbestos causes

20   lung cancer.

21        Q    Are you familiar with the views -- Dr.

22   Selikoff, he's passed away now, right?

23        A    He passed away in 1992.  Yes, sir.

24        Q    Okay.  So, are you -- were you familiar with

25   his views about this question of whether you have to have

KINSER v. CBS CORP., Case No. 94-2282

1   a diagnosis of asbestosis to relate to lung cancer?

2           MS. EZELL:  Objection, Your Honor.  It calls

3   for hearsay.  He's asking for Dr. Selikoff's opinion on

4   this, via this witness.

5           THE COURT:  He's, he's -- he has only asked

6   him:  Is he familiar with, with some document, is what I

7   understand.  Is that what you've done?

8           MR. McCOY:  I've asked him if he's familiar

9   with Dr. Selikoff's views on this topic.

10          THE COURT:  Well, how, please, would that not

11  be hearsay?

12          MR. McCOY:  I was just offering it for the

13  purposes of -- I mean, it would be equivalent to someone

14  who's an authority in the field expressing their, their

15  views on it.

16          THE COURT:  I -- the way I hear the question

17  now is:  You're asking Dr. Frank to tell us what Dr.

18  Selikoff's views were, and that would be hearsay.

19          MS. EZELL:  Yes, sir.

20          MR. McCOY:  Okay.

21          THE COURT:  Sustained.

22          MR. McCOY:  Okay.

23  BY MR. McCOY:

24      Q    So, if -- changing subjects now -- if Mr.

25  Kinser quit smoking in 1984, does this make it more or

KINSER v. CBS CORP., Case No. 94-2282

1   less likely he would develop a lung cancer in 2000?

2       A    It would make it less likely because of the

3   decreasing risk over time of giving up cigarettes.

4       Q    And can you give us some background about the

5   statistical evidence on what happens when a person quits

6   smoking to the risk of lung cancer?

7       A    Well, we talked about that earlier.  The

8   Markowitz paper speaks to --

9           THE COURT:  I believe this is cumulative, and I

10  have --

11          THE WITNESS:  We did talk about it earlier

12  today.

13          THE COURT:  Yes.  And I'm trying to urge you

14  along.

15          MR. McCOY:  Right.  Okay.  We'll --

16          THE WITNESS:  It goes down.  We'll just leave

17  it at that.

18          MR. McCOY:  Right.

19  BY MR. McCOY:

20      Q    Are, are these conditions -- like emphysema, is

21  that a marker of tobacco exposure?

22      A    It is the most -- the most common cause of

23  someone developing emphysema is cigarette smoking.  It's

24  not the only cause, but the most common.

25      Q    And let's just assume, then, that one of the

KINSER v. CBS CORP., Case No. 94-2282

1    primary physicians caring for Mr. Kinser is correct that

2    Mr. Kinser does not have the findings of emphysema.

3            What do the absence of those findings mean when

4    you look at the question of whether the lung cancer can

5    be attributed to tobacco?

6        A    It's basically irrelevant.  You don't need to

7    have emphysema to develop lung cancer.  What we have is a

8    history of smoking and secondhand smoke.  That is

9    sufficient to establish a relationship.

10           But the fact that he does or doesn't have

11   emphysema -- if he, in fact, did not have emphysema, then

12   it speaks to his cigarette smoking not being sufficient

13   to cause it, because he doesn't have it.

14       Q    And, Dr. Frank, if people lived into their 50s,

15   60s, or 70s, would they have asbestos in their lungs even

16   if they did not work in powerhouses?

17       A    Absolutely.  Everybody -- everybody in this

18   room has asbestos in their lungs, but in a much lower

19   level than someone who was occupationally exposed.  I

20   mean, much, much lower.

21       Q    Well, how -- is there any statistics on what

22   people would have who don't have the exposures in

23   occupational settings?

24       A    Sure.  In the 19--

25           MS. EZELL:  Objection, Your Honor.  I'm not

KINSER v. CBS CORP., Case No. 94-2282

1    sure of the relevance of the level of exposure of people

2    who haven't been occupationally exposed, given that this

3    case is about someone allegedly occupationally exposed.

4            THE COURT:  I don't know either.  If we're

5    going to talk about --

6            MR. McCOY:  Okay.  I'll withdraw the question

7    for the moment, Judge.

8            THE COURT:  Very well.  It's withdrawn.

9            MR. McCOY:  Right.  Yeah.

10   BY MR. McCOY:

11       Q    If, if the United States Government statistics

12   report, Dr. Frank, that over 80 percent of the lung

13   cancer cases are related to smoking, does that mean that

14   asbestos is unlikely to be the cause of Mr. Kinser's lung

15   cancer?

16       A    Absolutely not.  The reason most lung cancers

17   are related to smoking is because:  Of all the many

18   carcinogens, the most common one is cigarettes.  And so

19   more people smoke than are exposed to asbestos or arsenic

20   or radiation, and so most cancers are going to be related

21   to cigarettes.

22           That doesn't mean that all the other factors,

23   if someone has them, didn't play a role in someone

24   developing cancer.

25           MR. McCOY:  That's all the questions I've got.

KINSER v. CBS CORP., Case No. 94-2282

1    Thank you.

2              THE WITNESS:  You're welcome.

3              THE COURT:  Cross-examination, please.

4              MS. EZELL:  Yes, sir.

5              THE COURT:  Let me say something first before

6    you begin.

7              Do you have an iPad so you can take iPad

8    pictures of the, of what Dr. Frank wrote on that, on

9    those charts and put them in the record electronically?

10   Because if you don't, I do.

11             MR. McCOY:  We can do that, Judge.  Yes.

12             THE COURT:  But you probably have an iPad.  So

13   I suggest you take an iPad photograph and hook it on an

14   email and send it to the clerk, and it will go into the,

15   into the court record.

16             DEPUTY CLERK:  Can I just pull those pieces of

17   paper and put them in the court record?

18             THE COURT:  If you what?

19             DEPUTY CLERK:  Can I just take the paper and

20   put them in the court record?

21             THE COURT:  We're paperless.  How are you going

22   to send that to the Court of Appeals?

23             DEPUTY CLERK:  Our exhibits are all paper, and

24   we do send --

25             THE COURT:  Well, this is -- then we will use

KINSER v. CBS CORP., Case No. 94-2282

1   this advanced method.

2          I was on the original national committee that

3   computerized the courts, so I'm a big proponent of --

4          MR. McCOY:  We'll do that, Judge.  We'll get

5   it.

6          THE COURT:  Yeah, just -- it's easy.  Take an

7   iPad, stick it on an email to the clerk, and bing.

8          CROSS-EXAMINATION BY MS. EZELL:

9   Q    Good afternoon.

10  A    Good afternoon.

11  Q    I'm Sandra Ezell.

12  A    Hello, Ms. Ezell.

13  Q    Nice to meet you.

14  A    First time we've had interactions, I believe.

15  Q    Yes, sir.

16         But that is not for lack of trying on your

17  part, is it?

18  A    Well, I don't try to have interactions.  I try

19  to stay away from courts, but sometimes people decide

20  they want to have trials.

21  Q    You've testified in, probably, 1700

22  depositions, right?

23  A    Something like that.

24  Q    Close to 200 trials?

25  A    160 or so is where I think we're at, but it's

KINSER v. CBS CORP., Case No. 94-2282

1    getting close to 200.

2         Q    Okay.

3         A    That's in 35 years.

4         Q    Yes.

5              You've been testifying in asbestos litigation

6    about 35 years, --

7         A    Yes, ma'am.

8         Q    -- fair?

9              And you get paid -- I apologize.  And you

10   charge $400 an hour for your time spent working in this

11   litigation, which gets paid to wherever you're working at

12   the time, --

13        A    Well, --

14        Q    -- whichever university, correct?

15        A    -- it didn't start at 400, and the correct

16   figure now is 425 an hour.

17        Q    Oh.

18        A    And it all gets paid -- and it has been for

19   35 years -- to whichever university I've been working at.

20        Q    And that's what I said, right?  That it got

21   paid to your university?

22        A    Well, "to wherever I was working" is how you

23   put it.

24        Q    And did I state that correctly?

25        A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q      So "yes" would have been a good answer?

2             THE COURT:  Ask a question.

3      Q      Now, Mr. McCoy is one of the plaintiffs'

4   counsel that has paid you repeatedly over these 35 years

5   for the work that you've done; is that correct?

6      A      Well, again, nobody has paid me.  I've never

7   gotten a check; and on those rare occasions when they're

8   made out to me, they get sent back; but he has paid my

9   university, and not on numerous occasions.  I've done

10  reports for him, which he's paid me for; and I think this

11  is the third trial that I've done with him.

12     Q      Okay.  And as part of the, being a witness in

13  court -- in Federal Court in particular -- one of the

14  things that you have to do, sir, is maintain a list of

15  your testimony, correct?

16     A      Yes.

17     Q      And you have, in fact, complied with that rule,

18  starting in October of 1994, correct?

19     A      Yes.

20     Q      And you attach a copy of that testimony list to

21  the report that you prepared in this case, which we heard

22  you mention earlier today, correct?

23     A      Because it was in Federal Court, I was told I

24  needed to send a copy.  I always make them available if

25  asked.  Most of the cases I do are not in Federal Court,

KINSER v. CBS CORP., Case No. 94-2282

1   so they're not needed to be appended as it was in this

2   case.  But, yes, I make it available.

3        Q    So you did make it available.  Yes.

4             And did you bring it with you today?

5        A    No.

6        Q    All right.

7             MS. EZELL:  Your Honor, may I approach the

8   witness and hand him a copy of that?

9             THE COURT:  Yes.  You may approach the witness,

10  and you need not ask the Court's permission.

11            MS. EZELL:  I remember you told me that.  I'm

12  sorry.

13  BY MS. EZELL:

14       Q    Is that a copy of your report with your

15  testimony list appended to it?

16       A    Let me take a look.

17       Q    Yes, sir.

18       A    Yes.

19       Q    Okay.  Now, if you would turn, please, to

20  page 6 of your testimony list and look at testimony given

21  in July of 1998, do you see that?

22       A    Well, let me get to page 6.

23       Q    Yes, sir.

24       A    Yes.

25       Q    You see that you testified there on behalf of

KINSER v. CBS CORP., Case No. 94-2282

1    the Cascino Vaughan law firm?

2         A    Right.  But Mr. McCoy wasn't working with them

3    at that point.  I testified for Mr. Cascino at that time.

4         Q    But you haven't --

5         A    I've done work for the firm but not with Mr.

6    McCoy.

7         Q    And you have anticipated my question.  That is,

8    in fact, Mr. McCoy's law firm, correct?

