KINSER v. CBS CORP., Case No. 94-2282

E-FILED
Wednesday, 02 April, 2014  11:04:23 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

            Plaintiffs,         Docket No. 94-2282

    vs.                 Urbana, Illinois
                           January 10, 2014
CBS CORP., successor by       9:35 a.m.
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

            Defendant.


JURY TRIAL -- Day 3
(Testimony of Arnold Brody & Barry Castleman)

BEFORE THE HONORABLE HAROLD A. BAKER
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:    ROBERT G. McCOY, ESQUIRE
                      Cascino Vaughan Law Offices, Ltd.
                      220 South Ashland Avenue
                      Chicago, Illinois 60607
                      312-944-0600

For the Defendant:    SANDRA GIANNONE EZELL, ESQUIRE
                      Bowman and Brooke, LLP
                      901 East Byrd Street, Suite 1650
                      Richmond, Virginia 23219
                      804-649-8200

                      PAULA M. BURLISON, ESQUIRE
                      Bowman and Brooke, LLP
                      1441 Main Street, Suite 1200
                      Columbia, South Carolina 29201
                      803-726-7420

                      JACOB DANIEL SAWYER, ESQUIRE
                      Foley & Mansfield, PLLP
                      55 West Monroe, Suite 3430
                      Chicago, Illinois 60603
                      312-254-3800

KINSER v. CBS CORP., Case No. 94-2282

I N D E X

Page

WITNESSES ON BEHALF OF THE PLAINTIFFS:

ARNOLD R. BRODY

Direct Examination by Mr. McCoy ...............  3

Cross-Examination by Ms. Ezell ...............  81

Redirect Examination by Mr. McCoy ............ 123


BARRY CASTLEMAN

Direct Examination by Mr. McCoy ............... 127

Cross-Examination by Ms. Ezell ............... 192

Redirect Examination by Mr. McCoy ............ 228

Recross-Examination by Ms. Ezell ............. 231

KINSER v. CBS CORP., Case No. 94-2282

```
 1                    (In open court, 9:37 a.m.)

 2                    (Discussion off the record

 3                     between the Court and counsel.)

 4                    (Jury present, 9:39 a.m.)

 5          THE COURT:  Good morning, jurors.  Thank you

 6  for being so prompt and on time.

 7          I'm watching the weather.  I'm concerned about

 8  the fog because when the warm air hits the cold snow,

 9  we're bound to have fog.  So I'll keep my eye on it, and

10  I'll do my best to get you out of here in the daylight so

11  you can get home in the daylight.  Okay?

12          You ready to proceed, counsel?

13          MR. McCOY:  Yes.  We're ready to proceed,

14  Judge.

15          THE COURT:  Further evidence of the plaintiff.

16          MR. McCOY:  Okay.  Thank you.

17          The first witness today is going to be

18  Dr. Arnold Brody.

19          THE COURT:  Come up, please, Doctor.

20           ARNOLD R. BRODY, sworn, 9:39 a.m.,

21           DIRECT EXAMINATION BY MR. McCOY:

22      Q   Dr. Brody, let's start again by introducing

23  yourself to everyone.  Give your full name and spell your

24  last name for everybody.

25      A   Sure.  It's Arnold R. Brody, B-r-o-d-y.
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    And that's water up there for you.  Let us know

2 if you need more.

3    A    Thank you.

4    Q    Okay.  So the first question is:  What's your

5 current position, Dr. Brody?

6    A    So I'm a professor emeritus in the pathology

7 department at Tulane University Medical School.

8    Q    Are you a medical doctor?

9    A    I am not.  I'm a Ph.D.

10    Q    Can you tell us what education you had --

11         (Brief pause in proceedings; deputy

12         clerk is adjusting counsel's microphone.)

13    Q    Okay.  Tell us what education and training you

14 had leading to your current position here.

15    A    Right.  So after high school in New Hampshire,

16 I went out to Colorado to do a bachelor of science degree

17 in zoology.  That's the study of animals.

18         I then went, came right here, University of

19 Illinois, Champaign.

20    Q    So you and I went down Green Street this

21 morning, right?

22    A    That's right.  That's right, to find the old

23 house.

24    Q    Bring back old memories?

25    A    Find the old house that I lived in, that's

1   correct.

2           So I did a master of science degree here at the

3   University of Illinois, met my wife who lived in Illini

4   Towers.

5           And so after a master of science degree in

6   anatomy -- my degree was in anatomy.  That was the animal

7   anatomy, human anatomy.  That's where we learn how our

8   parts fit together and function:  muscles, bones, nerves,

9   joints, things like that.  Then I went back to Colorado

10  to do a Ph.D. -- that's a doctorate -- in cell biology.

11  Every living thing is made of cells.  We need to

12  understand how cells function.  Every disease has a

13  target cell from which that disease develops.  So cell

14  biologists like myself typically focus on different kinds

15  of cells.  My focus has been on lung cells over the

16  decades.

17          After the doctorate, I did three years of

18  post-doctoral study at Ohio State University.  So we had

19  this interesting balance of Big Ten schools -- right? --

20  Illinois and Ohio State.

21          So after the post-doc, then I started -- after

22  three years of post-doctoral study at Ohio State, I

23  started my academic career.

24      Q   Okay.  And your academic career, you mean as a

25  professor at the schools?

1      A     That's right.

2      Q     Okay.  When -- what was your first academic

3 appointment, --

4      A     It was --

5      Q     -- first position?

6      A     Right.  It was as an assistant professor --

7 that's a beginning professor -- in the medical school, in

8 the pathology department, at the University of Vermont.

9 I started there studying human lung disease, called

10 fibrosis, pulmonary fibrosis.  That means scarring in the

11 lung.  I was there for six years as an assistant

12 professor and then was offered a position at the National

13 Institutes of Health.

14           You might have heard of the National Heart,

15 Lung, and Blood Institute; National Cancer Institute --

16 there are 25 different institutes that make up the

17 National Institutes of Health.

18           I was the head of the lung pathology --

19 "pathology" is the study of disease -- I was the head of

20 the lung pathology laboratory at the National Institute

21 of Environmental Health Sciences.  That institute is

22 involved in understanding how agents in the environment

23 cause disease, human disease, and how we can develop

24 treatments and effective therapies.  There are no

25 effective therapies for any of the asbestos-induced lung

KINSER v. CBS CORP., Case No. 94-2282

1  diseases, for example.

2          So I was there for 15 years; and then I got an

3  offer from the Tulane University Medical School, in the

4  pathology department.  They offered me a full tenured

5  professor to teach in the medical school there, to carry

6  out basic science research, which I was very glad to

7  accept and was honored to accept that position.

8          And in 1999, I was promoted to vice chairman of

9  the pathology department and was there through 2005,

10  which is when Katrina came through, that huge hurricane,

11  of course, that blew a lot of people out of New Orleans,

12  including us; blew us to the East Coast.

13          And I finished my career, the last five years

14  of my career, as a professor in the Department of

15  Molecular and Biomedical Sciences at North Carolina State

16  University.

17          I retired in 2011; and then in 2012, I was

18  honored with this emeritus position.  "Emeritus" means,

19  from the Latin, "out of merit" or "out of honor."  And I

20  was very, as I say, honored to accept that position at

21  Tulane; and I'm currently working with scientists there,

22  some of them I hired when I was there as chairman/vice

23  chairman.  They have their own grants now, and we're

24  carrying out basic science research, continuing my work

25  with asbestos disease.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    When did you start the research of asbestos

2   diseases?

3       A    Well, that was actually back when I was an

4   assistant professor, beginning professor, at the

5   University of Vermont.  So in 1974, we had a visitor to

6   the department.  His name was Dr. Wagner, W-a-g-n-e-r.

7   He was from South Africa, pronounced his name "Vogner."

8            Dr. Wagner had established what's called an

9   "animal model of asbestos disease."  First of all, he

10  discovered that asbestos causes this cancer called

11  "mesothelioma," which is a cancer that's basically caused

12  only by asbestos.  So he, he made that discovery, and

13  then he developed an animal model.

14           "Animal model" means that this is what

15  scientists can use to understand the human disease.  You

16  can't follow the process in people.  You don't get to --

17  you don't get to see the asbestos land in people.  You

18  don't get to follow where the fibers go in people.  You

19  just don't get to do that, obviously.  So we use animal

20  models.  Take any disease that people get --

21  tuberculosis, AIDS, kidney diseases, diabetes -- there

22  are animal models that we use to understand these

23  diseases in people.

24           So he developed this animal model.  He came to

25  Vermont as a visitor.  He saw the work that I was doing,

KINSER v. CBS CORP., Case No. 94-2282

1   and he invited me to come and work with him in Wales, in

2   the United Kingdom, where he was at the time.  And I saw

3   the work that he was doing, and I was fascinated by this

4   animal model and the opportunity to understand the human

5   disease.

6            I took this model back to my laboratory in 1974

7   and, through those years, and then on my own when I went

8   to the National Institutes of Health, and have been

9   carrying out that work since.

10       Q    Have you done research concerning the effects

11  of smoking on the lungs?

12       A    Right.  So I've studied cigarette smoke and how

13  cigarette smoke affects the lungs.  I've studied how

14  asbestos injures the lungs.  Most of my work is related

15  to asbestos.

16            But we're currently, right now, doing studies

17  to understand what's called "synergy."  In other words,

18  there's this very interesting relationship between

19  cigarette smoking and asbestos exposure, where we know

20  there's an effect from asbestos alone in causing scarring

21  and lung cancer.  And we know that there's an effect from

22  cigarette smoking alone, which causes a number of

23  different things, including lung cancer and emphysema.

24            But when somebody's exposed to both, you

25  don't -- you don't just add the effects.  You multiply

KINSER v. CBS CORP., Case No. 94-2282

1   the effects so that it can become, at the highest level,

2   synergistic, when you're actually multiplying it.  Or --

3   and in more recent studies, it's been shown to be what's

4   called "supra-additive," meaning it's not quite

5   multiplicative, but it's more than just adding to it.

6           So there's something going on there in the

7   chemistry of the fibers and the smoke that makes it a

8   very dangerous combination, and that's one of the things

9   that I'm studying today, in fact.

10      Q    And we'll ask more questions about that later

11  on.

12          Had -- the United States Surgeon General has

13  published a number of reports about smoke.  Have you been

14  a part of any of those?

15      A    Well, one of the reports that they published

16  was called "The Risks of Secondhand Smoke," or sidestream

17  smoke; in other words, the smoke from other people's

18  habits.  And the question was:  Is that a carcinogen, and

19  is it -- can it be dangerous?

20          And the conclusions of the report was that it

21  is, and it is a carcinogen; and I was asked to review

22  that report and, if I agreed with it, to be a

23  signatory -- that is, to sign the report -- which I did.

24      Q    When was that?

25      A    That was, I believe, in the early '90s, early

KINSER v. CBS CORP., Case No. 94-2282

1  to middle '90s.

2      Q     The -- in the area of the literature, for a

3  moment, have you published on asbestos or smoking?

4      A     Well, sure.  I mean, one of the things that a

5  scientist has to do when they're a professor at a medical

6  school is they have to be able to be funded from the

7  outside.  In other words, the university gives you a

8  laboratory and a place to do your work, but they don't

9  pay for the equipment or supplies.  They don't pay for

10 the students.  They don't pay for salaries of the young

11 faculty who are working there.

12          So it's incumbent upon the senior professor to

13 be able to attract funding, and so I have to -- over the

14 decades, I've applied by writing research grants and

15 sending them to the National Institutes of Health; and

16 only about 10 to 15 percent of those applications are

17 funded, so it's a very competitive environment.

18          And I've been successful throughout.  I, I've

19 been -- I've been funded without interruption through my

20 career; and the answer to your question is:  I couldn't

21 do that unless I published my work.  I had -- what I've

22 done over the decades is out in the open medical

23 literature for anybody who's interested to read so that,

24 when I submit my grant proposals, that work is out there

25 and people can see what I've done and what is the

KINSER v. CBS CORP., Case No. 94-2282

1  likelihood that what I do with this grant money is going

2  to be successful.

3      Q    The -- let me ask you just to move that

4  microphone a little bit closer to you.  Can you do that?

5  Okay.  And lean into it a little more.  Okay, thanks.

6          So, as far as the publications goes, about how

7  many publications have you had concerning asbestos

8  diseases?

9      A    Well, it's, it's divided into -- I divide my

10  writings into two sections.  One is called "peer-reviewed

11  publications."  That means that's work reviewed by my

12  peers, and I have 153 of those kinds of papers.  And

13  about 130 or '40 of them or so relate directly to

14  asbestos.  The others are related to other lung diseases,

15  like viral diseases or asthma, things like that.  In

16  2012, we published a paper on asthma.

17          And then the other section of the writing is

18  called "proceedings" or "invited reviews."  So, for

19  example, if somebody's writing a textbook and has asked

20  me to write a chapter about asbestos in that book, I'll

21  put that in that section of invited reviews, and I have

22  50 of those.  So I have about 200 separate writings on

23  asbestos disease, and also have a book.

24      Q    Your field of specialty, would you -- would it

25  be fair to characterize that as molecular and cellular

KINSER v. CBS CORP., Case No. 94-2282

1  biology?

2      A    Molecular and cellular biology, yes.

3      Q    Right.

4      A    Well, it is now.  I mean, when I started my

5  work using Dr. Wagner's animal model systems where he

6  showed that these animals get asbestosis, lung cancer,

7  mesothelioma, we weren't looking at the genetics.  We

8  weren't looking at the molecular level.  That was -- I

9  mean, I'm old enough that I can say I started my work

10  before the areas of molecular biology.

11          So we were asking questions like:  Where do the

12  fibers go?  We know they go in the lung, but the lung is

13  a very complex organ.  Where do they go?  Where do the

14  fibers go in the lung?  And when they get there, how do

15  they injure the cells of the lung?  And how does that

16  injury lead to disease?

17          And then once we answered those questions, then

18  we were able to get into the molecular aspects of the

19  disease, which means at the genetic level, and that's

20  where we've been over the last 20 years or so.

21      Q    Molecular and cellular level research, is that

22  usually conducted in the laboratory with high powered

23  microscopes?

24      A    So, microscopes is one way to look at things.

25  I mean, these fibers -- for example, in individual

KINSER v. CBS CORP., Case No. 94-2282

1   cells -- you can't see unless you're using different

2   kinds of microscopes, certainly.

3           But molecular biology is carried out with

4   what's called the techniques of genetics and genomic

5   research where we're actually measuring sequences of the

6   various genes and how those sequences are changed and how

7   those genes are expressed.  That means:  get turned on.

8   We have -- humans have 20,000, or so, genes; and they're

9   not all working all the time, and that part of molecular

10  biology is understanding how that works.

11          Q    Have you been invited as a speaker to any

12  conferences or to make lectures concerning asbestos

13  disease or smoking?

14          A    Many times, sure.

15          Q    I'm sorry.  Your answer was?

16          A    Many times.

17          Q    Okay.  Could you give us some recent

18  examples --

19          A    Uh-huh.

20          Q    -- that would be pertinent here?

21          A    Well, I was a visiting professor at the Medical

22  College of Beijing for a couple of weeks and worked with

23  the medical students in China.  That was quite

24  fascinating.

25          I've been a visitor to the Harvard School of

KINSER v. CBS CORP., Case No. 94-2282

1    Public Health several times.  I've talked, been invited

2    to give talks at departments of pathology and laboratory

3    medicine and pulmonary medicine at various schools in

4    California and Texas and Florida and Boston, various

5    states around the country.

6            Two years ago, I gave a talk at the

7    mesothelioma conference in Australia, in Perth,

8    Australia.  Last year I gave a talk in London.  This year

9    I'm expected to give a talk in Los Angeles in March.  So

10   I -- you could pick a year, random year, out of my CV and

11   read the list.  Typically, every year I'm asked to do

12   something like that.

13        Q    Have you had any appointments or positions on

14   editorial boards that would review submissions to medical

15   journals?

16        A    Sure.  I do that regularly.  I just --

17        Q    How can, how can you be involved with a medical

18   journal when you're not a medical doctor?

19        A    Okay.  Well, that's a good -- I mean, that's a

20   question that can be asked immediately.  You say:  Well,

21   how can you be a professor in a medical school if you're

22   not a doctor?

23            Well, go to any medical school across this

24   country, and you'll find Ph.D.s like myself who are doing

25   a number of different things, teaching the basic sciences

KINSER v. CBS CORP., Case No. 94-2282

1   to the medical students -- physiology, embryology,

2   biochemistry, molecular biology -- things they need to

3   understand before they go into their clinical sciences.

4   So that's one thing.

5           Most of the basic science research carried out

6   in medical schools is carried out by Ph.D.s, so that's

7   not at all unusual, as I say; and it would be very

8   unusual -- in fact, I, I would bet anything that there's

9   not a major medical school in this country that does not

10  have Ph.D.s working along with the physicians in areas of

11  basic science in medicine.

12          Q    You've studied the medical literature --

13          A    Of course.

14          Q    -- even though you're not a medical doctor?

15          A    Well, of course.  I mean, I was -- this

16  morning, I received a request to review a manuscript that

17  was submitted to Current Reviews in Respiratory Medicine.

18  I'm on the editorial board of that journal, and so I'm

19  going to do that over the next week or so, take care of

20  that.

21          I'm on the editorial board of the American

22  Journal of Pathology.  That's the official journal of the

23  American Society for Investigative Pathology.

24          Q    What's "pathology"?

25          A    Well, "pathology" is the study of disease.

KINSER v. CBS CORP., Case No. 94-2282

1   That's just the simplest definition of "pathology."

2        Q    Okay.  Keep going.

3        A    I've been on the editorial board of the

4   American Journal of Respiratory Cell and Molecular

5   Biology for years, and I expect to continue to do those

6   things.

7        Q    As far as any awards that you've gotten over

8   the years, what ones do you consider most significant?

9        A    Well, I don't think there's any question that

10  being awarded a grant from the National Institutes of

11  Health is about as good as it gets.  In other words,

12  because it's so competitive -- I mean, I've been

13  competing with the great schools like University of

14  Illinois and Harvard and California, all those great

15  schools.  I compete with scientists at those schools

16  throughout my academic career.  And when I am awarded a

17  grant from the National Institutes of Health, as I have

18  many times, those are -- I call those the most

19  significant grants -- the most significant awards that

20  one can get.

21           I mean, I've had monetary awards from drug

22  companies.  For example, from -- Burroughs Wellcome drug

23  company gave me a monetary gift for presenting my

24  research for them.  That's an award.

25           But, as I say, year to year, day to day, being

KINSER v. CBS CORP., Case No. 94-2282

1  supported by the National Institutes of Health is the

2  most valuable award that a scientist can have.

3      Q    Have you had NIH grants, National Institutes of

4  Health grants, for asbestos-related research?

5      A    Throughout my career, without interruption,

6  that's correct.

7      Q    How about the research today that you said is

8  ongoing concerning smoking and asbestos combined?  Is

9  that NIH funding?

10     A    Right.  Sure.  That's supported by National

11 Institutes of Health.  That's not my grants directly.

12 Those are from, with, to my colleagues at Tulane

13 University Medical School.  They are -- I hired them

14 as -- quote, unquote -- as youngsters before their

15 tenured positions; but now they've grown into their own

16 tenured research positions and now are awarded their own

17 grants that allow us to continue that work.

18     Q    Dr. Brody, I made a note here of topics that

19 I've asked you to address.  I just want to run through

20 these so that the jury will know where we're going on the

21 specific topics.

22          The first topic would be:  Asbestos causes

23 multiple diseases, including lung cancer.  Is that

24 accurate?

25     A    Sure.  I can talk about that.

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q     All right.  The second one is:  How is lung
2   cancer caused?
3        A     Yeah.  I'm happy to talk about that.
4        Q     Third is:  How cigarette smoking and asbestos
5   interact to cause lung cancer.
6        A     We have -- you know, there are always a lot of
7   scientific questions; and I can't tell you that we know
8   all the answers there, but we have some very good ideas
9   as to, as to what it is about those two potent
10  carcinogens -- "carcinogens" are cancer-causing agents --
11  what is it about the two of them that combines to make it
12  a very dangerous combination?
13       Q     Now, in, in your field of testimony -- and
14  you've testified in a number of other asbestos-related
15  cases, right?
16       A     Many times.
17       Q     Okay.  You've testified for individual people,
18  and you've testified for companies, right?
19       A     I have.  That's right.  Typically for the
20  plaintiffs in cases like this, but I've testified for
21  about eight different companies over the years.
22       Q     In asbestos cases?
23       A     Right.
24             And if you're asking me to give exactly the
25  same testimony that you've asked me to give here today --
```

KINSER v. CBS CORP., Case No. 94-2282

1   that is, explain how asbestos and/or cigarette smoke

2   causes disease -- then I can do that.

3        Q    Right.

4             And you're not testifying here about,

5   specifically on Larry Kinser; you're testifying about,

6   generally, how the process works?

7        A    Right.  You, you've not asked me to look at Mr.

8   Kinser's records or his tissues or anything like that.

9   But I'll say that if, in fact, Mr. Kinser has lung cancer

10  and scarring in his lungs, then I'm going to explain how

11  that happened.  In other words, there's no reason to

12  think that his disease process is any different than

13  anybody else's.

14       Q    And that's typically -- when you testify, you

15  don't get records on the individual basis; is that true?

16       A    Typically, I do not.  That's right.

17       Q    And just to, also, clarify, you're not an

18  epidemiologist, but you're familiar with the publications

19  in the field?

20       A    Sure.

21       Q    So we've, we've talked about the kind of

22  equipment that you use in the laboratory somewhat, but

23  you might want to explain a little bit more about the

24  subjects and the equipment that you use for your

25  research.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Well, it's a broad spectrum, and the easiest

 2   way to explain it is:  There are a lot of different

 3   questions in the laboratory, and you need different kinds

 4   of equipment; and you need to carry out different sorts

 5   of experiments to answer the questions.

 6             So, for example, I mentioned one already where

 7   we want to know where the fibers land in the lung.  The

 8   lung is very complex.  They -- people and animals inhale

 9   the dust.  The fibers go into the various aspects of the

10   lung, and the only way to see that is with what's called

11   an "electron microscope."  This is a microscope that can

12   magnify things hundreds of thousands of times and allows

13   us to see things that would be completely invisible with

14   the naked eye and with -- invisible to what are called

15   "light microscopes," the kind of microscopes we use in

16   school.

17             Now, on the other hand, if we want to look at

18   whether or not cells are dividing -- that is, making new

19   cells -- we use a light microscope because that allows us

20   to see the chromosomes and allows us to see the, how,

21   whether or not the cells are dividing, so then we use a

22   light microscope.

23             Now, we want to know next whether or not

24   certain genes -- see, cancer is caused when genes that

25   control cell growth are damaged.  That's the definition
```

KINSER v. CBS CORP., Case No. 94-2282

1   of cancer:  loss of control of cell growth.  Our cells

2   have to keep a steady state of growth and replacement.

3   Cancer develops, and that's controlled by sets of genes,

4   and cancer develops when a set of those genes is damaged.

5          For that, you need a whole different set of

6   techniques, which are in the realm of molecular biology

7   where we can actually measure the nature of the gene, the

8   sequence of the gene, and whether or not it's expressed

9   normally, or whether or not it's been damaged.

10     Q    Dr. Brody, have you put together a slide

11  presentation to illustrate these topics that we talked

12  about?

13     A    Sure.  I have a number of different sets of

14  slide presentations.  One is what I've used for medical

15  students for years.  And others are for my colleagues

16  when I talk in pathology departments in medical schools

17  and we get into the intricacies of the molecular biology.

18  I have sets of slides that I use for juries.  Some of

19  the, some of the slides -- most of these are pictures

20  that I've taken with various kinds of microscopes.  Some

21  of them I use in all of those different settings; and

22  some, of course, I select based on what I think is going

23  to help most.

24     Q    Well, I --

25     A    So the answer to your question is:  Yes.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    I'd like to get started with the one that you

 2   put together for this jury.

 3        A    Of course.

 4        Q    Okay.  So if you want to step down here, --

 5        A    Okay.

 6        Q    -- we'll get everything set up.

 7        A    All right.

 8                  (Brief pause in proceedings; witness is

 9                  relocating at easel in front of the jury.)

10   BY MR. McCOY:

11        Q    Okay.  Dr. Brody, so this is, these are the

12   slides that you might use in lecturing students and you

13   present to juries and so on; and this is your selection

14   for today, so I'm going to let you go ahead and start the

15   slide --

16             MS. EZELL:  And I apologize, Mr. McCoy.

17             We have no objection to this PowerPoint

18   presentation being shown, Your Honor, by agreement.

19             THE COURT:  Very well.

20             THE WITNESS:  I'm sorry.  Did I miss something,

21   Your Honor?

22             THE COURT:  No.  You didn't miss a thing.

23   BY MR. McCOY:

24        Q    Okay.  So the first slide that you have up here

25   today is the introduction to this.  Those are your
```

KINSER v. CBS CORP., Case No. 94-2282

1   current positions, right?

2       A    That's right.  As I told you, I'm a professor

3   emeritus.  I also maintain an adjunct --

4            COURT REPORTER:  Excuse me.  I need you to

5   speak louder.

6            THE WITNESS:  Sorry.

7            COURT REPORTER:  "I also maintain an adjunct"

8   is the last thing I heard.

9            THE WITNESS:  It was because I wasn't

10  projecting.

11      A    So I also maintain a position as adjunct

12  professor because I still have a student finishing his

13  work at North Carolina State University.

14           So this is what you've asked me to talk about

15  today.  We know that asbestos causes lung cancer.  It

16  also causes scarring of the lung called "asbestosis."

17  "Asbestosis," by definition, is scarring in the lung from

18  inhaling asbestos.  It also causes what's called "pleural

19  plaque," which is scarring on the outside lining of the

20  lung.  We'll, we'll talk some more about that.

21           And I guess I should -- I think I've already

22  mentioned mesothelioma, but let me just say that that's a

23  cancer that -- the cells that line the outside of the

24  pleura are called mesothelial cells.  So if somebody has

25  a mesothelioma, that's a cancer of those outside lining

1   cells, and that's essentially caused only by asbestos.

2           So the question, "How is lung cancer caused?",

3   I'll get into in some detail, but the concept of cancer

4   means that there's been genetic damage.  Genes that

5   control cell growth have been damaged by a carcinogen,

6   cancer-causing agent.  That's what that means, and that's

7   how lung cancer is caused by a number of different

8   agents, including asbestos and cigarette smoke.

9           Now, the interaction of tobacco smoking and

10  asbestos I alluded to a little bit when I talked about

11  this synergy or this supra-additive -- and I'm going to

12  go into the details of, some of the details of how it is

13  that those two agents combine to be so dangerous.

14          All right.  Can I move on?  You'll interrupt me

15  if --

16      Q   Yeah.  I'll let you go ahead to the next slide

17  and explain the significance of this in, in terms of the

18  topics that you're addressing.

19      A   Okay.  So this is obviously a diagram, and this

20  diagram just allows me to -- I know you know where your

21  lungs are; but I just want to remind you that, when you

22  take a breath, the air comes down this tube that we call

23  the "trachea" or windpipe, and you can actually feel the

24  top of that in your Adam's apple right here.  That's the

25  voice box at the top of the trachea.

KINSER v. CBS CORP., Case No. 94-2282

1         When you take a breath, the air comes down
2    these tubes that we call "conducting airways" because
3    they conduct air down at the lungs.  Now, in -- among the
4    tubes is what's called the "gas exchange area."  That's
5    where we exchange oxygen and carbon dioxide.  There's
6    about 20 percent oxygen in the room air.  You have to
7    take that room air in, extract the oxygen; and that, of
8    course, takes place in the lungs.
9         Now, the diseases -- this, this diagram, also,
10   I use as a map to understand where the various asbestos
11   diseases develop.  So we start -- let's start with lung
12   cancer because lung cancer develops in the walls of these
13   tubes.
14        Now, I mentioned -- I don't know; maybe I
15   didn't mention.  The word is "target cell."  The target
16   cell is the cell from which the disease develops.  The
17   target cell for lung cancer -- and I'm going to show that
18   to you -- that target cell resides in the walls of the
19   airways.  It's the cell that lines the airways.
20        Now, out here in the gas exchange area, there's
21   another disease that develops that's called "asbestosis."
22   Asbestosis is scar tissue in the lung from inhaling
23   asbestos, and that occurs out in the gas exchange area
24   where we exchange oxygen and carbon dioxide.
25        Now this thin line, this black line that runs

KINSER v. CBS CORP., Case No. 94-2282

1    around the outside of the lung represents the pleura,

2    p-l-e-u-r-a, a very thin membrane, Saran Wrap thin

3    membrane.  And it has two components.  It has that

4    mesothelial cell layer I told you that can become a

5    cancer, mesothelioma.  And just under it, there's a very

6    thin, flexible connective tissue layer.

7            Connective tissue is -- you take your skin,

8    pinch it, let it go; hopefully, it will pop back.  And it

9    pops back because we have this connective tissue that

10   holds us and keeps us flexible.

11           Well, there's a very thin layer of connective

12   tissue just under the pleura.  So you take a breath, and

13   the lungs expand; and then you release it, and back they

14   go, and that's because of the elastic nature of that

15   connective tissue layer.

16           When somebody has pleural plaque, that

17   connective tissue layer gets scarred, and that's because

18   of injury to the cells around that connective tissue

19   layer.  And that's -- it means there's been injury,

20   pleural plaque; and it can be everything from benign

21   to -- not a problem -- to a life-threatening condition.

22           Okay.  It always helps to see what these things

23   look like.  So in order to see what these things look

24   like, I've told you I use what's called an electron

25   microscope, and you can see I've had this microscope for

KINSER v. CBS CORP., Case No. 94-2282

```
 1   a long time.  This microscope was actually a victim of
 2   Hurricane Katrina when it came through and blew things
 3   out of Tulane University.
 4             I can take a structure, as small as a period at
 5   the end of a sentence, to tissue as big as this device I
 6   have in my hand, put that tissue into this door right
 7   here in front of me, and enter it into a vacuum.  The,
 8   the column is evacuated.  It's a very high vacuum.  I've
 9   put the tissue in there; and electrons come down from the
10   top of the column, through the vacuum, and strike the
11   sample that I've put in there.  Then the electrons raster
12   over the surface of the sample and essentially recreate
13   what the surface of that sample looks like.  Then I can
14   collect those electrons with the electrons you see back
15   here and show here in that screen in front of me what the
16   surface of that sample looks like.  And then just off the
17   screen is a camera so I can take a permanent image of
18   whatever it is we're looking at.
19             So, for example, if I cut a piece of the lung
20   out here, then you can see the airways going off, and you
21   can see the pleura running around the top.  And I cut
22   this out and I put it into the microscope, and I take a
23   picture of it; it looks like this.  So here are those
24   airways running up.  Here's the very thin pleura running
25   around the outside.
```

KINSER v. CBS CORP., Case No. 94-2282

1            And now, again, let's go back to the map.

2    Okay?  These tubes are where lung cancer develops.  Out

3    here in the gas exchange area is where asbestosis

4    develops; pleural plaques, just under the pleura, that

5    connective tissue layer.  Okay?  Now, this is completely

6    normal.  This lung is completely normal, so we're not

7    seeing any of those things.

8            But, so let's see what a normal airway surface

9    looks like; and now I'm going to show you the target cell

10   for lung cancer, what it should look like.  So I'm going

11   to focus the microscope right down on the surface of our

12   airways, of this airway.

13           And let me just say:  Really, what I'm showing

14   you is one of our very effective defense mechanisms.  We

15   all walk around in our environment.  We're faced with

16   bacteria and pollen grains and a few asbestos fibers and

17   cigarette smoke; and all these things are in the

18   environment, and most of us don't get sick from them,

19   from this what we call "background layer."  And that's

20   because we have very effective defense mechanisms.  We

21   have nose hairs.  We have moisture in the back of our

22   throat.  We have these airways that I'm going to show you

23   now.

24           So let's see why, one of the reasons that the

25   airways are so effective.  I'm going to fill the screen

KINSER v. CBS CORP., Case No. 94-2282

1    with what's in this red spot right here, so it could be

2    anywhere along here -- or let's focus right here, focus

3    that and fill the screen, and so now this is what the

4    surface of our airways looks like.  And you see this says

5    "Human Bronchiole."  A bronchiole is a small airway, and

6    the surface of our airways is lined by these little

7    hair-like structures.  They're really not hairs at all.

