KINSER v. CBS CORP., Case No. 94-2282

E-FILED
Wednesday, 02 April, 2014  11:27:34 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

               Plaintiffs,          Docket No. 94-2282

   vs.                      Urbana, Illinois
                                January 14, 2014
                                9:00 a.m.

CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

               Defendant.


JURY TRIAL -- Day 5
(Testimony of Larry Allen Kinser)

BEFORE THE HONORABLE HAROLD A. BAKER
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:     ROBERT G. McCOY, ESQUIRE
                         Cascino Vaughan Law Offices, Ltd.
                         220 South Ashland Avenue
                         Chicago, Illinois 60607
                         312-944-0600

For the Defendant:     SANDRA GIANNONE EZELL, ESQUIRE
                         Bowman and Brooke, LLP
                         901 East Byrd Street, Suite 1650
                         Richmond, Virginia 23219
                         804-649-8200

                         PAULA M. BURLISON, ESQUIRE
                         Bowman and Brooke, LLP
                         1441 Main Street, Suite 1200
                         Columbia, South Carolina 29201
                         803-726-7420

                         JACOB DANIEL SAWYER, ESQUIRE
                         Foley & Mansfield, PLLP
                         55 West Monroe, Suite 3430
                         Chicago, Illinois 60603
                         312-254-3800

KINSER v. CBS CORP., Case No. 94-2282

I N D E X

Page

WITNESS ON BEHALF OF THE PLAINTIFFS:

LARRY ALLEN KINSER

Direct Examination by Mr. McCoy ................  4

Cross-Examination by Ms. Ezell ................  78

Redirect Examination by Mr. McCoy .............. 213

Recross-Examination by Ms. Ezell .............. 220

KINSER v. CBS CORP., Case No. 94-2282

```
 1                 (In open court, 9:08 a.m.)

 2            THE COURT:  Ready, counsel?

 3            MS. EZELL:  Yes, sir.

 4            THE COURT:  Bring the jury, please.

 5                 (Brief pause in proceedings.)

 6                 (Jury present, 9:09 a.m.)

 7            THE COURT:  Good morning, jurors.

 8            Please be seated.

 9            I understand from the clerk that you want me to

10   address the question of logistics for next week and how

11   long you're going to be captive.

12                 Number one, we will not be here on Monday.

13   That is a court holiday, and we will not work on Monday.

14                 How long will this last?  My best guess is into

15   the middle of next week.  That's my best guess.  And, of

16   course, I don't know if we'll have a blizzard or what

17   will happen, but that's the best I can say.  So we will

18   not be here Monday, and I expect this to be over the

19   middle of next week.  That is, you will be given the case

20   to deliberate on; and, then, of course, the length of

21   time is totally up to you.  You can take as long as you

22   want.  All right?

23                 Okay.  Now, we're ready to have further

24   evidence for the plaintiff.

25            MR. McCOY:  Judge, the plaintiff is going to
```

KINSER v. CBS CORP., Case No. 94-2282

1  call Larry Kinser.

2          THE COURT:  Very well.  Mr. Kinser, come up,

3  please.

4          (Brief pause in proceedings.)

5          LARRY ALLEN KINSER, sworn, 9:10 a.m.,

6          DIRECT EXAMINATION BY MR. McCOY:

7  Q    All right.  Mr. Kinser, go ahead and introduce

8  yourself by giving us your full name and spell your last

9  name for everybody.

10  A    Larry Allen Kinser, K-i-n-s-e-r.

11  Q    And, Mr. Kinser, I know you've got hearing

12  aids, so please let me know if you don't understand the

13  question.

14  A    Yes, sir.

15  Q    Okay.  Now, let's, let's just start by asking:

16  The position before you retired that you had was what?

17  A    Pipefitter.

18  Q    Okay.  And you retired in what year?

19  A    1996.

20  Q    Okay.  Now, did you work out of the local union

21  here?

22  A    Yes, --

23  Q    Okay.

24  A    -- Local 149.

25  Q    And where has that got its offices now?

KINSER v. CBS CORP., Case No. 94-2282

1       A    It's in Savoy, Illinois.

2       Q    And what year did you begin working through the

3   local, 14--

4       A    1962.

5       Q    During that period of time, 1962 to '96, was

6   there any period when you were not a dues-paying member

7   of the local?

8       A    Yes.  I was absent for about one year.

9       Q    And about when was that one-year period?

10      A    '77 to '78.

11      Q    And why was that?

12      A    We had moved to Florida.  I took a travel card,

13  which means that I could work out of another local.  I

14  worked down there for a little while; and then there was

15  no work at that time.  So we could not afford to pay the

16  union dues, so we -- I dropped my dues, and then we found

17  other work.

18          Then in 1978, my father asked me if I would

19  like to rejoin the union; and I said, "Definitely."

20      Q    Okay.  I've got here what I think we're going

21  to mark as Exhibit -- 86; is that right?

22          PARALEGAL ERTEL:  Yes.

23      Q    Okay.  This is Exhibit 86.  And I wanted to ask

24  you:  Is this something you recognize?

25      A    Oh, definitely.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Okay.  Tell us what a pipefitter does.

2    A    Pardon me?

3    Q    What does a, what does a pipefitter do?

4    A    A pipefitter, we run water lines, steam lines,

5  both welded and threaded, which you will use that cresc--

6  or that pipe wrench there.  And that's, that's pretty

7  much what we did.

8    Q    Did you work at a lot of industrial and factory

9  and large commercial settings?

10    A    Yes.  We did residence halls here in

11  Champaign-Urbana, also different factories.

12    Q    Did you use some wrenches that were smaller and

13  some bigger ones than this one?

14    A    I've never used any bigger one, but -- yes, I

15  did, too.  I used what they call a compound wrench, and

16  much smaller ones.  Yes.

17    Q    Where were you born at?

18    A    Pardon?

19    Q    Where were you born?

20    A    Fairfield, Iowa.

21    Q    And what day were you born?

22    A    February 15, 1934.

23    Q    So where did you graduate from high school?

24    A    I graduated from Catholic Central in Ottumwa,

25  Iowa.

KINSER v. CBS CORP., Case No. 94-2282

1      Q      In what year did you graduate high school?

2      A      In 1952.

3      Q      Did you go into the service after high school?

4      A      No.  I didn't go into service until 1954.

5      Q      Okay.  And what did you do after, between high

6  school and service as far as any full-time employment?

7      A      I was working as a laborer with, on some of the

8  jobs that my father was working on.

9      Q      Okay.  What was your father doing?

10     A      He -- my father was a pipefitter also.

11     Q      And what local was he working out of?

12     A      He was working out of -- I'm, I'm, I'm not

13  sure.

14     Q      Okay.

15     A      I don't know whether he was on travel card or

16  whether he had went into another local in Ohio where he

17  was working.

18     Q      Okay.  And you were working with him on some

19  jobs there?

20     A      Yeah.  I worked with him on one job.  Yes.

21     Q      Okay.  Before going into the service, did you

22  have any other full-time employment of consequence?

23     A      No.

24     Q      All right.  So you went into the service in

25  '54.  What branch did you go into?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    The U.S. Army.

2        Q    Okay.  And how long did you stay in the

3   service?  When were you discharged?

4        A    In 1957 I was discharged, honorable discharge.

5        Q    What was your rank at discharge?

6        A    SP5.

7        Q    And what's that?  The equivalent of what?

8        A    It's equivalent to a sergeant.

9        Q    Where did they send you while you were in the

10  service?

11       A    I started basic training in Fort Knox,

12  Kentucky.  I went to Indianapolis to Fort Benjamin

13  Harrison for training.  Then I went to Arlington,

14  Virginia, and I was discharged out of, through the

15  Pentagon.

16       Q    Through where?

17       A    Through the Pentagon, in Washington, D.C.

18       Q    All right.  So after the Army, what jobs did

19  you have before becoming a pipefitter?  And I'm talking,

20  again, about full-time jobs.

21       A    Full-time job?

22       Q    Right.

23       A    I, I started out as -- I tried, tried

24  chiropractic school.  I was there for about three,

25  four months; and my G.I. Bill, for some reason, didn't
```

KINSER v. CBS CORP., Case No. 94-2282

1  come through, and they didn't let me -- didn't want me to

2  finish school until they had some payment.  So I just

3  dropped out of it, and I never did find out what happened

4  to my G.I. Bill.

5      Q    What happened -- what other full-time jobs did

6  you have before pipefitting work?

7      A    I was a bartender for a while.  I worked at

8  Remington-Rand Shaver Division in Davenport, Iowa, and

9  Cedar Rapids, Iowa.  I was station manager in Cedar

10 Rapids.  I worked as a motel front desk clerk in

11 Davenport, Iowa, at the Tall Corn Motel.  I -- and the

12 Remington-Rand, I was in Davenport and Cedar Rapids.

13           I think that's, covers everything.

14     Q    Okay.  And then you moved over to

15 Champaign-Urbana sometime, right?

16     A    Yes.  In 1962, I -- my father asked me if I

17 wanted to join the pipefitting trade, and I said yes.  In

18 1962, I moved to Champaign.

19     Q    Okay.  Was your father working out of the local

20 here at that time?

21     A    Yes, he was.

22     Q    Okay.  And why was it that you chose to do the

23 same work as your father did, pipefitting work?

24     A    Yes.  I did the same thing as he did.

25     Q    Why did you make that choice?  Why did you do

KINSER v. CBS CORP., Case No. 94-2282

```
 1   that?
 2        A    It was a very lucrative job at the time.  The
 3   pay was, starting-out pay -- I started out at $2.10 in
 4   1962; and eventually, I think, when I retired, I was
 5   making, probably, $35 an hour through all the packages
 6   and everything, health and benefits and the whole thing.
 7             MR. McCOY:  I'm going to put on the ELMO for a
 8   moment.
 9             MS. EZELL:  No objection.
10             MR. McCOY:  By agreement, this is Exhibit 628.
11   BY MR. McCOY:
12        Q    Okay.  So who's this guy?
13        A    I'm afraid that's me --
14        Q    Yeah.
15        A    -- taken in, I believe, 1960.  I'm not, I'm not
16   positive.
17        Q    Right.  Okay.  All right.  You got married to
18   Donna?
19        A    Yes, sir.
20        Q    And I want to talk more about your -- and you
21   guys had the three kids?
22        A    Yes.  We have three children.
23        Q    Okay.  I want to talk about the pipefitter
24   career a little bit more --
25        A    Okay, sir.
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    -- in general.  Okay?

2         Can you tell us some of the places that you

3    worked at as a pipefitter?

4    A    Oh, gracious.  I believe I started at --

5    Q    I'm not asking you to list every one here, just

6    give us some examples of ones.

7    A    Illinois Street Residence Hall, Pennsylvania

8    Residence Hall, Abbott powerhouse, Wood River in Wood

9    River, Illinois.  There's many, many, many jobs.

10   Q    This is Defendant's Demonstrative Exhibit

11   Number 1.  Okay.  On here, it lists All Temp Insulation,

12   Argo Starch, Anaconda Aluminium, Builders Supply,

13   Caterpillar, Cholla -- is it? -- powerhouse, Clay City

14   Schools, Keokuk power station.

15        Is that some of the places you worked at?

16   A    I don't remember a lot of them.  Like I said,

17   it's -- we're going back 40, 50 years ago, --

18   Q    Uh-huh.

19   A    -- and it's, it's hard to remember exactly

20   where I did work at all those different times.

21   Q    Right.

22        Does that sound like some of the places?

23   A    It, it sounds like some of them.  Yes, sir.

24   Q    Okay.  Would it be fair to say you worked at,

25   probably, a hundred places or so?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I would say at least a hundred different places

2  in my span of life.  Yes, sir.

3      Q    As a pipefitter?

4      A    As a pipefitter, yes, sir.

5      Q    Okay.  What's it mean to say a "travel card"?

6      A    That means that I, I go to my union and pick up

7  a card, and the -- when I get to the next station -- say,

8  Chicago -- I go to their union hall and give them my

9  card, and they okay that I go to work in their union.

10     Q    So you get a travel card from the local here in

11 Savoy, and then you go to another pipefitters local in

12 another city?

13     A    Yes, sir.

14     Q    And that, that would happen because there

15 wasn't enough work out of the Savoy local?

16     A    That is true, sir.

17     Q    Did you work as a foreman on any jobs as a

18 pipefitter?

19     A    I worked at, foreman twice.  One of them was at

20 Abbott powerhouse.  We were taking out the coal-fired

21 burners and putting in oil burners; and I was also a

22 foreman at Clinton powerhouse, as a hanger foreman.

23     Q    Okay.  1996 is when you retired from

24 pipefitting work?

25     A    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    What was the reason for your retirement at that

2  time?

3      A    I could feel that my breathing was

4  deteriorating; and I didn't feel that I was able to keep

5  up the work, the best work that I could.  I think I was

6  slacking down on the job; and I told Donna, since I was

7  getting to the age of 62, that I would retire.

8      Q    As a pipefitter, did you work with a lot of

9  insulated piping?

10      A    Very much so.

11      Q    Okay.  The term "steam piping," what does that

12  mean to you?

13      A    "Steam piping" means that hot steam runs

14  through there.

15      Q    And how about the term "returns"?  What does

16  that mean to you?

17      A    The return is:  After the steam goes through

18  the pipe, it cools down, condenses into water, and the

19  return piping is what we -- that is what it is, return

20  piping.  It returns it to the original place to be

21  reheated and to go through the steam pipes again.

22              (Brief pause in proceedings.)

23              MR. McCOY:  Judge, we have one -- there's an

24  objection on this exhibit, 96.

25              THE COURT:  Pass it up to the clerk.

KINSER v. CBS CORP., Case No. 94-2282

1           MR. McCOY:  Okay.  The, the objection is that

2    it's got the redaction on there, and we're not offering

3    it to show any particular brand.  In fact, we don't want

4    to.  We just want to talk about generically that type of

5    material.

6           THE COURT:  Overruled.  You may proceed.

7           Did he say -- did he state your objection

8    accurately?

9           MS. EZELL:  I did not want it with the

10   redactions, and I think that it's important for the jury

11   to know what the brand is.

12          THE COURT:  No.  But he -- this is to

13   demonstrate how things are packaged, things, whatever

14   those things may be.

15          Go.

16          MR. McCOY:  All right.  That's right, Judge.

17   All right.  So we'll go ahead and put this on the ELMO.

18   This is Exhibit Number 96.

19   BY MR. McCOY:

20   Q    Is this a type of packaging material that you

21   recognize, Mr. Kinser?

22   A    Yes, it is.

23   Q    Okay.  Can you tell us what type of material

24   this is and how you know about it?

25   A    This is called asbestos cement.  We used

KINSER v. CBS CORP., Case No. 94-2282

1   that -- we mixed this.  It comes in a bag.  We put it in

2   a pail with water and mix it, and then we put it around

3   the 90s and 45s of our piping.

4         Q    Okay.  And when you say "we," are you

5   talking -- you mean pipefitters?

6         A    Pipefitters, yes, sir.

7         Q    Like yourself?

8         A    Yes.

9         Q    Okay.  So you personally used this material?

10        A    Definitely, I did.

11        Q    And just to clarify, there was more than one

12   brand of this material, right?

13        A    There is many brands.  Yes.

14        Q    Okay.  You used whatever was there on the job?

15        A    Whatever the contractor bought, we used.

16        Q    And maybe I should just have you explain a

17   little more.  What types of places was this cement used,

18   this asbestos cement?

19        A    The asbestos cement was used in all the

20   different buildings that I, I worked at, until they had,

21   until they used, got to where they used molded asbestos

22   for the 90s and 45s.

23        Q    Okay.  And, for instance, on the steam piping,

24   where would it be used?

25        A    It would be used on the 90s and 45s and

KINSER v. CBS CORP., Case No. 94-2282

1   sometimes, in fact, around the valves that we installed

2   there.

3        Q    How about on the return lines?

4        A    Same.

5        Q    Now, the next picture I have is Exhibit

6   Number 99.  This is agreed upon; this can be shown.

7            MS. EZELL:  No objection to the demonstrative.

8            MR. McCOY:  Maybe make this one a little

9   bigger.

10  BY MR. McCOY:

11       Q    Okay.  Is this a type of product that you

12  recognize from your work on steam piping in the returns?

13       A    Yes.  That looks like disassembled asbestos

14  covering.

15       Q    Okay.  And when you say "asbestos covering,"

16  what is it covering?

17       A    It means that it keeps the heat from

18  dissipating so quick till it gets to the place where it

19  needs to go.

20       Q    Okay.  What's its -- is this often called

21  "molded pipe covering"?

22       A    Yes.  This is probably three, maybe four-foot

23  in length.  It comes in a box; and when they need it,

24  they pull it out of a box and put it on the, on the

25  lines.

KINSER v. CBS CORP., Case No. 94-2282

```
 1          Q    So this fits around the pipe, --

 2          A    Yes.

 3          Q    -- the round pipe?  Okay.

 4          A    It comes with -- there's -- it comes in

 5     sections.  It will fit together on the, on the piping,

 6     and then it's wired; and then it will have an asbestos

 7     covering over the top of that.

 8          Q    Okay.  How is it that you, you know these

 9     materials are asbestos?

10          A    My foreman and general foreman would tell me to

11     go get a bag --

12               MS. EZELL:  Objection, Your Honor.

13          A    -- of asbestos --

14               MS. EZELL:  Excuse me.  Objection, Your Honor.

15     Move to strike, hearsay.

16               THE COURT:  As I say, how did you know?  Did

17     you say, "The foreman would tell me to go get it"?

18               MR. McCOY:  Yes.

19               THE COURT:  It's not offered for the truth of

20     the matter stated, but, but it's a direction.  He may be

21     heard.

22               MR. McCOY:  Go ahead, Mr. Kinser.

23               MS. EZELL:  I'm sorry.  May I just be heard?

24               I believe it is offered for the truth of the

25     matter that it is asbestos.  I understand your ruling,
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   but I just would like to say that for the record.
 2              THE COURT:  Okay.  So you've said it for the
 3   record; and I, I will only repeat that he is describing
 4   the work and how he was told to do certain things.
 5              Go ahead.
 6              MR. McCOY:  Okay.
 7   BY MR. McCOY:
 8       Q    And, Mr. Kinser, my, my question was how that
 9   you know these materials were asbestos.
10       A    Well, I started to say:  The foreman or general
11   foreman would tell us to go get the asbestos bags and mix
12   the mud for us, for them.
13              MS. EZELL:  Objection; move to strike, hearsay.
14              THE COURT:  Denied.  Overruled.
15   BY MR. McCOY:
16       Q    Did that happen over and over again?
17       A    Yes.  I've went through, probably, four or five
18   bags of this asbestos cement in my life.
19       Q    And how about the molded pipe covering?  How do
20   you know that's asbestos?
21       A    I was told that, to go get asbestos pipe
22   covering.
23       Q    And did you -- did these materials have a
24   certain type of appearance to them?  Let's take the
25   molded pipe covering.
```

1      A     Yes.  It was white, and it -- kind of chalky.

2   It -- when you put it together, it raised up a bunch of

3   dust.

4      Q     What do you mean, "It raised up a bunch of

5   dust"?

6      A     Well, you could see dust when they put it

7   together; the dust would, would fly and come up and be

8   white specks around where they were putting this piping

9   molding together.

10     Q     And next is Exhibit 637, which we'd show by

11  agreement, demonstrative.

12           A little smaller on this one.  That's good.

13           Okay.  Exhibit 637, can -- is this -- I'm

14  talking about the materials on there.  Is that something

15  you recognize?

16     A     Yes.  That is asbestos blankets.

17     Q     Okay.  And where have you seen these used?

18     A     In quite a few different buildings and places

19  that I worked.

20     Q     What, what were they used for?

21     A     They were used to contain the heat; would

22  not -- the heat would not dissipate nearly as quick with

23  those asbestos blankets on them.

24     Q     Were they -- did you actually personally have

25  to handle any of these blankets?

KINSER v. CBS CORP., Case No. 94-2282

```
1       A    Very often.

2       Q    How do you know they were asbestos?

3       A    My foreman would tell me to go remove the

4  asbestos blanket off the --

5            MS. EZELL:  Same objection, Your Honor.

6            THE COURT:  What's the objection?

7            MS. EZELL:  Hearsay.  The foreman told him.

8            THE COURT:  No, come on.  He's describing the

9  work conditions.  It's not the fact that the foreman told

10 him to do it.  It's how he did his job.

11           Overruled.

12           You may proceed.

13           MR. McCOY:  Yes.

14           MS. EZELL:  He can't tell the story without

15 saying that the foreman told him.  If he's telling what

16 he's doing, then perhaps he can say --

17           THE COURT:  I've overruled your objection.

18           MS. EZELL:  Thank you, Your Honor.

19           THE COURT:  You're welcome.

20 BY MR. McCOY:

21      Q    The question, Mr. Kinser, subject to the

22 objection, was:  How do you know these blankets were

23 asbestos?

24      A    My foreman would tell me to go remove these

25 asbestos blankets off of the things that we were getting
```

KINSER v. CBS CORP., Case No. 94-2282

1    ready to work on.

2        Q     Where would these asbestos blankets be found?

3        A     A lot of them, turbines; or boilers had

4    asbestos blankets on them.

5        Q     And did these have a certain type of appearance

6    and look to them that you learned to recognize?

7        A     Yes.  They were cloth, heavy, heavy cloth with

8    asbestos in between them; and they were -- it was just

9    like a comforter on the blank-- on your bed.  It was

10   thick, and then it was held together with pins; and then

11   it was put on the different things that we used them on.

12       Q     In the later years -- and I'm talking like

13   after the, like in the later 1980s or later -- was there

14   any special safety measures being taken when these type

15   of products were worked on?

16       A     No.  There was never any that I ever come

17   across.

18       Q     Well, I'm talking about in later time periods,

19   like in the -- after the, after the '80s.

20       A     After the -- oh, after the '80s?

21       Q     Yes.

22       A     I did run into one place that they were using

23   what we called "abate people."  They would go into a

24   room, close it off, seal it off, put on their white garbs

25   and dust mask, go in and remove the asbestos from the

KINSER v. CBS CORP., Case No. 94-2282

1  piping that we were working.

2          They would bag that piping -- or the asbestos

3  insulation and seal the bags up and took them somewhere.

4  I do not know where.

5          Then they would pull the ceiling down --

6  ceilings off of the room, and we would let -- they would

7  let it air out.

8          Then we would go in and do our work.

9      Q    Why were those precautions being taken on the

10  removal before you pipefitters would come in and do the

11  work?

12     A    It was asbestos insulation that they were

13  taking off.

14     Q    Right.

15          So you can also -- would, would -- was the

16  appearance of that material that was being removed the

17  same as what you've been describing?

18     A    Yes, very much so.

19          THE COURT:  Mr. McCoy and Ms. Ezell, will you

20  come to sidebar.

21              (Brief pause in proceedings; Court

22              and counsel confer at the sidebar.)

23  BY MR. McCOY:

24     Q    So, Mr. Kinser, do you know what asbestos

25  insulation looks like?

1    A    Yes.

2    Q    And how is it that you know that, from your

3  career?

4    A    Through my career?

5    Q    Yeah.

6    A    That's all we had when we started with, was

7  asbestos, asbestos covering.  And it just -- we just used

8  the same material -- looked like the same material every

9  year, so we called it asbestos.  My foreman and, would

10  tell me to go get asbestos pipe covering and cement, and

11  I would.

12         It's, it's just like having somebody tell me to

13  go get a glass or water or something like that.  I would

14  go get a glass water.  It's water.

15         This was asbestos.

16    Q    So let's say before 1990.  What percentage of

17  your job, best estimate you can give, involved this kind

18  of asbestos insulation material?

19    A    Probably --

20         MS. EZELL:  I'm sorry.  What was the time

21  frame?  I just missed the question.

22         MR. McCOY:  I said "before 1990."

23         MS. EZELL:  Thank you.

24    A    Probably about 90 percent of my time.

25    Q    All right.  I want to change subjects a little

1  bit.  The question I have is:  What, if any, dust was

2  created during the application or the tearing off/removal

3  of these asbestos insulation materials?

4      A    What did we use?

5      Q    What, what, if any, dust was created during

6  applying or taking off of the asbestos insulation

7  materials?

8      A    There was quite a bit of dust in the air, and

9  you could see the white specks.  Like I said before, it

10  was all over.  It would get on your clothes.  We'd take

11  our hands and brush it off.  Get on our boots, but we

12  didn't worry about that; we'd stomp our feet.  But it was

13  quite prevalent in the, in the air when we were using the

14  asbestos stuff.

15      Q    How was the dust created?

16      A    It was created either by us sawing or knocking

17  it off with the tools, or maybe breaking it off with our

18  hands, putting it on the pipe.  That, that all created

19  the, the dust.

20              (Brief pause in proceedings;

21              counsel conferring.)

22              MR. McCOY:  Okay.  These demonstratives are

23  being shown by agreement.

24              MS. EZELL:  Can you say the names for the

25  record?

