KINSER v. CBS CORP., Case No. 94-2282

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

    Plaintiffs,    Docket No. 94-2282

  vs.        Urbana, Illinois
          January 15, 2014
          9:00 a.m.

CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

    Defendant.


JURY TRIAL -- Day 6
(Testimony of William Joseph LaPointe)

BEFORE THE HONORABLE HAROLD A. BAKER
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:  ROBERT G. McCOY, ESQUIRE
        Cascino Vaughan Law Offices, Ltd.
        220 South Ashland Avenue
        Chicago, Illinois 60607
        312-944-0600

For the Defendant:  SANDRA GIANNONE EZELL, ESQUIRE
        Bowman and Brooke, LLP
        901 East Byrd Street, Suite 1650
        Richmond, Virginia 23219
        804-649-8200

        PAULA M. BURLISON, ESQUIRE
        Bowman and Brooke, LLP
        1441 Main Street, Suite 1200
        Columbia, South Carolina 29201
        803-726-7420

        JACOB DANIEL SAWYER, ESQUIRE
        Foley & Mansfield, PLLP
        55 West Monroe, Suite 3430
        Chicago, Illinois 60603
        312-254-3800

KINSER v. CBS CORP., Case No. 94-2282

I  N  D  E  X

Page

WITNESSES ON BEHALF OF THE PLAINTIFFS:

WILLIAM JOSEPH LaPOINTE

Direct Examination by Mr. McCoy ............... 19

Cross-Examination by Ms. Ezell ............... 81

Redirect Examination by Mr. McCoy ............ 115


FRANK PARKER

Deposition commenced .......................... 117

```
 1                    (In open court, 9:03 a.m.)
 2              THE COURT:  All right, if you'll be seated and
 3    come to order.  Good morning.
 4              MS. EZELL:  Good morning.
 5              THE COURT:  We have something to tell you about
 6    one of the jurors.  It's not bad; it's just information.
 7              Jessica, what is the juror's name?
 8              DEPUTY CLERK:  Juror John Hedrick.
 9              THE COURT:  Hedrick.  Where's he from?
10              DEPUTY CLERK:  I don't know.
11              THE COURT:  Is he from Champaign County?
12              DEPUTY CLERK:  I don't know.  I'd have to look
13    him up.
14              THE COURT:  Okay.  But anyway, Mr. Hedrick, who
15    sits on the end and so forth, the guy who said that he
16    had a surgical procedure -- it was coming up Tuesday
17    next -- he has rescheduled it.  He wants to serve.  He's
18    here doing his duty.  And so that's okay with us, and you
19    should know, though, that we have had this communication
20    back and forth with him.
21              Okay.  Are you ready to proceed?
22              MS. EZELL:  Your Honor, I have received from
23    Plaintiff some indication of some exhibits that they plan
24    to use with the first live --
25              THE COURT:  And you're not wearing your
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   microphone.
 2            MS. EZELL:  Oh, I am wearing it.  I just
 3   haven't turned it on.  I'm so sorry.
 4            THE COURT:  Yes, please.
 5            MS. EZELL:  Plaintiff's counsel advised us that
 6   he plans to use certain exhibits with their first live
 7   witness, and I'd like to argue about those.
 8            THE COURT:  Go ahead.
 9            MS. EZELL:  And I'd like to ask that the
10   witness be excused.
11            MR. McCOY:  Judge, that's fine.  This is Mr.
12   LaPointe.  He's here today.
13            THE COURT:  No objection.
14            MR. McCOY:  He's an expert on turbine
15   construction work.
16            THE COURT:  Yeah.  Would you step outside,
17   please.
18                (Witness LaPointe is exiting the courtroom.)
19            MS. EZELL:  Your Honor, the objections are
20   based on a, a number of different things.  I'll start
21   with what I think will probably be the least
22   controversial.  We received a packet of -- well, it's
23   Plaintiffs' Exhibit 317, and it is about a half an inch
24   thick; and it put me to mind, Your Honor, of those UA
25   journals that I brought with me yesterday.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              And what Your Honor said was:  While there may

 2    be a page or two there that might be relevant, I can't

 3    imagine that that whole exhibit is.

 4              And I -- my, my thought is, is that the same is

 5    true of this document.  Now, I don't know whether this

 6    witness can lay a foundation for this document at all,

 7    but what I can tell Your Honor -- I'm sorry.

 8              Mr. McCoy, would it be -- would you not stand

 9    right here by my notes for this argument?  Thank you.

10              Is it -- there is one page in here, page 11,

11    that has information about the Zion plant.  And I have

12    looked through this entire document; and other than that,

13    Your Honor, you'll see that there are a number of other

14    plants called out here:  LaSalle, Byron, Braidwood, Cook,

15    Arnold, and then -- I think, probably most

16    interestingly -- a plant called "Three Mile Island."

17              And so my objection to this document is that it

18    is far more over-inclusive than it needs to be for any

19    purpose in this case.  And to the extent that it, that

20    testimony, a proper foundation can be laid to discuss

21    Zion from this document, then we would have no objection

22    to that page and the cover page being a modified

23    exhibit --

24              THE COURT:  Well, let's cut to the chase here.

25              MS. EZELL:  Yes, sir.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1              THE COURT:  Mr. McCoy, what do you plan to

2    offer from this particular document -- whose exhibit

3    number is what? --

4              MS. EZELL:  317.

5              THE COURT:  -- with this prospective witness?

6              MR. McCOY:  The document --

7              THE COURT:  Don't stand too close to

8    Mrs. Ezell.

9              MR. McCOY:  That's right.

10             THE COURT:  You might see her notes.

11             MR. McCOY:  The document, Judge, it's titled

12   "Commercial Nuclear Power Plants."

13             THE COURT:  Yeah.  I saw it.  It was there.  I

14   got that.

15             MR. McCOY:  And it's a publication which

16   records the basic information about when --

17             THE COURT:  He's not -- is he going to talk

18   about Three Mile Island?

19             MR. McCOY:  No.  He's not talking about Three

20   Mile Island, and --

21             THE COURT:  Okay, obviously.

22             MR. McCOY:  -- he's only talking about plants

23   that he worked at or are in the Commonwealth Edison

24   system.

25             THE COURT:  Does he know about Zion?
```

7

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  He, he knows about Zion.  Yes.

 2              THE COURT:  How?

 3              MR. McCOY:  He knows about Zion for, for two

 4   main reasons.  One is he's seen the plant and

 5   specifications for Zion and read testimony that was given

 6   about it by Westinghouse's own witness.

 7              The second reason he knows about it is because

 8   he worked at all kinds of turbine systems during his

 9   career.  Fifty percent of his work was turbine work.  He

10   worked for Westinghouse on many jobs as the foreman for

11   Westinghouse, directing turbine work.

12              THE COURT:  Yeah.  Well, I'll have to hear

13   this --

14              MR. McCOY:  Right.

15              THE COURT:  -- as it's presented to see if, you

16   know --

17              MR. McCOY:  But he is a witness --

18              THE COURT:  It's a basis for his opinions, you

19   mean?

20              MR. McCOY:  Right.  He's an expert in turbine

21   work.

22              THE COURT:  He's an opinion witness.

23              MS. EZELL:  So as it relates --

24              THE COURT:  But he's not --

25              MS. EZELL:  Oh.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1          THE COURT:  -- he's not going to talk about --

 2          MR. McCOY:  Three Mile Island.

 3          THE COURT:  -- Zion other than generally?

 4          MR. McCOY:  He's seen some actual documents.

 5   He'll talk about specifics, but he --

 6          THE COURT:  What does that mean?  "He has seen

 7   some documents"?

 8          MR. McCOY:  Well, Westinghouse's documents for

 9   the Zion turbine.  Right.

10          THE COURT:  Okay.  So he's going to talk about

11   specs that --

12          MR. McCOY:  A couple of them.  Right.

13          THE COURT:  Right.

14          MR. McCOY:  Most of, most of the documents

15   we'll talk about when Westinghouse's witness comes in,

16   but he's talking about a couple.  But they're

17   Westinghouse documents.

18          THE COURT:  All right.  And you say they're

19   Westinghouse documents.  Did -- do you know that it's

20   been produced in discovery?

21          MR. McCOY:  Right.  These are the ones from the

22   Westinghouse attorneys that have the stamp on them that

23   come from their files, so --

24          THE COURT:  Well, you know, it -- I'm listening

25   generally, generically; and I, I'm not going to take time
```

KINSER v. CBS CORP., Case No. 94-2282

1   to have an offer of proof.  We'll just have to do it as

2   we go along.

3               MS. EZELL:  So as it relates to this document,

4   Your Honor, then, can we in some form or --

5               THE COURT:  I know what your objection is, and,

6   and the same ruling is going to come out of me, Mr.

7   McCoy, that came out about that, that publication of the

8   International Pipefitters Union.

9               MR. McCOY:  I --

10              THE COURT:  The whole thing isn't, isn't coming

11  into evidence, --

12              MR. McCOY:  I --

13              THE COURT:  -- but certain portions may.

14              Or they may know -- the jury may know that this

15  man who's going to offer opinions and who -- because of

16  his experience, training, and so forth -- can offer an

17  opinion; is going to say how he relied on certain

18  information that he got out of the document.

19              MR. McCOY:  Yes.

20              This document will not be shown at all to the

21  jury.  It's only for reference if he needs to get a date

22  as to when a plant was built.

23              THE COURT:  Okay.

24              MR. McCOY:  He knows when most of them were

25  built, --

KINSER v. CBS CORP., Case No. 94-2282

```
 1                THE COURT:  All right.  So --

 2                MR. McCOY:  -- but sometimes he'll forget.

 3                THE COURT:  So, Mrs. Ezell -- the defendant's

 4     objection about putting the whole document before the

 5     jury is not going to happen.

 6                MR. McCOY:  Right.  We're not putting any part,

 7     other than if he needs to look at something to find a

 8     date.

 9                THE COURT:  Okay.

10                MR. McCOY:  That's it.  And I'm not going to

11     show it to the jury.  He just can look it up.

12                THE COURT:  All right.

13                MS. EZELL:  All right.

14                THE COURT:  So I will sit and wait and see what

15     happens.

16                MS. EZELL:  Your Honor, --

17                THE COURT:  So far, so far, nobody's burned

18     you.

19                MS. EZELL:  Your Honor, I have three other

20     documents that I would like to address with the Court;

21     and before I do that, I need to provide the Court with

22     some information about this witness.

23                Mr. McCoy has represented that this witness has

24     seen certain drawings of the Zion plant, and he's seen

25     certain specifications.  And that is true.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1           But he did not do that in the course of his
 2   employment.  He did that for purposes of litigation.
 3   This witness is --
 4           THE COURT:  Isn't that true of any opinion
 5   witness, usually, in litigation?
 6           MS. EZELL:  Yes, sir.
 7           But let me tell you about this witness.  This
 8   witness is designated as an expert but spent his life in
 9   the construction trade; and so in the construction trade,
10   he has testified on numerous occasions that he did not
11   have any opportunity through the course of his training,
12   through the course of his work, to read diagrams.  He was
13   not given them and asked to interpret them.  He is not
14   familiar with what a drawing list is.  He has never heard
15   of a process specification.
16           THE COURT:  It sounds to me like that goes to
17   his credibility.
18           MS. EZELL:  Yes, sir.  But it also goes to
19   whether he can lay the foundation necessary to admit the
20   document.
21           THE COURT:  Who says he's going to admit it?
22           MS. EZELL:  He --
23           THE COURT:  Mr. McCoy just told me he's not
24   going to admit the document.
25           MS. EZELL:  This is a different document.  This
```

KINSER v. CBS CORP., Case No. 94-2282

1   is 101.  And Mr. McCoy sent it to me last night and said

2   that they, in fact, were going to admit it; so if they're

3   not going to admit it, then I guess I'm, I'm wasting

4   everybody's time.

5           THE COURT:  101, are you going to offer it in

6   evidence?

7           MR. McCOY:  I don't have to with this witness,

8   but he's going to talk about some part of 101.  I'm going

9   to publish some part of it.  101 is the specifications

10  from Zion that we got from Westinghouse.  These are the

11  original ones that Westinghouse claims were changed, and

12  that's the issue, --

13          THE COURT:  Yeah.

14          MR. McCOY:  -- is:  Were these changed?

15          But these are the ones.  Your Honor's already

16  ruled on these, actually, --

17          THE COURT:  Yes.

18          MR. McCOY:  -- in that part of the deposition

19  before.

20          MS. EZELL:  And what you ruled, Your Honor, was

21  that Mr. Parker could not lay a foundation to admit that

22  document into evidence; that as of right now, this

23  document is not in evidence.

24          And my argument is that:  Through this witness

25  who's about to take the stand, he cannot lay a foundation

KINSER v. CBS CORP., Case No. 94-2282

1   to admit this document and, therefore, this document

2   still cannot --

3           THE COURT:  Do you now claim that this

4   document, which purports to be the original

5   specifications for Zion which was produced by your client

6   in discovery, has some doubt about its authenticity?

7           MS. EZELL:  Your Honor, we've said -- I've said

8   this before.  My claim is, is that this is -- on many

9   levels.  Number one, I cannot give evidence of its

10  authenticity.  I can simply --

11          THE COURT:  How can you stand there and say --

12  when your client produced it in response for a, for a

13  discovery demand that -- "This is part of our records;

14  this is the original specification" -- that somehow now

15  you get up and say:  Well, it really isn't.

16          MS. EZELL:  Well, I'm not saying it isn't.

17          MR. McCOY:  And, Judge --

18          MS. EZELL:  I'm sorry.

19          I'm saying that it's Mr. McCoy's obligation,

20  under the rules of procedure, to bring a proper witness

21  to say that it is.

22          THE COURT:  Where?  Where was that?

23          MS. EZELL:  It just --

24          THE COURT:  It just needs to be authenticated;

25  does it not?

KINSER v. CBS CORP., Case No. 94-2282

```
 1          MS. EZELL:  It needs to be authenticated.

 2          THE COURT:  Does it not be authenticated when

 3   you say:  That is the original, real specification for

 4   Zion?

 5          MS. EZELL:  But, and nobody has said that.

 6          MR. McCOY:  Judge, that's --

 7          THE COURT:  When Westinghouse -- just contain

 8   yourselves.

 9          When Westinghouse, in response to the discovery

10   demand, said, "These, here you are.  Here are, here are

11   the original specs," --

12          MS. EZELL:  Yes, sir.

13          THE COURT:  -- you think that doesn't

14   authenticate it?

15          MS. EZELL:  And let me tell you what, what,

16   what -- what I'm talking about.

17          In response to discovery, Westinghouse -- or

18   any company -- has to produce anything in their files.

19   In their files could be documents from a supplier, could

20   be documents from Commonwealth Edison, could be documents

21   from OSHA.  Westinghouse is not in a position to

22   authenticate those documents just because they happen to

23   be in their files.