9         A    Yes.

10        Q    All right, sir.

11             And then if you would turn to page 8, would you

12   agree with me that twice on that page the Cascino Vaughan

13   law firm, where Mr. McCoy now works, is listed; is that

14   correct?

15        A    Yes.  Oh, that's right.  I'd forgotten that

16   there was another -- one other nonasbestos case that I

17   did with Mr. McCoy.  I take that back.

18        Q    Yes, sir.

19             And if you would turn to page 11 of your

20   testimony list, would you agree with me that the very

21   first entry and the second-to-the-last entry are the

22   Cascino Vaughan law firm, and then Robert McCoy?  Would

23   you agree with me?

24        A    Right.

25        Q    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              And if you would turn to the very next page, --

 2      A    But that --

 3      Q    -- do you --

 4      A    But that wasn't a trial.  It was just a

 5   deposition.

 6      Q    It was testifying under oath, --

 7      A    Right.

 8      Q    -- correct, sir?  Yes, sir.

 9              The next page, page 12, Robert McCoy, on the

10   first -- or, I'm sorry, on January the 8th and then again

11   on, for a trial that started on March the 3rd, do you see

12   that?

13      A    Yes.

14      Q    You agree with me that you testified under oath

15   in those two cases?

16      A    Yes.  It's the same case.

17      Q    Yes, sir.

18              But you testified twice?

19      A    Once a deposition, once at trial.  Yes.

20      Q    Yes, sir.

21              And on page 14, Mr. McCoy appears again in a

22   case called "Elam"?

23      A    Which was the one we had the deposition of

24   earlier.

25      Q    Yes, sir.
```

KINSER v. CBS CORP., Case No. 94-2282

1          Sometimes you have to testify more than once,

2    correct, in a case?

3        A    Yes.

4        Q    Yes, sir.

5             And on page 17, you agree with me that you

6    testified on behalf of Mr. McCoy in the "Baron" case and

7    then again in the "Baren" case?

8        A    Where's the second one?

9        Q    Page 17.  One is "R. McCoy," and the other is

10   "Robert McCoy."

11       A    Right.  And they were both -- well, it looks

12   like -- they're spelled differently.  It may be two

13   different cases, but they were depositions.  They weren't

14   trials.

15       Q    All right, sir.

16            And if you turn to the very next page, page 18,

17   you've got "Baron" again for Robert McCoy?

18       A    Again, a deposition, not a trial.

19       Q    Yes, sir.

20            You testified on behalf of Mr. Cascino again.

21   And then the "Boren" case?

22       A    Right.

23       Q    All right, sir.

24            And then, even though you have kept track of

25   your testimony since 1994, you would agree with me that

KINSER v. CBS CORP., Case No. 94-2282

1  you changed the format in which you kept track of your

2  testimony on -- if you go to page 30, beginning in 2009,

3  correct?

4       A    Yes.  And the reason for the change is I was

5  told by a lawyer that the way I was keeping it wasn't in

6  compliance with Federal Rule 26; that simply doing it as

7  I'd been doing it for, from 1994 to 2009 was no longer in

8  compliance.  I now had to give the specific docket number

9  and the venue for the case.  So that's why the change.

10      Q    And as a result of that change and the way that

11 you keep your books, we can no longer tell from the list

12 that you provide how many times since 2009 you have

13 testified on behalf of the Cascino law firm -- Mr.

14 Cascino or Mr. McCoy -- based on the paperwork that

15 you've provided, correct?

16      A    Because that's not what's requested.  I

17 complied with, as I understand it, Federal Rule 26.

18      Q    And --

19      A    And if you really wanted to know, you could

20 pull up all these cases and see who the law firm was.  I

21 don't particularly keep track of which firms I work with.

22           But you're right.  From this list, I could not

23 tell you how many times I've testified on their behalf.

24      Q    Yes, sir.

25           And this will go faster if I ask you a "yes" or

KINSER v. CBS CORP., Case No. 94-2282

1    "no" and you say "yes" or "no."  And if you need to

2    explain, you can.

3         A    Well, that's what I'm doing.

4         Q    So --

5         A    I'm trying to explain --

6              THE COURT:  Excuse me.  If you want me to

7    admonish the witness, you ask me to do it.

8              MS. EZELL:  I'm sorry, Your Honor.

9              THE COURT:  Don't you admonish the witness.

10             MS. EZELL:  I apologize.

11             THE COURT:  Ask another question.

12             MS. EZELL:  Certainly.

13             THE COURT:  And as nearly as you can, Doctor,

14   give a direct answer.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Proceed.

17   BY MS. EZELL:

18        Q    So irrespective of why you changed your

19   record-keeping reasons, to comply with the rule or not,

20   as of 2009, we can no longer tell from the paperwork

21   provided how many times you've worked with Mr. McCoy's

22   office; is that correct, sir?

23        A    Without doing additional research, that would

24   be correct.

25        Q    And you have, though, in fact, testified, both

KINSER v. CBS CORP., Case No. 94-2282

1    in deposition and in trial for Mr. McCoy on numerous

2    occasions since 2009, correct?

3        A    I don't know what "numerous" means.  I recall

4    this is my third trial with him in the last three or four

5    years.  I -- if I testified between 2009 and, let's say,

6    2010 or '11, I have no specific recollection.

7        Q    In fact, in 2013, less than a year ago, in

8    Chicago, a few hundred miles from here, you testified in

9    a case called "Deon Wright"; and Mr. McCoy was counsel in

10   that case.  Do you recall that?

11       A    Yes.  I recall that was one of the three cases

12   that I've done with him in the last several years.

13       Q    All right, sir.

14            Now, you have indicated to us on a few

15   occasions that you do not personally receive any money

16   for the testimony that you give, correct?  You -- that

17   money goes from Mr. McCoy's office to the department or

18   to the university where you work, correct?

19       A    Yes.

20       Q    And, however, you would not want to put this

21   jury in mind that you do not receive some indirect

22   benefit from testifying in these cases, correct?

23       A    Absolutely not.  I wouldn't want to mislead

24   this jury or anybody else.  I said I get great benefit as

25   the department head by having extra secretaries, extra

KINSER v. CBS CORP., Case No. 94-2282

```
 1   faculty, by being able to work internationally, so I get

 2   indirect benefit.  I thought I clearly said that this

 3   morning.  But I've never put a penny in my pocket.

 4           MS. EZELL:  Your Honor, I think that was a

 5   "yes" or "no" question.

 6           THE COURT:  I think that was a responsive

 7   answer, counsel.

 8           MS. EZELL:  All right.

 9   BY MS. EZELL:

10       Q    And so it's fair to say that in addition to

11   those things that you mentioned, that you have also

12   received the benefit of having funded trips, numerous

13   trips, to China, Thailand, Sri Lanka, Italy, India,

14   Brazil, Japan, Romania, Switzerland, Turkey, and Egypt,

15   correct, sir?

16       A    You've left a few out; but, yes.

17       Q    Okay.  Fair enough.

18       A    All for work.

19       Q    And, and you worked in those places?

20       A    Every one of them.

21       Q    Yes, sir.

22       A    Sometimes getting off a plane at midnight and

23   lecturing at 9:00 the next morning.

24       Q    You enjoy your job, correct?

25       A    I love my job.
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    All right.

2    A    I think it's a great opportunity to work as a

3  physician and do what I do.

4    Q    Yes, sir.

5         And you have testified before that you work --

6  because you love your job, you work about 3,000 hours a

7  year on all of your different duties, on the things that

8  we heard you talk about this morning, correct?

9    A    It's a rare week I don't work as few as

10  55 hours, and some weeks I work 80 -- sometimes more --

11  hours a week.

12    Q    And, and you've testified before; you've given

13  a rough approximation that that turns out to be about

14  3,000 hours a year, correct?

15    A    Something like that.

16    Q    Yes, sir.

17         And you've indicated that the money that you

18  generate from testifying in asbestos cases that gets paid

19  to your university, which is currently Drexel, is in the

20  area of 350- to $400,000; is that correct?

21    A    Some years.  This past year, it was more.

22    Q    All right, sir.

23         And that you work in the asbestos arena on

24  these cases approximately 300 of those 3,000 hours a

25  year, correct?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    I don't recall.

2             The way I work is I have a one-hour minimum to

3   do a case if I do a review.  Not every case that I review

4   ends up with a deposition --

5        Q    And --

6        A    -- or a trial, so I don't know the number of

7   hours.  But there's a one-hour minimum, so I can look

8   at -- I probably work 300, maybe 400 hours a year doing

9   legal work.

10       Q    Right.  So -- and, and I believe you may have

11  anticipated my question.  So you work about 300 hours a

12  year, correct, between 300 and 400 hours, to be specific,

13  with what you've just indicated?

14       A    Something like that.

15       Q    And, yet, you make approximately $400,000 a

16  year, correct?