8    They're extensions of the cell surface called "cilia,"

9    c-i-l-i-a.  And these cilia are constantly beating in a

10   wave-like, synchronous fashion.  So if there's something

11   that we inhale from the environment that lands on the

12   surface of our airways, it gets swept up to our mouth;

13   and we can swallow it or spit it out.  Very effective

14   defense mechanism.

15          Now, this is a human bronchiole, and I say this

16   is what our airways look like.  But when I talk about

17   these structures now, I'm talking about you and me and

18   rats and cats and guinea pigs and mice and giraffes.

19   Everything that breathes air has these same kinds of

20   defense mechanisms and structures that work the same way.

21       Q    What, what's the magnification on this?

22       A    Okay.  So look down here.  You see this in the

23   lower right-hand corner?  This is a size marker, so we

24   can tell pretty precisely how big and small these things

25   are.

KINSER v. CBS CORP., Case No. 94-2282

1          So, for example, this says "10" with a little

2    sign here.  That's a Greek symbol that means "micron."

3    So this line that you can easily see is 10 microns long,

4    but that's at a magnification of tens of thousands of

5    times.

6          So the question is, of course:  How big is a

7    micron?  Right?

8          Q    Yes.

9          A    All right.  So let me explain that.  So:  How

10   big is a micron?  If you take your thumb and your

11   forefinger and you make a little space that you can just

12   barely see with your naked eye, you've made just about a

13   millimeter.  So with your naked eye, you can see a

14   millimeter, not much more, but you can see a millimeter.

15          Now, take that millimeter and divide it a

16   thousand times.  Okay?  So what you've done then is

17   you've made 1,000 microns.  All right?  So 1,000 microns

18   is the same as a millimeter.  So you can see about

19   1,000 microns with your naked eye.  You obviously can't

20   see 10 with your naked eye.  You can't see 100.  You

21   can't see 500.  You can barely see 1,000.  But with the

22   electron microscope, it's easy to see ten microns; easy

23   to see one micron.

24          If you want to know how long these cilia are,

25   in your mind's eye, you can stand this bar up next to the

KINSER v. CBS CORP., Case No. 94-2282

1   cilia; then you'll see that they are about eight to

2   ten microns long.

3          Now, I know that maybe some of you have noticed

4   that there, some of these cells don't have cilia.  See,

5   I'm outlining this cell here for you, and there are no

6   cilia in that cell.  Some of these cells that don't have

7   cilia make mucus.  And you don't think much about mucus

8   unless you're a smoker or you have a bad cold and the

9   cilia are bringing the mucus up; or you cough it up, and

10  then you realize that you have mucus.

11         But most of the time we're making mucus in

12  amounts that just comes up to your mouth; you swallow it,

13  and you don't think anything about it, but it's happening

14  all the time.

15         Now, some of these cells are neither mucous

16  cells nor ciliated cells.  They're called

17  "undifferentiated cells."  In other words, they haven't

18  committed to being a ciliated cell or a mucous cell.

19  They're on the way.  Because we're always losing these

20  cells, we have to keep making new mucous cells and new

21  cilia cells.

22         Well, that undifferentiated cell is the target

23  cell for lung cancer.  Okay?  And it lives, normally, in

24  the lining of the airways; and there are millions of them

25  up and down all levels of the airways.  And when that

KINSER v. CBS CORP., Case No. 94-2282

1   cell has genetic damage, that opens the door to cancer,

2   and we're going to talk some more about that.

3           Okay.  So now you've seen the target cell for

4   lung cancer.  Let's look at -- so here's a normal airway,

5   plenty of ciliated cells, mucous cells.

6           Now, here's the airway of a cigarette smoker.

7   Q    Just for reference purposes, I -- this is the

8   seventh slide we're at now, so --

9   A    Okay.

10  Q    -- for the record.  Keep going.

11  A    So look at the difference in the airway of the

12  cigarette smoker.  First of all, I'll show you what the

13  differences are.  Here's the ciliated cell, but look at

14  the cilia.  They're abnormal.  They're short.  They're

15  really not well-developed.  They're not going to be very

16  effective at sweeping things up the airway.  That's the

17  first change.

18          The second change is that the cells are flat.

19  You see how they're flattened?  They're called actually

20  "squamous."  "Squamous" means flattened.  It's like your

21  skin.  The surface of your skin is a squamous epithelium.

22  An "epithelium" is a cell type that lines surfaces, so

23  your skin is an epithelium, and the surface of your skin

24  is a squamous epithelia.

25          Now, normally, we don't have squamous cells

1  lining our airways, but cigarette smokers cause a

2  transformation of the normal tall, ciliated, and

3  mucus-producing cells to this more squamous variety of

4  cell.

5          Now, the third major difference that you see is

6  that there are what are called "inflammatory cells."  See

7  all these little cells sitting on the surface?  These are

8  inflammatory cells.  These are cells that are coming in

9  to try to remove the agents that are causing the injury.

10  If it's asbestos, they're going to come in there and try

11  to remove the asbestos.  If it's cigarette smoke, they're

12  going to come in there and try to remove the particles of

13  cigarette smoke.  That's inflammation.

14          If you cut yourself, you get an infection; you

15  get inflammation because those cells are trying to remove

16  the bacteria that are causing the infection.  Same kind

17  of thing.

18          So you can see that the airway of a cigarette

19  smoker is very different.  I'm going to give you -- I'm

20  going to tell you one of the reasons here -- I'm going to

21  tell you one of the reasons that the combination of

22  cigarette smoke and asbestos is particularly dangerous:

23  because these squamous cells are more likely to pick

24  up/internalize asbestos fibers.

25          These cells in the normal airways are very poor

KINSER v. CBS CORP., Case No. 94-2282

1   engaging, in engaging cig-- I'm sorry.  They're very poor

2   in engaging asbestos fibers.  They move the asbestos

3   fibers across.  They don't pick up the asbestos fibers

4   very well.  A few, but not anything like these squamous

5   cells that line the airway of a cigarette smoker.  Okay?

6            So right away, you now have a more efficient

7   way of introducing the fibers into the target cells, the

8   cells that can become cancer cells.  Okay?  I'll talk

9   more about the other reasons in a minute, but that's one

10  reason.

11       Q    I have one question.  This, this appearance

12  that the smoker's airway might have, does that change

13  after they quit smoking?

14       A    Oh, yes.

15       Q    And I know you're going to talk more about

16  this, but that was just my question.

17       A     No.  That, that's a very good question, and the

18  answer is:  Absolutely.  The longer the time after you

19  smoke, the more likely it is that this appearance moves

20  back towards normal.  We do regenerate the normal

21  ciliated epithelium after smoking.  The longer after

22  smoking it is, the more of these normal cells you'll

23  find.

24            And as far as the risk of getting cancer, that

25  follows along the same way.  In other words, you never

KINSER v. CBS CORP., Case No. 94-2282

1   can get back to a zero risk of a nonsmoker, or the very

2   low risk of a nonsmoker; but the longer after, the time

3   after you've stopped smoking, the closer you get to the

4   risk being that of a nonsmoker.

5        Q    So next would be slide 8.

6        A    Okay.  All right.  Now I'm going to show you

7   what, a close-up of some of these cells that respond to

8   the presence of cigarette smoke and, and asbestos down in

9   the part of the lung where we get asbestosis.

10        So what I'm going to do is I'm going to go --

11   you see all those little air spaces?  We've got hundreds

12   and millions of these individual air spaces.  I'm going

13   to go into a single human air space.  I'm going to take

14   the microscope, and I'm going to go right down into the

15   air space.

16        It's kind of like if you'd think of this

17   courtroom as an air space.  Just pick out any one of

18   these and make believe you're sitting in it.  Okay?

19        And on the surface of all of our air spaces,

20   there's another kind of epithelium.  It's like a

21   carpet -- like this carpet here; it looks like it's put

22   together by carpet squares, perhaps.  If you think of

23   every one of these carpet squares as a cell, then you'd

24   have a concept of what the cells look like that cover all

25   of our air spaces.

KINSER v. CBS CORP., Case No. 94-2282

1           Now, when a person smokes or is exposed to

2    asbestos, we get inflammatory cells responding down in

3    these air spaces as well.  And there's a very special

4    cell that lives down there.  It's the last line of

5    defense that we have for removing these particles.  And

6    I'm going to show you what those cells look like.

7           And the concept of the size of the cell would

8    be -- if this room is an air space -- would be like this

9    podium right here.  So this podium would be just about

10   the size of one of these cells, or maybe about my size.

11   Okay?

12          So let me, let me show you what these cells

13   look like.  So any one of these air spaces, you take the

14   ceiling off; I put the microscope right over it and are

15   going to go right down, focus right down on the, on the

16   cell, in the air space.

17          And, and here's what it looks like.  So here's

18   the carpet down here, if you like looking down at this

19   carpet.  And notice this cell has kind of like little

20   bumps all over it?  And these are different kinds of

21   epithelial cells, cells that line surfaces.

22          But the focus of what I'm telling you now are

23   these cells, this one that has a tail end and this one

24   that has two of what are called "false feet" out in front

25   of it; and I caught this cell in the act --

KINSER v. CBS CORP., Case No. 94-2282

1              JUROR:  Your reflection of the laser is hitting
2  me right in the eye.
3              THE WITNESS:  Oh, dear.
4              JUROR:  I'm sorry.
5              THE WITNESS:  No, I'm sorry.  Has it been doing
6  that the whole time?
7              JUROR:  Yeah.
8              THE WITNESS:  Is that --
9              JUROR:  That's fine.
10             THE WITNESS:  I'll just stand here, if that's
11 ok.
12             DEPUTY CLERK:  That's a great spot because it
13 projects right on the wall.
14             THE WITNESS:  All right, so there's two cells
15 here.
16             COURT REPORTER:  And keep your voice up,
17 please.
18             THE WITNESS:  Oh, I'm sorry.
19             COURT REPORTER:  Don't forget me.
20             THE WITNESS:  All right, yes.
21      A    So there are two cells sitting on the carpet.
22 There's this one that's kind of ruffled, not going
23 anywhere.  Then there's this cell with the tail end and
24 these, what are called "false feet" in front of it.
25             And this air space once belonged to somebody

KINSER v. CBS CORP., Case No. 94-2282

```
 1  who was killed in a motorcycle accident.  I was on the
 2  medical examiner's autopsy call, and I went in and
 3  prepared this person's lungs so I could go from air space
 4  to air space and look for interesting things.
 5          One of the interesting things I found were
 6  these two cells sitting on the carpet, and this one was
 7  going after this pollen grain right here when I caught it
 8  in the act of doing that.  So this person, as he was
 9  riding along on his motorcycle, was inhaling a lot of
10  things.  One thing we know he inhaled was this pollen
11  grain which went zipping right past the cilia and landed
12  down in the carpet.
13          And I'm going to show you that's where asbestos
14  lands as well.  And cigarette smoke particles land down
15  there as well.  And there are these cells called
16  "macrophages."  "Macro" means big, and "phage" means
17  eaters.  They're the big eaters of the lung, and they
18  move -- they can move around -- I think we're old
19  enough -- at least I am -- to remember Pac-Man, the
20  yellow guy that zips around.
21          Okay.  They don't zip around like Pac-Man.
22  They move millimeters per minute.  So they're moving very
23  slowly across the air space surfaces.  And they can
24  detect the presence of foreign particles, like pollen
25  grains.
```

KINSER v. CBS CORP., Case No. 94-2282

1          We discovered in my laboratory the chemical

2   signal that attracts these cells to asbestos.  Very

3   complex cells, a very important defense mechanism.

4          Normally, in a nonsmoker, like you and I, we

5   have about two or three of these in every one of our air

6   spaces, ready to respond to the presence of foreign

7   particles.

8          Cigarette smokers can have hundreds of them in

9   every air space.  We published a paper a number of years

10  ago showing the response of macrophages to the presence

11  of the dust particles in cigarette smoke.  So these cells

12  are constantly trying to clean up the mess, whether it's

13  asbestos fibers or pollen or cigarette smoke.  Whatever

14  it is, these cells are responding.

15         And then they move up onto the escalator.  I

16  didn't use that term before.  That's the mucus and the

17  cilia.  We call it the "mucociliary escalator" because it

18  escalates things up to our mouth.  So these cells then

19  move up onto the escalator; and every time you swallow,

20  you're swallowing a few of your friends, these

21  macrophages that are constantly cleaning your air space

22  surfaces.

23         All right.  So now we've seen all the cells we

24  need to see to understand what happens when cigarette

25  smoke and asbestos get into the lung, so we can now -- I

KINSER v. CBS CORP., Case No. 94-2282

1    can show you a picture of asbestos.  I can't show you a

2    cig-- picture of cigarette smoke.  We've all seen

3    cigarette smoke.  Cigarette smoke contains inorganic

4    particles, silica and, and aluminum silicates, and

5    contains about 40 different carcinogens, cancer-causing

6    agents.  But I can't take pictures of those.  You can

7    measure them chemically, but that's not a very

8    interesting picture.

9            So if I were to show you -- so I'm showing you

10   what asbestos fibers look like under a microscope, and

11   you can see there's a one micron bar here, which you can

12   see this one micron bar, which is pretty easy to see in a

13   magnification of 4,300 times.  And you can see that some

14   of these fibers are hundreds of microns long, and some of

15   them start out at a micron and then fracture down to

16   smaller and smaller fibers.

17           And if these fibers were exposed to cigarette

18   smoke, they'd look exactly the same.  In other words, you

19   can't see the accumulation of cigarette smoke on the

20   fibers.  It's, it's -- these are chemical accumulations

21   that you can't take pictures of; but they can be measured

22   chemically, and have been.

23           So -- I didn't do this work, but some scientist

24   wanted to know:  Does -- do the carcinogens of cigarette

25   smoke bind to the surfaces of asbestos fibers?  The

KINSER v. CBS CORP., Case No. 94-2282

1    answer is:  Yes.  So there, now, is the second reason

2    that the combination of asbestos and cigarette smoke is

3    particularly dangerous because now -- I told you that the

4    fibers are more efficiently taken up by those cells in

5    cigarette smoke, and those fibers then can accumulate the

6    carcinogens of cigarette smoke; and now you have an

7    efficient way of introducing those carcinogens right to

8    the cells.  And I'm going to show you how the fibers

9    actually get into the nucleus, into the genes of the

10   cells as we go along.

11        Q    So why is it that we can't see, like, particles

12   of cigarette smoke binding in this picture?

13        A    They're what are called "ultramicroscopic."  In

14   other words, they're beyond the ability of -- they're,

15   they're so small, the particulates are so small that a

16   typical microscope wouldn't show it.

17             Now, there are some microscopes that can

18   measure things at the atomic level; and if one were to

19   use that, you probably could see some of the changes on

20   the surface of the fibers, but I've not done that.  I

21   don't know anybody who's done it.

22        Q    Be like going into a nuclear reactor or

23   something to get that small?

24        A    It -- they would be very small.  Yes, yes.

25             All right.  I'm going to show you, you know, a

KINSER v. CBS CORP., Case No. 94-2282

1  few of the features of asbestos fibers landing in the

2  lung and how the lung handles those fibers.  And here are

3  some macrophages.  Remember, I told you the macrophages

4  are trying to clean things up.  Here's one, two, three,

5  four, five macrophages; and they are picking up fibers.

6  You can see they're actually sharing some asbestos fibers

7  with one another in there, accumulating in this area.

8  Usually you find one or two macrophages, but here's a

9  bunch because they're collecting at these sites where the

10 asbestos fibers have landed.

11         Now, this is down on the carpet, down in the

12 air spaces, where the air spaces are.  And this is where

13 the cigarette-induced disease emphysema develops and

14 where the asbestos disease asbestosis develops.  And I

15 can show you that better in the next slide.

16         So my point here is that the macrophages are

17 coming in, and they're trying to pick up the fibers; and

18 at the same time they're doing that, the fibers are

19 toxic.  "Toxic" means that it kills the cells.  So

20 asbestos fibers are toxic.  Cigarette smoke is toxic.

21 The macrophages are fighting the big battle, and they're

22 not sufficient to prevent disease.

23         In fact, you can see, actually, this macrophage

24 here is dead.  There are little holes in it; it's dying.

25 And that's part of the disease process of both emphysema

KINSER v. CBS CORP., Case No. 94-2282

1    and asbestosis, because these macrophages that are coming

2    in to fight the agents are killed by those toxic agents

3    and actually participate in making the disease worse.

4              So this is an example of -- you know how

5    sometimes there are immune-mediated diseases where you

6    have an immune response?  Asthma is a good example.  You

7    have an immune response; your body has an immune response

8    to some agent in the environment, and you get sick

9    because of it.  I mean, there are a lot of examples like

10   that where our response to an outside agent causes us to

11   get sick.

12             Here's an example.  You have asbestos.  The

13   cells are responding.  The inflammatory cells are

14   responding to asbestos.  The cells get killed, and that's

15   part of the disease process.

16             Okay.  Now, this is from the lung of a rat.

17   Now, I'm showing you this because this is the only way

18   that you're going to be able to understand where the

19   fibers land when they go past the ciliated cells and land

20   down on the carpet and cause the disease asbestosis.  So

21   we'll talk about asbestosis for a minute.

22             Asbestosis is scarring in the lung from

23   inhaling asbestos.  Now, when I started my work, I think

24   I told you that we didn't know where the fibers went; so

25   we put these animals -- rats or mice -- put them in these

KINSER v. CBS CORP., Case No. 94-2282

1    chambers that are about six feet high/four feet wide.

2    There's an asbestos generator at the top of the chamber.

3    It generates a dust and make it dusty in the environment.

4    The animals inhaled the dust.

5            And if you look at them immediately after

6    exposure, which, like an hour -- you expose them for an

7    hour and then you take them out of the chamber, any

8    asbestos that you see in their lungs obviously landed

9    there during the hour, and then you can see where the

10   fibers landed.  And if you look at them, then, a few

11   hours later, or days later or weeks later or months

12   later -- years later when they have lung cancer,

13   mesothelioma -- then you can follow the process.  So

14   that's the concept of these experiments.

15           Now, this one was exposed for an hour, so this

16   is going to allow us to see where the fibers landed.  So

17   I'm going to focus on this spot.  So the animals are

18   exposed for an hour, take them out of the chamber, give

19   them an overdose of anesthetic because they don't wake up

20   from that.

21           I'm going to focus on this spot right here.

22   It's one of millions of spots like this around the lung.

23   Remember, this is the end of the airway where it opens

24   out into the little rooms.  I told you we're sitting in

25   one of these rooms.  Okay?  Air spaces, they're called.

KINSER v. CBS CORP., Case No. 94-2282

1   They have walls; the air spaces have walls.  The air

2   spaces also -- if you open the walls, you see the little

3   holes in the walls?  That's where the blood runs, so all

4   the blood in our bodies has to run through the walls in

5   these air spaces.  That's where it picks up the oxygen.

6            So I'm going to focus on this spot right here,

7   and I'm going to fill the screen with that spot right

8   there.  So let me orient you to this black hole right

9   here.  It's this black hole right here.  So we're looking

10   at this surface.  We're looking at the carpet, and now we

11   see asbestos fibers.

12            Remember these fibers I showed you here?  Some

13   of them are long and curly; some of them are short.  All

14   different shapes and sizes.  Now we're going to see all

15   different shapes and sizes sitting on the carpet.  Okay?

16            So the fibers have been inhaled.  Some of them

17   landed along the airways.  Some of them landed on the

18   ciliated cells.  And some of them went right past the

19   ciliated cells and landed on the carpet, and you can see

20   them down here.

21            Now, the two diseases, asbestosis and

22   emphysema, develop right down here.  Now, emphysema is

23   the opposite of asbestosis.  We need all of these air

24   spaces to create a huge amount of surface area to

25   exchange oxygen and carbon dioxide.  If you reduce the

KINSER v. CBS CORP., Case No. 94-2282

1   number of air spaces, you reduce that surface area.  Now,

2   emphysema happens when the walls of the air spaces break

3   down; so instead of having, like right here -- one, two,

4   three, four, five -- six little air spaces, you have one

5   big air space.  The physicists and the engineers will

6   tell you that is much less surface area than the six

7   small air spaces.  That's emphysema.  That's why people

8   with emphysema, with these air spaces broken down, get

9   short of breath, because they have less area to move

10  oxygen and carbon dioxide, and they're also trapping

11  carbon dioxide down here.

12         Okay.  Now, asbestosis, on the other hand,

13  caused by these fibers that you see right here, is

14  scarring in the lung.  Now, just underneath this carpet

15  that we're -- that I'm standing on right here that the

16  fibers landed on, there's a thin layer of connective

17  tissue.  Remember, I told you under the pleura?  Same

18  thing under the carpet:  There's a thin layer of

19  connective tissue so our lungs are elastic and supple.

20         If these cells surrounding or lying on top of

21  that connective tissue are damaged, are injured, we'll

22  get a scar -- just like if you damage your skin, you'll

23  get a scar -- as a result of the response of the target

24  cell for asbestosis.

25         The target cell for asbestosis is called the

KINSER v. CBS CORP., Case No. 94-2282

1  "fibroblast."  Fibroblast.  It's a cell that lives under

2  the skin.  It's a cell that lives under the carpet and

3  the lung, and it makes connective tissue.  And if there's

4  injury, it makes a scar in response to that injury.

5  That's what asbestosis is.  It sounds simple, but that's

6  what it is.

7          And so let me just, again, reiterate:

8  Cigarette-induced emphysema, more typically in the upper

9  lobes.  Cigarette smokers tend to get them in right

10  upper/left upper lobes.  The scarring of asbestosis tends

11  to be more concentrated in the lower lobes.  It has a lot

12  to do with gravity, but we can talk about that in a

13  little bit if you want.

14          All right.  So now we have --

15      Q    Just -- I have one question here.  At, at the

16  beginning when you were talking about your background,

17  you mentioned something called "pulmonary fibrosis."

18  How, how does that term fit in with what you're now

19  talking about as scarring?

20      A    Right.  So "pulmonary fibrosis" is the overall

21  term for scarring of the lung.  There are a lot of ways

22  to get pulmonary fibrosis.  There are a number of

23  different inhaled agents that cause pulmonary fibrosis.

24  Asbestos is one of them.  And when it's caused by

25  asbestos -- when the pulmonary fibrosis is caused by

KINSER v. CBS CORP., Case No. 94-2282

1   asbestos, it's called asbestosis.

2       Q    And the difference between the appearance of

3   the emphysema from the tobacco smoke and the scarring you

4   talked about from the asbestos would show up in what way?

5       A    Well, it depends on how you're looking at it.

6            So if you start out with an x-ray -- I'm not a

7   radiologist, obviously; but emphysema is recognized by

8   the radiologist as clear areas in the, in the radiograph.

9   Scarring is recognized as shadows on the x-ray.  That's a

10  very imprecise way of knowing just what the lung looks

11  like, but that's in general terms.

12           Now, the next way you can measure it is by

13  pulmonary function.  In other words, a person who has an

14  overwhelming scarring disease has what's called a

15  "restrictive disease."  They're restricted from taking a

16  deep breath.  They can't, they can't inhale like they

17  would like to, normally.

18           While if they have emphysema, they have what's

19  called an "obstructive disease."  They're obstructed from

20  exhaling.  Okay?  So radiographically, you can tell the

21  difference.  Functionally, you can tell the difference.

22  But the best way and the most sure way is with a

23  microscope.

24           And the microscope then -- you go down, and you

25  look at the lung and you say:  Well, look, this is

KINSER v. CBS CORP., Case No. 94-2282

1  normal.  Every one of those air spaces is perfectly

2  formed.  There's no emphysema here.  There's no scarring

3  either.  There's no asbestosis.  Or you can see it very

4  early on, very -- as the disease starts, you can see it

5  with a microscope.

6         THE COURT:  Okay.  Now, let me interrupt.  We

7  need a recess.  The jury may have a recess.  Take the

8  jury out.

9         (Jury absent, 10:43 a.m.)

10         THE COURT:  I got the signal that some jurors

11  needed a recess.  So we had a recess.

12         MS. EZELL:  Thank you, Your Honor.  For how

13  long?

14         DEPUTY CLERK:  Ten minutes.

15         MS. EZELL:  Okay, thank you.

16         THE COURT:  Ten minutes.

17         (Recess, 10:44 a.m. to 10:57 a.m.)

18         (Jury present, 10:59 a.m.)

19         THE COURT:  All right.  You may proceed.  Ask

20  another question, Mr. McCoy.

21         MR. McCOY:  Yes.

22  BY MR. McCOY:

23    Q    Dr. Brody, the next slide that we have up here

24  illustrates for us what, in terms of the topics that

25  you're covering?

KINSER v. CBS CORP., Case No. 94-2282

1      A     Right.  This is -- we're going to talk about

2   cancer now.  I told you that asbestosis is scarring of

3   the lung.  I told you that plaques is scarring underneath

4   the pleura.  And now we're going to talk about lung

5   cancer and what happens and how asbestos combines with

6   cigarette smoke to cause a lung cancer.

7            This is what a typical lung cancer looks like.

8   You can see it's -- this is a rather advanced case

9   because there's a large tumor in the central regions of

10  the lung, and some of the tumors are spreading; and you

11  can see they're associated more with the airways because

12  that's where the cancer started, in the airway.

13           Now, I just digress, just for a second, because

14  this is what normal pleura should look like.  You see the

15  pleura is very thin and unremarkable; but when you take a

16  close-up of the pleura in somebody exposed to asbestos

17  who has plaques, the surface of the pleura can get these

18  scars on it.

19           So you see the artist cut away the ribs.  This

20  is called a Netter diagram.  Dr. Netter has given us

21  atlases of the human body in health and disease.  We use

22  Dr. Netter's slides a lot to help us explain.  Here, Dr.

23  Netter's cut away the ribs, showing us the outside

24  surface of the lung; and you can see the scars, these

25  so-called plaques, because -- they're areas of scar

KINSER v. CBS CORP., Case No. 94-2282

1  tissue that are sitting on the surface of the pleura, and

2  they're the result -- oftentimes, more often than for any

3  other reason, they're caused by asbestos exposure.

4          Okay.  Now, let's go back and talk about

5  cancer.

6      Q    Just by my count now, I'm at slide number 15

7  for our record here.

8      A    Okay.

9      Q    Go ahead.

10     A    All right.  So let me give you the simplest

11  definition of cancer.  I said this before, but now I'll

12  explain what I mean.  Cancer is the loss of control of

13  cell growth.  So if I took a piece of your skin and I put

14  it under the microscope, I could show you that about 10

15  percent of your skin cells are growing.  You're always

16  losing skin, so you always need to make new skin cells.

17  In your lung and your liver, only about 1 percent are

18  growing.  You don't have to make a lot of new lung and

19  liver cells.

20          Now, humans have about 20,000 or so genes that

21  make us what we are.  And of those 20,000 or so genes,

22  about a hundred of them are called "growth-controlled

23  genes."  Some of them are even called "tumor suppressor

24  genes."  That might tell you a little bit about what they

25  do.

KINSER v. CBS CORP., Case No. 94-2282

1           Now, these growth-control genes are at the

2     center of understanding what's happening in the causation

3     of cancer.  Because, remember, I just told you that

4     cancer is a loss of control of cell growth.  So in order

5     to have a cancer, you have to have mistakes or errors or

6     mutations in a set of genes that control cell growth.

7     Okay?  That's the simplest concept that we can get to,

8     related to cancer.

9           Cancer is a very complex topic, but we're

10    trying to sort out just what it is about these genes that

11    makes some people more susceptible than others.  Most

12    people, no matter how much they smoke, no matter how much

13    asbestos they're exposed to, they don't get cancer.  You

14    still wouldn't want to take the risk because it's high

15    enough that, that, as I say, you don't want to take a

16    chance.  But most people don't get it.  Most people are

17    not susceptible.

18          But what is it that makes people susceptible?

19    It's whether or not the sets of genes that control cell

20    growth are damaged.  Now, how do carcinogens, like

21    asbestos, damage these genes?  That's what we're going to

22    talk about.

23          Now, this is the cover of the proceedings of a

24    meeting that I was at a few years ago.  It says "Cellular

25    and Molecular Aspects of Fiber Carcinogenesis."  Now what

KINSER v. CBS CORP., Case No. 94-2282

1   does that mean?  The concept of the meeting was to

2   understand how fibers cause cancer.  "Carcino" is cancer;

3   "genesis," how it's formed or caused.

4           Now, I talked to you about cells, showed you

5   cells.  I showed you the target cells for lung cancer and

6   asbestosis.  I talked about the target cell for pleural

7   plaque.  But you can't talk about carcinogenesis unless

8   you talk about the molecular aspects.  That's your genes,

9   the molecular study of genes.  So this meeting was

10  concentrated on how -- the molecular aspects, called

11  "carcinogenesis."

12          One of the ways that we study this is by taking

13  cells out of the body -- out of animals, out of people --

14  putting the cells in a dish, and adding the suspected

15  carcinogens.  You can expose the cells to cigarette

16  smoke, compon-- different components of cigarette smoke.

17  That's one of the ways, one of the best ways that

18  scientists found.  What is it about cigarette smoke that

19  causes cancer?

20          Well, because -- you can fractionate the

21  cigarette smoke into whole different sets of carcinogens

22  and treat the cells with those different components of

23  cigarette smoke.  Some are carcinogens; some are not.

24  Some are toxic, and some are not.  Okay?

25          You can do the same thing with asbestosis.  Add

KINSER v. CBS CORP., Case No. 94-2282

1   the fibers to the cells and see how they interact with

2   the, with the cells.

3           So here are -- on the cover of these

4   proceedings, for example, there are two cells.  And some

5   fibers have been added.  You can see there's a cell.

6   There's a fiber here.  Some small fibers have collected

7   around the center circle of the cell.  The center circle

8   of the cell is called the "nucleus."  The nucleus of the

9   cell contains all of our DNA.  "DNA" just means your

10  genes.  DNA is your genes.  That's, that's what that

11  means.

12          Now, the genes are individual segments specific

13  to you, make you what you are, because your DNA segments

14  are different than the person sitting next to you.  We

15  all have the same genes, but the DNA sequences are just

16  different enough from one person to the next to make us

17  different.

18          So notice how the asbestos is excluded from the

19  DNA, from the center circle, because we have this

20  protective membrane around the outside of the cell.  And

21  that's very important because we don't want the

22  carcinogens interacting with the DNA.  Now, one of the

23  things that scientists have known for a long time is that

24  when the cells divide, when we make new cells, we lose

25  this protective membrane.

KINSER v. CBS CORP., Case No. 94-2282

1          So we took cells that were dividing and treated

2    them with asbestos.  Other investigators -- not us -- but

3    other investigators did the same thing with cigarette

4    smoke.  So they were able to get very effective

5    interactions between the asbestos and/or the cigarette

6    smoke and the DNA.  So let's see what happens.

7          So here's what's supposed to happen.  This is

8    called -- this is normal cell division.  We have three

9    cells:  one, two, three.  You can see the nucleus on the

10   cells on the outside are intact.  The DNA's been stained

11   blue so you can see where it is.  The cell in the center

12   has received a signal to divide.  That means that it's

13   going to make two new cells, just like the original.  The

14   signal could be:  I added a growth hormone, or you had

15   a -- it's a skin cell and you had a cut in your skin; you

16   need to make new skin cells.  Whatever the reason, the

17   idea is that the DNA is condensed into these white

18   threads called "chromosomes."  Chromosome bands are

19   condensed DNA, and you can see the individual

20   chromosomes; and the idea is to make two sets of

21   chromosomes just like the original, and then you'll have

22   two new cells.

23          Now, let me show you what your chromosomes look

24   like.  The humans have 23 pairs of chromosomes.  You've

25   got one chromosome from your mother, one from your

KINSER v. CBS CORP., Case No. 94-2282

1    father; and those light and dark bands that line up on

2    the chromosomes, that's where all the 20,000 or so genes

3    are distributed across your chromosomes.

4            Now, the take-home message from this slide is:

5    Every one of our 20,000 genes must be in the correct

6    place on the correct chromosome.  There's no mixing and

7    matching allowed when it comes to where our genes are

8    distributed on the chromosomes.  If a gene is not in the

9    right place on the chromosome, it will not function.

10           So let's go ahead then.  Here's what is

11   supposed to happen.  Chromosomes form.  They replicate.