KINSER v. CBS CORP., Case No. 94-2282

```
1   BY MR. McCOY:

2        Q    The first one is Exhibit 376.

3             MS. EZELL:  Thank you.

4        A    That is a hand saw.

5        Q    Uh-huh.  And would that be used --

6        A    And we used that to set our insul-- asbestos

7   insulation.

8        Q    Is that during the application, removal of it,

9   or what?

10       A    Application and also removal.

11       Q    Why would it have to be cut during applying?

12       A    When applying?

13       Q    Yes.

14       A    All pipes didn't come in, say, eight-foot

15  sections, which -- or six-foot sections, whichever the

16  insulation was.  They would come in two-foot sections, so

17  they'd have to cut a two-feet piece of asbestos

18  insulation and then put it over the two-piece of pipe.

19       Q    How about going around a turn or a bend?

20       A    Most of the time, later in years, they had

21  molded stuff.  Before that, we would use the asbestos

22  cement and mix it and put it around the bends.

23       Q    Was the saw used during removal?

24       A    Yes.  The saw, we, we would -- in removal, we

25  would use many different things.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  This is Exhibit 661, also being shown by

2  agreement as demonstrative.

3            What's this, right here?

4      A     That is a chain hoist.

5      Q     Okay.  Was this used in application or removal

6  of asbestos insulation?

7      A     Not in removal of it, but we would use that to

8  let down some of our pipe when we cut it that had --

9  sometimes we did not take all of the asbestos off of the

10 piping, so we would use that chain hoist, and it would

11 wrap it around the insulation -- insulated pipe to let it

12 down.

13     Q     Would that create any dust?

14     A     Yes, it was.

15     Q     How, how did it do that?

16     A     It was crushing the asbestos piping covering.

17     Q     What happens when the asbestos pipe covering

18 gets crushed as far as the -- what's the air look like?

19     A     Very white, with white particles of dust in

20 them.

21     Q     This is Exhibit 375 by agreement.

22            Okay.  And so this is a basic hammer?

23     A     That's a hammer.

24     Q     Right.

25     A     It was very good at removing the asbestos

KINSER v. CBS CORP., Case No. 94-2282

1  insulation from the pipe that we were getting ready to

2  dismantle.

3       Q    Okay.  So you guys would just swing away and --

4  at the insulation?

5       A    Yes.  Most of the time it was just all thrown

6  away; and when they repiped, they would use new

7  insulation.

8       Q    Was this customary that hammers were used?

9       A    We used hammer, saw, hands -- sometimes we even

10  used our Channellocks that we had in our pockets to break

11  the insulation away from the piping.

12       Q    This is -- was this how you were trained to do

13  it?

14       A    Pardon?

15       Q    Was this how you were trained to remove the

16  insulation?

17       A    We never got any training.  We just -- when we

18  started with, that's what everybody else was doing.  I

19  followed along.

20       Q    So, I want to talk a little more on this

21  question of dust.  Okay?  People see dust in their houses

22  when you're vacuuming or you got a dirty bookcase or

23  something.

24       A    Yes, sir.

25       Q    How's this dust that you're talking about from

1   this asbestos insulation compare to what you might see in

2   your household?

3       A    It was bigger.  You could actually see it.  You

4   didn't have to go through sunlight to see the dust that

5   is in the home.  It just was almost like snowing outside

6   sometimes.

7       Q    Could you see the stuff traveling in the air?

8       A    Oh, yes.  Whenever you walked, you would take

9   it along with you.  People walking through -- say

10  electricians or plumbers would walk through -- they would

11  create the, the dust and stir up even more.

12      Q    Stir it up from the floor?

13      A    From the floor.

14      Q    How about your clothing when you were doing

15  this kind of work?  What did your clothes look like with

16  the asbestos insulation?

17      A    We would have white specks on us.

18      Q    What do you mean by "specks"?  You mean --

19      A    Well, little pieces of insulation that, when we

20  hammered or saw or took something to dismantle the

21  asbestos covering, it would get on us.

22      Q    When you say "little specks," you mean just two

23  or three or four or what?

24      A    Probably the size of your fingernail.

25      Q    How many, how many of these specks would you

KINSER v. CBS CORP., Case No. 94-2282

1   have on your clothes?

2        A    Oh, several.  You could actually see -- just

3   like snowflakes being on your, out -- when you walk

4   through a snowstorm.  That would be like that.

5        Q    How about your hair?

6        A    Air was --

7        Q    Your hair.  Hair.

8        A    Hair?

9        Q    Yes.

10       A    It didn't, did not get -- we had hard hats on.

11       Q    Okay.  Besides you as a pipefitter, what other

12  trades would be working with these asbestos-containing

13  products that we've talked about?

14       A    Well, the insulators would be the only one that

15  would be working with it.  But we had other pipe-- other

16  trades that was working in the proximity of where all of

17  this was going on.

18       Q    Okay.  Was the work of the -- you said the

19  insulators.  They were the ones who did most of the, most

20  of the work, right?

21       A    They did most of the insulating.  Yes.

22       Q    Right.  Okay.  And that was because that was

23  the job of their union by jurisdictional lines, right?

24       A    Yes.  By jurisdiction, yes.

25       Q    So the pipefitters did it, did it sometimes,

KINSER v. CBS CORP., Case No. 94-2282

1   like yourself; but it was mostly the insulators?

2       A    Mostly insulators, yes.  We -- like I stated

3   earlier, when, in my early career, when we was using that

4   asbestos cement, we had to use it because they didn't --

5   the insulators wasn't around when we used that, so we

6   would use it.

7       Q    Okay.  When -- on the jobs where you were

8   working, what portion of those had insulators,

9   percentage, your best estimate?

10      A    I, I didn't understand.  I'm sorry.

11      Q    Your jobs as a pipefitter, what portion of

12  those jobs did the insulators also work on?

13      A    The insulators would insulate 95 percent of the

14  piping.

15      Q    Okay.  And would they be on most of your jobs?

16      A    Yes.

17      Q    Okay.  And as far as the work of the insulators

18  is concerned, did that cause any dust that would be in

19  the work area of the pipefitters like yourself?

20      A    Yes.  We were, we were working very close to

21  the insulators.  Most of the time, we would weld a piece

22  of pipe, put it in the air; the insulators would come

23  right behind us and insulate, so we were there with them

24  all day long.

25      Q    As a pipefitter, did you ever breathe the dust

KINSER v. CBS CORP., Case No. 94-2282

1   from the insulators' work?

2       A    Definitely.

3       Q    Why do you say "definitely"?

4       A    There was no way of getting around it.  We did

5   not have any protective clothing.

6       Q    How far away were these insulators?

7       A    Sometimes they would be right next door to us.

8       Q    You --

9       A    In other words, five or, five or ten foot.

10      Q    I'm going to go back for a moment to the piping

11  work, and now if you're hav-- if a pipe's got asbestos

12  insulation on it, do the insulators always take that off;

13  or do the pipefitters sometimes just remove the pipe with

14  the insulation on it?

15      A    Insulators would remove some of the insulation.

16  We would remove some of the insulation.  We've dropped

17  pipe with insulation on it.  We've dropped bare pipe with

18  the insulation off.  It just a lot of times depends on

19  whether an insulator was around to where we would have,

20  could have him take it off.  Most of the time, they were

21  not around.

22      Q    So removal was something that pipefitters did,

23  as well as insulators?

24      A    Yes, but not as much.

25      Q    Okay.  What about the cleanup of asbestos

KINSER v. CBS CORP., Case No. 94-2282

1   insulation materials?  Can you --

2       A    The laborers would come in and clean it up.

3       Q    How was that done?

4       A    Usually by push broom.  They would, they would

5   pick the big pieces up; and at the time, they would just

6   put it in five-gallon drums and then take a push broom

7   and sweep the floor, use a dust pan to pick it up and --

8   or a shovel -- and put it in the five-gallon drums.  And

9   that even raised dust.

10      Q    Okay.  Was there dust during the sweeping with

11  the broom?

12      A    Yes, there was.

13      Q    Can you describe how that looked again,

14  compared to what you might do if you're sweeping out your

15  garage?

16      A    It was quite heavy.  It would all fall to the

17  floor, and the laborers would take the broom and clean it

18  up.  But sometimes it got pretty thick, and you just

19  walked through it, and the particles would fly.

20          MR. McCOY:  97 and 98.

21              (Brief pause in proceedings;

22              counsel conferring.)

23          MR. McCOY:  We'll, I guess, deal with the

24  objections on 97 and 98 at a break, Judge.

25          THE COURT:  Very well.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  I'll go, keep going.

 2    BY MR. McCOY:

 3         Q    Let's go to a place called the Zion nuclear

 4    powerhouse.  Did you work there?

 5         A    Yes, I did, sir.

 6         Q    Okay.  And where is that located at?

 7         A    It's near Chicago.

 8         Q    Okay.  Was this a travel card job?

 9         A    Definitely.

10         Q    Okay.  That, that's the territory normally of

11    the Chicago-based pipefitters local, right?

12         A    Yes, 597.

13         Q    Okay.  So how did you get up there?

14         A    I drove myself up there --

15         Q    Okay.  And how did you get --

16         A    -- in an automobile.

17         Q    Fine.

18              How was it that you got a job up there?

19         A    They were looking for people, or pipefitters;

20    and at the time, our local did not have work for some of

21    us, so we would go and -- different locals around.

22         Q    When did you work at Zion?

23         A    It was in 1974.

24         Q    Okay.  Was it before you went back to Florida?

25         A    Yes.
```

1        Q     Okay.

2        A     After I left -- after I left there in '74, we

3    went back to Florida.

4        Q     Okay.  And about when did you get back to

5    Florida?

6        A     Around the middle of October.

7        Q     Okay.  So how long were you at Zion before

8    going back to Florida?

9        A     I think it was about four and a half months.

10       Q     Were you there every day?

11       A     Yes, sir.

12       Q     Did you stay up there?

13       A     Yes, sir.

14       Q     All right.  So let's, let's talk about the work

15   at Zion.  And just give us a description of what

16   basically you remember that job involving, as far as your

17   work was concerned.

18       A     When I got there, one unit was partially

19   dismantled.  The other one, they were getting ready to

20   dismantle.  We took the asbestos blanket off of the other

21   unit.  We disconnected all the piping to that unit.  If

22   we had to, we cut the piping out.  Then we would clean

23   the gaskets off of the pipe connection, off the flanges.

24             We would take down the valves from underneath,

25   dismantle them.  They'd have to take off asbestos

KINSER v. CBS CORP., Case No. 94-2282

1    covering off of them, take the valves off so that they

2    could pull the piping out, clean the gaskets off of the

3    valves, removing all the piping off of the turbine to

4    where they could get inside the turbine to work.

5        Q    The time that you were at Zion, was there other

6    trades on this job also?

7        A    Yes, there was.

8        Q    Okay.  And about how many people were in the

9    pipefitter crews on the job?

10       A    I think we had, had eight in our crew.

11       Q    Okay.  Just give us an idea -- and I know

12   you're not a person who goes to Zion every day, and this

13   was quite a while ago.  But what was the dimensions of

14   this area that was being worked on for the turbine work?

15       A    Oh, my gosh.

16       Q    Bigger than this courtroom?

17       A    Pardon?

18       Q    Bigger than this courtroom?

19       A    Yes.  About -- or about the size of this

20   courtroom, I guess it would be.  About 150,

21   maybe 200 foot long and maybe 50, 60 foot wide.

22       Q    Okay.  Did these turbines have to be -- were

23   these -- were there disassembling, taking apart, of this

24   turbine?

25       A    I didn't understand.  I'm sorry.

KINSER v. CBS CORP., Case No. 94-2282

1       Q      Was there disassembly of the turbine?

2       A      Disassembly of the turbine, yes.

3       Q      Okay.  And what does that mean?

4       A      Taking the pipe away from it and pulling the

5  cover off the turbine.

6       Q      Was there -- is there also piping that goes

7  around the turbine?

8       A      Yes.  There was crossover piping, under--

9  underpiping, and stuff like that that had to be taken

10  off.

11              (Brief pause in proceedings;

12              counsel conferring.)

13              MR. McCOY:  Judge, I'm going to just show these

14  to the witness --

15              THE COURT:  You may.

16              MR. McCOY:  -- for foundational purposes.

17  BY MR. McCOY:

18       Q      Mr. Kinser, I've given you Exhibit 639 and 640.

19  Are these representative of what the types of piping and

20  turbine area looked like at Zion?

21       A      Yes, it is.

22       Q      Okay.

23              MS. EZELL:  And the reason I had an objection,

24  Your Honor, was:  I'm trying to find out if these are

25  actually Zion or not, so that's my objection, is

KINSER v. CBS CORP., Case No. 94-2282

```
 1   foundation.
 2           THE COURT:  He said representative, looked
 3   like; --
 4           MR. McCOY:  Yeah.
 5           THE COURT:  -- did he not?
 6           MR. McCOY:  Yes.  That's what I said, Judge.
 7           THE COURT:  Yeah.  So I assume they are not
 8   Zion instruments.
 9           MS. EZELL:  Thank you, Your Honor.
10           THE COURT:  Now, now.
11           I admonish them, "Don't thank the Court for its
12   rulings.  I'm just doing my job," and that's an exchange.
13   It doesn't mean anything between us.  Don't pay any
14   attention to that.
15           Go ahead.
16           MR. McCOY:  Okay.
17   BY MR. McCOY:
18      Q    Exhibit 640.  This, this photo is not Zion, but
19   it looks sort of like the Zion work area, right?
20      A    Yes.  It's similar to, to the one in Zion.
21   Yes, sir.
22      Q    Does the turbine go on for, further than this,
23   right?  This is just like the front, start of it?
24      A    This is just one of the -- it extends on back.
25      Q    Okay.  Was most of your work on the front area
```

KINSER v. CBS CORP., Case No. 94-2282

1  of the turbine?

2       A    Yes.  We did a lot of the dismantling of the

3  piping on the front of this turbine, or a turbine like

4  this.

5       Q    Okay.  And this right here, is it -- this is

6  also representative but not the actual picture at Zion,

7  right?

8       A    No.  Far as I know.  I, I cannot tell.  But

9  that's the kind of piping that would be underneath the

10 turbine.

11      Q    Underneath?

12      A    Underneath.

13           The turbine would be sitting on a, on the

14 concrete floor; and this would be underneath, kind of

15 like a steam tunnel where they put all the piping.

16 Instead of having it up above or on the ground, it would

17 be underneath.

18      Q    Okay.  Did you work underneath sometimes at

19 Zion?

20      A    Yes, I did.

21      Q    Okay.  Is this -- how much piping is there

22 underneath?

23      A    All, all the main, main steam and the return

24 would be underneath.

25      Q    Is it on the order of hundreds or thousands of

KINSER v. CBS CORP., Case No. 94-2282

1  feet?  Or how much piping we got underneath here?

2       A    Oh, I would estimate probably 5-, 600,

3  700 feet.

4       Q    What portion of that piping that we're looking

5  at would be asbestos-insulated?

6       A    It was all asbestos-insulated.

7       Q    And how do you know that?

8       A    That's all we used back then, is asbestos

9  insulation.  It looked like the, all the stuff that I've

10 ever used.

11      Q    Exhibit 658, I'm going to show you, Mr. Kinser.

12 Is that something that would help you to explain the

13 layout there at Zion that you remember?

14      A    That's, looks something like the layout would

15 be.

16      Q    Okay.  And I, and I understand you're -- we'll

17 have an additional witness to, on some of this, so I'm

18 just going to ask you about certain portions of it.

19      A    Fine.

20      Q    Okay.  So this is Exhibit 658.

21           So in the Zion building, there was a main floor

22 here on which the -- is that where the turbine was?

23      A    Yes.

24      Q    Okay.  That's that first photo, the 640 we

25 looked at, that's what that's sitting on?

KINSER v. CBS CORP., Case No. 94-2282

 1      A      That would be sitting on the main floor.  Yes,

 2    sir.

 3      Q      Okay.  And then we've got this mezzanine floor,

 4    which is below that?

 5      A      Yes.

 6      Q      Okay.  And that's got, that's made out of the

 7    grating?

 8      A      Most -- yes.  That would be where the piping

 9    would be.

10      Q      And that's under --

11      A      That would --

12      Q      So that --

13      A      That would be that area there.

14      Q      Right.

15             So this piping here would be between this

16    mezzanine floor grating and that main turbine floor?

17      A      Yes, sir.

18      Q      Okay.  Exhibit 659, is that also something that

19    would help you to explain the layout at Zion?

20      A      It looks familiar.  Yes, sir.

21      Q      All right.  So I'm just going to, again, ask

22    you some limited questions because we have another

23    witness who's much more familiar with the specifications

24    and layout.

25             All right.  So this shows the main turbine

KINSER v. CBS CORP., Case No. 94-2282

1    floor, and you've got one turbine unit over here and

2    another turbine unit over here, and there's an opening in

3    the center; is that --

4         A    Yes.

5         Q    -- basically how you remember?

6         A    That's basically the layout.  Yes, sir.

7         Q    Okay.  And then this one is Exhibit 6--

8              (Brief pause in proceedings;

9              counsel conferring.)

10   BY MR. McCOY:

11        Q    So, 657, Mr. Kinser, once again, I'll just be

12   brief; we have another witness to explain this more.  And

13   this shows -- this is the area, like here, of one of the

14   turbines, right, how it would stretch on, you said?

15        A    I'm sorry?

16        Q    You said the turbines would stretch on from

17   that, that one point, from the --

18        A    I'm, I'm still not clear on your --

19        Q    Okay.

20        A    -- question.

21        Q    Right.

22             Well, what I'm asking you is:  You mentioned

23   this was the area where you had a lot of your work,

24   right?

25        A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    Okay.  So that's the front part?

2       A    Yes.

3       Q    Okay.  And then so if we look at this drawing

4   right here, this would be that front area here?

5       A    Yes.

6       Q    And then you said it stretches on to different

7   parts afterwards?

8       A    Yes.

9            MS. EZELL:  Objection.  I apologize, Your

10  Honor, but I think the witness is having a hard time

11  following, so I'm going to object to leading; and I'm

12  going to just ask for regular questions and answers

13  during this part.

14           THE COURT:  Yeah.  I'll sustain the objection

15  to leading.

16           MS. EZELL:  Thank you, Your Honor.

17           I'm sorry.  Yes, sir.

18           THE COURT:  Get him to testify if you can.

19           MR. McCOY:  Okay.

20  BY MR. McCOY:

21      Q    All right.  So, the portion that, where you had

22  most of your work was, was what part here?

23      A    In the, in the front of the high pressure

24  turbine.

25      Q    Okay.  And the piping going in?

KINSER v. CBS CORP., Case No. 94-2282

1      A    On the piping there, yes, sir.

2      Q    Okay.  Was the rest of this also being worked

3  on?

4      A    If I remember right, yes, it was.

5      Q    Okay.  I want to talk about what you personally

6  did at Zion for a moment.

7      A    Okay.

8      Q    Okay.  Tell us what kind of work you did, and

9  I'd like you to focus on the part that would involve

10  asbestos insulation in one way or another.

11      A    Well, when we took the --

12      Q    A little louder.

13      A    When we took the piping off of the generator,

14  we had to -- I mean, the turbine, excuse me -- we had to

15  take the insulation off, break down the piping on it;

16  then take all the, like I said before, all the piping

17  away from the turbine to find out -- I didn't have any

18  idea what was wrong with it, but they were trying to fix

19  it, whatever it was wrong.  And it would take -- most of

20  the time we would be up there on the main floor.  A lot

21  of times, we were underneath, help taking the piping down

22  and the valves down.

23      Q    Was the removal of the insulation -- let me

24  clarify this one thing.

25           This turbine was, had already been built and

KINSER v. CBS CORP., Case No. 94-2282

1  was running, right, before?

2      A     As far as I remember, I -- far as I was know --

3  as far as I was told, yes.

4      Q     Okay.  So you guys were taking apart something

5  that was already there?

6      A     That had already been running.  Yes.

7      Q     Right.

8            The insulation had already been on there, and

9  it was being taken off?

10     A     Yes.

11     Q     Now, what, how did the insulation get removed?

12     A     With different methods:  our hands, saws,

13  hammer -- however we could get it off.

14     Q     What dust was there in the air during that time

15  period at Zion?

16     A     It was very dusty at the time.  It would -- if

17  they were removing the pipe underneath and we were

18  working upstairs, the dust would come up through the

19  gratings and through the openings of the pipes that we

20  had taken out.

21     Q     When you say "dust," how do you know that there

22  was dust coming up?

23     A     You could see it.  You could see the asbestos

24  dust come up.

25     Q     What about from, from your own work?  Did you

KINSER v. CBS CORP., Case No. 94-2282

```
 1   have to remove any?

 2        A    Pardon?

 3        Q    Did you have to remove any asbestos?

 4        A    Yes.  I did remove some asbestos covering from

 5   the pipes down below.

 6        Q    And about how much, in terms of distance on

 7   piping, did you have to remove yourself?

 8        A    I do not remember.  I, I would estimate myself

 9   helping remove probably, maybe, 100, 200 foot.

10        Q    Was that all the insulation that was removed on

11   this job?

12        A    No.  There was more insulation removed.

13        Q    And who was removing other insulation?

14        A    It was pipefitters, insulators.

15        Q    The asbestos blankets at Zion, what, if any,

16   work did you do involving those?

17        A    I helped take off the asbestos blanket off of

18   the, one of the turbines.

19        Q    Okay.  The appearance of those blankets, how

20   was it compared to what you've already talked about?

21        A    They were, they were dusty with asbestos dust

22   on them.

23        Q    How much blanket area are you talking about?

24   What's your best estimate?

25        A    Well, it covered the whole top of the turbine,
```

KINSER v. CBS CORP., Case No. 94-2282

1  which would be probably about 500 square feet, or maybe

2  more.  I, I don't remember the dimensions on the turbine;

3  but it -- I, I'd say 500 square foot or better.

4        Q    Did -- were you the only one removing blankets?

5        A    No.  We had other, other pipefitters removing

6  the blanket.

7        Q    Okay.  What, if any, dust was created during

8  the blanket removal?

9        A    There was some.  Yes.

10        Q    Does the term "crossover piping" have a meaning

11  to you?

12        A    Yes.  It's hooked to the turbine.

13        Q    Okay.  What, if any, work was being done as far

14  as disassembly of crossover piping at Zion?

15        A    As far as I remember, we had to do, take all

16  the piping off of the turbine; and the crossover piping

17  was on the reheaters and stuff like that.  They had to

18  see what was wrong with the whole unit.

19        Q    Was this job already -- this work project

20  already in progress when you got there?

21        A    Yes.  On one of the turbines, it was already in

22  progress.

23        Q    Okay.  And when you left, was the work still

24  ongoing?

25        A    Definitely.  Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

1      Q      Why was it that you stopped working at Zion

2    after about four and a half months?

3      A      Local 597 had men that was out of work; and if

4    you're on travel card, you get kicked out of the job,

5    and -- so the local men will have, have work, and then

6    you can go back to your own local.

7      Q      Local 597 is the Chicago local?

8      A      Yes.  597 is Chicago.

9      Q      So you got kicked off?

10     A      Well, --

11     Q      Bumped or whatever?

12     A      More or less kicked out, yes.

13     Q      By the locals?

14     A      Yes.

15     Q      Okay.  Was there any kind of protective safety

16   procedures being taken during asbestos removal at Zion to

17   control the dust?

18     A      I have never seen any.

19     Q      What, if any, Westinghouse personnel were at

20   Zion during your work?

21            MS. EZELL:  Objection, foundation.

22            THE COURT:  If he knows.

23     Q      You can answer.

24     A      Yes.  There was Westinghouse personnel around.

25     Q      Okay.  Who was there from Westinghouse?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I would assume they were engineers.  I have no

2  idea.

3      Q    What were they doing?

4      A    They were just walking around and watching the

5  progress of the work.

6      Q    How do you know they were from Westinghouse?

7      A    They had hard hats on and also -- I'd call them

8  smocks that had "Westinghouse" on the jackets.

9      Q    How could you, how could you tell they were

10  Westinghouse from the hard hats?

11      A    They were green and yellow.

12      Q    Okay.  What, what was there on the hard hat,

13  though, that made you think --

14      A    It was "Westinghouse" written on, on the hard

15  hat.

16      Q    How often did you see the Westinghouse

17  personnel on the job at Zion?

18      A    We probably saw them once or twice a day.  They

19  would be out walking around once or twice a day, but they

20  was just in and out.

21      Q    Okay.  So in terms of the chain of command to

22  direct the work of the pipefitter crews, what role, if

23  any, did these Westinghouse personnel play?

24      A    They would go to the superintendent, who would

25  go to the general foreman, who would go to the foreman,

KINSER v. CBS CORP., Case No. 94-2282

1    who would pass it down to us.

2         Q    Okay.  And by that, what do you mean?  Pass

3    down what?

4         A    Whatever they were concerned with.

5         Q    And what kinds of concerns was there in terms

6    of this job as far as the work that was being done?

7         A    [No response.]

8         Q    That's a bad question.

9              THE COURT:  It is.

10             MR. McCOY:  Yeah.

11   BY MR. McCOY:

12        Q    How, how, how did -- what role, if any, did the

13   Westinghouse people play in terms of your ultimately

14   getting your instructions to do the disassembly and so on

15   of the work, of the Zion piping?

16             MS. EZELL:  Objection, Your Honor.  I think

17   it's an improper question.  He can talk about what he

18   saw, but he can't talk about what Westinghouse did.  He

19   already explained he was way down the chain of command.

20             THE COURT:  Yes, indeed.

21             The form of the question is objectionable.  Ask

22   another.

23             MR. McCOY:  Okay.

24   BY MR. McCOY:

25        Q    Did the Westinghouse personnel direct the

KINSER v. CBS CORP., Case No. 94-2282

1    pipefitter superintendents and general foremen on the, on

2    the work to be done?

3        A    As far as I know, yes.

4        Q    Okay.

5        A    That's how we, we had -- the plans made, so the

6    Westinghouse personnel would tell us what, what to be

7    done.

8        Q    The --

9            THE COURT:  Is this a good time for a recess?

10           MR. McCOY:  Right.

11           THE COURT:  It's almost 10:30.

12           MR. McCOY:  Right.  That's a good --

13           THE COURT:  Take the jury out, please.

14                (Jury absent, 10:23 a.m.)

15           THE COURT:  I'll come back in about ten

16    minutes, and you can tell me what your objections -- or

17    whatever those exhibits you're having a problem with.

18                You can step down, Mr. Kinser, during the

19    recess.

20                (Recess, 10:23 a.m. to 10:44 a.m.)

21           THE COURT:  All right.  Out of the presence and

22    hearing of the jury, you told me there were some sort of

23    objections to some exhibit that you wanted me to

24    consider.

25                MS. EZELL:  Yes, sir.  I think --

KINSER v. CBS CORP., Case No. 94-2282

```
1            THE COURT:  You may be heard.

2            MR. McCOY:  It's been resolved by an agreement

3    as to how to handle it.

4            MS. EZELL:  Yes.  And what it was, Your

5    Honor --

6            THE COURT:  Terrific.

7            MS. EZELL:  But I just need to put a little

8    something on the record because there are some

9    constraints on that agreement.

10           On the 4th of April of 2012, there was a

11   partial motion for summary -- it was a motion for summary

12   judgment that was granted in part and denied in part in

13   this case.  And the portion of the motion that was

14   granted in part dealt with packaging, asbestos packaging

15   and asbestos gaskets; and so the exhibits that he showed

16   me were pictures of gaskets, and I needed to confirm with

17   him that the questions he was going to ask were, in fact,

18   going to stay within this order that had been issued in

19   this case.

20           He has assured me that he will, and so now I

21   don't have any objection to the demonstrative.

22           THE COURT:  Did the MDL issue that order?

23           MS. EZELL:  Yes, sir.  It was --

24           THE COURT:  Oh, because I was having a sinking

25   spell.  I was thinking:  Did I rule in this case?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  I apologize.  Yes, Your Honor.
 2    This was issued by Judge Robreno.
 3              THE COURT:  Well, some -- I have a few things
 4    to say about the MDL.  This is off the record.
 5                  (Discussion off the record.)
 6              THE COURT:  Okay.  We ready to go ahead?
 7              MS. EZELL:  Yes, sir.  We're ready.
 8              THE COURT:  All right.  Bring the jury.
 9    Thanks.
10                  (Jury present, 10:47 a.m.)
11                  (Discussion off the record between
12                  the Court and the deputy clerk.)
13              THE COURT:  I can only tell the jury this:
14    Should your employers disadvantage you or complain,
15    please let me know because I might have that employer
16    have a conversation with the United States Attorney.
17    Thank you.
18              All right.  You are especially protected.
19    Touch me not.
20              JUROR:  I just kind of thought it would be a
21    good idea if -- I wanted to be excused from work to keep
22    away from all the activities that I will probably be
23    engaged in.  When I go back, I will be probably hounded,
24    "What's going on?  What's going on?"
25                  Now I've been at very good liberty.  I've not
```

KINSER v. CBS CORP., Case No. 94-2282

1  discussed anything with anybody, but it's going to put me

2  in that predicament when I go back to work with 800

3  people, or in a facility with that many people, that I

4  would think it would be best if I could have the Court

5  grant me that day off, and I won't have to worry about

6  putting up with that.

7          THE COURT:  The Court will grant you that day

8  off.  Don't worry.  No.  No.  You are under my

9  protection.

10         Go ahead, Mr. McCoy.

11  BY MR. McCOY:

12     Q    By agreement, Exhibit 97:  And what is this,

13  Mr. Kinser?

14     A    It's a gasket.

15     Q    Okay.

16     A    Asbestos gasket.

17         MS. EZELL:  And we've agreed to this as a

18  demonstrative --

19         THE COURT:  Louder.  Put your microphone on.

20         MS. EZELL:  Oh, yes.  We've agreed to this as a

21  demonstrative, not an exhibit, Your Honor.

22         THE COURT:  All right.  Jurors, this is what we

23  call a "demonstrative aid," or "demonstrative exhibit."

24  It enables the witness to explain something.  It's, you

25  know, like a picture is worth a thousand words.

KINSER v. CBS CORP., Case No. 94-2282

1          Go ahead.

2   BY MR. McCOY:

3       Q    Were these used on steam piping systems, Mr.

4   Kinser?

5       A    Yes, they are.

6       Q    Okay.  These would be used -- were these used

7   at Zion?

8       A    Yes, they were.

9       Q    Tell us, basically, what -- do the pipefitters

10  work with gaskets?

11      A    Pardon?

12      Q    Do the pipefitters work with gaskets directly?

13      A    Yes, we did.

14      Q    Tell us what purpose the gaskets serve on the

15  piping systems.

16      A    Gasket keeps the, whatever is going through the

17  lines from leaking out.  The flanges that they have, or

18  the valves that they, we used have ridges in them; and

19  when you put -- when you put that gasket in there and

20  tighten up the bolts, then that makes a seal-tight thing,

21  something like a Ziploc bag or something like that.  It

22  doesn't let anything leak out.

23      Q    What sizes do the gaskets come in?

24      A    Oh, gosh.  They come from quarter inch up to --

25  I've seen 16-inch.  And I know that they probably go up

1  to 24- because there is 24- and even 36-inch pipe.

2      Q    Do gaskets have to get changed?

3      A    Yes.  When you break a flange loose with a --

4  say, two flanges loose, it will tear the gasket, so you

5  have to remove that gasket.

6      Q    How is gasket removal done?

7      A    With the --

8      Q    I'm talking about steam lines now.

9      A    Pardon?

10     Q    Steam line type gaskets.

11     A    It's done with a file.  I've used a hammer and

12  chisel on it; but most of the time, a file and a, a wire

13  brush.

14     Q    Exhibit 379.  I'm sorry.  I think 374.  My

15  mistake.  It's a demonstrative exhibit.  It's by

16  agreement.

17          That's what you mean when you say "file"?

18     A    That is a file.  Yes.  We use one, something

19  like that.

20     Q    Exhibit 377, also demonstrative, what's that?

21     A    That is a hand-held grinder.  That's got a cup

22  grinder on it; but usually we use the, a round wheel on

23  it.

24     Q    Okay.  For what -- does this have a role in the

25  gasket removal?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.  It -- very effective taking the gas--

2  asbestos gaskets off of flanges.

3      Q    Okay.  Why is it that you have to use these

4  tools, like wire brushes and files, to clean the gaskets

5  off?

6      A    Most of the time, it's heat-related, and it

7  makes it very brittle.  They do not come off of the

8  flanges very easy.

9      Q    Why is it important to have a clean flange that

10  you'd actually have to file or brush everything off?