24          In order to authenticate a document, you need

25   to have somebody from that company come and say, "This is
```

KINSER v. CBS CORP., Case No. 94-2282

1   an authentic document."  I am not from that company.  I

2   am counsel for that company.  I, I --

3             THE COURT:  It's a Westinghouse document; is it

4   not?

5             MS. EZELL:  If you say it is, Your Honor, if

6   you're taking judicial notice of that, then --

7             THE COURT:  No.  I'm not --

8             MS. EZELL:  -- it is.

9             THE COURT:  -- taking judicial notice of

10  anything.  You love to put words in my mouth.

11            MS. EZELL:  Well, no.  I'm saying -- I'm not

12  saying it, and you're not saying it; and he doesn't have

13  a witness who can say it.

14            THE COURT:  No.  But I'm trying to follow the

15  logic of your approach to this, when the plaintiff says

16  to Westinghouse, "Give me the documents, all the

17  documents you have dealing with, with Zion," --

18            MS. EZELL:  Yes, sir.

19            THE COURT:  -- and they give them the

20  specifications, --

21            MS. EZELL:  They give them all kinds of things,

22  including the specifications.

23            THE COURT:  -- that's a Westinghouse document;

24  is it not?

25            MS. EZELL:  Your Honor --

KINSER v. CBS CORP., Case No. 94-2282

1        THE COURT:  "I, the keeper of the Westinghouse

2   corporation, secretary, I'm responsible.  Here are my --

3   here are the documents."

4        MS. EZELL:  If he has an affidavit to that

5   effect, if he has a request for admission to Westinghouse

6   that says, "Please admit that Document Number Zion 1 is

7   an authentic document," then it is --

8        THE COURT:  Well, you know, --

9        MS. EZELL:  -- if he has a witness.

10        THE COURT:  -- this is all hypothetical,

11   really, because I haven't heard the witness and don't

12   know how you're going to go about it.

13        Now, what do you want to say, Mr. McCoy?

14        MR. McCOY:  The Westinghouse witness designated

15   in this case has testified on at least two or three

16   occasions in depositions -- and at the last trial

17   involving Zion -- that this is the specifications.

18        THE COURT:  Is that guy going to be here?

19        MR. McCOY:  Yeah.  He's the witness, Doug Ware,

20   we've been talking about.

21        THE COURT:  Well, --

22        MR. McCOY:  I'm just saying:  We have his

23   deposition testimony.  Not only did this come from

24   Westinghouse, but this is the document --

25        THE COURT:  And you're bringing this guy,

KINSER v. CBS CORP., Case No. 94-2282

```
1    right?
2              MS. EZELL:  I'll bring him.  Yes, sir.
3              THE COURT:  Okay.  You may have to connect it
4    up later before I say, "Yes, it's admitted."  I don't
5    know.  But it seems to me that for, for Westinghouse to
6    say, "I produced this document and it is the specs for,
7    for Zion," and now to stand up here in the trial and say,
8    "Wait a minute, wait a minute," Kings X, --
9              MS. EZELL:  Your Honor, --
10             THE COURT:  -- you don't know that.
11             MS. EZELL:  -- you misunderstand.
12             THE COURT:  No.  I'm done.  We're going to
13   proceed.
14             MS. EZELL:  Your Honor, --
15             THE COURT:  I'll rule on this as we go along.
16             MS. EZELL:  And just so I'm clear, --
17             THE COURT:  I now gather -- thank you for
18   warning me of what's coming.
19             MS. EZELL:  And, and just so the record is
20   clear, Your Honor, this is an objection as to the order
21   of proofs, not as to whether or not this document would
22   be admissible with a proper sponsoring witness.
23             And, and, and my objection -- which I don't
24   believe I have a ruling on -- is whether or not this
25   witness --
```

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  I will determine what's an

2    acceptable order of proof, not you.

3          MS. EZELL:  I know.  But I just wanted you to

4    understand that that was the nature of my objection, --

5          THE COURT:  Oh.

6          MS. EZELL:  -- and I know who will make that

7    determination.

8          THE COURT:  I, I -- Mrs. Ezell, I understand

9    your objection.  I understand where you're coming from.

10   And you've made a big record of it.

11         MS. EZELL:  Okay.  Well, I, and I in no way

12   intended to convey to the Court that I was standing here,

13   with my arms crossed, saying, "This is not a Westinghouse

14   document, and it's never coming in."

15         I'm saying that there are rules about how these

16   things happen, and they deal with the order of proofs;

17   and I don't think it's unfair to ask that Mr. McCoy

18   follow those rules, and that's simply all I was doing.

19         I didn't mean to offend the Court in any way.

20         THE COURT:  You did not.

21         MS. EZELL:  Thank you, Your Honor.

22         THE COURT:  You did not.  I have not been

23   offended by anything so far in this case, or anyone.

24         MS. EZELL:  Hopefully, that will be true

25   throughout.  Thank you.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  I hope so, too.  I hope I don't
 2    offend you.
 3              MS. EZELL:  Thank you, Your Honor.  I mean,
 4    yes, sir.
 5              THE COURT:  Okay.  Bring the jury back.
 6                   (Brief pause in proceedings.)
 7                   (Jury present, 9:20 a.m.)
 8              THE COURT:  Good morning, jurors.
 9              My reading of the forecast is that these are
10    supposed to be flurries, and they're going away, I hope.
11    Okay.
12              All right.  Further evidence for the plaintiff.
13              MR. McCOY:  Thank you, Judge.  The plaintiffs'
14    next witness will be William LaPointe.
15          WILLIAM JOSEPH LaPOINTE, sworn, 9:21 a.m.,
16                DIRECT EXAMINATION BY MR. McCOY:
17        Q    Mr. LaPointe, I'd like you to start, introduce
18    yourself to our jurors.
19              THE COURT:  You said "Mr. McCoy."  Surely, you
20    didn't mean that.
21              MR. McCOY:  I thought I said "Mr. LaPointe,"
22    but --
23              THE COURT:  Well, you may have.
24              MR. McCOY:  -- my voice --
25              THE COURT:  It came through to me, and I
```

KINSER v. CBS CORP., Case No. 94-2282

1    thought, "My, that's interesting."  Go ahead.  Start

2    again.  I'm sorry.

3              MR. McCOY:  My voice is a little bit hoarse

4    here.

5    BY MR. McCOY:

6        Q    Okay.  Mr. LaPointe, I'd like you to introduce

7    yourself to our jurors.  Begin by giving us your full

8    name and spell your last name for everybody.

9        A    I am William Joseph LaPointe, L-a-P-o-i-n-t-e.

10       Q    And where do you live now, Mr. LaPointe?

11       A    4647 Highway 141, Abrams, Wisconsin.

12       Q    Is that up toward Green Bay?

13       A    Twenty miles north of Green Bay.

14       Q    Okay.  And tell us when you were born.

15       A    Third month, third day of '48.

16       Q    Okay.  You're retired now?

17       A    Retired.

18       Q    And what work did you do before retirement?

19       A    I worked for 39 years as a

20   carpenter/millwright.

21       Q    Okay.  Millwright, can you spell that for

22   everybody?

23       A    M-i-l-l-w-r-i-g-h-t.

24       Q    Okay.  And what does a millwright do?

25       A    A millwright installs machinery, disassembles,

KINSER v. CBS CORP., Case No. 94-2282

```
 1    inspects, repairs any kind of working machinery with
 2    moving parts.
 3         Q    Turbine systems, is that --
 4         A    Turbine systems, paper machines, converting
 5    machines -- any kind of, any kind of machinery.
 6         Q    Okay.
 7         A    A mechanic.
 8         Q    You've got to wait until I finish my questions
 9    so our court reporter doesn't -- you know, create
10    frustration for her.  So hold off for a moment.
11              And can you give us an idea of what your
12    education has been, --
13         A    Well, --
14         Q    -- schooling?
15         A    -- I served an apprenticeship as a millwright
16    in Michigan, and then I moved to Wisconsin.
17         Q    Okay.  When did you start working as a
18    millwright?
19         A    In, in about 1970.
20         Q    And which locals, millwright locals, did you
21    work out of?
22         A    I started in Green Bay at 1146, and then I went
23    to 10-- that was a carpenter/millwright local; and then I
24    went to a millwright local exclusively, at 1056, out of
25    Waupaca, Wisconsin.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And have you had work where you traveled to
2  work in, in Illinois?
3      A    Yes.
4      Q    Okay.  Have you worked at Commonwealth Edison
5  sites?
6      A    Yes.
7      Q    Have you worked on systems that, turbine
8  systems of Westinghouse?
9      A    Yes.
10     Q    Have you worked for Westinghouse?
11     A    Yes.
12     Q    Okay.  Have you run jobs for Westinghouse on
13  turbines?
14     A    Yes.
15     Q    All right.  We'll get to some more of that in a
16  moment, but your career as a millwright covered, spanned
17  what years?
18     A    From about 1970 to the year 2005.
19     Q    And what portion in that time period was
20  turbine systems work?
21     A    About 50 percent.
22     Q    Have you served as a foreman on turbine jobs?
23     A    Yes.
24     Q    And have you worked on the erection of a brand
25  new turbine?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A      The only erection of a brand new turbine was

 2   the one at Kewaunee.

 3        Q      Have you worked on outages of turbines?

 4        A      Lots of outages.

 5        Q      Okay.  And what's an "outage"?

 6        A      An outage is an inspection, maintenance

 7   inspection, rebuild on their periodical downs.  When

 8   they -- on their periodical downs, when they refuel, they

 9   do a maintenance and inspection and repair of the

10   machinery.

11        Q      Do outages occur to correct defects?

12        A      Yes, they do.

13        Q      Can you give us an example of some of the

14   Westinghouse turbine systems that you've worked on?

15        A      I've worked at Kewaunee, Point Beach, Byron.

16        Q      Byron's a Commonwealth Edison facility, right?

17        A      Right.

18               LaSalle -- no, LaSalle is a -- excuse me.  I

19   worked at LaSalle.

20        Q      The question's about Westinghouse turbine

21   systems.

22        A      Combined lots, diff-- a lot of different

23   Westinghouse units.  PCA and Tomahawk was the

24   Westinghouse turbines.

25        Q      Chesapeake Bay?
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        A      Chesapeake Bay.

2               MS. EZELL:  Objection, Your Honor, leading.

3               THE COURT:  He's, he's suggesting an answer.

4               THE WITNESS:  Yes.  I worked at Chesapeake Bay.

5   BY MR. McCOY:

6        Q      Is that a powerhouse?

7        A      It's a big nuclear power plant.

8        Q      Byron's a nuclear powerhouse?

9        A      Huh?

10       Q      Byron's a nuclear powerhouse?

11       A      Byron is, too.

12       Q      Point Beach is?

13       A      Point Beach, Kewaunee.

14       Q      Okay.  P.H. Glatfelter?

15       A      P.H. Glatfelter's a paper mill, but they have

16   steam-driven turbines there.

17       Q      Pulliam powerhouse?

18       A      Pulliam plant is, is steam-driven turbines.

19       Q      In terms of your total amount of time as a

20   millwright on the turbine systems, how much, how much

21   would you say you actually worked on nuclear systems, in

22   terms, if you added it all up, day by day?

23       A      Oh.

24       Q      How many years?

25       A      If you added it up day by day, maybe 10,
```

KINSER v. CBS CORP., Case No. 94-2282

1   15 years.

2        Q     The South Texas project, have you worked on

3   that --

4        A     Yes, I have.

5        Q     -- nuclear -- is that a nuclear site?

6        A     It's a nuclear site, Westinghouse turbines.

7        Q     Okay.  The Woops power station in Pasco,

8   Washington?

9        A     Yes.  I worked there.

10       Q     Is that -- what's that titled?

11       A     It's Westinghouse units.

12       Q     Nuclear?

13       A     Nuclear facility.

14       Q     Baton Rouge -- Baton Rouge, Louisiana?

15       A     Is a nuclear facility.

16       Q     By Westinghouse?

17       A     Westinghouse.

18       Q     So, as a foreman, have you worked directly

19   under Westinghouse personnel?

20       A     Yes, I have.

21       Q     Can you describe how that works, what you do as

22   a foreman under the Westinghouse personnel and what they

23   do?

24       A     I carry out what the engineer who's running the

25   project -- he supervises all the different work, scope,

KINSER v. CBS CORP., Case No. 94-2282

1  and trades; and he issues what, what he wants done, and I

2  get it done.

3      Q    The engineer from where?

4      A    Westinghouse.

5      Q    On the nuclear jobs which might take several

6  months, maybe, involving -- excuse me, Your Honor, that's

7  why Your Honor didn't understand:  this hoarse voice

8  here.

9          On the nuclear job sites where you might have

10  an outage that takes more than four months, would there

11  just be one Westinghouse engineer out there?

12      A    No, no.  We might have two, three, four, half a

13  dozen of them.  A lot of times we ran two shifts.

14      Q    Have you had to work from the drawings and

15  specifications, the written ones, that Westinghouse has

16  prepared for turbine systems?

17      A    Yes.

18      Q    How many of those have you worked off of in the

19  years?

20      A    Oh, thousands.  Drawings they would bring

21  out -- they'd bring out a drawing for anything you took

22  apart.

23      Q    How about drawings that pertain to piping

24  systems?

25      A    Yes.  They, they bring out drawings that

KINSER v. CBS CORP., Case No. 94-2282

1   pertain to the pipe, how to, how to disassemble, remove.

2         Q    How about drawings that pertain to insulation

3   materials?

4         A    I've seen drawings for insulation materials.

5   Yes.

6         Q    When did your work on the Westinghouse turbine

7   systems begin?  What was the first time period?

8         A    1971.

9         Q    And where was that at?

10        A    Kewaunee.

11        Q    And what type of a job was that?

12        A    Nuclear power plant.

13        Q    Okay.  Was that new construction, from ground

14   up or --

15        A    New construction.

16        Q    About what time was the Kewaunee work

17   completed?

18        A    About December of 1973.

19        Q    How long did you spend at Kewaunee?

20        A    I worked on and off at Kewaunee from 1968 all

21   the way till it was online in December of '73.

22        Q    Now, I want to talk about ComEd sites for a

23   moment, changing subjects a little bit.  Which ComEd

24   plants have you worked at?

25        A    Byron, LaSalle, Dresden.  I worked at Clinton.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And how many different outages would you say

2  you worked at Commonwealth Edison's plants?

3      A    Several.

4      Q    The ones you talked about, these are all, all

5  nuclear plants, right?

6      A    Right.

7      Q    Now, you didn't actually work yourself at the

8  Zion powerhouse, right?

9      A    No.

10      Q    Okay.  Is it -- have you seen drawings and

11  specifications and read testimony about the Zion

12  powerhouse?

13      A    Yes.

14      Q    And in terms of the comparability of the Zion

15  powerhouse, based on what you've seen, to the ones where

16  you worked at, like Byron or Dresden or LaSalle or

17  Kewaunee, how would you compare those?

18      A    It was about the same as Byron or Kewaunee in

19  terms of age and, and materials used in the plant.

20      Q    So based on your experience and knowledge of

21  Zion, can you testify about work practices in insulation

22  materials that would happen on the turbine system at

23  Zion?

24      A    Yes.

25          MS. EZELL:  Objection, Your Honor, foundation.

KINSER v. CBS CORP., Case No. 94-2282

1   He, he's testified he worked at other places, and that's

2   not the same as working at Zion.

3           THE COURT:  Yeah, well, overruled.

4   BY MR. McCOY:

5       Q    The Zion powerhouse is closed, by the way,

6   right?

7       A    Right.

8       Q    Why, why did it close down?

9       A    The steam generators wore out, and they didn't

10  want to spend the money to replace -- hundreds and

11  hundreds of millions to replace the steam generators.

12      Q    Steam generators, being part of the turbine

13  systems?

14      A    It's part of the turbine systems and bring --

15  it creates the steam for the turbine systems.

16      Q    Okay.  The Zion turbine system, what kind of

17  configuration does that have?

18      A    It's a pressure boiler.

19          MR. McCOY:  Okay.  These are demonstrative

20  exhibits from yesterday by agreement, Judge.  We're

21  showing these.

22  BY MR. McCOY:

23      Q    Exhibit Number 658, this is a, a demonstrative

24  drawing of Zion.  You, you saw this yesterday; is that

25  right, Mr. LaPointe?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes.

 2        Q    Okay.  And, but the document you looked at, at

 3   Zion, before, the actual plans and specifications, that,

 4   that took place a year or more ago, right?

 5        A    Yes.

 6        Q    Okay.  So this is -- does this sketch reflect

 7   an overview of the Zion turbine system?

 8        A    Yes.

 9        Q    Okay.  Can you just describe for us briefly

10   what we've got here?

11        A    You have a vertical view of the turbine

12   building.  You have your, your first floor, ground floor.

13   You have your mezzanine deck; and then you have your main

14   floor, which is your turbine floor, which all your

15   turbines are on.

16        Q    Is this a typical turbine construction?

17        A    Typical turbine building.

18        Q    All right.  And it shows over there the nuclear

19   containment off to the side?

20        A    Yes.

21        Q    Okay.  So in terms of size of this kind of a

22   structure, I think the Zion turbine -- and let's take a

23   look at the main floor here.  This shows it's about

24   100 feet high.  Does that sound about right for a --

25        A    Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1       Q     -- building like this?  Okay.

2             What size generation, power, did the unit have

3   at Zion?

4       A     They were 1070s.

5       Q     Okay.  And how does that rank in terms of

6   relative size of nuclear powerhouses that you've been at?

7       A     They are big.  These are some of the biggest

8   units.  They have one high pressure and three low

9   pressure units.