17       A    Yes.

18       Q    All right.  And you --

19       A    So doing the math --

20       Q    Okay.  Well, let me ask a question.

21            So, so if, if I do the math on that, if I

22  multiply 300 hours a year times $425 per hour, I come out

23  with $127,500 a year; and, yet, you, sir, have testified

24  on numerous occasions that you net triple that, if not

25  more, and last year over $400,000 a year, correct?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes.
 2             THE COURT:  Is that a simple question?  I would
 3   think it's very complex.
 4             MS. EZELL:  It might not be the most complex
 5   question we've heard today, Your Honor, but I do believe
 6   it is complex.
 7             THE COURT:  Ask him -- I think it all boils
 8   down to the last thing:  Does he make more than 400,000 a
 9   year?
10             MS. EZELL:  Well, and that's not -- if that's
11   the question you heard, I better ask a different
12   question.
13             THE COURT:  Okay.
14             THE WITNESS:  I answered your question "yes."
15             MS. EZELL:  Okay.  But the judge said it wasn't
16   a good one, so I'm going to ask you another one.
17             THE COURT:  I didn't say it wasn't good.  I
18   said it was very complex.
19   BY MS. EZELL:
20        Q    So, sir, the question is quite simply:  You
21   bill for about 900 hours a year, and you work about
22   300 hours a year, correct?
23        A    Or 400 hours.  And as I said, I have a one-hour
24   minimum.  Not every chart takes me an hour.  I can
25   sometimes do multiple charts in an hour.  And that also
```

KINSER v. CBS CORP., Case No. 94-2282

1    includes the money in there -- and it's not a lot, but

2    some of it is reimbursement for expenses.  I bought my

3    own ticket to come today.  Mr. McCoy will get a bill for

4    my ticket.  So part of that money is reimbursement.  I

5    paid for my hotel last night.

6            Some consulting that I do on the outside -- I

7    don't keep that either -- I put that into that same fund.

8    But most of it is litigation.

9            So, yes, I bill for more hours than the clock

10   would say I work; but there are reasons for it, mainly

11   because most of the work is letter writing, not court

12   testifying or depositions, and I can do more than one

13   case in an hour.

14       Q    And --

15       A    And, yet, I charge for, with a one-hour

16   minimum.  If that's a problem, I'm sorry.

17       Q    In spite of all of the explanations that you

18   have for that, you billed for at least twice as many

19   hours as you work a year, if not three times, correct?

20   And you've been doing that since at least 2010?

21       A    Yes.

22            THE COURT:  That's two questions.

23       A    Yes and yes.

24       Q    All right.  And you don't disclose that to your

25   clients, do you?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Every client knows -- I got a call last week

2  from a lawyer I never worked with.  And I, I go through a

3  whole litany with every lawyer to have them decide if

4  they want to work with me; and I tell them a number of

5  things.  I tell them they'll get a draft report, but they

6  can't change my opinion.  They can have me write the

7  report to meet the legal requirements of their

8  jurisdiction since I'm not a lawyer and they vary around

9  the country.

10          I tell them what my fee is, which is 425 an

11  hour, minimum one hour.  If I don't take an hour to write

12  a report -- because I dictate them and it goes a lot

13  quicker -- they'll still get billed for an hour.

14          I tell them I don't ask for a retainer.  I've

15  never accepted a retainer from anybody.  I bill when I do

16  work.

17          I tell everybody the same thing, and they all

18  know that's it.  Do I not disclose it?  Yes.  I think I

19  do.  Every lawyer knows I have a one-hour minimum to do a

20  case for them.

21    Q    Do they know that at the end of every year for

22  the past four years you have billed two to three times

23  more than you've actually worked?

24    A    Well, not every lawyer ever comes and does a

25  deposition.  But I assure you:  For most of the lawyers

KINSER v. CBS CORP., Case No. 94-2282

1  who I do plaintiffs' work for -- and I do mostly

2  plaintiffs' work -- the defense lawyers such as yourself

3  always ask me about this kind of thing; and in many

4  depositions I've disclosed, as I'm doing to you and to

5  this Court, that I bill for more time than I actually

6  spend on doing the work.

7      Q    And so the only way that they find out is

8  because a defense lawyer did the math and not because

9  when they call you to retain you to work on their cases

10 you say to them:  If I can get your work done and another

11 case done and another case done and another case done in

12 one hour, then I'm going to have a windfall?

13         You don't say that to them when they call you

14 and retain you, do you?

15     A    I tell them however long its takes me to do the

16 case, there's a one-hour minimum.  And if somebody sends

17 me ten pieces of paper and that's sufficient to write a

18 report, they know it doesn't take me an hour to read ten

19 pieces of paper and dictate a report on their case.

20         MS. EZELL:  I move to strike that answer, Your

21 Honor.  That was a "yes" or "no" question.

22         THE COURT:  No.  It wasn't a "yes" or "no"

23 question, and the answer may stand.

24         MS. EZELL:  All right.

25

KINSER v. CBS CORP., Case No. 94-2282

```
 1  BY MS. EZELL:
 2       Q    So let's talk about the report that you
 3  actually wrote in this case, which is -- did you bring --
 4  you did bring a copy of that; you have a copy of that up
 5  there, don't you?
 6       A    Is it okay if I take it out now?
 7       Q    You --
 8       A    You didn't want me to look at it before.  Can I
 9  look at it now?
10            THE COURT:  Now, don't you be pejorative
11  either.
12            THE WITNESS:  Oh, I'm sorry, Your Honor.
13  BY MS. EZELL:
14       Q    Now, what is the date of the report that you
15  have in front of you, sir?
16       A    I actually have two.  The first one is
17  September 16, 2011; and the other is March 25, 2013.
18       Q    All right, sir.
19            Now, prior to preparing these reports, you were
20  given certain materials by Mr. McCoy; is that correct?
21       A    Yes.
22       Q    And the materials that you were provided were
23  provided by him and chosen by him and not called out
24  specifically by you, correct?
25       A    Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

1          Q     He sent you deposition summaries, not full

2     depositions, correct?

3          A     Correct.

4          Q     He provided you with an exposure history,

5     correct?

6          A     Yes.

7          Q     Do you need to read that report in order to

8     answer my questions?

9          A     Well, I'm looking to see what, what was

10    provided.  It's in the second paragraph of my letter.

11         Q     Well, I --

12         A     So I want to be sure that I'm accurately

13    answering your question.

14         Q     It's okay --

15         A     I don't remember in each case exactly what I

16    got sent, so I'm reading from my report that, yes, I did

17    get a deposition summary and other materials.

18         Q     So, so you didn't do any independent analysis,

19    other than what you were told by Mr. Kinser's lawyer, of

20    what the totality of the medical records were, correct?

21         A     I didn't ask for his pediatric records or his

22    records from 50 years ago.  I got records that were

23    sufficient to answer the question that his lawyer put to

24    me.

25         Q     You don't know what you don't know; isn't that

KINSER v. CBS CORP., Case No. 94-2282

1  right, sir?

2       A    I know that there are more records than what I

3  got sent.

4       Q    And you don't know what they are, nor what they

5  say?

6       A    Correct.

7       Q    Did you receive the deposition, either

8  deposition, of a Dr. Scanlon?

9       A    I certainly didn't get the deposition, and I

10  don't recall if I had the deposition summary.  This is

11  2011, and I don't recall which depositions they were.

12       Q    Do you know as you sit there right now who in

13  the medical history of Mr. Kinser Dr. Scanlon is?

14       A    I believe that was his treating pulmonologist

15  some years ago.

16       Q    And do you know what event in Mr. Kinser's

17  medical history he's responsible for?

18       A    For what event?  No.  I don't even understand

19  that question.

20       Q    Okay.  Well, I will represent to you that Dr.

21  Scanlon is the pulmonologist who discovered that Mr.

22  Kinser had an adenocarcinoma of the lung.

23       A    Okay.

24       Q    Okay?  And I will also represent to you that

25  Dr. Scanlon was deposed in this case, not once but twice.

KINSER v. CBS CORP., Case No. 94-2282

1    And so now, now that you know that, were you -- let me

2    ask you this question:  Is it normal for an expert

3    witness, such as yourself, to receive transcripts of

4    depositions from time to time that are essential for them

5    to render their opinions in cases such as this?

6         A     That's a very general question.  The answer:

7    From time to time, yes.  Most of the time, I don't read

8    depositions because I trust plaintiffs' attorneys, when

9    they send me facts about the case, that they're

10   accurately representing them; and I prefer not to waste

11   their clients' time and expenses, actually, for me to

12   read depositions, which generally don't add anything to

13   what a lawyer's characterization of the case might be.

14        Q     But you would agree with me, sir, that, had you

15   read Dr. Scanlon's deposition, you may have discovered

16   something that the treating doctor for Mr. Kinser's lung

17   cancer stated, that Mr. McCoy, for whatever reason, did

18   not share with you in this case?

19             MR. McCOY:  Your Honor, I object to that

20   question.

21             THE COURT:  Yeah.  Sustained.

22             MR. McCOY:  Thank you.

23             THE COURT:  Form of the question.

24   BY MS. EZELL:

25        Q     You don't know what was left out of the medical

KINSER v. CBS CORP., Case No. 94-2282

1  summaries that you received, do you, sir?

2      A    Again, as you correctly and succinctly put it,

3  I don't know what I don't know.  I know what I know.

4      Q    I would like you to assume that Dr. Scanlon

5  testified that Mr. Kinser does not have asbestosis.

6      A    I'm aware of that.

7      Q    He testified to it at his deposition.

8      A    I'm aware of that.

9      Q    And he also addressed another issue, which you

10  talked about, with regard to some of the medical records

11  that you brought here today.

12          And let me, let me back up.  You presented,

13  after the lunch break, a number of medical records that

14  you had reviewed where you picked out the word

15  "asbestosis."  Do you recall that?

16      A    Yes.  My short-term memory still works.

17      Q    Yes, sir.

18          And at -- when, in your preparation for coming

19  here to trial to testify, did you go through and identify

20  those records as being records that were important to

21  share with the jury?

22      A    I probably first saw those records when I wrote

23  my report, or at least some of them; in preparation for

24  coming here, working with Mr. McCoy over the last few

25  days, we arrived at those records.  Some work we did last

KINSER v. CBS CORP., Case No. 94-2282

1   week and over the weekend; some we did last night.

2       Q    Yes, sir.

3            And on the specific issue of bringing records

4   that had the word "asbestosis" in them, when did you do

5   that preparation work?

6       A    Picking out specific records to show to the

7   jury --

8       Q    Yes, sir.

9       A    -- was done yesterday.

10      Q    Okay.  And one of the records which you picked

11  out was a record by a doctor -- we have an agreement,

12  Ms. Jessica, about showing medical records that have not

13  previously been admitted, and this is one such record.

14  Thank you.

15           One of the records that you pointed out with

16  Mr. McCoy earlier today -- do you recall this record?

17      A    Yes, Dr. Palmer, the surgeon.

18      Q    Dr. Palmer, yes, I circled that when you said

19  it; and I even highlighted "asbestosis."  Do you see

20  that?

21      A    Yes.

22      Q    And it's dictated on 9/1 of 2000, and it didn't

23  get typed for a couple days.  And then you mentioned his

24  thorax being noncompliant because of asbestosis and

25  benign fibrous plaquing.  Do you remember that?