12   You can get what's called "faithful replication," making

13   all genes in all the right places and all the correct

14   chromosomes.  You'll get two new daughter cells, just

15   like the original; and that's what's supposed to happen

16   every time.

17           Now, as I told you, I can show you pictures of

18   asbestos, so I can show you that asbestos gets in and

19   interferes with this process, but I'm going to tell

20   you -- I can't show you the picture -- but cigarette

21   smoke does the same thing.  It gets into this, in amongst

22   this DNA replication and causes this, the similar kinds

23   of changes.  And let, let me talk about what those

24   changes are, and then we can talk about specifics.

25           So here the, here's a cell over in Panel A with

KINSER v. CBS CORP., Case No. 94-2282

1    no fibers, no cigarette smoke.  Half of the chromosomes

2    go to one side; half, the other.  You get two new cells,

3    just like the original, and everybody's happy.

4            Panel B, there's some asbestos fibers.  This is

5    a chrysotile fiber, one of the kinds of asbestos.  You

6    can see a long fiber.  This cell's about 40 microns

7    across.  You can see you need a microscope to see it.

8    This fiber's about 30 microns.  This is 10 microns.  Most

9    of the DNA is moved to the new cell.  Most of the DNA is

10   moved here.  But some of the DNA you can see has bound to

11   the surface of the fiber.  So that means the DNA is not

12   moved to its respective position in the newly forming

13   cell, and this produces a condition called "aneuploidy."

14   And you can see it up here, aneuploidy,

15   a-n-e-u-p-l-o-i-d-y.

16           Now, let me show you one more example of a

17   different kind of asbestos.  Same concept.  Here, the

18   cell is dividing, no fibers.  Half the chromosomes go to

19   one side; half, the other.  Here's a fiber spanning the

20   two cells.  So even though you have the daughter cells,

21   there's some DNA bound to the surface of the fiber.

22           Now, these are not cancer cells.  Okay?

23   Aneuploid cells are not cancer cells.  But the door has

24   been opened, and I'll take just a minute to explain what

25   I mean by the door being opened.

1          Now aneuploidy can be caused, obviously, by
2     asbestos, and I can show you that.  Aneuploidy is caused
3     by a number of different carcinogens in cigarette smoke.
4     Now, I told you that the carcinogens in the cigarette
5     smoke combine to DNA.
6          I'm sorry.  Let me say that again.  The
7     carcinogens of cigarette smoke combine to asbestos.  Now
8     you see the asbestos interfering with the DNA.  Now, if
9     it had carcinogens of cigarette smoke on it, I call it a
10     double whammy.  And that's the main reason that you can
11     see these synergistic, or supra-additive, effects --
12     whatever you want to call it.  It's a more efficient way
13     of introducing the asbestos carcinogen at the same time
14     as the cigarette-derived carcinogens.
15          Okay?  Now, what is the significance of
16     aneuploidy?  So here's this DNA signature here on the
17     fiber.  And I told you all of the genes, in order to
18     function, must be in the right place in the right
19     chromosome, which obviously this DNA is not.  I'm going
20     to tell you about two genes, just for a second, that I
21     study.  One of them's called p53; p53 is a tumor
22     suppressor gene.
23          When our cells -- if a cell we have becomes
24     aneuploid, that means an abnormal DNA division.  The p53
25     gene gets activated and stops the cell from dividing.

KINSER v. CBS CORP., Case No. 94-2282

1   Now, that means you can't pass the mistakes on to these

2   daughter cells because the cells stop dividing.  That's a

3   good thing.  That's what it's supposed to do.  That's why

4   it's called a "tumor suppressor gene," and we have a

5   series of those genes.

6           Now, what if in this DNA that's stuck here is

7   the p53 gene?  It's not going to work.  Okay?  So that

8   makes it more likely, then, that the DNA errors are going

9   to be passed on to the daughter cells, which is a

10  requirement for cancer.  I'll tell you about one other

11  gene.

12          We have a set of genes called "death pathway

13  genes."  In aneuploidy, or some other errors in the DNA,

14  the cell goes down what's called the death pathway and

15  dies.  You never hear about it again.  That's going on in

16  all of us all the time.

17          Smoking cigarettes, breathing somebody else's

18  cigarette smoke -- you go out in the sun; you get a

19  sunburn -- these are all carcinogens that interact with

20  your system.  We get aneuploid cells.  We get DNA damage.

21  The cells die, and you never hear about them again.

22          What if in this DNA is one or more of those

23  death pathway genes?  Not going to work.  Not going to

24  prevent the cell from dividing.  The cell goes on and

25  divides and goes down a cancer pathway.

KINSER v. CBS CORP., Case No. 94-2282

1           Last slide.  Okay, in this last slide, I want

2   to sort of reiterate what I told you about how cells

3   become cancer cells, but I also want you to understand

4   what's going on during this period called "latency."

5   "Latency" is the time from first exposure to the time the

6   person comes to the clinic.  Why does it take decades --

7   and, typically, it's 30, 40 years, or more -- why does it

8   take so long for these cancers to develop?  Well, this

9   helps us understand that.

10          So, here, the artist has given us a cell layer,

11  and it could be an epithelial cell layer of the airways.

12  It could be a mesothelial cell.  It could be any cell

13  surface that you're interested in studying.  It's just a

14  generic cell surface, an epithelial cell surface; and the

15  artist had a couple of lightning bolts in DNA damage,

16  damage to sets of genes.

17          Obviously, we're not talking about lightning

18  here.  We're talking about something from the

19  environment:  asbestos/cigarette smoke combining.

20          And the artist knows very well that cells with

21  DNA damage die.  And he's got one of the daughter cells

22  going off into the upper left-hand corner.  The DNA is

23  condensed, and the cells are doubled up; and it's going

24  to die.  And that's what's supposed to happen.  And you

25  never hear about it again.  As I say, it's going on in

1   all of us all the time.  Most of us are not going to get

2   cancer because these genes are working and protecting us.

3          But here we're talking about a cancer.  A

4   cancer has developed.  So the artist then is helping us

5   understand what's happening there.  So one of the

6   daughter cells then must survive.  And that's this

7   daughter cell right here.  And you can see it's dividing

8   because you can see the chromosomes.

9          And then he has this tumor, this odd-colored

10  tumor on -- and I'll tell you about the color in just a

11  second.

12         But from the first daughter cell to the time

13  the tumor develops in this space right here, you've got

14  to give me about 30 or 40 years; and I'll just take a

15  second to explain what's going on there in that 30 or 40

16  years.

17         Think about the airway lining cells in the

18  person smoking cigarettes.  He's causing the changes that

19  we talked about in the airways; and he's inhaling

20  asbestos, and the fibers are accumulating.  There's

21  carcinogens from cigarette smoke; and they're landing on

22  the target cells of the airways, and they're being picked

23  up and moved into the nucleus, the DNA, like I've just

24  showed you, over and over and over again.  One of these

25  cells with an error on -- gets a mistake, as I told you,

KINSER v. CBS CORP., Case No. 94-2282

1   p53 damage, or death pathway gene -- and that cell then

2   sits in the airway looking and acting like a perfectly

3   normal epithelial cell, and it can sit there like that

4   for months.

5          Eventually, they have to divide.  I told you an

6   expected time in the airway.  It's weeks or months.  And

7   eventually it has to divide; and so it divides -- two

8   cells, four cells, eight cells, sixteen -- all collected

9   in that certain area of the airway with one error.  It's

10  not a cancer.  It's producing a field of cells with an

11  error.

12         Okay.  Then one or more of those cells gets hit

13  again.  Another one of those fibers with a, bearing the

14  carcinogens of cigarette smoke or -- just an asbestos

15  fiber itself can cause that, or just the cigarette smoke

16  obviously can cause these errors.

17         But one of these cells then gets a second

18  error, and it starts to divide:  two cells, four cells,

19  sixteen, twenty-four -- making these, what are called

20  "fields of abnormal cells."

21         And they sit there like that for months until

22  one of the cells gets hit again.  Okay.  Now, I can stand

23  here and do that for a long time, but think about that

24  process for decades.  And, eventually, a single cell

25  grows out into a clone, into a tumor, and that's why the

KINSER v. CBS CORP., Case No. 94-2282

1    artist made these all the same color, because the tumor

2    is typically from a single cell with sufficient errors

3    and a combination of errors for that person.

4          Okay.  Remember, it's not easy to get a cancer

5    because of all these defense mechanisms we have.  But in

6    the person who has a cancer, that means, you know, that

7    there is a set of errors specific for that person that

8    has grown out.

9          Okay.  I'm going to take my seat.

10    Q    You've concluded your presentation on the

11    slides.  Thank you, Dr. Brody.  And I'll let you go ahead

12    and resume your seat.  I have a few more questions in

13    follow-up.

14          (Witness is resuming the witness stand.)

15    BY MR. McCOY:

16    Q    All right.  I'll ask this question:  Are

17    asbestosis and lung cancer the same disease?

18    A    No.  Obviously, now I think most people,

19    hopefully, in this courtroom could answer that question.

20    No.  They are not.  Remember, asbestosis is a scar tissue

21    disease where you have the fibroblast, the cell that

22    makes connective tissue, producing increased connective

23    tissue in the form of a scar.

24          And that really has nothing to do with genetic

25    damage.  Genetic damage is required for cancer.  So you

KINSER v. CBS CORP., Case No. 94-2282

1  have a set of genes that are damaged, those genes that

2  control cell growth, and then you get a cancer.

3         Now, the two diseases, obviously, can -- excuse

4  me -- can exist in the same person at the same time, but

5  they're very different diseases.

6         And just let me say so we're sure that it's

7  clear:  Asbestosis -- we've been studying asbestosis for

8  a long time, and we know that it requires the activation

9  of certain genes, not genetic damage, but activation of

10 genes, getting genes that turn these cells on to make

11 scar tissue.

12    Q    How about plaques?  Pleural plaques and lung

13 cancer, are those the same disease?

14    A    Well, of course, not at all.  Again, it's the

15 issue of scarring in a particular place, the, the pleura

16 versus the, what we talked about with the genetic damage.

17 You're activating genes that cause the pleural

18 fibroblasts to make scar tissue, versus genetic damage.

19    Q    Does a person need to have the nonmalignant

20 asbestos diseases, such as the asbestosis or pleural

21 plaques, in order to get cancer?

22    A    No, not at all.  There's -- as I indicated,

23 they're very separate diseases.  You don't have to have

24 one to have the other by any means.  Historically, what

25 happened was that people were, who were heavily exposed

1  to asbestos typically smoked cigarettes.  Okay?  And they

2  showed up at the clinic with the disease asbestosis from

3  their heavy asbestos exposure and the lung cancer from

4  the combination of asbestos and cigarette smoke.

5          And for a long time the thinking was, as your

6  question asks, the thinking was you have to have

7  asbestosis or that asbestosis caused the lung cancer.  I

8  mean, those are two conclusions that you could draw.

9          But as people learned that it's not a good idea

10  to smoke and as the asbestos exposure levels came down,

11  the question was:  Is there an increased risk of getting

12  a lung cancer without the clinical aspects of the disease

13  asbestosis?  Are you at an increased risk if you're

14  exposed to asbestos and smoke cigarettes, even if you

15  don't have the disease asbestosis, the clinical disease?

16  The answer is:  Yes.  There's very good literature that

17  explains that fact.

18      Q    What are the statistics on the increased risk?

19      A    Well, it, it depends, again, on what kind of

20  study you're looking at.  So let's start with the earlier

21  studies I was telling you about when the people were very

22  heavily exposed.

23          So there, if you didn't smoke cigarettes and

24  you only were exposed to asbestos, there were a few cases

25  of lung cancer, above the average; but they called that a

KINSER v. CBS CORP., Case No. 94-2282

1  risk of 1, let's say, not a very high risk.

2          But if you smoked a pack a day, then you

3  multiplied that -- this is the synergy -- you multiplied

4  that and got about a, a 30 percent risk.  So it increased

5  dramatically.

6          If you smoked three packs a day, you went up,

7  like, 80-fold risk.  So, I mean, it, it became huge.

8  That's the synergy.

9          Now, in this last year, scientists looked at

10 that similar population -- essentially, that same

11 population of people that had those huge numbers of

12 cases -- and found that the risks have gone down.

13     Q    Stat--

14     A    Still -- statistically, there's still more than

15 simply additive.  There's still, there's a risk increased

16 over just adding them.  They called it actually -- they

17 called it "supra-additive," meaning it's more than

18 additive.  So the risks are still there.  The

19 percentages -- I don't know; I'd have to go back and look

20 at the paper to get you the specific percentages.

21     Q    Okay.  I think we've already had some testimony

22 on the actual percentages.

23          But in terms of why these percentages might be

24 lower today, --

25     A    Yeah.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q     -- why would they, why would they have gone
 2   down?
 3        A     Yeah.  Well, because, as I said, fewer people
 4   are smoking and the, the concentrations of asbestos that
 5   people have been exposed to have gone down over the
 6   decades.  So the question was, for example:  If a person
 7   was exposed to asbestos and smoked cigarettes and they
 8   quit smoking, what does that do to their risk?  Well, it
 9   went down, and that's what a lot of those people did.
10   They quit smoking.  Fewer of them got cancer, but still
11   significantly above nonsmokers and nonasbestos-exposed.
12        Q     And this is what we've referred to as the
13   synergistic effect that we've been talking about?
14        A     Right.  The synergy is the fact that it's a
15   much greater effect than just adding asbestos by itself,
16   the effect of asbestos by itself or cigarette smoking by
17   itself, both of which can cause cancer.
18        Q     How about emphysema?  Are emphysema and lung
19   cancer the same disease?
20        A     No, not at all.  I, I explained that emphysema
21   is a breakdown of the walls of those air spaces; and,
22   again, that's a disease that's commonly found along with
23   a lung cancer.  And why?  Because cigarette smoking
24   causes both of them.  But one does not cause the other,
25   by any means.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    And I think you said they can get diff-- the
 2   different diseases -- someone can, can get asbestos,
 3   asbestosis, plaques, emphysema, and lung cancer all
 4   together, right?
 5        A    Absolutely.
 6        Q    Okay.  Then how can they, how can they get all
 7   these diseases?
 8        A    Well, think about it for a second.  So, give me
 9   them one at a time.
10        Q    Okay.
11        A    Which one did you give me first?
12        Q    Asbestosis.
13        A    Okay.  So that's scar tissue in the lung from
14   inhaling asbestos.  A person has asbestos landing down in
15   the air spaces, injures the carpet cells, and causes the
16   scar tissue to grow.  That's asbestosis.
17             Okay.  Next disease?
18        Q    Pleural plaque.
19        A    Right.  Same asbestos fibers, a proportion of
20   which land down on the air spaces, get transported to the
21   pleura -- that's a whole other story which I'm not going
22   to tell you about today -- the fibers get transported to
23   the pleura where they interact with those target cells
24   under the pleura, make a scar there.  You have a plaque.
25        Q    How about emphysema?
```

1      A     Same fibers -- all right, so the person's now a

2  smoker; nothing to do with asbestos.  All right?  Now the

3  person's a smoker.  The cigarette smoke is reaching the

4  air spaces.  The macrophages come in to clean it up and

5  produce enzymes and oxygen radicals, these inflammatory

6  agents that break down the walls of the air spaces.  I

7  mean, there's a -- there are enzymes called

8  "collagenases" that actually break down the scar tissue,

9  or break down the collagen, the connective tissue, and

10  cause emphysema.

11     Q     How does, how does the binding effect of the

12  as-- the carcinogens in the tobacco relate to the

13  asbestos fibers also entering the body in terms of having

14  these different diseases?

15     A     Yeah.  Well, the only disease that that

16  combination affects is the lung cancer.  Okay?  It has no

17  effect on the asbestosis.  It has no influence on

18  emphysema.  It has no influence on pleural plaque.  But

19  the fact that the carcinogens of asbest-- of -- the

20  carcinogens of cigarette smoke bind to asbestos makes it

21  more likely that both carcinogens, the asbestos and the

22  cigarette smoke, interact with the target cell of the

23  airways and produce a lung cancer.

24     Q     Does the asbestos or the plaques or the

25  emphysema actually cause the lung cancer?

KINSER v. CBS CORP., Case No. 94-2282

1      A     Not at all.  Not at all.  And as I've

2  explained, they're two very different processes.  They

3  can be in the lung at the same time, certainly, but they

4  don't cause it.

5      Q    If in a particular person their physician would

6  find asbestosis as a condition and, and some other

7  physicians didn't believe the same person had asbestosis,

8  does that mean that the lung cancer could not be related

9  to asbestos?

10          MS. EZELL:  Excuse me, Your Honor.  That is --

11  I object to that as calling for speculation about what

12  certain physicians might believe as being outside of this

13  witness's expertise, and calling for speculation in any

14  event.

15          THE COURT:  Can you say, with reasonable

16  scientific certainty, an answer to that?

17          THE WITNESS:  I have an opinion on that.  Sure.

18  I mean, I don't know where the "scientific certainty"

19  comes into that, but I certainly have an opinion on it.

20          THE COURT:  Reasonable scientific certainty.

21          THE WITNESS:  Yeah, well --

22          MR. McCOY:  His opinion --

23          THE COURT:  Wait a minute.  I've got to rule.

24  If, if -- rephrase the question to him.

25          MR. McCOY:  Okay.

KINSER v. CBS CORP., Case No. 94-2282

1    BY MR. McCOY:

2        Q    Do you have an opinion, to a reasonable degree

3    of scientific certainty, that if there would be some

4    physician that might find asbestosis in a person and

5    other physicians that look at the same person's lungs and

6    don't find it, whether that person's lung cancer could be

7    caused by asbestos?

8             MS. EZELL:  Your Honor, in spite of the new

9    parameters around the question, I still believe that that

10   calls for speculation; and it is -- it is not a question

11   that can be answered in the general.  It's a specific

12   medical question about a specific medical person, and we

13   don't have a foundation for this witness to answer it.

14            THE COURT:  Do you have an opinion?

15            THE WITNESS:  I do.

16            THE COURT:  He may state his opinion.

17   Overruled.

18       A    Okay.  My opinion is that if a physician finds

19   asbestosis, that would mean, by definition, that he knows

20   that there was asbestos exposure in this person's

21   background.  And that's what's the key to your question.

22            In other words, the next person, the next

23   doctor, might not find asbestosis by the criteria.

24            There are different ways to look at it, you

25   know?  You can look at it in an x-ray and, and not see

KINSER v. CBS CORP., Case No. 94-2282

1  it; but the next doctor could look at the tissue with a

2  microscope and absolutely, surely see it.

3          But the key is whether or not they know the

4  person had an asbestos exposure in their history.  If

5  they have an asbestos exposure and they have a lung

6  cancer, then that's what you need to establish, whether

7  or not it was associated with asbestos exposure.

8      Q    And once someone stops being exposed to

9  asbestos fibers in an occupational setting -- they're no

10  longer being exposed -- does, does the lung damage caused

11  by the asbestos start clearing up and going away?

12     A    No.  No, it doesn't.  The scarring caused by

13  asbestos can stop getting worse.  So a person who is

14  developing a scar tissue disease -- plaques or, or the

15  fibrosis related to asbestos -- and they stop getting

16  exposed to asbestos, the disease typically stops getting

17  worse; but it doesn't go away.

18          In some people, it actually can, what's called

19  "progress" and get worse.  The scarring can get worse.

20  But it doesn't go away.

21     Q    Get worse even after they stop breathing

22  fibers?

23     A    It can.  Not -- only about a third of people

24  that happens to, but it can happen.

25     Q    Is there some sort of statistical relationship

KINSER v. CBS CORP., Case No. 94-2282

1    that has been studied about people who have pleural

2    plaques and those who also develop lung cancer?

3        A    Well, sure.  I mean, I can't tell you the

4    statistics.  I don't know the specifics of the numbers.

5    But if a person has pleural plaques and is exposed to

6    asbestos -- those are two fairly typical associations;

7    that means pleural plaque is a likely response to

8    asbestos exposure -- those people have a higher degree of

9    lung cancer than somebody without plaques.

10            In other words, that means they've been exposed

11   to a sufficient amount of asbestos to cause lung injury

12   and plaque.  And if they smoke, then certainly they're

13   going to have an increased risk.

14       Q    You mentioned before that the lungs of the

15   smokers start getting better after they quit?

16       A    A number of things repair in the lungs of

17   smokers.  Yes.

18       Q    How long does this progress take to restore a

19   person back to normal, or close to normal?

20       A    Yeah.  It's continuing.  It takes decades to

21   even get close to the risk of a nonsmoker.  Because

22   remember those cancer fields I was telling you about?  So

23   every one of those cells with errors in it, if you have

24   those cells in your lung, makes it more likely you get a

25   lung cancer.

KINSER v. CBS CORP., Case No. 94-2282

1          Now, those clear over time.  As you keep
2   replacing cells, you keep purging those cells that have
3   the errors.  And that takes decades.
4       Q    Now, you described genetic mutations or
5   cellular mutations caused by asbestos.
6          My question is:  Can the mutations or errors
7   caused by tobacco smoke be distinguished between those
8   from the asbestos?
9       A    No.  That, that's a very good question.  So
10  scientists have established lists of errors, genetic
11  errors, that can be caused by asbestos and by cigarette
12  smoke and the combinations.  And there's really no way to
13  differentiate.
14         The -- if you -- if a person is only exposed to
15  asbestos, they have a different set of genetic errors
16  than a person that's exposed to cigarette smoke and, and
17  the combination of the two.  But there's a lot of
18  overlap.
19         So the answer is:  No.  You can't differentiate
20  them.
21      Q    What about a genetic error that's a mutation
22  caused by a combination of tobacco smoke and asbestos
23  fiber?  Can you differentiate that?
24      A    Same, same answer.
25      Q    Okay.  Can lung cancer be caused by some

1    mutations that are the result of asbestos, some that are

2    the result of tobacco, and some that are the result of

3    the combined effect?

4         A    So are you asking me:  Can, can you have

5    cancers caused by each one of those?

6         Q    What I --

7         A    You mean a separate cancer?

8         Q    What I -- no.  What I'm really asking is:  You

9    had said there needs to be multiple or a series of

10   genetic mutations?

11        A    Sure.

12        Q    Okay.  Within that series, can some of those

13   mutations be caused by asbestos, some caused by tobacco

14   smoke, and some caused by the combined effect?

15        A    I get it.  And the answer is:  Yes.

16   Absolutely.

17        Q    Can you explain how that would work?

18        A    Well, just think about -- I mean, some of the

19   asbestos fibers are going to get in there all by

20   themselves, not going to touch cigarette smoke; and

21   they're going to cause the genetic damage that I, that I

22   showed you.

23             We know that, we know that cigarette smoke by

24   itself has potent carcinogens.  Certainly by itself,

25   that's the greatest cause -- the largest cause of lung

KINSER v. CBS CORP., Case No. 94-2282

1    cancer known across the world is cigarette smoking.  So

2    we know that that can do it by itself.

3             And then if you get the combination, you

4    increase the risk dramatically because of this synergy or

5    supra-additive effect.

6        Q    Do most of the asbestos fibers that a person

7    would inhale in the occupational setting stay in the

8    lungs?

9        A    No, they don't.  Most of them are cleared by

10   these very effective defense mechanisms I showed you, the

11   mucociliary escalator, the macrophages, the mucus.  Most

12   of the fibers that are inhaled actually are cleared from

13   the lung.

14            It's those that are not cleared; those are the

15   ones that cause disease.  And because people

16   occupationally are exposed to trillions of fibers, you

17   know, the percentages that are left are sufficient to

18   cause disease.

19       Q    Do most people, even though they may not have

20   worked in occupational settings, have asbestos fibers in

21   their lungs?

22       A    We all have some.  I mean, there's a background

23   out there.  It's very low.  It doesn't cause disease.

24   But it's sufficient to accumulate over time into -- so

25   that all of us have some fibers in our lungs, not enough

KINSER v. CBS CORP., Case No. 94-2282

1  to cause disease.

2      Q    So why isn't it that most people would not get

3  an asbestos disease or lung cancer?

4      A    Well, it's dose.  I mean, dose-response --

5  these are dose-response diseases:  The more you're

6  exposed to, the more likely it is that you'll get a

7  disease.

8          Now, if all you're exposed to is what's in the

9  background that we all have from products that are

10  breaking down in buildings or automobile products or

11  whatever -- whatever the source, there are a few fibers.

12  There might even be a fiber floating around in here.

13  But -- you go out in the street, you find a few more.

14  And, but they're not sufficient to cause disease.  We

15  store them.  We store them.

16          So we've done studies like that.  In other

17  words:  How many fibers are there in people who have

18  never been occupationally exposed?  It can be millions.

19  That's not very many because you can get a billion fibers

20  into a thimble.  So if I took my lungs and digested them

21  down and concentrated all the fibers, I could have a few

22  million fibers there.  That's not very many, not enough

23  to cause disease.

24      Q    You mentioned -- you talked a lot about

25  fibrosis and asbestos, right?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A     Sure.
2        Q     Okay.  Can tobacco smoke ever cause any kind of
3   fibrosis?
4        A     So, you remember where I showed you the airways
5   go into the air spaces, that sort of area where they open
6   out into the little air spaces?  The ends of the airways
7   are called "bronchioles."  And some cigarette smokers,
8   heavy smokers, can develop what's called "respiratory
9   bronchiolitis."  That's the big word for inflammation in
10  the bronchioles, the ends of the airways.  And there can
11  be some scarring in those areas.
12       Q     So a different, different -- a very specific
13  area you're talking about?
14       A     It's a very specific area; it --
15       Q     How does that -- I didn't mean to cut you off.
16  I was just going to ask:  How does that differ from the
17  area where you might see it from asbestos?
18       A     Right.
19             So the upper lobes are typically where you see
20  cigarette smoke-induced diseases.  Emphysema, lung
21  cancers tend to form in the upper lobes, where the
22  scarring of asbestos diseases are down in the low -- more
23  in the lower lobes.  There's certainly a lot of overlap,
24  but they tend to differentiate.
25             If a person was a very heavy smoker and had
```

KINSER v. CBS CORP., Case No. 94-2282

1    scarring from the cigarette smoke, a radiologist might

2    overlap some of that with asbestos disease; but,

3    typically, those are not -- it's not a problem

4    establishing the difference, particularly under a

5    microscope.  I mean, if there's -- if you get to look at

6    the tissue with a microscope, then there's no confusion

7    at all.

8         Q    Well, would, would the, the -- any kind of

9    fibrosis from the tobacco smoke normally be seen on an

10   x-ray?

11        A    No.  That would be hard.  As I say, a

12   radiologist might be able to see it if it were a very

13   heavy smoker.  But you said "typically," and I'm saying

14   no.

15        Q    Well, the scarring or fibrosis then would be in

16   the, in the bases of the lungs --

17        A    From asbestos.

18        Q    -- is what that means?

19        A    From asbestos, right, in the lower lung zones.

20        MR. McCOY:  Let me run through my notes.  I

21   think I'm finished, Judge.

22             (Brief pause in proceedings.)

23        THE COURT:  Well, you'll be back on redirect,

24   won't you?

25        MR. McCOY:  Yeah, yeah.  I --

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Cross-examination.

2          MR. McCOY:  I'm finished.

3          THE COURT:  Good.

4          MR. McCOY:  Thank you.

5          Thank you, Dr. Brody.

6          THE WITNESS:  You're welcome.

7          MS. EZELL:  Your Honor, I just need to pick up

8   one of our demonstratives from yesterday.

9          CROSS-EXAMINATION BY MS. EZELL:

10     Q    Good morning.

11     A    Good morning.

12     Q    One of the things that you've mentioned a few

13   times this morning is something called supra-- oh, hold

14   on.  I'm a red dot here; I need to go to green dot.

15          (Brief pause in proceedings;

16          counsel adjusting microphone.)

17     Q    Okay.  One of the things that you've mentioned

18   this morning a few times is "supra-additive," and you've

19   made mention that that is different than

20   "multiplicative," correct?

21     A    That's right.

22     Q    So the current state of the research of the

23   relationship between smoking and asbestos, when those two

24   are present, is that it is no longer a multiplicative

25   effect; but it's just an additive.  It's no longer five

1   times ten equals fifty; it's something less than that,
2   correct?
3       A    So, let me, let me speak to that.
4            In the study, the most recent study that was
5   done, using a population of individuals who once had
6   those, as you indicate, 30, 50, 80 -- whatever it was --
7       Q    Yes.
8       A    -- that population once had those kinds of
9   numbers.
10           But that same group, then, now in more recent
11  years has, yes, has lost that synergy because of, as we
12  talked about, fewer smokers, less of an exposure.  It's
13  now more than additive.  They call it "supra-additive."
14      Q    It's no longer multiplicative; it's
15  supra-additive.  And if we look at the numbers involved,
16  it's not going to be -- the numbers, the net numbers, are
17  going to be lower than when they were multiplicative?
18      A    In that population.
19      Q    Yes, sir.
20      A    Now, there are a number of populations of
21  smokers and asbestos workers that have found synergy.
22  Now, have those changed over time?  I don't know.
23      Q    So --
24      A    I'm saying -- but, yes, in that one population
25  that's been studied, that's what happened.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    Okay.  So in the one population that's been
 2   studied, it was originally believed that the effect was
 3   higher than the effect is now believed to be.  Correct
 4   statement?
 5        A    Well, it was much higher, not "believed to be."
 6   I mean, it was higher; and now it's, it's come down.
 7   Sure.
 8        Q    Okay.  Now, this is a follow-up to the -- can
 9   we turn this down just a little?  I'm getting feedback in
10   my head.  I don't know if that's bothering anyone else.
11                 (Brief pause in proceedings;
12                 counsel adjusting microphone.)
13        Q    This is a follow-up to the question that Mr.
14   McCoy asked you about why some doctors might note
15   asbestosis in their record and others might not.  Do you
16   remember that question?  It was just a few moments ago.
17        A    I do remember that.
18        Q    Okay.  I want to ask you a slightly different
19   question.  If a pulmonologist knows that somebody has a
20   lung cancer because he diagnosed it -- okay? -- and he
21   also knows about the asbestos exposure history of that
22   patient -- so you understand those two facts I'm asking
23   you to assume so far?
24        A    Sure.
25        Q    And he finds that that patient does not have
```

KINSER v. CBS CORP., Case No. 94-2282

1   asbestosis, would you defer to that pulmonologist on that

2   diagnosis of asbestosis, or lack thereof?

3       A    Well, sure.  I, I'd defer to the diagnosis, but

4   I'm -- the question was whether or not you could say the

5   person's lung cancer was caused by asbestos or not.  That

6   was the question.  And, and --

7       Q    Well, I know, but I --

8       A    -- I can't --

9           THE COURT:  Just a minute.

10          MS. EZELL:  Yeah, I know.  I'm sorry, Your

11  Honor.

12      A    And you can't then make the leap, "Well, it

13  wasn't caused by asbestos," just because he doesn't make

14  the diagnosis of asbestosis.

15      Q    All right.  But I just want to make sure we're

16  clear.  I was asking a different question.

17      A    All right.

18      Q    So in my question, the question was:  If

19  there's a pulmonologist who diagnosed a lung cancer and

20  he was familiar before he diagnosed that lung cancer with

21  the exposure of asbestos and he also, in conjunction with

22  evaluating that patient, evaluated whether or not that

23  patient had asbestosis and determined that he didn't,

24  you, as a, as a nonmedical doctor, would defer to him in

25  that diagnosis; would you not, sir?

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    Yeah, of course.

 2      Q    Okay.

 3      A    That's not the -- that's not any issue that

 4 I've raised, or anybody's raised.  Diagnosis, that's not

 5 the point.

 6      Q    All right.  Thank you.

 7           Now, you have talked a lot of dose and

 8 response, and you did some studies with some rats; and

 9 you showed us portions of their lungs earlier this

10 morning, correct?

11      A    Right.

12      Q    And you indicated that you put them in a

13 chamber, or some such thing, for only an hour?  Did I

14 hear that correctly?

15      A    Right.  That's for certain kinds of studies.

16 Right.

17      Q    Okay.  And, and we have heard that an hour, in

18 this trial, is not a sufficient amount of time to receive

19 any type of dose sufficient to cause any kind of disease.

20 So can you explain how putting rats in a chamber for an

21 hour would make your study valid to evaluate their

22 exposure?  How did they get a big enough dose, I guess?

23      A    Well, if you're worried about the validity of

24 my studies, I wouldn't worry about that; they've been

25 vetted --
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q     No, no.

2        A     -- by better scientists than I.

3        Q     I'm not asking --

4        A     So here's the question --

5              THE COURT:  Excuse me.  Excuse me.

6              MS. EZELL:  Yes, sir.

7              THE COURT:  You both can't talk at the same

8    time.  Permit him to finish his answer, and wait till she

9    finishes her question.  Okay?

10             MS. EZELL:  Yes, sir.

11             THE COURT:  Go for it.

12   BY MS. EZELL:

13        Q     And just so I'm clear, I'm not questioning the

14   validity of your study.  I'm asking -- I'm giving you a

15   chance to explain to the jury, who has heard that one

16   hour isn't enough, why that was a sufficient dose?

17        A     I'm delighted to explain.

18        Q     Okay.  Thank you.

19        A     So as I said, you do an experiment based on the

20   questions you're asking.  So if the question is, "Where

21   do the fibers land in the lung?", the only way you're

22   going to be able to do that is by exposing the animals

23   for an hour, two hours, and then taking them out of the

24   chamber, giving them an overdose, and look at where the

25   fibers are.
```

KINSER v. CBS CORP., Case No. 94-2282

1          Now, if you want to produce a lung cancer, as

2    we have, then you need to keep exposing them through

3    weeks and months; and then they'll get the cancer through

4    the processes that I've explained.