11      A    We have to put a new gasket back in there, and

12  you can't have lumps in there, or you are going to have a

13  leakage problem.

14      Q    Do you know what the gaskets were made from

15  that were used on the steam lines?

16      A    Asbestos.

17      Q    And how do you know that?

18      A    They have been around since I have; and when we

19  would put the gasket -- or the flanges together, the

20  foreman would say, "Go get four or five or six 6-inch

21  gaskets" that we were using, "asbestos gaskets" that we

22  were using.

23      Q    Okay.  What, if anything, did you ever see on

24  the packaging about asbestos for the gaskets?

25      A    I'm sorry?

KINSER v. CBS CORP., Case No. 94-2282

1        Q     What, if anything, did you ever see written on

2    the packaging for the gaskets about asbestos?

3        A     They would just say "asbestos gaskets" --

4              MS. EZELL:  I'm sorry.  Objection as regards to

5    the question was vague as to time and place.  He asked --

6              THE COURT:  Well, no.  I mean, it's a proper

7    question.  And one of the issues in the case I pick up is

8    warnings.  And when he says, "What's on it?", he says,

9    "Nothing but asbestos."

10             The answer may stand for whatever the jury

11   wants to believe.

12             You are the complete judges of credibility and

13   weight in the case, not me.  You.  And I'll tell you that

14   again in your instructions.

15             Go ahead, Mr. McCoy.

16   BY MR. McCOY:

17       Q     What, if any, dust is created during gasket

18   removal?

19       A     It's -- it has to be dust, or it wouldn't come

20   off.  It would -- the grinder or the file would make,

21   make dust every time you took a gasket off the flange.

22       Q     Was -- what, if any, gasket removal work took

23   place at Zion?

24       A     Yes.  Every time we broke a flange or took a

25   valve out, they would have gaskets on it that we'd have

KINSER v. CBS CORP., Case No. 94-2282

1   to remove them.

2       Q    What's your best estimate as to how many

3   gaskets that you had to remove at Zion?

4       A    I would say probably 20, 25.

5       Q    And what are the size range of the gaskets at

6   Zion?

7       A    They range from, I would imagine, 4-inch up to

8   10 or 12.

9       Q    How long does it take -- does the amount of

10  time that it takes to actually remove the gasket vary?

11      A    Yes, a lot, because every now and then you'll

12  get lucky and a gasket will come off without any problem.

13  Sometimes you have to grind and grind and grind to get it

14  off.

15      Q    What about at Zion?

16      A    Same goes into that also.

17      Q    Okay.

18      A    Some of them would come off easy.  Some of them

19  are very difficult to get off.

20      Q    Did other pipefitters do gasket work at Zion?

21      A    Yes, sir.

22      Q    So that the estimate of 20 or so that you gave,

23  that's just you?

24      A    Yes.  That was just myself.

25      Q    The ins-- I want to go back to the asbestos

1    insulation material on the piping at Zion.  Can you

2    describe for us how that looked in comparison to what

3    you've already talked about?

4          A    It was the same color, which was white.  It

5    would -- it was chalky.  It would flake off just like the

6    rest of it in the jobs I've had before.  It was just

7    asbestos floating around, flakes floating around, stuff

8    like that.

9          Q    What, what would be your best estimate as to

10   the percentage of time on the job at Zion when insulation

11   was being removed or installed within 100 feet of where

12   you were working?

13         A    I'd say probably between 25 and 40 percent.

14         Q    Okay.  You might want to lean forward a little

15   bit.

16         A    I'm sorry.

17         Q    Okay.  Besides the pipefitters that were

18   working at Zion, what, if any, other trades were working

19   on asbestos materials?

20         A    Well, just the insulators and pipefitters.

21         Q    Okay.  And what were the insulators doing on

22   the insulation materials?

23         A    They would also be removing it and replacing it

24   after the piping was put back together.

25         Q    What, if any, dust from the insulators' work

KINSER v. CBS CORP., Case No. 94-2282

1  did you breathe at Zion?

2      A    There's no way of getting around it.  It was

3  floating in the air all the time.

4      Q    How about the, the cleanup work at Zion in

5  terms of the insulation materials?  How was that handled?

6      A    It was the same as the rest of the jobs.  The

7  pipe-- I mean, labor would come in and clean it up.

8      Q    Were you present during any of the cleanup work

9  on the insulation materials?

10     A    The ins-- the laborers were cleaning up most of

11 the time.  You'd take a piece off, and they would try to

12 get it cleaned up so you wouldn't step on it and create

13 more asbestos particles in the air.

14     Q    At Zion, what, if any, of the dust did you

15 breathe from the laborers' work cleaning up the

16 insulation materials?

17     A    What percentage?

18     Q    Did -- what, what -- what, if any, did you

19 breathe?

20     A    Oh, yes, we did.  There, there's no way of

21 getting around it.  It was -- it's all in the air.

22     Q    Was there carpenters working at Zion?

23     A    Yes.  There was carpenters.

24     Q    What, if any, scaffolding were they setting up?

25     A    There was scaffolding around the turbine.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     How much -- when you say "around," how much

2     around it?

3      A     Probably two sections, most -- almost all the

4     way around it, two sections high, which would be about

5     ten-foot high.

6                (Brief pause in proceedings;

7                counsel conferring.)

8      Q     Exhibit 638, is that representative, Mr.

9     Kinser, of how the scaffolding might be set up at Zion?

10     A     Yes.  It was similar.

11     Q     Okay.  So this demonstrative, by agreement, is

12     638.

13            And this, this depicts the, what you're talking

14     about in terms of setting up the scaffolding around the

15     turbine area?

16     A     Yes, sir.

17     Q     And, again, this is not -- this is not Zion,

18     but it's representative, right?

19     A     Of similar buildings, yes, sir.

20     Q     Okay.  What, if any, dust was there during the

21     takedown of the scaffolding?

22     A     They -- there was usually dust on the scaffold

23     boards.  When they -- the, the insul-- asbestos

24     insulation dust would get on the boards; and when they'd

25     take the scaffolding down, they would dump the boards to

KINSER v. CBS CORP., Case No. 94-2282

1   pull them out, to dismantle the scaffolding, and that

2   would dust -- dump the dust down to the next level, and

3   it would still create asbestos dust in the air.

4        Q    What, if any, dust did you remember breathing

5   from scaffolding work at Zion?

6        A    Well, probably about -- quite a bit because we

7   were working close to where the scaffolding was.

8        Q    Now, for your personal work at Zion, what you

9   did, what's your best estimate as to how much time that

10  you spent removing gaskets or insulation from piping

11  material -- piping areas?

12       A    I'd say probably about 25 percent.

13       Q    Were there safety meetings that you

14  participated in at Zion?

15       A    There was no safety meetings.

16       Q    Were there toolbox meetings?

17       A    No toolbox meetings.

18       Q    What, if any, warnings or precautions did you

19  get at Zion from, from any of the companies that were

20  working there?

21       A    We never got any warnings whatsoever.

22       Q    What, if any, signs did you see at Zion about

23  asbestos, signs posted?

24       A    I'm sorry?  I'm --

25       Q    What, if any, signs did you see posted at Zion

KINSER v. CBS CORP., Case No. 94-2282

1    about asbestos?

2        A    I have never seen an asbestos sign.

3        Q    What, if any, safety procedures or precautions

4    did the Westinghouse people at Zion suggest?

5        A    We never had any safety meetings.

6        Q    Now, in terms of your personal knowledge about

7    the dangers of asbestos, what did you know at Zion?

8        A    We never, we never knew that there was any

9    danger on asbestos.

10       Q    Did you know about the combined effect of

11   asbestos and tobacco on the lung before you quit --

12   before you worked at Zion?

13       A    No, sir.

14       Q    Was there a time period where you learned about

15   asbestos being able to kill people, or cause cancer?

16       A    If it was, it was after I retired.  They said

17   it was bad for you, but they never did say that it would

18   kill you.

19       Q    Now, the time period when you started -- you

20   started smoking cigarettes -- I want to change subjects

21   here -- when you were pretty young, right?

22       A    Yes.  I was 14 or 15 when I started smoking.

23       Q    And when did you quit?

24       A    1984.

25       Q    So before 1984, did you know anything about the

KINSER v. CBS CORP., Case No. 94-2282

1    combined effect of asbestos and tobacco?

2        A    No, sir.

3        Q    Why was it that you started smoking cigarettes?

4        A    Mostly peer pressure, just things to do.  That

5    was -- everybody was doing it, so I decided I'd join the

6    crowd.

7        Q    I'm going to show some more exhibits here.

8             (Brief pause in proceedings;

9             counsel conferring.)

10       Q    What information did you get from the media and

11   advertising about whether cigarettes were good or bad for

12   you when you first were starting smoking?

13       A    The -- every -- all the advertisements you

14   could see was, "Hey, they're good for you."  So we --

15   myself and, and probably a million other people -- kept

16   smoking.

17       Q    So did you see these kinds of ads?  This is

18   Exhibit 643, demonstrative, by agreement here.

19       A    That's similar.

20       Q    Okay.  And that was the brand you started on,

21   Lucky Strike?

22       A    I don't remember what I started with.

23       Q    Okay.  You started -- ultimately, you smoked

24   Salem, right?

25       A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q      Okay.  And this is Exhibit 645, by agreement.

2      A      Yes.

3      Q      That's the kind of advertising about, that you

4   remember?

5      A      Yes.  That was similar to all of it that was

6   being posted at that time.

7      Q      Exhibit 648, by agreement.

8      A      Yeah.

9      Q      What, if any, influence did the persons in

10  these advertising have on your judgment about whether you

11  would smoke or not smoke, meaning, like, the political

12  figures or the movie stars?

13     A      Well, every movie you went to, you could see

14  the movie stars smoking in the movies; and they were

15  advertising, "Well, smoke as long as you want because it

16  didn't -- doesn't seem to hurt anybody."

17     Q      Did you see advertising like these right here?

18     A      Yes, Ronald Reagan.

19     Q      That's -- that was Exhibit 644.

20            This is Demonstrative 647.

21     A      Santa Claus smoking.

22     Q      How about as far as women?  Anything out there

23  saying smoke was bad for your wife?

24     A      Do what?

25     Q      Anything, any -- anything you saw that, like

KINSER v. CBS CORP., Case No. 94-2282

1   would say, "Your wife shouldn't smoke"?

2       A    No, none.

3       Q    Exhibit 646 is another demonstrative.

4       A    No.  They were telling my wife, "Go ahead and

5   smoke, smoke, smoke."

6       Q    You know, you're -- I think you mentioned

7   your -- or did your parents smoke?

8       A    [Gesturing.]

9       Q    Did your parents smoke?

10      A    Yes.

11      Q    And is there anything that you remember telling

12  them not to smoke around the kids?

13      A    No.  That's quite hilarious there.

14      Q    That's Exhibit 641, a picture of the baby

15  telling Mommy to smoke.

16           And as far as the medical profession is

17  concerned, did you remember anybody, when you first

18  started smoking, amongst the doctors, saying that smoking

19  was bad, the doctors?

20      A    No, none.

21      Q    Okay.  Exhibit 642, is this, again, reflective

22  of the kind of advertising you saw?

23      A    [Gesturing.]

24      Q    Is this reflective of the kind of advertising

25  you saw?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    Okay.

3    A    Yes.

4    Q    Where it says 20,679 physicians called Luckies

5  less irritating.

6    A    Yeah.  That's the kind of advertisement that

7  they was showing at the time.

8    Q    How much did you smoke during the years when

9  you smoked?

10    A    I very seldom ever smoked during the day,

11  especially when I'm working.  I would say 8 to 10, maybe

12  12 cigarettes at night, sometimes not that much.  But I

13  never smoked during the day.

14         I couldn't keep a cigarette and work.  A lot of

15  people can.  A lot of people can put a cigarette in their

16  mouth and use a couple of their hands to work at, but I

17  couldn't -- I could not do that.  I tried it.

18    Q    And there wasn't any warnings when you started,

19  right?

20    A    No, none whatsoever.

21    Q    Okay.  When the warnings came out, why, why

22  didn't -- why didn't you quit?

23    A    Well, they come out in early '60s.  That means

24  that I had been smoking for a number of years and had

25  become addicted to the cigarettes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Did you try to quit when the warnings came out?

2      A     Oh, yeah, two or three, four times.  I always

3  tried to quit.  But it was -- you could -- one of those

4  things that went back and -- do it again.

5      Q     Describe what you went through in trying to

6  quit.

7      A     Oh, gosh.  I'd just quit, try to throw the

8  cigarettes away and put the lighters away and just say,

9  "I'm not gonna smoke anymore," but it didn't work.

10     Q     Why was it that you finally quit in '84?

11     A     My kids asked me to quit in '84, and I said,

12  "Okay.  I'm gonna quit."  And I dropped them right then

13  and there.

14     Q     Did you have secondhand smoke exposures during

15  your life?

16     A     Oh, yes.

17     Q     When did you have those?

18     A     When I was tending bar and around other people

19  that smoked.

20     Q     I want to talk about the breathing problems

21  that -- you said you retired in 1996.  When was it that

22  you first noticed any significant breathing issue?  Was

23  it around that time frame?

24     A     Probably about two or three years before, we

25  decided that it would be best that I retire.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Had, had there been any x-ray taken concerning

2    evaluation of you for asbestos exposure before your

3    retirement?

4    A    Yes.

5    Q    And how -- who -- was that arranged through the

6    union, or how was that done?

7    A    I believe that it was your company that told

8    the union that anybody that had worked 25 years or more

9    with asbestos should have an x-ray.

10   Q    Okay.  So it was arranged through the union?

11   A    Pardon me?

12   Q    Arranged through the union, that's how you

13   heard about it?

14   A    Yes.

15   Q    And did you have an x-ray at that time?

16   A    Yes, I did.

17   Q    Was this around 1994?

18   A    Well, I believe it was 1990.

19   Q    Okay.  And since the time of that x-ray, have

20   you been a client of my law firm?

21   A    [Gesturing.]

22   Q    Since the time of that x-ray, have you been a

23   client of my law firm?

24   A    Yes.

25   Q    Okay.  So after that, that x-ray, was -- did

KINSER v. CBS CORP., Case No. 94-2282

1    you have more medical checkups for your breathing?

2         A     Not until 199-- I think it was '96.  '95 or

3    '96.  I had a cough, and we were going to our family

4    reunion in Pigeon Forge, Tennessee, which we do every

5    year.  I had a cough.  I went to the doctor.  He give me

6    some medicine to take, and the cough went partially away.

7    And when I come back, it came back on me real strong.

8              I went to my family doctor, who was Dr.

9    Schefsky at the time; and he said that since I was 65 at

10   the time, he said, "I think that Medicare will go ahead

11   and let you have a CT scan."

12             So he scheduled a CT scan; and when it come

13   back, they found a spot on my lung.

14        Q    Okay.  And was this, then, around the year

15   2000?

16        A    Yes, it was.

17        Q    So after that, you got referred to Dr. Scanlon?

18        A    Yes.

19        Q    And while under his care and treatment, Dr.

20   Scanlon's, then you were diagnosed with lung cancer for

21   the first time, right?

22        A    Yes.

23        Q    Okay.  We've heard about some of the surgical

24   procedures from Dr. Scanlon's testimony.  Can you tell us

25   what, if any, pain that you experienced as a result of

KINSER v. CBS CORP., Case No. 94-2282

1    those procedures?

2        A    Well, mostly, while I was in the hospital,

3    which was ten days, they kept me pretty well sedated; and

4    so I have no idea what the pain was, but -- if they kept

5    me sedated it was, it would be pretty bad.

6        Q    And did -- you got some treatments after the

7    surgery for the lung cancer, right?

8        A    Yes.  I had some chemotherapy after the lung

9    cancer, after I got out of the hospital.

10       Q    What, if any, side effects did you have from

11   chemotherapy?

12       A    It was kind of nauseating.  After the first

13   bout, my doctor gave me some pills to take to keep from

14   vomiting.

15       Q    How many times did you have chemotherapy?

16       A    I had three times.

17       Q    And when you say "vomiting," was this very

18   little or a lot or what?

19       A    Pardon?

20       Q    How was it -- when you say "vomiting," was it

21   just a little or a lot or what?

22       A    No.  It was a, it was a little bit, but it --

23   the pills took care of it, and it wasn't too tremendous

24   bad, but it -- vomiting is always bad.

25       Q    All right.  How about:  How did you feel

KINSER v. CBS CORP., Case No. 94-2282

1    otherwise as a result of these chemotherapy treatments?

2         A    I felt fairly decent.

3         Q    So, ultimately, you were able to do a lot of

4    normal activities after the lung cancer treatments,

5    right?

6         A    Yes.

7         Q    You were able to walk and those types of

8    things --

9         A    Yes.

10        Q    -- that we heard about?  Okay.

11             Did the, did the lung cancer treatment cure the

12   breathing difficulties?

13        A    Oh, my gosh.  No.

14        Q    Why do you say that?

15        A    Well, when you lose part of your lung, you lose

16   part of your breathing ability.

17        Q    Can you describe how, how you felt after losing

18   part of your lung?

19        A    The breathing was more difficult.  Right now, I

20   have difficulty in even putting my socks and shoes on.

21   Like bending over, I -- every now and then, I'll almost

22   lose my breath; and I'll come up and I'll be huffing and

23   puffing.

24        Q    Has, has it changed since the lung cancer

25   surgery?

1      A    No.  It's got steadily worse.

2      Q    Can you describe, at the present time, what

3   kinds of limitations there are on your activities because

4   of breathing?

5           And I know we heard, heard your wife describe a

6   number.  I want to ask about some other ones.

7           How about walking?  How far can you walk now?

8      A    I have not timed it, but probably about half a

9   mile, maybe less.  I, I don't know.  I haven't been

10  walking.

11     Q    Was it, was it more before that you could walk?

12     A    Yes.

13     Q    How about bending over?  Does the breathing

14  have any effects on that?

15     A    Like I stated before, I have to stand up and

16  get my breath if, if it doesn't -- if I have to go back

17  down again, I have to stand up, get my breath, and then

18  redo whatever I was doing.

19     Q    Do you go grocery shopping with Donna?

20     A    Yes.  I go shopping with Donna.  Sometimes we

21  get to walking around and I tell her, "I can't go any

22  further," so I go back out to the truck and sit down.

23     Q    When you say you can't go any further, why?

24     A    I just wore out.

25     Q    From, from what?

KINSER v. CBS CORP., Case No. 94-2282

1       A       From breathing.

2       Q       How about chores around the house?  Did you,

3   did you help with those?

4       A       I used to mop the floors and vacuum, clean the

5   bathrooms, stuff like that.  But it's become very

6   difficult anymore to do any of that.

7       Q       Why is that?

8       A       My breathing.

9       Q       I want to talk about some other medical

10  conditions that you've had.  You have a pacemaker, right?

11      A       Yes, sir.

12      Q       How does that work as far as taking care of

13  you?

14      A       Very good.

15      Q       Have you had any problems with, with, after you

16  got the pacemaker?

17      A       No.  The only thing I had problems with was the

18  battery went, had to be replaced, so I had to go in

19  surgery and have a new battery put in.

20      Q       Have you had a diagnosis of diabetes?

21      A       I'm on a borderline of diabetes.

22      Q       Is there anything about the borderline

23  condition that's significantly limiting your abilities

24  here?

25      A       No.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q     You had some procedure on an artery on your
 2   neck, right?
 3        A     [Gesturing.]
 4        Q     You had a procedure on, on an artery on your
 5   neck?
 6        A     Yes.  I had a carotid artery that had to be
 7   cleaned out and a stent put in.
 8        Q     Okay.  Has there been any problems with that
 9   since?
10        A     None whatsoever.
11        Q     And years ago, you had a, an accident where you
12   injured -- where your back was injured, right?
13        A     Yes, sir.
14        Q     And is that -- you got treatment for that,
15   right?
16        A     I was in the hospital for 33 days.
17        Q     Okay.  And how old were you then?
18        A     I was 19.
19        Q     Okay.  And is, is any of the back a major
20   factor in terms of limiting your activities?
21        A     Yes.
22        Q     Tell us what limitations there are from the
23   back.
24        A     It's ongoing hurt.  A lot of times I have a
25   hard time standing up straight.
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Okay.

2    A    It just -- difficulty picking up different

3  things, heavy items.

4    Q    Anything else besides the back that, that

5  causes any significant limitations on your activities,

6  back and the breathing?

7    A    Back and breathing is about the only thing I

8  have.

9    Q    Would you say, as between the two, it's more

10  back or more breathing or what?

11    A    It would be more breathing.

12    Q    Why do you say that?

13    A    Because you, you -- a lot of times you don't

14  use your back on, on different things.  I know you use

15  your back on mopping floors and vacuuming, stuff like

16  that.  But the, the breathing makes it more difficult.

17    Q    Now, you mentioned that you, you thought you

18  were -- you understood you're cured from the lung cancer

19  now, right?

20    A    I'm sorry.  I didn't --

21    Q    I say:  You understand that your lung cancer

22  has basically been cured, the one you had in 2000?

23    A    I have been cured of this lung cancer.  Yes.

24    Q    Well, my question is:  Do you, do you ever have

25  thoughts about what might happen in the future from

KINSER v. CBS CORP., Case No. 94-2282

1   having had lung cancer before?

2       A    Yeah.  Well, we always talk about what could

3   happen.  I could get lung cancer again.  Even my family

4   could get lung cancer.

5       Q    Lung cancer from, from what?

6       A    From me bringing home asbestos on my clothes.

7       Q    How often do these kinds of thoughts cross your

8   mind?

9       A    Oh, it's not that often.  We, we, we trust in

10  the Lord about not having any more cancer.

11      Q    Is that something that you say prayers for?

12      A    Yes, sir.

13      Q    So far it's worked?

14      A    Pardon?

15      Q    So far it's worked?

16      A    So far so good.  Yes.  He's taken care of us.

17      Q    And you have ongoing monitoring for the lung

18  conditions and potential development of something else,

19  right?

20      A    Yes.  I -- after, after I got out of the

21  lung can-- out of the hospital with the lung cancer, I

22  had a CT scan for every six months for -- I believe it

23  was three years.  Then I went to every, every year for a

24  couple years.  Now I'm on every two years right now.

25      Q    And what do you have every two years?  Do you

1   have a CT scan or what?

2        A    CT scan.

3        Q    You have to see the doctor?

4        A    No.  I go to a, a place that does that.  Right

5   now it's Boston Imaging in Altamonte Springs, Florida.

6        Q    So, what are your thoughts each time when the

7   results don't show cancer?  What do you think about?

8        A    Well, I thank the Lord that there's no, no

9   spots on there.

10            MR. McCOY:  That's all the questions I have of

11   Mr. Kinser.

12            Thank you.

13            THE WITNESS:  You're welcome.

14            THE COURT:  Cross-examination.

15            MS. EZELL:  Yes, sir.

16              CROSS-EXAMINATION BY MS. EZELL:

17        Q    Good morning, Mr. Kinser.

18        A    Good morning.

19        Q    You've got water there?

20        A    Yes, ma'am.

21        Q    All right.  Can you hear me okay?

22        A    Yes.  Just --

23        Q    Tell me what you think the problem's gonna be.

24        A    That sounds great.

25        Q    Okay.  If at any point, you can't hear me, you

KINSER v. CBS CORP., Case No. 94-2282

1   let me know.  All right?

2        A    Yes, ma'am, I will.

3        Q    Okay.  I'd like to start with the ELMO, and I'm

4   going to show you what we have already shown the jury.

5   It's one of your lawyer's exhibits from his opening

6   statement.  Okay?

7        A    Yes, ma'am.

8        Q    Now, do you recognize what this photograph is?

9        A    Yes.  That's Zion powerhouse.

10       Q    All right, sir.

11            And so do you recognize what these two

12   buildings are right here?

13       A    Yes.  Those are the two nuclear reactors.

14       Q    All right, sir.

15            And do you recognize what this building right

16   here is?

17       A    That's the turbines building.

18       Q    And that's the building that we've been talking

19   about, correct, sir?

20       A    Yes, ma'am.

21       Q    All right.  And then there's other buildings

22   around there.  Do you know the names of all these other

23   buildings, --

24       A    I have no idea --

25       Q    -- what these are?

KINSER v. CBS CORP., Case No. 94-2282

1        A    -- what those other buildings are.

2        Q    All right.  So in the turbine buildings that

3    we've been talking about -- I'm going to use some of the

4    other exhibits that you used with your lawyer today.

5             You used this, which is Demonstrative -- well,

6    it's marked Kinser Exhibit 659.  Do you see that?  Do you

7    see that right there, sir, --

8        A    Yes, ma'am.

9        Q    -- 659?

10       A    Yes, ma'am.

11       Q    And you've indicated that in the turbine

12   building, which is this building right here, that you

13   thought this was the basic layout, correct, sir?

14       A    It looks similar.  Yes.

15       Q    All right.  So on one side, there was a Turbine

16   Unit Number 1; and in the middle, there's some open

17   grating.  And on the other end, there's a Turbine Unit 2,

18   fair enough?

19       A    Yes, ma'am.

20       Q    All right, sir.

21            And then, Turbine Unit 2 -- now, that is the

22   turbine that was broken down that was taken offline in

23   1994, correct, sir?

24       A    I have no idea.

25       Q    All right.  Well, there was only one turbine of

KINSER v. CBS CORP., Case No. 94-2282

1   the two that was not functioning in 1994.  You agree with

2   that, don't you, sir?

3        A    I have no idea, ma'am.

4        Q    All right, sir.  Fair enough.

5             So Turbine 2, this is a unit.  You agree with

6   that, what I'm pointing out here?

7        A    Yes.

8        Q    Okay.  And so this unit actually breaks down

9   into a number of components, correct?

10       A    Yes, ma'am.

11       Q    And you-all were kind enough to provide us with

12   another diagram of what those different components are,

13   approximately, correct, --

14       A    Yes, ma'am.

15       Q    -- sir?

16            And those are a high pressure turbine, --

17       A    Yes, ma'am.

18       Q    -- correct, sir?

19            And then three low pressure turbines, --

20       A    Yes, ma'am.

21       Q    -- correct, sir?

22            And then this generator?

23       A    Yes, ma'am.

24       Q    Now, if we go back to -- and that's on

25   Plaintiff's Demonstrative 657 that we were just looking

KINSER v. CBS CORP., Case No. 94-2282

1   at.

2           And I've drawn this pink line right here, and

3   that is -- if you'll look at your TV, that is Turbine

4   Unit Number 2, correct, sir?

5       A    I don't know which one it was.

6       Q    Okay.  So I've drawn this pink line here.

7       A    Yes.  I see the pink line.

8       Q    And that is a turbine unit?

9       A    Yes, ma'am.

10      Q    Okay.  And you don't know if it's 1 or 2?

11      A    No, ma'am.  I do not.

12      Q    All right.  Now, within this turbine unit, you

13  indicated that you, sir, were working on the piping

14  primarily on this turbine floor, the top floor, --

15  correct, sir? --

16      A    Yes, ma'am.

17      Q    -- that led to the high pressure turbine.

18           That's your recollection of what you were doing

19  at Zion?

20      A    Yes, ma'am.

21      Q    All right, sir.

22           Now, as you -- let me go back to this 659

23  really quick.  How, how large -- remember, you told Mr.

24  McCoy you thought you knew about how long this courtroom

25  was?

1      A      This would be about one unit.

2      Q      How long did you say it was?  How many feet?

3      A      I'd say 150, 200 feet.

4      Q      All right.  But now this picture that you

5  brought, this -- it says that this turbine floor is

6  actually about 800 feet.  Do you see that?

7      A      That's the main floor.  Yes, ma'am.

8      Q      And so this building right here, you reckon, is

9  longer than 200 feet?

10     A      Well, I imagine it is.  Yes, ma'am.

11     Q      And it may even be longer than 800 feet, for

12 all you know?

13     A      As far as I know, yes, ma'am.

14     Q      Okay.  And so one turbine unit is going to be

15 longer than 200 feet, correct?

16     A      I have no idea.  I never measured one.

17     Q      All right, sir.

18            And one turbine unit is made up of these

19 components that we talked about before, the high pressure

20 and, at Zion, three low pressure turbines and a

21 generator, correct, sir?

22     A      That's -- ma'am.

23     Q      And -- I'm sorry?

24     A      Yes, ma'am.

25     Q      And then there's also other things attached to

KINSER v. CBS CORP., Case No. 94-2282

1    it, which are reheaters?  Yes, sir?

2         A    Yes, ma'am.

3         Q    Okay.  Now, in 1974 when you were at Zion, you

4    do not recall which unit, 1 or 2, was broken down, --

5         A    No, ma'am.

6         Q    -- correct?

7         A    I do not.

8         Q    All right.  And so my, my question is:  Whether

9    it was 1 or 2, do you recall as you sit here now which

10   part of the turbine unit which composes itself -- we've

11   already discussed this -- of a high pressure turbine,

12   three low pressure turbines, and a generator -- which

13   part of the turbine had malfunctioned, if you know?