10      Q     Okay.  And we'll get to that on the next

11  drawing.

12            When you say "1070," what are you talking

13  about?

14      A     Megawatts, --

15      Q     Megawatts, can you --

16      A     -- what they put out.

17      Q     Okay.  That's how much electricity comes out?

18      A     Right.

19      Q     Okay.  Ten -- okay.

20            And then this is another illustration here.  Is

21  this also reflective of what you've seen in the plans and

22  specifications?

23      A     Yes.

24      Q     Okay.  And this is Exhibit 659.

25            Okay.  Can you tell us what we, what we're
```

KINSER v. CBS CORP., Case No. 94-2282

1    looking at here?

2        A    You're looking at the turbine floor, a vertical

3    view.  You're looking at the size of number 1 turbine

4    unit.  And you're looking at the open grating in between.

5    And then you have, at the right, number 2 turbine unit of

6    the same size.

7        Q    So the total building size is about 800 feet

8    here?

9        A    Oh, yes.

10        Q    Okay.  And the, the 207 foot would be

11    reflective of what?

12        A    The size of the turbine, length of the turbine.

13        Q    Okay.  What do you mean by "length of the

14    turbine"?

15        A    That's, that's the high pressure, the two low

16    pressures, and the generator -- so approximately 207 feet

17    long and 50 feet wide is the space it takes up.

18        Q    All right.  And where it says "open grating" in

19    the middle, what's that for?

20        A    That's an opening in the floor, and that's used

21    to lower stuff.  You take the grating out, and you can

22    lower stuff down to the mezzanine floor with the overhead

23    crane:  machinery, piping, you name it.

24        Q    And this shows an area about 50 feet wide

25    for the, for each of the turbine units.  Is that

KINSER v. CBS CORP., Case No. 94-2282

1    consistent --

2         A    True.

3         Q    -- with what -- okay.

4              All right.  Now, we're going to go to the final

5    diagram, which is Exhibit Number 657.  Actually, I want

6    to hold off on that one.  I want to show you a couple

7    others first.

8                   (Brief pause in proceedings;

9                   counsel conferring.)

10        Q    Okay.  Let me show you this one first.  This is

11   Exhibit 640.  All right?  And this is not actually from

12   Zion, but it's -- would this be representative of, of

13   what it would look like at Zion, based on your review of

14   plans and specs?

15        A    Yes.

16        Q    Okay.  And this -- what are, what are we

17   looking at here?

18        A    We're looking at a top view of the high

19   pressure turbine and part of the first low pressure unit.

20        Q    Okay.  So let's go, then, to Exhibit 652, which

21   was another illustration that we -- a sketch that we

22   prepared from the plans and specification information.

23   You've seen this also, right?

24        A    Yes.

25        Q    Okay.  And does this show, then, the different

KINSER v. CBS CORP., Case No. 94-2282

1   components within this turbine system of --

2       A    Yes.  It shows the steam piping coming from the

3   left to the high pressure, and then it shows your low

4   pressure units and your generator and your reheaters on

5   each side.

6       Q    And how many low pressures are there in this

7   system?

8       A    Three.

9       Q    The piping that's down below here, what, what

10  role does that have --

11      A    Well, all your --

12      Q    -- in the system?

13      A    Well, all the piping below is your feed piping

14  to your, to your low pressure units and, and to the

15  reheater piping.

16      Q    How much piping is down below here, in terms of

17  distances -- do you have an estimate of that? -- on a

18  project like this?

19      A    Miles.

20      Q    Let me go back again to 640.  So if we're

21  looking at, at this diagram, or this picture, 640, and

22  Westinghouse had built this turbine system originally at

23  Zion, where would the Westinghouse piping and system work

24  actually start on this diagram?

25      A    It would start at the two big pipes on the

KINSER v. CBS CORP., Case No. 94-2282

 1   right, which are your feed pipes.

 2        Q    Is that here?

 3        A    Yes.

 4        Q    And here?

 5        A    Yes.

 6        Q    Okay.

 7        A    Those are your steam feed pipes to your high

 8   pressure turbine.

 9        Q    So what about this part over here?  What --

10        A    Well, all --

11        Q    -- role -- what, what did Westinghouse -- what

12   role would Westinghouse have if it supplied the turbine

13   in this part here?

14        A    They would have supplied all that piping from,

15   from those two pipes there directly to the left.

16        Q    Okay.  So when we're looking at this diagram

17   here, which we're back to 657 -- I'm sorry.  I may --

18   this number's written a little funny; it's either 657 or

19   652.  I'll get that straightened out for you-all.  But I

20   think it's '57.

21             But this one here, where it's got this, this

22   part here with the piping and the press-- the turbine

23   there, what part of this type, then, is the Westinghouse

24   part?

25        A    Well, the piping on the left, that comes from

KINSER v. CBS CORP., Case No. 94-2282

1  your reactor room, and that's your steam feed pipes.  It

2  would have had to have been engineered and sized by the

3  manufacturer of the turbine to know what, what to use.

4      Q     This, this is the part -- this part would be

5  underneath?

6      A     Right.  That's underneath your, your turbine

7  floor.  That would be on the mezzanine floor.

8      Q     Okay.  The part up above would be the

9  Westinghouse part, right?

10     A     Yes.

11     Q     Okay.  But let me just, again, for comparison

12  purposes here:  On this diagram, this piping right here,

13  we're talking about -- that's, this is the Westinghouse,

14  right?

15     A     Right.

16     Q     Okay.  So if this was actually intended to

17  reflect that piping that's up here, then this would be

18  part of the Westinghouse system?

19     A     Yes.

20     Q     Okay.  So if somebody's working on the main

21  piping floor, other than these pieces coming up here, the

22  rest of it would be Westinghouse?

23     A     Yes.

24     Q     All right.  This picture here is Exhibit 639.

25  Can you tell us what that shows here?

KINSER v. CBS CORP., Case No. 94-2282

1      A     That's, that's typical of the piping

2   configuration on the mezzanine floor underneath the

3   turbine.

4      Q     Okay.  And Exhibit 637, what's that show?

5      A     That's, that's a high pressure turbine unit.

6            MS. EZELL:  I'm sorry.  What's the exhibit

7   number?

8            THE WITNESS:  That's a high pressure turbine

9   unit.

10           MR. McCOY:  637.

11           MS. EZELL:  Thank you.

12  BY MR. McCOY:

13     Q     Okay.  What's that on the, these --

14     A     Covered -- the turbine unit itself, on this

15  unit here, is covered with blankets.

16           (Brief pause in proceedings.)

17     Q     Okay.  Let's, let's go over another question

18  I've got here, and that's a question of:  Can you tell us

19  what parts of the turbine system at Zion would be

20  insulated?

21     A     All, all machinery and piping that -- if you

22  could touch it with your hand and it would burn you,

23  everything at that temperature or above was insulated.

24     Q     Okay.  This one again -- 657, I believe -- when

25  you talk about the piping that's up on the main turbine

KINSER v. CBS CORP., Case No. 94-2282

1  floor here, what about this, this piping here?

2      A    That would have been your crossover piping from

3  your low pressure units to your reheaters.  That would

4  have been all -- that's all insulated, --

5      Q    Okay.

6      A    -- heavily.

7      Q    And what about one of these?  This is a

8  reheater?

9      A    That's a reheater.  Them are all insulated,

10  with approximately five, six inches of insulation.

11      Q    How much insulation thickness is on the

12  crossover?

13      A    Oh, four to five inches.

14      Q    And what about -- I think you've already talked

15  about the piping down here being miles.  How much of this

16  would be insulated?

17      A    All of it.

18      Q    This is Exhibit 640 that shows the piping, the

19  steam -- the high pressure turbine, right?

20      A    Yes.

21      Q    This, this piping in here, it looks like it's

22  covered with metal.

23      A    It is.  It's covered with -- they used

24  aluminum, thin aluminum sheeting to cover -- or sometimes

25  stainless thin sheeting.  It was very thin, like a pop

KINSER v. CBS CORP., Case No. 94-2282

1    can type.

2         Q    Is there --

3         A    A couple --

4         Q    -- any insulation underneath that --

5         A    Yes.

6         Q    -- thin sheeting?

7         A    There is approximately five, five inches of

8    insulation underneath that sheeting and then covered.

9         Q    So underneath all these areas that look metal,

10   there's insulation?

11        A    Yes.

12        Q    Why is it four or five inches thick, the

13   insulation?

14        A    Well, to retain the heat in the piping, to

15   retain the heat in it, the steam and that, not to let it

16   cool off and escape before it's got where it's supposed

17   to go.

18        Q    Okay.  What did the engineers from Westinghouse

19   do on outages when a turbine was fully disassembled,

20   during the disassembly?

21        A    During the disassembly, they -- they supervise

22   the different trades in the removal and disassembly of

23   the machinery and equipment, the piping; and they do the

24   inspections.

25        Q    Inspection of what?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Of, of all of it.  The engineers inspect the

2   thicknesses of the piping, the flange joints, the moving

3   machinery parts for wear and tear.

4      Q    What did they do in the process of supervising

5   the trades, the Westinghouse engineers?  What did they

6   do?

7      A    Well, they tell -- they tell the

8   foremens/superintendents what they -- when they see

9   stuff, what they want done; and then he relays it to the

10  different crews and the leaders.

11     Q    Is that true for all of the trades?

12     A    Yes.

13     Q    So why would Westinghouse be concerned with

14  having Westinghouse engineers directing the trades on

15  large --

16          MS. EZELL:  Objection, Your Honor.  He can't

17  speak for all of Westinghouse and why they would be

18  concerned.

19          THE COURT:  I can't hear you.

20          MS. EZELL:  Objection, Your Honor.  He can't

21  speak for all of Westinghouse and why Westinghouse would

22  be concerned about something.

23          THE COURT:  Read me the question.

24          COURT REPORTER:  "So why would Westinghouse be

25  concerned with having Westinghouse engineers directing

KINSER v. CBS CORP., Case No. 94-2282

```
 1    the trades on large" -- and then there was the objection.

 2              THE COURT:  Have you finished your question?

 3              MR. McCOY:  The question's going to be "on

 4    large outages."

 5              THE COURT:  On large outages.  He may answer,

 6    if he knows, from his experience.

 7        A    Well, from my experience, they, they directed

 8    it all because it was to be done -- you know, there, on

 9    these new units, there was warranty work and all that.

10    It had to, to meet the specifications in order to be able

11    to be warrantied.

12        Q    Did Westinghouse engineers have safety control

13    on the jobs?