KINSER v. CBS CORP., Case No. 94-2282

```
 1          A     Yes.

 2          Q     And do you remember testifying when you had

 3     this document up that he found, quote, both --

 4          A     That's what he --

 5          Q     -- asbestosis and --

 6          A     That's what he says.  The word "and" is there.

 7     It's not:  Asbestos is characterized by plaquing --

 8                 MS. EZELL:  Your Honor, I didn't finish my

 9     question.

10                 THE WITNESS:  Oh, I'm sorry.

11                 MS. EZELL:  I apologize.

12     BY MS. EZELL:

13          Q     Do you remember testifying when you had this

14     document on the, with Mr. McCoy, that this doctor found

15     both asbestosis and pleural plaques?

16          A     I so testified because that's what his record

17     that he dictated said.

18          Q     Indicating that this doctor thinks they are

19     different; asbestosis and pleural plaques are not the

20     same thing?

21          A     I don't know what he thinks.  I mean, I, I know

22     that he separates "asbestosis" and "pleural plaquing."  I

23     can't say -- you know, in the various ways you could

24     construct what you call something, I don't know how he

25     views it.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Is that a fair reading of that "and"?

2      A    I think it's a fair reading of the "and."

3      Q    Yes, sir.

4           And had you read Dr. Scanlon's deposition, you

5    may have been -- had available to you some information

6    that the jury's going to hear later that Dr. Scanlon

7    specifically addressed Dr. Palmer's misidentification of

8    asbestos --

9      A    Asbestosis.

10     Q    -- asbestosis in this note; but you didn't have

11   that available to you, did you?

12          MR. McCOY:  Your Honor, I object to the --

13          THE COURT:  Sustained.

14          You do it in the beginning of your question.

15   You:  Now, there's something you haven't seen, but do you

16   agree it says this?

17          Now, go on.  Ask a question.

18          MS. EZELL:  All right, sir.  I think we'll just

19   go to the next thing.

20   BY MS. EZELL:

21     Q    Did you -- do you know who Dr. Barrett is as it

22   relates to this case?

23     A    Yes.

24     Q    And do you understand that he is, in fact, a

25   "B" reader?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.  He's a pulmonologist and a "B" reader,

2  and I've known of Dr. Barrett back into the early 1980s.

3    Q    And did Mr. McCoy provide you with a copy of

4  his report in this case?

5    A    I believe he did.  Yes.

6    Q    And do you recall from your reading -- did you

7  bring that with you today?

8    A    No.

9    Q    Did you -- did you read it?

10    A    If you provided it to me, I would read it.

11  Yes.

12    Q    Okay.  And you recall that Dr. Barrett, who is

13  a certified "B" reader, did not, in fact, find asbestosis

14  in Mr. Kinser, correct?

15    A    He found bilateral pleural plaques, and he

16  found no parenchymal changes that he considered to be

17  asbestosis.

18    Q    All right, sir.

19         And are you familiar with a Dr. Schonfeld?

20    A    Yes.

21    Q    And, in fact, in your initial report to Mr.

22  McCoy, you indicate -- second paragraph -- that the

23  materials that were sent to you included Dr. Schonfeld's

24  records, correct?

25    A    Yes.  And Dr. Schonfeld has one or two "B"

KINSER v. CBS CORP., Case No. 94-2282

1   readings in which he, too, did not find any evidence of

2   parenchymal disease and not --

3        Q    Let me ask a question.

4        A    Well --

5        Q    All right.  And this is also a medical record

6   that has been agreed to.

7             DEPUTY CLERK:  What's that exhibit number?

8             MS. EZELL:  Oh, I'm sorry.  It's part of Group

9   Exhibit, Medical Records Group Exhibit 2237.

10  BY MS. EZELL:

11       Q    And as one of the medical records that was

12  contained in Dr. Schonfeld's records was this letter that

13  you reviewed sometime prior to your writing your report,

14  September 16th of 2011, correct?

15       A    It's a 1994 report.  Yes.

16       Q    All right, sir.

17            And the report, which is -- can we zoom out

18  just a little bit?

19            DEPUTY CLERK:  Absolutely.

20            MS. EZELL:  Okay.  There we go.

21  BY MS. EZELL:

22       Q    This is a report that's signed by

23  Dr. Schonfeld -- and you know who he is, correct?

24       A    Yes.

25       Q    And he is someone that you understand has also

KINSER v. CBS CORP., Case No. 94-2282

1    testified on behalf of the plaintiffs that Mr. McCoy has

2    represented, correct?  In cases where you've also been

3    involved?

4         A    That -- I don't know who he's testified for

5    other than other cases that I've done for other attorneys

6    where I know he's testified.  I don't know -- and I did

7    not know until you just told me -- that he's testified

8    for Mr. McCoy.

9         Q    Fair enough.

10             And you see that this letter is actually not

11   written to Mr. McKinser -- to Mr. McKinser -- to Mr.

12   Kinser, but it's written to the Cascino Vaughan law firm,

13   where Mr. McCoy works, correct?

14        A    As was my letter, yes.

15        Q    Yes, sir.

16             And he is, is -- as stated in this letter, also

17   a NIOSH-certified "B" reader, correct?

18        A    Correct, which I am not.

19        Q    Yes, sir.

20             And he indicated that he reviewed chest x-rays

21   of Mr. Kinser on September the 11th of 1994, and he --

22   well, you tell me:  What were his findings?

23        A    Bilateral pleural thickening and

24   calcifications.

25        Q    And where do you see, when I say --

KINSER v. CBS CORP., Case No. 94-2282

1       A    They I don't say "bilateral."  I'm sorry.

2  Pleural thickening and calcification.

3       Q    Okay.  All right.

4       A    Twenty years ago.

5       Q    Yes, sir.

6            Now, you have -- you already indicated to us

7  that, in preparing for the work that you did in this

8  case, you relied on Mr. McCoy's representation of Mr.

9  Kinser's exposure history, correct?

10      A    Correct.  And he gave it to me again in court

11 as a hypothetical, to which I answered his questions.

12      Q    Yes, sir.

13           But I'm not talking about in court; I'm talking

14 about prior to preparing your opinions and writing your

15 report.  He conveyed to you in some form or fashion,

16 either in writing or via telephone, what Mr. Kinser's

17 exposure history was, correct?

18      A    In writing, yes.

19      Q    Okay.  And you indicated earlier today that you

20 had been to a number of power plants and other types of

21 plants; is that correct?

22      A    Yes.

23      Q    But you've never been to the Zion plant, have

24 you?

25      A    That's also correct.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    Okay.  And let's see, I would like, Ms.

 2   Jessica, to show the witness an exhibit but not the jury.

 3   It's a demonstrative.

 4              Can I see it when he's seeing it?  Oh, no.

 5              DEPUTY CLERK:  You can see it, right?

 6              THE WITNESS:  I can see it.

 7              MS. EZELL:  Okay.

 8              THE WITNESS:  But you have it in front of you.

 9              MS. EZELL:  Oh, no.  I just didn't know if --

10   can Mr. McCoy see it?

11              MR. McCOY:  I don't have anything on our

12   screen.  No.

13              MS. EZELL:  No?  Okay.  Did --

14              MR. McCOY:  I'll be happy to go to look at it.

15              MS. EZELL:  You want to come and just look at

16   it --

17              MR. McCOY:  Sure.

18              MS. EZELL:  -- really quick, and I don't know

19   if you'll even object to it.

20              MR. McCOY:  Oh, okay.

21              MS. EZELL:  It's just from yesterday.  I'm just

22   going to go over this part of it with him.

23                   (Brief pause in proceedings.)

24              MR. McCOY:  Yeah, sure.  It's all fine.  Go

25   right ahead.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Okay.  And with agreement, Your
 2    Honor, I'd request permission to display this
 3    demonstrative.
 4              THE COURT:  Absent objection, you may.
 5              MS. EZELL:  Thank you, Your Honor.
 6              All right.  Do you remember testifying earlier
 7    today that if you --
 8              MR. McCOY:  Your Honor, can we just have some
 9    background on, on how this -- what this is, though,
10    before he's questioned on it?
11              THE COURT:  Does the jury have this document in
12    front of them?
13              MS. EZELL:  Not yet.
14              THE COURT:  Not yet?  Okay.
15              MS. EZELL:  All right.
16    BY MS. EZELL:
17         Q    Do you remember earlier today creating -- can
18    you see this from there, sir?
19         A    Yes.
20         Q    Okay.  You created this chart.
21              Can everybody see it?  Okay.
22              And you drew this -- this is your dose-response
23    chart, right?
24         A    I can see it.
25         Q    Okay.  And you said that, you know, if you
```

KINSER v. CBS CORP., Case No. 94-2282

1   worked somewhere for a month, you had two times the

2   chance of getting lung cancer.  Do you remember that?

3       A    If you worked for a month with exposure to

4   asbestos in one setting, that would be the case.

5       Q    Yes, sir.

6            And you said, though, if you worked there two

7   years, you'd have seven times the risk.  Do you remember

8   saying that, sir?

9       A    Yes.

10      Q    Okay.  Now, with that in mind, I'd like to show

11  this agreed-to demonstrative; and what this is --

12           MR. McCOY:  Your Honor, Your Honor, just -- I'd

13  like to get some background on where this document came

14  from for the jury, just so they understand that.

15           MS. EZELL:  This is the, the slide shown

16  yesterday in opening with regard to the plaintiff's work

17  history.

18           MR. McCOY:  All I'm saying, Judge, is that this

19  is a document that the defense counsel put together.

20  This is their summary.  It's not something Dr. Frank saw

21  before or created.

22           THE COURT:  Is this a creation of yours, Ms.

23  Ezell?

24           MS. EZELL:  Yes, Your Honor.

25           THE COURT:  Okay.  That's, that's all he wants

KINSER v. CBS CORP., Case No. 94-2282

```
 1   to know.

 2           MS. EZELL:  Okay.

 3           THE COURT:  And you've agreed that everybody

 4   may look at it, so go ahead.

 5           MS. EZELL:  Thank you.

 6   BY MS. EZELL:

 7       Q   All right.  And I'll, I'll -- I'll show you

 8   because you weren't here yesterday, but we went through

 9   Mr. Kinser's life timeline in a number of different ways.

10           And starting in 1962 -- you may or may not know

11   this -- he moved to Champaign, and he joined this

12   Pipefitters, Plumber and Pipefitter Local 149.

13           And then he started working as a pipefitter at

14   that time, his first job being at the University of

15   Illinois at Champaign; and he worked on and off there

16   from 1962 to 1996.

17           Then in 1963 to 1995, covering -- what is

18   that? -- 32 years, he worked at all of these different

19   places on and off for 30-some-odd years.

20           Moving to 1963, he worked at the Pennsylvania

21   Residence Hall; and in 1964, he worked at the Abbott

22   powerhouse.

23           And I, I don't know if, if you were -- well,

24   you tell me.  Was this work history shared with you by

25   Mr. McCoy when you, when you received the exposure
```

KINSER v. CBS CORP., Case No. 94-2282

1    history of Mr. Kinser in this case?

2         A    No, because it was not his work history.  It's

3    your work history.  What he said to me was that he

4    began -- was a unionized member of the Plumber and

5    Pipefitters Local Number 149, beginning in 1962.

6              So what I was aware of is that he had that long

7    history and that he, he retired in 1996.  So I have the

8    same facts; I just don't have all of those details.

9         Q    Yes, sir.  Okay.

10             And so if, based on your dose-response diagram,

11   Mr. Kinser worked at these locations for more than two

12   years -- and let me just represent to you that none of

13   these sites are the Zion plant.  None of them on this

14   entire page are the Zion plant that's at issue in this

15   case.

16        A    I see that, Ms. Ezell.

17        Q    So if he worked at these locations -- and I'll

18   also represent to you that Mr. Kinser has testified that

19   they had asbestos on site.