5          Q    And you've said "overdose," so is --

6          A    I never said "overdose."

7          Q    Well, you may, you may not have meant to, but I

8    thought I just heard it, and it doesn't matter.

9          But when you dosed them, did you use a higher

10   concentration of dosing during that one hour than

11   somebody who is working in a, as a pipefitter would

12   normally be exposed to in an hour?

13         A    The word "overdose" was used by me to explain

14   how we give them the anesthetic that kills the animals.

15   Okay?

16         Q    Fair enough.

17         A    That's the overdose.

18         There's no overdose when it relates to the

19   asbestos.  That, that's a complete -- we know very well

20   that these animals are not overdosed with asbestos.

21         The answer to your question is:  Yes.  We're

22   using a high concentration of dust, hopefully much

23   greater than anybody got in a workplace within the last

24   50 years or so.  But we know that some people -- like

25   insulators and miners and millers and baggers -- got that

KINSER v. CBS CORP., Case No. 94-2282

1  kind of concentration, and so the animals received

2  something very similar to that.

3      Q    And so you were able to replicate in one hour,

4  by increasing the dose, a higher concentration; is that

5  what you're saying?

6      A    No.  I didn't say that.

7      Q    Okay.

8      A    What I --

9      Q    And then -- I apologize.  You gave a thorough

10  answer, so I'll just move on.  I have a different area to

11  cover.

12          When Mr. McCoy was asking you about whether

13  diseases were the same or different, one of the two

14  things I wanted to ask you about that I'm not sure he

15  covered:  Are pleural plaques and asbestosis the same

16  disease?

17      A    No.  They are not.

18      Q    Okay.

19      A    So -- go ahead.  You want me to go ahead or --

20      Q    No.  I just wanted to clarify that.  I wasn't

21  sure that we had covered that.

22      A    Okay.

23      Q    I would like to display, please, on the ELMO a

24  portion of your presentation that we've already seen, if

25  I could.

1          We just saw this during your presen-- and can

2     you zoom out just a little?

3          Okay.  So you used this slide earlier; did you

4     not, sir?  And you have a -- if you can't see it on the

5     TV --

6          A    I see it.  Sure.

7          Q    -- it's right there in front of you.

8          Did you, did you put this at the bottom?

9     "Pleural plaques in pulmonary asbestosis," is that your

10    language?

11         A    No.

12         Q    Okay.  So do you agree with that statement?

13         A    Well, I wouldn't use "pulmonary asbestosis."

14    Now, some people use "pleural asbestosis."  Maybe whoever

15    put that there meant to do that, and maybe -- I don't

16    even -- I'm not sure if that's from Dr. Netter or not.  I

17    mean, that's not a common use of the term for plaques.

18         Q    And, in fact, when you were describing --

19         A    Oh, I'm sorry.

20         Q    I --

21         A    I hate to interrupt.  May I?

22              THE COURT:  You may finish your answer.

23         A    Yes.  And, and it wasn't -- you didn't

24    interrupt me.

25         Q    Okay.

KINSER v. CBS CORP., Case No. 94-2282

1    A    I'm just saying -- I see what this says.  What

2  this actually says is, "Pulmonary plaques in pulmonary

3  asbestosis," so what Dr. Netter, or whoever put that

4  there, is saying is:  Here are plaques in a case of

5  somebody with asbestosis in the lung.  That's all that

6  is.

7    Q    Right.

8         But it -- but when you were describing the

9  location that you would find asbestosis, this is not that

10  location, is it, sir?

11    A    No, no.  But where I was describing it would be

12  what the meaning is here:  asbestosis in the structure of

13  the lung, in the gas exchange area.

14    Q    In fact, this simply describes pleural --

15  this -- what you used this for was to show the location

16  of pleural plaques and scarring, correct?

17    A    Correct.

18    Q    Okay.  Thank you.

19         You have indicated that the -- what we -- what

20  you've been talking about today, and to a great deal, is

21  something called a genetic error, correct?

22    A    Well, genetic errors are required to cause

23  cancer.  Yes.

24    Q    So if the result of the genetic error involved

25  in this case is a lung cancer, there is no way for you or

KINSER v. CBS CORP., Case No. 94-2282

1  any scientist to tell whether or not that lung cancer was

2  caused by asbestos, tobacco, or a combination thereof by

3  looking at the cancer, correct?

4     A    Okay.  So the first thing is:  It's not "a

5  genetic error"; it's a series of genetic errors.  But

6  your question is a good one, and there is no way to know

7  whether those series -- which of the errors in those

8  series was caused by asbestos, by cigarette smoke, and a

9  combination.

10         What we do know is that the combination

11  produces a higher risk than either one of those alone.

12     Q    And I'll ask a better question.  So, if the

13  result of the genetic series of errors in this case is a

14  lung cancer, you cannot -- nor could anyone else -- tell

15  whether or not that series of genetic errors was caused

16  by smoking alone, asbestos alone, or a combination of

17  asbestos and smoking simply by looking at the lung

18  material, correct?

19     A    I agree.

20     Q    Now, you have testified before, haven't you,

21  sir?

22     A    Many times.  Sure.

23     Q    And I believe you've indicated earlier; but

24  about 95 percent of the time you testify, you testify on

25  behalf of plaintiffs' lawyers.  Is that correct?

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    Right.
 2      Q    And you've testified before for Mr. McCoy,
 3  haven't you?
 4      A    I have.
 5      Q    All right, sir.
 6           And you get paid --
 7      A    Sure.
 8      Q    -- to do that, certainly?
 9      A    Of course.
10      Q    And you charge $550 per hour, if I'm correct?
11      A    Correct.
12      Q    And you charge that portal to portal for
13  daytime hours.  Fair?
14      A    Right.
15      Q    Okay.  And for the number of years that you've
16  been doing this -- and I think you described that earlier
17  today -- it would be fair to say that you have charged
18  over $2 million testifying and preparing to testify in
19  cases involving asbestos issues?
20      A    Close to that, right.
21      Q    All right, sir.
22           Oh, and you mentioned your SEM, your scanning
23  electron microscope, during your direct examination.
24      A    Right.
25      Q    And you showed us a picture of it.  And that
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1    was you in the picture?
 2         A     Yeah.  Couldn't you tell?
 3         Q     I could.
 4               And it's true, sir, that no matter how far you
 5    zoom in on your, using that microscope -- if you still
 6    had it, or a new one if you purchased one -- and look at
 7    a piece of asbestos fiber, you cannot tell the source of
 8    that asbestos fiber, correct?
 9         A     True.
10         Q     So you can't tell if it came from a particular
11    plant or a particular location or a particular
12    manufacturer?
13         A     No.  And the lung can't tell either.  In other
14    words, the lung responds to fibers the same for whatever
15    the source might be.
16         Q     All right, sir.
17               Now -- may I have the ELMO, please?
18               Now, this is a slide that you showed us earlier
19    today; is that fair?
20         A     Yeah.
21         Q     And this is part of your slide presentation.
22    And you've represented that this is half of a lung,
23    correct, with some cancer depicted, correct?
24         A     That's all right.
25         Q     And is this the right lung or the -- the right
```

KINSER v. CBS CORP., Case No. 94-2282

1   half of the lung or the left?

2       A    This is the right lung.  You can tell because

3   there are three lobes.

4       Q    Correct.

5            And the left has two?

6       A    Correct.

7       Q    And in Mr. Kinser's case, if you know, what

8   portion of the lung had cancer?

9       A    I don't know.

10      Q    Okay.  I'm going to show you what is a

11  demonstrative that we've used previously in this trial

12  which has been previously marked as Defendant's

13  Demonstrative Number 4.  And can you tell me:  Is this a

14  right or a left lobe?

15      A    That is a left lung.

16      Q    And, and is this the demarcation between the

17  top and the bottom lobe?

18      A    Yes, it is.

19      Q    And so would it be fair to describe to the

20  jury, then, that this -- this cancer is located in the

21  upper left lobe?

22      A    Correct.

23      Q    Okay.  Thank you, sir.

24           So when we were looking at this to describe

25  different cancer, it wasn't necessarily Mr. Kinser's

KINSER v. CBS CORP., Case No. 94-2282

1  cancer; it was just for demonstrative purposes?

2      A    That's true.

3      Q    Okay.  And, in fact, if we zoom in on this

4  right here, if we can -- I don't know if we can get that;

5  I bet we can.

6           The type of cancer listed there is not

7  "non-small cell adenocarcinoma," is it?

8      A    It's not.  This is a squamous cell carcinoma.

9      Q    And those two are different?

10     A    Well, they have, they have the same target

11  cell, and they develop in the same kind of airways; but

12  they are different -- they are a different spindle cell

13  type.  Yes.

14     Q    So for purposes of what you were explaining

15  there, it's -- they have the same location; they'll

16  spring up in the same place.  But at the end of the day,

17  a pathologist looking at them on a slide would report

18  back that one was a squamous cell cancer, and one was an

19  adenocarcinoma.  And that would be different types of

20  cancer, fair?

21     A    True.  Right.  But, remember, that changes not

22  a single word of anything I said earlier.  What you said

23  is correct.  It doesn't change anything that I've said.

24     Q    Thank you.

25           The one thing it might change is if Mr. Kinser

KINSER v. CBS CORP., Case No. 94-2282

1    has an adenocarcinoma.  Then at least it -- he doesn't

2    have a squamous cell, so that slide wouldn't apply to him

3    in that regard either.  Fair?

4         A    No, no, because -- all, all I'm saying -- the

5    reason I said it won't change anything I said is because

6    I'm not dealing with the final diagnosis of the cancer.

7    I'm dealing with how these agents cause cancer, and they

8    cause a squamous cell cancer or an adeno cell carcinoma

9    or any of the other pulmonary cancers by the same

10   mechanism.

11        Q    Okay.  So with regard to Mr. Kinser's case, you

12   have not been provided any of the depositions that have

13   been taken in the case; is that fair?

14        A    That's right.

15        Q    And you haven't been provided any of the

16   deposition summaries of any of the witnesses in the case?

17        A    True.

18        Q    You have not been provided with medical records

19   for Mr. Kinser?

20        A    True.

21        Q    You have not been provided with his work

22   history, the various sites that he worked?

23        A    I was asked to present a generic explanation of

24   how these agents cause cancer; and if, in fact, Mr.

25   Kinser has those diseases, then that's what happened in

KINSER v. CBS CORP., Case No. 94-2282

 1   him.  But, no, I've not reviewed anything specific to

 2   him.

 3        Q    Okay.  And you, you don't know what job in

 4   particular Mr. Kinser had, correct?

 5        A    That's right.

 6        Q    And you mentioned earlier some information

 7   about insulators, but you don't know if he was an

 8   insulator or not, do you?

 9        A    I do not.

10        Q    All right.  And you had put the slides up

11   earlier, indicating the aneuploidy -- did I say --

12        A    Aneuploidy.

13        Q    Aneuploidy.  I always get that wrong.

14             -- that was caused by asbestos, and you didn't

15   bring slides that shoyed -- that shoyed -- that showed

16   aneuploidy caused by cigarette smoke; but it would have

17   been genetically the same process, correct?

18        A    I think I said that.  I'm sure I said that --

19        Q    Okay.

20        A    -- because -- yeah.

21        Q    And so cigarette smoking would also cause the

22   genes not to be in the right place?

23        A    Sure.

24        Q    Okay.  And were you asked, since this case

25   involved a smoking history, to attempt to

1   diagrammatically depict that for the jury in any way?

2       A    Well, I wasn't, because that's not -- I mean, I

3   haven't done those kinds of studies with cigarette smoke.

4   A number of other investigators have.  So I brought what

5   I, what I've done --

6       Q    Okay.

7       A    -- and explained what others have done.

8       Q    And you haven't been asked, have you, sir,

9   about other carcinogens -- or, I'm sorry.  You haven't

10  been asked in this case to present similar slides about

11  other carcinogens that also cause cancer, have you, sir?

12      A    I've not.  I mean, we could be here a long time

13  if we're going to talk about all the carcinogens that

14  cause lung cancer.

15      Q    Yes, sir.

16           And so, just so I am clear, when we are talking

17  about -- and if I could, Jessica, please have the -- oh,

18  I still have it.  May we zoom out?

19           When you described earlier today, using this

20  diagram, the target cell for lung cancer, this is a

21  target cell that is not just a target for lung cancer

22  caused by smoking or caused by asbestos, correct?  It's a

23  target cell for any carcinogen that you inhale.  Fair?

24      A    No question.

25      Q    Okay.  So even though you weren't asked to

KINSER v. CBS CORP., Case No. 94-2282

1  provide information about other possible carcinogens in

2  your presentation today, I'm going to ask you about

3  certain carcinogens and ask you whether or not these

4  target cells would have been susceptible to the toxicity

5  of those carcinogens.  Okay?

6      A    If you, if you now -- I can tell you now.

7  Obviously, you can name whatever you want.  But

8  whenever you name a carcinogen that's known to cause lung

9  cancer, my answer's going to be "yes."

10     Q    Okay.  Well, I'm going to ask the questions --

11     A    Okay.

12     Q    -- and you -- but if I get one wrong, you have

13  to tell me.

14          So secondhand smoke I think we've talked about;

15  and, in fact, you can answer that now, but I want to talk

16  to you a little bit more about that work you did with the

17  Surgeon General.

18          But is secondhand smoke one of the carcinogens

19  that is also something that could have been -- that this

20  cell would have been receptive to?

21     A    Yes.

22     Q    All right, sir.

23          How about radon gas?

24     A    Sure.

25     Q    Air pollution?

KINSER v. CBS CORP., Case No. 94-2282

1     A    Well, that's kind of broad.  I mean, air

2  pollution contains a number of different carcinogens.

3  But, but if there's something in -- quote, unquote -- air

4  pollution that causes lung cancer, the answer's yes.

5     Q    All right.  So you got me on one.  Let me ask a

6  better question.

7     A    I didn't get you.

8     Q    How about ozone in the air pollution?

9     A    Sure.

10    Q    How about the sun, which is known to cause skin

11  cancer?  Is that something that in any way can get into

12  the lungs?

13    A    I wouldn't think so.

14    Q    Okay.  But the sun is a carcinogen for the

15  skin?

16    A    Of course.

17    Q    All right, sir.

18         How about nickel?

19    A    I think nickel's a lung cancer, but I -- causes

20  lung cancer, but I'm not sure.

21    Q    Fair enough.

22         How about arsenic?

23    A    Yes, for sure.

24    Q    Silica?

25    A    Silica, certainly.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q     Beryllium?

 2        A     I'm not sure.

 3        Q     All right.  Paint?

 4        A     Well, --

 5        Q     Certainly -- and, and paint is made of many

 6   compounds, and so let me just say that the, that the --

 7   how did you say it? -- the carcinogic -- carcinogenic

 8   aspects of paint --

 9        A     Right.

10        Q     -- if they are inhaled, especially the fumes?

11        A     Sure.

12        Q     All right.  And coal?

13        A     Well, same issue.  I mean, coal has a number of

14   carcinogens associated with it.

15        Q     And if those are inhaled into these cells, they

16   can cause lung cancer?

17        A     Sure.

18        Q     And engine exhaust and diesel fuel, correct?

19        A     Yes.

20        Q     How about radiation?  Is radiation from x-rays

21   or CT scans -- those are a carcinogen as well, aren't

22   they?

23        A     They are.  Yes.

24        Q     Now, a lung cancer can, can be caused

25   irrespective of whether or not you've inhaled any of the
```

KINSER v. CBS CORP., Case No. 94-2282

1   carcinogens that we've just discussed; can it not, sir?

2        A    Well, I think you're asking me:  Can you get a

3   spontaneous lung cancer with no known outside influence?

4        Q    Your question is better than mine.  Could you

5   please answer it?

6        A    Sure.  That could happen.

7        Q    And do genetics play a role in that?

8        A    Yeah.  No question.  That person who's highly

9   susceptible could be exposed to essentially nothing other

10  than having genetic errors spontaneously.

11       Q    And if you have a family history of death, of

12  deaths from diseases associated with smoking, is that an

13  indicator of your predisposition to genetic issues caused

14  by smoking?

15       A    Well, that's a broad question.  I mean, if

16  somebody has -- smokes and dies of emphysema, that would

17  have nothing to do with a related person getting a lung

18  cancer.

19            If somebody gets a chronic bronchitis and dies

20  from infection, that would have nothing to do with

21  somebody getting a lung cancer, you know, so -- but if

22  the family has a history of lung cancer, could it be

23  playing a role in the genetics of that person?  Of

24  course.

25       Q    I would like to now turn your attention to the

KINSER v. CBS CORP., Case No. 94-2282

```
 1    work that you did with the Surgeon General.  You --
 2              THE COURT:  This is a good time to go to lunch.
 3    Jurors, --
 4              MS. EZELL:  Sorry, Your Honor.
 5              THE COURT:  -- see if you can be back by 1:00.
 6    If you can't, I'll wait for you.  Okay, we'll be in
 7    recess.
 8              And, Doctor, you may step down.
 9              THE WITNESS:  Thank you.
10                   (Jury absent, 12:08 p.m.)
11              THE COURT:  All right.  We'll be in recess till
12    1:00.
13                   (Recess, 12:08 p.m. to 1:07 p.m.)
14                   (Jury present, 1:08 p.m.)
15              THE COURT:  All right.  Ask another question.
16    BY MS. EZELL:
17        Q    Dr. Brody, good afternoon.
18        A    Good afternoon.
19        Q    Have you heard cancer referred to in the past
20    as "a disease of the elderly"?
21        A    Sure.
22        Q    And one of the reasons that we see cancer
23    develop in older people is, as we grow older, the genetic
24    errors we've been discussing in our bodies build up over
25    time, right?
```

KINSER v. CBS CORP., Case No. 94-2282

1        A      Right.

2        Q      The immune system is not as effective as we

3   grow older, is it?

4        A      True.

5        Q      Now, you have not been called in this case to

6   say whether or not Mr. Kinser has, or had in the past,

7   lung cancer?

8        A      True.

9        Q      And you're not here to express any opinions

10  about what did or did not cause lung cancer if he had it,

11  correct?

12       A      True.

13       Q      You're not here to say whether or not any

14  particular product or any particular exposure would or

15  may have caused his lung cancer, correct?

16       A      I don't think I did that.  No.

17       Q      And that's not what you're here to do?

18       A      That's right.

19       Q      All right, sir.

20              Now, you indicated this morning that you were a

21  signator of the Surgeon General's report dealing with --

22  you said secondhand smoke, but I think it's called "The

23  Health Consequences of Involuntary Exposure to Tobacco

24  Smoke."  Is that correct?

25       A      That's the -- that is the official name.

KINSER v. CBS CORP., Case No. 94-2282

1    That's correct.

2         Q    Okay.  And, and that -- your role with regard

3    to that report was similar to a peer reviewer, correct?

4    You read articles and scientific preparations that were

5    submitted to the Surgeon General to be included in the

6    final report; is that fair?

7         A    Well, in a sense.  But, I mean, I wouldn't

8    say -- I wouldn't take credit for playing a primary role

9    in the writing of that document.  Let's be sure that

10   that's clear.  I reviewed the final document.

11        Q    All right, sir.

12             And at the end of the day, after having

13   reviewed the final document that was released by the

14   Surgeon General -- and who was the Surgeon General when

15   that document was released, if you recall?

16        A    It was Koop.

17        Q    It was Koop?

18        A    Yes.

19        Q    You -- did you agree with the findings of that

20   group as it related to the health consequences of

21   involuntary exposure to tobacco smoke, as it -- well, let

22   me -- I apologize.  Let me withdraw that question.

23             As they related to -- did you agree with the

24   findings of the Surgeon General's report on the health

25   consequences of involuntary exposure to tobacco smoke as

KINSER v. CBS CORP., Case No. 94-2282

1    it related to lung cancer?

2         A    As a general principle, yes.  I mean, it's a

3    huge document.  Now, if -- do I agree with every word in

4    there?  Probably not.  But as a general principle, sure.

5         Q    All right, sir.

6              And just so we can have a basis to start from,

7    a common ground, explain what "secondhand smoke" is, or

8    "involuntary exposure" is.

9         A    Well, this is the smoke you get from somebody

10   else's cigarette.  I mean, if you -- if you were smoking

11   in this room, the smoke would waft around; we'd all

12   inhale part of it, and that would be the smoke we're

13   talking about.

14        Q    And as a result of, of being around involuntary

15   exposures, individuals take in carcinogens through their

16   airways that you've described -- in the same process that

17   you've described inhaling primary cigarette smoke,

18   correct?

19        A    Sure.

20        Q    And it's -- it is true that in that, in that

21   Surgeon General's report, as well as in other similar

22   scientific journals or findings, smoking, as well as

23   secondhand smoke, has been found to be extremely harmful

24   to individuals of tender years; is that correct?  You'd

25   agree with that?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Individuals of tend-- do you mean youngsters?

2      Q    Yes, sir.

3      A    Yes.  Sure.

4      Q    So to translate that, if you are a baby, a

5  toddler, or a, a young, young/not-quite teenager, or

6  teenager, you are more susceptible to the genetic danger

7  of secondhand smoke or of smoking, correct?

8      A    Probably, yes.

9      Q    All right, sir.

10          And it's clearly also harmful to adults?

11     A    Of course.

12     Q    Now, I'd like for you to assume that from 1962

13 to 1972, Mr. Kinser smoked -- Mr. Kinser smoked.  Okay?

14 And you're aware that Mr. Kinser was a smoker, correct?

15     A    From what I understand.

16     Q    And I would like you to also assume that, from

17 1962 to 1972, he worked as a pipefitter in various

18 locations where asbestos was not controlled.  Okay?

19     A    Sure.

20     Q    And you understand, having worked in the, in

21 studying asbestos, that there came to be a time in 1972

22 where OSHA began to control the environment where

23 asbestos was used, or to eliminate the use of asbestos,

24 correct?

25     A    Well, I, I can't tell you about the years, but

KINSER v. CBS CORP., Case No. 94-2282

1    I know that you have an expert coming in here who can

2    tell you exactly what you want to know about those years.

3    I don't know specifically about the years, but there

4    certainly was a time when it was controlled; and these

5    controls changed over time.

6         Q    All right.  Well, I'd like for you to assume

7    for me that that -- in 1972, there was an OSHA regulation

8    that controlled the use of asbestos in the workplace.

9    Can you do that for me?

10        A    Sure.

11        Q    Okay.  So, you are now assuming that Mr. Kinser

12   smoked from 1962 to 1972; that he worked in an asbestos

13   environment during those years, and then he -- and then

14   in 1972, OSHA began to control his work environment.  And

15   one more thing:  In 1984, he quit smoking.  Okay?

16        A    Okay.

17        Q    My question is:  You would agree with me that

18   the fact that he quit smoking in 1984 did not affect the

19   risk of genetic mutation that you've described today, the

20   risk of lung cancer that you've described today, which he

21   was at risk for between the years 1962 and 1972 when he

22   was both smoking and working in an environment where

23   there was asbestos, correct?

24        A    Well, that's a pretty complex question you've

25   got there, but let me see if I can put it together.  So,

KINSER v. CBS CORP., Case No. 94-2282

1  so he smoked for ten years, '62 to '72.

2      Q    Well, he smoked during those ten years.  Yes,

3  sir.

4      A    During those ten years.  And then he smoked a

5  while after that because you said he quit in '84?

6      Q    Yes, sir.

7      A    Right, okay.  And so what you're asking me is

8  if quitting in '84 had anything to do with the risk of

9  his exposure during the years he was smoking?

10     Q    During 1962 to '72.

11     A    All right, all right.  So that sounds like a

12 disconnected question to me.  What is -- quitting in '84

13 is not going to have any effect on what he had during

14 those years; but, of course, he quit in '84, so the time

15 after that -- after '84 -- that's when it affected

16 whether or not he was going to get a cancer.

17     Q    Yes, sir.

18          And earlier today you mentioned that there was

19 a period of time after your exposure before -- you called

20 it the time period from exposure to clinic.  Do you

21 remember that?

22     A    That's the latency period.

23     Q    The latency period.

24          And you said it was between 30 and 40 years,

25 correct?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Typically.  It can be less; it can be a lot
 2   more.
 3        Q    Yes, sir.
 4             So 40 years from 1962 is 2002, and 30 years is
 5   1992.  And -- oh, math -- 30 years from 1972 is 2002.
 6        A    Right.
 7        Q    And 40 years is 2012.
 8        A    Right.
 9        Q    Did I do the math?
10        A    Sure.
11        Q    Okay.  So we've got a -- if we'd just do the
12   averages, the latency period from the 1962 to 1972
13   exposure would be 1992 to 2012 that you would tend to
14   expect that somebody who was exposed during those years
15   would show up at the clinic with a lung cancer, correct?
16        A    You can't say "expect."  You can't do that.
17   What, what you do is you see when he did show up at the
18   clinic, and then you go back from there and ask:  Is that
19   a reasonable time from his time from first exposure?  And
20   if it was somewhere within 20 to 40 years, you say
21   "sure."
22        Q    Okay.
23        A    But there's no expectations there.
24        Q    All right.  I'll do that then.
25             So let's say he showed up at the clinic in 2000
```

KINSER v. CBS CORP., Case No. 94-2282

1  with lung cancer.  That falls within the '92 to two

2  thousand --

3       A    Yeah.  He started smoking in '62.  Of course,

4  that's --

5       Q    And so that would be a reasonable time period

6  for somebody who was exposed to asbestos and smoking from

7  '62 to '72 to show up with a lung cancer, in your

8  opinion?

9       A    Sure.  I mean, he could -- there are a lot of

10 other combinations you could have in there, but that's

11 fine.

12      Q    All right, sir.

13           Now, going back to -- well, no.  Let's just go

14 forward.

15           Do you agree with me that pleural plaques,

16 which you've discussed already today, is a dose-response

17 disease?

18      A    Yes.

19      Q    Do you agree with me that asbestosis, which

20 you've already described today, is a dose-response

21 disease?

22      A    Yeah.

23      Q    Do you agree with me that lung cancer, which we

24 have discussed today, is a dose-response disease?

25      A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Can you explain to the jury for each of those

2   three diseases:  How much actual exposure in time and

3   duration is necessary to cause each of those diseases?

4      A    Well, I wish I could tell you with some surety.

5   It's so, it's so different for different people that

6   nobody could sit up here, or anywhere else, and say:

7   This amount of asbestos, or this amount of smoke, is

8   going to cause disease.  You can't do that.  Nobody can

9   do that.

10         The, the point is that they all are

11   dose-response diseases.  We know:  The more you're

12   exposed to it, the more you are likely to get the

13   disease.  But there's no way to know just how much it

14   takes.

15      Q    Okay.  So I'll break it down then.

16         So as you sit there today, you know that

17   pleural plaques is a dose-response disease, but you

18   cannot say to a reasonable degree of certainty how much

19   dose is necessary to cause pleural plaques.  Fair?

20      A    Yeah.  Of course, because -- remember that most

21   people, no matter how much asbestos they're exposed to,

22   don't get a disease.  So right there, that, that tells

23   you that there's so much different variability among

24   individuals that nobody can stand here and tell you the

25   dose it takes for a given individual.

KINSER v. CBS CORP., Case No. 94-2282

1          We -- however, it's very clear, if you look at

2     the millions of people who have been affected:  Those who

3     are exposed to the most asbestos are more likely to get

4     the disease than those who are exposed to less.

5          Q    And the same question for asbestosis.  As you

6     sit here today in this courtroom, you know that

7     asbestosis is dose-response related; but you cannot tell

8     how much of a dose would be necessary to cause asbestosis

9     in Mr. Kinser, can you?

10         A    Same answer.  And same answer for lung cancer

11    as well.

12         Q    And for pleural plaques as it relates to Mr.

13    Kinser, you don't know how much dose that would take

14    either?

15         A    Well, you know, if you could go back and

16    construct his dose, then you'd know.  That's a very good

17    point you're making.  In other words, I can't sit here

18    and predict what a dose is going to do to a given

19    individual.

20         But if you have a given individual with an

21    asbestos exposure and you see their disease and you can

22    go back and reconstruct their dose, then you know how

23    much it took to cause the disease in that person.

24         Q    And you haven't been provided with a dose

25    reconstruction in this case, have you?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     That's not what I do.

 2        Q     No, no.  And I apologize.

 3              I asked:  You haven't been provided with a dose

 4    reconstruction in this case?

 5        A     No.  Be-- and even if I were, it wouldn't be

 6    very helpful to me because that's not what I do to, to

 7    present my findings.

 8        Q     Okay.  And you're not aware that a dose

 9    reconstruction has even been performed in this case?

10        A     No.  And you certainly don't need it for this,

11    for this case and most cases because he has a disease --

12    or he had a disease, whichever the case is -- and he had

13    an exposure.  So whatever that exposure was caused this

14    disease.

15        Q     But, but right now as, as we -- as you sit and

16    I stand, we don't know how much that exposure was?

17        A     Right.

18        Q     And we don't know when it was?

19        A     Well, I don't know.  Maybe somebody can tell

20    you.  I don't know.

21        Q     But not you, and not today?

22        A     That's not what I do.

23        Q     Okay.  Switching gears a bit, you discussed

24    about, earlier today, during your slide presentation, the

25    body's defense mechanisms for fighting infiltrates -- do
```

KINSER v. CBS CORP., Case No. 94-2282

1    you recall that? -- the things that we breathe in and how

2    the body has a number of defense mechanisms that, that

3    fight those off.

4         A    I do recall that, of course.

5         Q    All right, sir.

6              And these mechanisms help to clear pollutants,

7    fibers, smoke -- first through our nose and then secondly

8    in our passages and then out of our lungs, correct?

9         A    Sure.  That's the idea.

10        Q    And there are some in the trachea, as well?

11        A    Well, you saw them.  Sure.

12        Q    Yes, sir.

13             And so if somebody's trachea has been harmed

14   over time through smoking, you would expect that his

15   ability to have defense mechanisms in that area would be

16   compromised, correct?

17        A    Well, I explained how cigarette smoking makes

18   it -- "compromises," the word you used, is fine --

19   changes the nature of the airways and makes it less

20   effective as a clearance mechanism, of course.

21        Q    All right.

22        A    That's exactly what I explained to the jury.

23        Q    Okay.  And you talked about chron-- you

24   mentioned emphysema today.

25        A    Right.

KINSER v. CBS CORP., Case No. 94-2282

1        Q     And is another way that that's referred to as

2    "chronic obstructive pulmonary disorder"?

3        A     Well, emphysema can be part of that syndrome,

4    chronic obstructive pulmonary disease, certainly.

5        Q     It's part of the cluster?

6        A     COP-- right.  COPD, chronic obstructive

7    pulmonary -- chronic obstructive pulmonary disease, part

8    of that can be emphysema.

9        Q     Okay.  And you indicated that, that that was

10   the -- emphysema was the opposite of asbestosis.  You

11   talked about that this morning, and you explained how one

12   blocks the passages in one way; and one blocks in a

13   different way, correct?

14       A     Right.

15       Q     Okay.  Now, if someone has COPD, that is

16   generally caused by smoking, correct?

17       A     It is.  That's right.

18       Q     And the blockages from COPD to the lungs are

19   permanent, correct?