14        A    I do not know, ma'am.

15        Q    Okay.  So if we have testimony in this case

16   later that, in fact, the generator had malfunctioned, you

17   wouldn't have any information about that one way or the

18   other?

19        A    I would not, ma'am.

20        Q    All right.  But you would agree with me that

21   that would be a couple hundred feet away from where you

22   were working?

23        A    I have no idea, ma'am.

24        Q    But that's not in the area that you've

25   described where you were working, correct, sir?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    No.  I was working on the front of the turbine.

 2        Q    And by "turbine," we've got a picture up here

 3  with four turbines, right?  We've got a high pressure

 4  turbine, which is this one right here?

 5        A    Yes, ma'am.

 6        Q    And then we've got one, two, three low pressure

 7  turbines, --

 8        A    Yes, ma'am.

 9        Q    -- correct, sir?

10             And you were working in this area in this

11  piping that you've described, correct, sir?

12        A    Yes, ma'am.

13        Q    Okay.  So if it's the generator, which I've

14  circled in pink, that was malfunctioned in 1974, would

15  you agree with me that that was a couple hundred feet,

16  more or less -- or let me ask a better question.

17             You would agree with me that that was a long

18  distance from where you were working, correct, sir?

19        A    I guess it was.

20        Q    It would take longer for you to walk from that

21  generator to that turbine than it would take me to walk

22  from one end of this courtroom to the other.  Fair

23  enough?

24        A    I guess it is.

25        Q    Do you have a specific recollection in your
```

```
 1   mind right now of Zion power plant?
 2        A    Yes.
 3        Q    You worked at 100 power plants, or 100
 4   different jobs over the course of your life?
 5        A    Yeah.
 6        Q    You worked there for three or four months out
 7   of a 50-year history; but, right now, you remember what
 8   it looks like?
 9        A    Well, of course.
10        Q    All right, sir.
11             Now, would it surprise you to know that, even
12   though you and Mr. McCoy spent a lot of time talking
13   about gaskets, that this high pressure turbine did not
14   have any gaskets on it?
15        A    If you say so.
16        Q    Well, I'm not asking about that.
17             I'm asking whether or not that would surprise
18   you.
19        A    There was gaskets in the high pressure system.
20        Q    So you would disagree with me if I said there
21   weren't?
22        A    Yes, I would.
23        Q    All right.  So if, in fact, this high pressure
24   turbine was the type of turbine that was molded in such a
25   way so that the top of the turbine and the bottom of the
```

KINSER v. CBS CORP., Case No. 94-2282

1    turbine fit together so that gaskets were not necessary,

2    that would not be the turbine you remember at Zion,

3    correct?

4        A    That is probably true.  I didn't say anything

5    about gaskets on -- they, they did have gaskets in the,

6    between the top and the bottom of some kind.

7        Q    Yes, sir.

8            But you were working -- and I'm just going by

9    what you said -- you were working by the high pressure

10   turbine, and all of your testimony with Mr. McCoy was

11   about your observations of the high pressure turbine,

12   which you said you had a picture up here that it was

13   broken, and that's what they were working on, correct?

14           MR. McCOY:  Your Honor, I object.  This

15   misstates the testimony.

16           THE COURT:  Well -- are you able to take her

17   down?

18           COURT REPORTER:  Yes, I am.

19           THE COURT:  You are?  Wow, good for you.

20           MS. EZELL:  I'll do it again.

21           THE COURT:  Ask, ask the question again, and

22   would you humor me by being slower?

23           MS. EZELL:  I will.

24           THE COURT:  Thank you.

25           MS. EZELL:  I will try.  I don't do it on

1    purpose, Your Honor; it's just how I talk.

2              THE COURT:  I, I understand that.

3              MS. EZELL:  Okay.

4    BY MS. EZELL:

5        Q    Now, you testified with Mr. McCoy that you were

6    working in the area that we have high-- I have

7    highlighted in yellow --

8        A    Yes, ma'am.

9        Q    -- on what I'm now going to refer to as Defense

10   Demonstrative -- what is our next number? -- whatever our

11   next number is; I'll tell you in just a minute.

12             You were working in the yellow area right here,

13   next to the high pressure turbine.  Yes, sir?

14       A    Yes, ma'am.

15       Q    And this was the turbine that you described for

16   the jury earlier today was, was not working and that you

17   helped take part -- well, you took the blanket off of it?

18       A    Yes.

19       Q    You remember talking about that?

20       A    No.  It was not that, not that one that I took

21   the blanket off.  This was already in process of working.

22   I did not take the blanket off of whichever one that this

23   was.

24       Q    Yes, sir.

25             So you, you've described to us that you were

KINSER v. CBS CORP., Case No. 94-2282

1   working in this area.

2       A    Yes.

3       Q    And you described taking the blanket off of the

4   top of the turbine.  And how big did you say that the

5   turbine was?

6       A    I have no idea.  It was huge.

7       Q    "Huge," as in ten feet?  "Huge" as in 100 feet?

8   What kind of "huge" are we talking?

9       A    I have no idea.  I, I do not know the

10  dimensions of the turbine.

11      Q    Right.

12           But, but you have been willing, when Mr. McCoy

13  was asking you questions, to give rough approximations;

14  and I'm wondering if you can search your recollection and

15  give us an approximate estimate of how big the high

16  pressure turbine at Zion was, how long it was, and how

17  tall it was, if you can?

18      A    I cannot estimate.  I do not know.

19      Q    All right.  But, but you're sure that what

20  you're remembering was Zion?

21      A    Yes, ma'am.

22      Q    All right.  Now, when you were talking about

23  Mr. McCoy at the very beginning of your direct

24  examination, you described -- and you used these terms a

25  number of times -- "what we did," and "what was done back

1  then."

2          Do you recall talking about things like -- and

3  if I could, this is Plaintiff's Exhibit 96, previously

4  shown to the jury.  You talked about cement.  You talked

5  about block.  You talked about various tools.

6          Do you remember that, sir?

7      A    Yes, ma'am.

8      Q    And what you were describing at the beginning

9  of your direct examination was your recollection over the

10  course of your whole career, correct?

11      A    Not entirely.  No, ma'am.

12      Q    No, not entirely, because at 10:06, Mr. McCoy

13  said, "Now let's go to the Zion nuclear power plant."  Do

14  you remember that?

15      A    Yes, ma'am.

16      Q    So everything that you were talking about prior

17  to that was just your general recollections of the more

18  than 100 jobs that you had worked at that you now

19  remember as a collective memory.  Fair enough?

20      A    Yes, ma'am.

21      Q    All right, sir.

22          Now, getting to this bag of cement that's on

23  your screen now, --

24      A    The asbestos cement, ma'am.

25      Q    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              And you did say it was asbestos cement.
 2              Now, my question to you, sir, is:  If you were
 3   to go to the Lowe's -- do you ever go to the Lowe's or
 4   the Home Depot?
 5        A    Yes.  I know Lowe's and the Home Depot.
 6        Q    Yes, sir.
 7              And if you were to buy a bag of cement to put a
 8   pole in to hang a flag on, or to put up a basketball
 9   hoop, --
10        A    Yes, ma'am.
11        Q    -- and you were to open up that bag of cement
12   and you were to throw it up in the air, it would be right
13   dusty, wouldn't it?
14        A    I guess it would.  I've never tried it.
15        Q    Well, I haven't either, but I imagine it would
16   be dusty, correct, sir?
17        A    I suppose.
18        Q    But it wouldn't have any asbestos in it, would
19   it?
20        A    Not to my knowledge, it doesn't.
21        Q    All right.  So just because something is cement
22   doesn't mean it's asbestos, correct?
23        A    Do what?
24        Q    Just because something is cement doesn't mean
25   it's asbestos, correct?
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    I suppose you're correct.

2        Q    All right.  And the people who you testified,

3   when you were talking to Mr. McCoy, who told you, "Go get

4   the cement," --

5        A    Asbestos cement, ma'am.

6        Q    Yes, sir.

7             -- they're not here in the case; they're not

8   going to come and testify, are they?

9        A    I have no idea.

10       Q    Well, we haven't seen them yet, have we, sir?

11       A    No.

12       Q    Okay.  And it is your recollection -- not of

13   Zion in particular, but of your whole career -- that

14   people would say to you, "Go get the asbestos cement,"

15   correct, sir?

16       A    Yes, ma'am.

17       Q    You don't remember a time when that stopped

18   happening, do you, sir?

19       A    No.

20       Q    All right.  Oh, and we talked about this just

21   briefly, and I found my note.

22            You described that you took the asbestos

23   blanket off the turbine and that it was approximately 500

24   square feet.  Is that what you recall --

25       A    That's --
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    -- testifying?

2    A    That's an estimate.  I do not know the size of

3  it.

4    Q    But do you -- has anything that you and I have

5  talked about made you, make you question this answer

6  which you gave Mr. McCoy earlier today?

7    A    No.

8    Q    All right, sir.

9         So if it turns out that this high pressure

10  turbine and these low pressure turbines are not 500

11  square feet, then maybe the turbine you're recalling

12  removing those blankets from is not at Zion; maybe it

13  isn't, correct?

14    A    No.  That was not correct because I do not know

15  the size of the turbine at Zion.

16    Q    Yes, sir.

17    A    I do not have any idea how big it is or how big

18  the asbestos blanket was.  I'm just -- that was just an

19  estimate.

20    Q    Uh-huh.  Okay.  Now, I would like to show you

21  what we have marked as Defendant Demonstrative 234.  This

22  has been previously shown to the jury, and this is a

23  timeline which you've seen a couple different times in

24  this case, and it started with my opening statement.

25         Do you remember this?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    I remember something about it.  Yes, ma'am.

 2        Q    Okay.  You were here during the opening

 3   statements, which happened on Wednesday of last week?

 4        A    Yes, ma'am.

 5        Q    All right, sir.

 6             And I, I believe that we, we have some work to

 7   do on this together today because there are some things

 8   that I've learned that I had not learned before, so --

 9             MR. McCOY:  Your Honor, Your Honor, I object to

10   counsel's comments.  I mean --

11             THE COURT:  Yeah.  Ask a question.

12             MS. EZELL:  Yes, sir.

13   BY MS. EZELL:

14        Q    Now, you have talked with Mr. McCoy about

15   advertising.  You would agree with me that the

16   advertising, which you just indicated with Mr. McCoy that

17   you reviewed, came out before you started smoking,

18   correct, sir?

19        A    Yes.

20        Q    All right.  So, and you started smoking in

21   1949, correct, sir?

22        A    Somewhere along in that.

23        Q    All right.  So we can add your smoking

24   advertisement in here:  Before 1949, smoking ads.  All

25   right, sir.
```

KINSER v. CBS CORP., Case No. 94-2282

1           And then when did you graduate from high
2     school, sir?
3           A     1952.
4           Q     Okay.  So from 1952 to 1954, you worked as a
5     laborer, which -- tell the jury what a laborer is.
6           A     A laborer is a man that does anything,
7     everything.
8           Q     Is it a union job, sir?
9           A     No.  This was not.
10          Q     Okay.  And you worked as a laborer on a site
11    where your father was doing what, sir?
12          A     Pipefitting.
13          Q     Yes, sir.
14                And so during this time, from 1952 to 1954, he
15    was doing pipefitting in places where there was also
16    asbestos, correct, sir?
17          A     Far -- no.
18          Q     Okay.  What kind of pipefitting was he doing?
19          A     This was -- it was pipefitting, but this was --
20    where I was working with him was a Standard Oil truck
21    terminal.  There was no asbestos on the piping.
22          Q     They didn't have anything to insulate at --
23          A     No, ma'am.
24          Q     -- Standard Oil?
25          A     No, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q    But --
2        A    It was bare piping, and it was covered --
3        Q    Yes, sir.
4        A    -- with dirt and sand.
5        Q    Yes, sir.
6             And you later worked at Shell?
7        A    Yes, ma'am.
8        Q    And Shell Oil had all kinds of insulation?
9        A    Aboveground, yes, ma'am.
10       Q    Yeah.  But at Standard Oil, no insulation.  All
11  right.  We'll write that on here:  Standard Oil, no
12  insulation.
13            All right.  And then you were in the Army, and
14  you went to chiropractic school, correct?
15       A    Yes, for three or four months, until my --
16  until I couldn't get my G.I. Bill.
17       Q    And did you start chiropractic school before
18  you were discharged from the Army, sir?
19       A    No.  It was after the Army.
20       Q    All right.  We'll get that corrected.
21       A    In 1957.
22       Q    All right.  And it -- I guess -- so was that in
23  Davenport, Iowa?
24       A    Yes, ma'am.
25       Q    All right.  And you worked as a bartender,
```

KINSER v. CBS CORP., Case No. 94-2282

1  correct?

2      A    Yes, some.

3      Q    And then in 1962, you moved to Champaign,

4  Illinois.  Yes, sir?

5      A    Yes, ma'am.

6      Q    And then you joined the union that we've heard

7  about quite a bit during your direct testimony, union --

8  Plumbers and Pipefitters Local 149, based out of Savoy,

9  correct?

10      A    Yes, ma'am.

11      Q    But for the first five years, you were an

12  apprentice, correct?

13      A    Yes, ma'am.

14      Q    And then after five years, you got your union

15  card?

16      A    Yes, ma'am.

17      Q    All right, sir.

18          Now, and we heard that the, that -- well, let

19  me ask you this.  Part of being in the union, it's, it's

20  not just about getting work assignments; is that a fair

21  assessment of a union membership?

22      A    It's not --

23      Q    It's -- oh, I'm sorry.

24          It's not just about work assignments, correct?

25      A    Mostly, it is.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     There are other benefits; are there not, sir?

2      A     Other benefits?

3      Q     Yes, sir.

4      A     Well, yes.  We have our health insurance and

5   retirement fund.

6      Q     Yes, sir.

7            And, in addition, isn't there also --

8   especially back in the '70s, there's a -- and '60s --

9   there's a sense of -- you called each other "brothers";

10  did you not, sir?

11     A     We still call ourselves "brothers."

12     Q     Yes, sir.

13           And so there's a sense of brotherhood and

14  fraternity -- and now that extends to men and women --

15  but there's a sense of community associated with being in

16  a union; isn't that correct?

17     A     Yes.  It's just like lawyers.  They're the same

18  way.

19     Q     I have no answer to that one.

20           And your father was in the same union that you

21  were in, correct?

22     A     Yes, ma'am.

23     Q     So he was also a member of the, of the

24  Pipefitters and Plumbers Union, but he wasn't in the same

25  local as you?

1     A    He was always in the same local as I am.

2     Q    Oh, okay.  I apologize.  I misheard that.  I

3 thought he was in a local in Ohio.

4     A    No.  He was working in Ohio at the time that I

5 got hurt.

6     Q    So he was on a --

7     A    I think he was on --

8     Q    He must have had a card?

9     A    -- a travel card.  Yes, ma'am.

10     Q    Okay.

11     A    I'm not certain.

12     Q    Okay.  And another thing about being in a union

13 is that the union looked out for you, not just about

14 getting you a job, but sort of sticking up for you during

15 your job; is that a fair assessment?

16     A    Yeah.  Yes.  I guess it is, ma'am.

17     Q    And so one of the things that would come up in

18 the '60s, '70s, to -- and through today, but that is not

19 important -- so at least through 1994 when you retired --

20 '96 when you retired is something called a

21 "jurisdictional dispute," correct?

22     A    Yes.  I've heard of that.

23     Q    Yes, sir.

24          And what a jurisdictional dispute is -- and Mr.

25 McCoy mentioned it earlier today -- is when, let's say, a

KINSER v. CBS CORP., Case No. 94-2282

1   pipefitter and a millwright both think that they should

2   be given the work, a particular piece of work at a job

3   site.

4        A    Yes, ma'am.

5        Q    And so the union will come in and advocate.

6   The Pipefitters Union will come in and advocate for the

7   pipefitters; the Millwright Union will come in and

8   advocate for the millwrights, correct?

9        A    Yes, ma'am.

10       Q    All right.  And that will generally be worked

11  out with the two unions, as well as the companies

12  involved; they collaborate or they file disputes and work

13  it out later so that you-all are protected in your job

14  jurisdictions.

15       A    Yes.  The business agents take care of

16  every jurisdictional -- jurisdictional dispute.

17       Q    Okay.  And another thing that the union does

18  for you is that they provide you with information, right?

19  They keep you current on things like we've been talking

20  about, about jurisdictional issues, about what's going on

21  with your brothers in other locals; they provided you

22  with different types of information about that, correct?

23       A    Yes, ma'am.

24       Q    All right, sir.

25            And so what I'd like to show you now -- and if

KINSER v. CBS CORP., Case No. 94-2282

1    I could just show this to the witness and not the jury,

2    please --

3              MR. McCOY:  May I see this?

4              MS. EZELL:  This is Defendant's Exhibit 2285.

5              Can you give Mr. McCoy a copy.

6    BY MS. EZELL:

7        Q    And this is -- can you see that there?

8        A    [Nodding head up and down.]

9        Q    This is a monthly periodical that your union --

10   let me turn to the page where I can show you this is your

11   union; well, you may know it anyway -- but that your

12   union put out to each of the union members, correct?

13       A    It's not my union.  It comes out of the

14   headquarters of, main headquarters.

15       Q    Right.

16            And let me just show you right here; see where

17   I've got this right here, "The official publication of

18   the United Association of Journeymen and Apprentices of

19   the Plumbing and Pipefitting Industry of the United

20   States and Canada," and your union fell within the

21   jurisdiction of this headquarters, --

22       A    Yeah.

23       Q    -- which is an AFL-CIO Canadian oversight,

24   correct?

25       A    Yes, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And so these journals were journals that were

2    available to you to review and were sent to you, and they

3    provided you with all types of information, correct, sir?

4      A    Yes, ma'am.

5      Q    And, in fact, I don't know if it's this

6    episode -- or this journal or not, but are you a baseball

7    fan?

8      A    Pardon?

9      Q    Are you a baseball fan?

10     A    No.

11     Q    Okay.

12     A    Well, yes, but --

13     Q    Okay.

14     A    I, I follow the Cubs, but I'm not that close.

15     Q    All right, sir.

16          But some of these journals covered things from

17   politics to baseball, didn't they?

18     A    Yes, ma'am.

19     Q    All right, sir.

20          MS. EZELL:  And, and so, Your Honor, I would

21   now offer and ask permission to publish to the jury

22   Defendant's Exhibit 2285.

23          MR. McCOY:  Your Honor, may I just see the

24   document?

25          MS. EZELL:  Did you not just get a copy?

KINSER v. CBS CORP., Case No. 94-2282

1          Did somebody give him a copy?

2          This one just has my notes on it.  That's all.

3          (Brief pause in proceedings.)

4          THE COURT:  Well, we immediately, before anyone

5   says anything, are going to have a problem admitting the

6   whole magazine, which may have totally irrelevant

7   material in it.  But there may be some relevant material

8   in it, and it's only the relevant material that should go

9   to the jury.  Right?

10         MS. EZELL:  My intention, Your Honor, is to

11  draw his attention to relevant issues, not the baseball

12  section.  And then if you -- if it's Your Honor's

13  preference, I can submit a shortened version of this

14  magazine.

15         THE COURT:  It may have to be redacted.

16         MS. EZELL:  Yes, sir.  Absolutely.

17         THE COURT:  All right.

18         MR. McCOY:  My objection, my objection on this,

19  Judge, is, in part, what you just said.  The other

20  objection I have is, is still a foundation objection for

21  specific information in some of --

22         THE COURT:  Well, I think that --

23         MR. McCOY:  It hasn't been established that he

24  actually saw, saw this, read this one.

25         THE COURT:  Okay.  That would be a thing you

KINSER v. CBS CORP., Case No. 94-2282

1  should pursue.

2           MS. EZELL:  Well, Your Honor, part of the case

3  is whether or not this information was available to him

4  from whatever source, and that part we've already

5  established.

6           THE COURT:  I understand that, but how is it

7  going to hurt to ask, "Did you --

8           MS. EZELL:  It doesn't.

9           THE COURT:  -- read it?"

10          Go for it.

11          MS. EZELL:  It doesn't, but it doesn't -- well,

12 I'll just ask him.

13          THE COURT:  Yes.  That's the best you can do.

14 BY MS. EZELL:

15      Q    And when you had this made available to you,

16 sir, did you read these journals from time to time?

17      A    Sometimes, but not very often.

18      Q    All right, sir.

19          MS. EZELL:  And with that, Your Honor, I'd ask

20 permission to publish to the jury certain portions of the

21 journal.

22          THE COURT:  Do you know which portions she's

23 going to publish?

24          MR. McCOY:  No.  That was the question I had,

25 and I, I'd restate my objection to foundation as to this

KINSER v. CBS CORP., Case No. 94-2282

```
 1   portion --
 2          THE COURT:  Well, would you advise me somehow
 3   what you plan to publish?
 4          MS. EZELL:  Do you want me to show counsel over
 5   the lunch break, Your Honor?
 6          THE COURT:  What a splendid idea.  It's now --
 7   see if you can work that out.
 8          Be back at 1:00, please.  Don't discuss the
 9   case among yourselves or with anyone else.
10              (Jury absent, 11:58 a.m.)
11          THE COURT:  You may step down, Mr. Kinser.
12          We'll be in recess till 1:00.
13              (Recess, 11:58 a.m. to 1:01 p.m.)
14          THE COURT:  We were having a chambers
15   discussion, and I don't know if I misapprehended
16   something.
17          The demonstrative aid with the bag of cement
18   that Mr. Kinser testified the "asbestos cement," the big
19   word across the front is redacted.  Did I understand
20   correctly, Ms. Ezell:  You wanted it redacted?
21          MS. EZELL:  No, sir.  I wanted it unredacted.
22          THE COURT:  Then I did misapprehend that.  If
23   you want it unredacted, I'll get it unredacted.
24          You got a picture of it without being blocked
25   out?  What's it say?
```

KINSER v. CBS CORP., Case No. 94-2282

1        MR. McCOY:  It's got some company's name in

2   there.  I don't know what company's name it is.  It's

3   just got a brand in there.

4        THE COURT:  It doesn't say "asbestos"?

5        MR. McCOY:  No, just the company's name.

6        THE COURT:  Well, why in the world do you want

7   it?  To blame it on somebody else?

8        MS. EZELL:  Yes, sir.

9        MR. McCOY:  See, that's why --

10       THE COURT:  We're going to have an instruction

11  on that; that's not an affirmative defense.  It's an

12  argumentative denial.  We'll, we'll come to that when we

13  get to the conference on instructions.  You misapprehend

14  the law of Illinois of comparative fault.

15       MR. McCOY:  I can, I can get an unredacted copy

16  of it.

17       THE COURT:  No.  The word --

18       MR. McCOY:  I'm saying, Judge --

19       THE COURT:  It doesn't say "asbestos."  It says

20  the "Joe Blow Construction Company" or something.

21       And I, I agree it doesn't have any probative

22  value in this case, not the way the issues are.

23       Okay.  Then that's all on the record, and I did

24  misapprehend.  I thought it said "asbestos," and that's

25  why you wanted it out, but you didn't want it out at all?

KINSER v. CBS CORP., Case No. 94-2282

1            MS. EZELL:  I did not.

2            THE COURT:  Okay.  All right.  Then that's

3    cleared up.

4            Now, what else were we squab-- we were

5    disputing some --

6            MS. EZELL:  Yes, sir.  Over the lunch break, I

7    provided Mr. McCoy with much abbreviated versions of

8    three exhibits, the first of which we had started to

9    discuss with the witness prior to the lunch break.  And

10   these are three journals, pipefitter journals.

11           THE COURT:  Yeah.  I see nothing wrong with the

12   pipefitter journals, and they will be -- they're relevant

13   about information and knowledge and, and -- but, again,

14   only certain portions, maybe.

15           MS. EZELL:  Yes, sir.  And we've, we've taken

16   what were, in three cases, 40-page journals and taken

17   them down to five or six pages each.

18           THE COURT:  And you've agreed to that?

19           MR. McCOY:  I've agreed to it being redacted.

20   I was trying to understand what parts --

21           THE COURT:  Well, go ahead.

22           MR. McCOY:  These are official obviously --

23           THE COURT:  When you get it nailed down, let me

24   know.

25           MR. McCOY:  We will be ready in just a moment.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            THE COURT:  Sure.  That's splendid.  You're in
 2   agreement.
 3            (Brief pause in proceedings.)
 4            MS. EZELL:  Your Honor, there's a difference
 5   between showing Mr. McCoy a set of exhibits and
 6   previewing my cross-examination.  I'm a little bit
 7   uncomfortable telling him what I'm going to do in my
 8   cross-examination before I do it because I'm not exactly
 9   sure how it's going to play out.
10            I've given him the copies of the exhibits,
11   pared down to the pages I'm going to talk about; but I
12   don't really want to tell him what I'm going to say.
13            THE COURT:  I don't blame you a bit.  No.
14   That, that sounds like smart advocacy.  Okay.
15            But then, then you're just going to display
16   portions that deal with some sort of information about
17   asbestos?
18            MS. EZELL:  Your Honor, I'm going to, I'm -- I
19   will represent to the Court that everything I'm going to
20   talk to this witness about has some relevance to some
21   portion of this case, whether it has something to do with
22   the historical context --
23            THE COURT:  All right, with that assurance -- I
24   accept that assurance.
25            MS. EZELL:  Thank you, Your Honor.  We also --
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  You're welcome.

 2              MS. EZELL:  Oh, sorry, sorry, sorry.  I keep --

 3    I, I've done meditation on trying to stop that.

 4              We have, also, a video that we cannot seem to

 5    get the sound for, Your Honor.

 6              DEPUTY CLERK:  I'm calling my tech up to see if

 7    we can get it fixed.

 8              MS. EZELL:  Okay.  I believe Mr. McCoy has

 9    indicated he doesn't object to me playing the video.  I

10    would like to play it with sound during this

11    cross-examination; but if I can't get the sound, we might

12    just have to play it at a later time.

13              THE COURT:  I, I have seen and been in cases

14    where the lawyers played a piece of the deposition and,

15    and -- well, as I said:  Were you asked this question?

16    Did you give this answer?

17              MS. EZELL:  Oh, it's not, it's not --

18              THE COURT:  I mean, I've seen that done.  I

19    don't know what you're going to do.  But if you want to

20    play a piece of video, I'm not going object.

21              MR. McCOY:  I, I said to her, Judge, that the

22    video was fine to play.  It's possible I have an

23    objection to a question she asked.

24              THE COURT:  Well, that's different.

25              MR. McCOY:  But that's fine.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1               THE COURT:  That's different.

2               MS. EZELL:  And this is not a video deposition,

3    Your Honor.

4               MR. McCOY:  The video is okay.

5               MS. EZELL:  And so what I -- I guess what --

6    let me make my request clear and formal.

7               In the event that we are unable to resolve the

8    technology prior to my completion of my

9    cross-examination, I would request that the Court permit

10   me to recall this witness to ask questions about the

11   content of this video at a later time, which shouldn't be

12   a problem since he's here every day.

13              THE COURT:  I am going to reserve ruling to see

14   if the techie -- there she is -- all stand.

15                   (Brief pause in proceedings.)

16              THE COURT:  Let's press ahead.  Bring the jury

17   back, please.

18                   (Brief pause in proceedings.)

19                   (Jury present, 1:19 p.m.)

20              THE COURT:  I apologize, jurors.  We've been

21   delayed by technical problems and some other things.

22   Blame it on me.  It's my fault.

23              Okay.  Ask another question, Ms. Ezell.

24              MS. EZELL:  Yes, sir.

25              If I could have the ELMO, please.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MS. EZELL:

 2        Q    Okay.  Good afternoon, Mr. Kinser.

 3        A    Good afternoon.

 4        Q    You may recall that just prior to the lunch

 5   break we were discussing these, what we've referred to as

 6   the UA journals.  Do you remember that, --

 7        A    Yes, ma'am.

 8        Q    -- starting that conversation?

 9             And now usually these journals are about

10   40/50 pages long; but we have, with the Court's

11   assistance, made them a little bit shorter.

12        A    Okay.

13        Q    You understand that, correct?

14        A    Yes, ma'am.

15        Q    Okay.  And the first one that I'm showing you

16   is 22-- Defendant's Exhibit 2284.  And what is the date

17   on here?

18        A    November 1991.

19        Q    And again, please?

20        A    November 1991.

21        Q    And if I were to ask you if this is dated

22   November 1971, would you agree with me?

23        A    Yes, ma'am.

24        Q    Okay.

25        A    I'm sorry.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    That's okay.
 2             And now I'm going to just direct you to a
 3    couple different places in here and ask you about certain
 4    things.  Now, one of the issues in your case, as you
 5    know, is whether or not information was available to you
 6    about whether or not asbestos was dangerous or could kill
 7    you, correct?
 8        A    Yes.
 9             MR. McCOY:  Your Honor, I object to that
10    statement of the law at this point in time in this case.
11             MS. EZELL:  I'll rephrase.
12             Do you recall --
13             THE COURT:  Well --
14             MS. EZELL:  Oh.
15             THE COURT:  It's withdrawn.  All right.  You
16    may withdraw it.
17             MS. EZELL:  Withdrawn.  Yes, sir.
18    BY MS. EZELL:
19        Q    Do you recall testifying earlier this morning
20    that you knew before you were diagnosed with pleural
21    plaques that asbestos was dangerous, but you didn't know
22    it could kill you?
23        A    Yes, ma'am.  That's true.
24        Q    Okay.  So in this 1971 journal that was sent
25    out by your union -- could we focus on this, in a little
```

KINSER v. CBS CORP., Case No. 94-2282

1  bit?  Thank you.  All right.