14        A    Yes, they did.  They gave safety meetings.

15        Q    Is there anything unusual about Westinghouse

16    engineers who, that would be on site directing piping

17    work at Zion as part of an outage to correct --

18              MS. EZELL:  Objection.  I'm sorry.  Objection,

19    Your Honor, --

20              THE COURT:  But, please, --

21              MS. EZELL:  -- he wasn't at Zion.

22              THE COURT:  -- please, Mrs. Ezell, let him

23    finish his question, --

24              MS. EZELL:  All right.

25              THE COURT:  -- and then you object.
```

KINSER v. CBS CORP., Case No. 94-2282

1           MS. EZELL:  I will.

2           THE COURT:  Start again.

3           MR. McCOY:  Okay.

4   BY MR. McCOY:

5       Q    Mr. LaPointe, is there anything unusual about

6   Westinghouse engineers being on site, directing the

7   piping work for the turbine at Zion as part of an outage

8   involving a full disassembly?

9       A    No.

10          MS. EZELL:  Objection.

11          THE COURT:  Well, the answer's stricken for a

12  moment.

13          MS. EZELL:  Objection, foundation.  This

14  witness was never at Zion.  He doesn't have the

15  foundation to say what was or was not unusual.

16          THE COURT:  Overruled.  He's answering from his

17  experience on similar -- the same kinds of projects, and

18  it goes to his credibility.  He may answer, if he knows.

19          MR. McCOY:  Could I have the question read

20  back?

21          THE COURT:  Yes, please.

22          COURT REPORTER:  "Mr. LaPointe, is there

23  anything unusual about Westinghouse engineers being on

24  site, directing the piping work for the turbine at Zion

25  as part of an outage involving a full disassembly?"

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Do you understand the question?

2          THE WITNESS:  No.  It was not unusual.

3    BY MR. McCOY:

4          Q    Why not?

5          A    Because -- well, after a unit was run and it

6    was disassembled completely and things inspected and

7    changed and tolerances taken, there were expansions and

8    contractions of steel and piping and stuff.  It was not

9    unusual to make, make an adjustment or a change.

10         Q    What do you mean by "expansion"?

11         A    Well, your piping -- your piping, when you heat

12   it up on the turbine, it -- the piping expands, just like

13   the -- as something gets hotter, piping expands in

14   length; and it will put pressure on your turbines, on the

15   turbine itself, because it's bolt-- it's bolted to it.

16   And if it puts too much pressure on it and pushes the

17   turbine itself out of alignment, the steam glands, all

18   that, leak excessively, so then you have to mod--

19   re-correct this.

20              And in order to do that, you have to make a

21   modification in your, your piping.  You either got to

22   shorten it up or put some kind of expansions or put a

23   loop in it.  There's a lot of different things they did

24   to correct it.

25         Q    Okay.  That could require taking out and

KINSER v. CBS CORP., Case No. 94-2282

1  rerunning piping?

2      A    Yes.

3      Q    And why is it important to try to correct that

4  kind of a defect in the turbine systems?  Why can't you

5  just let it keep going even though there's a little --

6      A    Well, because it --

7      Q    -- defect on it?

8      A    -- because it, when it puts pressure on your

9  turbine, it pushes it out of alignment.  Your steam

10  glands leak.  The next thing you know, the bearings are

11  out of it, and you have a great wreck.

12     Q    What do you mean by a "great wreck"?

13     A    It comes apart.

14     Q    What happens when a turbine comes apart?

15     A    Well, the blades come out of them.  They go

16  through shells.  Parts fly off.  It's just a mess.

17     Q    Do the types of insulation materials used in

18  the powerhouse settings such as Zion include

19  cement-molded pieces of insulation and blankets?

20     A    Yes.

21     Q    Now I want to show you Exhibit 95.

22          Exhibit 95, what type of insulation material is

23  that one?

24     A    That's a block-type insulation.

25     Q    Okay.  And is block-type of insulation used in

KINSER v. CBS CORP., Case No. 94-2282

1    the powerhouse turbine work?

2        A    Lots of it, yes.

3        Q    Can you give us some examples of where block

4    insulation is used on turbine systems?

5        A    Block insulation is used on the cast shells of

6    the high pressure, over the top, around the bottom,

7    around the piping.

8            The only place it is not covered with block

9    insulation would be the bolted joints on your horizontal

10   joint or where you have flanges on your piping; then they

11   had blankets.  But, otherwise, it was all block

12   insulation, and it was covered with either a metal or a

13   cloth-type material that was white-washed.

14       Q    Do the, do these turbine structures, like the

15   high pressure and the low pressures, do they have covers

16   that go over them?

17       A    Doghouses, yes.  The high pressure has a

18   doghouse that goes completely over it, the whole thing,

19   when it's running.  It's a steel enclosure.  It's sprayed

20   inside with a sound-deadening asbestos material.

21       Q    This Exhibit Number 640, does that show that

22   doghouse in the --

23       A    No.  The doghouse has been removed off the top

24   of it.  It goes over the top of that whole unit.

25       Q    Okay.  So that would be, that would be --

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Right.

 2        Q     -- over here, the doghouse, usually?

 3        A     Yes.  It covers that whole unit.

 4        Q     All right.

 5        A     They're big.

 6        Q     Okay.  What about this?  Is this a doghouse for

 7  low pressure?  Or is this a cover for the low pressure?

 8        A     Is what?

 9        Q     This one right here, what's, what's this --

10        A     That's, that's -- that's the outer shell of the

11  low pressure, and that does not get a doghouse.  That's

12  just the way it is.

13        Q     Okay.  That's a shell?

14        A     That's just a shell.

15        Q     Okay.  So if you take off the doghouse or the

16  cover on the high pressure, you're going to see all

17  this --

18        A     Yes.

19        Q     Okay.  And that's where, then -- this, this

20  type of piping out here would appear when you take off

21  the doghouse cover?

22        A     [No response.]

23        Q     That's where you'd see all this piping?

24        A     Yes.  On the, on the high pressure, you'd see

25  all the piping.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  Is there anything unusual about removing

2  the doghouse cover on an outage where there's a full

3  disassembly?

4      A     No.  You have to.  Every time you have to

5  remove it.

6      Q     In the 1973 time frame -- if a project was

7  being done in '72, or in '73 completed, what types of

8  insulation materials were being used on the powerhouse

9  systems at that time?

10      A     Most, most -- a lot of asbestos insulation was

11  being used.

12      Q     How do you know that?

13      A     Because I worked on it.  And in, in the same

14  units from the '70s, early '70s, in the early '80s, they

15  were removed.  Asbestos abatement people were removing

16  the insulation and putting new insulation on and putting

17  big stickers on it:  "Asbestos-free."

18      Q     After, after it had been removed?

19      A     Yes.

20      Q     And that was when?

21      A     In the early '80s.

22      Q     Is that when you -- when did you first see

23  asbestos abatement procedures?

24      A     In the early '80s.

25      Q     All right.  So I'm going to go back to the

KINSER v. CBS CORP., Case No. 94-2282

1   turbine disassembly process for a moment.  And I'd like

2   you to describe for us what places where insulation would

3   be removed if you assume there was a major outage to

4   correct some defects that involved complete disassembly

5   of the Zion turbine?  What would be removed?  Where would

6   it be taken from, --

7        A    You --

8        Q    -- the insulation?

9        A    You would take the covers off of, of the

10  in-feed piping, maybe.  You would take that off and take

11  the, take the insulation off of it to correct the

12  expansion problems on the piping to the turbine.

13            Your side feed pipes, you might take, you might

14  take the insulation on the, on the mezzanine deck off on

15  that and make a modification on, on the stress levels on

16  the piping, shorten them, put a U-bend in them for

17  expansion.  That was done on piping a lot.

18       Q    How about on the horizontal joints?

19       A    You took, you took -- to take the turbines and

20  all that apart, you took the blankets all off of the

21  horizontal joints around the exhaust piping joints on the

22  high pressure and that.  You took all that off.  You took

23  your blankets off your crossover pipes on the joints --

24  on the horizontal, the verticals -- so you could lift all

25  these pieces of the turb-- piping off that had it, block

KINSER v. CBS CORP., Case No. 94-2282

1   insulation that was fastened securely to them.

2       Q    Why did you have to remove that block

3   insulation?

4       A    For -- there was different reasons.  On the, on

5   the crossover piping and horizontal joints, sometimes

6   after we, they were installed originally and then they

7   were covered with the insulation, they got too close to

8   the joints to take the bolts out.  So once you took your

9   blankets off and you went, took your nuts off your bolts,

10  you can't get the bolts out because the block insulation

11  was too close.

12          As an example, you might have had six inches of

13  clearance, and you needed twelve inches to take those

14  bolts off.  Well, then you knocked off the, the hard

15  insulation.  You knocked it off so you can remove the

16  bolts so you can take the, that part off; and it was

17  repaired later.

18      Q    How big are the bolts that you're talking

19  about, in terms of weight or size?

20      A    On the high pressure turbine, the nuts alone

21  weigh 75 pounds apiece.  The bolts weigh upwards of --

22  they could be 150, 200 pounds, each bolt.  The nuts and

23  the bolts were always lifted with a, with a nylon and a

24  chain fall on a crane.

25      Q    The bolts were serving what purpose?

KINSER v. CBS CORP., Case No. 94-2282

1      A    They were holding the upper half of the turbine

2  to the lower half.

3      Q    So it would be like holding the cover --

4      A    Right, holding the cover.  It was made in two

5  halves.

6      Q    Now, if you could, could you illustrate for us

7  on this diagram here what you're talking about on these

8  bolts and the need to deal with the insulation to remove

9  those?  Could you show us that?

10     A    Sure.

11     Q    Okay.  I've got a pen here.  I'll let you draw

12  this for us.

13              (Brief pause in proceedings; witness is

14              relocating at easel in front of the jury.)

15  BY MR. McCOY:

16     Q    Go ahead.  What I'd like you to do is

17  illustrate for everybody the kind of configuration that

18  you're talking about on the bolts and how that requires

19  any kind of work with asbestos insulation.

20              (Brief pause in proceedings;

21              witness is illustrating on the easel.)

22     A    This is your high pressure here.

23     Q    You may have to turn a little bit for our last,

24  our end juror.

25     A    This is your high pressure unit here, if you

1   can visualize it, your shaft in it.

2           And this is your horizontal joint.  This is

3   your top cover, your bottom cover here.  You have these

4   big bolts that go through it.  The bolts are that big

5   around.  It has nuts on here that weigh 75 pounds apiece;

6   one on the top, one on the bottom.  They're, they're a

7   hollow bolt.  They got a heat -- usually put a heat rod

8   in them.  And, anyway, right behind them, you have your

9   block insulation.  That's, that's here right behind them

10  on the turbine.  It's -- usually block insulation is

11  covered with a, with a fab cloth and white-washed.

12          Well, these nuts have to come off, and you've

13  got a wrench on here you put on.  To take them off, you

14  put your heat rods in, and you have what we call the

15  "slug wrench."

16          And, anyway, this insulation here, when it was

17  put on after the turbine was put together, it was put

18  down to here, this block insulation.  It covered it, and

19  then, of course, this was covered later with your --

20  removable blankets were whited on over these bolts.

21      Q    How thick is that insulation block?

22      A    The block is approximately five inches thick.

23          Anyway, a lot of times, it got too close.  On

24  the first time around, it was too close to these bolts

25  because it was put on after the turbine was assembled,

KINSER v. CBS CORP., Case No. 94-2282

1   and it was too close.  So on the first removal of them

2   and so on, we put the wrenches on them.  You were hitting

3   the insulation sometimes.

4           And, of course, these bolts, in 1972, in the

5   early '70s, all this was tightened with big, big wrenches

6   with a 16-pound sledgehammer; and you put the wrenches on

7   here and -- the heat rods in them -- and you, you slugged

8   them tight with the sledgehammer.  You stood on them.

9           And, like I said, the first time around, these

10  wrenches -- they, they hit insulation.  Well, you just

11  took and knocked that insulation off until you could get

12  those bolts all out.  And once it was apart and then when

13  they -- once it was apart, then they came in, the

14  insulator, and they recut that insulation back and made

15  it a little wider so you wouldn't have that in the

16  future.

17      Q    This, what you're showing us here, would be the

18  two covers, --

19      A    Right.

20      Q    -- half, the upper half and the lower half; and

21  that's what has to be removed, the top?

22      A    Right.  The top has to be removed to get at

23  your guts on the inside:  your spindle, your blades, your

24  shrouds.

25      Q    And these bolts go all around?

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    All the way around to the shaft here on each
 2  side.
 3      Q    Okay.  All right.  I think that's --
 4      A    Prob-- on an average one, you probably have 25
 5  to 30 bolts on each side.
 6      Q    On each side?  Okay.
 7           All right.  Go ahead, and you can have your
 8  seat back there.  Thank you.
 9              (Witness is resuming the witness stand.)
10  BY MR. McCOY:
11      Q    Now, in order to get those bolts free, you had
12  to -- you talked about using certain tools, right?
13      A    For what?
14      Q    To free up the bolts, you talked about using
15  certain --
16      A    Yes.
17      Q    -- tools?
18      A    Yes.  You used big steel slug wrenches, which
19  were made to be beaten on with a sledgehammer; and you
20  put a chain fall on them usually, and you held that
21  wrench tight one way, as tight as you could.  And then
22  you slugged it, and, of course, until you relieved it.
23           But at the same token, on the inside of the
24  bolt is hollow, and you had an electric heat rod that was
25  heating it, making that bolt get longer.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  Exhibit 663, by agreement, demonstrative

2  exhibit, what's that show us?

3      A    A slug wrench.

4      Q    That's one of the tools you talked about --

5      A    Yes.

6      Q    -- being -- okay.

7           And Exhibit 662, you mentioned that one also,

8  right?  What's that?

9      A    It's a 16-pound sledgehammer.

10     Q    Okay.  Was that a sledgehammer that just any

11  ordinary guy could swing on the job?

12     A    No.  That was -- that was a beast.

13     Q    And a beast of a guy to swing this?

14     A    Yes.  You took turns.  You put two men on each,

15  on each one:  one guy swing for a while, step off, and

16  let the other one.

17     Q    And the process you're describing of loosening

18  these bolts, what effect did that have in terms of, of

19  releasing, or causing asbestos insulation to go in the

20  air?

21     A    Well, not everybody was a perfect swinger with

22  that sledge; and sometimes it was known to miss, and it

23  landed wherever it did.  It hit insulation.  It knocked

24  it loose.  It hit steel bolts.  You name it.  Not

25  everybody was a perfect swinger.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     This is Exhibit 657 again.  The crossover

2  piping here that we're looking at, what part of that was

3  removed during a complete disassembly?

4      A     The top crossover pipe had to be removed.  It

5  was a T-pipe on top of the unit.  And they weighed a lot

6  of tonnage.  They were approximately, probably, four and

7  a half -- the side pipes were four and a half to five

8  feet in diameter with the insulation on them; and they

9  were approximately 50 feet long.  The actual pipe with

10  the T in the middle, which sat on top of that low

11  pressure turbine, was bolted down to it; and on each

12  side, it was bolted to the piping on the walls, on the,

13  on the reheaters.

14      Q     What's the thickness on the surface area --

15  that's a bad question.  Sorry.

16            What's the thickness of the insulation on the

17  crossover piping at a place like Zion?

18      A     Approximately four to five inches of piping --

19  I mean, insulation.

20      Q     And in terms of the total surface area of the

21  insulation that's on that crossover piping at a place

22  like Zion, how much, approximately, would that total

23  surface area be?

24      A     Oh, thousands of feet.  Three crossovers could

25  be several thousand feet.

KINSER v. CBS CORP., Case No. 94-2282

```
 1      Q    Have you seen a diagram of the act-- or a
 2  drawing of the actual surface area of the crossover
 3  piping at Zion?
 4      A    I've seen a lot of diagrams --
 5      Q    Okay.
 6      A    -- of piping.
 7           (Brief pause in proceedings;
 8           counsel conferring.)
 9      Q    Exhibit 129, Mr. LaPointe, does that -- is that
10  one you saw before?
11           MS. EZELL:  Your Honor, we have no objection to
12  this exhibit being admitted.
13           THE COURT:  You may proceed.
14           MR. McCOY:  Okay.
15           THE WITNESS:  Yes.
16  BY MR. McCOY:
17      Q    Okay.  Let me -- I'll just put it up on the
18  ELMO --
19      A    Sure.
20      Q    -- so everybody can see it, Exhibit 129.
21           So, this is a drawing from Zion.  So that, that
22  shows -- this would be the crossover piping, right, "X
23  over"?
24      A    [No response.]
25      Q    You've got to answer for us, "yes" or "no."
```

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    And that shows the thicknesses, one and a half

3    outer, one and a half -- "one and a half inner, one and a

4    half outer," what's that mean?

5    A    Well, they, they put -- an inch and a half

6    layer was -- when you put block insulation, you put an

7    inch and a half layer the first time.  Then you put

8    another layer over it, and you stagger your joints so you

9    cover the splits in the first insulation.  You cover

10   that.

11   Q    Okay.  So it shows two surface areas, one for

12   the inner and one for the outer, 3400-something and --

13   A    Yeah.

14   Q    -- 3700-something.  So that's about seven

15   thousand --

16   A    Yes.

17   Q    -- one hundred.

18        Does that sound like what it would be on a Zion

19   turbine for insulation?

20   A    Oh, yes.  Yes.  It's a big area.

21   Q    And what portion of that has to be removed on a

22   complete disassembly of the 7,000?

23   A    We removed hundreds -- a hundred feet on the

24   end, maybe, when we took the bolting out, you know.

25   Q    I'm talking about just the crossover piping

KINSER v. CBS CORP., Case No. 94-2282

```
 1   now.

 2        A    On the crossover piping, --

 3        Q    Right.

 4        A    -- the only -- on a complete disassemble, you

 5   normally only took off the insulation on the end.  If the

 6   bolts didn't, didn't come out, you had to make room for

 7   them.  Otherwise, you took off just the blanket

 8   insulation.

 9        Q    All right.  So how much of this was removed

10   then?  Basic-- on a disassembly, roughly, how many feet,

11   square feet would you be talking about?

12        A    I don't know.  A few hundred, a thousand square

13   feet sometimes, maybe.

14        Q    Okay.  How about the blanket insulation?  What

15   part of that had to be removed?

16        A    All of it.

17        Q    The 1300?

18        A    1300.

19        Q    And this is just crossover piping?

20        A    That's just crossover piping.

21        Q    Continuing on, areas, back to the question of

22   where there was insulation removal on the disassemblies,

23   what about on the, the vertical joints?

24        A    On the vertical piping joints?

25        Q    Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    Each side of the turbine, on your crossover

 2  pipes, went, went out beyond the turbine.  You had a

 3  vertical joint up in the air there that you took apart.

 4  The pipe is approximately three and a half feet in,

 5  across, the inside diameter of that pipe.  It was bolted

 6  together; the joint was, out there, the crossover to

 7  that.  And you had to remove the blanket insulation; and,

 8  like I said, you had to remove sometimes a foot on each

 9  side of that, of the block insulation, to get the bolts

10  out.  There wasn't enough room.

11      Q    You're talking about a foot in diameter?

12      A    [No response.]

13      Q    Like a foot, a foot in the length, right?

14      A    Right, in the length of the pipe.  Right.

15      Q    And I said each side, --

16      A    Each side.

17      Q    -- right?  Okay.

18           So how many vertical joints --

19      A    You had one at each side of the turbine, on

20  each low pressure.

21      Q    How about on the blankets around the high

22  pressure system?