20             According to you, the work that he did at these

21   locations would subject him to seven times the risk of an

22   asbestos-related disease -- of asbestos-related lung

23   cancer, correct?

24        A    Yes.

25        Q    Okay.  And would be more than sufficient for

KINSER v. CBS CORP., Case No. 94-2282

1  any other -- for an increased risk of any other

2  asbestos-related disease, correct?

3      A    I've so stated that, when I was given that

4  question by Mr. McCoy earlier.

5      Q    All right.  Now, --

6      A    And I'll agree that you're correct with your

7  statement to me as well.

8      Q    One of the -- oh, I'm -- I need to go back,

9  Jessica.  I'm sorry.

10          One of the places that he worked during 1963 to

11  1995 may look familiar to you, and I'm just going to

12  circle it on here.  It's called the Ashland Refinery.  Do

13  you know where that is?

14      A    I've been there.

15      Q    Yes, sir.

16          And, in fact, you worked as a consultant for

17  the Ashland Refinery from 1988 to 1994, and those dates

18  actually overlap with Mr. Kinser; do they not, sir?

19      A    Your statement is almost correct.  I was a

20  consultant to Ashland Oil Company, not just the refinery.

21  I served as a consultant to their many enterprises,

22  including their road paving division and their chemical

23  plants, but included the refinery; and, in fact, the very

24  first interaction I ever had with them, they invited me

25  to give a talk to their Health and Safety Committee on

KINSER v. CBS CORP., Case No. 94-2282

1    the hazards of asbestos, which I did.

2        Q    Yes, sir.

3            And you did that at the same time that Mr.

4    Kinser reports that he was being dispatched to that

5    location and -- because he was there off and on between

6    '63 and '95, and you were there between '88 and '94,

7    correct?

8        A    So our times would have overlapped, and he

9    would have been exposed to asbestos in his work as a

10   pipefitter at the Ashland Refinery.

11       Q    Yeah.

12           And did you ever meet him when you were there?

13       A    No.

14       Q    And did you, did you personally do anything for

15   him or any of his colleagues when you saw them smoking,

16   to say, "You need to stop smoking and get a new job.

17   This is very dangerous"?

18       A    Well, actually, when you're on the refinery

19   property, smoking's not allowed, so I never saw anybody

20   smoking.

21           The interactions I had were in the main

22   administrative building, most of the time.  I never saw

23   anybody smoke there.  I actually ended up working for a

24   number of years, as you pointed out, including working

25   with the director of their medical department.  I sent my

KINSER v. CBS CORP., Case No. 94-2282

1   residents there to train.  And one of the things we did

2   work on was a, sort of a health and wellness program,

3   which included stopping smoking.

4          So, yes, we did work with them and did work

5   with Ashland to institute anti-smoking and other issues.

6          They had an exercise facility there, which they

7   would let the workers use.

8          So, yes, I was involved in preventive

9   activities with Ashland.

10   Q    All right.  Let me ask better questions.

11          There was a smoking lounge, and there were

12   places for people to smoke at the Ashland facilities

13   during this time period, correct?

14   A    I don't know.  I never -- I never visited one.

15   I never saw anybody smoking at the refinery.  And I

16   assure you:  Around a refinery, in most places, you don't

17   want people smoking around gasoline, oil, and natural

18   gas.

19   Q    Certainly not in the area where that is stored.

20          But in 1963, people smoked on the job, and

21   accommodations were made for smokers; were they not?

22   A    I have to take your word for it.  I wasn't

23   there in 1963.  My first visit there would have been in

24   the late 1980s; and as far as I was aware, I never saw

25   anybody at the refinery smoke.  If there were smoking

KINSER v. CBS CORP., Case No. 94-2282

1  lounges, I did not see them.

2      Q    But you're aware of the statistics of how many

3  of the people in the trades were smoking because you

4  testified about that earlier today.

5      A    Sure.

6      Q    Yes.

7           And you never personally went up to Mr. Kinser,

8  or any of his colleagues, and gave him the information

9  that you're giving the jury today about the risk and the

10  dangers that he was in, working for the company that you

11  were consulting for, did you, sir?

12      A    That is correct.  I worked with the medical

13  director of the company to institute a company-wide

14  policy.  I didn't go worker by worker, asking, "Do you

15  smoke?"  And, you know, "Maybe it's not a good idea.  You

16  shouldn't smoke."  I did not do that.  You're correct.

17      Q    Did you make any signs and put them up?

18      A    Did I make signs?

19      Q    Did you make any signs?

20      A    No.

21      Q    Did you put up a warning sign of, of, "If

22  you're going to smoke, go work somewhere else"?

23      A    No.

24      Q    Did you put up a sign that said, "Asbestos can

25  be harmful to your health"?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    No.  OSHA regulations required that those signs
 2   be in place.
 3        Q    Starting when?
 4        A    Early 1970s.
 5        Q    1972?
 6        A    Early 1970s.
 7        Q    You worked at OSHA, and you worked at -- you
 8   worked at NIOSH, and you consulted for OSHA; and you know
 9   it was 1972, correct, sir?
10        A    I didn't work at NIOSH till the 1990s; and then
11   it was as a consultant, if you will.  I did not work at
12   OSHA.  I've been an advisor to them.  Yes.  I know that
13   the signs were required, starting in 1992 [sic].
14        Q    Thank you.
15             Okay.  You were discussing with Mr. McCoy --
16   Your Honor, I have quite a bit more material.  I'm not
17   sure when you wanted to take a break.  I'm just looking
18   up and seeing we're at the half hour.  I'm happy to keep
19   going or stop.
20             THE COURT:  Well, I, I want to tell you:  I'm
21   going to send this jury home, to get home in the daylight
22   today, because of the weather; and --
23             MS. EZELL:  I think that's a good idea.
24             THE COURT:  -- I'm not going to keep them here
25   past quarter to 4:00.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Okay.

 2              THE COURT:  So we'll have a short recess.  If

 3     you need a recess, jurors, you always can.

 4              MS. EZELL:  Okay.

 5              THE COURT:  We'll have a short recess.

 6                   (Jury absent, 2:33 p.m.)

 7                   (Recess, 2:33 p.m. to 2:43 p.m.)

 8                   (Discussion off the record

 9                   between the Court and counsel.)

10                   (Jury present, 2:47 p.m.)

11              THE COURT:  Please be seated.

12              All right.  Ask another question, Ms. Ezell.

13              MS. EZELL:  Thank you, Your Honor.

14     BY MS. EZELL:

15         Q    Just prior to the break, you and I were

16     discussing, sir, what date the OSHA standards were

17     enacted; and I'm not sure if I misheard, but did you say

18     "1992" or "1972"?

19         A    I said 1972.

20         Q    Okay, thank you.

21         A    But there actually have been multiple standards

22     since that first one.

23         Q    I apologize.  I'm taking care of my electronics

24     here.  Can you hear me now?  Okay.