20       A     That depends on the nature of the change.  So

21   if it's emphysema, the answer is yes.

22             If it's chronic bronchitis, the answer is:  Not

23   necessarily.

24       Q     All right.  If it is emphysema and not

25   bronchitis, then it is a permanent impairment in the

KINSER v. CBS CORP., Case No. 94-2282

1  breathing of the individual, correct?

2      A    Correct.

3      Q    All right.  And that would also be a permanent

4  impairment to defense mechanisms for clearing the lungs,

5  correct?

6      A    Not necessarily, because the upper airways are

7  not necessarily affected when there's emphysema because

8  that's a different area of the lung.  So chronic

9  bronchitis, then, would be affecting the upper airways,

10  and that can repair.  That can change.  That can improve

11  over time.

12     Q    So when you say "not necessarily," that means

13  sometimes it can affect your ability to -- it can affect

14  your self-defense mechanisms; and sometimes it does not,

15  correct?

16     A    True.

17     Q    All right.  Now, you are, in fact, sir, a

18  pathologist; is that correct?

19     A    Well, that's not quite fair.  If you say I'm a

20  pathologist, that means I'm an M.D. and I'm not.

21     Q    Okay.

22     A    So, but I'm an experimental pathologist.  I

23  study disease.  I use experiments to understand disease.

24     Q    All right, sir.

25          And with respect to pathology in the Kinser

KINSER v. CBS CORP., Case No. 94-2282

1  case, you have not been provided with any pathology of

2  Mr. Kinser's lung tissue to review, have you, sir?

3      A    True.

4      Q    A biopsy that was taken in this case was not

5  provided to you to review; is that correct?

6      A    Correct.

7      Q    And you indicated earlier that that, in fact,

8  was one of the best tools, best mechanisms for

9  determining exactly what was taking place in an

10  individual's lung, correct?

11      A    Sure.  If, if I were diagnosing the disease or

12  if I were asked to study the lung tissue, I would --

13  that's what I would want to see.

14      Q    All right.  Now, you do know -- and I -- you

15  said earlier that -- well, let me ask you one question.

16  You would agree with me that a 30-year smoking history,

17  in and of itself, is a significant smoking history,

18  correct?

19      A    Sure.

20      Q    All right, sir.

21          And you would agree that, in terms of

22  statistics, a lifetime of cigarette smoking is a more

23  powerful carcinogen than a lifetime of occupational

24  exposure to asbestos alone, correct?

25      A    Correct.

KINSER v. CBS CORP., Case No. 94-2282

```
 1      Q    All right.  Now, there are a number of issues
 2 related to smoking and health that are not just
 3 carcinogenic, but just negative for health; would you
 4 agree with that?
 5      A    Absolutely.
 6      Q    In fact, you, you -- you've looked at that;
 7 you've published on that, and you've studied that,
 8 correct?
 9      A    Yes.
10      Q    Now, the risks of cancer specifically
11 associated with smoking are determined by a number of
12 different factors.  Do you agree with that?
13      A    I'm not sure what you mean.  Everything --
14 whether or not somebody gets a cancer is a genetic issue,
15 but --
16      Q    Okay.
17      A    -- maybe -- go ahead.
18      Q    Well, let me ask a better question.
19           Isn't it true, sir, that the age which you
20 start smoking is important to determining your later risk
21 for cancer?
22      A    Oh, sure.  The longer you smoke, the earlier
23 you start, the more likely you are to get cancer.
24      Q    All right, sir.
25           And your family history is important to
```

KINSER v. CBS CORP., Case No. 94-2282

1    determining your later risk of cancer, correct?

2        A    Can be.  Sure.

3        Q    The presence of COPD is important in

4    determining your later risk of cancer, isn't it, sir?

5        A    Well, I thought you asked me that already.

6        Q    Oh.

7        A    So the issue is -- I mean, if somebody has

8    chronic obstructive pulmonary disease, that does not

9    necessarily say anything about a genetic defect that, or

10   a genetic susceptibility to getting a cancer.  They are

11   two very separate things.

12       Q    Right.

13       A    So you changed from talking about things that

14   do make a difference to something that probably does not.

15       Q    Yes.

16            And my question is not:  Does it indicate a

17   genetic predisposition?  But:  Does it indicate a, a set

18   of symptomatology or a medical condition that makes an

19   individual more susceptible to a lung cancer?

20       A    No.  It doesn't make them more susceptible.

21   What, what it means is that -- having chronic obstructive

22   pulmonary disease means that you've smoked a lot.  And if

23   you've smoked a lot, you're more likely to get a lung

24   cancer.  That's what the relationship is there.

25       Q    And you would agree with me that the average

KINSER v. CBS CORP., Case No. 94-2282

1  smoker loses about 14 years -- the average male smoker

2  uses about -- loses about 14 years off the average life

3  span as compared to the average nonsmoker, correct?

4      A    Again, that's totally dose -- again, that's

5  dose-related.  So the more you smoke, the more likely you

6  are to get a cancer that is going to prevent you from

7  living your full life span.

8      Q    Right.

9      A    I mean, that's all that says.  I don't know the

10  exact numbers.  Fourteen years, I'm not familiar with

11  that.

12        But I am familiar with this concept of:  The

13  more you smoke, the younger you are likely to, to die

14  and, therefore, more likely that you'll die before your

15  life span should have ended.

16      Q    And in the Surgeon General's report that you

17  worked on, one of the -- they, they provide anyone who

18  reads this report with a number of statistics associated

19  with the harmful effect of smoking; is that correct?

20      A    Yeah.  That's -- if "14 years" is in there,

21  that's great.  I'm sure that's right.  I just don't have

22  that number on top of my head.

23      Q    And one of the things that they provide is the

24  increased mortality associated with being a smoker,

25  correct?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Sure.

2      Q    And the increased mortality with being a

3   recipient of secondhand smoke, correct?

4      A    Yes.

5      Q    And so whether or not it's 14 years -- which

6   you don't recall, and that's fine -- but you would agree

7   with me that someone who smokes or is subjected to

8   secondhand smoke, on average, is going to have a shorter,

9   significantly shorter life expectancy than someone who

10  does not, correct?

11     A    Statistically, that's true.  In other words,

12  there are some people who will have no effect from that,

13  and there are others who have a significantly shortened

14  life span, of course.

15     Q    All right, sir.

16          Now, we spoke earlier about OSHA regulations,

17  and you did not specifically recall that they had been

18  passed in 1972; and I would just like for you to, for

19  purposes of this question, just assume that they were.

20  Okay?

21     A    Sure.

22     Q    And so if an individual was exposed in 1974 --

23  two years past OSHA, past the OSHA regulations going into

24  effect -- to thermal insulation that contained no

25  asbestos -- it was dusty; it was blankets; it was

KINSER v. CBS CORP., Case No. 94-2282

```
 1    pipefitting; but it contained no asbestos -- that

 2    incident, sir, would not add to his total asbestos

 3    exposure over the course of his lifetime, would it?

 4         A    If there are no asbestos in whatever he was

 5    exposed to, of course it wouldn't add to his risk.

 6              MS. EZELL:  All right, sir.

 7              I have no further questions, Your Honor.

 8              THE COURT:  Any redirect?

 9              MR. McCOY:  Yes.

10               REDIRECT EXAMINATION BY MR. McCOY:

11         Q    Dr. Brody, I'm going to give you Exhibit 496

12    and -- 496.

13              MS. EZELL:  I'm sorry.  Can I have the two

14    numbers again?

15         Q    496 is the Markowitz publication from 2013,

16    "Asbestos, Asbestosis, Smoking and Lung Cancer; New

17    Findings from the North American Insulator Cohort."

18    Markowitz is M-a-r-k-o-w-i-t-z.

19              And this is 1979, from the New York Annals of

20    Science.  The first author is Hammond, and the second

21    author is Selikoff.  This is titled "Asbestos Exposure,

22    Cigarette Smoking, and Death Rates," and that's Exhibit

23    Number 461.

24              I think you had mentioned that you didn't have

25    with you, before, the papers on the smoking synergism.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Excuse me.  I apologize, Mr. McCoy.

 2              Your Honor, I think this might be outside the

 3    scope of cross.  I didn't ask about any articles or

 4    any --

 5              THE COURT:  I haven't any idea what it is

 6    because he hasn't asked the question yet.

 7              MS. EZELL:  All right, sir.

 8    BY MR. McCOY:

 9         Q    You had mentioned before you didn't have these,

10    these articles.  Are these the articles you're talking

11    about when you're, when you're covering the smoking

12    synergy issues?

13         A    Right.  So these are --

14         Q    Right.

15              The only question --

16         A    Yes, yes.

17         Q    -- I have is just simply:  Is there anything

18    else you haven't said about these that you want to add

19    right now, or have you covered it?

20         A    Well, no, no.  I mean, you --

21              MS. EZELL:  Excuse me.  That was covered in

22    direct, Your Honor, not in cross; and so this is outside

23    the scope of the cross-examination.

24              THE COURT:  I'll give you recross.

25              MS. EZELL:  Thank you, Your Honor.
```

```
 1   BY MR. McCOY:

 2        Q    All I want to say is that these papers --

 3        A    Yes.

 4        Q    -- describe the details of the populations of

 5   people I was telling you about, the insulators that had

 6   these huge synergies that were measured; and then the

 7   follow-up on that, this last year, 2013, where the same

 8   populations were studied showing the supra-additive

 9   effects in the same population.  And these are the two

10   papers that I was referring to.

11        A    Okay.

12        Q    And --

13             THE COURT:  I thought you said you only had one

14   question.

15             MR. McCOY:  On that.  I, I -- now I think I

16   might have three more, Judge, total.  I'll count them.

17   BY MR. McCOY:

18        Q    The first question is:  How many times -- or

19   how many different companies have asked for you to

20   testify about asbestos for them in, in the courtrooms, or

21   depositions?

22        A    Eight different companies.

23        Q    Okay.  And do they -- do you charge them the

24   same amount that you would charge my law firm?

25        A    Of course.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    And is your testimony the same when you testify
 2   for them?
 3        A    Of course.
 4        Q    Okay.  Has Westinghouse, or CBS Corporation,
 5   ever asked you to testify?
 6        A    They have not.
 7             MR. McCOY:  Okay.  That's all.  See, that was
 8   four, Judge.
 9             THE COURT:  Recross.
10             MS. EZELL:  No, thank you, Your Honor.
11             THE COURT:  Thank you.
12             You may step down.
13             THE WITNESS:  Thank you, Your Honor.
14                 (Witness Brody excused, 1:35 p.m.)
15             THE COURT:  Call your next witness.
16             MR. McCOY:  The next witness is going to be
17   Barry Castleman.  I think we have to get him from the
18   room behind.
19             THE COURT:  I want a logistical discussion with
20   counsel at sidebar.
21             MS. EZELL:  Yes, sir.
22                 (Brief pause in proceedings; Court
23                 and counsel confer at sidebar.)
24             MR. McCOY:  Judge, I've got Dr. Barry Castleman
25   here.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              (Brief pause in proceedings; Court

 2              and law clerk confer at sidebar.)

 3         THE COURT:  All right.  Come back up to

 4    sidebar.

 5         MS. EZELL:  Yes, sir.

 6              (Brief pause in proceedings; Court

 7              and counsel confer at sidebar.)

 8         THE COURT:  I should share that information

 9    with you.  I'm advised that the threat of fog has been

10    withdrawn.

11              BARRY CASTLEMAN, sworn, 1:37 p.m.,

12              DIRECT EXAMINATION BY MR. McCOY:

13         Q    Dr. Castleman, can you go ahead and introduce

14    yourself?  Tell everybody your name and spell your last

15    name for everyone.

16         A    My name is Barry Castleman, C-a-s-t-l-e-m-a-n.

17         Q    You may have to lean forward a little bit and

18    push that microphone in.

19              Your occupation presently is what?

20         A    I'm a public health worker.  My field is toxic

21    substances control.

22         Q    Okay.  And you're not a medical doctor, but

23    you're a Ph.D.?

24         A    Well, a doctor of science, Sc.D., technically.

25         Q    Okay.  And why don't you go ahead, then, and
```

KINSER v. CBS CORP., Case No. 94-2282

1   tell us where you presently work for and give us a brief

2   description on your educational background also.

3        A    Well, I work as an independent consultant, and

4   I have since 1975.

5             I -- my background is that I'm a chemical

6   engineer, bachelor's degree; and my master's degree is in

7   environmental engineering, both from the Johns Hopkins

8   University in Baltimore.  My doctorate's in occupational

9   and environmental health policy from the Johns Hopkins

10  School of Hygiene and Public Health.

11       Q    When did you get your doctorate?

12       A    1985.

13       Q    Okay.  And your master's was when?

14       A    1972.

15       Q    And what -- have you worked in industry?

16       A    Yes.

17       Q    Okay.  When did you work in industry?

18       A    After I graduated with my chemical engineering

19  degree, I worked for a chemical company called "Hercules"

20  at their research center in 1968 and 1969.

21       Q    And what kind of position did you have there?

22       A    I was a -- I was an engineer in the small-scale

23  sample preparation department; and our job in my area was

24  to use the smallest industrial-type equipment to

25  manufacture things that had already been, maybe, dreamed

KINSER v. CBS CORP., Case No. 94-2282

1   up in a laboratory, and they wanted to now scale it up to

2   making something in a hundred gallon glass-lined reactor.

3   So we would, we would do that.  Or sometimes we would do

4   modifications of existing industrial processes that they

5   wanted to tinker with without interrupting their

6   production at the plant.  Those were the kinds of things

7   we did in my area.

8       Q    Have you had an interest in asbestos over the

9   years?

10      A    Yes.

11      Q    When did that start?

12      A    That started when I was in graduate school

13  getting my master's degree.  I was being trained in air

14  pollution control.  And this was 1970/1971.  The Congress

15  had just created the Environmental Protection Agency and

16  was funding fellowships for training people in the field,

17  and I started reading up on the health effects of air

18  pollutants because I was interested in knowing how

19  serious a problem air pollution was from a health

20  standpoint.  I mean, did it just make people's eyes burn

21  in Los Angeles, or was it really killing people?  So I

22  wanted to read about the health effects.

23          And I came across asbestos within the first few

24  months of this, and I was quite fascinated by the extent

25  of the hazard and the utter lack of control that existed

KINSER v. CBS CORP., Case No. 94-2282

1   for it in 1970.  And I wrote my master's thesis about

2   that.  That was the beginning of my interest in asbestos

3   in 19-- 1970, 44 years ago.

4       Q    And what work have you done after Hercules?

5       A    Well, I went back -- after I graduated with the

6   master's degree, I went to work as a local health

7   official in the Baltimore County Health Department in the

8   Division of Air Pollution and Industrial Hygiene.

9            I initiated a campaign to warn brake mechanics

10  not to use compressed air hoses to blow out brake

11  assemblies because of the cancer hazard of the dust.

12  This was a typical and widespread practice.

13           There were other kinds of projects.

14           I also implemented, or worked in the

15  implementation of state air pollution control regulations

16  for industries using chemicals.  Because of my background

17  in chemical engineering, I got that.

18           I did, also, special toxic investigations for

19  the head of the health department on occasion.

20      Q    And you've been serving as a consultant

21  since -- what year did you say?

22      A    1975.

23      Q    Okay.  Do you have your own consulting

24  business?

25      A    Well, you could call it that.  I mean, I'm a --

KINSER v. CBS CORP., Case No. 94-2282

1   I'm the secretary.  I'm the accountant.  I answer the

2   phone.  I have not had a boss or been one since 1975,

3   which I've found a very agreeable arrangement.

4       Q    Have you had consulting positions in the public

5   health field?

6       A    Yes.

7       Q    Can you tell us about those?

8       A    Well, they included federal government

9   agencies:  the Environmental Protection Agency, Consumer

10  Products Safety Commission, the Occupational Safety and

11  Health Administration, the Congress's Office of

12  Technology Assessment, the Federal Trade Commission, the

13  Justice Department.

14          They've included environmental groups and

15  nongovernmental organizations like the National Resources

16  Defense Council, Greenpeace, the Environmental Defense

17  Fund, the Sierra Club.

18          Also, international organizations like the

19  International Labour Organization in Geneva, the World

20  Health Organization, and the World Bank.  I've recently

21  written documents published by the World Health

22  Organization and the World Bank on substitutes for

23  asbestos.

24      Q    Have you had any publications that you've

25  written about asbestos?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.  I've written a doctoral thesis, which was

2  also published as a book, called "Asbestos:  Medical and

3  Legal Aspects," and probably about 50 medical and

4  scientific articles in journals.

5      Q    I'm going to hand you what's -- is that a copy

6  of your -- that's your book?

7      A    Yes.  This is the Fifth Edition.  The book

8  is -- was largely identical to my doctoral thesis when it

9  was first published in 1984, and it's been expanded four

10  times, so now it's about twice the size of my doctoral

11  thesis.

12      Q    Are you the only author on that book?

13      A    No.  There's a chapter on substitutes for

14  asbestos.  One of the eleven chapters was written by

15  Stephen Berger.  I edited that, but he wrote it.

16          And then there are much smaller sections.  One

17  is a smaller section on medical cases contributed by Dr.

18  Grace Ziem, Z-i-e-m.

19      Q    Have you done any teaching?

20      A    Yes.

21      Q    In what areas have you taught?

22      A    Well, I've taught in engineering.  We had a

23  course -- we had a course in the chemical engineering

24  department at Johns Hopkins that I helped teach in the

25  '80s about ethical issues that engineers confront, things

KINSER v. CBS CORP., Case No. 94-2282

1    like auto safety and other kinds of things where

2    engineers working for companies identify problems and

3    then had the problem of getting upper management to act

4    on those problems.  We talk about dumping of hazardous

5    wastes and other kinds of stories that illustrated the

6    kinds of dilemmas engineers can face when they're

7    confronted by these kinds of issues.

8              I've also been a guest lecturer in lots of

9    universities and medical schools, schools of public

10   health, on the subject of asbestos, export of asbestos

11   hazards to developing countries, the double standards of

12   global corporations in, operating in developing countries

13   under conditions that would not be permitted in Europe or

14   the United States.

15             Other kinds of issues having to do with the

16   disclosure of conflicts of interest in comprising expert

17   panels for the World Health Organization -- these are

18   some of the subjects that I've investigated and published

19   about.

20        Q    Have you been -- have you presented before the

21   United States Congress or any of its committees?

22        A    Yes.  I've testified at congressional hearings

23   on occasion.  The first time was 1973 when I was a local

24   health official, and I talked about the community

25   exposure to asbestos.  I brought in a five-pound paper

KINSER v. CBS CORP., Case No. 94-2282

1    bag of asbestos that I had just bought in a hardware

2    store.  The only mark on the bag was the price; and that

3    was one of the things that I talked about, about how

4    public exposure was very much in need of some control in

5    the United States.  That was the year of peak asbestos

6    use in the United States, 1973.  I was 26.

7              And then there have been other hearings since

8    then, most recently in 2007, Senate hearings on banning

9    asbestos.

10        Q    How many times have you testified at

11   congressional committees or --

12        A    Oh, five to ten times.

13        Q    Now, this is by invitation from the committees,

14   right?

15        A    Right.  You don't just show up and say, "I want

16   to testify."

17        Q    And as far as your publications, in addition to

18   the, to the book that we've got up there in front of you,

19   have you written other articles or chapters about

20   asbestos?

21        A    Yes.  Asbestos has figured prominently in

22   things I've written.  I've also written about toxic

23   chemicals, but -- there are many articles in, you know,

24   journals like Archives of Environmental Health, American

25   Journal of Industrial Medicine, International Journal of

KINSER v. CBS CORP., Case No. 94-2282

```
 1  Health Services, International Journal of Occupational
 2  and Environmental Health, those kinds of journals.
 3       Q    Are those primarily peer-reviewed journals?
 4       A    Yes.
 5       Q    Okay.  You'll have to still be a little bit
 6  louder for us.
 7       A    I'll try.
 8       Q    Okay, thank you.  It's a long ways over here.
 9            About how many different publications have you
10  had in your career?
11       A    I don't know; 50, 60, maybe, articles and
12  journals, chapters in books.
13       Q    And you've also testified in court before; is
14  that right?
15       A    Yes.
16       Q    And most of your testimony's been for the
17  lawyers like myself who represent persons claiming injury
18  from asbestos?
19       A    Yes.
20       Q    How much is your hourly rate?
21       A    $400.
22       Q    And how much of, of your time is actually spent
23  on trial-related work?
24       A    I average about one or two trials a month, so
25  most of my time is available for other things.  I do a
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1  lot of international work.
 2           About a year ago I went to India and spent a
 3  month working with people on trying to get asbestos
 4  regulated, controlled, or banned.  And I met with
 5  government officials.  I showed them some of the
 6  documents that the World Health Organization and the
 7  World Bank had published that I had written by way of
 8  trying to persuade them to initiate action in their own
 9  states to halt the use of asbestos in public building
10  construction, those kinds of things.
11      Q    So how would you characterize the way in which
12  you spend most of your time, other than the part that's
13  relating to the lawsuit work?
14      A    Well, I've always tried to do -- since I became
15  an independent consultant, I've always tried to do the
16  things that were the most useful things I could be doing,
17  based on my own abilities and background and the kinds of
18  problems and issues that come, comes to my attention.
19           And I've al-- and I've never taken a job just
20  for money.  I've always figured I'll -- I'll try to just
21  get paid when I can get paid for the things I can get
22  paid for and hope that I make enough so that I can do
23  what I want with my life's time and not have to worry
24  about just taking jobs because of the money.
25      Q    Have you studied the literature and, and
```

KINSER v. CBS CORP., Case No. 94-2282

1   documentation about the, what was known in the, from a

2   public health perspective about the dangers of asbestos?

3       A    The public health and corporate history of

4   asbestos are the subject of my doctoral thesis, and

5   they're the subject of this book.  Yes.  That's been

6   something I've spent a lot of time looking into.

7       Q    Have you conducted research to collect

8   documentation in this area?

9       A    Yes.

10      Q    For example?

11      A    Well, I've gone to libraries of many kinds,

12  looking for all kinds of documentation, medical and

13  nonmedical -- you know, engineering journals, trade

14  magazines, legal publications, safety publications,

15  popular magazines and newspapers; not just medical

16  journals, medical abstracts and publications and medical

17  textbooks.

18          I've also looked in the archives of the United

19  States Government and state governments for workers'

20  compensation claim records relating to asbestos disease.

21          I've also seen a great many documents which

22  have surfaced in the course of the last 35 years of legal

23  discovery involving a great many companies who have been

24  obliged to disclose documents relating to their own

25  knowledge about, their historical knowledge about

KINSER v. CBS CORP., Case No. 94-2282

1    asbestos and the hazards that are associated with its

2    use.

3              And these are the subjects that -- these are

4    the elements of the history that I have tried to tell in

5    my doctoral thesis and in the book.

6         Q    Dr. Castleman, are you prepared here today to

7    address what was known in the public health related

8    literature about the dangers of asbestos?

9         A    Yes.

10        Q    And I would like to put a date on it -- before

11   1935? -- as the first question.

12        A    Yes.

13        Q    Okay.  And have you selected some publications

14   for that purpose?

15        A    Just a few.  I mean, I'll talk about the

16   highlights of what was known and one or two documents we

17   might show for that time period.

18        Q    So the period before 1935 -- do you have the

19   documents up there with you?

20        A    Yes, I do.

21        Q    Okay.  The first one that you selected, is, is

22   that Exhibit 503?

23        A    Right.  But that's not where the story begins.

24        Q    Okay.  Where -- well, where does it begin?

25        A    Well, the earliest publications were government

KINSER v. CBS CORP., Case No. 94-2282

1   publications in Great Britain for the Annual Reports of

2   the Chief Inspector of Factories for the years 1898 and

3   1899.  And in these publications, the Lady Inspectors of

4   Factories, who were part of the inspection team, reported

5   seeing lung disease among workers in workplaces,

6   factories where asbestos was processed, and used the term

7   "the evil effects of asbestos dust," calling for dust

8   control in these, in these installations.

9           And then in 1917/1918, there were publications

10  in Radiology journals in this country where doctors

11  described using chest x-rays as a diagnostic tool for

12  lung disease in different work populations exposed to

13  different types of dusts, and so they published the chest

14  x-ray films of workers who were exposed to asbestos and

15  silica and other dusts.

16          Also in 1918, the U.S. Bureau of Labor

17  Statistics published a report called -- something about

18  mortality of workers in dusty trades.  I forget the exact

19  title.  And in this report, authored by Frederick

20  Hoffman, an insurance actuary with Prudential, it was

21  noted that the -- there had been reports of deaths in

22  asbestos factories in the Annual Reports of the Chief

23  Inspector of Factories in England, so this was

24  information being conveyed to an American audience in a

25  U.S. Government publication.

KINSER v. CBS CORP., Case No. 94-2282

 1              And in the section on asbestos, Hoffman wrote

 2    that it was generally the practice of American and

 3    Canadian life insurance companies to not sell asbestos to

 4    workers in -- to not sell life insurance to workers in

 5    the asbestos industry because of the occupational hazards

 6    in their industry.  And he had some limited statistics in

 7    which deaths in the asbestos workers were attributed to

 8    such things as pneumonia and tuberculosis.

 9              The word "asbestosis" wouldn't appear in

10    medical journals until 1925.

11              And then there were a number of reports, cases,

12    individual cases.  The first case in 1924, in which the

13    disease was called fibrosis of the lungs due to asbestos

14    dust -- the word "asbestosis" wasn't used, but that was

15    what was being described -- described a woman who died at

16    the age of 33 who had started working in an asbestos

17    factory at the age of 13, had been totally disabled by

18    the time she was 26; and then after she died, this report

19    was published by a pathologist who examined her lung

20    tissues and published about what he found, describing

21    this new, still fairly new disease entity, which was

22    going to be called "asbestosis."

23              And then there were a number of other cases

24    reported in the 1920s, mostly in the British Medical

25    Journal, which is in every medical library I've ever

KINSER v. CBS CORP., Case No. 94-2282

1  walked into.  And that, in turn, reports at the end of

2  1927 were the subject of an editorial in the Journal of

3  the American Medical Association the next month, January

4  of 1928, about pulmonary asbestosis, telling American

5  doctors that they should be looking for this because we

6  had a large asbestos industry, a large growing asbestos

7  industry in this country, and that shortly we would have

8  this disease, too.

9        And then, then comes this 1930 report --

10   Q   And I'm -- I would ask permission, Your Honor,

11  just to admit this for the limited purpose of showing it

12  to the jury, not to go back to the jury.

13        THE COURT:  Is there objection to that?

14        MS. EZELL:  No, not to showing it, Your Honor.

15  You've already ruled on this.  This is one of those

16  learned treatises.

17        THE COURT:  All right.  You may proceed.

18   A   So this is just the cover of the report, and

19  it's an official government report from the Factory

20  Inspector in Great Britain.  It's called "Report on the

21  Effects of Asbestos Dust on the Lungs."  That is the

22  medical part.  And the second part of the report is

23  called "Dust Suppression in the Asbestos Industry."  And

24  it's by Dr. Merewether and Mr. Price.

25        This is one of the most widely cited articles

KINSER v. CBS CORP., Case No. 94-2282

1  in the literature on asbestos and disease.  It was the

2  first attempt to see how widespread asbestosis was in the

3  industry where asbestos products were manufactured.  So

4  rather than just looking at individual cases, the factory

5  inspectors went out and did medical examinations of over

6  300 workers in the asbestos textile industry; and they

7  found 26 percent of them had asbestosis.

8          They found that the, the disease did not

9  develop right away.  The 89 people in the study with less

10 than five years in the industry, none of them had

11 asbestosis yet.  And Merewether described this as a

12 "maturation period" for the disease; that no matter how

13 massively you were exposed to asbestos dust, you wouldn't

14 have any symptoms or, or signs of illness until after the

15 first five years from the onset of your exposure.  And

16 then the prevalence rose from 25 percent to over

17 80 percent in the longest exposed workers, the ones with

18 20 years or more in the industry.

19     Q     And is --

20     A     Merewether described the protective measures.

21 Local exhaust ventilation was the principal one where, if

22 you have a dust-producing process, to put a hood

23 partially enclosing that, connected by ductwork to a dust

24 collector with a fan in that system to draw the

25 dust-laden air away from the breathing zone of the

KINSER v. CBS CORP., Case No. 94-2282

1   worker.

2           And Merewether also wrote that workers should

3   be educated to a sane appreciation of the risk of this

4   material which had this delayed lethal potential but

5   which had no warning properties.  It didn't cause you to

6   get headaches or nausea.  It didn't cause your eyes to

7   get irritated.  It didn't cause the kinds of effects that

8   toxic solvents, for example, often do in warning you that

9   it's doing some, doing you some harm.  It seemed like a

10  very -- totally ordinary dose.

11      Q    After this publication, which is Exhibit 503

12  that you've been talking about by Merewether, was there

13  any additional information in the literature that you

14  wanted to discuss now in the period before 1935?

15      A    Yes.

16      Q    Okay.  What's that?

17      A    There were -- then cases started getting

18  published in the United States in 1930, cases of

19  asbestosis, some of them in people with as little as nine

20  months' exposure.  A Pennsylvania pathologist reported a

21  case of a man who had a severe asbestosis nine years

22  after having a job for nine months in an asbestos factory

23  where there was no dust control.  So this showed that not

24  very long periods of exposure could, could have very

25  serious results.

KINSER v. CBS CORP., Case No. 94-2282

1           There were other reports describing asbestosis

2     in asbestos product users -- insulation workers --

3     starting with a report at a conference held in Chicago in

4     1932, where a government doctor presented a case and said

5     that the worker had been disabled with asbestosis and

6     compensated for it by his employer, the U.S. Government.

7     He worked in a government hospital, this man did,

8     maintaining the asbestos, the insulation on the pipes and

9     the boilers.

10          And so there would be additional reports in the

11    literature -- dozens of them -- in the '30s and '40s and

12    '50s, separate reports of death and disease among

13    insulation workers, people who were using asbestos, heat

14    insulation, and, of course, if there were construction

15    workers using those products.

16          I guess the last thing, there were other kinds

17    of workers -- boiler riveter in 194-- '34, one of a

18    hundred cases of asbestosis reported in The Lancet, the

19    world's oldest medical journal published in England, in

20    every medical library I've ever walked into.  That and

21    the British Medical Journal are the British equivalents

22    of our Journal of the American Medical Association, which

23    was believed to have been read by 80 percent of the

24    doctors in the 1920s, according to historians who have

25    written about the AMA and its journal.

KINSER v. CBS CORP., Case No. 94-2282

1          So that brings us up to 1935.  Asbestosis was a

2    recognized disease, its symptoms/its pathology fairly

3    well understood.

4          Q    Had it been reported that people were dying by

5    1935 of that?

6          A    Oh, yes.  From that -- like that woman at the

7    age of 33, they were mostly -- the case reports were

8    fatal cases.  They were cases of people who were either

9    totally disabled or, or had died and were being reported

10   upon after they died by doctors doing autopsies and

11   examining their lung tissues.

12         Q    Okay.  So if we take the next period of time,

13   from 1935 to 1950, what additional information came to

14   light in the public health field publications about the

15   dangers of asbestos?

16         A    In a word:  cancer.  The case reports of lung

17   cancer started being published in the United States and

18   England in 1935, individuals who had died with this

19   lung-scarring disease, asbestosis, and also lung cancer.

20   And the doctors -- lung cancer was a lot less common then

21   than it is now; and so the doctors were raising the

22   possibility that maybe asbestos is capable of causing

23   cancer, as well as this lung-scarring disease,

24   asbestosis.

25         And then by 1938, a German doctor titled his

KINSER v. CBS CORP., Case No. 94-2282

```
 1    paper:  "The Occupational Cancer of Asbestos Workers."
 2    That was Dr. Nordmann.  His --
 3         Q    Could you just spell the last name for us?
 4         A    N-o-r-d-m-a-n-n.
 5              The German government was compensating lung
 6    cancer as an occupational disease in asbestos workers by
 7    1939, and that was reported in the German literature, in
 8    the German Medical Weekly, which is the German
 9    counterpart to our Journal of the American Medical
10    Association, the most widely available German general
11    medical journal published.
12              And then in, then in the '40s, there continued
13    to be cases reported in the United States and England and
14    Germany, primarily.
15              By 1949, they -- the British government
16    reported that of 235 deaths from asbestosis they were
17    aware of, 31 of these people had died from cancers of the
18    lung and pleura, or 13 percent.
19              An editorial that appeared soon afterward in
20    the Journal of the American Medical Association about
21    that said that the normal rate of lung cancer in general
22    autopsies is 1 percent.  So that means you would have
23    expected two or three out of 235 to have had lung cancer
24    and pleural cancer; and, in fact, there were 31, not two
25    or three.  The chances of this happening as a chance
```

KINSER v. CBS CORP., Case No. 94-2282

1    occurrence is like flipping a coin ten times and getting

2    heads all ten times.  It's very unlikely to -- that

3    the -- the real chance was 1 percent; and, yet, they came

4    up with all those cases in 235 deaths.