2          Now, this page is entitled "Our Troubled

3  Environment," correct?

4      A    Yes.

5      Q    And it deals with a number of issues:

6  disclosure issues, Senate panel on water pollution.  But

7  right up here is the very first issue.  Do you see

8  "Asbestos as a Killer"?

9      A    Yes, ma'am.

10     Q    And would you agree with me, then, that one of

11 the areas where you could go for information in 1971 to

12 find out about the dangers and the extent of the dangers

13 associated with asbestos was to your union?

14     A    I don't think they knew about it then.

15     Q    Well, this is their publication, correct?

16     A    It comes from headquarters.  Yes.

17     Q    Yes, sir.

18          And so it says "Asbestos as a Killer," and

19 I'll, I'll -- if you could read along with me, it says,

20 "There's a study at Mount Sinai School of Medicine" --

21 I'm gonna read over here; it's easier for me -- "in New

22 York City, shows that men who worked for as little as one

23 year in an asbestos factory died of cancer at five times

24 the expected UA death rate," which is the same as the

25 title of this article -- or of this journal, "UA" -- so

KINSER v. CBS CORP., Case No. 94-2282

1  "at five times the expected union death rate for the

2  disease."

3            Do you see that I have approximated that first

4  sentence?

5      A    Yes, ma'am.

6      Q    And then the second sentence is about this

7  Dr. Irving Selikoff, the gentleman we've heard about,

8  testified about in this case.  Do you see that one?

9      A    Pardon?

10     Q    Do you see his name right there in that second

11 sentence?

12     A    Yes, ma'am.

13     Q    And then the first sentence of the second

14 paragraph is about a survey of insulation workers and the

15 deaths associated with asbestos.  Do you see that?

16     A    Yes.

17     Q    So you would agree with me that your union,

18 the -- let me make sure I read it right.  Well, of

19 course, I don't have it on that one.  I've, I've cut the

20 pages down; I don't have the title.

21            But in any event, the Plumbers and Pipefitters

22 Union put out this journal in 1971; and it talks about

23 exactly the issue we're talking about, which is asbestos

24 as a killer, correct?

25     A    It's talking about insulators there.  It's not

KINSER v. CBS CORP., Case No. 94-2282

1    talking about pipefitters.

2         Q    No, sir.

3              But it's talking about asbestos, correct?

4         A    Oh, yes.  It's talking about asbestos.  Yes,

5    ma'am.

6         Q    And so your union knew in 1971 that asbestos

7    was a killer, and it put it in its journal?

8              MR. McCOY:  Your Honor, I object to that

9    characterization of the question.

10             THE COURT:  Well, specifically why?

11             MR. McCOY:  Because he, he's not in a position

12   to know what his union knows.  He's in a position to say

13   that this was in their journal.

14             THE COURT:  Well, that's what she's asking him.

15   There is this article in the union magazine.  That,

16   that's the base question.  The union article -- the

17   article does appear in the union magazine.

18             Ask another question.

19             MS. EZELL:  All right.

20   BY MS. EZELL:

21        Q    So do you specifically recall when you were

22   discussing with Mr. McCoy earlier today that the

23   pipefitters -- "we," your group of eight -- at Zion did

24   not know the health risks associated with asbestos?  Do

25   you recall that?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    No, ma'am.  We did not.

2        Q    You did not?

3        A    No, ma'am.

4        Q    That was your testimony this morning, and

5  that's your testimony today?

6        A    Pardon me?

7        Q    That was your testimony this morning, and it's

8  still your testimony?

9        A    Yes.

10       Q    All right.  Now, if we look at -- well, let me

11  see what else is in this one.  There was something else I

12  wanted to draw your attention to.  Hold on.  All right.

13  I'll go back to that.

14            So if we go to 1972 -- now you've been sitting

15  here in this courtroom every day that we've been in this

16  trial, correct?

17       A    Yes, ma'am.

18            THE COURT:  You know that.

19            MS. EZELL:  Yes, sir.

20  BY MS. EZELL:

21       Q    And 22-- Defendant's 2285 is dated 1972,

22  correct?

23       A    Yes, ma'am.

24       Q    You see that right there?

25            All right.  And so this journal came out in
```

KINSER v. CBS CORP., Case No. 94-2282

1  1972, which you understand was the year that OSHA was

2  passed.

3       A    Okay.

4       Q    All right, sir.

5            And so inside this journal is an article, or is

6  a section on a page about asbestos standards being held

7  inadequate.  Do you see that?

8       A    Yes, ma'am.

9       Q    Now, this also is your union talking to the

10  members and the brothers of the union about issues

11  associated with asbestos, correct?

12      A    It looks like it.  Yes, ma'am.

13      Q    Okay.  And, in fact, it says that the leading

14  authority on asbestos-caused cancer is warning that tens

15  of thousands of workers exposed to asbestos would die

16  because of inadequate regulations issued by the

17  Occupational Safety and Health Administration.  Do you

18  see that?

19      A    Yes, ma'am.

20      Q    There was concern about that.  Do you see that?

21      A    Yes, ma'am.

22      Q    And, in fact, do you recall there being some

23  concern about the OSHA regulations not applying to

24  smaller work sites of less than 20 employees?

25      A    No.  I've never heard that, or seen that.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  Did you ever go to job sites that were
2  smaller than 20 employees?

3      A    Yes, we have.

4      Q    Okay.  And so at some point, did you ever get
5  concerned about the fact that OSHA might not apply to
6  those?

7      A    No, ma'am.

8      Q    Okay.  All right.

9           Now, returning your attention to the 1971,
10  which is Defendant's Exhibit 2284, we heard about,
11  earlier today, Local 597.  Do you remember testifying
12  about them?

13      A    [No response.]

14      Q    Local 597, you remember --

15      A    In Chicago.

16      Q    Chicago.

17           And so these are the -- this is a picture of
18  the fellas in 1971.  These are the same guys -- maybe not
19  the same guys, but these are members of the union that
20  kicked you out of Zion when they needed work; is that
21  correct?

22      A    It could be.  Yes, ma'am.

23      Q    All right, sir.

24           Now, 1973, I have our last journal, and it's
25  Defendant's Exhibit 2286.  And in addition to talking

KINSER v. CBS CORP., Case No. 94-2282

1    about asbestos and regulations that covered the

2    workplace, your union also talked to you about things

3    that were going on politically and economically, correct?

4              MR. McCOY:  Your Honor -- Your Honor, again,

5    that misstates what's going on here.  The union published

6    things in journals.  She -- the question misstates the

7    journals, that they talked to them.

8              THE COURT:  Well, --

9              MR. McCOY:  I object to that.

10             THE COURT:  -- she asked him if, if the union

11   did that.

12             And if you know, you may answer, Mr. Kinser.

13   If you know -- do you understand the question?

14             THE WITNESS:  No, sir, I didn't.

15             THE COURT:  Ask it again.

16   BY MS. EZELL:

17        Q    In addition to talking to you about things like

18   asbestos and jurisdictional issues that we've already

19   talked about, --

20        A    Yes, ma'am.

21        Q    -- and regulations, did the unions also discuss

22   with you, or convey information to you, about politics or

23   the economics of the times?

24        A    Sometimes they got into politics, but that,

25   that was between each member.  It wasn't the union itself

KINSER v. CBS CORP., Case No. 94-2282

1    saying, "Okay.  This is it."

2         Q    All right, sir.

3              Now, I'm going to show you part of

4    Exhibit 2286, and this is a report from the General

5    President, Martin J. Ward.  Do you know who he is?

6         A    Yes, I do.

7         Q    He was the president of the Plumbers and

8    Pipefitters Union, correct?

9         A    Well, he was the, the president of the --

10        Q    Over--

11        A    -- big corporation.

12        Q    --sight union?

13        A    Yes, ma'am.

14        Q    Okay.  And, and just because part of what we're

15   talking about in this case is the historical context, do

16   you recall this being -- the 1973 -- do you recall this

17   being true that, "The nation's energy crisis has become a

18   problem for all seasons.  There are fuel shortages in the

19   winter, gasoline shortages in the summer, rising prices

20   all year-round.  And, in addition, there is a constant

21   threat of blackouts and brownouts at peak periods of

22   electricity demand"?

23        A    Yes.  I remember that.

24        Q    You remember the energy crisis during --

25        A    Yes, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

1     Q     -- that time period?

2           And do you also recall the efforts that were

3     made during that time period to increase the United

4     States' self-sufficiency in the area of energy?

5     A     Yes.

6     Q     And nuclear power was one of the big focuses in

7     that area, correct?

8     A     Yes, it is.

9     Q     All right.

10    A     Or was.  Yes, ma'am.

11    Q     All right.  And another thing that the union

12    was involved with -- and we haven't talked about this

13    yet, but it's on this same exhibit that we've been

14    discussing, page 6, was boycotts and walkouts and things

15    of that nature, correct?

16    A     I don't remember any.

17    Q     Well, and -- were you ever -- were you ever

18    involved in a boycott, a walkout, or a strike?

19    A     On a strike, yes, ma'am.

20    Q     All right, sir.

21          And one of the reasons that unions were

22    involved with boycotts or walkouts or strikes could be --

23    it could be economics; it could be jurisdictional.  But

24    it could also be related to safety, correct, sir?

25    A     I don't think so.

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q    All right.  So if we look here, this is on

2   page 6 of the journal, and it is about a Shell boycott.

3   Do you see that?

4        A    Yes, ma'am.

5        Q    And you worked for Shell, correct?

6        A    Yes, ma'am.

7        Q    All right, sir.

8             And this is in the, in the Plumbers and

9   Pipefitters, who worked for Shell, and this is about a

10  walkout to protest the company's refusal to give them a

11  voice in establishing health safeguards and Shell's

12  refusal to negotiate pensions.

13            You see that?

14       A    Yes, ma'am.

15       Q    Would you agree with me that "health

16  safeguards" are safety issues?

17       A    I believe so.

18       Q    All right, sir.

19            Okay.  Now, I'd like to go back to Defendant's

20  Demonstrative 2334 and talk about your work history.

21  Now, you have described some of this, but I believe this

22  morning when Mr. McCoy put this demonstrative up, you

23  indicated that you cannot recall that you had worked at

24  all of these places.  Is that fair?

25       A    That's fair.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1       Q    Okay.  So let's see which ones you can recall.
 2  You did indicate that you recalled working at the
 3  University of Illinois in Champaign, correct?
 4       A    Yes, ma'am.
 5       Q    All right.  Now, do you recall working at All
 6  Temp Insulation?
 7       A    Not to my recollection.
 8       Q    All right, sir.
 9            I'm going to -- I would like to show the
10  witness a document and not the jury, please.
11            Oh, I can't see it when I do this, can I?
12            MR. McCOY:  Which exhibit --
13            MS. EZELL:  It's Defendant's Exhibit 2301.
14  BY MS. EZELL:
15       Q    Do you see the document?  Can you read it?  I
16  can't tell if it's centered properly.  You know what --
17       A    I see it.  I see it.  It's fine.
18       Q    I can't -- I have to turn pages.
19            Okay.  All right.  So do you see this, and is
20  this your signature down here?
21       A    Yes, ma'am, it is.
22       Q    All right.  And now let me flip over to this
23  here page.  Now, this Exhibit A, do you see that?
24       A    Yeah.
25       Q    Okay.  And, and did the first page say that
```

KINSER v. CBS CORP., Case No. 94-2282

```
1    these are places that you had worked?

2        A    Are some of the places I worked.  Yes, ma'am.

3        Q    Okay.  And is Argo on there?  You can keep

4    that.

5        A    Yes.  Argo's on there.

6        Q    All right.  Could we have the ELMO back,

7    please.

8             All right.  And how about All Temp?  Is that on

9    there?

10       A    All Temp, yes, it's there.

11       Q    How about Anaconda Aluminum?

12       A    It is not on there.

13       Q    All right.  I'll bring you another one.

14             (Brief pause in proceedings.)

15       Q    All right.  Well, let's get through what's on

16   there, and then we'll come back.  Tell me what else is on

17   there.  Read me what else is on there.

18       A    Ashland Refinery.

19       Q    All right, sir.

20       A    Builders Supply.

21       Q    Yes, sir.

22       A    Burnham Hospital.

23            Caterpillar Plant.

24       Q    All right.

25       A    Cholla powerhouse.
```

KINSER v. CBS CORP., Case No. 94-2282

1     Q    Yes, sir.

2     A    Clay City Schools.

3     Q    Yes, sir.

4     A    Keokuk power station.

5     Q    Yes, sir.

6     A    Shell Refinery.

7     Q    Shell.

8     A    University of Illinois.

9     Q    All right.  All right.  So Burnham is here, and

10   what years does that say you worked, if it does, that you

11   worked at Burnham?

12    A    It's -- all of them are, all except for the --

13   well, let's see.  Brian?  I don't have a Brian on here.

14    Q    Burnham.

15    A    Burnham Hospital?

16    Q    Yes, sir.

17    A    '96.

18    Q    Okay.  And then it also had Shell on there; is

19   that correct?

20    A    Shell Refinery, yes, ma'am.

21    Q    And what years do you have down for that?

22    A    '90-'94.

23    Q    All right, sir.

24         Okay.  Now, do you remember giving a deposition

25   in this case, sir?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Give a deposition on what, ma'am?

 2        Q    Did you remember giving a deposition in this

 3   case?

 4        A    Yes, ma'am.

 5        Q    And do you remember at that deposition being

 6   asked about where you worked?

 7        A    I do not recall.  No.

 8        Q    Okay.  All right.  Let's get -- all right, sir.

 9             MS. EZELL:  Give me a minute here, Your Honor,

10   I'm just getting organized here.

11                  (Brief pause in proceedings.)

12   BY MS. EZELL:

13        Q    I'm going to give you some more.  Trade you.

14   Thank you.

15             Okay.  Just hold on to those, and I'll ask you

16   to do some stuff with them in just a second.

17             All right, sir.  Do you have -- at the bottom,

18   there's blue exhibit stickers.

19        A    Yes.

20        Q    Do you see those?

21        A    Yes, ma'am.

22        Q    And can you find blue exhibit sticker 2329?

23        A    I have it right here.

24        Q    Okay.  And is this a document that has your

25   signature at the bottom?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes, ma'am, it does.

2      Q    And you signed it under oath?

3      A    Yes.  Well, --

4      Q    You see the notary there at the bottom?

5      A    No.  This was not signed under oath.  It says

6  it's signed to the best of my -- it's signed and

7  subscribed to.  This is the --

8      Q    The Notary signed it?

9      A    The Notary signed it.

10     Q    Okay.  So it was signed and notarized, so we

11  know it's your signature?

12     A    Yes, ma'am.

13     Q    Okay.  Now, in this -- let me ask you this:  So

14  for the Ashland Refinery -- that one's listed on there,

15  correct?

16     A    Yes, ma'am.

17     Q    Now, does it indicate -- or let me ask you.  I

18  could call your attention to paragraph 3.  At the Ashland

19  Refinery, did you regularly engage in activities or work

20  in close proximity to others engaged in activities that

21  caused the release of asbestos fibers in the air?

22     A    One minute, please.

23     Q    Yes, sir.

24          (Brief pause in proceedings.)

25     A    I see, on paragraph 3, yes, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     And did you also, while you were at Ashland,

2  breathe in asbestos dust for the time period that you

3  worked at that job site?

4      A     Yes, ma'am.

5      Q     And you worked at that job site, which is

6  located in St. Paul, Wisconsin, correct, sir?

7      A     Yes.

8      Q     And you worked there -- the first year you

9  worked there was 1963, correct?

10      A     Yes.

11      Q     And the last year that you worked there was

12  1995, correct?

13      A     Not necessarily, no.

14      Q     Well, --

15      A     This was a time period, not exact dates.

16      Q     You worked there off and on between 1963 and

17  1995?

18      A     No, ma'am.  On and off.

19      Q     On and off?

20      A     I worked there, come home, worked there, come

21  home.  I did not stay there for all, all the time.

22      Q     You weren't there from 1963 to 1995?

23      A     Oh, no.

24      Q     You went there sometimes, and you'd come back;

25  and you'd go back?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.

2      Q    So the very first time you would have been

3  there is '63, and the last time you would have been there

4  is '95?

5      A    It could be that way.  I, I -- I would say so,

6  yes, '63 till '95, or somewhere along in there.

7      Q    And when you, when you signed this document,

8  what you said was, is that the first year that you were

9  there was '63, and the last year that you were there was

10  '95?

11      A    Yes.  That's what it says.

12      Q    Yes, sir.

13          And while you were there, if I can direct your

14  attention to paragraph 4, you were exposed to

15  asbestos-containing products for at least six months.  Do

16  you see that?

17      A    Yes, ma'am.

18      Q    Including Flex-a-lite gaskets.  Do you see

19  that, sir?

20      A    Yes, ma'am.

21      Q    And Fel-Pro gaskets?

22      A    Yes, ma'am.

23      Q    And those are brand names for gaskets, correct?

24      A    Yes, ma'am.

25      Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

1              Now, if you could next go to the Caterpillar

2    plant.  Do you see that?

3        A    Yes, ma'am.

4        Q    And that's -- and we're going to do this a

5    little bit quicker if we can.  If we can't, we won't.

6              The Caterpillar plant, which is in Joliet,

7    Illinois, you worked there, correct?

8        A    Yes.

9        Q    You also worked at Cholla powerhouse in St.

10   John, Arizona?

11       A    Yes.

12       Q    You worked at Keokuk power station in Keokuk,

13   Iowa?

14       A    Yes.

15       Q    And University of Illinois, Champaign,

16   Illinois?

17       A    Yes.

18       Q    And you worked at each of those locations for

19   the first time in 1963 and for the last time in 1995,

20   correct?

21       A    That's what this says.  That's not what I

22   meant.

23       Q    But that's what you said when you signed this

24   document?

25       A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1        Q     All right, sir.

2              And at each of those locations, you regularly

3    engaged in activities and worked in close proximity to

4    others engaging in activities that caused the release of

5    asbestos into the air?

6        A     Yes, ma'am.

7        Q     And you breathed that asbestos?

8        A     Yes, ma'am.

9        Q     All right, sir.

10             And at all of those locations, which we've just

11   described, you were exposed to asbestos-containing

12   products for at least six months, called Flex-a-lite

13   gaskets and Fel-Pro gaskets?

14       A     Yes, ma'am.

15       Q     And each of them individually?

16       A     Yes.

17       Q     All right, sir.

18             Now, if you could turn to Defendant's

19   Exhibit 2328.  The blue sticker at the bottom will help

20   you find it.

21       A     2328?

22       Q     Yes, sir.

23       A     Yes, ma'am.

24       Q     Okay.  Now, this one has a number of different

25   job locations on it as well.

KINSER v. CBS CORP., Case No. 94-2282

1      A      Uh-huh.

2      Q      All of these, except for the University of

3  Illinois, have the same employment dates.  Do you see

4  that?

5      A      Yes.

6      Q      All of them are from 1963 to 1995; --

7      A      Yes, ma'am.

8      Q      -- do you agree with that?

9      A      Yes, ma'am.

10     Q      Except for the University of Illinois, which is

11  from 1962 to 1996?

12     A      Yes, ma'am.

13     Q      Okay.  I think we're going to get in trouble

14  here in a minute if we -- if you don't wait till I finish

15  asking the question before you answer because I'm getting

16  "the look."

17            Okay.  And so let me just name these locations,

18  and then I'll ask you some questions about them.

19            So one is All Temp Insulation at La Crosse,

20  Wisconsin; one is Argo Starch, Argo, Illinois; Ashland

21  Refinery again, in St. Paul, Wisconsin; Builders Supply,

22  Peoria, Illinois; the Caterpillar plant, Joliet; Cholla,

23  St. John, Arizona; Clay City Schools in Clay City,

24  Indiana; Keokuk again, in Keokuk, Iowa; and University of

25  Illinois again, in Champaign.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            And so you worked at all those places?
 2      A    Uh-huh.
 3      Q    And at all --
 4            THE COURT:  Say "yes" or "no," Mr. Kinser.
 5            THE WITNESS:  Yes.  I'm sorry.
 6            THE COURT:  All right.
 7      A    Yes, ma'am.
 8      Q    And at all those places, looking at paragraph
 9  2, you were employed as a pipefitter, correct?
10      A    Yes, ma'am.
11      Q    And looking at paragraph 3:  At all of those,
12  you were regularly engaged in activities -- or you worked
13  next to people who were engaged -- crumbling and
14  pulverizing asbestos, correct?
15      A    Yes, ma'am.
16      Q    And those people who were crumbling and
17  pulverizing asbestos created finely divided airborne
18  asbestos dust, correct?
19      A    Yes.
20      Q    And you, sir, at all of these plants, breathed
21  in asbestos dust through the course of your employment,
22  correct?
23      A    On this?  No.
24      Q    If you look at page -- at paragraph 3, it
25  indicates that you have signed this document, again with
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1  a notary.
 2        A    Yes, ma'am.
 3        Q    And you signed the document that said:  When
 4  they were pulverizing and creating fine asbestos dust,
 5  that you, --
 6        A    Yes, ma'am.
 7        Q    -- in fact, breathed it in?
 8        A    Yes, ma'am.
 9        Q    Okay.  And now you're saying that you didn't
10  breathe it in, even though it was there?
11        A    This is, pertains to the University of Illinois
12  that is circled, not the rest of these.
13        Q    Sir, the products are identified by the
14  circles, but you only fill in the form as to the places
15  that you worked; isn't that correct, sir?
16        A    I did not fill any, any circles out on this
17  one, ma'am, just on the University of Illinois.
18        Q    Yes, sir.
19             Let me show you.  Just compare one form to the
20  other.  Product identification, which we're getting ready
21  to get to, is done by circles, so this is where you know
22  what products you worked at.
23             But on this one, you listed only four places;
24  and on this one, you listed all these other places,
25  correct?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A    This says that I crushed asbestos at all of

2  these plants, right?

3      Q    It says either you did, or some folks around

4  you did.

5      A    I, I did not crush or do anything in any of

6  these places except the University of Illinois, which I

7  have circled the things that I did.

8      Q    Okay.  But other people around you in these

9  other plants crushed and pulverized asbestos, correct?

10     A    I don't know whether they did or not, ma'am.

11     Q    Well, and let me just ask you this:  When you

12  signed this document on the 31st of October in 2008, did

13  you believe it to be true then?

14     A    No.  I -- this is just the University of

15  Illinois on the paper.  It does not say anything about

16  any of the rest of the places that I worked, ma'am.

17     Q    Yes, sir.

18          And so you didn't cross out the section that

19  says, "I breathed in asbestos," correct?

20     A    Pardon?

21     Q    You didn't cross out the part that says you

22  breathed in asbestos, correct?

23     A    I did, at the university.

24     Q    Yes, sir.

25          And if, if you read this document, paragraph 3

KINSER v. CBS CORP., Case No. 94-2282

1   applies to all of the companies listed in paragraph 5,

2   correct?

3       A    No, ma'am.

4       Q    Let's read paragraph 5.  "I was exposed to the

5   above [products] for at least six months.  In addition, I

6   have five years of occupational exposure.  To the best of

7   my recollection, I was exposed to asbestos-containing

8   product(s) while working at the below job site(s)."

9           Do you see that?

10      A    I under-- I understand where you're coming

11  from.

12      Q    Yes, sir.

13      A    But the places that I have, did this was only

14  one place, and that was the University of Illinois.

15      Q    All right.

16      A    The rest of those, I did not circle.  So I, I

17  didn't do that at these places.

18      Q    So, and what -- for what purpose did you say

19  that you did?

20      A    This was just a list that they, they sent me

21  and, to circle the products that are listed in paragraph

22  4 --

23      Q    Yes, sir.

24      A    -- that I used at different places.  And

25  University of Illinois is the only place that -- some of

KINSER v. CBS CORP., Case No. 94-2282

1   these places -- this, in paragraph 4, was used.

2       Q    All right.  So, so let me just -- you did work

3   at all these places?

4       A    Yes.

5       Q    And the only point of difference that you have

6   with me is with the words "crumbled and pulverized"?

7       A    No.  There's no difference between "crumble"

8   and "pulverize."

9       Q    The only distinction that you have as between

10  your job at the University of Illinois and your other

11  positions is that you're agreeing with me that you

12  crumbled and pulverized asbestos there, but you didn't do

13  it at the other places, correct?

14      A    The places that are listed in paragraph 4, --

15      Q    Yes, sir.

16      A    -- I did not use any of them in the rest of

17  these places.

18      Q    Uh-huh.

19      A    That's what I'm trying to say.

20      Q    All right.  So go to paragraph 6 then.  Now,

21  this is a paragraph where you have to check a box, right?

22  You have to pick something, and you can pick all or none

23  of these boxes.

24      A    Yes, ma'am.

25      Q    So, so read in paragraph 6; it says, "To the

KINSER v. CBS CORP., Case No. 94-2282

1 best of my recollection, I was exposed in the following

2 way(s)."

3          Number one -- and you put an X in front of

4 this -- "I altered, repaired, or otherwise worked with an

5 asbestos-containing product such that he was exposed on a

6 regular basis to raw asbestos fibers."

7          Is there an X in front of that?

8     A    Yes, ma'am.

9     Q    All right.  The second box:  "I was employed in

10 an industry or occupation such that I worked on a regular

11 basis in close proximity to workers who altered,

12 repaired, or otherwise worked with an asbestos-containing

13 product."

14          Did you put an X in front of that?

15    A    Yes, ma'am.

16    Q    All right.  So as it relates to Defendant's

17 Exhibit 2328, you worked at All Temp, Argo, Ashland,

18 Builders, Caterpillar, Cholla, Clay, Keokuk, and

19 University of Illinois, correct?

20    A    Yes, ma'am.

21    Q    And the University of Illinois is different

22 than all of these other places because there you engaged

23 in crumbling and pulverizing asbestos?

24    A    Yes.

25    Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              But in all these other places, you inhaled

 2    asbestos, correct?

 3         A    As far as I remember, yes, ma'am.

 4         Q    You worked around people who were working with

 5    asbestos?

 6         A    As far as I remember, yes, ma'am.

 7         Q    You worked as a pipefitter?

 8         A    Yes, ma'am.

 9         Q    So you yourself were working on asbestos?

10         A    Pardon?

11         Q    So you yourself were working on asbestos?

12         A    Probably.  Yes, ma'am.  But not --

13         Q    But you're not sure?

14         A    Pardon?

15         Q    You're not sure?

16         A    I'm positive that I worked with asbestos.  Yes,

17    ma'am.

18         Q    All right, sir.

19              And, now, to get to the products, you've

20    identified certain products that you remember by name

21    working at at one or more of these locations that we've

22    just described, and those products include:  DH Mineral

23    Fiber Coating, which is a type of cement, correct?

24         A    Yes.

25         Q    Refractory cement, correct?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    Yes.

 2      Q    Asbestos rope, correct?

 3      A    Yes.

 4      Q    Asbestos tape, correct?

 5      A    Yes.

 6      Q    Metalkase Nucon fire brick, correct?

 7      A    Yes.

 8      Q    And Metalkase Nucon fire brick contains

 9 asbestos, correct?

10      A    Yes.

11      Q    Tabexkase Nucon fire brick, correct?

12      A    Yes, ma'am.

13      Q    And Metalkase Nucon fire brick again?

14      A    Yes, ma'am.

15      Q    Okay.  And now we've done these two.  Our final

16 one is Defendant's Exhibit 2330, if you could turn to

17 that, please.

18      A    This still hasn't been cleared up on this --

19      Q    Yes, sir.

20      A    -- as far as I'm concerned.  No, ma'am.

21      Q    Okay.  Well, let's go to 2330.

22      A    Yes.

23      Q    And this is another time where you've signed

24 the document, correct?

25      A    Yes, ma'am.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And on this one, there's just four job sites,

2  right?