23      A    Well, you had blankets around the high

24  pressure, a horizontal joint.  You had blankets around

25  the piping on the, the piping off of the high pressure.
```

KINSER v. CBS CORP., Case No. 94-2282

1   You had blankets around that.  Again, we had to remove

2   all those blankets, take the joint piping above on the

3   top of the high pressure off, and spread the piping back

4   with chain falls and nylons to give it room so you could

5   pick that cover up, straight up off of there.

6          And on each side, you've got your valving,

7   where it says right up on that side's -- up there at the

8   high pressure on top, that was all covered in blankets.

9   All that had to be removed to get at that.

10      Q    What about the generator area, oil piping?

11      A    Your --

12      Q    Any insulation on that?

13      A    Your generator oil piping, because the oil is

14  so hot, all the piping off of that, which is four- or

15  five-inch piping, all of that is all insulated, hard

16  insulation on the pipe itself.  The joints, they're

17  wrapped with blankets.

18      Q    What would happen on a disassembly, as far as

19  removal of any --

20      A    You'd have to remove the, the joint blankets;

21  and then some of these pipes, they were six-, eight-,

22  ten-foot long.  You had to remove two joints actually and

23  take the pieces of pipe right out of there so you had

24  room to get the valves off, to get the, into the

25  generator.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     What about on the reheaters?  Was there any

2   insulation that had to be removed on those during the

3   full disassembly?

4      A     You had your manway insulation on piping, on,

5   on reheaters.  You had manway covers that, inspection

6   covers.  That was covered with blankets or, or a block,

7   block insulation and a little, maybe a little doghouse

8   over it.  You had to remove that because you had to take

9   the bolts off and take the inspection covers off.

10     Q     How much surface area would you be talking

11  about for that insulation on the reheaters, to remove?

12     A     Oh, maybe 50, 100 feet.

13     Q     For each reheater?

14     A     For each reheater.

15     Q     And how many did Zion have?

16     A     Six.

17     Q     This is Exhibit 661.

18           Exhibit 661, what's this right here?

19     A     It's a come-along.

20     Q     Okay.  And what role does that have in any of

21  the insulation work during turbine disassemblies?

22     A     We used, we used come-alongs and nylons to pick

23  up smaller piping and that helped, out of the way.  You

24  rigged it up with those on the overhead crane.

25     Q     How did that affect any of the, of the

1    insulation?

2         A    Well, chains, you'd drop and they'd damage the

3    covering on the insulation and stuff.  Or, also, we used

4    them to pull in the slug wrenches, keep them tight.

5         Q    This is Exhibit 657 again.  On piping

6    underneath the main floor of the mezzanine floor piping,

7    what removal, if any, would occur of insulation during an

8    outage that was necessary to correct equipment operation

9    that took place within a year or so after the original

10   insulation?

11        A    Well, on the mezzanine deck, most of that --

12   all that piping was hard block insulation.  There was

13   very little, very little blankets put on it.

14        Q    Okay.

15        A    So if you had to do any, any rework or

16   modifications, you had to remove the block insulation to

17   get at the piping.

18        Q    And how about rework?  What type of rework or

19   modifications on piping --

20        A    Well, --

21        Q    -- would take place if you had to correct

22   something soon after the original were installed?

23        A    It -- again, like I said before, it has to do

24   with heat expansion and that.  No two metals expand the

25   same, really.  And if you had too much expansion on

KINSER v. CBS CORP., Case No. 94-2282

1    something, they had to correct it, so they made a

2    modification on it.

3            THE COURT:  Are you at a stopping place, Mr.

4    McCoy?

5            MR. McCOY:  We can stop now.  I'm nearing --

6            THE COURT:  All right.  Jurors may have a

7    recess.  Take the jury out, please.

8            You may step down, Mr. LaPointe.

9            THE WITNESS:  Thank you.

10               (Jury absent, 10:24 a.m.)

11           MR. McCOY:  We're getting pretty close to the

12   end.

13           THE COURT:  Out of the presence of the jury:

14   The jury, the jury gave the sign to the clerk that they

15   wanted a recess.

16           MR. McCOY:  Right.  We're within about

17   15 minutes, and we'll be done.

18           THE COURT:  Okay.  We'll be in recess, ten

19   minutes.

20               (Recess, 10:24 a.m. to 10:39 a.m.)

21           THE COURT:  Okay.  Bring the jury.

22               (Brief pause in proceedings.)

23               (Jury present, 10:41 a.m.)

24           THE COURT:  All right.  Ask another question,

25   please.

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:
 2       Q    Mr. LaPointe, you talk about the whole process
 3   of a turbine outage, where there's a complete disassembly
 4   at a place like Zion.  How much pipe insulation, in terms
 5   of distances, would be removed during that type of major
 6   outage?
 7       A    Thousands of feet.
 8       Q    And what about square footage?  Is it -- that
 9   translates into more square feet than the distance feet,
10   right?
11       A    Yes.
12       Q    Okay.  So how about blankets during that type
13   of outage?  How much would be removed in terms of square
14   footage?
15       A    Well, you -- blanket insulation, you had
16   thousands of feet of blanket you removed.  I mean, it was
17   lots.  Sometimes -- you know, a lot of it was two layers
18   deep.
19              (Brief pause in proceedings;
20              counsel conferring.)
21          MR. McCOY:  Judge, this is Exhibit 101.
22          THE COURT:  Yes.
23          MR. McCOY:  This is the one we had talked about
24   already, the spec--
25          THE COURT:  Well, ask a question.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  Okay.

 2   BY MR. McCOY:

 3       Q    I wanted to show this to the witness.  This is

 4   a document --

 5              THE COURT:  Well, you can show it to him on the

 6   ELMO, and no one else can see it but the witness.

 7              MR. McCOY:  Okay.

 8              THE COURT:  Okay.

 9              MR. McCOY:  Fine.

10              THE COURT:  And then you can enlarge and focus

11   and all our modern stuff.

12   BY MR. McCOY:

13       Q    All right.  Do you see this, Mr. LaPointe?

14       A    Yes.

15       Q    Okay.  This is a document that you've seen

16   before from the Zion files?

17       A    Yes.

18       Q    Okay.  And this is about insulation and

19   lagging, right?

20       A    Yes.

21       Q    Okay.  And have you seen -- or this -- I want

22   to direct you, I should say, to page number 8, sheet 8 of

23   this, of this diagram.

24       A    Yes.

25       Q    Okay.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Your Honor, objection to testimony
 2     regarding this document.  It's outside of this witness's
 3     expert report.  It's outside of his expertise.  And it
 4     is, as regards a document to which a proper foundation
 5     has not been laid.
 6              THE COURT:  Is this document something you
 7     considered, Mr. LaPointe, in preparation for testimony
 8     today?
 9              THE WITNESS:  No.  It was in the documents I
10     looked at from Zion -- I don't know how you put it.
11              THE COURT:  Did you consider this document in
12     connection --
13              THE WITNESS:  Yes.  I looked at, I looked at
14     this document.
15              THE COURT:  In, in preparation for testimony
16     today?
17              THE WITNESS:  Yes.
18              THE COURT:  And I understand this was a
19     document Westinghouse produced for you?
20              MR. McCOY:  Yes.  From the Westinghouse Zion
21     files produced, right.
22              THE COURT:  Overruled.  You may proceed.
23     BY MR. McCOY:
24         Q    All right.  Then we're on Exhibit Number 101,
25     which is -- get this up here.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              DEPUTY CLERK:  Can I show that to the jury,
 2    sir?
 3              THE COURT:  I can't hear you.
 4              DEPUTY CLERK:  Can I show it to the jury?
 5              THE COURT:  No.  He's got more work to do with
 6    it.
 7              MR. McCOY:  All right.  I'll keep going.
 8    BY MR. McCOY:
 9         Q    All right.  So, does this document show the
10    types of blankets that were specified at Zion?
11         A    Yes.
12         Q    Okay.  And one of the types of blankets is the,
13    what's called "Class B" here, right?
14         A    Yes.
15         Q    And that's for what temperature range?
16         A    From 600 degrees and below.
17         Q    And the description of the Class B blankets in
18    terms of construction shows that they're made from this
19    type of -- certain material, right?
20         A    Yes.
21         Q    Okay.
22         A    Amosite asbestos.
23         Q    And asbestos cloth jacket, right?
24         A    Yes.
25         Q    That's the Zion specifications?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Yes.

 2        Q    Prepared by Westinghouse?

 3        A    Yes.

 4        Q    Okay.  So my question is whether -- my question

 5   is whether these types of Class B blankets for

 6   600 degrees, up to 600 degrees, would be used at Zion?

 7        A    Yes.

 8        Q    Why do you say that?

 9        A    Because your spec-- there's your specifications

10   for Zion, and it says that was the specs they used.  At

11   that time, that's what they used.

12        Q    Okay.  What would be the temperature range,

13   typically, at Zion for the system?

14        A     600 degrees.  Some below 600, but you -- most

15   of it just around the 600-degree temperature mark.

16        Q    Right.  So that would be the Class B area?

17        A    Yes.

18             MR. McCOY:  All right.  Judge, I don't really

19   need to show the document to the jury then.

20             THE COURT:  You may do whatever you're going to

21   do.

22             MR. McCOY:  All right.  I'm finished --

23             THE COURT:  You're in charge of the

24   interrogation.  I'm not.

25             MR. McCOY:  Okay.  I'm finished with it then.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:
 2        Q    All right.  Now, you mentioned -- we talked
 3   about disassembly.  During a turbine outage, there also
 4   had to be a -- it also had to be put back together,
 5   right?
 6        A    Yes.
 7        Q    Okay.  And so in this time period -- say Zion
 8   1974 outage -- if the unit had asbestos insulation that
 9   would already have been installed, did, as a matter of
10   practice, Westinghouse change that asbestos insulation
11   and throw it away?
12        A    They, they took it off -- in that time frame,
13   most insulation was taken off, whichever we had to, and
14   stored wherever you could, wherever there was space; and
15   most of it, somebody reinstalled what was usable,
16   reinstalled it.
17        Q    So if it was asbestos taken off, normally
18   asbestos was reinstalled?
19        A    That's the -- they put back on what was on.
20        Q    All right.  I want to ask you about dust
21   created during insulation removal work.  You've had the
22   opportunity to observe this.
23        A    Yes, I have.
24        Q    Okay.  You've had an opportunity to observe it
25   on turbine work?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A      Yes.

2      Q      Have you created some of it yourself?

3      A      Created a lot of it myself.

4      Q      How far does this kind of dust travel on a

5   turbine overhaul?

6      A      On a turbine overhaul, that dust that we made

7   traveled from end to end of the building.  It laid on top

8   of piping on floors.  It laid all over.  And you, you

9   eventually had to clean up.

10     Q      And how was cleanup handled?

11     A      When we were done with the gen-- well, in

12  between, it was swept and shoveled into, into 55-gallon

13  garbage drums.  You swept the floor and shoveled it up.

14     Q      Did the cleanup create more dust?

15     A      Well, the brooms usually do create more dust.

16  It's dry in -- it's dry in powerhouses.

17     Q      Could you -- was dust visible during the

18  cleanup?

19     A      Oh, yeah.  You swept an area.  You looked

20  behind you.  There was dust that settled behind you.  In

21  fact, we used brooms first to shovel, at the end, to, to

22  sweep up everything we could; and then we used big dust

23  mops, four-foot dust mops, to try and pick up the dust

24  that you couldn't with the, with the brooms.

25     Q      What did these -- when was there dust control

1   practices for the insulation work on the Westinghouse

2   work, turbine jobs?

3       A    When I first started to see it appearing, it

4   was in the early '80s.

5       Q    All right.  I have a, a video that we're going

6   to show.  It's Exhibit 81.  And you saw this video

7   before, on --

8       A    Yes.

9       Q    -- pipe cutting, right?  Okay.

10          Is this video representative of some dust that

11  would be created during pipe cutting?

12      A    Yes.  It was the practices of the time.

13      Q    I said "pipe cutting."  I meant pipe insulation

14  cutting, right?

15      A    Yes.

16          MR. McCOY:  All right.  We're going to go

17  ahead, Judge, and show Exhibit 81, which is a short

18  video.

19          MS. EZELL:  Your Honor, I would just object to

20  the foundation as to not being representative of any

21  particular day or time or any activities at Zion.

22          THE COURT:  Did you ask him, again, what it's

23  representative of?

24          MR. McCOY:  I'll clarify that, Judge.

25

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:
 2        Q    The video that we're about to show, you saw it
 3   last night, right?
 4        A    Yes.
 5        Q    Okay.  Is that representative of, of dust that
 6   would be created during work that would go on in a
 7   turbine outage, such as at Zion?
 8        A    Yes.  That was insulating work, and that's how
 9   it was done.
10             THE COURT:  All right.  The objection's
11   overruled.  You may display it.
12             MS. EZELL:  Yes, sir.
13                  (Brief pause in proceedings.)
14                  (Exhibit is published in open court.)
15   BY MR. McCOY:
16        Q    All right.  Now, Mr. LaPointe, the video that
17   we've just seen, is that what you would see when you look
18   in the air in the powerhouse in these outages and there's
19   asbestos being cut, sawed, or hammered?
20        A    Yes.
21        Q    Okay.  If somebody showed a video that didn't
22   have asbestos dust that was visible during the cutting
23   and sawing or hammering, would that be an accurate
24   representation?
25        A    No.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q     Why do you say that?

2        A     Because dust was created when you sawed that

3   stuff and you, you handled it.  It was created.  It, it

4   settled everywhere.

5        Q     What about if there's work on that mezzanine

6   floor underneath the main turbine floor and somebody's up

7   on the main turbine floor?  Would --

8        A     Well, you --

9        Q     -- there -- let me finish the question.

10             What, if any, dust might come up from the

11  asbestos insulation work on the mezzanine floor to the

12  turbine floor?

13             MS. EZELL:  Objection, improper hypothetical;

14  no testimony about any work on the mezzanine floor.

15             THE COURT:  Oh, I've heard testimony about

16  that.  Overruled.

17  BY MR. McCOY:

18       Q     Go ahead.

19       A     Yes.  You had, you had grating, steel grating

20  in the floor between the turbines when they're back to

21  back.  You had that steel grating.  You had steel grating

22  underneath the reheaters; and some of it was open

23  underneath the -- right directly under the reheater, that

24  was open, some of it.

25             And all hot air in that building, from the
```

KINSER v. CBS CORP., Case No. 94-2282

1   basement going up, it worked like a chimney.  Every -- it

2   came up, and it came up through the gratings.  If

3   somebody down below was cutting and making dust, of

4   course, it, it rose like a chimney.  It rolls right up

5   through that grating and came up as high as it could and

6   settled out.

7       Q    For -- let's, let's talk about another type of

8   material:  gaskets.  You know about those, right?

9       A    Yes.

10      Q    Okay.  You worked with those many times?

11      A    Many, many times.

12      Q    Okay.  You directed people working in those as

13  a foreman?

14      A    Yes.

15      Q    You had Westinghouse engineers direct you in

16  gasket removal?

17      A    Yes.

18      Q    For a turbine system that was built, finished

19  off in the year 1973, completed, like Zion, what were the

20  gaskets made out of?

21      A    They were asbestos gaskets.  They were -- oh,

22  it skips me right at the second, the brand name on them.

23      Q    You don't have to give any brand names here.

24      A    Oh.

25      Q    We don't need that.

KINSER v. CBS CORP., Case No. 94-2282

1          A     Yeah.

2          Q     How do you know they were asbestos?

3          A     Because it was the only gasket that would

4    withstand the heat temperatures of the piping.

5          Q     Why is it necessary to take off asbestos

6    gaskets during these turbine outages like Zion?

7          A     Well, you, you take them apart because the

8    heat -- after that asbestos gasket was put in place, it

9    was pliable when you put it in place; and you squeezed it

10   up, crushed it as you tightened your fittings.  And then

11   the heat, from the months of running, it got hard,

12   brittle.  Brittle.  So when you took it apart, you

13   scraped and pulled some of it off.  Like I said, it got

14   brittle.  Some stuck to this.  Some stuck to that.  You

15   pulled it off.  You cleaned it up.  You cut new gaskets.

16         Q     Give us a few examples of locations where

17   gaskets would be removed from during a turbine

18   disassembly at Zion.

19         A     You had -- on the low pressures, on the

20   crossover pipe, on the bottom bolted down, we called it

21   the "spooled pieces," bolted to the low pressure unit

22   turbines -- you had the three of them -- and you had the

23   three crossover pipes that bolted down to them.  It was

24   called the spool pieces in there.

25               And you had about four of those gaskets, big

1    gaskets that were five feet, five feet across and maybe

2    three inches in width.  And then, like I said, it was

3    maybe a quarter inch thick, close to it, that you made

4    up; and they fit in between all those spool pieces, and

5    that crossover pipe was bolted down on it.

6         Q    Where else would gaskets be removed?

7         A    Anywhere the piping was put together, there was

8    gaskets.

9         Q    So when you had to take apart two pieces of

10   the --

11        A    Right.  Your oil pip--

12        Q    -- pipe --

13        A    Your oil piping, you used the same gasket

14   material.  They used it for everything.  On the oil

15   piping, there was gaskets, the same stuff.  There was --

16   anywhere pipes were bolted together -- some were, some of

17   the big pipes didn't use that particular gasket.  If they

18   had an inner flange, they used a Flexitallic gasket that

19   came.  But that was an asbestos gasket, too.

20        Q    That was?

21        A    That was.  Flexitallic was an asbestos gasket.

22        Q    Gasket removal, how was that typically done?

23        A    It was done with a putty knife and a hammer and

24   a wire wheel grinder.  If you couldn't scrape and get it

25   off, you wire-wheeled it off with the wire wheel until it

KINSER v. CBS CORP., Case No. 94-2282

1  was clean, and --

2      Q    Did Westinghouse furnish those, those tools?

3      A    All those tools came in a Westinghouse

4  retrokit.

5           MR. McCOY:  Next, Judge, we'd like to show

6  Exhibit Number 82, which is another short video.  This

7  one is on --

8           THE COURT:  Proceed.

9           MR. McCOY:  -- gasket removal.

10 BY MR. McCOY:

11     Q    For foundation, you've seen this video also?

12     A    Yes, I have.

13     Q    Okay.  And is this also representative of

14 gasket removal that would occur in a place like Zion?

15     A    Yes, practices of the times.  This is how it

16 was done.

17          MR. McCOY:  All right.  Go ahead with that.

18              (Exhibit is published in open court.)

19          MR. McCOY:  Okay.  We'll go ahead and stop this

20 here.

21 BY MR. McCOY:

22     Q    Does that reflect what the conditions looked

23 like during gasket removal?