25              But the first one, which would have covered the
```

KINSER v. CBS CORP., Case No. 94-2282

1   Zion plant which came online in 1973, was enacted in

2   1972, correct?

3       A    Yes.

4       Q    All right, sir.

5            Do you agree that there are at least 3- to 400

6   chemicals in cigarettes?

7       A    Yes.

8       Q    And of those 3- to 400 chemicals, at least

9   three dozen of those have been determined to be

10  cancer-causing agents?

11      A    Yes.

12      Q    And, in fact, one of them is a radioactive

13  material, referred to as Polonium-210, correct?

14      A    Yes.

15      Q    And that one has been linked to cancer due to

16  its ability to bind with other cancer-causing agents,

17  correct?

18      A    I can answer "yes" to the first part of the

19  question.  I've not read anything about the second half

20  of that question, about the binding.

21      Q    All right, sir.

22      A    Actually, radioactive materials combine to

23  asbestos.  That has been shown as far back as 1915, but I

24  can't speak to it the way you've put it to me.

25      Q    One of the chemicals found in cigarette smoke

KINSER v. CBS CORP., Case No. 94-2282

 1    is a radioactive material called Polonium-210, which is

 2    known to cause cancer?

 3         A    Yes.

 4         Q    All right, sir.

 5              And irrespective of any other chemical

 6    exposure, smoking by itself causes cancer?

 7         A    Without question.

 8         Q    And secondhand smoke, irrespective of whether

 9    you are a smoker, causes lung cancer, correct?

10         A    I don't understand the question.  It's not

11    "irrespective" if you are a smoker.  Secondhand smoke

12    will cause cancer in people who are not direct smokers.

13    Yes.

14         Q    All right, sir.

15              And you are familiar with the National

16    Institute of Health; are you, sir?

17         A    Considering I worked there, yes.

18         Q    And you would consider it one of the foremost

19    medical research centers, correct?

20         A    Using that description, yes.

21         Q    All right, sir.

22              MS. EZELL:  By agreement, Your Honor, I'd like

23    to show to the jury Defense Demonstrative Number 2.

24         Q    All right.  Do you recognize this chart taken

25    from the National Institute of Health, which describes

KINSER v. CBS CORP., Case No. 94-2282

1    the lag time between smoking consumption in the United

2    States and the incidence of lung cancer in men?

3        A    I don't use this exact chart, but I use one

4    very similar to teach my students.  Yes.

5        Q    All right, sir.

6             And earlier you described the correlation

7    between dose and response -- I wrote it down as "ham and

8    eggs or salt and pepper."  Do you remember using those

9    terms?

10       A    Yes.

11       Q    And this is an example of that; wouldn't you

12   agree?

13       A    No.  It wasn't dose-response.  It was signal

14   tumors.

15       Q    Signal tumors.  I apologize.

16       A    All right.  It wasn't, it wasn't dose-response.

17       Q    And, nevertheless, this is also one of those

18   things that just kind of goes hand-in-hand, like ham and

19   eggs and salt and pepper, because what we've got here, if

20   I'm correct, is we've got a cigarette consumption line

21   matching almost identically with a lung cancer line in

22   the United States in men.

23             Do you agree with that, sir?

24       A    That -- yes.  And that's part of the reason I

25   agree that cigarette smoking causes lung cancer.  There's

1    many lines of evidence.  This is one of them.

2         Q    All right, sir.

3              Now, you talked about the fact that Mr. Kinser

4    was addicted to, to tobacco.  Do you remember talking

5    about that with Mr. Kinser?

6         A    Oh, I never said that Mr. Kinser was addicted.

7    I said smokers are addicted.  I can't speak to Mr.

8    Kinser.  Mr. Kinser actually gave up cigarettes in 1984.

9    I don't know if he had to overcome addiction or not.  I

10   haven't discussed that with him, and the medical records

11   don't speak to that.

12             I talked about cigarette smoking being

13   addictive.  I never used that to specifically refer to

14   Mr. Kinser.

15        Q    Okay.  In fact, there is a, a medical formula

16   for determining whether or not somebody is, in fact,

17   addicted to cigarettes, correct?

18        A    I'm not aware of such a formula that you speak

19   of.

20        Q    Are you, are you familiar with the DSM-IV?

21        A    The psychiatric --

22        Q    Yes, sir.

23        A    I know that it exists.  I'm not familiar with

24   its details.  I'm not a psychiatrist.

25        Q    Okay.  In any event, you spoke about addiction

KINSER v. CBS CORP., Case No. 94-2282

1  with Mr. McCoy earlier today, correct?

2      A    I did.

3      Q    But you would agree with me that the addiction

4  to cigarettes is not the issue when determining the

5  causative factor for lung cancer; it's actually the

6  carcinogens in the cigarettes, correct?

7      A    I agree.

8      Q    So irrespective of whether or not he was a

9  smoker by choice or a smoker by addiction, it's the fact

10 that he took in carcinogens that made him predisposed to

11 lung cancer, correct?

12     A    Yes.

13     Q    All right, sir.

14          Now, you indicated when you were talking with

15 Mr. McCoy that you had reviewed Mr. Kinser's current

16 medical condition and that you believed that his

17 conditions were either correctable or treatable.  Do you

18 recall saying that earlier today?

19     A    Yes.

20     Q    And do you believe, as you sit here now, that

21 you have a full and complete understanding of all of Mr.

22 Kinser's medical conditions?

23               (Brief pause in proceedings.)

24     Q    Do you require some documents in order to

25 answer that question?  It's fine if you do.

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.  I do need some documents --

2    Q    Okay.

3    A    -- because I want to be accurate in my answer

4 to you.

5    Q    Absolutely.

6    A    What I have here is a report of June 14, 2013,

7 so that's as recently as six months ago.  I can't speak

8 to anything that may have developed in the last six

9 months.

10        But what I can say is:  His doctor at that time

11 had a list of 19 active problems.  I think that's a

12 pretty comprehensive list.  There is an error on here.

13 Number 14 mischaracterizes the type of lung cancer he

14 had.  But other than that, I think this is a pretty

15 comprehensive list of what his problems are.  And if he's

16 developed something since then, I have to confess:  I'm

17 not aware that that's the case.

18    Q    Yes, sir.

19        And which doctor is that that you are referring

20 to?

21    A    This is signed by Dr. Weinreich,

22 W-e-i-n-r-e-i-c-h, signed on June 14, 2013, who's the

23 author of this report.

24    Q    And on -- in June of 2013, what other doctors,

25 if you know, was Mr. Kinser treating with for any other

KINSER v. CBS CORP., Case No. 94-2282

1    conditions or ailments?

2        A    I do not know.

3        Q    Okay.  Do you know whether or not Mr. Kinser is

4    currently being treated on a daily regimen of any

5    medications?

6        A    Again, I have a list of medications that he was

7    taking as of June.  I presume some of these he is still

8    taking, but I can't speak with any authority past June

9    14, 2013, as to what medicines he's currently taking.

10       Q    All right, sir.

11            Are you aware, as you sit there today, of Mr.

12   Kinser's medical history?

13       A    Yes.

14       Q    You've represented that you believe you have

15   his current medical condition there in your hand.  Are

16   you aware of his complete medical history?

17       A    Well, again, I can't speak to what I don't

18   know, but I can speak to what's here, which is his

19   cardiovascular history, his respiratory history, disease

20   management, pulmonary review of systems, and active

21   problems.

22            If there are other things besides this note,

23   I'm not aware of them.

24       Q    All right, sir.

25            MS. EZELL:  Your Honor, by agreement, I would

KINSER v. CBS CORP., Case No. 94-2282

1    like permission to display Defense Demonstrative

2    Number 3.

3        Q    All right, sir, having reviewed Mr. Kinser's

4    medical history, I would like you to -- first of all, let

5    me orient you just briefly with this document.

6            Are you familiar with this?  Have you seen this

7    before?

8        A    No.

9        Q    This document, as you can see down here, is

10   sourced by the U.S. Department of Health and Human

11   Services.  And this diagram indicates cancers and chronic

12   diseases associated with smoking; and over here is a,

13   "Secondhand Smoke," diseases that can manifest in

14   children and adults.

15           Do you see that now?

16       A    Yes.

17       Q    All right.  I would like to walk with you

18   through, since you've reviewed Mr. Kinser's medical

19   records, the diseases which you're aware of that he has

20   manifested assoc-- that are also associated with smoking.

21           Did you, in your review of his records, find

22   that he had COPD?

23       A    Some doctors claimed that he did.  Some said

24   that he didn't.

25       Q    Okay.  I'm showing you now Defendant's

KINSER v. CBS CORP., Case No. 94-2282

1    Exhibit 2203, which a medical record that by agreement

2    may be shown to the jury.  This is a diagnostic record

3    from that same diagnostic group that you showed us

4    earlier with Mr. McCoy.  Do you see where I have

5    highlighted "COPD is present"?

6        A    Yes.

7        Q    Okay.  And so in your review of the medical

8    records, you saw this term, "COPD," occur on other

9    occasions as well?

10       A    Yes.  But that's a radiologist's report, and

11   radiologists don't make that diagnosis.  That's a

12   clinical diagnosis that an internist or pulmonologist

13   ought to be making.

14            You can't make a diagnosis of COPD from an

15   x-ray.  You can suggest it.  You can suggest that there

16   are changes consistent with COPD, which you would

17   certainly expect.  If you put it back up, the date was

18   two thousand --

19       Q    Eight.

20       A    -- eight.

21            Considering he had half of his lung out in

22   2000, the rest of the lung would have expanded to

23   compensate for that, which looks like COPD; but, again,

24   his treating pulmonologist did not feel he had COPD,

25   according to what I'm aware of.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Yes.

2         But if his treating pulmonologist comes here

3    and testifies that the he, in fact, does have COPD, that

4    would be news to you?

5    A    I don't know if it would be news.  If that's

6    what he testifies to, then I would agree that he has

7    COPD.

8    Q    Okay.  And you would agree with me that COPD is

9    also on this list of diseases that is associated with

10   smoking, correct?

11   A    Yes.  Could, could we maybe just short-circuit

12   this?  I could just take this and tell you which ones

13   that he has that are related to his smoking.

14   Q    Well, --

15   A    Would you allow me to do that?

16   Q    No.  I'm going to have to ask the questions.

17   That's, that's how we do it here.

18        THE COURT:  No.  Let her, let her ask her

19   questions.

20        THE WITNESS:  Yes, Your Honor.  I'm sorry.

21        THE COURT:  Thank you.  No.  That's all right

22   to volunteer to do that.

23   BY MS. EZELL:

24   Q    And you would agree with me that he had Stage

25   IIA lung cancer, non-small cell adenocarcinoma, correct?

KINSER v. CBS CORP., Case No. 94-2282

1      A     Yes.

2      Q     And so that would correlate with a lung cancer,

3  correct?

4      A     Yes.

5      Q     All right, sir.

6            And are you aware of his family history, which

7  also was noted in his medical records on numerous

8  occasions?

9      A     To a certain extent, I recall that there was

10 family history.  I don't recall all the details.

11     Q     Okay.  I'm showing you now from Defendant's

12 Group Exhibit 2222, of which the entire exhibit will be

13 proffered to the Court, another portion of that exhibit,

14 medical record, from the Mid-Florida Hematology and

15 Oncology Center.  Do you see that?

16     A     Yes.

17     Q     And do you see "Family History," where I've

18 highlighted in orange?

19     A     Yes.

20     Q     And could you just read that for the jury?

21     A     "Relevant for cerebral and aortic aneurysm."

22     Q     All right, sir.

23           And so did you -- is that significant as it

24 relates to smoking history for his family?  Aneurysms are

25 associated, right, if we look at --

KINSER v. CBS CORP., Case No. 94-2282