5              We're going up to, what, 1950?  That's about

6    it, basically, lung cancer being widely recognized as an

7    asbestos disease by 1950.  This is spilling out into

8    other kinds of publications.  By the end of the '40s,

9    1948, the Washington Post and the New York Times and

10   BusinessWeek all had articles saying that asbestos causes

11   occupational cancer.  They were more general articles

12   about work and cancer, but they mentioned asbestos as a

13   cause of lung cancer.

14             In 1949, in another article in -- the New York

15   Times and Scientific American had an article called

16   "Cancer and Environment," again, talking about asbestos

17   and lung cancer.

18             In 1950, Newsweek quoted Dr. Wilhelm Hueper,

19   H-u-e-p-e-r, who was at the U.S. National Cancer

20   Institute, a leading authority who had published a great

21   deal about occupational and environmental cancer, saying

22   that the reason -- one of the reasons that the lung

23   cancer rate in the country was going up -- in urban

24   areas, especially -- was because of the emission of

25   carcinogenic air pollutants, such as asbestos, from the

KINSER v. CBS CORP., Case No. 94-2282

1    industries in this country.

2        Q    Okay.  That takes us through 1950.  And what

3    additional information was, came out in the publications

4    that related to the public health field between 1950 and

5    1965?

6        A    Well, there were a great many more publications

7    on cancer and asbestos, generally concluding that there

8    was a very high likelihood.  There had already been about

9    80 publications on cancer and asbestos before 1950, and

10   so there just continued to be more.

11            There was a modern-type -- a couple of

12   modern-type epidemiological studies, one in the U.S. in

13   1954 by Breslow and his coworkers in the American Journal

14   of Public Health and one by a British epidemiologist,

15   Richard Doll, D-o-l-l, concluding that asbestos workers

16   had a much greater risk of lung cancer than would have

17   been expected based on the vital statistics in the

18   regions that they came from, the death rates in the

19   communities and states and cities where they, where they

20   lived.

21            Then in 1960, a rare cancer called

22   "mesothelioma" was strongly associated with asbestos in a

23   report from South Africa.  Thirty-three cases of this

24   pleural mesothelioma were shown to -- 32 of the 33 had a

25   history of occupational or environmental exposure to

KINSER v. CBS CORP., Case No. 94-2282

1    asbestos.

2            So this, in turn, set off a great deal of

3    interest, and then cases started getting reported from

4    shipyards all over the world in the 1960s, throughout the

5    shipyard trades, not just the insulation workers, but the

6    plumbers, the pipefitters, the carpenters, the sheet

7    metal workers, the electricians.

8            And then there was a big conference in 1964 in

9    New York, organized by Irving Selikoff.  Selikoff had

10   published a mortality study in the Journal of the

11   American Medical Association earlier in 1964 where he

12   followed up the members of the New York and New Jersey

13   locals of the Insulation Workers Union, the union of

14   workers that, that handled insulation, heat insulation,

15   the pipe coverers.  And these people worked in

16   industries, general buildings, and shipyards, and had a

17   lot of asbestos exposure; and Selikoff found that cancers

18   of the lung and pleura in this population -- he would

19   have expected six or seven cases, based on the vital

20   statistics from New York and New Jersey of men of that

21   age, and the number -- and they found 45 of these men.

22   One out of five of these men died of lung cancer and

23   cancer of the pleura, mostly lung cancer.

24           And there was also excess deaths from

25   gastrointestinal cancer.  There were a number of deaths

KINSER v. CBS CORP., Case No. 94-2282

1   from asbestosis.  It was a pretty appalling picture

2   Selikoff found in 1964, and that led him to organize an

3   international conference later that year at the Waldorf

4   Astoria Hotel in New York City.  And papers were

5   presented there, and the proceeding was published in

6   1965, which had 750 pages of articles about the lethality

7   of asbestos by experts from all over the world.

8           And that was one of the things I came upon

9   rather quickly when I started going to the medical

10  library to read about asbestos five years later; and I

11  was, as I said, quite dumbfounded by the, the extent of

12  the hazards recorded there.

13          One of the papers presented at the conference

14  was by Molly Newhouse and Hilda Thompson, and they were

15  epidemiologists in England who had identified 76 cases of

16  mesothelioma in one hospital in London, and these people

17  had all died.  They identified 76 control patients who

18  were of the same age and gender as the people that had

19  died.

20          And they went to the survivors, the relatives

21  of the people that had died with mesothelioma; and they

22  went to the people who were in the control group.  And

23  they questioned all of these people about their history

24  of how they could have ever been exposed to asbestos.

25  And they found that most -- that the, that the

KINSER v. CBS CORP., Case No. 94-2282

1   mesothelioma population had far more people with

2   occupational exposure of asbestos than the control group.

3   That wasn't surprising.

4            But then, excluding that, they found that the

5   mesothelioma group had quite a few people whose only

6   exposure was household contact.  They were the brothers,

7   sisters, the children, the spouses of the

8   asbestos-exposed worker.  The worker would come home with

9   dust all over his clothes, hair, shoes, lunchbox, in the

10  car.  And the family would get exposed to this mineral

11  dust accumulating in the living environment of their home

12  and get cancer from that -- a cancer which was very

13  strongly associated with asbestos, not smoking, not

14  anything else.

15           And, and excluding both the occupational cases

16  and the household contact cases, the same researchers

17  found there was a statistically significant association

18  with neighborhood exposure:  people who didn't have

19  occupational or household contact exposure, but who lived

20  within a half-mile radius of an asbestos air pollution

21  point source.

22           And so this study showed that the population at

23  risk, as we say in public health, was enormous from

24  society's use of asbestos because of all of the people

25  that were exposed, either occupationally or through

KINSER v. CBS CORP., Case No. 94-2282

1    household contact or through neighborhood exposure in the

2    manner demonstrated by this study by Newhouse and

3    Thompson.  So that was one of the things that was

4    presented at this conference in 1965.

5            THE COURT:  Mr. McCoy, let's have a recess.

6    Take a ten-minute recess.  Take the jury out, please.

7                  (Jury absent, 2:13 p.m.)

8            THE COURT:  Counsel, come to the sidebar.

9                  (Off-the-record discussion at sidebar.)

10                 (Recess, 2:15 p.m. to 2:31 p.m.)

11                 (Jury present, 2:33 p.m.)

12           THE COURT:  Be seated.

13           All right, Mr. McCoy, ask another question.

14   BY MR. McCOY:

15       Q   Dr. Castleman, I want to go to the period after

16   1965, or starting in 1965.  On, on the subject of the

17   asbestos diseases from a public health perspective, did

18   any new information come to light?

19       A   Well, there was additional studies, of course;

20   but there hasn't been a whole lot learned additional to

21   what Newhouse and Thompson documented and what was known

22   by 1965 about the lethality of asbestos.

23           There came additional information in 1967 about

24   the synergistic effect of smoking and asbestos when it

25   came to dramatically increasing the lung cancer rate of

KINSER v. CBS CORP., Case No. 94-2282

1    people with both of those types of exposures.  But aside

2    from that, very little.

3        Q    When was "smoking history" first listed in

4    studying the persons who had been exposed to asbestos,

5    reports of that?

6        A    1953.  There's been a lot published about lung

7    cancer, and asbestos, before that, between 1935 and 1953;

8    but only in 1953 do you see for the first time any

9    discussion of a smoking history of a case of lung cancer

10   in a worker exposed to asbestos.

11       Q    In terms of the recognition of the hazards of

12   these two toxins, smoking and asbestos, which one came

13   first?

14       A    Well, I think that that, what I just related,

15   suggests at least in terms of widespread recognition,

16   asbestos came first, widespread in the field about people

17   writing about those things.

18       Q    Have you reviewed documents about Westinghouse

19   relating to Westinghouse's knowledge of asbestos disease

20   and the scientific literature at Westinghouse's own

21   facilities?

22       A    Yes.

23       Q    When did you start that?

24       A    Well, sometime after I got involved in these

25   kinds of cases, I started to see documents that were

KINSER v. CBS CORP., Case No. 94-2282

1    being produced in litigation; and, of course, there was

2    also published literature by the medical director of

3    Westinghouse in the 1930s and the 1940s and other stuff

4    that was part of the published literature relating to

5    knowledge available to that company.

6          Q    Have you published your own review of the

7    Westinghouse-related documentation?

8          A    Yes.  There's a section on Westinghouse in

9    Chapter 9 of my book, "Company Knowledge."

10         Q    So where does the timeline begin for

11   Westinghouse on the knowledge of asbestos?

12         A    Well, in terms of what I have seen documented,

13   the 1930s.

14         Q    And have you selected some specific documents

15   to highlight Westinghouse's knowledge?

16         A    Yes, I have.

17         Q    Okay.  I'd like to go through those with you.

18         A    All right.

19         Q    What's the first one that you've picked for,

20   specifically as to Westinghouse?

21         A    Well, this is a medical report in a journal

22   called "Industrial Medicine" by the medical director of

23   Westinghouse, whose name was T. Lyle Hazlett,

24   H-a-z-l-e-t-t.

25         Q    This is Exhibit Number 206, right?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    Okay.  And what year was this one?

3    A    This was published in May of 1936.  The journal

4 was called "Industrial Medicine," and that was the

5 journal of the company doctors in the United States.

6 There was a professional association of company doctors

7 called the American Association of Industrial Physicians

8 and Surgeons, and they had been formed in 1916; and in

9 the early '30s, they began to publish this journal.

10    MR. McCOY:  Your Honor, I'd ask to admit this

11 just as a learned treatise for showing it to the jury

12 now.

13    THE COURT:  There's no objection.

14    MS. EZELL:  To admitting it, yes, sir; but not

15 to publishing it.

16    THE COURT:  No.  Well, I'm not going to send --

17    MS. EZELL:  Okay.

18    THE COURT:  -- any treatise to the jury.

19    Okay.  You may proceed.

20 BY MR. McCOY:

21    Q    I'll highlight a couple portions of this.  But

22 go ahead, Dr. Castleman:  Describe the significance of

23 this to Westinghouse's knowledge as it may pertain to

24 asbestos.

25    A    Well, the journal contained a number of

KINSER v. CBS CORP., Case No. 94-2282

1  articles in the late, in the 1930's that talked about

2  asbestosis, medical examinations, disability,

3  compensation for asbestosis, textbooks about asbestosis

4  that were being published.

5          And in this particular -- this is kind of, more

6  of a more general type of report on engineering control

7  of industrial health hazards.

8      Q    What's that mean?

9      A    Well, the problems -- he calls it

10 "medical-engineering control."  The problems are medical,

11 but the solution is engineering.  So you have an

12 identified hazard of exposure; then you need to do some

13 engineering on the industrial process so that there's

14 exhaust ventilation, or whatever kind of control is

15 necessary, to reduce the workers' exposure to the hazard.

16     Q    What does Dr. Hazlett -- does he report in here

17 on, on the controls, the types of controls that would be

18 used?

19     A    Well, he speaks about it in general terms.

20 Yes.  And he talks about, you know, such things as --

21 well, he lists removal of the source and protective

22 devices; and the removal of the source starts with the

23 substitution of non-toxic materials.

24     Q    What's that mean?

25     A    Oh, that means if you have a hazardous, a very

KINSER v. CBS CORP., Case No. 94-2282

 1   hazardous solvent -- like benzene, for example, there had

 2   been many articles by 1936 talking about using other

 3   solvents that have the same solvent properties but don't

 4   have as toxic an effect as benzene, things like toluene

 5   or xylene instead, to reduce the hazard of the workers in

 6   the industry.

 7        Q    In this, in this article that is published,

 8   that Dr. Hazlett wrote here, is there anything in here

 9   that he's got wrong?  Or has he got it right about how

10   you view the importance in the public health field of

11   these controls?

12        A    Well, lots of people wrote the same types of

13   things, in terms of substitution being a logical

14   approach; and if you can't do substitution, then you have

15   to control the exposures with something like local

16   exhaust ventilation.

17        Q    And what's the next publication that you've

18   selected --

19        A    Well, there's --

20        Q    -- concerning Westinghouse?

21        A    -- a series of publications.  Westinghouse was

22   involved from the beginning in a group called "Industrial

23   Hygiene Foundation."  This is a group that was formed in

24   1936 or so.  In 1937, they started publishing something

25   called the "Industrial Hygiene Digest."  The Digest

KINSER v. CBS CORP., Case No. 94-2282

1    contained abstracts or summaries of articles appearing in

2    hundreds of medical and scientific journals around the

3    world.  They had a staff of people at the Industrial

4    Hygiene Foundation reading these journals and either

5    extracting or writing abstracts or summaries of the

6    essential content of these articles.  Many of the

7    articles originally didn't even appear in the English

8    language, so this was a valuable resource for companies

9    that were members of the Industrial Hygiene Foundation,

10   such as Westinghouse.

11          And lots of these abstracts, between 1937 and

12   1957 -- over 200 of these abstracts -- talked about the

13   dangers of asbestos.  They were summaries of articles

14   either about asbestos itself or about occupational cancer

15   in which asbestos was named, something like that.

16        Q    Where did the abstracts, the over 200, appear?

17        A    The abstracts appeared in the monthly issues of

18   the Industrial Hygiene Digest, which were sent to member

19   companies of the Industrial Hygiene Foundation, which

20   Westinghouse was for 30 years, from 1937 to 1967.

21          And I've looked at some -- through this, and

22   there are a couple of these I could comment on.

23        Q    Okay.  That was my next question.  Is there any

24   abstracts in that group of 200 that you wanted to single

25   out for, to the jury here today?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Yes.

 2              There's one, number 713 -- no, it's 714.  There

 3   are actually two articles, 713 and 714, both appearing in

 4   the German journal whose title translates as "The Journal

 5   for Cancer Research."  And 714 is by Martin Nordmann, and

 6   it's called "The Industrial Cancer of Workers in

 7   Asbestos."  And so here the author of the article is

 8   saying, for sure, asbestos causes occupational cancer;

 9   and he explains two cases of his own, four cases

10   previously published, and shows a consistency, most

11   notably, in the number of autopsied individuals that had

12   died with asbestosis and what, the fraction of that group

13   that had lung cancer.  And the lung cancer rate in such

14   people was excessive in England and in Germany, and this

15   would be a very consistent finding from then on in the

16   literature on lung cancer and asbestos.

17        Q     What year was that publication by Nordmann?

18        A     That was published in 1938, and the abstract

19   was published later that year in the United States, in

20   the Industrial Hygiene Digest, in 1938.

21        Q     For those on our jury who may not know what the

22   term "abstract" means, can you just briefly explain that?

23        A     By "abstract," I mean these one-paragraph

24   summaries of the articles that were written by the staff

25   at the Industrial Hygiene Foundation or, or copied by the
```

KINSER v. CBS CORP., Case No. 94-2282

1    staff from the original articles, or copied from some

2    other abstracting publication.  All three things -- all

3    three ways were used.

4        Q    So an "abstract" is like a summary of what was

5    in the liter-- or the article?

6        A    Right.  It's a summary of the article.

7        Q    And what's the next abstract that you wanted to

8    point out?

9        A    This is a, an article on asbestosis by Baader,

10   B-a-a-d-e-r, a German expert, published in the German --

11   the most widely read German medical journal, the German

12   Medical Weekly.  I mentioned this when I said that it was

13   reported that lung cancer was being compensated as an

14   occupational disease in asbestos workers in 19-- by 1939.

15   It's Baader's article I'm referring to as the source for

16   that.  And so here we have an abstract of that, in

17   English, provided to the members of the Industrial

18   Hygiene Foundation and two libraries that received the

19   Industrial Hygiene Digest.

20            Just a couple more.  One's number 366, and it

21   was an article published in, in this country in 1942 by a

22   couple pathologists in New York.  They had seen two

23   individuals with asbestosis in their pathology ward in a

24   five-year period, and both of them had lung cancer.  And

25   they were insulation workers.  They were not asbestos

KINSER v. CBS CORP., Case No. 94-2282

1   product factory workers.  They weren't asbestos mining

2   workers.  They were people who used asbestos insulation

3   products, heat insulation, and whose exposure arose from

4   working with those asbestos products.

5          And so they remarked on how that seemed

6   striking that both of the cases of asbestosis they'd seen

7   were people that had died of lung cancer; and then they

8   included a tabular presentation of similar cases up to

9   that time published in Germany, England, and in the

10  United States.

11         And the last one I have selected is a, an

12  article published in the German Medical Weekly by Wedler,

13  W-e-d-l-e-r; and he reports on 29 individuals that had

14  died with asbestosis and been subject to autopsy.  And

15  four of them had cancers of the lung.  Two of them had

16  cancers of the pleura, the membrane enclosing the lungs.

17  And Wedler said that all of these are occupational

18  cancers; and Wedler was the first to say that the pleural

19  cancers, or mesotheliomas, are asbestos-related.  He was

20  the first in the world to say that.

21         And even though this was published in Germany

22  in 1943, that abstract appeared in England in 1944 in the

23  Bulletin of Hygiene and then was reprinted in the

24  Industrial Hygiene Digest in January of 1945.

25         The Industrial Hygiene Foundation had its

KINSER v. CBS CORP., Case No. 94-2282

1  meeting of its Board of Trustees in 1945, in May of 1945.

2  I have a picture of this in my book, of the people that

3  were there; and one of the people on the Board of

4  Trustees is from Westinghouse.  So Westinghouse had a

5  prominent role in the Industrial Hygiene Foundation.

6      Q    And we have a copy of that picture here today,

7  right?

8      A    We do.

9      Q    Okay.  This is Exhibit 627?

10     A    Right.

11     Q    And, again, it's just being used --

12          (Brief pause in proceedings.)

13     A    So he's one --

14     Q    Wait, wait a minute.

15          (Brief pause in proceedings;

16          counsel confers.)

17  BY MR. McCOY:

18     Q    This is Exhibit Number 627.  This is from

19  page 683 of your book; is that right, --

20     A    Yes.

21     Q    -- Dr. Castleman?

22     A    Yes, it is.

23          MR. McCOY:  And this is just for publication

24  only, Judge, --

25          THE COURT:  Yes, go ahead.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            MR. McCOY:  -- by agreement.

 2            THE COURT:  Yes, I understand.

 3            MS. EZELL:  I apologize.  May we just mark this

 4    as a demonstrative because I don't think we're

 5    introducing his full book, are we?

 6            MR. McCOY:  Right.  That's fine.

 7    BY MR. McCOY:

 8       Q    So this is, this is from your chapter on your

 9    book on historical research on toxic substances, and

10    what's this picture show in relationship to Westinghouse

11    here?

12       A    Well, the trustees of the Industrial Hygiene

13    Foundation were meeting in the boardroom of Johns

14    Manville, the biggest asbestos company in the United

15    States.  And the fourth guy from the right, standing, is

16    a gentleman from Westinghouse.  His name is Joseph

17    Dilworth, --

18       Q    Here?

19       A    -- D-i-l-w-o-r-t-h.

20       Q    Right here?

21       A    Yes.

22       Q    This guy up here?  Okay.

23       A    So that's all as to that.

24            The same time --

25       Q    Well, what -- just briefly, for everybody,
```

KINSER v. CBS CORP., Case No. 94-2282

1    what's the purpose of this Board of Trustees on the

2    Industrial Hygiene Foundation?  What do they meet about?

3        A    Well, they're like the managing directors of

4    the group.  The group -- the Industrial Hygiene

5    Foundation by this time had about 300 major industrial

6    corporations as members.  Their annual meetings in the

7    late '40s were noted by the New York Times and the Wall

8    Street Journal, so this was a big operation, based in

9    Pittsburgh.

10            Next is -- the cover page of the Digest was

11   called "Foundation Facts."  It came out every month.  And

12   this is Exhibit 212.

13            And it just mentions that there was a meeting

14   in, between people from the National Safety Council and

15   the Industrial Hygiene Foundation.  And Dr. Hazlett,

16   medical director of Westinghouse, was appointed to serve

17   as the main liaison between these two organizations.

18       Q    I'm also going to publish this one, if we can

19   have agreement on it.

20            MS. EZELL:  What's the number?

21            MR. McCOY:  Exhibit 212.

22            MS. EZELL:  That's fine --

23            MR. McCOY:  Okay.

24            MS. EZELL:  -- for publication only.

25            MR. McCOY:  By agreement for publication only,

KINSER v. CBS CORP., Case No. 94-2282

1    Judge.

2                    (Brief pause in proceedings.)

3    BY MR. McCOY:

4        Q    Okay.  I've highlighted some parts of this

5    article, but go ahead and --

6        A    I was going to talk about what the National

7    Safety Council is.

8        Q    Okay.

9        A    The National Safety Council is based in

10   Chicago.  It was formed in 1912.  It's still around.  It

11   was a major industry association, initially created to

12   deal with safety hazards in industry, to get people to be

13   wearing safety glasses and safety gloves and put things

14   like guards on fast-moving belts so that there would be a

15   metal guard around the belt so you couldn't get your

16   sleeve caught and have your arm pulled in, those kinds of

17   very cost-effective safety measures that became adopted

18   by industry over a hundred years ago, even in the absence

19   of any government regulation.

20                And so the National Safety Council started

21   dealing with health hazards in the 1920s, and their

22   publications talk about asbestosis and asbestos hazards,

23   starting in 1929.  By -- they had annual meetings,

24   national safety conferences, which were also published;

25   and there were many articles -- in the 1930s,

1  especially -- talking about asbestos hazards and

2  asbestosis, compensation issues and laws, prevention,

3  dust control systems, medical diagnosis, air sampling --

4  all the different elements of industrial hygiene relating

5  to asbestos and disease.

6      Q    How was it that Westinghouse would know about

7  what was going on in the National Safety Council?

8      A    Well, Dr. Hazlett, the medical director, was

9  actually on the Executive Board of the National Safety

10  Council.  He was one of the officers of the National

11  Safety Council, as well as a prominent member of the

12  Industrial Hygiene Foundation, at least in the 1940s, the

13  early '40s.  I have a document where he's listed as being

14  on the Executive Committee.

15      Q    Did Dr. Hazlett personally have any

16  publications, or contribute to any publications, that

17  specifically discussed health hazards of asbestos?

18      A    Yes, he did.  There's -- he contributed to a

19  book called "The Principles and Practice of Industrial

20  Medicine," published in 1943 in Baltimore by Williams &

21  Wilkins Company.  He was one of a number of authors of

22  that, and that book had a section on asbestosis.

23          He also wrote his own text on industrial

24  medicine, published in 1947, called "Introduction to

25  Industrial Medicine."  And here, again, asbestosis was

KINSER v. CBS CORP., Case No. 94-2282

1    discussed as a disease that could -- serious consequences

2    could develop to people with seven or, seven to

3    nine years of heavy exposure.  It was noted.

4         Q    Okay.  Have you selected any documents to

5    highlight for us about Westinghouse's industrial hygiene

6    area?

7         A    Yes, I have.

8         Q    Briefly describe for us -- and we're going to

9    have an industrial hygienist testify, but could you

10   briefly -- we haven't have any testimony about:  What is

11   industrial hygiene's function?

12        A    "Industrial hygiene" is the use of personal

13   protective equipment or engineering controls to protect

14   workers from health hazards.  So personal protective

15   equipment would be safety glasses, safety shoes,

16   harnesses on scaffolding, respirators for dusts.

17             And then engineering controls would be things

18   like the design of industrial ventilation systems

19   where -- depending on the amount of exhaust air you need,

20   the diameters of the pipes, the length of the piping

21   through which the air has to flow -- you can size the fan

22   you need in order to drive that system so you will have a

23   sufficient face velocity at the place where the workers'

24   exposure would have otherwise occurred.

25             And so engineers, since the '30s, have been

1   writing textbooks; and people specializing in industrial

2   hygiene have developed this in -- from an engineering

3   standpoint, it's not very, very advanced to design

4   industrial ventilation systems.

5        Q    Did Westinghouse have an in-house corporate

6   industrial hygiene department?

7        A    They did.  They had a, they had -- just like

8   Dr. Hazlett was a leader in the field of industrial

9   medicine, Edgar Barnes was a leader in the field of

10  industrial hygiene among the industrial hygienists

11  working for big business in the United States in the

12  1930s.

13       Q    What was his last name?

14       A    Barnes, B-a-r-n-e-s.

15       Q    And have you singled out any memos, or selected

16  memos from the Westinghouse industrial hygiene area?

17       A    Yes.  These are corporate documents which were

18  produced by Westinghouse in litigation.  One is

19  January 11, 1946, and this is a two-page letter from Mr.

20  Barnes to the assistant plant manager, assistant works

21  manager of what's called the "South Philadelphia Works,"

22  one of the Westinghouse plants.

23            And so he writes in here about workers who were

24  using asbestos for installation on steam turbines and

25  says that they found several cases of lung conditions in

KINSER v. CBS CORP., Case No. 94-2282

```
 1   such workers that he thought might be related to their

 2   occupation.  He talks about compensation claims being a

 3   possibility --

 4            MS. EZELL:  Excuse me.  Excuse me, Your Honor.

 5   This witness is reading from an exhibit that has not been

 6   admitted; and Westinghouse objects to this, the admission

 7   of this exhibit.  It is not a learned treatise.  It is an

 8   internal Westinghouse document, and a proper foundation

 9   needs to be laid; and that has not been done yet, and

10   there's no question pending for this reading of this

11   document.

12            THE COURT:  We had this discussion earlier,

13   before the trial began.  You produced it in discovery as

14   a document belonging to Westinghouse, a record of

15   regularly conducted activity.

16            It's admitted, and your objection's overruled.

17            He may proceed with what you're doing.

18            MS. EZELL:  Your Honor, this is not that same

19   document, but can I just have a standing objection with

20   regard to this same series of documents --

21            THE COURT:  What do you mean:  It's not the

22   same document?

23            MS. EZELL:  It's not the document that we had

24   that argument about.

25            THE COURT:  No.  But it's, but it's one you
```

KINSER v. CBS CORP., Case No. 94-2282

```
1   provided.

2           MS. EZELL:  Yes, sir.

3           THE COURT:  And it's -- and it was a

4   Westinghouse document kept in the regular course of

5   business, as we used to say, a record of a regularly

6   conducted activity.

7           MS. EZELL:  That foundation hasn't been laid,

8   but Your Honor has already ruled with regard to that.

9           And I'm simply -- I, I --

10          THE COURT:  If you produced it as, in response

11  to the interrogatory -- "Give me Westinghouse's

12  documents" -- and it was produced, that would lay a

13  sufficient foundation for it.

14          MS. EZELL:  I understand that that's what

15  you've ruled, Your Honor.

16          THE COURT:  I do.

17          MS. EZELL:  And I'm simply saying that there

18  are a series of these documents, I believe, to follow;

19  and rather than have me hop up every time, I'm just

20  asking for a standing objection to this series of

21  documents, based on the Court's prior ruling.

22          THE COURT:  It's agreeable that we have a

23  standing objection, and it's agreeable to the Court.

24          MR. McCOY:  Yes.

25          THE COURT:  And the standing order is that it's
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   overruled.

 2            MS. EZELL:  Thank you, Your Honor.

 3            MR. McCOY:  All right.  So I would ask, then,

 4   that we show this document as Dr. Castleman is describing

 5   it.

 6            MS. EZELL:  I'm sorry.  Do we have an exhibit

 7   number?

 8            MR. McCOY:  This is Exhibit --

 9            THE WITNESS:  193.

10            MR. McCOY:  Right.

11   BY MR. McCOY:

12       Q    Go ahead, Dr. Castleman.  You've already told

13   us it was a 194-- it's either a '46 or '48 document from

14   Westinghouse.

15       A    Yes.

16       Q    And I believe the, the author on this is

17   Mr. E.C. Barnes.  It's a little hard to read, --

18       A    Yes.

19       Q    -- but he's an industrial hygiene engineer for

20   Westinghouse.  You've explained that.

21       A    Right.

22       Q    Okay.  So --

23       A    And I was just saying that Barnes, in the

24   second paragraph, talks about there being individuals

25   with lung conditions -- "several cases" he says -- which
```

KINSER v. CBS CORP., Case No. 94-2282

1    might be related to their exposure in this department;

2    and he says a claim for compensation by these people

3    "would be very difficult to defend."  And he says that

4    the ventilation -- the protection provided in this

5    department "can hardly be called suitable or adequate."

6            And then again in the next paragraph, he again

7    returns to the subject of a compensation claim and says

8    that we could better defend the claims -- or, or we'd

9    have a better defense if we cleaned up this operation by

10   installing protective measures so that, if people made

11   claims after the protective measures were installed, we'd

12   at least have a defense that the dust was controlled by

13   that time.  That's the argument he's making in the third

14   paragraph.

15       Q    Now, when you say "this operation," what, what

16   are we talking about?  Are we talking about some,

17   something that Westinghouse is doing out in the field,

18   like the Zion powerhouse?  Are we talking about one of

19   Westinghouse's own, own manufacturing plants?

20       A    This is --

21           MS. EZELL:  Objection, Your Honor.  Calls for

22   speculation.  This is a 1945 document.  This witness has

23   no way of knowing what Westinghouse believed in 1945

24   about Zion.

25           THE COURT:  Find out the foundation of, for his

1   information.

2          MR. McCOY:  Okay.

3   BY MR. McCOY:

4      Q    How, how is it that you're familiar with the

5   facility that's being discussed in this document, Dr.

6   Castleman?

7      A    Well, it's a document that comes up again and

8   again in some of these papers.  The South Philadelphia

9   Works was one of Westinghouse's manufacturing

10  establishments.

11     Q    Westinghouse owned?

12     A    Yes.

13     Q    Okay.

14         THE COURT:  So, so this is about the South

15  Philadelphia what?

16         THE WITNESS:  The South Philadelphia Works.

17         THE COURT:  Oh, okay.

18         THE WITNESS:  The letter's addressed to the

19  assistant works manager, right on the top of the letter.

20         THE COURT:  All right.  It itself shows the

21  relationship.  You may proceed.

22     A    And then he talks about some other hazards of

23  asbestos where they -- at a table where they fill and sew

24  the blankets, which needed ventilation; and he talks

25  about the, you know, the need -- and he even says that he

KINSER v. CBS CORP., Case No. 94-2282

1   has a sketch for the proposed method of ventilation.

2          So in this operation, the industrial hygienist

3   is saying:  Look, this can be controlled, and this is how

4   it can be controlled.

5      Q    Blankets for what?

6      A    Insulation.

7          And then he talks about another operation where

8   asbestos is mixed with water, and the wet mixture is

9   applied to the turbines; and, again, he's recommending an

10  exhaust hood and talking about methods that can be used

11  in designing a ventilation system.

12         He says ventilation for this operation could

13  probably be provided and connected to the same system

14  that he wants to use in the adjoining room for the other

15  hazard he's talked about in this 1946 letter.

16     Q    This is part of the turbine manufacturing area?

17     A    Right.

18         The next item, if you want -- is an April 1948

19  letter.

20     Q    Okay.  Let's, let's just identify this one for,

21  for the record before we --

22     A    The number is 194.

23         MR. McCOY:  Okay.  And this, this is also being

24  offered subject to the objection and the agree-- the

25  standing objection, Judge.

KINSER v. CBS CORP., Case No. 94-2282

1           THE COURT:  Very well.

2           MR. McCOY:  Okay.

3           THE WITNESS:  And here he's talking about --

4    BY MR. McCOY:

5      Q    Exhibit 194, go ahead.

6      A    Here he's talking about the operation of a saw,

7    and the saw is used for cutting asbestos materials and

8    created what he says is "a large amount of dust . . .

9    breathed by the men running the saw."  And here he again

10   recommends that properly designed exhaust equipment be

11   provided; and he says, "Considerable care should be

12   exercised to minimize hazards of this type."  That's also

13   by Mr. Barnes.