3      A    Yes.

4      Q    Caterpillar, Clay City, Keokuk, and the

5  University of Illinois?

6      A    Yes, ma'am.

7      Q    And you worked as a pipefitter.  It says that,

8  correct, on this document?

9      A    Yes, ma'am.

10      Q    And it also indicates that you regularly

11  engaged in activities where you worked in close proximity

12  to others engaged in activities that crumbled and

13  pulverized asbestos; it says that on this document as

14  well, correct?

15      A    Yes, ma'am.

16      Q    Creating finely divided airborne asbestos dust?

17      A    Yes, ma'am.

18      Q    You breathed in the asbestos dust through the

19  course of your employment, correct?

20      A    Yes, ma'am.

21      Q    And you worked with a product by the name of

22  Worthington, correct, paragraph 4?

23      A    I'm sorry?

24      Q    Paragraph 4, you see the circles there?

25      A    Yes, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

```
1         Q     You worked with a manufacturer named
2    "Worthington"?
3         A     Yes, ma'am.
4         Q     You worked on their pumps, correct?
5         A     Yes.
6         Q     On their compressors?
7         A     Yes.
8         Q     And on their turbines?
9         A     Yes, ma'am.
10        Q     And those turbines, do you recall specifically
11   the dimensions of those turbines, sir?
12        A     No.  Just like I said for the other turbine, I
13   do not recall the, the length of them, the heighth, the
14   width.
15        Q     Yes, sir.
16              So at the Caterpillar plant, how many turbines
17   were there?
18        A     Pardon?
19        Q     At the -- I'm sorry.  At the Caterpillar plant,
20   how many turbines were there?
21        A     They -- I didn't work at any turbine at the
22   Caterpillar plant.
23        Q     All right.  At the Clay City Schools, were
24   there any turbines?
25        A     I didn't work at any turbines there.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q     All right.  Were there any there, in spite of
 2   whether you worked on them or not?
 3        A     No.  There was none there.
 4        Q     At -- there were at Caterpillar, though?
 5        A     I -- if there was, I don't know.
 6        Q     And at Keokuk, the power station, how many
 7   turbines were there?
 8        A     I have no idea, ma'am.
 9        Q     All right, sir.
10              And at the University of Illinois, how many
11   turbines were there?
12        A     I'm not positive, but I think there was three.
13        Q     And what did the blankets look like for those?
14        A     They're asbestos blankets.
15        Q     Yes, sir.
16              What did they look like?
17        A     Like the picture on the other one.
18        Q     Were they pre-made to fit the turbine, or were
19   they blankets that just basically looked like a comforter
20   that you put on your bed that had to be cut and, and put
21   on top of a turbine once you got there?
22        A     I think they were pre-made, ma'am.
23        Q     All right, sir.
24              And what year, between 1962 and 1996, do you
25   remember them being pre-made?
```

KINSER v. CBS CORP., Case No. 94-2282

1        A    I don't remember, ma'am.

2        Q    All right, sir.

3             And what was your job at the University of

4    Illinois relative to the turbines?

5        A    With these turbines?

6        Q    Yes, sir.

7        A    Tearing them apart and having them repaired.

8        Q    Yes, sir.

9             And in conjunction with your work at the

10   University of Illinois, working on those turbines

11   there -- which were not Westinghouse turbines, correct?

12       A    Not to my knowledge.

13       Q    No, sir.

14            They were Worthington turbines, right,

15   according to your document?

16       A    Yes.

17       Q    Yes, sir.

18            How, how big was the room that they were in?

19       A    I have no idea.

20       Q    When you're talking about the turbines, how

21   many high pressure versus how many low pressure were

22   there?

23       A    There was one high pressure and two low

24   pressure ones.

25       Q    Okay.  So it was just one turbine unit then?

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A     There was three or four -- two or three.  Two

 2  or three.  I'm not, I'm not positive.

 3      Q     Yes, sir.  Okay.

 4            MS. EZELL:  Your Honor, may I just see if the

 5  technology has been --

 6            THE COURT:  Well, Ms. Burlison, did Ms. Fleming

 7  give you a cable that works now?

 8            MS. BURLISON:  She did, Your Honor.

 9            MS. EZELL:  Do we know --

10            MS. BURLISON:  We have not tested the sound.

11            MS. EZELL:  Can we give it a test?

12            THE COURT:  I couldn't hear.

13            MS. EZELL:  May we test it, or should we just

14  see if it goes -- we'll just go live?

15            THE COURT:  Or you can go live with something

16  else if, if it's --

17            MS. EZELL:  I think this is a good time, if

18  we -- if I could just lay a foundation, and then we'll

19  see what happens.

20            THE COURT:  Go for it.

21            MS. EZELL:  All right.

22  BY MS. EZELL:

23      Q     Do you recall, sir, testifying, when you were

24  talking with Mr. McCoy, about spending 20 to 30 percent

25  of your time while you were at Zion putting insulation
```

KINSER v. CBS CORP., Case No. 94-2282

1  on, or being around people who were putting insulation on

2  piping?

3       A    Yes, ma'am.

4       Q    All right, sir.

5            What I would like to do, sir, is show a video

6  of some insulators and pipefitters doing some piping back

7  in the time frame that we're talking about; and then I'd

8  like to ask you some questions about it, and it's just a

9  couple minutes.

10      A    Fine.

11      Q    All right.  Let's cross our fingers.

12           MS. EZELL:  All right.  We're ready, I hope,

13  Ms. Jessica.

14           MR. McCOY:  Your Honor, I just want to make

15  sure -- okay.  I think we got the background as to who

16  shot this video.

17           MS. EZELL:  Well, it wasn't me.

18           MR. McCOY:  This is a U.S. Army video, I

19  believe, War Department video.

20               (Brief pause in proceedings.)

21           MS. EZELL:  It's not working.

22           All right.  Can we just pause it.

23  BY MS. EZELL:

24      Q    In just a minute, Mr. Kinser, we're going to

25  get to the part where they're doing insulation.  And

KINSER v. CBS CORP., Case No. 94-2282

1   because we don't have the benefit of volume, I'm just

2   going to have Ms. Burlison pause it; and I'll ask you a

3   question or two.  Okay?

4        A    Yes, ma'am.  Fine.

5        Q    All right.  Can you please play the video, Ms.

6   Burlison.

7             (Exhibit is published in open court.)

8        Q    Now, what's he doing?

9        A    He's covering the cover over the asbestos pipe

10  covering.  There is a -- after you put your asbestos on,

11  you put a cover over that, and then it's kind of like

12  a --

13       Q    Can you pause it?

14       A    -- paste that you put over that to seal the

15  cover over the insul-- asbestos insulation.

16       Q    All right.  Now, what you're calling

17  "asbestos," this video refers to as "insulation,"

18  correct, if you look at what's on your screen right now?

19       A    Canvas insulation, yes.

20       Q    Yes, sir.

21            And so do you recall a time when the insulation

22  material became something other than infused with

23  asbestos?  It had fiberglass; it was made of other

24  materials.  Do you remember when that happened?

25       A    As far as I know, it never did happen.

KINSER v. CBS CORP., Case No. 94-2282

```
1         Q    All right, sir.

2              If you could go ahead and play the video.

3              (Publishing of exhibit continues.)

4         Q    And that's a pipe cover, correct?

5         A    I think that's what it is, but I'm -- I won't

6    swear it to.

7         Q    All right.  We'll find out together.

8              Do you know what that is?  That's clay, right?

9         A    I don't know what that is, ma'am.

10        Q    Well, if I tell you that -- okay.

11             Can you pause the video?

12             If I tell you that that's mixed clay, or mixed

13   cement, what would be the purpose of that in pipefitting?

14        A    To put around joints.

15        Q    To do what with --

16        A    Bends.

17        Q    To seal them up?

18        A    [Gesturing.]

19        Q    To seal them up?

20        A    No.  To keep, just insulation.  Just like your

21   straight length would cover the pipe, --

22        Q    Yes, sir.

23        A    -- they would make this mud and put it around

24   the joints.  That was before they had pieces that were

25   molded for these different joints.
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    All right.  Go ahead.

2              (Publishing of exhibit continues.)

3    Q    He's taking the canvas off of the insulation

4    right now, correct?

5    A    No, he's not.  He's just taking -- they have a

6    covering on that that holds the two pieces together.

7    They just take part of it off to where the two pieces

8    fall apart.  They slap it back on the pipe and put that

9    as-- adhesive on there, and then they put their canvas on

10   there.

11   Q    All right.  I think we just saw the different

12   sizes that were available.

13   A    Yes.

14   Q    And what's he painting on that?

15   A    He's painting, probably, what they call "glue"

16   that -- after the two pieces are put together to hold

17   them in place, that is kind of like a sock that fits

18   over; and it's held, holds these pieces in place.

19   Q    Well, where's all the dust?

20   A    Pardon?

21   Q    Where's all the dust?

22   A    That's the canvas that he's putting on.

23   Q    Yeah.

24              Where's the snow and the dust and the asbestos

25   all flying around that we heard about this morning?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    He's very careful.

 2        Q    He's very careful?

 3        A    Yes, ma'am.

 4        Q    Oh.  He's doing the same job you did, though,

 5   right?

 6        A    Sometimes.

 7        Q    Yes, sir.

 8             And he's doing the same job that people around

 9   you were doing, right?

10        A    Sometimes.

11        Q    And you agree with me that it doesn't look that

12   dusty in his work area when he's doing his work, correct?

13        A    Not on this video, no, ma'am.

14        Q    And you heard Mr. McCoy say before the video

15   started:  I didn't make this video?

16        A    The what?

17        Q    I did not make this video.

18        A    That's fine.

19        Q    Yes, sir.

20        A    There's dust there.

21        Q    There was a little bit of dust there.  Yep.

22        A    So there is dust in there.

23        Q    All right.  So that is a clay -- what do you

24   call that?  Clay?

25        A    Asbestos mud.
```

KINSER v. CBS CORP., Case No. 94-2282

1     Q     Well, you call it mud?

2     A     Asbestos mud.

3     Q     Yes, sir.  I -- yes, asbestos mud.

4           That's not very dusty, though, is it?

5     A     It de-- not after it's mixed with water, no.

6     Q     No.

7           In fact, it's got, like, a Play-Doh

8  consistency?

9     A     Yeah.  You can do that.

10    Q     Yeah.  All right.

11    A     But before, it comes in a bag, dry.

12    Q     Yes, sir.

13    A     And then you mix water with it, and all -- when

14 you're mixing that water with it, all that dust comes up

15 into your face.

16    Q     And, and the dust that comes into your face, if

17 there's no asbestos in the cement, then the dust that

18 comes into your face doesn't have any asbestos it in

19 either, right?

20    A     This was asbestos cement, ma'am.

21    Q     But if it wasn't asbestos cement, if it was

22 just the stuff like we talked about at the Lowe's and the

23 Home Depot, that dust gets in your face, too, but there's

24 no asbestos in there, right?

25    A     I have no idea.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  Well, I think without the volume,

2   we've exhausted the helpfulness of this video, Your

3   Honor, unless Mr. McCoy wants to play it through.  I've

4   gotten everything I need out of it.

5          MR. McCOY:  I've got no need for any further on

6   it, Judge.

7          THE COURT:  Okay.  Very well.  Shut it down.

8   BY MS. EZELL:

9      Q    Now, while you were working at these locations

10  that we have discussed, you don't specifically recall who

11  your employer was at any particular job, do you, sir?

12     A    No, ma'am.

13     Q    The, the custom and practice was for you to be

14  assigned from the union to a general coun-- or general

15  contractor, and that could be any number of folks,

16  correct?

17     A    Yes, ma'am.

18     Q    Okay.  But one thing you recall specifically is

19  that during the time that you were working at Zion you

20  were not a Westinghouse employee, correct?

21     A    Very definitely true.

22     Q    All right, sir.

23          You were -- were you a Commonwealth Edison

24  employee, the people who owned the plant?

25     A    No, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    All right, sir.

2            And you don't, as you sit here today, remember

3       the name of the folks who cut your paycheck during that

4       time period?

5       A    No, ma'am.

6       Q    Now, in addition to the products that we have

7       already discussed, there are a couple of other products

8       which I believe you have identified that you have -- you

9       specifically recall having had exposure to during the

10      course of your entire work life.

11           You specifically recall -- do you not, sir? --

12      that you have been exposed to products, asbestos products

13      manufactured by Johns Manville insulation, correct?

14      A    Yes, ma'am.

15      Q    You specifically recall -- do you not, sir? --

16      that you have been exposed to asbestos-containing

17      products manufactured by a company called CertainTeed,

18      correct?

19      A    Yes, ma'am.

20      Q    You specifically recall -- do you not, sir? --

21      that you have been exposed to asbestos-containing

22      products manufactured by Owens Corning?

23      A    Yes, ma'am.

24      Q    All right, sir.

25           All right.  Now, I want to talk to you about

KINSER v. CBS CORP., Case No. 94-2282

1    Shell Oil, okay?

2         A    That's fine with me.

3         Q    Do you recall, as you sit there right now, when

4    the first time was that you went to work for Shell Oil?

5         A    No, ma'am.  I do not.

6         Q    If I asked you whether or not you worked there

7    in the 1970s, what would your answer be?

8         A    I would not know.

9         Q    What about if I said:  The Shell Oil in Wood

10   River, Illinois?  Does that help you?

11        A    Yes, ma'am.  That is where I worked.

12        Q    All right.  And you worked there about five or

13   six different times?

14        A    Yes, ma'am.

15        Q    And you worked there during the decades of the

16   '70s and the '80s, correct?

17        A    As far as my recollection is, yes.

18        Q    All right, sir.

19             So that's another thing that I need to correct

20   on our timeline, if I could have the ELMO back.

21             I have you working at the Shell Oil Refinery

22   starting in the '90s, but you also worked there in the

23   '70s and the '80s, correct?

24        A    As far as I recollect, yes, ma'am.

25        Q    And while you worked at Shell Oil, you believe

KINSER v. CBS CORP., Case No. 94-2282

1    that you were exposed to asbestos-containing insulation,

2    correct?

3         A    Yes, ma'am.

4         Q    And you worked at Burnham Hospital; that was

5    your last job, actually, before you retired, correct?

6         A    Yes, ma'am.

7         Q    And you recall specifically that you believe

8    you were exposed to asbestos-containing materials while

9    you worked at Burnham Hospital?

10        A    Yes, ma'am.

11        Q    All right, sir.

12             And you've indicated that, that -- well, I'll

13   withdraw that.

14             THE COURT:  You didn't say anything.

15             MS. EZELL:  Okay.

16   BY MS. EZELL:

17        Q    Now, I would like to talk to you about 1974 and

18   your work at the Zion power plant.

19        A    Okay.

20        Q    All right.  Now, you worked there for four to

21   five months, correct?

22        A    Yes, ma'am.

23        Q    To the best of your recollection, which four to

24   five months were they?

25        A    It was just before -- I arrived from -- I left

1    there and went to Florida.  I arrived in Florida the

2    middle of October, just before Halloween.

3        Q    Okay.  And so I'm not very good at math, so

4    I'll just ask you:  What months were you at Zion?  What

5    day did you start, if you know?

6        A    What month did I start?

7        Q    Yes, sir.

8        A    Probably July.

9        Q    So July through October you believe you were

10   there?

11       A    End of, end of September/first of October.

12   Yes, ma'am.

13       Q    End of September/first of October.  All right,

14   sir.

15            And the purpose of your work at Zion was to

16   do -- was to assist with a shutdown, correct?

17       A    Yes, ma'am.

18       Q    All right.  And you were not working on a

19   generator, correct?

20       A    Not on a generator, no.

21       Q    All right.  And the reason that you left Zion

22   was that you were called away to go to another job,

23   correct?

24       A    Yes.  And then I decided not to do that; I

25   decided to go home.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    But the reason that you left Zion was because
 2   you got called to another job?
 3        A    Yes, ma'am.
 4        Q    All right.  And you showed us some pictures
 5   with Mr. McCoy earlier today, and I would like to review
 6   those with you.
 7             This is Plaintiffs' Demonstrative 95, and that
 8   is block asbestos, correct?
 9        A    As far as I know.
10        Q    But it could be block insulation, right?
11             MR. McCOY:  Objection.
12        A    I don't know.
13             MR. McCOY:  I did not --
14        A    I've never seen --
15             THE COURT:  Excuse me; excuse me.  There's an
16   objection.
17             MR. McCOY:  Right.
18             I did not show this picture to Mr. Kinser.
19             MS. EZELL:  I apologize.  He handed it to me.
20   I thought he used it.
21             Do you have any objection?
22             MR. McCOY:  To your using it?
23             MS. EZELL:  Yes, sir.
24             MR. McCOY:  You can go ahead, and you can use
25   it.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  All right.

 2    BY MS. EZELL:

 3         Q    I'm showing you Plaintiff's Exhibit 95 for

 4    demonstrative purposes.  Do you see this Demonstrative --

 5         A    Yes.  I can see it.

 6         Q    -- 95?

 7              Do you recognize what's in here as block

 8    insulation?

 9         A    As far as I can tell, it's block insulation.

10    Yes, ma'am.

11         Q    And what would you call it?

12         A    I don't know what it is.

13         Q    You think that's made out of asbestos?

14         A    I have no idea.  I don't know what it is.

15         Q    How would we be able to tell?

16         A    If I saw the package it came in.

17         Q    What if you didn't?

18         A    Pardon?

19         Q    What if you didn't see the package that it came

20    in?

21         A    Then I couldn't identify what it is.

22         Q    So the only way you know if something is

23    asbestos is if you read the package that it came in and

24    it says "asbestos" on it?

25         A    Not necessarily, no, ma'am.
```

KINSER v. CBS CORP., Case No. 94-2282

1       Q     All right.  So how else could we tell if that's

2    asbestos?

3       A     It would be, probably, from my foreman.

4       Q     So if somebody told you?

5       A     Yes.

6       Q     Okay.  But if they were wrong, they were wrong.

7    So you wouldn't know for sure; you'd only know what you'd

8    been told.

9             So other than somebody --

10            THE COURT:  Wait a minute.  Is that a question

11   or a statement by you?

12            MS. EZELL:  It's a mix.

13            THE COURT:  Well, don't mix.  Please ask a

14   question.

15            MS. EZELL:  Yes, sir.

16   BY MS. EZELL:

17      Q     And so setting aside what somebody might tell

18   you, how would you, sir, know such that you could testify

19   under oath that that, what appears on your screen, is

20   asbestos, --

21      A     I couldn't.

22      Q     -- other than reading the package?

23      A     I couldn't.

24      Q     So you don't have any way to look at something

25   that looks dusty and know that it's asbestos?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Not really, no.

 2        Q    Okay.

 3             MS. EZELL:  Well, let me ask:  Did you show him

 4   this one?

 5             MR. McCOY:  That one, yes.

 6             MS. EZELL:  Okay.

 7   BY MS. EZELL:

 8        Q    And I'm showing you what has been previously

 9   shown to you this morning as Demonstrative 99, and do you

10   recognize this?

11        A    Yes, ma'am.

12        Q    Do you remember what you called it this

13   morning?

14        A    Yes, ma'am.

15        Q    What did you call it?

16        A    Asbestos insulation.

17        Q    And it could also just be referred to by some

18   other people as "insulation," correct?

19        A    Yes, ma'am.

20        Q    Because if we look at that, just like it is

21   right now, with no packaging and no labeling, we cannot

22   tell if that's asbestos, correct?

23        A    Depends on when that picture was taken, ma'am.

24        Q    Yes, it does.

25             Do you know when that picture was taken?
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        A     No, ma'am.  I do not.

2        Q     All right.  And why does it depend on when the

3  picture was taken?

4        A     Because everything was asbestos.

5        Q     Until?

6        A     Until I left the piping trades, 1996.

7        Q     And if you're wrong and it was only asbestos

8  until 1972 and that picture was taken in 1973, then that

9  can be nonasbestos insulation, correct?

10       A     I suppose it could be.

11       Q     All right, sir.

12             Now, do you recall when you were speaking with

13  Mr. McCoy about when you learned about your particular

14  condition?

15       A     Yes, ma'am.

16       Q     And he said:  How did you come -- how did you

17  come to get your x-ray?

18             Do you remember him asking you that question?

19       A     Yes, ma'am.

20       Q     And you said, "Your company came to the union,"

21  speaking to Mr. McCoy.

22       A     Pardon me?  I'm --

23       Q     You said, "Your company came to the union."

24  You were talking to Mr. McCoy, correct?

25       A     Not to me specifically, no.
```

```
1        Q    Okay.  No, sir.
2             But he -- you said to Mr. McCoy, "Your company
3   came to the union"?
4        A    Well, if I did, I -- it was a misunderstanding.
5   They come to the union hall, and the union hall told us
6   to go get x-rays --
7        Q    All right, sir.
8        A    -- and where to go.
9        Q    And what did the union hall -- why did the
10  union hall tell you to go get x-rays?
11       A    Because we were told from the union hall that
12  anybody that has worked from nine -- for 25 years with
13  asbestos should go get an x-ray.
14       Q    And, and did they tell you what their health
15  concerns were, or what their concerns were or why they
16  were doing this all of a sudden on that, on that day when
17  that happened?
18       A    No, ma'am.  They did not.
19       Q    Okay.  And as a result of that, you did -- what
20  did you do?
21       A    Pardon?
22       Q    What did you do when the union hall told you to
23  do that?
24       A    I went and got an x-ray.
25       Q    All right.  And who did you see?
```

KINSER v. CBS CORP., Case No. 94-2282

1        A    I have no idea.  I don't know where I went, who

2    I saw, or who give me the x-ray.

3        Q    All right.  But as a result of that x-ray, you

4    believed that you had asbestosis, correct?

5        A    Yes.

6        Q    All right.  And I'd like to show you what's

7    been previously shown, Defendant's Exhibit 2237, and this

8    is a copy of a letter -- now, and Mr. McCoy --

9             THE COURT:  Three false starts.  Withdraw what

10    you said and start again.

11             MS. EZELL:  Yes, sir.  I withdraw what I've

12    started.

13             THE COURT:  Thank you.

14    BY MS. EZELL:

15        Q    When, relative to your x-ray, did you become a

16    client of Mr. McCoy's?

17        A    Pardon?

18        Q    When, relative to your x-ray, did you become a

19    client of Mr. McCoy's?

20        A    Right after the x-ray.

21        Q    All right.  And would that have been around the

22    time that this letter, which is Defendant's Exhibit 2237,

23    from Dr. Schonfeld was prepared?

24        A    Yes.

25        Q    And is that why the letter from Dr. Schonfeld

KINSER v. CBS CORP., Case No. 94-2282

```
 1   is addressed to Mr. McCoy's law firm instead of to you,
 2   sir?
 3        A    I have no idea, ma'am.
 4        Q    Do you, do you know if you got a copy of this
 5   letter?
 6        A    No.  I do not know if I got a copy of it.
 7        Q    All right.  Do you -- do you see and have you
 8   had a chance to review this letter, and it doesn't say
 9   the word "asbestosis" on it?
10        A    So?
11        Q    Well, and so I'm wondering:  If Dr. Schonfeld
12   did not diagnose you with asbestosis, you still came to
13   believe you had asbestosis then, correct?
14             MR. McCOY:  Objection, Your Honor.
15             THE COURT:  Sustained to the form of the
16   question.
17   BY MS. EZELL:
18        Q    As of 1994, you believed you had asbestosis,
19   correct?
20        A    Yes.
21        Q    You didn't learn that from your doctor,
22   correct?
23        A    No.
24        Q    Did you learn it from your lawyer?
25             MR. McCOY:  Objection, Your Honor.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Well, she can ask where he got the
 2     idea from.
 3              MR. McCOY:  I just don't want any
 4     attorney-client --
 5              THE COURT:  Yes.  Well, I -- I'm waiting.
 6     She's asked the question:  Did your attorney tell you you
 7     had asbestosis?
 8              THE WITNESS:  What was the question, ma'am?
 9     BY MS. EZELL:
10         Q    Did your lawyer's office tell you you had
11     asbestosis?
12         A    No, ma'am.
13         Q    Who told you then, if it wasn't your doctor and
14     it wasn't your lawyer?
15         A    It had -- it had to be the doctor that, that
16     told me after they read the x-ray.
17         Q    Yes, sir.
18              And I'm -- and what the doctor told you is what
19     he put in this letter --
20              THE COURT:  How does he know that?
21     BY MS. EZELL:
22         Q    Is what the doctor told you what he put in this
23     letter, that you had pleural thickening and
24     calcification?
25         A    And?
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q     Yes, sir.

2              And so that is not the same thing as

3    asbestosis, is it?

4        A     I have no idea.  I'm not a doctor, ma'am.

5        Q     Okay.  And then after 1994 when you were told

6    that -- or you came to believe that you had asbestosis,

7    when you would go for medical appointments and -- and you

8    would be asked to give a physical, a history and

9    physical, correct?  That's part of a medical appointment?

10       A     Sometimes; sometimes, no.

11       Q     And when they would ask you, "What is your

12   medical history?", you would report to those doctors, "I

13   have asbestosis."

14       A     No.  I didn't say that.  I -- if I said

15   anything, I said I worked around asbestosis -- asbestos.

16   I didn't say I had asbestosis.

17       Q     So --

18       A     I didn't know at the time that I had

19   asbestosis.  I thought I had asbestosis.

20       Q     I'm sorry.  Could you say that again.  I missed

21   a word, I think.

22       A     I --

23             THE COURT:  Read back the -- read back the

24   witness's statement.

25             MS. EZELL:  Thank you, Your Honor.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1              COURT REPORTER:  "I didn't know at the time
2    that I had asbestosis.  I thought I had asbestosis."
3    BY MS. EZELL:
4         Q    All right, sir.  And then we'll fast-forward to
5    1994.  Well, that's not very much forward.  But sometime
6    shortly after you met with Dr. Schonfeld and you received
7    this letter --
8         A    I don't remember meeting with this doctor.
9         Q    This letter is dated September the 24th of
10   1994, correct?
11        A    Yes.
12        Q    Do you see that right up here?
13        A    Yes.
14        Q    Now, that's your name?
15        A    Yes.
16        Q    And you know that you have pleural thickening
17   and calcification, correct?
18        A    The --
19             MR. McCOY:  Objection, Your Honor.  That was
20   not his testimony.
21             THE COURT:  Well --
22             MR. McCOY:  He said, he said he hasn't seen --
23             THE COURT:  I'm not sure what she's asking him.
24             MR. McCOY:  Right.
25             THE COURT:  If she's asking him if the letter
```

KINSER v. CBS CORP., Case No. 94-2282

1  says that and if he agrees with it or -- I'm not sure

2  what's being asked.

3          MR. McCOY:  He said he has not seen the letter,

4  so that's my objection.

5          MS. EZELL:  Your Honor, what he just said is he

6  doesn't remember --

7          THE COURT:  Excuse me.

8          MS. EZELL:  Okay.

9          THE COURT:  Ask a question.  Don't argue.

10          MS. EZELL:  Okay.  I thought you were waiting

11  for me to say something.

12          THE COURT:  No.  I was not.

13          MS. EZELL:  Okay.

14          THE COURT:  Ask another question.

15  BY MS. EZELL:

16      Q    And so you just -- you indicated that you're

17  not sure you met with this doctor?

18      A    No.

19      Q    Do you, do you think that this letter may not

20  pertain to you?

21      A    It probably pertains to me, but I did not meet

22  with that doctor.  I do not know who he is.

23      Q    Okay.  So this is dated September 24th of 1994;

24  and then on October 11th of 1994, you filed your lawsuit

25  in this case, correct?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    [No response.]

 2             MR. McCOY:  Your Honor, Your Honor, I -- again,

 3   objection.  I don't know if he knows when a lawsuit was

 4   filed.  That's my objection.

 5             THE COURT:  All right.  Sustained as to

 6   foundation.

 7   BY MS. EZELL:

 8        Q    Do you know that you filed a lawsuit in this

 9   case?

10        A    I have no idea.

11        Q    I'm going to --

12             MR. McCOY:  Your Honor, I, I certainly can

13   stipulate that my law firm filed a lawsuit.

14             THE COURT:  I will take judicial notice --

15             MR. McCOY:  Right.

16             THE COURT:  -- of the Court's own record if you

17   ask me to.

18             MR. McCOY:  Yes.

19             MS. EZELL:  I have a few questions about this,

20   so I'll just approach the witness.

21             THE COURT:  I beg your pardon?

22             MS. EZELL:  I have a couple questions about

23   this complaint; so if he doesn't remember, I probably

24   ought to show it to him.

25             THE COURT:  Well, proceed.  Nobody wants me to
```

KINSER v. CBS CORP., Case No. 94-2282

1   be involved.  I won't.

2   BY MS. EZELL:

3       Q    Do you see the date here, 11th of October,

4   1994?