24     A    Yes.

25     Q    Okay.  Back in 1974, was anybody wearing

1   respirators or breathing protection?

2       A    No.  Nobody was -- nobody was issued that

3   stuff.  Just a paper mask at the most.

4       Q    Have, have you discussed with Westinghouse

5   engineers practices about ordering materials for large

6   turbine projects or outages?

7       A    Yes, I have.

8       Q    Okay.  And how far in advance of the actual use

9   of these materials does the ordering occur?

10      A    A couple years.

11      Q    And I want to talk about the, the process of

12  erecting a new turbine, like happened at Zion before Mr.

13  Kinser got there.  But that process of actually erecting

14  the turbine, how long does the insulation last for a

15  place the size of Zion?

16      A    About five years.

17      Q    I mean, how long does the insulation work

18  itself, the insulation part of the work, go on?

19      A    About the last two years.

20      Q    If someone said to you that Westinghouse

21  stopped using asbestos insulation for turbine work after

22  the OSHA regulations came out in July of 1972, what would

23  you say about that?

24          MS. EZELL:  Objection, Your Honor, --

25          THE COURT:  Yeah.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  -- foundation, calls for

2    speculation.

3          THE COURT:  He's described his work experience

4    and wherever he's been through, through this time period.

5    And -- read the question.

6          MR. McCOY:  The question is:  If someone --

7          COURT REPORTER:  Do you want me to read it?

8          THE COURT:  Wait a minute.  He's going to do it

9    again.  He withdraws that one.  He's going to ask it

10   again.

11         MR. McCOY:  Right.

12   BY MR. McCOY:

13     Q    If someone said to you, Mr. LaPointe, that

14   Westinghouse stopped using asbestos insulation for

15   turbine work after OSHA regulations came out in July of

16   1972, what would you say?

17     A    No.  I don't believe that.

18         MS. EZELL:  Objection, move to strike.

19         THE COURT:  Again, --

20         MS. EZELL:  I was waiting for a ruling from the

21   bench.

22         THE COURT:  Well, the form of the question is

23   objectionable.  I agree.

24         You know, what does his experience show about

25   the validity of that?

KINSER v. CBS CORP., Case No. 94-2282

```
 1            MR. McCOY:  Okay.  I'll ask a different
 2    question, Judge, and withdraw that one then.
 3    BY MR. McCOY:
 4        Q    Based on your experience, was Westinghouse
 5    using asbestos insulation for turbine work after OSHA
 6    regulations came out in July of 1972?
 7        A    Yes.
 8        Q    Why do you say that?
 9        A    Because it -- because in '73, when we finished
10    up at Kewaunee, they, they were using it.
11        Q    "They," meaning?
12        A    [No response.]
13        Q    "They," meaning who?
14            THE COURT:  Say who's "they" and who's "it."
15            MR. McCOY:  Right.
16        A    Oh.  Westinghouse was overseeing the turbine
17    until it was started up, and it was started up in
18    December of '73.  The insulation was put on in the two
19    years previous to this, and -- in that time frame, and it
20    was asbestos insulation.
21        Q    And that was the job you were on?
22        A    That was a job I was on.
23        Q    Your compensation, how much -- how much does my
24    firm pay you for your time?
25        A    They pay me $50 an hour and expenses.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q    Okay.  And what would you -- how does that
2   compare to what is the going rate that millwrights
3   currently get paid with benefits?
4        A    It's low.
5             MR. McCOY:  All right.  That's all the
6   questions I have.  Thank you, Mr. LaPointe.
7             THE COURT:  Cross-examination.
8             MS. EZELL:  Thank you, Your Honor.
9               CROSS-EXAMINATION BY MS. EZELL:
10       Q    Good morning, Mr. LaPointe.
11       A    Good morning.
12       Q    You worked at Kewaunee in December of '73, you
13  just testified?
14       A    Yeah.
15       Q    And you said -- you said that there was
16  asbestos there when they finished insulating that place?
17       A    Yes.
18       Q    Yes.
19            And because you said there was asbestos at
20  Kewaunee in 1973, you want this jury to think there was
21  asbestos at Zion in 1974, correct?
22       A    I don't.
23       Q    You said that there is asbestos at Zion when
24  you testified with Mr. McCoy, --
25       A    That's what --
```

KINSER v. CBS CORP., Case No. 94-2282

1    Q    -- didn't you?

2    A    -- the, that's what the paperwork showed.

3    Q    You gave an opinion as an --

4    A    On the paperwork.

5    Q    Let me finish my question if you do not mind,

6    sir.

7         You gave an opinion as an expert in this case

8    that there was asbestos insulation on the turbine systems

9    at the Zion plant in 1974; did you not, sir?

10        MR. McCOY:  Your Honor, that, that misstates

11   the question.

12        THE COURT:  I don't think he was asked that.

13   Sustained.

14        Ask a question -- ask a different question.

15        MS. EZELL:  All right.

16        THE COURT:  Or another -- rephrase it.

17   BY MS. EZELL:

18   Q    Do you have an opinion about whether or not

19   there was asbestos at Zion?

20   A    Yes.

21   Q    And is it your opinion that you have either

22   given or implied that there was?

23   A    From the paperwork I read, from the documents,

24   yes.

25   Q    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
1              And didn't you just say before I stood up and
2    before -- well, I was going to say before Mr. McCoy sat
3    down, but he hasn't yet -- before Mr. McCoy stopped
4    asking you questions, that one of the bases for this jury
5    to believe that there was asbestos at Zion is because
6    "they" kept using "it" in '73?
7              Remember the judge said, "Say who 'they' are,
8    and say what 'it' is"?
9         A    "They" was the contractor who was in charge of
10   the job of installing the machinery and the equipment --
11        Q    Yes, sir.
12        A    -- and insulating it.
13             It's whatever -- I don't know what you're
14   looking for.  It's whatever the paperwork at plants like
15   Zion -- it's whatever, whatever the paperwork shows.
16        Q    So, not less than five minutes ago, you
17   testified that one of the bases for your opinion in this
18   case that Zion had asbestos is because that's just how it
19   was done in '73, correct?
20        A    No.
21        Q    All right.  And you testified that the reason
22   that you know how it's done in '73 is because you worked
23   at Kewaunee?
24        A    Yeah.
25        Q    Yes?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Yes.

 2        Q     And you did that in December of '73; they had

 3   finished up?

 4        A     We finished up.

 5        Q     And, and you say there was asbestos there?

 6        A     There was.

 7        Q     Yeah.  And you're saying it again now.

 8              And, and because you say that, you want this

 9   jury to believe there was asbestos at Zion.  That's one

10   of the reasons you want the jury to believe there was

11   asbestos at Zion, correct?

12        A     Now, I don't -- I don't believe the way --

13              THE COURT:  What he's saying -- you haven't

14   said something.  You start, and then you quit.

15        A     I never said that.  What I said was:  Due to

16   the documents that I have read from Zion, they said they

17   used asbestos there.  It says it.

18        Q     We're going to get to that, --

19        A     Yeah.

20        Q     -- I promise you.

21              I'm wondering why you would share your

22   experiences at Kewaunee if it has nothing to do with Zion

23   and this case is about Zion, so I asked you --

24        A     Kewaunee -- Kewaunee was built, was finished

25   after Zion.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And so you think it is important as an expert

2  to convince this jury that there was asbestos at Zion to

3  say that at Kewaunee -- which is in what state?

4      A    Wisconsin.

5      Q    Wisconsin.

6           That somehow, the fact that you say there was

7  asbestos in Wisconsin in '73 somehow proves there was

8  asbestos in Illinois in '74?

9           MR. McCOY:  Your Honor, that's, that's

10 argumentative.

11          THE COURT:  Sustained.  It's an argumentative

12 suggestion.  Think about circumstantial evidence,

13 counsel.

14          MS. EZELL:  All right.

15 BY MS. EZELL:

16     Q    Let's go on, now, to the documents about Zion

17 and talk about Exhibit 129 that has been admitted during

18 your direct examination.  Do you recall:  You referred to

19 this document during your direct examination, sir?

20     A    Yes.

21     Q    And you used it to talk about the length of the

22 crossover and the crossunder pipe?

23     A    Yes.

24     Q    And this document -- you would agree with me --

25 is a Westinghouse document, correct?

KINSER v. CBS CORP., Case No. 94-2282

1        A    Yes.

2        Q    And this document refers to something called

3    "insulation," correct?

4        A    Yes.

5        Q    Because in order to have a turbine that

6    functions properly, you have to insulate it, correct?

7        A    Correct.

8        Q    And two of the most important types of

9    insulation for a turbine system are block insulation and

10   blanket insulation, correct?

11       A    Correct.

12       Q    And page 2 of the documents says "Westinghouse

13   Corporation," right here, correct?

14       A    Yes.

15       Q    Yes, sir.

16            And over here, it continues to talk about

17   "insulation, crossover piping," correct?  You see my pen?

18       A    Yes.  Yes.

19       Q    "Insulation, crossunder piping"?  Yes, sir?

20       A    Yes.

21       Q    "Block," you see that?

22       A    Yes, ma'am.

23       Q    "Blankets"?

24       A    Yes, ma'am.

25       Q    "Block, blanket, block, blanket," you see that?

```
 1        A    Yes.

 2        Q    And nowhere -- and I'll hand you this document

 3   so that you don't think I'm playing any sort of

 4   electronic shenanigans -- nowhere on Plaintiff's

 5   Exhibit 129 does the word "asbestos" appear, correct?

 6             (Brief pause in proceedings.)

 7        A    Not on this particular drawing, no.

 8        Q    No, sir.

 9             And so when you said that you reviewed the

10   Westinghouse documents to determine -- if I could have

11   that back, thank you -- to determine whether or not there

12   was asbestos at the Zion plant, did you review

13   Plaintiff's 129?

14        A    Yes.  That was just used for square footage

15   purposes.

16        Q    Yes, sir.

17             And you know that at some point in time,

18   whenever that was, there came a point that the industry

19   continued to use -- may I have the ELMO, please? --

20   continued to use block insulation without asbestos to

21   insulate turbines, correct?

22        A    Would you please rephrase that?

23        Q    Yes, sir.

24             There was a time when asbestos was used almost

25   exclusively for insulation in the turbine industry, --
```

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    Yes.

2        Q    -- agree?

3             There was a time when there -- some companies

4    used asbestos, and some companies used nonasbestos, sort

5    of a transition period in the insulation of the turbine

6    industry, correct?

7        A    Correct.

8        Q    And then there was a time when the industry

9    overwhelmingly used nonasbestos materials, correct?

10       A    Correct.

11       Q    But irrespective of where we are on that

12   timeline, the insulation that they used was categorized

13   as "block insulation," correct?

14       A    All along, it was -- no matter when it was

15   used, it was categorized as "block insulation."

16       Q    And blanket?

17       A    And blanket.

18       Q    All right, sir.

19            Now, you spent a lot of time with Mr. McCoy

20   talking about "during that type of outage."  Do you

21   remember that?

22       A    Yes.

23       Q    And "during that type of shutdown," correct?

24       A    Uh-huh.

25       Q    And --
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Say "yes" or "no" --

 2              THE WITNESS:  Yes.

 3              THE COURT:  -- because "uh-huh," doesn't write

 4    down.  Okay.

 5    BY MS. EZELL:

 6         Q    What broke, if you know, at Zion in 1974?

 7         A    I do not know what broke at Zion in '74.

 8         Q    All right.  Can I have the ELMO, please.

 9              All right.  Can you zoom out just a smidgeon.

10              This is a picture of -- do you know?

11         A    A nuclear power plant.

12         Q    Okay, a nuclear power plant.  Yes, sir.

13              Do you know which nuclear power plant is

14    depicted in Demonstrative Number 9?

15         A    Could this be Point Beach?

16         Q    I will represent to you, sir, that, in fact,

17    this is Zion.

18         A    It has a lot of similarities.

19         Q    Would it be fair to say that this is as close

20    as you've come to the Zion nuclear power plant, this

21    photograph right here?

22         A    Yes.

23         Q    So when you were talking to Mr. McCoy about

24    "this type of outage," or "this type of shutdown at

25    Zion," you were basically taking the culmination of your
```

KINSER v. CBS CORP., Case No. 94-2282

1  life experiences with outages and shutdowns and applying

2  them to this power plant, correct?

3       A    My experience with power plants of this time

4  frame and era, yes.

5       Q    All right, sir.

6            Now, I'm showing you what has been previously

7  marked and shown to the jury as Defendant's Demonstrative

8  8.  You and Mr. McCoy looked at a demonstrative very

9  similar to this during your direct examination.  Do you

10 recall that, sir?

11      A    Yes.

12      Q    And I have a few questions to ask you about

13 this.

14      A    Sure.

15      Q    This is the high pressure turbine, correct?

16      A    Correct.

17      Q    It's insulated with block and blanket, correct?

18      A    Correct.

19      Q    This is three low pressure turbines, correct?

20      A    Correct.

21      Q    They're insulated with?

22      A    The condensers below the floor down there are,

23 have a spray-on insulation on them; but the turbine, the

24 low pressure turbines themselves have no insulation on

25 them until you get to the crossover piping.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    So the actual units themselves have no

2  insulation?

3    A    No.

4    Q    All right, sir.

5         This is the generator, correct?

6    A    Correct.

7    Q    It is insulated with?

8    A    There's no insulation on the generator --

9    Q    Okay.

10   A    -- other than the oil piping.

11   Q    All right, sir.

12        These are the reheaters, correct?

13   A    Correct.

14   Q    Two reheaters for each low pressure turbine?

15   A    Yep.

16   Q    They're insulated with?

17   A    Block insulation and blankets on the manways.

18   Q    All right, sir.

19   A    Usually.

20   Q    Usually.

21   A    The manways sometimes have blankets on all of

22  them.  Sometimes on some of the manways they have a --

23  what would you call it? -- a removable frame made out of

24  metal sheeting and, but insulated with block insulation

25  in it, a cover, like, to go over it.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     And at Zion, which?

2      A     I do not know at Zion what, whether they had

3   the blankets over the manway on them or the, or the

4   covers.

5      Q     All right, sir.

6            And you described -- when you were talking to

7   Mr. McCoy -- what the Westinghouse turbine unit was.  Do

8   you recall that, sir?

9      A     Yes.

10     Q     And if we were to do that on this document, do

11  you agree with me that the Westinghouse turbine unit

12  includes this high pressure turbine, the low pressure

13  turbines, the reheaters, and the generator -- this area

14  that I am circling but not drawing on Demonstrative 8

15  right now?

16     A     That's all Westinghouse equipment.  Yes.

17     Q     All right, sir.

18           When you were talking about, with Mr. McCoy,

19  a "complete shutdown" or a "complete overhaul," do you

20  remember using the word "complete"?

21     A     Yes.

22     Q     You were describing a malfunction of the

23  turbine, correct?  You talked about the turbine, "When it

24  breaks, pieces fall off, and it's ugly," I think you

25  said.

KINSER v. CBS CORP., Case No. 94-2282

```
1        A     It gets ugly.

2        Q     Yes, sir.

3              And if I were to represent to you that in 1974,

4     nothing on the turbine broke at Zion, then all of that

5     testimony about "ugly turbines" would not apply in this

6     case, correct?

7        A     Of all parts flying off, if they didn't -- if

8     it didn't have a wreck, no, parts didn't fly off.

9        Q     All right.  And, in fact, if the turbine didn't

10    break, then everything you said about turbines breaking

11    doesn't apply in this case?

12       A     I -- rephrase that.  I, I don't know what, what

13    you're talking about.