```
1      A    If I could be so gentle as to suggest:  You're
2   confusing two different things.  He is at risk and did
3   have an aortic aneurysm because he was a smoker.  His
4   family history has nothing to do with his smoking.
5           I don't know if the family members also smoked,
6   which would have put them at an increased risk, or if
7   there's an underlying disease that gives them weak
8   abdominal aortic walls.  And there are such conditions.
9   So I can't, I can't sort them out.
10          But, certainly, smoking is a factor that
11  increases having an aneurysm.
12      Q    And you were not provided by Mr. McCoy any
13  information about his family's smoking history?
14      A    If it was in the records, I don't recall it.
15      Q    Okay.  Let me represent to you that his father
16  smoked three packs a day; and his mother smoked as well,
17  but not to the same extent.
18      A    I knew that they were smokers; his parents were
19  smokers.  I didn't know the details of the history.  I
20  know that he has secondhand smoke.
21      Q    Are you aware of what his father died of?
22      A    No.
23      Q    I'm showing you now another part of --
24      A    It may have, it may have been in the records.
25  I just don't recall.  I remember reading about his
```

KINSER v. CBS CORP., Case No. 94-2282

1    father, and I forget -- he lived into his 90s, but I

2    don't recall what he died of.

3        Q    I'm showing you now Defendant's Exhibit 222

4    [sic], also part of that medical record we've been

5    reading, and if you could just read the orange part

6    there.

7        A    Well, I got the dates wrong.  "Father died in

8    his early 70s, secondary to emphysema.  Mother at" --

9    it's cut off -- "62 of cerebral aneurysm.  One brother is

10   alive and well."

11       Q    All right, sir.

12            And then, finally, also part of Defendant's

13   Exhibit 2222, another medical record, updating the family

14   history, if you can read that highlighted in orange.

15       A    "There is a very strong history of cerebral

16   aneurysms.  His mother died at age 63 from a ruptured

17   cerebral aneurysm, and his brother ruptured a cerebral

18   aneurysm at the age of 69 and is currently comatose and

19   in a vegetative state."

20       Q    So you'd agree with me, then, sir, that his

21   father who died of emphysema and his mother and his

22   brother who were stricken by aneurysms are all

23   susceptible to diseases that are associated with smoking,

24   correct?

25       A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    Now, you're aware that Mr. Kinser himself has
 2   suffered a, a stroke, correct?
 3        A    I believe that's in the records.  I don't --
 4   oh, let's see.  Actually, no.  I'm not aware that he had
 5   a stroke.
 6        Q    All right.  Do you ever -- I believe it's in
 7   your most recent medical record that he has -- well, let
 8   me just put it here.  Defendant's 2204, which is also a
 9   medical record that will be submitted in its entirety
10   later to the clerk, a medical record, I've highlighted in
11   orange -- if we could zoom in just a little bit,
12   Ms. Jessica.
13             Does that help you refresh your recollection as
14   to whether or not --
15        A    That's not a stroke.
16        Q    All --
17        A    That's a separate disease.
18        Q    All right.  And what is a "TIA"?
19        A    A transient ischemic attack, which is a
20   short-term, self-correcting reduction of blood flow to
21   the head and brain, which can, over time perhaps, give
22   someone, if they continue, stroke-like symptoms.  But a
23   self-correcting TIA is a transient, as the name implies,
24   limited neurologic episode involving the head.
25        Q    Are these often referred to as a "mini stroke"?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A     Some people may refer to them as "mini

2  strokes," but they're technically not strokes.

3      Q     All right, sir.

4            And has he taken precautionary measures so that

5  he will avoid having future strokes?

6      A     Yes.  He's taking aspirin.

7      Q     And in addition to that, has he gone, undergone

8  any procedures?

9      A     He had a carotid endarterectomy.

10     Q     All right, sir.

11           Now, one of the -- do you know what the number

12 one fatality -- or, I guess, the number one killer of men

13 over the age of 50 is in the United States?

14     A     Heart disease.

15     Q     All right.  And how is Mr. Kinser as it relates

16 to heart disease?

17     A     He has had a history of heart disease.

18     Q     All right, sir.

19           And you would agree with me that heart disease

20 is also associated with smoking, correct?

21     A     Yes.

22     Q     And do you know the extent of the work that has

23 been done with Mr. Kinser as it relates to his heart

24 disease?

25     A     He has had a permanent pacemaker put in.  That

KINSER v. CBS CORP., Case No. 94-2282

 1    appears to be the treatment he has received for that.

 2        Q    All right, sir.

 3             Okay.  Thank you, Jessica.  I'm finished with

 4    this.

 5             Now, I'd like to go back to this chart that you

 6    were working on earlier today; and I think it will be

 7    marked as a demonstrative, a plaintiffs' demonstrative,

 8    at some point.  And I apologize; I don't know what to

 9    refer to it as.

10             But do you recall when you drew on the lungs of

11    this chart over here?  You, you drew different things.

12    But this red right here rep-- can you see okay --

13        A    Yes.

14        Q    -- from there, sir?

15             Everybody can see?

16        A    I drew that to represent lung cancer.

17        Q    And you wrote "CA" in the middle.  What is

18    that?

19        A    Cancer.

20        Q    All right.  And you drew this in the lower lobe

21    of this, of this lung; is that correct?

22        A    That's where I drew it on that diagram.  That

23    doesn't necessarily represent where Mr. Kinser had his

24    lung cancer.

25        Q    All right.  Well, which lung was Mr. Kinser's

KINSER v. CBS CORP., Case No. 94-2282

1    cancer in?  Can you tell me without looking at your

2    notes?

3         A    No.  I can't remember.

4         Q    All right.

5         A    There's two sides to the lung.  I know he had

6    half his lung out.  I don't remember which side it was.

7              And the records actually don't speak to which

8    side in the records, so I apologize.  I don't know.

9         Q    So the records that you've been provided do not

10   tell you where in Mr. Kinser's lung his cancer was

11   located?

12        A    And it is irrelevant to what caused it, but I

13   do not know where he had it.

14             MS. EZELL:  By agreement, Your Honor, I would

15   request permission to display Defendant's Demonstrative

16   Number 4.

17             THE WITNESS:  If I looked at the surgical

18   report, I might be able to remember, but --

19             THE COURT:  Well, don't volunteer.

20             THE WITNESS:  All right.

21             THE COURT:  Please.

22   BY MS. EZELL:

23        Q    All right, sir, do you recognize on the

24   television monitor in front of you what appears to be a

25   lung?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     It's half a lung.

 2        Q     Half of a lung.

 3              And do you recognize a white -- let's see if

 4   this works.

 5              DEPUTY CLERK:  Nope.

 6              MS. EZELL:  Nope.  Sometimes it does.

 7   BY MS. EZELL:

 8        Q     Do you recognize a white substance here in it?

 9        A     Yes.

10        Q     And what is that, if you know?

11        A     What does it represent?  It could be a lot of

12   things, but let us take it that it represents a lung

13   cancer.

14        Q     All right, sir.

15        A     It could be other things as well.

16        Q     Now, isn't it true that most office -- most

17   office.  I'm sorry; it's been a long day.

18              Most often, asbestos is found in the base or

19   the bottom of the lung; isn't that correct?

20        A     You said the word "asbestos."  Do you mean --

21        Q     Asbestos -- I'm sorry.  Pleural plaques is

22   found in the base of the lung?

23        A     No.

24        Q     It's found in the pleura, correct?

25        A     Right.  And most of the pleura is not at the
```

KINSER v. CBS CORP., Case No. 94-2282

1   base.  Most of it is along the side of the lung.  He had

2   it diaphragmatically, I believe, and also on the side.

3        Q    Yes, sir.

4             And asbestosis, which you have testified Mr.

5   Kinser has, is found in the bottom portion of the lung,

6   correct?  Most often.

7        A    Most often.

8        Q    Um --

9        A    Not very commonly in the upper lobes, but --

10       Q    Well, --

11       A    -- most often in the lower lobes.

12       Q    -- the question is:  Isn't it most often found

13   in the lower lobe?  And the answer to that is?

14       A    Yes.

15       Q    All right, sir.

16            And it is, in fact, true that cancer from

17   cigarette smoking is most often found in the upper lobe,

18   correct?

19       A    Yes.

20       Q    And taking everything else aside and thinking

21   only about the location of the cancer, which I represent

22   to you is in the upper lobe which was removed from Mr.

23   Kinser -- setting everything else you know aside about

24   this, doesn't the location alone make it more likely that

25   if there was only one cause of this lung cancer that that

KINSER v. CBS CORP., Case No. 94-2282

1    cause is smoking?

2        A     Well, that's an "if" question.

3        Q     Yes, it is, sir.  And what is the answer?

4        A     No.

5        Q     All right.  This is exactly the type of cancer

6    that you would expect someone who smoked to have,

7    non-small cell adenocarcinoma, correct?

8        A     No.  Can I explain?

9        Q     Um --

10       A     Am I allowed to explain this answer?

11             THE COURT:  No, no.  You'll get a chance on

12   redirect, --

13             THE WITNESS:  Okay.

14             THE COURT:  -- I'm sure.

15             THE WITNESS:  Okay.

16   BY MS. EZELL:

17       Q     And this is exactly the location where you

18   would expect -- the upper portion of the lung is where

19   you would expect a smoking lung cancer to occur, correct?

20       A     Most lung cancers occur in the upper lobes and

21   centrally located.  Asbestos, to a certain extent, moves

22   the location in some of the lung cancers to the periphery

23   and to the lower lobe.

24             But location alone will not tell you what was

25   the cause of the cancer, neither smoking nor asbestos,

KINSER v. CBS CORP., Case No. 94-2282

1  even though most lung cancers are found centrally located

2  in the upper lobes in most people because most people get

3  their lung cancers from smoking.

4       Q    But before I told you that this cancer in this

5  man was located in the upper lobe, you drew the lung

6  cancer in this case in the lower lobe, closer to where

7  you believe asbestosis would be located if there was any

8  in Mr. Kinser, correct?

9       A    I apologize if that misled you or misled the

10  jury.  I had no such intention.  It was not referring to

11  Mr. Kinser at all.  It was simply to put on the diagram

12  that you could get lung cancer.

13           Neither Mr. McCoy, or you until just now, have

14  asked me about location.  I'll be happy to discuss that

15  at length.  And that does not represent the usual

16  location of most lung cancers; and I apologize, and I

17  certainly did not intend that to mislead anybody.

18       Q    Speaking of not talking about Mr. Kinser, you

19  brought us data and articles about shipyard workers.  Mr.

20  Kinser has never been a shipyard worker, has he?

21       A    Not to my knowledge.

22       Q    Speaking of not talking about Mr. Kinser, he

23  has never been an insulator, has he?

24       A    Not to my knowledge.  He was a member of the

25  Plumbers and Pipefitters Local.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Yes, sir.

2         He's never been an insulator, has he?

3    A    They would have gotten very upset if he would

4    have done insulation work.

5    Q    He's never been a railroad worker, has he?

6    A    To the best of my knowledge, he's never worked

7    for a railroad.

8    Q    You talked about mesothelioma; but he's never

9    had mesothelioma, has he?

10   A    He has not, but he's at a greater risk for

11   developing it.

12   Q    Your timeline that you presented with Mr. McCoy

13   had a lot of entries.  It had a lot of dates, but it

14   didn't have anything about Mr. Kinser on it at all, did

15   it?

16   A    It was speaking about our development of

17   knowledge and what we know about asbestos, and then we

18   moved on to apply that to Mr. Kinser.

19   Q    So the answer to my question:  If the jury

20   looks at their notes and consults their recollections

21   about what was on your timeline that you brought to the

22   Kinser case, they will not recall anything about Mr.

23   Kinser on your timeline, will they, sir?

24   A    I can't say what any member of the jury will or

25   will not recall.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    There's nothing on there about him, is there?

2    A    We weren't speaking about Mr. Kinser at that

3    time.

4    Q    So the answer to my question is "no"?

5    A    There was nothing about Mr. Kinser on the

6    timeline when we were talking about the generic issue of

7    asbestos and its ability to cause disease and when that

8    was.  No.

9         MS. EZELL:  I don't have anything else for this

10   witness, Your Honor.  Thank you.

11        THE COURT:  Redirect.

12        And, please, don't go into new things.

13        MR. McCOY:  Yes, Judge.  I understand.

14            REDIRECT EXAMINATION BY MR. McCOY:

15   Q    Dr. Frank, does the family history of Mr.

16   Kinser, meaning his parents, meet -- does that family

17   history mean that his lung cancer could not be caused by

18   asbestos?

19   A    Of course not.

20   Q    And why do you say that?

21   A    Because I'm not aware that asbestos had

22   anything to do with his family's diseases.  None of the

23   diseases that I discussed with Ms. Ezell had anything to

24   do with asbestos.  And Mr. Kinser has whatever he brought

25   from his family's genetics and predispositions, along

KINSER v. CBS CORP., Case No. 94-2282

1    with a job that exposed him to asbestos.

2        Q    Is there anything about the genetics and

3    predisposition that Mr. Kinser might get from his family,

4    based on the history you have in this case, that means

5    he's going to be dying sooner?

6        A    No.

7        Q    Why do you say that?

8        A    First of all, he's outlived both of his parents

9    in terms of his own age; and he's survived eleven years

10   or so past when his brother got disease, so he doesn't

11   appear to have been influenced in a great way from those

12   problems because he's lived longer than his parents.