14     Q    Okay.  This, this signed by Mr. Barnes, says at

15   the top, "Headquarters Medical Department"?

16     A    Right.

17     Q    Okay.  And I know it's a little unclear.

18   April 30th of what year?

19     A    1948.

20     Q    Okay.

21     A    So Barnes, as an industrial hygienist, worked

22   in the medical department of the corporation.

23     Q    And I -- and this looks like -- what is it --

24   "Trans," t-r-a-n-s, "and Generator Division"?

25     A    Yes.  It says "Trans. and Generator Division."

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And what is -- did I take that -- did you

2   finish that one?

3      A    Yes.

4      Q    Okay.  The next one?

5      A    The next one's by a later industrial hygienist

6   writing in June of 1954.  This is item -- Exhibit 196.

7      Q    Okay.  Let me just get this out so we can show

8   it here.

9           MR. McCOY:  This is being also offered subject

10  to the standing objection, Judge.

11          THE COURT:  Go ahead.

12          MR. McCOY:  It's a Westinghouse document.

13          THE COURT:  I'll remind you:  It's five after

14  3:00.

15          MR. McCOY:  Right.  We're nearing the end.

16  BY MR. McCOY:

17     Q    Okay.  And the significance of this one then,

18  Dr. Castleman, for Westinghouse?

19     A    He's calling attention to dust associated with

20  the use of asbestos cloth, and he said it's "very

21  desirable to ventilate the room more effectively."  He

22  talks about sheet material being thrown around from one

23  bench to another and asbestos fibers being raised in the

24  breathing atmosphere of the workers.

25     Q    This is also about the South Philadelphia

KINSER v. CBS CORP., Case No. 94-2282

1   Works?

2        A    Yes.

3        Q    Next?

4        A    Three years later, report of a plant visit --

5             MS. EZELL:  I'm sorry.  What exhibit are we on?

6             THE WITNESS:  Exhibit --

7             MR. McCOY:  This is, this is Exhibit 197, also

8   being offered subject to the standing objection.

9             THE COURT:  Very well.  You may proceed.

10       A    This is called "Report of Plant Visit," and

11  it's dated July 24, 1957.  This is also by the industrial

12  hygienist who wrote the preceding document, Wilbur

13  Speicher, S-p-e-i-c-h-e-r, another industrial hygien--

14            MS. EZELL:  I'm sorry.

15            Your Honor, I have an objection/comment.  There

16  is some, some on-the-screen editing being accomplished;

17  and I'm curious as to whether or not the copy that the

18  witness is reading from has the copy that Mr. McCoy has,

19  with the words that Mr. McCoy is not showing to the jury.

20            MR. McCOY:  Yeah.  That's -- yeah.  I can, I

21  can explain this real quick.

22            THE WITNESS:  It's my handwriting.

23            MR. McCOY:  Right.

24            THE WITNESS:  Those were from my files, and so

25  that shouldn't be in the document shown to the jury.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  Well, Your Honor, this is a

2    witness's observation about these documents, and he's

3    testifying.  I think those are exactly what should be

4    shown to the jury.

5          MR. McCOY:  Okay.

6          THE COURT:  Why, why are these -- I don't want

7    to carry this discussion on in the presence of the jury.

8    It's a legal matter, and it's not their concern.

9          Can't you show him the same thing that, that

10   he's looking at?

11         MR. McCOY:  I think he has the same thing.

12         THE WITNESS:  You can just put a yellow sticker

13   over those parts.

14         MS. EZELL:  My objection is:  His notes

15   shouldn't be edited.

16         THE COURT:  I understand.  And before we would

17   ever send it to the jury, I would remove any annotations

18   or things that aren't attributable to the scrivener of

19   the document.  Or do you understand me?

20         MS. EZELL:  Oh, no.  I understand you.  And I'm

21   saying that I do not believe it is appropriate to redact

22   this witness's notes that he has summarized, because he

23   is the one offering these documents.  And Mr. McCoy is

24   editing out this witness's comments about these

25   Westinghouse documents.  And I think that, because he is

KINSER v. CBS CORP., Case No. 94-2282

```
 1  the one sponsoring these documents, his notes are

 2  relevant.

 3          MR. McCOY:  It -- Judge, I'm more than happy to

 4  leave in the notes, if that's what she's saying.  It's

 5  fine with us, so --

 6          THE COURT:  Very well.

 7          MS. EZELL:  Yes, sir.

 8          THE COURT:  Okay.  Leave them in.

 9          MR. McCOY:  Okay.

10  BY MR. McCOY:

11      Q    That's your notes at the top when you looked at

12  the document before, right, Dr. Castleman?

13      A    Right.  When I initially saw the documents, I

14  just made a little note about --

15      Q    Okay.

16      A    -- what I thought was particularly interesting

17  about the document.

18      Q    And that's what you're describing to the jury?

19      A    Yeah.

20      Q    Okay.

21      A    Only I'm looking at the rest of the document as

22  I talk to the jury, to be very clear about what it says.

23          THE COURT:  Very well.  Proceed.

24      A    So this is July 1957.  The industrial hygienist

25  is writing to the safety supervisor at one of the plants.
```

KINSER v. CBS CORP., Case No. 94-2282

1    And item number 2 in the middle of the first page talks

2    about a circle saw used for cutting asbestos board, which

3    he says "should be very much better ventilated," and

4    talks about the dust being excessive and that this

5    creates a situation of exposure to surrounding workmen.

6           So here, there's recognition of a bystander

7    hazard as well as the hazard to the workers most directly

8    exposed in this industrial process.

9      Q    How does that mean -- how does that relate to a

10   bystander?  Is that the part about "surrounding workmen"?

11     A    Yes.  I mean, it shows an awareness of that

12   aspect of the danger.

13          And then there were toxic solvents and other

14   hazards he calls attention to in the rest of his letter,

15   which we needn't bother spending time on.

16          Next, --

17     Q    This comes from who?

18     A    Wilbur Speicher, S-p-e-i-c-h-e-r, who was an

19   industrial hygienist at Westinghouse.

20          MS. EZELL:  I'm sorry.  Number, please?

21          MR. McCOY:  Exhibit 197.

22          MS. EZELL:  Thank you.

23   BY MR. McCOY:

24     Q    It comes from an industrial hygienist --

25     A    Right.

LISA KNIGHT COSIMINI, RMR-CRR
Official Court Reporter - U.S. District Court
(217) 355-4227

KINSER v. CBS CORP., Case No. 94-2282

1      Q     -- at Westinghouse?

2      A     Right.

3            Just a couple more.

4            March 27, 1961, this is a memorandum --

5      Q     Again --

6      A     -- from an industrial hygienist at

7   Westinghouse, talking about an operation where they took

8   air samples; and they were doing horizontal boring and

9   facing of asbestos casings.

10           MS. EZELL:  Excuse me.  May we have the exhibit

11  number?

12           MR. McCOY:  Yes.  It's Exhibit 199; and, again,

13  we're offering this subject to the standing objection.

14     A     So these are processes involving asbestos

15  casings, and the hygienist writes that, "The dust

16  concentration became so great that the operator could not

17  remain at the machine during the operation," and talks

18  about that as a health hazard.

19           And the last corporate document in this list is

20  January 29, 1973, from Wilbur Speicher.

21     Q     Let me, let me just get this up here.

22  Exhibit 201, this is?

23     A     Right.

24     Q     And, again, being offered subject to the

25  standing objection.

KINSER v. CBS CORP., Case No. 94-2282

1      A     And he's calling attention to the hazards of

2  asbestos cloth being torn by hand and excessive exposures

3  associated with workers doing that, and urges the finding

4  of a substitute for the asbestos cloth.

5           So that, that concludes the corporate documents

6  that I selected as indicative of what Westinghouse

7  actually knew about asbestos hazards at the various times

8  and at various operations where they used asbestos

9  products.

10     Q     Dr. Castleman, do Westinghouse's documents show

11 that any of the, the recommendations by the industrial

12 hygiene or medical personnel that you've found in these

13 documents were ever implemented?

14     A     No.  The documents don't -- there are no

15 documents that, that confirm that any of these industrial

16 ventilation systems or other things that were proposed

17 were actually installed.

18     Q     So, what is your opinion as to what

19 Westinghouse should have been doing, based on these

20 documents that you've reviewed, and from a public health

21 perspective?

22     A     Well, it seems like they should have done what

23 the industrial hygienist recommended, but the industrial

24 hygienists don't run the company.  And they were making

25 these recommendations to plant managers and other

KINSER v. CBS CORP., Case No. 94-2282

```
 1    executives of the company, and those were the people who
 2    would decide; and they would decide based on, mainly,
 3    business considerations, such as compensation claims and
 4    other kinds of concerns like that, which are described in
 5    some of these memos.
 6         Q    What is your opinion, based on these
 7    documents -- again, from a public health perspective --
 8    as to what Westinghouse should have done in terms of
 9    doing air testing or having safety precautions or
10    warnings for asbestos out in the field, places like the
11    powerhouses where they were actually installing turbines,
12    based on the knowledge that you've talked about in these
13    documents?
14         A    Well, clearly, the hazards of the kind that
15    were documented in the plants also existed out in the
16    field where these products were used and installed.  And
17    you know, the company -- I -- from an ethical and moral
18    standpoint, if not from any legal responsibility before
19    OSHA in the 1970s, they should have been doing
20    something --
21              MS. EZELL:  Objection.  Move to strike.
22    Ethical, moral, and legal responsibilities are outside of
23    this witness's purview.
24              THE COURT:  The jury will disregard what's
25    ethical and moral, and the motion is allowed.  That's
```

KINSER v. CBS CORP., Case No. 94-2282

1  stricken.

2          MR. McCOY:  Okay.

3  BY MR. McCOY:

4      Q    So leaving out the part that's been stricken,

5  Dr. Castleman, what's your opinion as to what

6  Westinghouse should have done out in the field, like in

7  the powerhouses, as far as safety precautions, testing

8  the air, and warnings?

9      A    Well, they should have done what Merewether

10  recommended in his report on asbestos in 1930:  get the

11  workers to have a sane appreciation of the risk and take

12  seriously all the measures they could apply to limit

13  their exposure to asbestos dust.

14      Q    There was -- Dr. Hazlett's article back in 1936

15  talked about substitution.  When were substitutes

16  available for asbestos insulation materials of the types

17  that might be used in a powerhouse?

18      A    They were available in the 1940s and

19  thereafter, probably before then.

20      Q    How do you know that?

21      A    There were articles published in the

22  literature, in the technology literature and journals,

23  with names like "Power Plant Engineering and Power," as

24  well as the chemical engineering journals in the 1940s

25  and 1950s, describing the use of mineral wool insulation.

KINSER v. CBS CORP., Case No. 94-2282

1   So if a company was aware of asbestos being a hazard and

2   wanted to substitute asbestos insulation with a safer

3   material, the mineral wool was available.

4           Entire oil refineries were insulated with

5   mineral wool, and that was covered in the trade ind-- in

6   the trade press of the oil industry in articles published

7   in the 1940s and in the 1950s.

8       Q    Okay.  I'm going to change topics, and then

9   we'll be done here soon, pretty soon.

10          "OSHA" stands for what?

11      A    Occupational Safety and Health Administration.

12      Q    "EPA" stands for?

13      A    Environmental Protection Agency.  These are two

14  governmental agencies of the federal government.

15      Q    When were these agencies actually created?

16      A    OSHA, in 1971; EPA, in 1970.  Prior to that

17  time, there was no regulation of health hazards in

18  industry or pollution of the environment in the country.

19      Q    Did OSHA or EPA enact regulations concerning

20  asbestos?

21      A    Yes.  OSHA did.  Oh, so did EPA.

22      Q    When, when did OSHA have regulations?

23      A    They initially had some regulations in 1971.

24  They issued an emergency temporary standard at the end of

25  the year.  They published a so-called permanent standard

KINSER v. CBS CORP., Case No. 94-2282

1  in June of 1972.

2          So the permanent standard laid out a lot of

3  elements of control that were required by companies using

4  asbestos products or working with asbestos products.

5  There was a maximum exposure called a "permissible

6  exposure limit" for daily average exposure.  There was a

7  ceiling limit twice that high for peak exposure for short

8  periods.

9          And there were other requirements for periodic

10  medical monitoring of the workers, periodic air sampling

11  of the workplace, warning labels on products, warning

12  signs in areas where high exposures were occurring, and

13  the provision of the appropriate types of respirators for

14  varying levels of exposure that exceeded the permissible

15  exposure limit.  All of these things were contained in

16  the standard.

17      Q     Did EPA enact regulations?

18      A     EPA banned asbestos in sprayed asbestos

19  fireproofing and, in 1973; and in molded pipe covering

20  and insulation, the type that was widely used before that

21  in industry, in 1975.  Asbestos was banned in those, in

22  those products, as an air pollution hazard by the

23  Environmental Protection Agency.

24      Q     And did these OSHA or EPA regulations

25  immediately solve the public health concerns about

KINSER v. CBS CORP., Case No. 94-2282

1    asbestos?

2            MS. EZELL:  Objection, calls for speculation.

3            THE COURT:  Read me the question.  I think I

4    heard it.

5            COURT REPORTER:  "And did these OSHA or EPA

6    regulations immediately solve the public health concerns

7    about asbestos?"

8            THE COURT:  With all of his education and

9    experience and background, he's qualified to answer that.

10   He may answer.

11       A    No.  Their continued use of asbestos in lots of

12   things went on.  Lots of exposures went on.  Lots of

13   violations of the OSHA regulations went on.  I mean, OSHA

14   had a few thousand inspectors.  We had millions of

15   workplaces that were subject to OSHA regulations, and so

16   the inspections were few and far between.  Even in the

17   industries that were target industries, like the asbestos

18   industry, there weren't very many OSHA inspections.

19           MS. EZELL:  Move to strike as nonresponsive.

20   There is no evidence in this case of any violation --

21           THE COURT:  You didn't ask the question.  How

22   can you claim it's nonresponsive?

23           MS. EZELL:  It was nonresponsive, outside the

24   scope, and it was a 403 prejudicial response, indicating

25   that there was somehow some violation at Zion; and

KINSER v. CBS CORP., Case No. 94-2282

1   there's absolutely no evidence of that in this case.

2              THE COURT:  Nobody said that.

3              This -- I'll -- it's overruled.  You may

4   proceed.

5              MR. McCOY:  I'm very --

6              THE COURT:  I'll make a comment on the record

7   later.

8              MR. McCOY:  I'm very close to finish, Judge.

9   BY MR. McCOY:

10     Q     The exposure limits you mentioned that were set

11  by OSHA, when was the law enacted?

12     A     The law was enacted in '70, the last days of

13  the year.  The agency opened in April of 1971.  And then

14  the rest happened.

15     Q     When did the, when did the limits become

16  effective?

17     A     Well, the permanent standard was published in

18  June, and the limits became effective a month later, in

19  July 1972.  But the, the permissible exposure limit for

20  daily average exposure in the 1972 standard was five

21  fibers per cubic centimeter, and the 1972 standard said

22  that that comes down to two fibers per cubic centimeter

23  July 1, 1976.

24             And the reason for this delay is because OSHA

25  had to weigh economics against health protection.  All

KINSER v. CBS CORP., Case No. 94-2282

1   standards had to be, according to the law,

2   technologically feasible.  And so OSHA expected -- and

3   received -- a court challenge when they published the

4   regulations; and in order to make the regulations survive

5   that challenge, they gave industry four more years to get

6   the exposures down to a level that was already required

7   by law in England since 1969.

8        Q    So the, the standards on the lower amount

9   became effective in 1976?

10       A    Right.

11       Q    Okay.  Now, did, did those initial regulations,

12  other than the spray-on fireproofing, ban the use of

13  asbestos such as the type that would be on the pipe

14  coverings or might be used in the gasket materials?

15       A    Well, in the pipe covering, yes, the EPA

16  regulations in 1975 banned the use of asbestos in molded

17  insulation for pipe covering.

18       Q    In 1975?

19       A    In 1975.

20       Q    Okay.  Before that, there was no ban?

21       A    No.

22            MR. McCOY:  That's all the questions I have,

23  Judge.  Thank you.

24            THE COURT:  All right.  You may have a recess,

25  jurors.  We'll keep it short and keep going on this.

KINSER v. CBS CORP., Case No. 94-2282

```
 1          Go ahead; take the jury out, please.

 2              (Jury absent, 3:21 p.m.)

 3          THE COURT:  This is out of the presence and

 4   hearing of the jury.  I will add to my remarks about the

 5   objections to this witness's testimony and so forth.

 6          The issue in the case -- this is a plain old

 7   negligence case:  Whether in the exercise of ordinary

 8   care Westinghouse might or could have done things or had

 9   knowledge, which shows that, that they were not

10   exercising ordinary care.

11          And we still have the issue in the case that's

12   coming up.  It's going to be a real issue:  Was there,

13   was there asbestos present at this Zion plant?  That's

14   all down the road.

15          But, but what he's talked about -- I'm just

16   saying this for the record to explain my ruling -- is

17   what Westinghouse might or could have done in the

18   exercise of ordinary care.

19          MS. EZELL:  And, Your Honor, just so, to say

20   for the record my response, --

21          THE COURT:  You may be heard.

22          MS. EZELL:  Thank you.

23          His answer, in my hearing, went beyond that

24   insofar as he indicated that the regulations that went

25   into effect in 1973 were not complied with because there
```

KINSER v. CBS CORP., Case No. 94-2282

1  were hundreds of violations; there were a number of

2  plants that didn't comply, leaving the clear and

3  prejudicial impression in the jury's mind that the plant

4  at issue in this case was noncompliant, or that there was

5  some evidence of noncompliance at Zion.

6          And that is something he has no evidence of.

7  He did not research that.  He has no foundation to even

8  plant that seed in the jury's mind.  And that's why I

9  asked to have his answer, insofar as that speculative and

10 prejudicial retort, stricken.

11         But I understand Your Honor's ruling; I am

12 simply putting my thought process on the record.

13         THE COURT:  You don't have to apologize for

14 your statement in the record.  You're a lawyer in this

15 case.

16         No.  That will be taken up; I assume you are

17 going to -- you are going to offer evidence that there is

18 no asbestos at Zion; and if that's -- if the jury

19 believes that, all this is, is not going to -- the jury

20 isn't going to follow it.

21         MS. EZELL:  Right.

22         THE COURT:  But it still can come in.  It's

23 still in the rec-- it's in the evidence.  That's what it

24 comes down to, and I'm just explaining again to you my,

25 my approach to this.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              We're in recess.
 2              MS. EZELL:  Thank you, Your Honor.
 3                   (Recess, 3:24 p.m. to 3:36 p.m.)
 4                   (Jury present, 3:38 p.m.)
 5              THE COURT:  Please be seated.
 6              Go ahead.
 7              MS. EZELL:  Thank you, Your Honor.
 8              THE COURT:  Cross-examination.
 9              MS. EZELL:  Yes, sir.
10                   CROSS-EXAMINATION BY MS. EZELL:
11         Q    Now, we've been calling you "doctor," but
12    you're not a medical doctor, are you?
13         A    That's right.
14         Q    And you are not a pathologist, are you?
15         A    I'm not any kind of medical doctor, including a
16    pathologist.
17         Q    All right.  So you're not a radiologist, are
18    you, sir?
19         A    That's another kind of medical doctor I'm not.
20         Q    All right.  You're not actually a, an
21    epidemiology specialist either, are you?
22         A    No.  Training in epidemiology, but I don't
23    specialize in that field.
24         Q    Okay.  And you don't work as a toxicologist in
25    any form or fashion?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A     No.

2      Q     You're not a certified industrial hygienist,

3   are you?

4      A     No.

5      Q     You are not an occupational physician?

6      A     I'm not any kind of a doctor.  That's right.

7      Q     All right, sir.

8            You have never conducted any kind of industrial

9   hygiene sampling survey where you've gone into a

10  workplace and tested for asbestos, have you?

11     A     I've never done a survey that included sampling

12  by me.  That's right.

13     Q     All right.  You're not a design or a materials

14  expert of any nature?

15     A     No.

16     Q     And you would agree with me that medicine and

17  law are the foundations of public health, correct?

18     A     Yes.

19     Q     And you have neither a medical degree, nor a

20  law degree?

21     A     Well, that's right.

22     Q     All right.  Now, I'd like to talk with you

23  about your work history.  You worked at a company -- and

24  you mentioned it with Mr. McCoy earlier -- called

25  "Hercules"; is that right?

KINSER v. CBS CORP., Case No. 94-2282

1     A     Right.

2     Q     And you had some sort of dispute with them, and

3 they asked you to leave their employment, correct?

4     A     They asked me to leave a couple days early

5 because I was raising concerns about the way they were

6 dumping hazardous wastes, in 1969.

7     Q     Yes, sir.

8           And so the -- with that explanation, the answer

9 to my question of whether or not the Hercules company

10 asked you to leave is "yes," correct?

11    A     Right.

12          I was scheduled to leave at the end of the

13 month, and a couple days earlier they said, "You can go

14 now."

15    Q     Yes, sir.

16          And so then you went to work for the Baltimore

17 County Health Department, correct?

18    A     Right.

19    Q     And you were fired from that job, too, weren't

20 you?

21    A     After I testified at the congressional hearing,

22 they fired me; then they rehired me with full back pay

23 after I could challenge them on that.

24    Q     Yes, sir.

25          So in spite of all that explanation, one of the

KINSER v. CBS CORP., Case No. 94-2282

1  things that occurred between you and the Baltimore County

2  Health Department was that they fired you?

3      A    For testifying about companies in Baltimore

4  County using asbestos to filter beer and gin, yes.

5      Q    Yes, sir.

6           And then you went to work for the Maryland

7  Public Research Interest Group after that job, correct?

8      A    No.  The next job was with a group called the

9  Center for Science in the Public Interest in Washington.

10     Q    All right.  And then you went to work for the

11 Maryland Public Research Interest Group, correct?

12     A    "Maryland Public Interest Research Group," it

13 was called.

14     Q    And they fired you, too?

15     A    Right.

16     Q    All right.

17     A    I haven't had a boss or been one since 1975.

18 That was the end of that job.

19     Q    All right.  So then after you got fired from

20 there, you became a consultant?

21     A    Right.

22     Q    In the same field that you'd been fired three

23 times?

24     A    Well, I became a consultant in toxic substances

25 control.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Right.  But you'd been working -- you had

2   bosses in the field of public health; and that didn't

3   work out, so then you just became your own boss, correct?

4      A    It worked out fine.  I quit that job.  I -- in

5   the end, I wasn't fired.  I quit that job.  They rehired

6   me.  They paid me full back pay for the month I was out.

7   And then I said, "Okay.  Now, I'm ready to move on.  I'll

8   see you later."

9      Q    Now, sir, you've testified before that you were

10  fired from the Maryland Public Research Interest Group,

11  and then you started your own company, and that's what

12  happened?

13     A    That's right.

14     Q    All right.  Now, you testify under oath quite

15  often, don't you, sir?

16     A    It averages one or two trials a month.

17     Q    Yes.

18          And you've testified in numerous depositions

19  for asbestos litigation throughout the United States,

20  averaging 60 to 70 per year in the past five years,

21  correct?

22     A    Well, it got that high.  I managed to get it

23  down to 34 last year.

24     Q    All right.  And you get paid, when you testify,

25  $400 an hour, correct?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Most of the time.  There are plenty of
 2   uncollected bills to defendants for taking my depositions
 3   that I haven't gotten around to collecting.
 4        Q    Mr. McCoy pays his bills?
 5        A    Usually, yes.
 6        Q    All right.  And when you bill your time, you
 7   don't just bill your time for testifying; you also bill
 8   your time for preparation, correct?
 9        A    Yes.
10        Q    For writing reports, correct?
11        A    Well, if reports are needed in the case.
12   They're usually not.
13        Q    You wrote a report in this case?
14        A    Well, if there was a report in the case --
15   there's usually a charge for the report.  Sometimes I
16   don't charge, but usually I charge for those.
17        Q    As you sit right there right now, without
18   looking to your left, do you know whether or not you
19   wrote a report in this case?
20        A    I don't remember.
21        Q    All right.  And you charge, not just for the
22   time that you spent working, but you also charge for
23   travel, correct?
24        A    Yes.
25        Q    And to get here, you had to come from Maryland?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A      Right.

 2        Q      In a snowstorm?

 3        A      Yeah.  Well, it was snowing a little bit.

 4        Q      Yes, sir.

 5               And so to be here with us and testify for three

 6    or four hours, you'll bill, probably, three days' time,

 7    at least, at $400 an hour?

 8        A      Well, you know, it's the hours.  It's not the

 9    days.  I don't bill all day.  You know, if I'm traveling

10    five hours, I go for five hours.

11        Q      Yes, sir.

12               And that travel time is whether you're sleeping

13    or working or watching a movie?

14        A      Well, whatever I'm doing on the airplane while

15    the airplane's flying me wherever I'm going, it is.

16        Q      Yes, sir.

17               And you told us about some other stuff you do

18    besides testifying and working on cases like this.  But

19    the fact of the matter is:  You and I were together at a

20    case in October of last year -- do you recall that? --

21    in Connecticut?

22        A      I do.

23        Q      All right, sir.

24               And at that time, you told me that 95 percent

25    of your total income is generated from testifying in
```

KINSER v. CBS CORP., Case No. 94-2282

1    asbestos litigation, irrespective of the fact that that's

2    not the only thing that you do for a living.  Is that

3    still the case?

4         A    Right.  Nobody pays you to spend a month in

5    India trying to get asbestos banned.

6         Q    All right, sir.

7              So it's still true, then, that plaintiffs'

8    counsel, like Mr. McCoy, have overwhelmingly funded your

9    gainful employment since 1976 when you started your own

10   firm, correct?

11        A    Well, defense counsel, by taking all these

12   depositions, have made a contribution, too; but most of

13   my income is related to working in the litigation, and

14   that's enabled me to spend most of my time on things that

15   pay little or nothing.

16        Q    Yes, sir.

17             And in that time, you have billed to a company

18   that you are the secretary and the testifier over

19   $3 million, correct?

20        A    Well, if you go back 34 or '5 years that I've

21   been doing this, probably that's correct.

22        Q    Yes, sir.

23             Now, I would like to talk to you about your

24   book, which you discussed with Mr. McCoy during your

25   direct examination.  And you indicated that this copy is

KINSER v. CBS CORP., Case No. 94-2282

1    the Fifth Edition, correct?

2        A    Right.

3        Q    Now, most of the information contained in this

4    book is based on documentation that you received

5    initially for your doctoral thesis; you've already

6    explained it was for your doctoral thesis.  But the

7    information that you obtained for this book was from

8    plaintiffs' lawyers like Mr. McCoy, correct?

9        A    No.  Most of the stuff in the book is from the

10   published medical, scientific, and other literature.

11       Q    All right.  Let me ask a better --

12       A    Most of the corporate documents were obtained

13   from litigation.  So if your question's about the

14   corporate documents that were not published -- things

15   like, you know, Lyle Hazlett's text on industrial

16   medicine, but things that relate to corporate knowledge

17   and internal corporate knowledge -- yes, those are not

18   the kinds of materials that a historian or me would have

19   access to, unless they were, surfaced in something like a

20   lawsuit.

21       Q    All right, sir.

22            So let me ask you a better question.  You

23   conducted independent research of information that was

24   available to the public, correct?

25       A    Right.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    And you included that information in your book?

2       A    Sure.

3       Q    And you have also included information about

4  corporations and their documents; and you received all of

5  those from plaintiffs' counsel like Mr. McCoy, correct?

6       A    Not all of them.  Defense lawyers have also

7  provided me with documents.  When they take my

8  depositions so many times, I frequently invite defense

9  counsel to provide me with documents from their clients

10  that would help me have a fuller understanding of what

11  their clients have known and done over the years.

12       Q    Yes, sir.

13            And, overwhelmingly, the documents that you

14  have in here have come from plaintiffs' counsel.  Yes?

15       A    Most of the corporate knowledge documents have

16  come to me from plaintiffs' counsel, who got it from

17  defendants.

18       Q    All right, so --

19       A    None of these documents has ever been shown to

20  be a forged document in the 35 years I've been doing

21  this.

22       Q    Okay.  Thank you.

23            So the words "Westinghouse Electric

24  Corporation" are in Volume 5, correct?

25       A    There's a section on Westinghouse in, in the

KINSER v. CBS CORP., Case No. 94-2282

```
 1   book.

 2        Q    In this book?

 3        A    Right.

 4        Q    But in Volume 1 -- which was published what

 5   year?

 6        A    1984.

 7        Q    Westinghouse wasn't in that book, were they?

 8        A    No.  I don't think I'd seen any Westinghouse

 9   internal documents at that time.

10        Q    So the answer to my question, "Was

11   Westinghouse --

12        A    They were --

13        Q    Okay.  Let me finish my question.

14             The answer to my question -- "Was Westinghouse

15   in Volume 1 in 1984?" -- is?

16        A    No.

17        Q    All right, sir.  I have another question.

18             This volume, Number 5, doesn't come with a dust

19   cover?

20        A    No.

21        Q    But Volume 1 had one?

22        A    Yes.

23        Q    All right.  And Volume 1's dust cover had a

24   tribute or a, a little statement of gratitude, correct?