5       A    Yes, ma'am.

6       Q    All right, sir.

7            And do you see your name and your wife's name

8   up here?

9       A    Yes, ma'am.

10      Q    And so this is the -- and do you see that it

11  was filed on October 26th of 1994?

12      A    Yes, ma'am.

13      Q    And so that -- and it says "Complaint" right

14  there?

15      A    Yeah.

16      Q    Okay.  You can hold on to that.  I'm going to

17  ask you a few more questions.

18           So do you understand that document to be the

19  document which started your lawsuit that we're here in

20  this trial about?

21      A    I guess.  I, I really don't know.

22      Q    All right, sir.

23           So looking at that document -- actually, let me

24  do it this way.  Can I show the witness the document and

25  not the jury?

KINSER v. CBS CORP., Case No. 94-2282

```
1              DEPUTY CLERK:  Uh-huh.

2              THE COURT:  Yes, you can.

3              MS. EZELL:  Thank you.

4              THE COURT:  If you ask the clerk, she'll do it.

5              MS. EZELL:  Thank you, your Honor.

6              Is it centered?

7              DEPUTY CLERK:  You're fine.

8              MS. EZELL:  I'm trying to get this section.

9   BY MS. EZELL:

10       Q    Okay.  At the time that you originally filed

11  your lawsuit in this case, sir, isn't it true that you --

12  that you did not just hold Westinghouse accountable for

13  your lung cancer?

14             MR. McCOY:  Your Honor, I'll object because the

15  stipulation --

16             THE COURT:  Sustained.

17             MR. McCOY:  My law firm filed the lawsuit.

18             THE COURT:  Excuse me.  I'm not going into the

19  history of this tort and the multi-district litigation

20  panel and things of that -- there, 403 will certainly

21  apply to, to take the jury down about issues and so forth

22  that, that don't concern them, really.

23             That's -- you know, to go back to 1994 -- and

24  I'm not going to review the history of the multi-district

25  litigation panel and what's happened to all the asbestos
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   cases in the United States.

 2            MS. EZELL:  Yes, sir.

 3            And just for the record, Mr. McCoy's objection

 4   was to the form of the question because I said that he

 5   filed the suit, and Mr. McCoy did.

 6            Your ruling is as to --

 7            THE COURT:  Well, I'm going beyond that.

 8            MS. EZELL:  No.

 9            THE COURT:  You're venturing down a path that I

10   don't know is going to lend to the jury's understanding

11   of the particular issues of this case.

12            MS. EZELL:  And I accept that.  I just, for the

13   record, would like to say that I have a different

14   position with regard to that as, you know -- as we

15   know --

16            THE COURT:  Well, tell me at recess.

17            MS. EZELL:  Yes, sir.

18            THE COURT:  Okay.

19            MS. EZELL:  I would just like to make a record

20   on this particular issue.

21            THE COURT:  And we'll do that at recess; and if

22   I agree with something you're doing, we'll have the jury

23   back and let you go into it.

24            MS. EZELL:  Thank you, Your Honor.

25
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MS. EZELL:

 2        Q    At no time, sir, have you filed any kind of

 3   lawsuit against the tobacco companies, correct?

 4        A    No, ma'am.

 5        Q    All right, sir.

 6             Now, you did, however, bring with you a number

 7   of tobacco advertisements today; did you not, sir?

 8        A    No, ma'am.  I did not.

 9        Q    Your lawyer brought with him a number of

10   tobacco advertisements today, correct?

11        A    As far as I know, yes, ma'am.

12        Q    And you indicated --

13             MS. EZELL:  Mr. McCoy, those are supposed to be

14   up here, and I don't see them.

15                  (Brief pause in proceedings.)

16   BY MS. EZELL:

17        Q    Santa Claus was smoking?

18        A    Yes, ma'am.

19        Q    Yes, sir.

20             And, and you did not mean to indicate that you

21   used advertisement as your information about where you

22   received -- as your source of safety information, did

23   you, sir?

24        A    No.

25        Q    No.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              Doctors, over the years, have told you not to
 2      smoke, correct, sir?
 3          A    It's been some time ago that I did smoke.  But
 4      at the time, I don't remember a doctor telling me not to
 5      smoke.
 6          Q    In the '80s, --
 7          A    Yes, ma'am, in the '80s.
 8          Q    -- you had doctors in the medical records
 9      indicating that smoking was hazardous for your health,
10      correct, sir?
11          A    As far as I know, yes, ma'am.
12          Q    Yes, sir.
13               And in the '70s -- get the timeline out -- so
14      you quit smoking here in 1984, correct, sir?
15          A    Yes, ma'am.
16          Q    So prior to that in the '80s, you had doctors
17      telling you that it was not healthy for you to smoke,
18      correct?
19               That's what we just covered.  I apologize.  I
20      shouldn't have even re-asked you the question.
21          A    I, I don't know that a doctor ever told me not,
22      to quit smoking.
23          Q    Yes, sir.
24               In 1970, every pack of cigarettes that you
25      smoked came with a warning; did it not, sir?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    I don't know what time, when the warning come

 2    on, ma'am.

 3        Q    Okay.  But you told us -- you've already told

 4    us that you receive your information in your news from

 5    sources -- because back in the '70s, there was -- there

 6    was very few television options, correct?

 7        A    Yes, ma'am.

 8        Q    There was no Internet, correct?

 9        A    That's true.

10        Q    And most people received their news through the

11    nightly news or through news magazines, correct, sir?

12        A    And billboards.

13        Q    Yes, sir.

14             And billboards more for advertising than news,

15    correct?

16        A    No.  But they were advertising cigarettes.

17        Q    Yes, sir.

18             And so as it relates to news, you indicated

19    that you got your news from a magazine called Newsweek.

20    Do you recall --

21        A    No, ma'am.  I did not ever say that.

22        Q    All right, sir.

23             And that you also had Reader's Digest.  Do you

24    recall that?

25        A    I had never got Reader's Digest back then,
```

KINSER v. CBS CORP., Case No. 94-2282

1    ma'am.

2         Q    All right, sir.

3              And so you knew in 1964, when everyone else

4    found out in the United States, that smoking was bad for

5    you, and it could cause any number of diseases,

6    especially of the lungs, correct?

7         A    I guess I got that information.

8         Q    Yes, sir.

9         A    I don't remember it, but --

10        Q    And, and nothing about Santa smoking in

11   Exhibit 647 or Ronald Reagan smoking in Exhibit 644

12   changed the fact that you knew that smoking had toxic

13   chemicals in it that would hurt you -- could hurt you,

14   correct?

15        A    Not to my knowledge, no.

16        Q    All right, sir.

17             Now, your, your father smoked between two and

18   three packs a day from the day you were born, correct,

19   sir?

20        A    I don't know how much my father smoked when I

21   was born, ma'am.

22        Q    Do you remember giving your deposition in this

23   case?

24        A    Nope.

25        Q    All right.  Now, if you look at this document,

KINSER v. CBS CORP., Case No. 94-2282

1    it will tell you on the front -- you see it's got your

2    name, "Kinser"?

3            Oh, take my little sticky off because that will

4    get in your way; you won't be able to see anything.

5        A    Deposition of Larry Kinser.  Yes, ma'am.

6        Q    Yes.

7            And it says it was on September 11th of 2013.

8    You see that?

9        A    Yes, ma'am.

10       Q    And do you remember on September 11th of 2013

11   that Mr. Sawyer over here, Jake Sawyer, came to, and took

12   your deposition; --

13       A    Yes.

14       Q    -- he asked you questions?

15       A    I remember him very well.

16       Q    Yes, sir.

17           And at that deposition, there was a court

18   reporter like we have here in court?

19       A    Yes, ma'am.

20       Q    And you swore to tell the truth?

21       A    Yes, ma'am.

22       Q    All right, sir.

23           Now, if you could turn to page 64 of that

24   deposition, and I would direct your attention to line 1.

25   And I'm going to ask you if you were asked these

KINSER v. CBS CORP., Case No. 94-2282

1   questions and you gave these answers.  Okay?

2       A    Sure.

3       Q    So you read along with me, and you tell me if I

4   do it right.

5            "Question:  I understand that your father

6   smoked during his life?

7            "Answer --

8       A    During his life, yes.

9       Q    All right.  Wait until -- and at the end, I'll

10  ask you a question.  Okay?  I'm going to read; and at the

11  end, I'll ask you a question.  Okay?

12      A    Yes, ma'am.

13      Q    All right.  So, "Question:  I understand your

14  father smoked during his life?

15           "Answer:  Yes.

16           "Question:  And you lived in a family home with

17  your father until you turned 18?

18           "Answer:  I believe so.

19           "Question:  And he smoked throughout the time

20  that you were living at his home?

21           "Answer:  Yes.

22           "Question:  How much did he smoke?

23           "Answer:  Oh, he would smoke two or three packs

24  of cigarettes a day.

25           "Question:  Would he smoke in the house?

KINSER v. CBS CORP., Case No. 94-2282

1         "Yes."

2         Did I read that correctly?

3    A    Yes, ma'am.

4    Q    So your father smoked two to three packs of

5  cigarettes a day from the day that you were born in the

6  house where you lived, correct, sir?

7    A    May I put an interjection there?

8         THE COURT:  No.  You may either answer the

9  question, say you don't understand it, or wait for your

10 lawyer to do something.

11   A    My father and mother -- am I okay?

12   Q    You can answer.  Did I -- were you asked those

13 questions, and did you give those answers?

14   A    I did --

15        THE COURT:  Well, you didn't put that to him.

16        MS. EZELL:  I --

17        THE COURT:  Come on.  You shifted grounds.  You

18 didn't -- that's not the question before the witness.

19        Am I right, Lisa?

20        MS. EZELL:  You're right.

21        COURT REPORTER:  I'll have to go check.

22        THE COURT:  Go look.  She asked him if he lived

23 at the house where his parents smoked when he was a baby.

24        COURT REPORTER:  I found it.  Shall I read it?

25        THE COURT:  Yes.  Go ahead.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            COURT REPORTER:  "So your father smoked two to
 2  three packs of cigarettes a day from the day that you
 3  were born in the house where you lived, correct, sir?"
 4            THE COURT:  That's the question that was
 5  pending.
 6            If you know, you may answer.
 7       A    My, my father and mother were divorced when I
 8  was a young baby, and I did not live with them until --
 9  they got back together when I graduated from high school
10  in 1952.  I made a mistake on that deposition.
11       Q    All right, sir.
12            Did your mother smoke?
13       A    Yes, she did.  Very little.
14       Q    And so you would agree with me today that, in
15  spite of your deposition testimony, that irrespective of
16  whether you were at your mom's home or your dad's home,
17  from the day you were born you lived in a house where
18  there was a smoker, correct?
19       A    Possibly, yes.  My mother did not smoke that
20  much when we lived with my grandfather.
21       Q    Okay.  If you could continue on page 64, I'm
22  going to ask you a few more questions about that page, if
23  I could direct your attention to line 15.
24            "Question:  And did your mother smoke?
25            "Answer:  Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              "Question:  And how much did she smoke?

 2              "Answer:  Probably eight or ten cigarettes a

 3     day.

 4              "Question:  Did she smoke in the house?

 5              "Answer:  Yes."

 6              Did I read that correctly?

 7      A    Yes.

 8      Q    Okay.  So --

 9              THE COURT:  No, no.  Were you asked those

10     questions, and did you give those answers?  That's the

11     proper litany and protocol.

12              MS. EZELL:  Yes, sir.

13              THE COURT:  Thank you.

14     BY MS. EZELL:

15      Q    Were you asked those questions, and did you

16     give those answers?

17      A    Yes, ma'am.

18      Q    All right, sir.

19              And so, then, did you either live with your

20     mother or your father from the time you were born until

21     you were 18 years old?

22      A    I lived with my mother until -- I'll say --

23     okay, 18.

24      Q    Yes, sir.

25      A    After I got out, graduated from high school,
```

KINSER v. CBS CORP., Case No. 94-2282

1    yes, ma'am.

2         Q     And so from the time you were born, you were

3    exposed in the home where you lived to a smoker smoking

4    in the home, correct?

5         A     That and, amongst other places, yes, ma'am.

6         Q     Yes, sir.

7               Now, your father died of emphysema, correct?

8         A     Yes.  That's what he was autopsied at.

9         Q     Yes, sir.

10              And your wife has also smoked, from when you

11   met her until 1994; she finally quit, correct?

12        A     Except for a couple times when she quit, yes,

13   ma'am.

14        Q     All right.  And your mother died of a

15   smoking-related disease, correct?

16        A     She died of an aneurysm in the brain.

17        Q     Now, you have testified about how much you

18   personally have smoked since you started smoking when you

19   were 15 years old, correct?

20        A     That's right.

21        Q     And you have testified in, in -- well, let me

22   just ask you:  Did you smoke different amounts over the

23   course of your life?  Or did you always smoke the same

24   amount?

25        A     Different amounts.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Yes, sir.

2           And, in fact, at some points, you were smoking

3  as few as ten cigarettes a day or less, correct?

4      A    Yes, ma'am.

5      Q    And at some points, you were smoking as much as

6  a pack and a half a day or more, correct?

7      A    No.

8      Q    All right, sir.

9           I'll -- let me give you a different deposition.

10 This one is the one that was taken in July.  I'm wrong.

11 Let's go back to the September one.

12          And if you could, turn to page 63.

13          No.  That's not right.

14     A    Okay.

15     Q    All right.  We're going to put a pin in that.

16          All right.  Now, in addition to lung cancer,

17 sir, you have also suffered, have you not, from skin

18 cancer?

19     A    From what, ma'am?

20     Q    Skin cancer.

21     A    Skin cancer, yes, ma'am.

22     Q    In fact, you have suffered from what they call

23 "basal cell carcinoma," correct?

24     A    I guess.  I don't know.

25     Q    If that's what the medical records say, you

KINSER v. CBS CORP., Case No. 94-2282

```
 1   would have no reason to quarrel with that, correct?

 2        A    If the medical records say that, yes, ma'am.

 3        Q    You have had two spots of basal cell carcinoma

 4   removed from your left forearm, correct?

 5        A    I guess.

 6        Q    Well, do you remember having cancer cells

 7   removed --

 8        A    Yes.

 9        Q    -- from your left forearm?

10        A    Yes, ma'am.

11        Q    All right.  And you have had one basal cell

12   carcinoma removed from your right upper arm?

13        A    No, --

14        Q    All right.

15        A    -- not to my knowledge.

16        Q    That's okay.

17             MS. EZELL:  May I show the witness a document?

18             See if this will refresh your recollection.

19             Do I have this part right here?

20             DEPUTY CLERK:  Yep.

21   BY MS. EZELL:

22        Q    Okay.  Do you see your name right here, sir?

23        A    Oh, yes.

24        Q    Okay.  You see this says two spots.  We already

25   talked about this, left forearm, right?
```

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes, ma'am.

2    Q    And then this one, one spot, right upper --

3    that's an arrow up -- arm.

4    A    I don't remember that.

5    Q    Okay.  And it says that it was removed, but it

6    never healed.  You see that right beneath it?

7    A    I see that, but I don't remember.

8    Q    Uh-huh.

9         And then -- yes, sir -- so then I also see that

10   you had a basal cell carcinoma on your nose?

11   A    Yes, ma'am.

12   Q    Do you recall that one?

13   A    [No response.]

14   Q    All right, sir.

15        And you had a basal cell carcinoma spot on your

16   right cheek, correct?

17   A    Yes.

18   Q    And then moving down -- well, here's another

19   reference to that right upper arm.  You don't remember

20   that, huh?

21   A    No.  I've never had anything on my right upper

22   arm that I remember.

23   Q    All right.  Let's read this one together.  This

24   is Defendant's Exhibit 2307.

25        So we have an agreement that we can show all

KINSER v. CBS CORP., Case No. 94-2282

```
 1   medical records, Jessica.  Could I publish this, please?

 2            MR. McCOY:  Judge, it's fine.

 3            THE COURT:  Very well.

 4   BY MS. EZELL:

 5      Q    Okay.  So this -- to take us back up here, this

 6   is your name, right?

 7      A    Yes.

 8      Q    And this is 8/2/02; that's the date?

 9      A    Yes.

10      Q    And this is some handwritten notes, and then

11   here's some typewritten notes, correct?

12      A    Yes.

13      Q    And then up here is, "1 spot right" -- there's

14   an arrow up -- "arm, times three years; 'was removed but

15   never healed.'"

16            You see that?

17      A    I see that.

18      Q    All right.  And then here is -- that first note

19   was in June; and then two months later, in August, you go

20   back and it says, "Removal area upper right arm and

21   possible right face."

22            Do you see that?

23      A    Yes.  I see that.

24      Q    All right.  And you still, as you sit there,

25   you have no recollection of having that cancer on your
```

KINSER v. CBS CORP., Case No. 94-2282

1  arm?

2      A    On my upper right arm?  No, ma'am.

3      Q    All right, sir.

4          THE COURT:  How much more cross-examination do

5  you have?

6          I'm not chiding you.

7          MS. EZELL:  No.  I understand, Your Honor.

8          Maybe 15, 20 minutes.

9          THE COURT:  The jury's been here over an hour

10  now.  We'll have a recess.

11          Take the jury out, please.

12          And you may step down, Mr. Kinser, during the

13  recess, and we'll be in recess for ten minutes or so.

14              (Recess, 2:44 p.m. to 2:55 p.m.)

15          THE COURT:  We're going to do something outside

16  the presence of the jury.

17          MS. EZELL:  Yes, Your Honor.  I wanted to make

18  an offer of proof with the witness on the issue of the

19  complaint, but I don't know if you wanted to do that

20  during the break or at the end --

21          THE COURT:  I don't -- where's Mr. McCoy?

22          MS. EZELL:  Oh, I am so sorry.

23          MR. McCOY:  I'm still here.

24          MS. EZELL:  Oh, he's here.

25          MR. McCOY:  I'm here.

KINSER v. CBS CORP., Case No. 94-2282

1            THE COURT:  First off, I've got to know what

2       the objection is and where you're going.

3            What's the objection?  I mean, you know, to

4       look at the face of the 1994 complaint, what relevance

5       can that have to this and, when we have all of the

6       proceedings -- quiet.

7            They're my help.

8            They're -- anyway, what is it you're going to

9       offer?

10           MS. EZELL:  Your Honor, as you know, we are --

11      we are but less than 1 percent of this man's work life.

12           We also have an issue --

13           THE COURT:  Wait a minute.

14           MS. EZELL:  Oh, I don't have my mic on.

15           THE COURT:  You are less than 1 percent?

16           MS. EZELL:  We are less than 1 percent of his

17      work life.  This case represents less than 1 percent of

18      his work life.

19           There is an issue, therefore, of, not just of

20      alternative defendants and, you know, relative

21      contribution; but there is an issue of causation because

22      we do not have enough exposure at this plant, under our

23      theory of the case, to represent a sufficient exposure to

24      even cause the disease that they're claiming in this

25      case.  And so it is our intention to put in proofs, like

KINSER v. CBS CORP., Case No. 94-2282

1   we did over the alternate sites and the alternate

2   products, of the other people that they sued, not -- I

3   don't need to show the complaint.  I just need him to say

4   that he worked at these other places and that he sued

5   these people because he thought that they're the ones who

6   caused his lung cancer.

7         THE COURT:  Okay.  Now, when you get to the

8   point of saying, "He sued these other people," --

9         MS. EZELL:  Yes, sir.

10         THE COURT:  -- you run, you run square into the

11   Illinois law of comparative fault, or con-- the way they

12   phrase it nowadays is "contributory negligence" by the

13   plaintiff.

14         And I have to warn you:  I've looked at the

15   proposed instruction that you've tendered in which you

16   try to make a claim of a prox-- of sole proximate cause

17   as an affirmative defense.  And it is not an affirmative

18   defense; it is an argumentative denial of "a proximate

19   cause."

20         That, the plaintiff's burden is to prove that

21   you were a proximate cause, not that some -- it isn't

22   your part to do anything but deny that you are "a

23   proximate cause."

24         MS. EZELL:  Yes, sir.

25         THE COURT:  And if the jury, for instance,

KINSER v. CBS CORP., Case No. 94-2282

1    should find that at least more than half of the injuries

2    are attributable to some other cause, or to the

3    plaintiff's own failure to exercise ordinary care, then

4    they'll have to find for the defendant.

5            MS. EZELL:  Well, and, and then the second

6    argument, Your Honor, is:  If not permitted to say, "You

7    sued," then I think at the very least we ought to be able

8    to say, "You blamed," because I understand that there is

9    a difference between suing and blaming.  But, but the --

10   if he says, "I didn't blame them; I didn't think they

11   were responsible at all," then the complaint is

12   impeachment for that position.

13           And the fact that he blamed them and held them

14   accountable means that at some point in time he believed

15   that they were -- that their conduct was causally related

16   to his disease; and that is evidence, I believe, we are

17   allowed to put before this jury.

18           THE COURT:  Well, --

19           MR. McCOY:  Judge --

20           THE COURT:  Yes, Mr. McCoy.

21           MR. McCOY:  I was going to say on this point:

22   The filing of a claim is not evidence of exposure.  The

23   defendant's position here is that there is sufficient

24   evidence to say that these other defendants listed in the

25   complaint are the cause, and not Westinghouse.  If that's

KINSER v. CBS CORP., Case No. 94-2282

1    their position, then they have the burden to prove that

2    claim, that somebody else was the sole proximate cause or

3    was, was -- whatever portion they want to say of it.

4           But it's their burden to produce that evidence.

5    They can't do it through simply a claim which is

6    unsupported by evidence.

7           THE COURT:  You know, his state of mind that he

8    believes he inhaled, you know, and this is a question

9    about whether -- still in the case -- whether he was, in

10   fact, exposed to asbestos at the Zion plant.  And why

11   isn't it relative that at one point he thinks, he thinks

12   they're to blame -- he claims they're to blame; but at

13   some other point, he claimed all these other people were

14   to blame, too?

15          MR. McCOY:  Because a claim itself is not

16   evidence.  We cannot rest our case on merely having sued

17   and filed a claim against Westinghouse here.  Those

18   claims have to be proven, and by evidence.

19          And, and, also, the filing of the complaint was

20   judgment of our law firm as to who the defendants should

21   be in this case.

22          THE COURT:  What did the MDL do with these

23   other claims?

24          MR. McCOY:  The MDL dismissed some of them.

25   Some of them were settled independent of the MDL.  Some

KINSER v. CBS CORP., Case No. 94-2282

1   of them were resolved by agreements, or by the bankruptcy

2   procedures when a lot of these companies went bankrupt;

3   and then you didn't even have to prove that, the civil

4   standards in the bankruptcy courts, --

5           MS. EZELL:  Your Honor -

6           MR. McCOY:  -- so --

7           MS. EZELL:  Oh, sorry.

8           MR. McCOY:  -- that's why I say:  The mere

9   claim in the lawsuit doesn't establish evidence of

10  exposure.

11          I have no problem of she asking about "what

12  evidence," or, "What do you know about exposure to this

13  defendant?"  That's fine.

14          But to say -- to imply that just because

15  they're in the complaint that there is such evidence that

16  he has or knows about, that's why -- that's where my main

17  objection lies.

18          MS. EZELL:  Your Honor, at one point there was

19  some discovery issue, and I don't remember what it was;

20  and Mr. McCoy said, "Well, Ms. Ezell wasn't in the case

21  then.  That was some other lawyer"; and you looked at me,

22  and you said, "But she's bound by it."

23          And the fact of the matter is, is whether Mr.

24  Kinser went through and gave Mr. McCoy a list, as I would

25  expect that he would have, of where he worked and who he

KINSER v. CBS CORP., Case No. 94-2282

1   worked with and what his history was, or whether Mr.

2   McCoy's law firm just made it up, that complaint was

3   filed on Mr. Kinser's behalf.  And at some point, he

4   believed that those people were accountable; and in a lot

5   of instances, he has represented to those people that he

6   thinks that they're accountable in proceedings that we do

7   not plan to put in any way before this Court, before this

8   jury.

9           But the fact that he believed that they were to

10  blame means that he himself has doubts about the relative

11  causation of Westinghouse, relative to the causation of

12  other people, and that's something -- just the word

13  "blame," not the word "sue" -- that I think we should be

14  permitted to put before this jury, because it goes to the

15  probative value of his pointing the finger, apparently,

16  solely at Westinghouse, as compared to where he was

17  really pointing his multiple fingers and toes when this

18  litigation began.

19          MR. McCOY:  That's -- those, again, reflect

20  judgments of lawyers about suing this claim against --

21          THE COURT:  Well, he adopts it.  When he signs

22  the pleading, it becomes an admission on his part.

23          MR. McCOY:  Right.

24          THE COURT:  He, he -- I mean, he -- that's,

25  that's crazy, passing it to the lawyers that they're the

KINSER v. CBS CORP., Case No. 94-2282

```
1   ones who made the claim.

2           MR. McCOY:  Well, he doesn't, he doesn't -- I

3   don't know that he, he signs these pleadings.  I mean,

4   the lawyers --

5           THE COURT:  It doesn't make any difference.

6   You signed it in his behalf, --

7           MR. McCOY:  They're --

8           THE COURT:  -- speaking for him.

9           MR. McCOY:  Let me see the complaint.

10          MS. EZELL:  I'm sure you have a copy of the

11  complaint.

12          MR. McCOY:  I don't have it right here with me.

13          MS. EZELL:  Well, I don't have it either.  I'll

14  get a copy.

15          Do we have the complaint, the amended

16  complaint?

17          MS. BURLISON:  Yes.

18              (Brief pause in proceedings.)

19          THE COURT:  It comes down to:  Were you a

20  prox-- was your client a proximate cause of his getting

21  lung cancer?

22          MS. EZELL:  Right.

23          THE COURT:  And not that someone else was the

24  sole proximate cause; that you were not a proximate

25  cause.
```

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  Right.  And because we've heard

2    about dose and response and because we've heard about all

3    of this science --

4          THE COURT:  Slow down.

5          MS. EZELL:  Sorry.

6          Because we've heard about dose-response and all

7    of the science associated with lung cancer causation, the

8    number of defendants, the number of years that he worked

9    in those --

10         THE COURT:  Well, now you're arguing

11   persuasiveness and so forth; and I'm worried about Rule

12   403, of leading a jury into tangential issues.

13         MS. EZELL:  But I don't get -- they won't even

14   have the benefit of knowing that there's something I need

15   to persuade them about if I can't tell them that he at

16   some point blamed these other people.

17         I mean, it's not persuasiveness, Your Honor;

18   it's simply putting the matter in front of them.  They

19   don't have this matter in front of them yet.  They don't

20   have any information about the fact that at one point in

21   time --

22         THE COURT:  You have a lot of evidence before

23   this jury that he inhaled asbestos at all these other

24   work sites.

25         MS. EZELL:  Yes, I do.  But that --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  And he only worked for you four
 2    months.
 3              MS. EZELL:  Yes, sir.
 4              THE COURT:  And why -- you know, the jury might
 5    decide on that that you are not a proximate cause, and it
 6    might not.  I don't know.  But, when you look at all the
 7    years of exposure and then his personal health record, --
 8              MS. EZELL:  Yes, sir.  But I --
 9              THE COURT:  -- then you wonder -- then there's
10    a legitimate question of whether what Westinghouse did or
11    failed to do is "a proximate" cause.
12              MS. EZELL:  I agree with everything that you
13    said, and I think that just because we've managed to put
14    good evidence as to those issues in does not mean that
15    other good evidence should be excluded.  It's not
16    cumulative.  It's a different issue.
17              It goes to his state of mind as to who he
18    believes is responsible for his injuries.
19              THE COURT:  Well, let me see if we can get
20    around it a different way.
21              Mr. McCoy, you're trying to say something, --
22              MR. McCOY:  I, I --
23              THE COURT:  -- started to.
24              MR. McCOY:  I just, I object to further
25    questioning by Mr. Kinser about a complaint which he
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   knows nothing about.

 2              As far as Your Honor's concerns about the

 3   lawyers having made some admissions or something in that,

 4   that can be addressed by, by whatever Your Honor finds on

 5   that.

 6              But it's not questioning for Mr. Kinser, and

 7   that, that's my additional objection.  He doesn't -- he,

 8   he doesn't know what the lawyers did or what the basis of

 9   these claims were.  He's made that very clear.  He

10   doesn't know.

11              THE COURT:  Why would it not be permissible for

12   the defense to ask Mr. Kinser on cross-examination if he

13   inhaled asbestos fibers at the University of Illinois, at

14   Abbott plant?

15              MR. McCOY:  That's fine.

16              THE COURT:  Don't you believe that that might

17   or could have contributed to cause your, your physical

18   condition?

19              MR. McCOY:  I -- that question is fine, Judge.

20              THE COURT:  And if he says he doesn't believe

21   it, then, then I'm not sure that Mrs. -- Mrs. Ezell can't

22   say, "Well, didn't you once claim it did?"

23              MR. McCOY:  That's fine.

24              MS. EZELL:  Okay.  Well, we can --

25              MR. McCOY:  But that's --
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1          THE COURT:  Now, I'm, I'm -- I'm seriously

 2   concerned about leading the jury down some tangential

 3   point and the God-awful mess that came out of the

 4   multi-district litigation panel, in my opinion.

 5          But that, that's -- you know, that question has

 6   not been asked:  Don't you believe that the fact that you

 7   inhaled asbestos fibers at the University of Illinois --

 8   that you inhaled asbestos fibers when you were working at

 9   some other place, and so forth -- and that contributed to

10   cause your, your physical condition?  Do you believe

11   that?

12          I mean, you're asking if he believes he has

13   asbestosis, and, and it seems to be it depends on who's

14   reading the medical information as to whether you got

15   asbestosis or went along with asbestosis.

16          Anyhow, I will not -- let me say this.  Here's

17   my ruling.  You may not question him about the complaint

18   that went to the MDL and what he alleged in those, in

19   those complaints.

20          But you can ask him, as I have explained here,

21   "You inhaled asbestos at the University of Illinois.  Do

22   you believe that could contribute to your medical

23   condition?"

24          MS. EZELL:  Yes, sir.  I'm listening.

25          THE COURT:  And if he says no, he doesn't, then
```

KINSER v. CBS CORP., Case No. 94-2282

1  I don't know; then the next question will be, "You did

2  claim it once in, in this litigation?"