14       Q     You testified to the jury -- and you explained

15    to them at great length -- all of the disassembly that

16    would be necessary --

17       A     Yes.

18       Q     -- to a turbine, right?

19             You used a picture, --

20       A     Yes.

21       Q     -- which I've now marked as Plaintiffs' -- or

22    Defendant's Demonstrative 10.  You remember this picture?

23       A     Yes.

24       Q     This is a picture of a turbine, and tell us:

25    Is this at Zion or not at Zion?
```

KINSER v. CBS CORP., Case No. 94-2282

1    A    It's -- I couldn't specifically tell you if

2  that one's at Zion, --

3    Q    All right, sir.

4    A    -- that particular picture.  They're a lot

5  alike.

6    Q    All right.  So this one is not Zion, I'll

7  represent to you.

8        So you used this not-Zion Demonstrative Number

9  10, and you explained to the jury at great length all of

10  the disassembly that would be necessary and all of the

11  pipe removal that would be necessary if the high pressure

12  turbine malfunctioned at Zion.

13        Do you remember doing that?

14    A    Not if it mal-- I didn't use -- no, not if it

15  malfunctioned.  I did not --

16    Q    If it fell apart and parts flew --

17        THE COURT:  Wait.  Let him finish his answer.

18        MS. EZELL:  All right.

19        THE COURT:  Have you finished your answer?

20        THE WITNESS:  I said:  This is what it takes to

21  take one apart, to inspect it, clean it, maintain it.

22  BY MS. EZELL:

23    Q    Okay.  And you talked about it flying apart --

24    A    I --

25    Q    -- and being --

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    They've had units fly apart.

2        Q    Okay.

3        A    Westinghouse has.

4        Q    You don't have any information about whether

5   the Zion high pressure Turbine Unit 2 ever flew apart or

6   anything like that, do you?

7        A    No.

8        Q    No.

9             And if the high pressure turbine in 1974 was

10  not disassembled -- the doghouse did not come off -- then

11  all of your testimony relative to this document would not

12  apply to Mr. Kinser, correct?

13       A    On -- no.  On, on a maintenance overhaul, --

14       Q    Uh-huh.

15       A    -- the doghouses came off of everything.  They

16  opened stuff and inspected stuff every time.  Certain

17  stuff was -- different stuff at different times, but it

18  was all opened and inspected.

19       Q    What if, in 1974, there was no maintenance

20  overhaul?  Who told you there was a maintenance overhaul?

21       A    That --

22            MR. McCOY:  Your Honor, that's two questions.

23            THE COURT:  Yes, it is.

24            MS. EZELL:  I'll strike the first one.  I'll

25  ask the second one as a foundation question.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              Who told you --
 2              THE COURT:  Start again.
 3              MR. McCOY:  Can he answer the first question?
 4              THE WITNESS:  In that --
 5              THE COURT:  Wait, wait.  There's no question.
 6   She asked you a double question.  She can't do that.
 7              Ask a single question, please.
 8              MS. EZELL:  Yes, sir.
 9   BY MS. EZELL:
10        Q    Who told you there was a maintenance overhaul
11   of the Zion nuclear power plant in 1974?
12        A    They overhauled every unit twelve months after
13   they started them.
14        Q    The Zion power plant went online in?
15        A    '73.
16        Q    Turbine 1 went online in -- what month of '73?
17        A    Sixth, I want to say.
18        Q    Turbine 2 went online in?
19        A    I believe the eleventh month.
20        Q    Or the twelfth, would that --
21        A    Twelfth, somewhere --
22        Q    All right, sir.
23        A    -- around there.
24        Q    So if there was a major shutdown of Turbine 2
25   when Mr. Kinser was there in July of '74, twelve months
```

KINSER v. CBS CORP., Case No. 94-2282

1    had not gone by, had there?

2        A     Twelve months had not gone by.  But, in the, in

3    the early stages of these, starting these units up,

4    they -- six months I've seen them take them down.

5        Q     But --

6        A     Three months I've seen -- after they started

7    them, they shut them down; and they had problems, and

8    they did modifications.  Took them apart.  It didn't --

9    after they successfully ran for a couple years, it was

10   every twelve, twelve months; part of that unit was taken

11   apart.

12       Q     Right, sir.

13             But, but all of that experience that you've

14   just described is not an experience about the Zion plant,

15   and it's not an experience about Mr. Kinser, correct?

16       A     I, I don't know where you're --

17       Q     You said you've seen them break down after

18   three months; --

19       A     Yeah.

20       Q     -- you don't know if that happened at Zion?

21       A     I don't know that that happened.  No.

22       Q     You've seen them break down after six months;

23   you don't know if that happened at Zion?

24       A     No.

25       Q     You said after they've been up and running for

KINSER v. CBS CORP., Case No. 94-2282

1    two years or so you've seen them --

2        A    No.

3        Q    -- being taken care of?

4        A    One year, they're overhauled.

5        Q    This one, Turbine 2, hadn't been going for two

6    years -- for a year, had it?

7        A    No, but that -- some didn't make three months.

8        Q    Now, if I were to represent to you, sir, on

9    this demonstrative which has already been shown, that, in

10   fact, the generator had a problem all the way down here

11   at the end -- it wasn't the high pressure turbine; it

12   wasn't the low pressure turbine.  But, in fact, it was a

13   problem with the generator.  Okay?

14       A    Yes.

15       Q    Is today the first time you're hearing that?

16       A    If you tell me it, that's the first time I've

17   heard it.

18       Q    All right.  Then all of the testimony that

19   we've heard from you about disassembling turbines and

20   cutting pipes and taking apart and doing maintenance and

21   warranty work on turbines doesn't apply when a generator

22   is down, does it, sir?

23       A    No.  I should put this differently.

24            Many times, when they had a generator down for

25   something, they opened a lot of other machinery because

KINSER v. CBS CORP., Case No. 94-2282

1    they had time to do it.  They opened it and inspected and

2    looked at it.

3         Q    And in 1974, if the generator went offline,

4    when the generator went offline, you have no specific

5    knowledge to offer this jury about whether the high

6    pressure turbine was opened up and inspected, do you?

7         A    No.

8         Q    You have no information to offer this jury

9    about whether or not any of the three low pressure

10   turbines were opened up and inspected, do you, sir?

11        A    Not on that outage, I do not.

12        Q    Okay.  This is -- Plaintiff has used this as

13   Plaintiffs' Exhibit 637 during your examination.  Do you

14   recognize this document?

15        A    Yes, I do.

16        Q    And what did you describe this as?  What type

17   of, what piece of equipment?

18        A    This is a turbine.

19        Q    Low pressure?  High pressure?

20        A    It's a high pressure turbine.

21        Q    All right, sir.

22             Is this in the Zion nuclear power plant?

23        A    No.

24        Q    All right.  Well, this is Defendant's

25   Demonstrative Number 7, so I'm going to write "not Zion"

1    on here.  Are these the kind of blankets --

2         A    Nobody ever said it was Zion.

3         Q    Are these the kind of blankets that would have

4    been used on the high pressure turbine at Zion?

5         A    They're the type of blanket that would have

6    been used on a turbine.

7         Q    Yes, sir.

8              And you understand that there are basically two

9    different types of blankets that the industry used.

10   Initially, blankets looked more like the comforter you

11   would have on your bed; and they would come to the site,

12   and they would need to be cut and fitted to the machine,

13   such as depicted in this photograph that's on your

14   computer right now, correct?

15        A    They'd look like that.  Yes.

16        Q    Yeah.

17             And then eventually the blankets changed, and

18   they would be -- the blanket manufacturer subcontractor

19   would come out and measure the turbine; and then back at

20   their headquarters or their warehouse, they would

21   actually pre-make the blankets to fit the specific

22   dimensions of the turbine so they would be pre-fit

23   blankets that wouldn't need to be cut or in any way

24   modified once they got to the site, correct?

25        A    No.  Most of the blankets that I -- there were

KINSER v. CBS CORP., Case No. 94-2282

```
 1   some that came in boxes.  Yes.  But there was a lot of
 2   them that, blankets like that were made on site.  They
 3   had people sewing them and cutting them and making them
 4   on site.
 5       Q    So are these on-site blankets here, depicted in
 6   this photograph?
 7       A    I do not know that.  I wasn't there when they
 8   were making them.
 9       Q    All right.  So if the blankets at Zion turn out
10   to have been not made on site, then that would be
11   different than your experience, correct?
12       A    If, if the blankets were what?
13       Q    If the blankets were not made on site at
14   Zion -- they weren't cut --
15       A    Yes.
16       Q    -- and fitted on site at Zion -- but were,
17   instead, created and sized and prepackaged off site, that
18   would be different than any experience you had while you
19   were a millwright, correct?
20       A    Well, they -- there was blankets at times that
21   were shipped to a site with the machinery.  Yes.
22       Q    And you have no idea, as you sit here today,
23   whether or not the blankets at Zion were prepackaged or
24   whether or not they were --
25       A    No.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q     -- cut to fit --

2      A     I have --

3      Q     -- once they got there?

4      A     I have no idea of that.

5      Q     Now, you're not a pipefitter, correct?

6      A     No.

7      Q     In fact, we've heard testimony about

8  jurisdictional issues between different unions in this

9  case.  Millwrights and pipefitters have had

10 jurisdictional disputes as it relates to jobs in the

11 past, correct?

12     A     I believe there's been disputes with every

13 trade.

14     Q     And have you, yourself, been involved in a

15 dispute where you thought you were supposed to do a job

16 and a pipefitter thought that they were supposed to do

17 that job?

18     A     It was whoever the company issued it to.

19     Q     And --

20     A     That's the end of the line.

21     Q     And so that's how it ended.  That's how the

22 dispute ends, right, when the company decides; is that

23 what you're saying?

24     A     [Nodding head up and down.]

25     Q     But my question was:  Have you, yourself

KINSER v. CBS CORP., Case No. 94-2282

1  personally, been in a dispute as a millwright with a

2  pipefitter about who was supposed to do a particular job?

3      A    No.

4      Q    All right, sir.

5           Because the jobs are spelled out fairly well,

6  correct?

7      A    That -- they are whoever the customer or

8  company issues the work to.

9      Q    And is -- are you taking the position, then,

10 that the union has no dog in that fight?

11     A    They have very little dog in that fight.

12     Q    That if a pipefitter thinks that that's a

13 pipefitter's job, that they're not going to go and

14 register a complaint and say, "They've got a millwright

15 doing my job"?

16     A    They can register a complaint.  But the bottom

17 line is:  It's whoever the customer and the employer

18 issues that work to.  And the union has to take it up

19 with the employer and the customer, not the, not the

20 employees.

21     Q    The union is involved in deciding those

22 disputes, correct, sir?

23     A    That's right.

24     Q    Yes, sir.

25          Now, you have testified for Mr. McCoy before,

KINSER v. CBS CORP., Case No. 94-2282

```
 1   correct?

 2        A    Yes.

 3        Q    And you have been designated as an expert in

 4   numerous cases for him, correct?

 5        A    Correct.

 6        Q    And you plan to testify for him in other cases?

 7        A    Probably.

 8        Q    It's been less than a year that you, since

 9   you've testified in court for him before?

10        A    Yes.

11        Q    And sometimes you even testify in cases where

12   the, the issues involved involve a millwright, correct?

13        A    Yes.

14        Q    But you're, you're here today in a case

15   involving a pipefitter?

16        A    Yes.

17        Q    All right.  Now, I have looked at -- do you

18   have a copy of your resume/CV with you today --

19   curriculum vitae, as we've heard some folks describe it?

20        A    [No response.]

21        Q    Do you have a copy with you?

22        A    Mr. Bob has a copy.

23        Q    Mr. Bob?

24             (Brief pause in proceedings;

25             counsel conferring.)
```

KINSER v. CBS CORP., Case No. 94-2282

1              MR. McCOY:  This was Exhibit 68 for --

2              MS. EZELL:  I'm not admitting it.  I'm just

3    going to ask him a couple questions.  Thank you, though,

4    Mr. McCoy.

5    BY MS. EZELL:

6         Q    Now, you had indicated earlier to the jury that

7    you had worked, drew a paycheck from Westinghouse,

8    correct?

9         A    Yeah.

10        Q    All right.  And you have provided to us, as

11   you, as you must, a copy of your work history, correct?

12        A    Yes.

13        Q    And on here, specifically, you have

14   indicated -- when did you retire?

15        A    February of 2005.

16        Q    Okay.  So from February of 2005, you have

17   indicated where you have worked, correct?

18        A    [No response.]

19        Q    Going backwards?

20        A    Yes.

21        Q    Yes, sir.

22             You call it your "professional experience,"

23   correct?

24        A    It's a resume.

25        Q    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              And if you'll look at it with me, you can go to
 2   page -- because it's in reverse chronological order, --
 3        A    Yes.
 4        Q    -- correct?
 5              You can go to page 7, and the last job that you
 6   call out in detail was in 1998, correct?
 7        A    Yes.
 8        Q    All right.  So now, prior to that, I see you've
 9   got -- you did millwright work at a Westinghouse site in
10   Florida on page 6.
11              You worked for Westinghouse --
12        A    Where did you see --
13        Q    On page 6.
14        A    Where in -- where do you see one in Florida?
15        Q    "Orlando, Florida, millwright and valve shop."
16              MS. EZELL:  May I show the witness and not the
17   jury, please?
18              THE COURT:  Certainly.
19              THE WITNESS:  On page 6?
20              MS. EZELL:  Well, it's on page 6 of my version.
21   BY MS. EZELL:
22        Q    You see this right here?
23        A    Yes.
24        Q    All right.  So in, from 1998 to 1999, you were
25   in Orlando, Florida?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A    No.  No.  No.  I wasn't in Orlando, Florida.

2      Q    All right.  So this doesn't say "Orlando,

3    Florida" right here?

4      A    That's where their office is.

5      Q    Okay.  So where were you?

6      A    Point Beach nuclear power plant.  It says there

7    right there by your finger, --

8      Q    Located in?

9      A    -- "Job Location."

10     Q    Located in?

11     A    In Wisconsin.

12     Q    All right.  Then on page 5, you did some more

13   work with Westinghouse in the 2000s, correct, and in

14   1999?  I've highlighted it in yellow there to help you

15   out.

16     A    Yes.

17     Q    And then on page 4, nothing.

18          And then on page 3, Byron station, that was in

19   2002?

20     A    Yes.

21     Q    On page 2, nothing.

22          And then on page 1, Byron station and Genoa

23   station?

24     A    Yes.

25     Q    Where's Kewaunee?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Kewaunee was before this time frame of --

 2        Q     That's back --

 3        A     A lot of work at Kewaunee was before -- before

 4   '98.

 5        Q     Yeah, so --

 6        A     It was in the '70s, the '80s, and into the

 7   '90s.

 8        Q     Right.

 9              So if I look here at "Additional Experience,"

10   it says, "Millwright, December 1, 1969, through January

11   of 2000; job locations, various"?

12        A     Right.

13        Q     So that's when you had this experience at

14   Kewaunee, right?

15        A     Kewaunee and -- right --

16        Q     All right.

17        A     -- and other areas.

18        Q     Now, we've gone through a six-, seven-page --

19   eight-page list of your job experience where we've called

20   out your Westinghouse experience, correct?

21        A     Page what?

22        Q     I'm sorry.

23              Is it -- can you hear me all right?

24              COURT REPORTER:  I can.

25              MS. EZELL:  Yeah.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MS. EZELL:
 2        Q    We have gone through an eight-page -- well, I
 3   guess it's an eight-page fax; it's a seven-page --
 4        A    Okay.
 5        Q    -- resume --
 6        A    Yeah.
 7        Q    -- with your job experience.
 8        A    Right.
 9        Q    And on Westinghouse experience where you've
10   been in a management capacity where you've drawn a
11   check --
12        A    Yeah.
13        Q    -- from Westinghouse, we've talked about those,
14   correct?
15        A    No.
16        Q    We've just called them out?
17        A    No, no, no.  No, we haven't, because that's
18   before -- you go back to '98, and a lot of Westinghouse,
19   the time I worked for them, was before '98.
20        Q    Yes, sir.
21             But not where you worked directly for them?
22        A    Oh, I worked directly for them.
23        Q    If I'm looking at the resume that you provided
24   to Westinghouse in this case, a case where Westinghouse
25   is involved, it -- I look where you've called out
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1    Westinghouse as your direct employer.  Based on this
 2    paperwork, you don't indicate any employment with
 3    Westinghouse prior to --
 4         A    It --
 5         Q    -- 2000; is that correct?
 6         A    Because, because this resume, when it was made
 7    out, this resume, --
 8         Q    Yes, sir.
 9         A    -- I didn't, I didn't -- it never went back
10    past hardly 2000.
11         Q    Yes, sir.
12         A    It wasn't needed to go back beyond that.
13         Q    All right, sir.
14              It's not because in 1972 the regulations
15    changed; that has nothing to do with it?
16         A    No.
17         Q    All right.  You have no idea, do you, sir,
18    whether or not Mr. Kinser was involved in taking off or
19    putting on insulation at Zion?
20         A    No, ma'am.
21         Q    And you have no idea, if he was involved in
22    taking on or putting off -- taking off or putting on
23    insulation, whether that insulation contained asbestos,
24    do you?
25         A    The only fact I have is what the paperwork that
```

KINSER v. CBS CORP., Case No. 94-2282

1    I read said.

2         Q    That is an excellent point.

3              So may I show the witness and not the jury.

4              You discussed with Mr. McCoy paperwork, right

5    here, that I'm showing you.  This is called "Sargent &

6    Lundy Form 40-G," incorporated into a Westinghouse

7    Electric document, correct?  You see that where I've

8    highlighted "Sargent & Lundy Form 40-G"?