13   That doesn't mean he won't develop those diseases further

14   in the future.  But we have to deal with what we find in

15   the records now; and to the extent he's had those

16   diseases, he's had them corrected by his treatment from

17   his physicians.

18       Q    Mr. Kinser had some non-small cell

19   adenocarcinoma in his left upper lobe.  Does that mean

20   it's not related to asbestos?

21       A    Of course not.  Asbestos can give you that cell

22   type and other cell types, the same cell types you get

23   from smoking and in the same locations where you can get

24   it from smoking.

25       Q    And, and how is it that you're able to, to say

KINSER v. CBS CORP., Case No. 94-2282

 1   that that location alone -- what experience or training

 2   or publications have you looked at to be able to say the

 3   basis for that experience?

 4       A    There are papers back -- I apologize if I get

 5   the dates wrong.  But there's papers back, I believe, in

 6   the late 1970s by Kannerstein, K-a-n-n-e-r-s-t-e-i-n, and

 7   Churg, C-h-u-r-g.  That's Jacob Churg, not Andrew Churg,

 8   his son, who's -- sees the world of asbestos differently.

 9   But both of those were among my teachers, and they

10   published on the cell type and the locations of

11   asbestos-induced lung cancers.  They have a number of

12   such publications.

13           And they showed that you get the same relative

14   distribution of cell types from asbestos as you get from

15   cigarettes.  This is in contradistinction to other

16   materials that cause lung cancer that will markedly alter

17   the cell type.

18           For example, I give a course every spring on

19   occupational and environmental cancers.  I focus on lung

20   cancer, and some substances change the cell type.

21   Asbestos and cigarettes give you the same cell type; and,

22   again, according to their studies, while there's some

23   migration from the upper to the lower lobes, that alone

24   is not in any way sufficient to tell you what the cause

25   of the cancer was.

KINSER v. CBS CORP., Case No. 94-2282

1              If I had a smoker who had a lower lobe cancer,

2    I would still relate it to smoking.  If I had an upper

3    lobe cancer related to asbestos, that wouldn't change my

4    opinion either.

5         Q    When you take those trips that you've described

6    to the different countries, like India and China and so

7    on, what's the primary purpose of your travel?

8         A    Primarily to teach and educate others about

9    occupational health hazards.

10        Q    Did you just recently go to India?

11        A    I did.  I left on the 11th of December at 10:00

12   in the morning.  I got to New Delhi about midnight.  I

13   got to my hotel and asleep about 1:00; and at 9:00, I was

14   in a meeting, and by 11:00 I was lecturing.  That was

15   Friday.  And then I lectured on Saturday, and then I

16   lectured on Sunday and Monday and Tuesday and Wednesday;

17   and then I flew home.

18        Q    What kinds of topics are you covering in these

19   foreign countries?

20        A    The first two days was a conference in the oil

21   and gas industry, and I talked about -- primarily, the

22   first talk was about benzene, which is another

23   cancer-causing agent that you get from exposure to

24   petroleum products.

25             The second talk I actually gave for a colleague

KINSER v. CBS CORP., Case No. 94-2282

1   who at the last minute couldn't go; it was on water

2   issues in the oil and petroleum industry.  She'd given me

3   her slides.

4          Sunday, Monday, and so forth, I gave a series

5   of lectures to doctors in training for occupational

6   health.  I talked about how to take a good history,

7   talked about how to approach patients.  I taught them

8   about how to read x-rays with the ILO classification; the

9   "B" reader exam that we've talked about, that

10  classification.  I gave them a talk about silica because

11  that's a big problem over there, so we talked about

12  silicosis.  I gave a talk on asbestos.  I gave a talk on

13  occupational lung cancers.

14         Those are the kinds of topics, plus answering a

15  lot of questions and talking about how they, as future

16  occupational physicians, can work within their companies

17  to try to prevent disease in the workers of the companies

18  they're going to be working for.

19     Q    Are you invited to go make these presentations?

20     A    I'm invited.  I've been going to that

21  particular medical college in New Delhi for the last ten

22  years.  It's called Maulana Azad -- M-a-u-l-a-n-a; second

23  word, A-z-a-d -- Maulana Azad Medical College.  It's the

24  number two college in all of India out of three hundred

25  and, I think, forty-seven medical schools there now.

KINSER v. CBS CORP., Case No. 94-2282

1  Very well respected school.

2          They have the only department of occupational

3  health.  They have one doctor.  I go to help him when he

4  has his course every year for these doctors in training.

5          I pay my way over there; I pay for my own hotel

6  out of the moneys that get generated from my doing this

7  work.  I'll simply say:  It's not exactly a vacation.

8      Q    So the money that my law firm would be paying

9  to Drexel University for your time in this case would be

10 going to help fund the travel and the lectures that

11 follow?

12     A    Correct.

13         And on this particular occasion -- I misspoke

14 when I said I came back.  Well, I did come back; but I

15 flew for close to 30 hours with layovers and things.  I

16 ended up in California, a little town called Fresno, the

17 raisin capital of the world; and I spent Thursday night,

18 after traveling, working with an attorney and testifying

19 in court the next day.

20         And it was not a case like this.  It was for

21 the Department of Justice because it was a criminal case

22 about exposing people to asbestos; and I was asked to

23 testify on behalf of the federal government in that case.

24         So these are not exactly pleasure trips that I

25 take, but it's part of the nature of the work that I do;

KINSER v. CBS CORP., Case No. 94-2282

1   and as Ms. Ezell pointed out before, I really do like my

2   work, which is why I do this kind of thing.

3            MR. McCOY:  I have no further questions.

4            THE COURT:  Okay.  I didn't hear anything

5   different.

6            MS. EZELL:  No, sir.

7            THE COURT:  All right.  You may step down,

8   Doctor.  Thank you.

9            THE WITNESS:  Thank you.

10           (Witness Frank excused, 3:23 p.m.)

11           THE COURT:  All right.  You said you had a

12  short witness presentation?

13           MR. McCOY:  We have a short reading deposition.

14  I have to go get it --

15           THE COURT:  How long will it take?

16           MR. McCOY:  I don't know if we can get done in

17  20 minutes.  It might go over a couple.

18           THE COURT:  What do you mean "a couple"?

19           MR. McCOY:  I didn't -- it's a read-in, so I

20  don't know whether 20 or 30, so --

21           THE COURT:  Okay.  I just want to get them out

22  of here.

23           MR. McCOY:  Okay.  Understood.

24           (Brief pause in proceedings; the

25           Court is conferring with the law clerk.)

KINSER v. CBS CORP., Case No. 94-2282

1           THE COURT:  Did you have any questions that you

2  were going to write down to give to me to see if it was

3  appropriate to ask?

4           No?  Thank you.

5           Okay.  If you do have questions, be sure and

6  raise your hand and let me know before I let the witness

7  escape.  Okay.

8           While they're getting organized, I'm looking at

9  the weather report for Friday; and it's a slight chance

10  of flurries before noon and a slight chance of snow and

11  cloudy.  It doesn't look like it's going to be real bad

12  at all.  I think you won't have any trouble getting here.

13           Is the 9:30 time better for you than 9:00?

14           I can't see whether you're saying "yes" or

15  "no."

16           DEPUTY CLERK:  Yes.

17           THE COURT:  Yes, okay.  Well, I'll go with 9:30

18  then.

19           MR. McCOY:  I'm just checking the length.  This

20  can be done in 20 minutes or less.

21           THE COURT:  Okay.  They're going to present

22  a deposition --

23           MS. EZELL:  Your Honor, I, I apologize.

24  This --

25           THE COURT:  Why?  What did you do?

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  We haven't been given a copy of

2    this yet, and we haven't seen if it conforms with Your

3    Honor's rulings.  This is not what we were advised would

4    be next.  We were told it would be a video dep, and so we

5    haven't had a chance to look at whatever they're getting

6    ready to read.

7          MR. McCOY:  I won't say any more, Judge.  I

8    told them just before this:  We had a read-in dep.  This

9    is -- conformed to the rulings.  There was nothing that

10   Your Honor struck from this testimony.  This is a --

11         THE COURT:  Well, you can object as we go along

12   if you have an objection.  How's that?

13         MS. EZELL:  These are the ones, Your Honor, we

14   came in early yesterday, and we argued already; and we've

15   already had rulings on them, and what we needed to get

16   was a copy back from them after it had been changed to

17   make sure --

18         THE COURT:  To see about the changes?

19         MS. EZELL:  Yes, sir.

20         And we were waiting for those.

21         THE COURT:  Do you have one?

22         MR. McCOY:  There was no changes, so this is,

23   this is -- all we did was highlight the way it was

24   before, so anyway --

25         THE COURT:  Who's in charge of this?  You or

KINSER v. CBS CORP., Case No. 94-2282

```
 1   Ms. Burlison?

 2          MS. EZELL:  Ms. Burlison is.

 3          THE COURT:  Okay.  Ms. Burlison, is -- are you

 4   familiar with what's happening here, and is this okay?

 5          MS. BURLISON:  Your Honor, I don't, I don't

 6   know the answer to that.  I'm sorry.  You saw him hand it

 7   to me, so I don't know what he's --

 8          THE COURT:  I do know the answer.

 9          Jurors, you're excused now until 9:30 tomorrow

10   morning.  Don't discuss the case with anybody else.

11   Don't let anybody talk to you.

12          I hear that this is done:  Sometimes jurors go

13   and look things up on the Internet.  Don't do that.

14   Don't do that.  It's the evidence that's presented here;

15   that's all you can consider.

16          I, I've never had a problem like that, but I

17   hear from colleagues and other, other people; but

18   sometimes that happens.

19          Good night.  Have a good evening, and I will

20   see you back tomorrow morning.  You'll all get home in

21   the daylight today.

22              (Jury dismissed for the day, 3:27 p.m.)

23          THE COURT:  And, counsel, be sure and

24   straighten out the record with Jessica before you leave.

25          MS. EZELL:  We absolutely will, Your Honor.
```

KINSER v. CBS CORP., Case No. 94-2282

1           THE COURT:  We'll be in recess till tomorrow

2    then.

3           MS. EZELL:  At 9:30?

4           THE COURT:  9:30.

5           MS. EZELL:  Yes, sir.

6           MR. McCOY:  Judge, I have -- we don't have to

7    be on the record.

8                 (Discussion off the record regarding

9                 further scheduling in the trial.)

10                (Trial adjourned, 3:28 p.m.)

11

12                 * * * * * * * * * *

13

14                 REPORTER'S CERTIFICATE

15       I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

16   that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18       Dated this 9th day of January, 2014.

19

20

21              s/Lisa Knight Cosimini
                _____
                Lisa Knight Cosimini, RMR-CRR
22              Illinois License # 084-002998

23

24

25