25        A    Well, there was a statement that Selikoff was
```

KINSER v. CBS CORP., Case No. 94-2282

1    quoted as saying that he, he endorsed the book

2    whole-heartedly.

3         Q    All right.  And on the dust cover, it said,

4    "There is an abundance of valuable material for

5    plaintiffs and their attorneys preparing his case, as

6    well as information on how to deal with defense

7    arguments."  Correct?

8         A    That's what the publisher put on the dust cover

9    of the First Edition.

10        Q    Yes, sir.

11             And the publisher got that information from

12   you, I assume; it was your book?

13        A    No.  I wrote the book.  The publisher wrote the

14   dust cover.  When I complained about that language,

15   telling him I'd probably hear it for the rest of my

16   life -- which has proven true -- they simply said, "We

17   own the book.  You're just the author."

18        Q    Do you find it ironic that the publisher, Aspen

19   Publishing, 30-whatever years ago, was able to predict

20   that, in fact, you would spend the next 30 years

21   assisting plaintiffs' counsel in coming up with arguments

22   against defense?

23        A    The publisher didn't say that on the dust

24   cover.

25        Q    Well, all right.  You want me to read it again?

KINSER v. CBS CORP., Case No. 94-2282

1          "There's an abundance of valuable material for

2    plaintiffs and their attorneys preparing his case, as

3    well as information on how to deal with defense

4    arguments."

5          For something that you did not provide them,

6    that sounds strikingly how you've spent your life,

7    doesn't it?

8        A    I don't think of that as being the way I've

9    spent my life.  It's -- one of the things I've done is

10   testifying in these trials about once a month.  I've done

11   a lot of other things with my life.

12       Q    But, but when you spend your time in trial and

13   when you spend your time doing the things that are in

14   this book, that's exactly what you do?

15       A    I provide the information to the jury.  It's

16   based on what was published.  It's based on the corporate

17   documents.  It's based on the documentary historical

18   record.  And I testify about those documents.  I didn't

19   create those documents.  I testify about what they all

20   mean.

21       Q    Yes, sir.

22          And you do that without ever having worked at

23   Westinghouse, without ever having spoken to the folks at

24   Westinghouse about what they might have meant when they

25   wrote those documents; you simply read them and tell the

KINSER v. CBS CORP., Case No. 94-2282

1    folks what you think they mean, right?

2        A    Yes.

3        Q    And, yet, the document has words on it; and

4    other people, giving it a fair reading, might think it

5    means something else?

6        A    Well, if you think that these documents mean

7    something different than what I said they mean, you're

8    welcome to ask me about it.

9        Q    Well, I just might.

10            But my question was that people who read the

11   document might, with a fair reading, come up with a

12   different conclusion because what you're doing is just

13   your personal interpretation; it doesn't come from a

14   place of any additional knowledge, other than reading the

15   document, based on any contact with Westinghouse?

16       A    I don't think anything I've said about these

17   documents was much of an interpretation.  For the most

18   part, I was reading things that actually were contained

19   in the documents and telling the jury about what they

20   said.

21       Q    But the part that was interpretation, if you

22   could just answer my question, is not based on any

23   additional information that you got from Westinghouse?

24       A    No.  It's based on what the documents contain

25   and who, what I know about the people that wrote some of

KINSER v. CBS CORP., Case No. 94-2282

1   those documents.

2       Q    And just so everyone is clear, you did not ever

3   work at Westinghouse?

4       A    That's right.

5       Q    All right.  And prior to publishing the first

6   volume of your book, you actually sent certain portions

7   of it to plaintiffs' counsel to review and to give you

8   input prior to that publication, correct?

9       A    I sent the corporate knowledge chapter to, the

10  draft of that to several of the lawyers -- maybe three of

11  the lawyers -- who were doing the greatest amount of

12  discovery, asking them:  Is there anything in here that's

13  incorrect?  And if there's something that I've left out

14  that you think is significant, send me the documents, and

15  I'll look at them.

16      Q    So you did, in fact, send that to plaintiffs'

17  lawyers, asking them for their input on the quality and

18  the fulsomeness of your book, correct?

19      A    Right.  They didn't send me anything of value

20  in return.

21      Q    All right, sir.

22           Now, speaking about the other information that

23  you have located, all of the information, aside from the

24  corporate knowledge documents that you've discussed, that

25  was information that anybody who wanted it could go and

KINSER v. CBS CORP., Case No. 94-2282

1    get at a medical library, correct?

2         A    Well, --

3         Q    Or a different library?

4         A    Certainly, that's true of medical textbooks and

5    medical journal articles.  Certainly, those things were

6    publicly available.

7         Q    And the ones that weren't available at a

8    medical library would be available at other libraries or

9    in the other places where you did your research; you

10   didn't have any sort of special access or special powers

11   that others who were looking for this type of information

12   would not have had, correct?

13        A    Correct.

14        Q    All right.  So that publicly available

15   information would have also been available to people who

16   were employing pipefitters; isn't that correct?

17        A    It was available in the sense that there were

18   medical libraries around the country that they could have

19   gone to.  If they wanted to ask about the hazards of

20   asbestos, they could looks things up.

21        Q    Yes, sir.

22             As you sit here right now, do you know who was

23   employing Mr. Kinser in 1974?  Do you know who his

24   employer was?

25        A    No.  My testimony is about the defendants, not

KINSER v. CBS CORP., Case No. 94-2282

1    about the plaintiffs.

2        Q    So you're not here to talk about Mr. Kinser;

3    you're just here to talk about CBS -- Westinghouse?

4        A    Right.

5        Q    All right.  So how about Commonwealth Edison?

6    Do you have any reason to believe that they didn't have

7    access to the information that you've testified to, this

8    publicly available information?

9        A    Certainly, if they wanted to, they could have

10   gone down -- they could have sent someone to a medical

11   library to find out about the hazards of asbestos if they

12   didn't already have information.

13       Q    Now, I know that you indicated that you're not

14   here to testify about Mr. Kinser.  But let me ask if you

15   actually, in preparing to testify, became aware of

16   anything about him.  Are you familiar with his work

17   history?

18       A    Well, I understand he's a pipefitter.

19       Q    All right, sir.

20            And do you know where he was a pipefitter?

21       A    Well, aside from this Westinghouse project in

22   1974, I don't know all the details of the different work

23   sites he worked at.

24       Q    And do you know where, in 1974 for

25   Westinghouse, this Westinghouse project you just

KINSER v. CBS CORP., Case No. 94-2282

1  described was?

2       A    Well, you mentioned the company.  But, again,

3  these are not details that really are important to my

4  testimony.

5       Q    Are you familiar with his health history?

6       A    I understand that he was operated on for lung

7  cancer and has survived a lot longer than most people who

8  have lung cancer diagnosed survive.

9       Q    When did you come to understand those things?

10      A    In talking to plaintiffs' counsel to, last

11  night; perhaps earlier.

12      Q    You didn't know those when you wrote your

13  report?

14      A    I don't remember even writing the report.  I

15  mean, the report, very often, is kind of a standard

16  language, 15-page report, about the public health history

17  of asbestos; and these reports get submitted wherever

18  they're required for the various courts around the

19  country.

20      Q    Okay.  So in addition to providing your

21  standard report that could apply to any number of

22  individuals, you've also brought some documents with you

23  and testified about a number of different articles.

24           And so, just so I am clear, you have talked to

25  us today about insulators.  You are aware, are you not,

KINSER v. CBS CORP., Case No. 94-2282

1   that Mr. Kinser was not an insulator?

2        A    Yes.

3        Q    You have talked to us about mesothelioma.  You

4   are aware, are you not -- or are you? -- that there is no

5   issue of mesothelioma in this case?

6        A    Well, there's concern about it; but as far as I

7   know, there's no diagnosis of it.  Yes.

8        Q    There, there -- there is no diagnosis, and

9   there is no concern by any medical doctor who has treated

10  Mr. Kinser, --

11       A    Well, I --

12       Q    -- correct?

13       A    -- think there's concern that he may have

14  cancer, but he's too frail to be even biopsied to see if

15  that's the case, as I understand it.

16       Q    And where did you come about this

17  understanding?

18       A    In speaking with Plaintiffs' counsel.

19       Q    So Mr. McCoy has conveyed to you that there is

20  some medical concern that he may have mesothelioma, but

21  he is too frail to be biopsied?

22       A    The man has already had lung cancer.

23       Q    I'm aware of that.  Yes, sir.

24       A    He's had plenty of asbestos exposure.  Anybody

25  like that would be a high risk, at high risk of getting

KINSER v. CBS CORP., Case No. 94-2282

1    mesothelioma or another primary lung cancer or be -- you

2    know, these are just things that, that go with the

3    history of exposure that he has.  It's not, you know, any

4    great extrapolation to say what I said about his, his

5    risk --

6        Q    And --

7        A    -- and the fact that he must live from day to

8    day hoping that he doesn't wake up with a new death

9    sentence.

10       Q    Yes, sir.

11            And, yet, it's entirely possible that none of

12   that is true because you have not looked at one medical

13   record; you have not consulted with any of his doctors,

14   and you have no idea whether or not he has any of the

15   indicators of mesothelioma.  Isn't that correct?

16       A    Well, I don't practice medicine, and I haven't

17   conducted -- conducted any interrogations of his doctors

18   or read any of the enormous documentation associated with

19   the development of this case.

20            As I said, my testimony is about the defendant,

21   not about the plaintiff.

22       Q    Right.

23            So the answer to my question:  All of this

24   conjecture that you have just offered with regard to

25   death sentences and mesothelioma, it is equally possible

KINSER v. CBS CORP., Case No. 94-2282

1    that absolutely none of that is true?

2         A    Well, it's possible he doesn't have cancer at

3    this time.  That's right.

4         Q    And, in fact, there is no evidence that you are

5    aware of that he has any cancer at this time?

6         A    Right.

7         Q    Now, you have brought us evidence about people

8    who mine asbestos?

9         A    Well, I mentioned that asbestos is mined and

10   that some of the workers that were described in the

11   literature were not asbestos miners.

12        Q    Right.

13             And, yet, you know that Mr. Kinser is not an

14   asbestos miner and never has been, correct?

15        A    Right.

16        Q    You testified about raw bags of asbestos

17   purchased at hardware stores; and you know, sir, do you

18   not, that that has nothing to do with the issues in this

19   case?

20        A    Well, I don't know of the plaintiff having

21   handled bags of raw asbestos, if that's what you mean.

22        Q    Correct.

23             Now, you know, in fact, that the insulation,

24   whether it is asbestos-containing insulation or

25   nonasbestos-containing insulation, is in the form of pipe

1   covering, blankets, and not in raw bags of asbestos

2   purchased in hardware stores, correct?

3        A    Right.  It's pipe covering.  It's, it's

4   insulated cements that are sold as powders and mixed with

5   water and used in odd shapes and elbows, on pipes.

6   It's -- asbestos cloth is described in some of these

7   documents.  Asbestos boards are described in some of

8   these documents.

9        Q    Yes, sir.

10            And none of the facts of this case, or the

11  facts of Mr. Kinser's work history, have anything to do

12  with anything involving raw bags of asbestos in hardware

13  stores?

14       A    As far as I know.

15       Q    And you may not know that; but as far as you

16  know, that's true, correct?

17       A    That's right.

18       Q    Now, you also brought us a number of documents

19  from the corporate history of Westinghouse.

20       A    Right.

21       Q    And quite a few of those involved the South

22  Philly Works.  Do you recall those documents?

23       A    Yes.

24       Q    And the South Philly Works is not a plant owned

25  by Commonwealth Edison, correct?

KINSER v. CBS CORP., Case No. 94-2282

1        A    As far as I know, it's not.

2        Q    It is not a plant where the engineers in charge

3    of designing the plant are an engineering firm named

4    Sargent & Lundy, correct?

5        A    As far as I know, that's correct.

6        Q    It is not, in fact, a plant where Westinghouse

7    is a supplier of turbine engines for nuclear power; isn't

8    that correct?

9        A    No.  It's a Westinghouse plant.

10       Q    Yes, sir.

11            So the South Philly Works plant -- and if I

12    could have access to the ELMO, Ms. Jessica.  I am showing

13    what has been previously admitted as Plaintiff's 3-- no,

14    193.

15            The South Philly Works plant -- the first

16    document is dated 19-- what did you call that?  '46?

17       A    Yes.

18       Q    Or '45?

19       A    I think it's '46.

20       Q    Yes, sir.

21            And then you would agree with me that that

22    document is prior to 1972, correct?

23       A    Yes.

24       Q    Yes, sir.

25            And then the next document you brought from the

1    Westinghouse annals is Plaintiffs' Exhibit 194.  And what

2    is this date?

3         A    1948.

4         Q    1948.

5              And you'd agree with me that that predates

6    1972, correct?

7         A    Yes.

8         Q    Yes, sir.

9              And the next document that you have is

10   Westinghouse Exhibit -- I'm sorry, Kinser Exhibit 196.

11   And that's from what date?

12        A    1954.

13        Q    Predating 1972?

14        A    Right again.

15        Q    Yes, sir.

16             And the next document -- oh, I'm sorry.  And

17   this is also -- the one we just discussed, which was 196,

18   is also from the South Philadelphia Works, --

19        A    Right.

20        Q    -- correct?

21        A    Yes.

22        Q    And then this document, which is 197, is from

23   July 24th of 1957, which you would agree with me predates

24   1972?

25        A    Right.

KINSER v. CBS CORP., Case No. 94-2282

1          Q     All right, sir.

2                And then, finally, we have a document out of

3    East Pittsburgh, dated March 27th of 1961, which you

4    would agree with me predates 1972, correct?

5          A     Right.

6          Q     And you have testified that in 1972 the

7    regulations in effect from OSHA changed the occupational

8    requirements as it related to asbestos, correct?

9          A     Well, it created requirements on employers and

10   manufacturers.

11         Q     Yes, sir.

12               And in creating those, it changed what the old

13   requirements used to be, correct?

14         A     Well, it introduced requirements where there

15   hadn't been any.

16         Q     And that's a change?

17         A     That's a change.

18               But to imply that there were requirements

19   before that would be misleading, and I wouldn't want to

20   mislead the jury.

21         Q     All right.  Now, the other document that you

22   brought us is Number 1; and if you could -- this one is

23   1973, --

24         A     Right.

25         Q     -- right?

KINSER v. CBS CORP., Case No. 94-2282

1          And this -- what does this say?

2     A    It's some engineering service.

3     Q    Uh-huh.  And then what does this -- what does

4  this say?

5     A    Well, it -- the name you're pointing to looks

6  like E.J. Elevaty [phonetic].

7     Q    All right.  And if we could zoom in just a

8  little bit more, all right.

9          Now, read that first sentence for me.

10    A    It says, "The asbestos samples taken in the" --

11 something or another, looks like "'L' Building on

12 January" -- what's it? -- "24th," looks like, "1973,

13 during the setting of asbestos -- oh, cutting of asbestos

14 cloth with hand shears and folding the cloth several

15 times have not exceeded the maximum allowable limits for

16 peak exposure -- for peak concentrations or an eight-hour

17 average."

18    Q    All right, if you would stop there.

19         Now, that -- the first thing I want to draw

20 your attention to is the part that I've highlighted in

21 pink, which is the "'L' Building."  Where in the Zion

22 plant is the "L" Building?

23    A    I have no idea if "'L' Building" has anything

24 to do with the Zion plant.

25    Q    Okay.  So you've anticipated my next question,

KINSER v. CBS CORP., Case No. 94-2282

```
 1   which is:  It wasn't your intent by bringing this
 2   document in particular and showing it to the jury to, in
 3   any way, indicate that this document was related to this
 4   case, correct?
 5       A    It's related to the case, in my opinion, but
 6   it's not related to the, to the workplace at issue in
 7   this case.
 8       Q    Correct.
 9            And, in fact, it would not surprise you that in
10   1974 plants that preexisted the 1972 regulation that had
11   been built before that, that had been insulated before
12   that, would still have asbestos on site because abatement
13   had not occurred; curative measures had not occurred.
14   That would not surprise you, correct?
15       A    Well, there was basically no regulation in the
16   country in 1970 and 1971.
17       Q    That wasn't my question.
18            It would not surprise you that, in 1973, there
19   were --
20            THE COURT:  Excuse me.
21            MS. EZELL:  Yes, sir.
22            THE COURT:  Are you saying that's not
23   responsive, and you want me to admonish him to answer?
24            MS. EZELL:  I am now.
25            THE COURT:  All right.  I am.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              It is responsive.  It's not directly; and you

 2     asked a question that's a paragraph long, and, and you're

 3     going to get an answer that isn't "yes" or "no."

 4              MS. EZELL:  All right.

 5     BY MS. EZELL:

 6         Q    In 1973, there were plants, were there not,

 7     sir, that had been built prior to 1973?

 8         A    Of course.

 9         Q    And those plants could have been built in 1960,

10     correct?

11         A    Sure.

12         Q    And those plants could have contained "L"

13     Buildings, correct?

14         A    Right.

15         Q    And by '73, it wouldn't surprise you that they

16     still had asbestos?

17         A    Well, that was the year of peak asbestos use in

18     the United States, 1973; it wouldn't surprise me at all

19     that --

20         Q    Yes, sir.

21         A    -- they had asbestos.

22         Q    And if we read right here, the rest of that

23     sentence that you read for me, that indicates -- does it

24     not, sir -- that that plant, which had been built prior

25     to '73, was complying with the regulations of OSHA to
```

KINSER v. CBS CORP., Case No. 94-2282

1    test for the limits of asbestos exposure at that site,

2    correct?

3        A    Well, he's saying that the exposures measured

4    in, in connection with the cutting of asbestos cloth with

5    hand shears did not raise dust that would be in violation

6    of the regulations.

7        Q    And you know that cutting asbestos can, in

8    fact, disturb asbestos and create dust?

9        A    Sure.

10       Q    So that, in fact, is a good thing that cutting

11   asbestos with hand shears was being monitored, correct?

12       A    Yes.

13       Q    And so that is a good practice to monitor that

14   activity, correct?

15       A    Yes.

16       Q    And for a plant in 1973 to be monitoring the

17   cutting of that would be consistent with the new

18   regulations under OSHA, correct?

19       A    Yes.

20       Q    All right.

21           (Brief pause in proceedings.)

22           MS. EZELL:  May I show the witness a

23   demonstrative, Defendant's Demonstrative Number 5?

24           MR. McCOY:  By agreement.

25           THE COURT:  It's fine with me.  Go ahead.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              DEPUTY CLERK:  Would you like the jury to see

 2   it, too?

 3              MS. EZELL:  I told Mr. McCoy I'd lay a

 4   foundation before I showed it to the jury.

 5              Can you see that on your screen, sir?  I can't

 6   see it on mine, so I don't know how magnified it is.

 7              THE WITNESS:  I think you've got what you want

 8   right there.

 9              MS. EZELL:  Okay.

10   BY MS. EZELL:

11        Q    Do you recognize -- and I have handed you in

12   your hand the OSHA regulation from 1972, correct?

13        A    Yes.  This is the whole regulation.  The part

14   on the screen is a part of the regulation.

15        Q    And to be helpful, I -- on your hand copy, I

16   have written a little pink number 2 next to this call-out

17   so that you might be able to locate it easily, given the

18   small print.

19        A    Yes.

20        Q    All right.  So having said that, do you

21   recognize this section of the OSHA standard from June 7th

22   of 1972?

23        A    Yes, I do.

24              MS. EZELL:  All right.  Is that sufficient, Mr.

25   McCoy?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  That's -- yeah, just so long as he

 2   knows what's coming.

 3              MS. EZELL:  Okay.

 4              MR. McCOY:  You can just show him the other

 5   one.

 6              MS. EZELL:  I'm going to just ask him questions

 7   about this, and then I'll do the next one.

 8              Can you show that to the jury now?

 9   BY MS. EZELL:

10      Q    All right, sir.  Now, this is required by OSHA

11   in 1972 to be placed in the workplace where airborne

12   concentrations of asbestos may be high; is that correct?

13      A    The way they put it is -- right, where they

14   "may be in excess of the exposure limits" in the

15   standard.

16      Q    All right, sir.

17              And you have not brought with you to this trial

18   any indication that the Zion nuclear power plant --

19   whether it was Commonwealth Edison or Sargent & Lundy or

20   Westinghouse -- ever was cited for failure to comply with

21   that, have you?

22      A    No.  I don't know anything about their OSHA

23   record, if they have one.

24      Q    All right, sir.

25              MS. EZELL:  If I could just show the witness
```

```
1   the next --
2             MR. McCOY:  Just go ahead, if you want.
3             MS. EZELL:  Oh, okay.  I think by agreement.
4             MR. McCOY:  Yeah, by agreement.
5             MS. EZELL:  Okay.
6   BY MS. EZELL:
7        Q    The next one is little pink number 3.
8             And if you could, once you've located this,
9   either on the large one; or you can, just by looking at
10  it, take a look at this.  And explain -- well, I'll ask
11  you a question once you've oriented yourself.  Just let
12  me know.
13       A    Go ahead.
14       Q    This is part of the OSHA regulation from
15  June 7th of 1972 as well, correct?
16       A    Right.
17       Q    And this is required to be printed in letters
18  of sufficient size and contrast so it can be readily
19  visible and legible; and this label has to say, "Caution:
20  Contains asbestos fibers; avoid creating dust; breathing
21  asbestos dust may cause serious bodily injury -- or
22  bodily harm," correct?
23       A    Right.
24       Q    And as of 1972, that was the law, correct?
25       A    That was the required text of the warning label
```

KINSER v. CBS CORP., Case No. 94-2282

1    on asbestos products in the OSHA standard.

2         Q     And you have not brought with you any evidence,

3    have you, sir, that the Zion power plant -- whether it

4    was Commonwealth Edison, Sargent & Lundy, or

5    Westinghouse -- was ever found to have violated this

6    provision of the OSHA standard from 1972, have you?

7         A     No.  I don't know anything about Zion's OSHA

8    record, if they have one.

9         Q     Now, you have talked to the jury about Mr.

10   Hazlett.  Do you recall having that conversation with Mr.

11   McCoy?

12        A     Right.

13        Q     And I just want to make sure that, that we're

14   clear on a couple things.

15              May I have the ELMO?

16              This is previously admitted, Plaintiffs' 206.

17   And this is the article that you -- you reviewed with Mr.

18   McCoy about "Medical-Engineering Control of Industrial

19   Health Hazards," correct?

20        A     Right.

21        Q     And you and Mr. McCoy went through this, and

22   you indicated that Mr. Hazlett had laid out some, some

23   safety principles here and that he had done it in a, in a

24   journal that was widely read and widely circulated within

25   the industry, correct?

KINSER v. CBS CORP., Case No. 94-2282

1      A     Well, among the field of industrial medical

2   doctors, yes.

3      Q     Yes.  Within his industry, correct?

4      A     Well, I would say it was within the profession

5   of industrial medicine/occupational health.

6      Q     All right, sir.

7            And could you just read for the jury the

8   portion I have highlighted in pink?

9      A     It says, "Active medical-engineering control of

10  these problems at this time will have an important

11  bearing on future practices and on future legislation.

12  Which way the pendulum will swing will depend on how

13  actively cooperation is established between industrial

14  management and physicians."

15     Q     And so you would agree with me that at this

16  time, in 19-- do you know the date of this?

17     A     '36.

18     Q     In 1936 -- oh, yes, there is it, right here.

19           In 1936, that the head of industrial hygiene at

20  Westinghouse had in mind not only industrial hygiene, but

21  future regulation that required cooperation between

22  industry and government to protect the workers, correct?

23     A     It's a little hard for me to read the mind of

24  Dr. Hazlett, the company medical director; but he clearly

25  is saying that it's -- progress is going to depend on

KINSER v. CBS CORP., Case No. 94-2282

1    corporate management doing what the medical, medical

2    doctors recommend to the companies.

3        Q    And in 1972, what Dr. Hazlett predicted -- Dr.

4    Hazlett, from Westinghouse, predicted -- came about,

5    correct?

6        A    Well, yeah, another 36 years later, there

7    finally was government regulation of industry because,

8    partly because their companies hadn't done a better job

9    on their own in the intervening time.

10       Q    Yes, sir.

11            And on Plaintiffs' 212, this indicates that Dr.

12   Hazlett was the medical director of Westinghouse.  We've

13   already talked about that.  But he was also a member of

14   the Council's Executive Committee and the Foundation's

15   Medical Committee.

16            He was a thought leader in his field in the

17   1930s and 1940s around this issue, wasn't he?

18       A    Well, he operated at a high level in the field

19   of industrial medicine, both being a prominent doctor in

20   the organization of the National Safety Council and the

21   organization of the Industrial Hygiene Foundation, which

22   were the big organizations in the field of industrial

23   health that corporations had established in this country

24   in the 1940s.

25       Q    And you would agree with me that that's a good

KINSER v. CBS CORP., Case No. 94-2282

1  thing?

2      A    It's a good thing, certainly, in terms of

3  arming him with knowledge and some persuasive ability to

4  get corporate management to do things to protect workers.

5      Q    Now, I'd like for you to assume that in the

6  1960s when the initial bid for the Zion turbine was sent

7  out -- do you understand the bidding process on turbine

8  plants?

9      A    No.

10      Q    Okay.  Fair enough.

11           So when a -- turbine plant, I didn't call it

12  the right thing.

13           Do you understand the bidding process on a

14  nuclear power plant?

15      A    Well, I mean, I have a general lay person's

16  understanding that, you know, bids are solicited; and

17  certain types of things are required as part of the

18  application in making such bids to construct these large

19  industrial projects.

20      Q    Okay.  So if Westinghouse initially responded

21  to a request for bids in 1966 that was issued by

22  Commonwealth Edison -- Commonwealth Edison via Sargent &

23  Lundy -- and they said, "We would like this bid, but we

24  suggest as a counterproposal that you use nonasbestos

25  insulation at the Zion plant," would you agree with me

KINSER v. CBS CORP., Case No. 94-2282

1  that that would have been a good thing for Westinghouse

2  to have done?

3       A    It would have been exceptional.

4       Q    That would have been a --

5       A    I don't know -- I don't know of anyplace else

6  in this country where that happened in 1966.

7       Q    But if that happened as it relates to the Zion

8  plant, that would have been a good thing; it would have

9  been a reasonable thing for that manufacturer to have

10 done?

11      A    Right.

12      Q    And would you agree with me that if, in

13 response to the OSHA regulations which you've already

14 testified to, that the original plan that the Zion plant

15 be built with asbestos insulation was modified and the

16 Zion plant was actually built with no asbestos, that that

17 also would be a good thing?

18      A    That would be very exceptional.  Yes.

19           MS. EZELL:  All right.  I have no further

20 questions, Your Honor.

21           THE COURT:  Anything on redirect?

22           MR. McCOY:  Just a couple, Judge.

23             REDIRECT EXAMINATION BY MR. McCOY:

24      Q    You said 1973 was a peak year for asbestos use

25 in the United States.  What do you mean by that, Dr.

KINSER v. CBS CORP., Case No. 94-2282

1  Castleman?

2      A     Well, I have a graph in my book of the history

3  of asbestos use in this country, and the highest use was

4  nearly 800,000 tons in 1973.  It kept on going up even

5  after Selikoff documented what he did in the mid-'60s and

6  had that big conference because there was no regulation.

7      Q     OSHA --

8      A     And then when there started to be environmental

9  regulations, OSHA regulations in the early '70s, and

10 publicity about asbestos in the media, then things slowly

11 started to turn around; and the use of asbestos in this

12 country started to go down.

13     Q     Did OSHA, when it came out in '72, stop the use

14 of what was in the inventories of companies that had

15 asbestos products?

16     A     No.  And OSHA's regulations never had the

17 authority to ban anything.  They didn't have that

18 authority.  They could only set the exposure limits and

19 issue standards along those lines.

20     Q     Now, you were asked about the Zion powerhouse,

21 and you were also asked about the OSHA regulations and

22 provisions in those, warnings and so on.  What I'd like

23 you to do is to tell us about OSHA in regard to the

24 year -- I'd like you to put it in 1974; and I'd like you

25 to tell us what should have been done by a contractor who

KINSER v. CBS CORP., Case No. 94-2282

1   was supervising the removal of asbestos-containing

2   materials, assuming they were, at a powerhouse in that

3   year, 1974, in order to be compliant with OSHA, the

4   contractor supervising the removal and directing it?

5       A    Well, they would have had to take pretty

6   extraordinary measures to limit the exposure of workers.

7   It's very dusty removing pipe covering that's been in

8   service and in industry from these pipes.  These are

9   large pipes, and large amounts of this material are

10  involved.

11          And it means putting respirators on the workers

12  that are doing the work.  It means using -- doing what

13  you can to wet the material before you remove it.  It

14  means bagging it in, in impermeable plastic bags as you

15  take it off.  It means not just dropping it 15 feet onto

16  the ground as typically would occur if you weren't

17  particularly concerned about the dangers of the dust.

18          It would have required changing a lot of

19  things.  It would have required spending more money,

20  doing the job more slowly.  It would have almost

21  certainly involved letting the workers know that asbestos

22  was dangerous.  It would be hard to be in compliance with

23  the regulations, which didn't specifically require you to

24  tell the workers about asbestos; but if you did all these

25  things to control the dust, probably the workers would be

1   able to, to figure out that it was, because this stuff

2   was really dangerous.

3       Q    Would allowing the use of hammers or chain saws

4   to cut off asbestos insulation from large piping be

5   compliant with OSHA in 1974 at a powerhouse where --

6       A    I don't see how it could have been.  No.

7            MR. McCOY:  That's all the questions I have.

8            MS. EZELL:  Briefly, Your Honor.

9              RECROSS-EXAMINATION BY MS. EZELL:

10      Q    I want you to assume that at Zion there will be

11  testimony that there were no respirators used in 1974.

12  Okay?

13      A    Right.

14      Q    Isn't one explanation for that that there was

15  no asbestos there?

16      A    I suppose that's a possibility.

17      Q    Yes, sir.

18           I want you to assume that the wetting process,

19  the bagging process, and the special clothing was not

20  used at Zion in 1974.  Okay?

21      A    All right.

22      Q    Isn't one explanation for that that there was

23  no asbestos at Zion?

24      A    Either that, or they were in flagrant violation

25  of the regulations, --

KINSER v. CBS CORP., Case No. 94-2282

```
1         Q    Yes, sir.

2         A    -- one or the other.

3         Q    And, and --

4              THE COURT:  That's a key issue in this case,

5    isn't it, counsel?

6              MS. EZELL:  That's a key issue in this case.

7    Yes, sir.

8              THE COURT:  You bet ya.

9    BY MS. EZELL:

10        Q    And so you have no evidence that they weren't

11   in compliance with OSHA --

12        A    Well, I, --

13        Q    -- at that time?

14        A    -- I'm not here to prove or disprove whether

15   there was asbestos-containing insulation in this, in this

16   industrial facility at that time.  I'm not here about

17   that.

18        Q    Yes, sir.

19             So to answer my question:  All of the things

20   that you mentioned needed to be done; if they weren't

21   done, one explanation for why they weren't done is that

22   the plant was in complete compliance with OSHA, and there

23   wasn't --

24             THE COURT:  This calls for the grossest sort of

25   speculation on this man who knows nothing about Zion or
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1    any of those facts.

 2              MS. EZELL:  Your Honor, he has opened the door

 3    to this by the questions Mr. McCoy has asked him.

 4              THE COURT:  Oh.

 5              MS. EZELL:  And he, he's willing to answer.

 6              THE COURT:  Go ahead.

 7    BY MS. EZELL:

 8         Q    Now, one explanation for why there were no

 9    respirators, there were no wetting procedures, there were

10    no bagging procedures is that this plant was in complete

11    compliance with OSHA; and there was no asbestos present,

12    correct?

13         A    That is theoretically possible.  Yes.

14         Q    Yes, sir.

15              MS. EZELL:  Nothing further.

16              THE COURT:  Good.  Step down.

17              THE WITNESS:  Thank you, Your Honor.  Have a

18    nice day.

19              THE COURT:  Thank you.

20              MS. EZELL:  Oh, Your Honor, what about the jury

21    questions?

22              THE COURT:  Jurors have any questions for this

23    witness?  No?  Okay.

24              (Witness Castleman excused, 4:25 p.m.)

25              THE COURT:  Now, jurors, you're excused for the
```

KINSER v. CBS CORP., Case No. 94-2282

1  weekend.  Be back Monday at 10:00 a.m.  I've got a 9:00

2  meeting I can't avoid.  Be here at 10:00.

3          Remember, don't talk about the case with anyone

4  else or let them talk to you, and don't try to look up

5  things for yourself.

6          Good night and have a nice weekend.  There may

7  be patchy fog.  Look out for it.

8              (Jury dismissed for the day, 4:26 p.m.)

9          THE COURT:  All right.  Out of the presence and

10 hearing of the jury, I need to discuss logistics with

11 you.

12         MS. EZELL:  Yes, sir.

13         THE COURT:  How many experts do you have, Mr.

14 McCoy?

15         MR. McCOY:  We have two very much shorter

16 experts.  They're construction experts and not like

17 these, these types of guys.  We have two of those guys.

18 They're much shorter.  And we have -- one's from Chicago,

19 and one's from Wisconsin, so --

20         THE COURT:  Okay.  And aside from those two

21 construction --

22         MR. McCOY:  And then we have the video.

23         THE COURT:  And then you have the video that

24 lasts all day?

25         MR. McCOY:  The video of industrial hygiene --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              DEPUTY CLERK:  That's four hours now, I heard,
 2    Judge.
 3              THE COURT:  It's now down to four hours?
 4              DEPUTY CLERK:  Isn't that correct?
 5              MS. EZELL:  That's what I've been told.  Four
 6    hours, yeah.
 7              MR. McCOY:  I think that sounds right.  I kept
 8    trying to get it down.
 9              THE COURT:  How many days do you anticipate
10    this will take you?
11                   (Brief pause in proceedings.)
12              MR. McCOY:  I just hadn't added that up, but I
13    mean less than, less than three days.
14              THE COURT:  Okay.
15              MR. McCOY:  Between two and three days.
16              THE COURT:  All right.  And then you're ready
17    to come forward, right, Mrs. Ezell?
18              MS. EZELL:  Yes, sir.
19              THE COURT:  And how many days do you anticipate
20    the defense case will take?
21              MS. EZELL:  Yes, sir.  Depending on what the
22    evidence of the plaintiff turns out to be, I think our
23    longest case would be four days, but we are hoping that
24    we can eliminate certain witnesses, depending on what
25    happens in Mr. McCoy's case.  But our longest case would
```

KINSER v. CBS CORP., Case No. 94-2282

1   be four days.

2          THE COURT:  Okay.  Well, I'm -- like I say, I

3   need to understand the logistics.  We've got Martin

4   Luther King Day coming up.

5          MS. EZELL:  Yes, sir.

6          THE COURT:  Okay.  All I can do is, as usual,

7   bid you to do your best, and we'll go from there.

8          10:00 on Monday morning.

9          MS. EZELL:  Thank you, Your Honor.  Have a good

10  weekend.

11         THE COURT:  Delightful.

12         MR. McCOY:  Judge, I do have one thing we can

13  do off the record, I think, very briefly.

14             (Discussion off the record.)

15             (Trial adjourned, 4:29 p.m.)

16              *  *  *  *  *  *  *  *  *  *

17                REPORTER'S CERTIFICATE

18      I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

19  that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21      Dated this 11th day of January, 2014.

22

23              s/Lisa Knight Cosimini
              _____
              Lisa Knight Cosimini, RMR-CRR
24            Illinois License # 084-002998

25