3      MS. EZELL:  Okay.  I'll proceed in that

4  fashion, Your Honor.  Thank you.

5      I mean:  Yes, sir.

6      THE COURT:  You're welcome.

7      No.  It's, it's a difficult question, and I'm

8  trying to walk the tight wire up the middle.

9      MS. EZELL:  I know.

10      Your Honor, you may recall -- may I have the

11  ELMO?  I just have one other evidentiary issue.

12      This exhibit, although not --

13      THE COURT:  Oh, yeah.  With the redaction on

14  it.

15      MS. EZELL:  I would like to ask the Court to

16  give the jury an instruction -- and I don't know that

17  this will be objected to -- but that this is not a

18  Westinghouse product.  I mean, I just think that this

19  redaction gives a false impression.  I wanted it

20  unredacted.  We don't have, apparently, an unredacted --

21      THE COURT:  Well, I mean, the fact that it's --

22  suppose it is some other company; it says the "ABC Bagel

23  Company" on there.

24      MS. EZELL:  I think Mr. McCoy knows what it

25  says.

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Well, no.  He does.  He told me.

2   He told us right here, too.

3          MR. McCOY:  I have, I have no problem telling

4   the jury that's not a Westinghouse product.

5          THE COURT:  Okay.

6          MR. McCOY:  I didn't make --

7          THE COURT:  If you two agree on that, far be it

8   from me to gainsay what you're doing.

9          MR. McCOY:  They didn't manufacture that

10  product.

11         THE COURT:  All right.

12         MS. EZELL:  All right.

13         THE COURT:  All right.  Now, are we ready, or

14  do you need a little more time?

15         MS. EZELL:  I'm ready, Your Honor.

16         THE COURT:  Okay.  Bring the jury back,

17  Richard, please.

18              (Brief pause in proceedings.)

19              (Jury present, 3:12 p.m.)

20         THE COURT:  All right.  Reassembled and you may

21  ask another question, Mrs. Ezell.

22         MS. EZELL:  Yes, sir.

23         May we have the ELMO?

24         Ladies and gentlemen of the jury, just by, by

25  stipulation of counsel and with the Court's permission,

KINSER v. CBS CORP., Case No. 94-2282

1    because this has been redacted, I've been advised that I

2    am permitted to inform you that this product is not a

3    Westinghouse product.  It was manufactured by a -- by

4    some company that is not important, but it's just

5    important to point that out.  So I'm just pointing that

6    out to you, and that is Exhibit 96.

7                 THE COURT:  So stipulated, Mr. McCoy?

8                 MR. McCOY:  Yes, Judge.

9                 THE COURT:  All right.  And the stipulation is

10   a fact, which you would accept as a fact.

11                All right.  Ask a question.

12                MS. EZELL:  Thank you.

13   BY MS. EZELL:

14        Q    Mr. Kinser, isn't it true that, during the

15   course of your smoking history, sometimes you would smoke

16   two to three cigarettes a day, correct?

17        A    Yes.

18        Q    And sometimes you would smoke up to a pack and

19   a half a day, correct?

20        A    That's -- that's what I said, but it's

21   debatable.  I do not know how much I would smoke at

22   night.

23        Q    Yes, sir.

24                But in your -- and with regard to it being

25   debatable, when you testified under oath in September, --

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     That's fine.

 2        Q     -- you didn't say it was debatable; you said

 3   you smoked up to a pack and a half a day, correct?

 4        A     Fine.

 5        Q     Correct?

 6        A     Yes, ma'am.

 7        Q     Okay.  All right.  Now, we've talked about some

 8   of the places that you've worked and some of the

 9   companies through whom you have, you believe to have been

10   exposed to asbestos.

11             And I want to go back and, go back to our

12   timeline and just make sure that we have completed these.

13             Now, you, in fact, believe -- do you not,

14   sir? -- that you were exposed to asbestos by working at

15   Anaconda Aluminum as a pipefitter, correct?

16        A     Yes.

17        Q     All right, sir.

18             And you worked at the Pennsylvania Residence

19   Hall as a pipefitter as well?

20        A     Yes.

21        Q     And at the Abbott powerhouse, correct?

22        A     Yes.

23        Q     And all of these companies that we've talked

24   about that are shown here from 1962 that you worked

25   through 1972 -- and let me just flip over; there's no new
```

KINSER v. CBS CORP., Case No. 94-2282

1    companies before 1972.

2           Between 1962 and 1972, you know that you had

3    asbestos exposure, correct?

4        A    Definitely.

5        Q    All right, sir.

6           Now, in addition to these companies, isn't it

7    true that you believe you have received exposure from

8    the, either the products or through working in

9    association with the following companies.  Okay?

10          And I'll just say a company, and you say "yes"

11   or "no."  Okay?

12       A    Yes, ma'am.

13       Q    You understand the question?

14       A    No.

15       Q    No.

16          I'll ask you the name of a company, and you

17   tell me whether or not you believe that they have caused

18   you asbestos exposure.

19       A    Yes, ma'am.

20       Q    All right, sir.

21          The A.P. Green Refractories Company?

22       A    Yes.

23       Q    ACandS, Inc.?

24       A    Yes.

25       Q    Armstrong World Industries?

KINSER v. CBS CORP., Case No. 94-2282

1      A      Yes.

2      Q      Asbestos Claims Management Corporation?

3      A      Yes.

4      Q      National Gypsum Company?

5      A      Yes.

6      Q      Coltec Industries?

7      A      Yes.

8      Q      Flexitallic, Inc.?

9      A      Yes.

10     Q      Fibreboard Corporation?

11     A      Yes.

12     Q      GAF Corporation?

13     A      Yes.

14     Q      Garlock, Inc.?

15     A      Yes.

16     Q      Pittsburgh Corning Corporation?

17     A      Yes.

18     Q      Uniroyal, Inc.?

19     A      Pardon me?

20     Q      Uniroyal, Inc.?

21     A      I'm not positive.

22     Q      All right, sir.

23            I'm going to show you a document, and I'm going

24     to ask you if this refreshes your recollection.  Okay?

25     Now, you remember this document I showed you earlier?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes.

 2        Q    You see that name right there, "Uniroyal"?

 3        A    Yes.

 4        Q    Does that --

 5        A    Okay, Uniroyal, yes.

 6        Q    Yes, sir.

 7        A    I -- since you showed it to me, I know what

 8   you're talking about now.  Yes, ma'am.

 9        Q    Okay.  W.R. Grace Company?

10        A    Yes.

11        Q    Rhone-Poulenc, P-o-u-l-e-n-c, formerly known as

12   Amchem Products?

13        A    May I --

14        Q    Yes, sir.

15             You see your name here?  And then we've got

16   Rhone, R-h-o-n-e, --

17        A    Oh, yes.

18        Q    -- dash, Poulenc, P-o-u-l-e-n-c, formerly known

19   as Amchem --

20        A    Yes.

21        Q    -- Products?

22        A    Yes.

23        Q    You agree that that company exposed you to

24   asbestos at some point?

25        A    Yes, ma'am.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    All right, sir.

2           And all of those companies that we just went

3    through and that we went through on your timeline and

4    that we talked about when we were talking about your

5    affidavits -- none of those are Westinghouse, correct?

6      A    Not to my knowledge, they aren't.

7      Q    All right.  And all of those exposures occurred

8    during those 100 or more jobs that you worked over the

9    course of your life, correct?

10     A    Yes.

11     Q    All right.  Now, to go back to where we had

12   left off, we were talking about your skin cancers.  Do

13   you recall right before the break?

14     A    Yes, ma'am.

15     Q    And in addition to the areas that we had

16   discussed before -- this is 2308.  It's a medical record.

17   We have an agreement that those can be published.

18          These are additional biopsy sites where you had

19   skin cancer, correct?

20     A    Okay.

21     Q    Can you zoom in just a little bit?

22          The "left posterior shoulder," so that's the

23   left shoulder on the back.  Do you remember that?

24     A    Yes.

25     Q    The right, your right -- I'm sorry, your left

KINSER v. CBS CORP., Case No. 94-2282

1    nose.  We already talked about that one, probably.

2         A    Yes.

3         Q    Your right scalp line.  So did you have a skin

4    cancer on your scalp --

5         A    Yes.

6         Q    -- as well?

7         A    Yes.

8         Q    Your left forearm, you had another one on your

9    left forearm?

10        A    Forearm, yes.

11        Q    Yes, sir.

12             And then left lower eyelid?

13        A    Yes.

14        Q    Okay.  And you haven't been back to the --

15        A    No.

16        Q    -- skin doctor in a while, have you?

17        A    No, ma'am.

18        Q    Every time you went there, they took some kind

19   of cancer off of you, didn't they?

20        A    Yes, ma'am.

21        Q    So you stopped going?

22        A    I stopped going because I didn't care for the

23   last gentleman that took care of me, so I'm going to a

24   different place when I get back home.

25        Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

1          Now, you would agree with me, wouldn't you,

2   sir, that you have, in fact, been diagnosed with chronic

3   obstructive pulmonary disease and emphysema, correct?

4          A    That's true.

5          Q    All right, sir.

6          Now, do you remember talking to us about

7   retirement?

8          A    Yes.

9          Q    Could I have the ELMO, please?

10          And you indicated that the reason that you had

11   retired in 1996 was because you did not feel you could

12   give work your full commitment because of your breathing

13   problems?

14          A    Yes, ma'am.

15          Q    Yes, sir.

16          And in 1996, your family lived in Florida,

17   right?

18          A    Yes, ma'am.

19          Q    All your kids lived down there?

20          A    Yes, ma'am.

21          Q    Your wife wanted to move to Florida?

22          A    Back to Florida.

23          Q    Yes, back to Florida.

24          And so in 2000, prior to the diagnosis -- what

25   day in 2000, if you recall, were you diagnosed with your

KINSER v. CBS CORP., Case No. 94-2282

1  lung, lung cancer?

2       A    August -- around August 18th.

3       Q    All right, sir.

4            So I'm going to show you -- it's a medical

5  record that we have an agreement can be displayed to the

6  jury.  It's Defendant's Exhibit 2317.  And this is a

7  record that is dated June the 26th of 2000.  Do you see

8  that?  I've highlighted it.

9            And it says in this H part -- that's history,

10 physical, and information, "HPI."  Do you see that?

11           It says that you told -- and this is a record

12 from Dr. Scanlon.

13      A    Uh-huh.

14      Q    Yes, sir?

15      A    Yes, ma'am.

16      Q    And you remember he testified that you did not

17 have asbestosis?  Do you remember that?  He did that

18 yesterday.

19      A    Yes.

20      Q    Okay.  But he says here in the history, which

21 is the information that he took from you, that you were

22 diagnosed with asbestosis in 1990.  That's what you told

23 him, correct?

24      A    I guess I did.

25      Q    Yes, sir.  And, and then, if you move down to

KINSER v. CBS CORP., Case No. 94-2282

1  this second highlighting, he says that you have no

2  wheezing or chest pain or fever.  You see that?

3      A   Yes.

4      Q   And then it says your wife says that you were

5  always short of breath -- SOB, short of breath; it

6  doesn't stand for anything else -- and the patient really

7  doesn't agree with that.

8      A   I guess that's --

9      Q   So she told him you were always short of breath

10 in 2000; and you told him, "No, I'm not."  Is that fair?

11     A   I think, I think I understand what you're

12 saying, but I won't be positive.

13     Q   All right.  Well, why don't you read -- look at

14 the screen.  Read, starting with the word "The."  Read

15 that.

16     A   Right.

17     Q   You can read it out loud if you'd like.

18     A   "The patient's wife says he is also SOB;

19 however, the patient really doesn't agree with that."

20     Q   So if your wife said you were "always" short of

21 breath and you didn't agree with that, you told him you

22 didn't agree with that, right, or he wouldn't have

23 written it here?

24         THE COURT:  How does he know that?

25     A   I guess.  Yes, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  I mean, you know, just personal
 2   knowledge.
 3              MS. EZELL:  Yes, sir.
 4   BY MS. EZELL:
 5       Q    Were you, did you give the doctor information,
 6   or the doctor's office information about you when you
 7   went in for your visits?
 8       A    Did I give my doctor's office what?
 9       Q    Information.
10       A    About what?
11       Q    About you.
12       A    I suppose I did.
13       Q    Yes, sir.
14              If you read down here, it says you worked at
15   Publix.  You must have told him that.  They wouldn't have
16   known it otherwise, right?
17       A    Okay, fine.
18       Q    Yes, sir.
19              And so does that -- do you recall, right now,
20   that in 2000 you were not having any problems with being
21   short of breath?
22       A    That's not true.
23       Q    Okay.  And so is it possible that, in addition
24   to being worried about not being able to give your all at
25   your job, you also had reached an age where you could
```

KINSER v. CBS CORP., Case No. 94-2282

1  retire, and you wanted to move to Florida; and that's why

2  you retired?

3      A    No.  It was not.  I could have worked till I

4  was 65 or 70.  I decided that I could not do my best at

5  my work; and that's what I decided, because I just

6  have -- couldn't breathe properly, so I decided that I

7  would retire.

8      Q    Yes, sir.

9      A    It was not because I reached the age of

10  retirement, because I could have worked longer.  There

11  was -- there's no cut-off date that you can work.

12      Q    And in 1962 -- or 1996, you could not get a

13  travel card to go back to Florida, could you?  Your

14  choice, if you wanted to move to Florida, was to retire,

15  correct?

16      A    I could have gotten a travel card if I wanted

17  one.  I did not want one.

18      Q    All right, sir.

19          MS. EZELL:  Your Honor, if I could just have a

20  minute.

21          THE COURT:  Sure.

22              (Brief pause in proceedings.)

23          MS. EZELL:  All right, Your Honor.  I think

24  that's all the questions we have.  Thank you.

25          THE COURT:  Redirect.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            REDIRECT EXAMINATION BY MR. McCOY:

 2       Q    Mr. Kinser, did the local union in Savoy have

 3  meetings?

 4       A    Yes, we did.

 5       Q    How often did the local have meetings, for the

 6  membership?

 7       A    I believe it was once a month.  I haven't been

 8  to a meeting for years.

 9       Q    All right.  At any of these local meetings in

10  Savoy, before 1990, were you told not to crumble and

11  pulverize asbestos?

12       A    We were never told anything about asbestos.

13       Q    Crumbling and pulverizing of asbestos, is that

14  what happened at Zion?

15       A    Some of it, yes.

16       Q    Did you know that asbestos was going to cause

17  the conditions that Dr. Scanlon found when you were at

18  job sites when there was crumbling and pulverizing of

19  asbestos?

20       A    No, sir.

21       Q    When did you know asbestos would cause those

22  kinds of conditions?

23       A    I believe it was mid to late '80s.

24       Q    The Westinghouse representatives at Zion, were

25  they present when there was dust?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes, they were.

 2        Q    Did the Westinghouse representatives at Zion

 3   say asbestos was a killer?

 4        A    No, sir.

 5        Q    Did the Westinghouse representatives at Zion

 6   stop you from working around the asbestos dust?

 7        A    No, sir.

 8        Q    Did any of the pipefitters based out of Local

 9   597 who were on the job at Zion tell you asbestos was

10   dangerous?

11        A    No, sir.

12        Q    Did any of the personnel at the University of

13   Illinois?

14        A    No.

15        Q    When you worked at Abbott Labs, did they tell

16   you it was dangerous, asbestos?

17        A    No.

18        Q    Okay.  These journals of the International --

19   this is the International journal, right?

20        A    Yes, sir.

21        Q    Okay.  This is not published by the local in

22   Savoy, right?

23        A    No.  It comes from the International.

24        Q    Okay.  Did, did you have to -- did you

25   subscribe to these journals and get these, where you had
```

KINSER v. CBS CORP., Case No. 94-2282

1  to pay for them?

2       A    No.  They come free.

3       Q    Okay.  So this is just something that was sent

4  to you, like, for whatever you want to read it for?

5       A    Yes.

6       Q    Okay.  Did you read this every, every time you

7  got it?

8       A    No.

9       Q    Did the union always have your correct address

10 for even mailing this journal where you could get it?

11      A    No.  In fact, I was at the union hall

12 yesterday; and they had the wrong address down for me

13 there, so I had to have them change it.

14      Q    Was this journal coming to you before '73?

15      A    I don't remember it.

16      Q    Westinghouse's attorneys showed you a video.

17 Did that accurately depict the amount of dust that would

18 come from cutting and sawing of asbestos insulation at

19 Zion?

20      A    I'm sorry.  I didn't hear the first part of the

21 question.

22      Q    Okay.  Westinghouse's attorneys showed you a

23 video, --

24      A    Okay.

25      Q    -- the one about the asbestos pipe covering.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes.

 2        Q    Okay.  Did that video accurately depict the

 3   amount of dust that was visible from cutting and sawing

 4   asbestos at Zion?

 5        A    No.

 6        Q    Why do you say that?

 7        A    What they were doing there is running straight

 8   lengths of, of asbestos insulation.  There was no -- they

 9   were not cutting it.  When he did cut it out for that

10   union, when he put it together, you saw the dust come up.

11   That's what happens.

12        Q    What about hammering or crushing and

13   pulverizing of asbestos insulation?  Did that video

14   accurately depict the dust from that?

15        A    Yes.

16        Q    I'm talking about the, like, using the hammer

17   on it.

18        A    Oh, the hammer?

19        Q    Yes.

20             MS. EZELL:  Asked and answered.

21        A    Hammer will really show up the asbestos dust.

22        Q    Okay.  Did the video accurately show that?

23        A    I don't believe so.

24             (Brief pause in proceedings.)

25        Q    All right.  I can't find that right now, but --
```

1    oh, here it is.

2         This is the exhibit that the Westinghouse

3    attorneys had showed you.  And this one shows the, the

4    pink line here where there's piping coming into the

5    turbine, right, --

6         A    Yes.

7         Q    -- on one side, and then there's the turbine

8    structures on the other side.

9         A    Yes, sir.

10        Q    Okay.  In terms of the amount of time that you

11   spent working on this piping over here versus working on

12   these structures on the other side of that, that pink

13   line, including the part underneath there, how -- what

14   portion of your time for you was divided?  How was that

15   divided?

16        A    I probably worked about 75 percent on the

17   front.

18        Q    On the piping?

19        A    On the piping.

20        Q    And the other 25 percent was where?

21        A    Underneath with valves and taking the valves

22   down and taking pipe out.

23        Q    How about on the other side of the pink line

24   there?

25        A    We didn't get into that.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  What about as-- what about removal of

2  the blankets?  Where was that?  Was that on --

3      A    I didn't get in on the removal of the blanket

4  on that one.  I did on the other one.

5      Q    What do you mean by "the other one"?

6      A    The second turbine.  I don't know which one it

7  was, --

8      Q    Okay.  So --

9      A    -- whether it was 1 or 2.

10     Q    Okay.  Explain, explain what you mean by "the

11  second turbine" that you got in on the blankets.

12     A    Well, it was the next turbine over that they

13  were putting, taking the blanket off and have to unfasten

14  it, removing it off of the top of the turbine.

15     Q    Okay.  So what you're saying is:  There was

16  work on the second turbine that also took place?

17     A    It was, it was getting started when I left.

18     Q    What, what did you do as far as working on the

19  blanket removal of the second turbine?

20     A    Just helped move it off, off the top of it.

21     Q    And what else was going on on that second

22  turbine?

23     A    Nothing right then.

24     Q    Just blanket removal?

25     A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And that's -- and then after that is when you

2  went -- when you left?

3      A    Yes.

4      Q    Okay.  How is it that you remember about four

5  and a half months at Zion?

6      A    Because we were going back to Florida.

7      Q    Okay.

8           (Brief pause in proceedings.)

9      Q    Staying again with this exhibit, Defendant's

10 Demonstrative Exhibit 8, this high pressure turbine, was

11 that dismantled, then, by other pipefitters and other

12 trades?

13     A    Yes.

14     Q    Okay.  And also this --

15     A    Yes.

16     Q    -- low pressure --

17     A    Yes.

18     Q    -- systems?  Okay.

19          And were you present when that disassembly was

20 ongoing?

21     A    Yes.  But I was working up on the front of the

22 turbine.

23     Q    Okay.

24     A    I was present when they were working on it.

25 Yes.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    And what, if any, dust did you see from the

2   disassembly work on the other parts?

3       A    If, if there was asbestos insulation on it,

4   they were taking it off; and if there was dust in it,

5   they would knock it off and clean, clean it up with --

6   laborers would clean it up.

7       Q    Was it -- would it -- was it fair to say that

8   most all the turbine was taken apart?

9       A    Yes.

10          MR. McCOY:  That's all the questions I've got.

11  Thank you.

12          THE WITNESS:  You're welcome.

13          MS. EZELL:  May I have --

14          THE COURT:  Excuse me.  I didn't hear anything

15  outside the scope of cross.

16          MS. EZELL:  There was some new information with

17  regard to cross, but if -- it's fine, Your Honor.  I --

18          THE COURT:  Well, no.  It's not fine.  I don't

19  want to be unfair to you.  Go ahead.  Ask a question.

20  But I'm -- I thought he was covering what you did on

21  cross.

22              RECROSS-EXAMINATION BY MS. EZELL:

23      Q    As it relates to Defendant's Demonstrative

24  Number 8, Mr. Kinser, you just talked about this with Mr.

25  McCoy.

KINSER v. CBS CORP., Case No. 94-2282

1        A      Pardon?

2        Q      You just talked about -- you just talked about

3   this with Mr. McCoy, correct?

4        A      [Nodding head up and down.]

5        Q      Yes?

6        A      I think -- if I understand your question, yes.

7        Q      And you indicated that, if this is Turbine

8   Number 2, that you worked on Turbine Number 1 removing

9   the blankets, correct?

10       A      Yes.

11       Q      And you indicated that the blankets were on top

12  of the turbine; is that fair?

13       A      Covered up the turbine, yes.

14       Q      And by "covered it up," where exactly did they

15  cover it?  From the very bottom of the ground to the very

16  top of the turbine?

17       A      Yes.

18       Q      All right.  Now, you indicated that the reason

19  that you can remember Zion so clearly, as compared to all

20  of your other jobs, is because you were going back to

21  Florida, correct?

22       A      Yes.

23       Q      And, yet, sir, your memory as it relates to

24  when you lived in Chicago, or Illinois versus when you

25  lived in Florida is not even that clear, is it, sir?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    I'm -- I don't get your indication, ma'am.

 2        Q    When you testified at your deposition and you

 3   were asked about when you lived in Illinois versus when

 4   you lived in Florida, you had a hard time recalling that,

 5   didn't you, sir?

 6        A    I guess I did.  I don't remember it.

 7        Q    If you can get your July deposition, I can

 8   direct you to the page 37.

 9        A    Is that the big one or the little one?

10        Q    I don't know.  It's the one that says "July

11   the --

12        A    I've got one that says "September" on it.  It's

13   the other one?

14        Q    It's the other one.

15        A    Okay.

16        Q    Page 37.

17        A    I'm on 37.

18        Q    Yes, sir.

19             And, and if you can just read, starting at line

20   7 -- just read it to yourself and then read over to the

21   next page, and then I'll ask you a question.

22        A    What am I supposed to read?

23        Q    Just read starting on line 7 --

24        A    Yes, ma'am.

25        Q    -- on page 37 to yourself.  And then read over
```

KINSER v. CBS CORP., Case No. 94-2282

1   to page 38, line 9; and I'll ask you a question.

2        A    Okay.

3              (Brief pause in proceedings.)

4        A    Okay.

5        Q    All right.  Now, isn't it true, sir, that at

6   this deposition, which was taken in 2011 -- that would be

7   on the front page --

8        A    Yes, ma'am.

9        Q    -- that you were asked, "Where in Florida did

10  you move at this time; is that --

11             THE COURT:  Would you please -- were you asked

12  this question, and did you give this answer?

13             MS. EZELL:  Yes, sir, but I'm not --

14             THE COURT:  That is the proper way.  If you're,

15  if -- you know, are you asking to refresh his

16  recollection?  That's a different thing.  I don't know

17  what you're doing.

18             MS. EZELL:  I'm using this document to refresh

19  his recollection about the quality of his memory at the

20  time of the deposition.

21             THE COURT:  Well, let me hear a question about

22  that.

23             MS. EZELL:  Okay.

24  BY MS. EZELL:

25        Q    At the time of this deposition, sir, were you

KINSER v. CBS CORP., Case No. 94-2282

1    asked about where you moved in Florida?

2        A    Yes.

3            THE COURT:  No, no, no, no.  Did reading that

4    refresh your memory now about difficulty in remembering

5    when you moved to Florida?

6            MS. EZELL:  Okay.

7            THE COURT:  Did it refresh your memory?

8            THE WITNESS:  I, I didn't hear your answer --

9    or your question, Your Honor.  I'm sorry.

10           THE COURT:  Ask him that.

11           MS. EZELL:  Yes, sir.

12   BY MS. EZELL:

13       Q    After having read the page that I asked you to

14   read, do you recall that at your deposition you couldn't

15   remember whether you moved to Deerfield Beach or St.

16   Cloud, Florida?

17       A    That's true.

18       Q    And your wife actually interrupted the

19   deposition and gave you the answer?

20       A    That's true.

21       Q    And do you remember that at your deposition you

22   couldn't remember what year you moved to Florida?

23       A    I moved there a couple, three times.

24       Q    Yes, sir.

25           But your wife interrupted to tell you that you

KINSER v. CBS CORP., Case No. 94-2282

1  moved there in 1979, correct?

2       A    Okay, fine.

3       Q    That's what happened at that one page, correct?

4       A    Okay.  That's fine.

5       Q    But is that a "yes"?  That's what happened?

6       A    Yes, ma'am.

7            MS. EZELL:  Okay.  I have nothing further, Your

8  Honor.

9            THE COURT:  Very well.

10           Now, do you want to ask questions, because that

11  kind of opened something up new?

12           MR. McCOY:  No, Judge.  I think we're --

13           THE COURT:  Okay.

14           MR. McCOY:  -- we're done.

15           THE COURT:  You may step down.

16           THE WITNESS:  Thank you, Your Honor.

17              (Witness Kinser excused, 3:42 p.m.)

18           THE COURT:  Now, next, further evidence for the

19  plaintiff.

20           MR. McCOY:  Judge, we have the deposition of

21  Mr. Frank Parker.

22           THE COURT:  That's the doctor, the surgeon?

23           MR. McCOY:  He's actually an industrial

24  hygienist, Plaintiffs' expert witness.

25           THE COURT:  Oh, okay.

KINSER v. CBS CORP., Case No. 94-2282

1           Go on home, jurors because this -- you're never

2    going to see this before dark fell, and it's quarter of;

3    and it's cleared up, I understand.  Tomorrow should be a

4    good travel day, too.

5           Be back at 9:00 tomorrow.  Don't discuss the

6    case among yourselves or with anyone else.  Don't let

7    anybody talk to you about it.

8              (Jury dismissed for the day, 3:42 p.m.)

9           THE COURT:  Okay.  I'll see you-all in the

10   morning.

11             (Trial adjourned, 3:43 p.m.)

12

13             *  *  *  *  *  *  *  *  *  *

14

15                  REPORTER'S CERTIFICATE

16        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

17   that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19        Dated this 14th day of January, 2014.

20

21

22

23              s/Lisa Knight Cosimini
                _____
                Lisa Knight Cosimini, RMR-CRR
24              Illinois License # 084-002998

25