9         A    Yes.

10        Q    Mr. McCoy provided you with this drawing, 40-G,

11   correct?

12        A    I believe he did.

13        Q    Yes, sir.

14             Well, Westinghouse didn't, did they?

15             THE COURT:  Excuse me.  This is argumentative,

16   and we're getting -- you know, he doesn't know.  McCoy

17   gave it to him.

18             MS. EZELL:  Well, and my distinction was:  He

19   didn't get it while he was on the job, and so I should

20   have asked the question a better way.

21             THE COURT:  Yes, yes.

22             MS. EZELL:  I apologize.

23             THE COURT:  Very well.

24   BY MS. EZELL:

25        Q    While you were working at Westinghouse, you

KINSER v. CBS CORP., Case No. 94-2282

```
 1    never received a copy of this document?

 2        A    No.

 3        Q    No, sir.

 4        A    I read -- I read a lot of documents in their

 5    archives though.

 6        Q    Okay.  Now, you remember that you testified

 7    that, when insulation work is done, that a lot of times

 8    that they would take the insulation off, store it, and

 9    then put back on what they had used before.

10             Do you remember testifying to that earlier

11    today?

12        A    Yes.

13        Q    And so if what they took off didn't have

14    asbestos in it in the first place, what they put back on

15    didn't have asbestos either, correct?

16        A    That could be it.

17        Q    I'm sorry?

18        A    That could be a point.  Yes.

19        Q    Is there some way that that could not be true?

20        A    Well, if you put back on what was there,

21    it's -- it's what was there.

22        Q    And if it didn't have asbestos?

23        A    Well, if it didn't have asbestos, then it

24    didn't.

25        Q    All right.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1              All right.  So this is Drawing Number 40-G.
2              And I'm wondering if you were provided in the
3    course of your preparation to testify here today with
4    this drawing -- only to the witness, and it will require
5    some zoom help -- which is Drawing 40-H.  Have you seen
6    this drawing before?
7              THE COURT:  Can you read it?  I can't.
8         A    I can't even read it, so I have no idea what it
9    even is.
10        Q    All right.  Well, I'll just ask you about it,
11   whether you can read it or not.
12             Were you provided in the course of your
13   preparations to come here and talk today to the jury with
14   a document called "Sargent & Lundy Form 40-H,"
15   incorporated into a Westinghouse document?
16        A    I cannot recollect that.
17        Q    All right.  So I would like you to assume for
18   me that two years after Sargent & Lundy put out Form 40-G
19   they came out with Form 40-H.  Okay?
20        A    Okay.
21        Q    And that there were other changes in there, but
22   one of the major changes between Form 40-G and Form 40-H
23   was that Form 40-H said:  Use asbestos-free blankets in
24   insulation of turbines on all Sargent & Lundy
25   Commonwealth Edison jobs.
```

KINSER v. CBS CORP., Case No. 94-2282

1      A     If you say so.

2      Q     I'm representing that to you.

3      A     If you say so, that you read that.  I didn't

4    read that.

5      Q     Well, and I apologize for not bringing a copy

6    that we could zoom in on.

7            But I'm representing to you that 40-H says,

8    "Use asbestos-free blankets."  All right, sir?  You

9    accept that representation for the next question I'm

10   going to ask you?

11     A     If you say so, yes.

12     Q     All right.  You were not provided with that

13   document when you said that you had reviewed all of the

14   Westinghouse documents to come here and provide your

15   opinion as to whether or not there was any asbestos at

16   the Zion plant in 1974, correct?

17     A     I didn't read that document.  I, I read -- I

18   gave an opinion on all the documents I read.

19     Q     Right.

20           And in fairness to you, sir, you -- that's all

21   you can do?

22     A     Yes.  If I wasn't there, that's all I can do.

23     Q     And you, and you weren't there, and you didn't

24   have that document?

25     A     No.  I did not see that document.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  I don't have anything further, Your

2    Honor.

3          THE COURT:  Redirect.

4           REDIRECT EXAMINATION BY MR. McCOY:

5     Q     Mr. LaPointe, you worked at the LaSalle plant,

6    right?

7     A     Yes, I did.

8     Q     That's a Commonwealth Edison nuclear plant; is

9    that right?

10    A     Yes.

11    Q     Okay.  And the construction on that began in,

12   sometime in 1973, and it was completed much later than

13   Zion, right?

14    A     Right.

15    Q     Okay.  Was Commonwealth Edison using asbestos

16   insulation at LaSalle?

17    A     I -- what I observed there --

18    Q     Yes.

19    A     -- of valving in the containment, we, we had to

20   replace two big valves that were wore out.  They had

21   asbestos abatement people -- everybody had jobs to do,

22   and they had asbestos abatement people that removed the

23   insulation on these valves, the lagging and the

24   insulation on them, so that the valves could be cut out.

25   They did that.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q     That was done at LaSalle, a plant that was

 2    built after Zion?

 3        A     Yes.

 4        Q     Now, --

 5        A     They did -- that's what they did there --

 6        Q     All right.

 7        A     I read --

 8              MR. McCOY:  All right.  That's all I needed to

 9    know.  Thank you, Mr. LaPointe.

10              MS. EZELL:  Nothing further.

11              THE COURT:  That's it?

12              MR. McCOY:  That's all.

13              THE COURT:  Okay.  Step down.  You may step

14    down.

15              THE WITNESS:  Okay.  Thank you.

16                  (Witness LaPointe excused, 11:51 a.m.)

17              THE COURT:  All right.  Go to lunch, jurors.

18    Don't discuss the case with anyone else while you're

19    gone.  Don't let them talk to you about the case.  1:00,

20    you'll come back.

21                  (Jury absent, 11:51 a.m.)

22              THE COURT:  All right.  We'll resume at 1:00.

23                  (Recess, 11:51 a.m. to 1:02 p.m.)

24                  (Discussion off the record.)

25              THE COURT:  Ready?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Yes, sir.

 2              THE COURT:  Bring the jury.

 3                   (Brief pause in proceedings.)

 4                   (Jury present, 1:04 p.m.)

 5              THE COURT:  Okay.  Jurors, the, the next

 6  witness is a video deposition, and I am sorry to report

 7  to you that it will last some four hours and 50 minutes;

 8  but we'll break it up and finish it tomorrow, and we'll

 9  have recesses as appropriate.

10              You may proceed, Mr. McCoy.

11              MR. McCOY:  Okay.  Yes.  The next witness is

12  going to be Frank Parker, by videotape, industrial

13  hygienist.

14              THE COURT:  Very well.

15              MR. McCOY:  And we're ready to roll, I think.

16              THE COURT:  Right.

17                   (Parker deposition begins, 1:05 p.m.)

18              THE COURT:  Time for a recess.  Okay.  We'll

19  have a ten-minute recess and come back and watch more of

20  the video.

21              Take the jury out, please.

22                   (Jury absent, 1:59 p.m.)

23                   (Recess, 2:00 p.m. to 2:11 p.m.)

24              THE COURT:  Ready?  Okay.  Bring the jury.

25                   (Jury present, 2:13 p.m.)
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  If the clerk will permit us, we
 2    will proceed.
 3              All right.  Go ahead, Mr. McCoy.  Set her up.
 4              MR. McCOY:  Continuation of Mr. Parker.
 5              (Parker deposition resumes, 2:14 p.m.)
 6              THE COURT:  Is this a good place for a recess?
 7              MR. McCOY:  Yes.
 8              THE COURT:  Yes?
 9              Oh, you've got a question.  Give it to the CSOs
10    as you come out, and I'll look at it.
11              (Jury absent, 3:11 p.m.)
12              THE COURT:  We'll be in recess.  He'll bring
13    back the thing to me after he gets them hooked up.
14              MS. EZELL:  Your Honor, I -- Your Honor, we
15    just wanted to -- I just wanted to put something on the
16    record that occurred.  Is this now a good time, or do you
17    want to wait until we're done with the recess?
18              THE COURT:  Well, he's leaving.
19              MS. EZELL:  He's not.
20              MR. McCOY:  I'm here.
21              THE COURT:  Okay.  All right.  You may be
22    heard.
23              MS. EZELL:  Yes, sir.  I, I was advised that
24    our witness that we were prepared to have tomorrow
25    morning -- because I thought we were going to start
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1    evidence tomorrow morning -- would -- I asked Mr. McCoy

 2    if it would be permissible to suspend the playing of this

 3    video and start with our live witness because --

 4              THE COURT:  Has he agreed?

 5              MS. EZELL:  He has agreed.

 6              THE COURT:  Good.  We'll do it.

 7              MS. EZELL:  All right.  Thank you, Your Honor.

 8              THE COURT:  No.  I'm pliable, you know, maybe.

 9              Hey, don't go away.

10                (Brief pause in proceedings.)

11              THE COURT:  The clerk will read the question

12    into the record.

13              DEPUTY CLERK:  "Did Mr. Kinser use gloves," and

14    there's a slash and it says, "What material?"

15              And then number 2 was:  "Who provided them?"

16              THE COURT:  The response to this is:  There's

17    no way to put this question to the witness because this

18    is a video deposition, --

19              MR. McCOY:  Right.

20              THE COURT:  -- and you just have to take it as

21    it is.

22              MS. EZELL:  Right.

23              THE COURT:  When they come back, I'll tell --

24    I'll tell them that.

25              MR. McCOY:  Right.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1           THE COURT:  Okay.  We're in recess.  I'm not

 2    here.  I'm working on another case.

 3           MS. EZELL:  Okay.

 4                (Recess, 3:13 p.m. to 3:28 p.m.)

 5                (Jury present, 3:29 p.m.)

 6           THE COURT:  All right.  Jurors, a question was

 7    put to me by one of your members about what clothing did

 8    Mr. Kinser have on the occasion, and there was a

 9    discussion in the deposition.

10           There's no way we can put an additional

11    question to the witness in the deposition, obviously, and

12    so you'll just, you'll just have to take the information

13    that you have before you.

14           Okay.  Let's go ahead.

15           MR. McCOY:  All right.  Rolling.

16                (Parker deposition resumes, 3:30 p.m.)

17                (Brief pause in proceedings

18                due to a technical issue.)

19           MR. McCOY:  I'm going to just have it brought

20    to where we were, just one minute.

21                (Brief pause in proceedings.)

22                (Parker deposition resumes, 3:31 p.m.)

23           THE COURT:  Is this a stopping point right now,

24    Mr. McCoy, you think?

25           MR. McCOY:  It can be, Judge.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Well, I know that.

 2              I mean -- I mean, for instance, it's about 4:25

 3    or so.

 4              MR. McCOY:  It would be a fine point.  Yes,

 5    Judge.

 6              THE COURT:  So we should adjourn till tomorrow

 7    morning with everybody?

 8              MR. McCOY:  That will work out fine.

 9              THE COURT:  Okay.  Jurors, you're excused for

10    the day.  Don't discuss the case among yourselves or with

11    anyone else while you're gone.  Don't let anyone talk to

12    you about it.  Be back tomorrow morning at 9:00.  Thank

13    you very much.

14              (Jury dismissed for the day, 4:18 p.m.)

15              THE COURT:  Anything I can do, or we will

16    adjourn for the day?

17              MR. McCOY:  I have one item, just to make sure

18    and -- we're working; we've provided the defense with the

19    list of the medical bills that we're claiming are related

20    to asbestos, and that's been provided since the pretrial

21    order.  We're only claiming the ones for the lung cancer.

22    We withdrew any claim for any aggravation, so that's been

23    withdrawn.

24              And I say that because I didn't get any

25    response from them that there was anything disputed.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Okay.  I wrote myself a note, "I am
 2    puzzled by the failure to ask L.K. about medical bills
 3    and expenses and put them into evidence."  Now I've got
 4    an answer.  Thank you.
 5              MR. McCOY:  Right.
 6              MS. EZELL:  No, Your Honor.  You don't have an
 7    answer because what I've told Mr. McCoy from the
 8    beginning --
 9              THE COURT:  Well, --
10              MS. EZELL:  -- is that we had no stipulation on
11    this issue.
12              THE COURT:  Okay.  Wait a minute.  When I say
13    "I have an answer," it means that you are aware of this,
14    and you're working on it.
15              MS. EZELL:  Oh, yes.
16              THE COURT:  That's all I care.  I'm just
17    thinking of how not, not to have things slowed down.
18              Okay.  We will resume tomorrow morning at 9:00.
19              MR. McCOY:  Judge, just to be clear now, I did
20    ask this about three or four days ago here at trial about
21    it, and they said they would be getting back to me.  That
22    was for the other attorney, Paula.
23              THE COURT:  Do you have a paid, paid medical
24    bill?
25              MR. McCOY:  We don't have, we don't have all,
```

KINSER v. CBS CORP., Case No. 94-2282

1    every bill.  What we have are the records, basically

2    mostly from Medicare, showing all the, all the charges

3    that were billed --

4             THE COURT:  Well, aren't they paid bills?

5             MR. McCOY:  Well --

6             THE COURT:  Because that's what authenticates

7    it and pervades, you know -- or at least in my

8    experience, make it admissible into evidence:  You've got

9    a paid bill.

10            MR. McCOY:  I will, I will go back and see how

11   many we actually have bills for.

12            THE COURT:  Yeah.  Or something that shows what

13   was paid, who paid it, and that it was paid.

14            MR. McCOY:  Right.

15            THE COURT:  Okay.  Now, I'm out of that.  I'm,

16   I'm just the judge.  I'm not a lawyer.

17            MR. McCOY:  Well, I'm, I'm -- under the, under

18   the law, it's the amount billed that is the claim in

19   Illinois.  There's Illinois law on that.

20            THE COURT:  Yeah, yeah.  But I'm thinking

21   admissibility of documents, and a paid bill is -- man,

22   that comes right in.

23            MR. McCOY:  Right.  But we don't have -- I

24   don't think we have too many.

25            THE COURT:  Or some record.  I mean, it doesn't

KINSER v. CBS CORP., Case No. 94-2282

```
 1   have to be a paid bill.  For instance, if Medicare is on

 2   the hook for X dollars.

 3            MR. McCOY:  We have that.  We have those

 4   records showing everything.

 5            MS. EZELL:  And, Your Honor, just so you're

 6   clear, the confusion is, as you heard, Mr. Kinser has a

 7   number of different medical issues; and he has a number

 8   of things that are not related to asbestos in any way.

 9   And so to separate out his medical bills is not something

10   that we think we should be asked to do.  We think it's

11   something that they should be required to prove up.

12            THE COURT:  Yes.

13            MR. McCOY:  We did separate it out and give it

14   to them, and so far I haven't heard any dispute.

15            THE COURT:  Okay.

16            MR. McCOY:  Now, if somebody needs to go

17   through each item, Judge --

18            THE COURT:  I'll deal with it as it comes to

19   me.

20            MS. EZELL:  Okay.  Well, --

21            THE COURT:  I'm going home now.

22            MS. EZELL:  Goodbye.

23                 (Trial adjourned, 4:22 p.m.)

24                 * * * * * * * * * *

25
```

KINSER v. CBS CORP., Case No. 94-2282

1

2

3

4

5                    REPORTER'S CERTIFICATE

6

7        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

8   that the foregoing is a correct transcript from the

9   record of proceedings in the above-entitled matter.

10

11       Dated this 15th day of January, 2014.

12

13

14

15                    s/Lisa Knight Cosimini
                   Lisa Knight Cosimini, RMR-CRR
16                 Illinois License # 084-002998

17

18

19

20

21

22

23

24

25