UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

                Plaintiffs,          Docket No. 94-2282

     vs.                             Urbana, Illinois
                                     January 16, 2014
                                     9:05 a.m.
CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

                Defendant.


            EXCERPT from JURY TRIAL -- Day 7
            (Testimony of Robert Norwood Jones)

         BEFORE THE HONORABLE HAROLD A. BAKER
          SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

 For the Plaintiffs:      ROBERT G. McCOY, ESQUIRE
                          Cascino Vaughan Law Offices, Ltd.
                          220 South Ashland Avenue
                          Chicago, Illinois 60607
                          312-944-0600


 For the Defendant:       SANDRA GIANNONE EZELL, ESQUIRE
                          Bowman and Brooke, LLP
                          901 East Byrd Street, Suite 1650
                          Richmond, Virginia 23219
                          804-649-8200

                          PAULA M. BURLISON, ESQUIRE
                          Bowman and Brooke, LLP
                          1441 Main Street, Suite 1200
                          Columbia, South Carolina 29201
                          803-726-7420

                          JACOB DANIEL SAWYER, ESQUIRE
                          Foley & Mansfield, PLLP
                          55 West Monroe, Suite 3430
                          Chicago, Illinois 60603
                          312-254-3800

KINSER v. CBS CORP., Case No. 94-2282

I  N  D  E  X

Page

WITNESS ON BEHALF OF THE DEFENDANT:

ROBERT NORWOOD JONES

Direct Examination by Ms. Ezell ................  3

Cross-Examination by Mr. McCoy ................ 23

Redirect Examination by Ms. Ezell ............. 49

Recross-Examination by Mr. McCoy .............. 62

Further Redirect Examination by Ms. Ezell ...... 66

Juror Question ................................ 67

KINSER v. CBS CORP., Case No. 94-2282

```
 1                (In open court; jury present.)
 2            ROBERT NORWOOD JONES, sworn, 9:09 a.m.,
 3              DIRECT EXAMINATION BY MS. EZELL:
 4       Q    Good morning.
 5       A    Good morning.
 6       Q    If you could, sir, start us out by telling us
 7   your name and spell your last name for the record.
 8       A    Robert Norwood Jones, J-o-n-e-s.
 9       Q    All right, sir.
10            And tell us where you live.
11       A    In New Orleans.
12       Q    All right.  And what do you do for a living?
13       A    Well, I've been a professor of medicine at
14   Tulane since the 1970s.
15       Q    All right.  And are you board-certified in any
16   specialties?
17       A    Yes, in internal medicine and pulmonary
18   disease, which deals with lungs and breathing.
19       Q    All right, sir.  And if you could, just take a
20   moment and tell the ladies and gentlemen of the jury what
21   your educational background was prior to becoming
22   board-certified in those areas.
23       A    I finished undergraduate work at the University
24   of Southern California and went to medical school at
25   Tulane and graduated in 1966; served an internship; and
```

KINSER v. CBS CORP., Case No. 94-2282                    4

1   then went in the Navy for three years as a medical

2   officer.  And after getting out of the Navy in 1970, I

3   completed residency training in 1972 and pulmonary

4   training in 1974.  I was certified as a specialist in

5   internal medicine in 1973 and in pulmonary disease in

6   1974.

7        Q    And where did you do your residency training?

8        A    Charity Hospital, New Orleans.

9        Q    All right, sir.  And you mentioned that you

10  were in the military.  Yes, sir?

11       A    I was in the Navy.  I was a doctor and had

12  destroyer duty out in Vietnam and then went with the

13  Marine Corps back in San Diego.

14       Q    All right.  Have you, through the course of

15  your profession, been a member of any professional

16  societies?

17       A    A good many.

18       Q    All right, sir.  Can you tell us some of those

19  that you've been a member of that have to do with your

20  testimony you're going to give here today?

21       A    Well, the main ones in the field of pulmonary

22  disease are the American Thoracic Society and the

23  American College of Chest Physicians.  I'm also a member

24  of the American College of Occupational and Environmental

25  Medicine and a member of the American College of

KINSER v. CBS CORP., Case No. 94-2282

1   Physicians and belong to a number of other organizations

2   as well.

3        Q    Now, we've heard about peer-reviewed articles

4   in this case.  Have you authored publications and

5   peer-reviewed articles over the course of your career?

6        A    Yes, I have.

7        Q    And in what areas have you published, if you

8   could just take a minute and describe for the ladies and

9   gentlemen of the jury?

10       A    Well, all my research, 30 or more years of it,

11  was in the epidemiology of occupational lung disease.

12  Most of my contributions have been in that area or in the

13  area of x-rays and breathing tests that are used for the

14  study of occupational lung disease.

15       Q    All right.  And you used the word

16  "epidemiology" of lung disease.  Can you tell us what

17  "epidemiology" means?

18       A    Well, it means the study of occurrence of

19  disease in an exposed population, and it really seeks to

20  answer the question:  Why do some individuals get sick or

21  injured while others escape?

22            And then clinical medicine has to do with

23  actually diagnosing who's sick, who's well.  And then

24  laboratory medicine, experimental medicine, has to do

25  with finding out the mechanisms of disease and injury.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     All right, sir.  And approximately how many

2   publications over the course of your career have you had

3   in the, epidemiology that you've just described?

4      A     Well, I don't know.  I think I've authored more

5   than 80 contributions, but they're divided:  some of them

6   in the results of epidemiologic surveys, some of them in

7   epidemiologic method, some of them in radiography and

8   lung function test.

9      Q     And in --

10     A     So I don't know.

11     Q     Oh, I'm sorry.  Go ahead.

12     A     I wouldn't be able to apportion those

13  correctly.

14     Q     And in preparing those publications, did you

15  yourself participate in epidemiological surveys or

16  studies?

17     A     Oh, yes.  That's, that's what I did.

18     Q     And just briefly, so the ladies and gentlemen

19  of the jury can appreciate your background, describe what

20  an epidemiological survey is.

21     A     Well, you have heard -- the researchers will

22  have heard that there's a problem with some product, --

23     Q     Yes, sir.

24     A     -- so you, you inquire as to who would be

25  exposed to that.  It might be users of spray paint.  It

KINSER v. CBS CORP., Case No. 94-2282

1   might be manufacturers of asbestos-containing materials.

2   You would try to identify a population where there would

3   be a range of exposure.

4        Q    All right.

5        A    Then you would go and ask the people who are

6   exposed if they'd participate in a study.  Then you apply

7   whatever tests you're doing, x-rays or breathing tests,

8   to the people in that population.  You see who is better

9   off and who's worse off, and then you compare that to the

10  amount of exposure that they've had.

11        And what you're trying to do is to learn the

12  mathematical relationship between exposure and disease,

13  and the mathematics is necessary because the government

14  wants to regulate exposures down to a level where no

15  disease will occur.

16        Q    And, and just so we're clear, you have

17  participated and not just written about the results of

18  the types of studies you've just described, correct, sir?

19        A    Yeah, every step:  design, study design; data

20  collection; analysis; and publication.

21        Q    All right.  Now, have you been retained by

22  Westinghouse/CBS to come here and testify as an expert in

23  this case?

24        A    Yes.  I didn't really know who the defendant

25  really was.  I was retained by a law firm that I'd done

KINSER v. CBS CORP., Case No. 94-2282

1    some work for before; and, and until I saw deposition

2    transcripts, I didn't know who the defendant was.

3        Q    And so who the defendant was, was that

4    important to the opinions that you're prepared to render

5    in this case?

6        A    Oh, it never is.  No.

7        Q    All right, sir.  However, have you testified in

8    cases where Westinghouse has been a defendant in the

9    past?

10       A    Probably so.  You know, in many of these

11   actions, there, there are a dozen defendants or more, --

12       Q    All right.

13       A    -- so I don't keep track of all that.

14       Q    Have you ever testified in a case where I have

15   been the attorney?

16       A    Probably so.

17       Q    Have you ever been retained by the plaintiffs

18   in cases like this?

19       A    Asbestos cases?

20       Q    Yes, sir.

21       A    Yes.

22       Q    And do you charge a certain dollar amount per

23   hour when you're preparing to come, when you're preparing

24   your evaluation of the case?

25       A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    How much do you charge?

2      A    $500 per hour.

3      Q    All right.  And then when you leave the New

4  Orleans area, do you charge a certain flat rate per day

5  to do your work?

6      A    I do.

7      Q    And is that equivalent of a ten-hour day?

8      A    Yes.

9      Q    All right.

10     A    $5,000 per day, plus travel expenses.  They're

11  pretty expensive these days.

12     Q    Yes, sir.

13        And in order to prepare to render the opinions

14  that we'll get to in a few minutes, have you done some

15  evaluation of records in this case about Mr. Kinser?

16     A    Yes.

17     Q    All right.  Tell the ladies and gentlemen of

18  the jury what you reviewed in order to come here and give

19  them your opinions.

20     A    Medical records, chest imaging studies, plain

21  x-rays and CTs, deposition testimony.  Those are the

22  principal things on which I can base an opinion.

23     Q    All right, sir.  Now, have you ever met Mr.

24  Kinser?

25     A    I did not until this morning.  I saw them get

KINSER v. CBS CORP., Case No. 94-2282

1   off the elevator and guessed that's Mr. and Mrs. Kinser.

2        Q    All right, sir.  But do you -- did you have an

3   opportunity to read not one, but two of his depositions?

4        A    Yes, I did.

5        Q    All right, sir.  And did you, at my request,

6   also review the conditions of his lungs based on the

7   medical records that you've reviewed?

8        A    Yes.  The, the principal things there are:  He

9   had a lobe of the lung removed and has a pathology report

10  of that.  And then he had these imaging studies,

11  especially a CT scan.

12       Q    All right.  Now, did you notice, when you were

13  looking at his medical records, whether Mr. Kinser had

14  any lung or lung tissue or lung area changes related to

15  asbestos exposure?

16       A    Well, first, the lobe that was removed, the

17  left upper lobe, was examined by a pathologist; and there

18  was no mention of anything resembling asbestosis.  And,

19  secondly, looking at the plain x-ray, and particularly

20  the CT scan, there's no evidence from imaging studies

21  that he had asbestosis.

22            Now, he had pleural plaques, but plaques

23  develop at a much lower exposure level than is required

24  to cause asbestosis, so many more exposed persons have

25  plaques than have asbestosis, which is scarring deep in

KINSER v. CBS CORP., Case No. 94-2282

1   the lung.

2       Q   Okay.  And have you today, at my request, come

3   prepared to use the, the board here and explain to the

4   jury, through drawing, the difference between pleural

5   plaques and asbestosis?

6       A   Well, sure, I can.

7       Q   All right.

8           Jake, if you can help with the board.

9           If you can come down here with Your Honor's

10  permission -- if you could just come down here --

11          THE COURT:  She knows she has my permission.

12          MS. EZELL:  I know; I know.

13          THE COURT:  We've had other witnesses do this.

14          THE WITNESS:  Okay.

15              (Brief pause in proceedings; witness is

16              relocating at easel in front of the jury.)

17          (Discussion off the record.)

18  BY MS. EZELL:

19      Q   If you could, sir, now, starting with pleural

20  plaques, using this board, describe for the jury what

21  pleural plaques are.

22      A   Well, I'm going to start with the lung because

23  I have to distinguish one pleura from another.

24      Q   All right.

25      A   Okay.

1      Q    If you could, sir, start with the lung.

2          THE WITNESS:  Does this thing work?

3          DEPUTY CLERK:  Oh, of course it does.  I'm just

4     going to help it though.  There you go.

5          THE WITNESS:  It needs all the help it can get.

6      A    I'm going to draw a crude representation of a

7     right lung.  And the windpipe comes down, and the

8     bronchus goes into the right lung, and blood vessels go

9     in and out; and this area is called the "hilum," or the

10    root of the lung.

11          And the lung itself, in this outline, is

12    covered with a membrane, and it's the pleura.  But this

13    section of pleura here, which I'll draw in green, is

14    called the "visceral pleura."  "Viscus" means organ, and

15    so this is the pleura of the organ.

16          Now, up here, at the root of the lung, the same

17    pleural membrane reflects around, and it coats the

18    undersurface of the ribs, the upper surface of the

19    diaphragm; so it's one continuous membrane, but only part

20    of it is part of the lung.  This is called the "parietal

21    pleura," from the Latin "parietes," meaning wall.

22          Now, pleural plaques don't occur on the lung at

23    all.  They occur on the parietal pleura.

24      Q    Do you need another pen?

25      A    No.  We're okay.

KINSER v. CBS CORP., Case No. 94-2282

1        Q      All right.

2        A      They occur typically on the chest wall and on

3    the upper surface of the diaphragm.  They can even occur

4    around here centrally, but you never see them practically

5    because the spine gets in the way of looking at it on the

6    frontal view.

7              So you've got the lung covered with visceral

8    pleura; you've got parietal pleura, and pleural plaque

9    are on the parietal pleura, so they're not part of the

10   lung.

11       Q      All right.  And then is it possible to use this

12   lung to also show the jury what asbestosis would look

13   like in this lung?

14       A      Well, asbestosis really causes some shadowing

15   down in the bases of the lung, more than you normally

16   see.  If you see a chest x-ray, normally the lung doesn't

17   look just black.  It's got white structures in it, and

18   those white structures are blood vessels.

19             And asbestosis, or any other interstitial lung

20   disease, adds lines or dots that are not part of the

21   vessels, so you're looking for nonvascular opacities in

22   the lung.

23             Anyway, that, that's what asbestosis looks

24   like.  It's crudely drawn.  It's a bunch of lines.  It's

25   always heaviest in the bottom of the lung.

KINSER v. CBS CORP., Case No. 94-2282

1            And in the United States, in the last 40 or

2    more years, you never see asbestosis radiographically

3    extending up into the upper half of the lung.

4            Q    And in the medical records, we see some of the

5    doctors mention the word "asbestosis."  You saw that when

6    you looked through them, didn't you, sir?

7            A    Yes.

8            Q    And do you, do you have any idea why they would

9    have, have mentioned that in the medical records with Mr.

10   Kinser?

11           A    Well, they didn't see lung scarring or

12   fibrosis, according to all I can read of the medical

13   record; but they saw these pleural plaques.  And the

14   understanding of the general group of doctors in medical

15   practice of the distinction between a pleural effect of

16   asbestosis and a lung scarring effect is not very

17   distinct.  And some of them see pleural plaque and say,

18   "Hey, this is asbestosis," but that's not correct.

19           Q    All right.

20           A    These plaques, by the way -- and in Mr. Kinser,

21   these plaques are very conspicuous because they've

22   calcified.  Calcification is a degenerative change in a

23   very old plaque.  Plaques start showing up in x-rays

24   20 years after the first exposure to asbestos, but the

25   calcifications may indicate a 40-year-old plaque.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    All right.  I'm going to -- I'm going to make
2  you use this pen no matter what.
3           You've drawn a right lung here?
4      A    Yes.
5      Q    Where is Mr. Kinser's lobectomy?
6      A    Where is his lobectomy?
7      Q    Yes, sir.
8      A    Well, let me -- I've used a black pen.
9      Q    He's not --
10     A    Save the red one.
11          The left lung is over here, heart in the
12  middle, aorta up here.  Anyway, the left lung is -- upper
13  part and lower part.
14     Q    Yes, sir.
15     A    The lower part got amputated.
16          On the lateral view, the left lung, the fissure
17  dividing them comes down like this, so the left upper
18  lobe and left lower lobe.
19     Q    All right.  And we've heard testimony that when
20  he had his left upper lobectomy, he lost one quarter of
21  his lung capacity.
22     A    Well, that's not right.
23     Q    And, and that was going to be my question.  So
24  can you use this diagram to explain to the jury what his
25  lung capacity is and why that's not right?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    The diagram won't help.

 2        Q    All right.

 3        A    The left lung is smaller than the right.  The

 4   upper lobe of each lung is smaller than the lower lobe.

 5   So he had the smaller lung losing less than half of that

 6   capacity.  So he had, maybe -- lost 18 percent or

 7   16 percent at the most.

 8        Q    All right.  Are we done drawing now?

 9        A    I'm finished.

10        Q    All right.  Thank you, sir.

11             MS. EZELL:  Shall we make this a demonstrative

12   and take a picture; is that the best thing to do?

13             DEPUTY CLERK:  You know what, just stick the

14   board over there, and I'll --

15             MS. EZELL:  You'll take care of it?

16             DEPUTY CLERK:  Yeah.

17             MS. EZELL:  Okay.  Without, without touching

18   any of the drawing on there, if you'll just move that

19   over there.  Thanks, Jake.

20                  (Brief pause in proceedings;

21                  witness is resuming the witness stand.)

22   BY MS. EZELL:

23        Q    All right, Doctor, when you indicated that you

24   saw pleural plaques and not asbestosis in Mr. Kinser,

25   what exactly -- where exactly did you see those findings?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A    The plaques are on his right and left chest

2  wall and right and left diaphragm.

3      Q    All right.  And what records did you

4  specifically review where you found those plaques?

5      A    I didn't need the records.  I looked at the

6  imaging.  But I did review the report of his surgical

7  operation and the pathologist's report of the lung

8  removed, and I -- that's, that's one of the main reasons

9  for saying that not only does no asbestosis show up on

10  his x-rays and CT scan, but even a pathologist with a

11  microscope didn't find it.

12      Q    So when he had his left upper lobe removed,

13  there were, there was pathology taken; is that what

14  you're saying?

15      A    Yes.

16      Q    And tell the ladies and gentlemen of the jury

17  what that means.

18      A    Well, every tissue removed at surgery has to be

19  examined by a pathologist.

20      Q    All right.

21      A    And in the case of lung tissue, microscopic

22  slides are made, stained, and the microscope's used to

23  examine them.

24      Q    Okay.

25      A    And the pathologist examines the organ grossly,

KINSER v. CBS CORP., Case No. 94-2282

1    cuts the tissue specimens that are going to be shaved and

2    stained and mounted; and then he interprets what he sees.

3        Q    All right.  And you reviewed his report?

4        A    Yes.

5        Q    And when you reviewed that report, did you find

6    any indications of asbestosis?

7        A    No.  There was nothing described in that report

8    resembling asbestosis.

9        Q    Did you find anything about lung cancer?

10       A    Yes.

11       Q    All right.  And what type of lung cancer did

12   Mr. Kinser have, based on that pathology?

13       A    Adenocarcinoma.

14       Q    All right, sir.  Did you, at my request, in

15   reviewing Mr. Kinser's deposition and his medical

16   records, make an assessment of his smoking history?

17       A    Yes.

18       Q    And what is your evaluation of his smoking

19   history?

20       A    Well, it's not an evaluation.  His own

21   testimony indicated that he started smoking at 14 or 15

22   and smoked up to a year in which he would have been age

23   50, so 35 or so years of smoking.

24            And he said the rate of smoking was variable,

25   from just a few cigarettes a day to a pack and a half.

KINSER v. CBS CORP., Case No. 94-2282

1  And that's characteristic, particularly of construction

2  workers who may work on a job where you can't smoke but

3  maybe on a break in the morning or afternoon, and then on

4  the weekends they can smoke ad-lib.

5      Q    All right, sir.  And in doing your -- did you

6  conduct an as-- I apologize.  I'll withdraw that

7  non-question.

8           With that evaluation in mind, I'd like to talk

9  with you now about Mr. Kinser's lung cancer.  Okay?

10     A    Yeah.

11     Q    Did you evaluate his smoking history in

12  consideration of the cause of his lung cancer?

13     A    Yes.

14     Q    Did you evaluate his history of asbestos

15  exposure in consideration of the cause of his lung

16  cancer?

17     A    I evaluated the results of his asbestos

18  exposure -- namely, that he had plaques but not

19  asbestosis -- and used that to assess any possible

20  contribution of asbestos to the cancer.

21     Q    All right, sir.  And what is the importance of

22  the distinction between his asbestos exposure and the

23  results of his asbestos exposure which you just drew in

24  my question?

25     A    The distinction is because nobody knows how

KINSER v. CBS CORP., Case No. 94-2282

1   much exposure he had in terms of quantitative exposure.

2   He knew what the general conditions of dustiness were on

3   these jobs.  He did not know what portion of the dust

4   contained asbestos fiber in a respirable size.

5       Q    All right.

6       A    So he didn't know, and no one else knew.  No

7   workman, no construction or ship building worker, wears a

8   dust sampler around for all his working life.  Nobody can

9   know.

10          We look to see what the effect is.  We know he

11  had enough exposure to cause pleural plaques.

12      Q    Yes, sir.

13      A    And there's no evidence that he had enough

14  exposure to cause asbestosis.  And in my opinion, you

15  need asbestosis to be reasonably certain that he had

16  enough exposure to asbestos to put him at increased risk

17  of lung cancer.

18      Q    All right.  Now, let's talk about his lung

19  cancer and what caused his lung cancer.  In your opinion,

20  having evaluated his smoking history, do you have an

21  opinion, to a reasonable degree of medical and pulmonary

22  certainty, as to whether or not his smoking history alone

23  is sufficient to have caused the adenocarcinoma which Mr.

24  Kinser suffered from?

25      A    Well, clearly, that's enough smoking to cause

KINSER v. CBS CORP., Case No. 94-2282

1   lung cancer, whether you had asbestos exposure or not.

2       Q    All right, sir.

3       A    So that is "a cause" or "the cause" of his

4   cancer.

5       Q    All right.  Looking at the medical records and

6   the depositions that you have looked at in this case, was

7   Mr. Kinser's asbestos exposure medically linked to his

8   lung cancer in this case?

9       A    I don't think so because I believe, and have

10  believed for a long time, that without a diagnosis of

11  asbestosis, either from x-rays or from the tissue

12  examined microscopically -- without that diagnosis, you

13  don't have a substantial contribution to lung cancer

14  causation that's been proven, so you don't have a

15  reasonably certain attribution of the cancer to asbestos.

16      Q    Now, did you also, at my request, take a look

17  at Mr. Kinser's recovery from his lung cancer?

18      A    Well, in the sense that -- here he is today --

19  he's cured.  I mean, if you have a lung cancer taken out

20  surgically and you're disease-free to ordinary

21  examination five years later, you're cured, period.

22      Q    All right.  So let me just ask these opinions

23  now to a reasonable degree of medical certainty.  Do you

24  have an opinion, to a reasonable degree of medical

25  certainty, as to whether or not asbestos caused Mr.

KINSER v. CBS CORP., Case No. 94-2282

1    Kinser's lung cancer?

2         A    I do have such an opinion.

3         Q    And your opinion is?

4         A    It did not.

5         Q    All right.  Do you have an opinion, to a

6    reasonable degree of medical certainty, as to whether or

7    not Mr. Kinser's smoking alone caused his lung cancer?

8         A    I do.

9         Q    And what is your opinion?

10        A    That it did.  And as far as smoking alone, I

11   don't know of any other candidate risk factor than

12   asbestos, and that didn't meet the test for causation; so

13   as far as I know right now, smoking alone caused his

14   cancer.

15        Q    Yes, sir.

16             And do you have an opinion, to a reasonable

17   degree of medical certainty, as to whether or not Mr.

18   Kinser is cured of the lung cancer that he suffered in

19   the year 2000?

20        A    Yes.  I've said that.  He was cured on, as of

21   September 1, two thousand and -- what? -- five.

22             MS. EZELL:  All right.  I have no further

23   questions for this witness.

24             THE COURT:  Cross-examination, Mr. McCoy.

25

KINSER v. CBS CORP., Case No. 94-2282

```
 1            CROSS-EXAMINATION BY MR. McCOY:

 2        Q    Dr. Jones, when did you start testifying in

 3   asbestos cases?

 4        A    In the late 1970s, there were a bunch of

 5   layoffs at a Johns Manville plant in the New Orleans

 6   area, --

 7        Q    Uh-huh.

 8        A    -- and I began to be called to testify in some

 9   workers' comp cases.

10        Q    In the past five years, what's been your

11   average annual compensation for your work on asbestos

12   cases?

13        A    Well, you know, I can't really tell you that

14   because I don't categorize my income in asbestos versus

15   silica versus chemical spills.  I can't tell you.

16             I can tell you overall about how much money I

17   make from my entire consulting practice per year, but I

18   can't break it out for asbestos alone.

19        Q    Okay.  So can you tell us how much you, you've

20   been averaging over the past five years from lawsuit or

21   litigation-related matters?

22        A    Well, from my consulting practice, which is

23   basically all my professional income now, I make probably

24   between 125 and $200,000 -- maybe 225 at the, at the

25   highest in the past five years, but I don't recall being
```

KINSER v. CBS CORP., Case No. 94-2282

1   that productive.

2        Q    Okay.  And the consulting practice you're

3   talking about, that's lawsuit litigation?

4        A    Well, it's occupational and environmental lung

5   disease, whether there's litigation there or not.  I

6   think litigation's responsible for most of the referrals

7   to me.

8        Q    Dr. Jones, this is your deposition that was

9   taken on April 25 -- or testimony that was taken on

10  April 25, 2013.  I'd direct your attention to page 41.

11       A    Uh-huh.

12            (Brief pause in proceedings.)

13       Q    Okay.  Let me go ahead and -- Dr. Jones, were

14  you asked these questions, and did you give these answers

15  at that time, in April of this year?

16            "Question:  And your amount that you've

17  averaged over the past five years for the compensation

18  from the work you've done on lawsuit or litigation

19  matters is about how much, average, over the past five

20  years?

21            "Answer:  Well, probably about $200,000.

22            "Question:  Per year?

23            "Answer:  Average."

24            Did -- were you asked that question, and did

25  you give that answer?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I may well have.  I'm pretty sure the court

2   reporter took it down correctly; but just the

3   off-the-top-of-the-head estimate, that's all I can give

4   the jury here today.

5      Q    Okay.  And your hourly compensation for this

6   kind of work is, you said, about $500 an hour?

7      A    Yes.

8      Q    Okay.  And most of the time you've been working

9   for attorneys representing the defendants in these cases;

10  is that right?

11     A    Defendants, period, yes.

12     Q    Dr. Jones, the word "consensus," when you talk

13  about that within a group of doctors, what's that mean?

14     A    "Consensus," I think, means "general

15  agreement."

16     Q    It means most of the doctors agree with it;

17  there may be some that disagree, right?

18     A    I think that would fall within the idea of a

19  consensus.

20     Q    Okay.  In your report in this case, you stated

21  that the prevailing view is that you have to have a

22  diagnosis of asbestosis to have the lung cancer be

23  related to the asbestos exposure; is that right?

24     A    Yeah.  I think that's the prevailing opinion --

25     Q    Okay.

KINSER v. CBS CORP., Case No. 94-2282

1     A    -- among people who really know the asbestos

2  epidemiology.

3     Q    All right.  So let's take a look at a document

4  here, Exhibit 412.

5         MR. McCOY:  Your Honor, I'd like to go ahead,

6  if it's all right, and show this to our jurors.

7         MS. EZELL:  I don't believe it's admitted.  I

8  think he can show it to the witness, Your Honor.

9         MR. McCOY:  This is cross-examination.

10         THE COURT:  Did you address something to me?

11  Because I heard your voice but not --

12         MS. EZELL:  Oh, I'm sorry.  I defrocked here.

13  Let me put it back on.

14         It -- I believe this is not admitted, so I

15  think it's proper to show to the witness but not to the

16  jury.

17         THE COURT:  Is it not admitted, Jessica?

18         DEPUTY CLERK:  No, sir.

19         THE COURT:  Show it to the witness only.

20  BY MR. McCOY:

21     Q    This is a publication of the American College

22  of Chest Physicians; is that right?

23     A    Yeah.

24     Q    Okay.  This is a publication of 2009; is that

25  right?

1      A    Yes.

2      Q    And you're a member of this organization; is

3    that right?

4      A    I am; and, in fact, I was a participant in this

5    research.

6      Q    Right.

7           And you characterized the American College of

8    Chest Physicians as the -- as a primary authority for

9    practitioners within the field of pulmonary medicine,

10   right?

11     A    Yeah.  I think it's more directed towards

12   practicing pulmonary physicians, whereas the American

13   Thoracic Society is more directed toward academic

14   pulmonary practices.

15     Q    So this is a reliable publication, right?

16     A    Yes.

17          MR. McCOY:  Okay.  Your Honor, I'd move to

18   admit this for the purposes of cross-examination without,

19   again, going back to the jury later.

20          MS. EZELL:  No objection.

21          THE COURT:  It's received for those purposes.

22          MR. McCOY:  All right.  Let's go ahead and put

23   this on the screen, please, Jessica.  Thank you.

24   BY MR. McCOY:

25     Q    Okay.  This publication came out in the Chest

KINSER v. CBS CORP., Case No. 94-2282

1  magazine in 2009, and that's the official publication of

2  the American College of Chest Physicians, right?

3      A    Yeah.

4      Q    This publication, particular article, is a

5  consensus statement.  It's tit-- it's by Dr. Banks as the

6  lead author on it, and it's "American College of Chest

7  Physicians Consensus Statement on the Respiratory Health

8  Effects of Asbestosis."

9      A    Yes, "Asbestos."

10     Q    And I'm going to point to the highlighted areas

11 here.  The "Outcome" from the research was, that's

12 published in this article is that, "Consensus was reached

13 on 23 of the 32 statements and formed the basis for this

14 document."

15          And in this case, the -- this was a, sort of

16 like a questionnaire that was submitted to doctors,

17 including yourself; and the doctors provided information

18 that Dr. Banks then used for the publication, right?

19     A    Yeah.

20     Q    Okay.  And it shows here -- among the consensus

21 statements it shows -- showing agreement, that means they

22 had a consensus; there was a consensus agreement, right?

23     A    Well, that's right.  But let me point out that

24 the word "consensus" in this paper is misused.  In this

25 sense, all this was was a committee that never met and

KINSER v. CBS CORP., Case No. 94-2282

1    never deliberated.  This was a questionnaire thing where

2    we never had the chance to discuss our opinions and try

3    to persuade other persons as to their soundness.

4            So this was not a consensus.  This was a result

5    of a vote, like people solicit votes for every other

6    thing.

7        Q    Nonetheless, it was published in the official

8    publication of the American College of Chest Physicians,

9    accepted, and peer-reviewed, right?

10       A    That doesn't make it a consensus.

11       Q    Okay.  And it, continuing on here, consensus

12   statement number 17 -- can we make that just a little bit

13   larger?

14           It says, "Workers who have significant asbestos

15   exposure (but who do not have asbestosis) are at

16   increased risk of bronchogenic carcinoma."  That would

17   include lung cancer, right?

18       A    "Bronchogenic carcinoma" means lung cancer.

19           But if you dissect that statement, how do you

20   know who has had sufficient exposure to be at increased

21   risk -- meaning substantially increased risk -- of lung

22   cancer?

23       Q    Okay.  Nonetheless, Doctor, this was published

24   as a, as a consensus statement; and as it shows in the

25   back here, there's an acknowledgment that, by the

KINSER v. CBS CORP., Case No. 94-2282

1    authors, "We acknowledge the important contributions of

2    our expert panel and thank them for their participation,"

3    the panel that you were a part of, right?

4        A    Yes.

5        Q    And then it says, "The following experts agreed

6    to be recognized," and then it goes through and lists

7    quite a number of doctors -- I'm not going to count them.

8    Would you agree:  There's more than 20 in there?

9        A    There are a lot.

10        Q    Okay.  Any of these people that you would

11    dispute their expertise in this area?

12        A    No.  I don't dispute anybody's expertise in the

13    area.

14            What I'm saying is --

15        Q    Thank you, Doctor.

16            So the panel --

17            MS. EZELL:  He -- excuse me, Your Honor.  He

18    was not permitted to finish his answer.

19            THE COURT:  The answer was responsive, and you

20    may ask him on redirect.

21            MS. EZELL:  I will.  Thank you.

22            THE COURT:  Good.

23    BY MR. McCOY:

24        Q    Okay.  And then the panel, as you had already

25    said, included yourself, right?

1    A    Yes.

2    Q    Okay.  Sir, if the -- the consensus statement

3    in the American College of Chest Physicians, would you

4    agree that's different than what you characterize in this

5    case as "the prevailing view"?

6    A    Yes, I do.

7    Q    Okay.  Thank you.

8         I'd like to also, then, direct your attention

9    to what's Exhibit 428, and -- I guess we can show it to

10   the doctor for a moment.

11        Okay.  Exhibit 428, this is something from the

12   American Journal of Epidemiology.  I think you said you

13   have had a lot of epidemiological background, right?

14   A    Yes.

15   Q    Okay.  I assume --

16   A    That is mainly what I did for 30 years.

17   Q    Right.

18        And this is an article by a Dr. Cullen that was

19   published in 2005.

20        So is this, again, one of the documents that a

21   professional in your field might rely upon?

22   A    Yes.

23   Q    Okay.  Thank you.

24        MR. McCOY:  Now, again, Judge, I would like to

25   allow this, for cross-examination purposes, to be

KINSER v. CBS CORP., Case No. 94-2282

1    published to the jury -- again, not to go back to the

2    jury.

3            MS. EZELL:  I don't, I don't believe a

4    sufficient foundation has been laid for publication.

5            THE COURT:  So cross-examination for

6    credibility?

7            MS. EZELL:  He can cross-examine him.  I'm just

8    saying for publication I think there are things in this

9    article that are irrelevant, and I don't think a

10   foundation --

11           THE COURT:  Well, I don't know that he's going

12   to show him the whole article.

13           You can, you can display selected portions.  Go

14   ahead.

15           MR. McCOY:  Thank you.

16   BY MR. McCOY:

17       Q    Okay.  So as we've indicated already, this was

18   from the American Journal of Epidemiology in 2005;

19   Dr. Mark Cullen, who's at the Occupational and

20   Environmental Medicine Program and the Cancer Center at

21   Yale University School of Medicine in New Haven,

22   Connecticut.  The title of the article is "Predictors of

23   Lung Cancer among Asbestos-exposed Men in the

24   Beta-Carotene and Retinol Efficacy Trial."

25           Is that right, Doctor?

KINSER v. CBS CORP., Case No. 94-2282

1      A      That's correct.

2      Q      And, again, I'm going to certain highlighted

3  portions.

4             Dr. Cullen and the other authors state, "In

5  conclusion, we found that among current and former

6  smokers exposed occupationally to asbestos, risk of lung

7  cancer increases with increased exposure duration, even

8  in persons without clinical evidence of asbestosis.  Men

9  with radiographically apparent pleural plaques and

10  preexisting obstructive lung disease are at higher risk

11  than men without them.  Whether it is related to the

12  apparently vitamin-sensitive effect observed in subjects

13  with asbestosis or an independent effect of asbestos,

14  intense occupational exposure, even in the absence of

15  asbestosis, confers significant lung cancer risk in this

16  population."

17             The acknowledgement, "This work was supported

18  by the National Cancer Institute grant."

19             That would be one of the publications that

20  should be taken into account in determining the

21  prevailing view, right?

22      A      Well, yes, and you have to take --

23      Q      Thank you, Doctor.

24      A      -- many more --

25             MR. McCOY:  I, I --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  You'll get a chance to tell "many

 2    more," as soon as Mrs. Ezell gets back up.

 3    BY MR. McCOY:

 4        Q    Doctor, this one is Exhibit Number 611.  Again,

 5    I'll have it shown to the witness.

 6              MR. McCOY:  This, actually, had been identified

 7    by prior testimony, Judge, as reliable in our case.  I'll

 8    ask --

 9              MS. EZELL:  What's the number?

10              MR. McCOY:  This is Exhibit 611, Wilkinson.

11    BY MR. McCOY:

12        Q    This article, by Dr. Wilkinson, appeared in The

13    Lancet.  This is 1995.  Again, this would be one of, one

14    of the publications that you've seen and rely upon in

15    your medical career; is that right?

16        A    I didn't rely upon it.  I criticized it in the

17    journal Chest.

18              MR. McCOY:  Your Honor, then, based upon the

19    testimony of our witness that this is reliable, I'll ask

20    that this be allowed for publication to the jury but not

21    to go back.

22              THE COURT:  Well, you can cross-examine him

23    about it.

24              MR. McCOY:  All right, thank you.  I'll go

25    ahead, then, with this on the screen.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:
 2        Q    This publication from Dr. Wilkinson, as I say,
 3   in The Lancet in 1995 -- and that's a widely read medical
 4   journal, right?
 5        A    Yes, it is.
 6        Q    This is Dr. Wilkinson's background.  He's from
 7   the London Chest Hospital and the Royal Brompton Hospital
 8   and National Heart and Lung Institute in London.
 9             I'm assuming you must know him, right?
10        A    Know what?
11        Q    Know Dr. Wilkinson.
12        A    I don't know Dr. Wilkinson, but these
13   authors --
14        Q    You do --
15        A    -- I do know some others.
16        Q    You said you did write an article criticizing
17   his findings yourself, right?
18        A    Yes.
19        Q    Let's see what -- I'm going to go through some
20   of his findings here.  "Summary:  This study was designed
21   to test the hypothesis that the risk of lung cancer from
22   asbestos exposure is confined to persons with
23   radiographic evidence of pulmonary fibrosis."
24             That would be basically an indicator of --
25   pulmonary fibrosis -- of asbestosis, right?
```

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.

2      Q    Okay.  And then we go to the page at the end.

3   In his conclusions, Dr. Wilkinson and the other authors

4   in this paper state, "More importantly, from a practical

5   point of view" -- you might want to enlarge this just a

6   little bit more.

7            Other way.  Thank you.

8            "More importantly, from a practical point of

9   view, it indicates that asbestos exposures which do not

10  cause small opacities on the chest radiograph may

11  nonetheless increase the risk of lung cancer, and this

12  needs to be considered by those responsible for

13  industrial hygiene and compensation of workers with

14  asbestos-related lung disease."

15           And when they talk about "small opacities,"

16  again, that's one of the indicators of the asbestosis,

17  right?

18     A    Yes.  The lines I drew on that diagram are

19  considered linear or irregular small opacities.

20           (Brief pause in proceedings.)

21     Q    This one is Exhibit 470.  I'll ask that this be

22  shown to the witness.

23           So this publication is by Dr. Gunnar Hillerdal

24  in the Scandinavian Journal of Environmental Health in

25  1997, titled, "Asbestos, Asbestosis, Pleural Plaques and

KINSER v. CBS CORP., Case No. 94-2282

1  Lung Cancer."

2            Again, is this one of the publications within

3  your field?

4      A    It appears to be, but I don't regularly read

5  it.

6            MR. McCOY:  Once again, Your Honor, I would ask

7  that this be --

8            THE COURT:  You may cross-examine if he agrees

9  or disagrees with the statement.

10           MR. McCOY:  Well, I'm, I'm going to

11  cross-examine him on the --

12           THE COURT:  Well, you do it any way you want

13  to.

14           MR. McCOY:  Okay.

15           THE COURT:  Go ahead.

16           MR. McCOY:  All right.  I'd like to have it be

17  shown to the jury.

18           THE COURT:  Any objection?

19           MS. EZELL:  He said he doesn't read this.  I

20  don't think there's a foundation, Your Honor.

21           THE COURT:  Well, that's not true.  I mean,

22  it's something in his field that he can be asked about.

23  You may proceed.

24  BY MR. McCOY:

25      Q    Doctor, as we said, this is, was published in

1    1997 by a Scandinavian physician here, Dr. Hillerdal.

2         And the summary of what he has concluded here,

3    that -- the title of this article, first, is "Asbestos,

4    Asbestosis, Pleural Plaques and Lung Cancer."  And he

5    concludes in here, under the abstract at the beginning,

6    states, "Inhalation of asbestos fibers increases the risk

7    of bronchial carcinoma.  It has been claimed that

8    asbestosis is a necessary prerequisite for malignancy,

9    but epidemiologic studies usually do not have enough

10   statistical strength to prove that asbestos-exposed

11   patients without asbestosis are without risk.  Several

12   recent studies do actually indicate that there is a risk

13   for such patients.  In addition, case-referent studies of

14   patients with lung cancer show an attributable risk for

15   asbestos of 6 percent to 23 percent, which is much higher

16   than the actual occurrence of asbestosis among these

17   patients.  Thus, there is an increasing body of evidence

18   that, at low exposure levels, asbestos produces a slight

19   increase in the relative risk of lung cancer even in the

20   absence of asbestosis.  Consequently, all exposure to

21   asbestos must be minimized."

22        So, again, do you -- in terms of your

23   assessment of the prevailing view, I assume you disagree

24   with this, right?

25        A    I agree with that last sentence.  You shouldn't

KINSER v. CBS CORP., Case No. 94-2282

1    be exposed to asbestos.  But as to the rest of it,

2    there's a lot of contrary evidence in the literature.

3        Q    Next is Exhibit Number 451.

4             Sorry.  Got an earlier one here.

5             The next one -- I don't have the number on this

6    one yet, Judge, but this is a --

7             MS. EZELL:  I'm sorry.  I need to know what

8    article it is.  Is it not 451?

9             MR. McCOY:  I don't have a number on it yet.

10             Judge, I'll just go ahead while we're looking

11    for the number on this.

12             THE COURT:  Very well.

13             MS. EZELL:  Can I see it then?

14             MR. McCOY:  Sure.  Sorry.

15             MS. EZELL:  That's all right.  I got it coming

16    to me.

17             MR. McCOY:  And, again, I'll ask this one be

18    shown to the witness.

19             DEPUTY CLERK:  What exhibit number is this?

20             COURT REPORTER:  They don't know yet.

21             MR. McCOY:  We're looking it up.

22                (Brief pause in proceedings.)

23             MR. McCOY:  It's -- 451 is the number.

24             Judge, I'll ask, again, this be shown to the

25    witness.

KINSER v. CBS CORP., Case No. 94-2282

1              DEPUTY CLERK:  It's on for the witness.

2              MR. McCOY:  Okay, sorry.  I'm not looking.

3              DEPUTY CLERK:  I know.

4              MR. McCOY:  It doesn't show on my screen.  I

5    see it on his.  Thanks.

6    BY MR. McCOY:

7         Q    Okay.  So this article is published in the

8    American Journal of Industrial Medicine.  Again, that's a

9    journal that many people rely upon in your field; is that

10   right?

11        A    Yes.

12        Q    And that's 1997, and this article is titled

13   "Radiographic Asbestosis Is Not a Prerequisite for

14   Asbestos-Associated Lung Cancer in Ontario

15   Asbestos-Cement Workers" by a Dr. Finkelstein, medical

16   doctor.

17        A    Yes.

18             MR. McCOY:  Again, I'll ask that this, again,

19   be shown to the jurors, not to go back.

20             THE COURT:  You're going to use it in

21   cross-examination, aren't you?

22             MR. McCOY:  Yes.

23             THE COURT:  Is there objection?

24             MS. EZELL:  No, not for that purpose, Your

25   Honor.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  I couldn't hear you.

 2              MS. EZELL:  Oh, no -- I don't know why -- not

 3    for that purpose, Your Honor.

 4              THE COURT:  Very well.  You may proceed.

 5    BY MR. McCOY:

 6         Q    And this publication by Dr. Finkelstein again

 7    deals with this same question of whether you need

 8    asbestosis, right?

 9         A    Radiographic asbestosis.

10         Q    "Radiographic," that means something that can

11    be seen on an x-ray, right?

12         A    That's correct.

13         Q    Asbestosis in its earlier stages is not always

14    visible on x-rays, right?

15         A    That's correct.  It has to be present in a

16    microscopic state, and that has to advance to the point

17    where it can be seen on the x-ray.

18         Q    Okay.  And Dr. Finkelstein concludes in here,

19    "Data published in the last decade demonstrate that the

20    statement 'radiographic asbestosis is a prerequisite for

21    asbestos-attributable lung cancer' is logically

22    untenable."

23              And I, I assume you also disagree with that as

24    being the prevailing view, right?

25         A    Well, no.  You know, I think that if you have
```

KINSER v. CBS CORP., Case No. 94-2282

1    histologic asbestos and not radiographic asbestosis, your

2    cancer is still attributable to asbestos exposure, at

3    least in part, so the distinction's important.

4         Q    Okay.  But he's talking here about radiographic

5    asbestosis, right?

6         A    Right.  And I don't require radiographic

7    asbestosis to make an attribution if there's

8    histologic --

9         Q    Okay.

10        A    -- asbestosis.

11        Q    All right.  So it could be either one?

12        A    He's talking only about radiographic.

13        Q    Right.

14             But for your purposes, it could be either one?

15        A    Yes.

16        Q    Okay.  And there were some doctors who did

17   report asbestosis in the medical records of Mr. Kinser,

18   right?

19        A    I don't think they reported it based on a

20   finding that would support the diagnosis.  I think it's

21   confusion with pleural plaques.

22        Q    Okay.  You, you disagree with their

23   interpretation and finding of asbestosis; is that right?

24        A    Yes, I do.

25        Q    All right.  This is Exhibit 469.  I'll ask this

KINSER v. CBS CORP., Case No. 94-2282

1  be shown to the witness.

2          This one's a publication by Dr. Hessel in 2005,

3  in Thorax.  That's, again, a journal that is used by many

4  in the medical profession, right?

5      A    Yes.  I have contributed to it.

6          MR. McCOY:  Judge, I would again ask that this

7  be allowed to be shown to the jury for the purposes of

8  cross-examination only.

9          MS. EZELL:  No objection --

10         THE COURT:  All right.  You may proceed.

11         MS. EZELL:  -- for that purpose.

12 BY MR. McCOY:

13     Q    Doctor, so the title of this one is "Asbestos,

14 Asbestosis, and Lung Cancer:  A Critical Assessment of

15 the Epidemiological Evidence," Dr. Hessel and other

16 authors in 2005.

17         This article states, "The question of whether

18 lung cancer can be attributed to asbestos exposure in the

19 absence of asbestosis remains controversial.  Nine key

20 epidemiological papers are reviewed in a

21 point/counterpoint format, giving the main strengths and

22 limitations of the evidence presented.  Of the nine

23 papers, two concluded that asbestos -- asbestosis was

24 necessary and seven that it was not."

25         So he's saying that the weight of the

KINSER v. CBS CORP., Case No. 94-2282

1  epidemiological evidence is 7 to 2 in favor of not

2  needing this clinical diagnosis, --

3      A    Well, --

4      Q    -- this diagnosis?

5      A    May I read the rest of that abstract?

6      Q    Well, my question was:  He's saying that the

7  weight of the epidemiological evidence --

8      A    The rest of his language --

9      Q    Doctor, --

10         THE COURT:  Wait.  Let him finish, and then you

11 answer.  Okay?

12         THE WITNESS:  Yes, sir.

13 BY MR. McCOY:

14     Q    Dr. Jones, Dr. Hessel is saying in that

15 publication that the weight of the epidemiological

16 evidence is that seven articles favor not needing

17 asbestosis, and two would say that it is needed, right?

18     A    Those -- that's a quote.  Yes.

19     Q    Okay.  Thank you.

20         Now, let me move on to a couple more questions.

21     A    Before you move on --

22         MR. McCOY:  Judge, --

23         THE COURT:  No.  Doctor, you can't volunteer.

24 Ms. Ezell will ask you --

25         THE WITNESS:  Ah, yes.

KINSER v. CBS CORP., Case No. 94-2282

1              THE COURT:  -- to explain.  Just -- you'll get

2     a chance.  Hang on.

3     MR. McCOY:

4          Q    Okay.  So this one is Exhibit 665.  Again, I'll

5     ask this be shown to the witness.

6              This is an article by Dr. Edge?

7              MS. EZELL:  Excuse me.  We don't have a copy of

8     that.

9              Thank you.

10    BY MR. McCOY:

11         Q    This is an article by Dr. Edge that was

12    published in Environmental Research in 1976; and, again,

13    this would be part of the materials that would be relied

14    upon in your field, right?

15         A    Yes.

16         Q    Okay.

17              MR. McCOY:  Your Honor, again, I would ask this

18    be shown for cross-examination only.

19              THE COURT:  Right.  You may, you may proceed.

20    BY MR. McCOY:

21         Q    This publication by Dr. Edge from Great Britain

22    is titled "Asbestos Related Disease in

23    Barrow-in-Furness."

24              Dr. Edge states, "Meanwhile, it is clear that

25    this group of shipyard workers with pleural plaques

KINSER v. CBS CORP., Case No. 94-2282

1   (without evidence of pulmonary fibrosis)" -- that's the

2   asbestosis, right?

3        A    Yeah.

4        Q    -- "have a two and a half times increased risk

5   of developing carcinoma of the bronchus, when compared

6   with matched controls without plaques."

7        A    Yeah.

8        Q    Okay.  Doctor, is -- do you agree with the

9   position that there can be an increased risk of lung

10  cancer just from having pleural plaques alone?

11       A    No.

12       Q    Again, that, that statement is one that -- let

13  me find something here.

14            You do agree that asbestos exposure can cause

15  pleural plaques, right?

16       A    Yes.

17       Q    Okay.  So if Dr. -- Larry Kinser's treating

18  physician thought that the pleural plaques were enough

19  evidence to relate the lung cancer to the asbestos

20  exposure, you would disagree, then, with that treating

21  physician, right?

22       A    Well, I do.

23       Q    Okay.  Thank you.

24            Dr. Jones, under your criteria for diagnosing

25  asbestosis, that would include an x-ray that looks like

KINSER v. CBS CORP., Case No. 94-2282

1    findings of a linear interstitial abnormality at the lung

2    bases; is that right?

3        A    Yeah.

4        Q    This is Exhibit 48.  This is a medical record,

5    and I think we can show this --

6            MS. EZELL:  Yeah.  We have an agreement on

7    that.

8        Q    -- by agreement.  Okay.

9            This is one of Larry Kinser's medical records

10   from Drew Medical, Inc.  It is a CT of the chest, done by

11   Dr. Neigut in 2011?

12           It says, reports his findings here:  "Minimal

13   linear scarring or subsegmental atelectasis is noted at

14   both lung bases."

15           You saw this in the medical records, right?

16       A    Yes.  I think I --

17       Q    And you, you, you think -- did you -- is it

18   your opinion that this is not a finding of asbestosis; is

19   that what you think?

20       A    I, I've looked at the CT scan from 2011, and it

21   does not show asbestosis.

22       Q    Okay.  Does it show the things that the doctor

23   found?

24       A    He's had subsegmental atelectasis at both lung

25   bases intermittently, and constantly since 2000 at the

KINSER v. CBS CORP., Case No. 94-2282

1  left base.

2      Q    So do you agree -- my question is:  Do you

3  agree with his reported findings, --

4      A    Yes, --

5      Q    Okay.  Thank you.

6      A    -- what's outlined.

7      Q    Thank you.

8          And you just don't agree that Mr. Kinser has

9  asbestosis, right?

10     A    That's right.

11     Q    Okay.

12     A    I don't agree with his conclusion.  I agree

13 with his description.

14     Q    Thank you.

15         And I just wanted to ask about one other thing.

16 Let me find it here.

17         This is Exhibit 035, and, again, this is a

18 medical record and can be shown by agreement.

19         In this spirometry that was done by Dr.

20 Scanlon, it says here that "Mr. Kinser is a male with a

21 brief remote smoking history."  Do you agree with that

22 characterization by Dr. Scanlon?

23     A    Certainly not.  He's --

24     Q    I'm sorry.  You said what?

25     A    Certainly not.  He smoked --

KINSER v. CBS CORP., Case No. 94-2282

1    Q    You don't agree --

2    A    -- for 35 years.

3    Q    Okay.  Thank you.

4         Doctor, is there anything about the treating

5    physicians that you do agree with here as far as the

6    relationship of the lung cancer to asbestos?

7    A    Well, as far as the idea of causation, if he

8    said that a pleural plaque serves to indicate asbestos

9    causation, I disagree with that, not because he's Dr.

10   Scanlon.  I'd disagree with anyone who said that about

11   any cancer.

12   Q    Right, because you have a prevailing view that

13   you've asserted, right?

14   A    I have a view.

15        MR. McCOY:  Okay.  Thank you.

16        THE COURT:  Okay.  Redirect.

17        MS. EZELL:  All right, sir.

18          REDIRECT EXAMINATION BY MS. EZELL:

19   Q    Doctor, starting with that medical record we

20   just looked at, on the Dr. Scanlon "history of remote

21   smoking," why would you disagree with that?

22   A    Well, he didn't stop until the late 1990s, I

23   think.

24   Q    Where would Dr. Scanlon --

25   A    1990.

KINSER v. CBS CORP., Case No. 94-2282

```
1        Q    Where would Dr. Scanlon -- I want to switch

2   because I think it's going from green to red without me

3   pushing anything.

4             DEPUTY CLERK:  Okay.

5                  (Brief pause in proceedings;

6                  counsel exchanging microphones.)

7   BY MS. EZELL:

8        Q    Where does Dr. Scanlon get a patient's smoking

9   history, if you know?

10       A    From the patient's oral statement --

11       Q    All right, sir.

12       A    -- or from a questionnaire filled out.  Usually

13  from just oral statement.

14       Q    Okay.

15       A    But he, he didn't -- he was right about the

16  smoking history being remote because I remember now that,

17  according to his own testimony, Mr. Kinser stopped

18  smoking about age 50.

19       Q    So by the time he saw Dr. Scanlon, time had

20  passed since he quit smoking?

21       A    That was 16 years later.  But he had smoked for

22  35 years.  That wasn't a brief smoking history.

23       Q    All right.  Now, I want to go back and talk to

24  you about the concept of "consensus."  Do you remember

25  spending a right much time with Mr. McCoy on that issue?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Yes.  I think I adequately exhibited my opinion
 2   there, but if you want to ask me something about it --
 3        Q     Well, I might want to ask you a few things
 4   about that.
 5              And did -- do you agree that a consensus is
 6   when most people agree on something, but some people do
 7   not?
 8        A     That's consistent with the definition of a
 9   consensus.
10        Q     All right, sir.  And in preparation to come
11   here and give your testimony, did you and I review a
12   number of articles -- some written by you, some written
13   by others in your field -- that deal with the issue of
14   identifying lung cancer based on a threshold finding of
15   asbestosis?
16        A     Yes.
17        Q     And did those articles that we reviewed
18   represent a different opinion than those articles that
19   you reviewed with Mr. McCoy?
20        A     Well, surely.  There are, there are 30, 40, 50
21   articles bearing on the question.  And to wave two or
22   three or a half dozen around that support one view -- or
23   two or three or a half dozen that support the opposite
24   view -- that's not the way you arrive at a reasonable
25   opinion on this issue.
```

KINSER v. CBS CORP., Case No. 94-2282

1            And I've reviewed many, many asbestos studies.

2     This is probably the best studied occupational carcinogen

3     in the world.

4            Q    All right.

5            A    There have been more studies of lung cancer

6     mortality related to asbestos than any other.

7            Q    And before we talk about some of the articles

8     that you discussed with Mr. McCoy, can you explain to the

9     ladies and gentlemen of this jury what the difference is

10    between "risk" of lung cancer and "cause" of lung cancer?

11           A    Well, I mean, the risk of lung cancer you

12    determine by looking at who gets it and who doesn't, or

13    how much of an exposure can cause somebody to get it; so

14    the "risk" of lung cancer is a, is a statistical concept.

15           Actual causation is something else.

16           Q    All right.  And in this case, were you asked to

17    evaluate the actual cause of Mr. Kinser's lung cancer?

18           A    Yes.  But in the, in the -- the concept of risk

19    is in there.

20           Q    Yes, sir.

21           A    You --

22           Q    But --

23           A    If you have asbestos exposure, you've got some

24    level of risk of lung cancer.  If you've got sufficient

25    exposure, you have a significant risk.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Right.

2         So the concept of risk is included in cause,

3    but it's not the entire issue of cause?

4    A    That's correct.

5    Q    All right, sir.  Now, I'd like to go and review

6    with you some of the articles, just briefly, that you

7    reviewed with Mr. McCoy; and I'll start with the one that

8    he started with, and this is -- I believe all these were

9    displayed to the jury, so if I could have the ELMO,

10   please.

11        This was the first one, and this is the one

12   that I believe you indicated that you had participated

13   in; and Mr. McCoy pointed out that you were one of the

14   participants, and you were thanked for your participation

15   here in the appendix, correct?

16   A    Yes.

17   Q    Now, tell us how you came to participate in

18   this.

19   A    Well, I was called by Dr. Banks, and he asked

20   if I'd participate.  Dr. Banks and I have known each

21   other for 25 or more years, 30 years.

22   Q    Do you think this was a good study?

23   A    I don't think the Delphi method, which involves

24   circulating tallies of who voted for what and seeing if

25   it influences someone to change his opinion -- I don't

KINSER v. CBS CORP., Case No. 94-2282

1  think those arrive at a consensus.  I think they're

2  simply just like casting your vote on Facebook for

3  somebody.

4       Q    All right, sir.  And so we haven't had any

5  testimony yet in this case about what the Delphi method

6  is, so can you explain just briefly how this, what the

7  methodology of this survey was that came up with this

8  consensus that you're critical of?

9       A    Well, the Delphi method involves asking a bunch

10  of questions to a panel, and then the investigators or

11  researchers tally up.

12            And say the question is:  Do asbestos-induced

13  pleural plaques serve as an adequate marker of asbestos

14  correlation of lung cancer?

15            And back come these answers and they say:

16  Well, 60 percent say yes, and 40 percent say no.

17            And then they circulate the same questions and

18  see if anybody is influenced by the popularity contest of

19  the answer and changes his or her opinion.

20            And because people don't interact with each

21  other, because they don't discuss the reasons they

22  believe this or that, it's less efficient even than a

23  committee.

24       Q    Okay.  What is an appropriate methodology for

25  reaching a consensus among medical professionals?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I'm not sure on controversial issues you're

2   going to have a consensus in the sense of overwhelming

3   belief.  At the present time, I don't think there is a

4   consensus on whether or not you need asbestosis to make

5   attribution.  That's why I put down the words I did:

6   "The prevailing view," not "consensus."

7      Q    All right, sir.  And Mr. McCoy showed you a

8   list of participants in this study, and you said that you

9   did not dispute their expertise; but you did dispute

10  something, and you didn't get a chance to tell him what

11  you disputed.

12          Have we talked about that?  Or is there

13  something else that you wanted to mention?

14     A    I don't remember what I disputed, and I -- I

15  can't say that all these people are excellent x-ray

16  readers or that, you know, most, most of us are not

17  excellent pathologists.  So we don't have the same

18  experience or background.

19     Q    All right, sir.  Now, the next one I'd like to

20  talk to you about is the last one that you visited with

21  Mr. McCoy on, which is Exhibit 451.  And do you see this

22  article?

23     A    I do.

24     Q    And in this article, you talked about his--

25  histologic asbestos and -- radiographic asbestosis and

1    histologic asbestosis, correct?

2         A    Yeah.

3         Q    You talked with Mr. McCoy about that?

4         A    That's correct.

5         Q    Now, in the Kinser case, isn't it true, sir,

6    that you have evaluated whether or not there was

7    asbestosis not just radiographically, but also path--

8    looking at the pathology?

9         A    I didn't look at it myself.  I'm not a

10   pathologist.  But the report of the pathologist does not

11   describe lung scarring or asbestos bodies in the tissue.

12        Q    So I'll ask a better question.  In coming to

13   your opinion that there is no asbestosis in Mr. Kinser's

14   case, you relied not just on the radiographic views that

15   you looked on, you looked at yourself; but also on the

16   pathology report and found no asbestosis there either,

17   correct?

18        A    That's correct.

19        Q    All right, sir.

20             THE COURT:  I think we need a recess.

21             MS. EZELL:  Okay.

22             THE COURT:  It's half past 10:00.  Take the

23   jury out.

24             You may step down, Doctor, during the recess.

25                  (Jury absent, 10:26 a.m.)

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  We'll be in recess about ten
 2     minutes.
 3                   (Recess, 10:27 a.m. to 10:40 a.m.)
 4              THE COURT:  All right.  Bring the jury.
 5                   (Brief pause in proceedings.)
 6                   (Jury present, 10:41 a.m.)
 7              THE COURT:  All right.  Ask another question,
 8     please.
 9              MS. EZELL:  May I have the ELMO, please?  Maybe
10     I already do.  I do already.
11     BY MS. EZELL:
12         Q    I'm showing you Plaintiff's Exhibit 469.  You
13     may recall discussing this with Mr. McCoy.
14              Can we zoom in on this?
15              This was a document that Mr. McCoy asked you
16     questions about, and you wanted to read something further
17     on.  Do you recall what it was that you wanted to explain
18     further about this document?
19         A    Well, yes.  The opening sentence is, I think,
20     what he highlighted, or the opening two sentences.  But
21     if you read the rest of it, it states in part, "It is
22     unlikely that epidemiology alone can put either the
23     strict scientific or practical medicolegal questions
24     beyond doubt."
25         Q    All right, sir.
```

1      A    So the first sentence or two makes it sounds

2  like he had a strong opinion on, on the subject.  If you

3  read the remainder of the abstract, it's clear that he

4  does not have a strong opinion on whether the current

5  evidence -- or he has an opinion that it does not come

6  down crucially on either side.

7      Q    Okay.  All right.  Now, another article that

8  you were shown is Plaintiff's Exhibit 428, and it was

9  the -- do you remember the vitamin study?

10      A    Right.

11      Q    Yes, sir.

12          How important did this vitamin study turn out

13  to be in the epidemiology of lung disease?

14      A    Well, not important at all.  This is a, sort of

15  a throwaway thing from a study that was not only not

16  successful; it turns out that these dietary supplements

17  were responsible for increasing the cancer rate,

18  apparently, in the people that received them.  So the

19  study was abandoned forthwith because the experimental

20  group was getting cancers more often than the control

21  group.

22      Q    And so using the preliminary findings from a

23  study that ended the way you described to support the

24  notion of a consensus the other way from you, how is that

25  from a scientific methodology?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Well, it's not something to reject out of hand.

2  Like I've said in response to an earlier question, you

3  read dozens and dozens and dozens of studies; and you try

4  to synthesize, according to each, the weight you do for

5  study design, for the analysis, for the authors' stature.

6  And then you develop, finally, an overall view on the

7  question.

8           And I think it more likely that you need

9  asbestosis to make a sound attribution.

10     Q    Okay.  Now, you indicated when this article

11  came up, Plaintiffs' 611, that you had actually prepared

12  and written a criticism of this in the, in a journal.  Do

13  you recall that?

14     A    Yes.  I was invited with my coauthors to submit

15  a criticism of this particular article, and our

16  submission was to the journal of Thorax.

17     Q    All right, sir.  And what was the nature of

18  your criticism?

19     A    Well, for one thing, this is sort of

20  epidemiology arcana; but case-control studies cannot

21  answer questions of causation, and this was a

22  case-control study, the Wilkinson study.

23     Q    All right, sir.

24     A    And that's, that's one of them.

25           Another one is they really don't know who, who

1    has asbestosis and who doesn't.

2         Q    Now, the final -- well, let me check and make

3    sure before I say that -- the final article I want to

4    talk to you about is where we're going to go back to

5    where we started.  Do you remember the consensus article,

6    which is Plaintiffs' 412, and you talked about the

7    methodology, the polling that they did -- what did you

8    call it? -- the Facebook voting?

9              Now, in addition to reaching consensus, isn't

10   it true, sir, that they also didn't reach consensus on

11   certain things, even using this methodology?

12        A    That's correct.

13        Q    And if you could, read one -- this one here

14   I've highlighted where they did not reach consensus.

15        A    Yes.  They found that workers that had smoking

16   and asbestos exposure did not have double the risk of

17   lung cancer compared to smokers that did not have

18   asbestos exposure.

19        Q    All right.  And so even those folks couldn't

20   agree that people who had been exposed to asbestos had

21   twice the risk of lung cancer as those who had just

22   smoked alone, correct?

23        A    That's correct.

24        Q    All right, sir.  All right.

25             Now, you talked with Mr. McCoy about -- he said

KINSER v. CBS CORP., Case No. 94-2282

1    "Plaintiff's treating physician," but you know that's Dr.

2    Scanlon, right?

3        A    Yes.  I read Dr. Scanlon's deposition.

4        Q    And I, I apologize.  I didn't ask you about

5    that.  You did read him in forming your opinions,

6    correct?

7        A    Yes.

8        Q    And Mr. McCoy asked you whether or not you

9    disagree with Dr. Scanlon about whether or not pleural

10   plaques show that Mr. Kinser's lung cancer is related to

11   his asbestos exposure.  Do you recall --

12       A    Yeah.

13       Q    -- discussing that?

14            Why would Dr. Scanlon's evaluation of Mr.

15   Kinser be flawed in that area and yours be correct?

16       A    Well, I think we've been through pretty much

17   all this, but I believe that pleural plaques develop --

18   can develop after very small exposure.  So right there,

19   you could say:  You can't take a plaque and say, "Oh,

20   this guy's got an asbestos-induced lung cancer."

21            But the more plaques you've got, probably the

22   more exposure you had.

23            But you -- unless you have enough to cause

24   asbestosis, the evidence just doesn't support --

25       Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     -- an attribution.

 2              But I didn't have any problem with Dr. Scanlon.

 3   Anybody who says that a plaque serves as a marker of

 4   asbestos causation I would disagree with.  It's not

 5   anything personal about Dr. Scanlon.

 6              MS. EZELL:  All right, sir.

 7              I have nothing further for the witness.

 8              THE COURT:  Anything else of the witness?

 9              MR. McCOY:  Just a couple questions on this,

10   follow-ups on what was just asked.

11                  RECROSS-EXAMINATION BY MR. McCOY:

12        Q     You mentioned something about the pathology

13   report and the pathological findings, right, --

14        A     Yes.

15        Q     -- of Mr. Kinser?

16        A     There's more than one --

17        Q     Okay.

18        A     -- response.

19        Q     Yes.

20              And the pathological report was, reflects the

21   diagnosis of the lung cancer, right?

22        A     Yes.

23        Q     Okay.  The physician was looking at some

24   thread-like things that were basically a fluid from

25   washings, right?
```

1      A    Well, that was from the needle biopsy, but then

2    they had the whole lobe out.

3      Q    Right.  And then in the, in the pathology

4    report from the needle biopsy, that's where the lung

5    cancer was found, right?

6      A    That's where it was first found, but --

7      Q    All right.

8      A    -- it was --

9      Q    So then, so then --

10          MS. EZELL:  Your Honor, he didn't get a chance

11   to finish that question -- that answer.

12          THE COURT:  Did you finish your answer?

13          THE WITNESS:  No, I didn't.  I said --

14          THE COURT:  Then you may.

15          THE WITNESS:  -- that's where the diagnosis was

16   made but, first; but then they took the whole lobe out,

17   and the diagnosis was there again.

18   BY MR. McCOY:

19     Q    Okay.  Of cancer?

20     A    Of cancer.

21     Q    Right.  Okay.

22          And you said that nothing was seen under a

23   microscope about asbestosis, but I'm going to show you

24   Exhibit 624 here.

25          That's what you said, right?  Nothing was seen

KINSER v. CBS CORP., Case No. 94-2282

1    under the microscope, right?

2         A    The pathologist didn't report anything

3    consistent with asbestosis.

4         Q    He didn't --

5         A    That's what I said.

6         Q    He didn't report it?

7         A    Right.

8         Q    Okay.  So it doesn't say that it wasn't there,

9    right?

10        A    No, but you can't --

11        Q    Okay.

12        A    -- assume that it was.

13        Q    All right.  That's an assumption.

14             All right.  Let's take a look at what was seen

15   here.  This is Exhibit 624.  These are medical records by

16   agreement.

17             MS. EZELL:  I don't have -- we don't have an

18   exhibit of this number.

19             DEPUTY CLERK:  624 was discussed on 1/9.

20             MS. EZELL:  Previously admitted?

21             DEPUTY CLERK:  Uh-huh.

22             MS. EZELL:  Okay.

23             MR. McCOY:  That's the operative report.

24             MS. EZELL:  Okay.  We have it a different

25   number.  I've got it.

KINSER v. CBS CORP., Case No. 94-2282

```
 1            MR. McCOY:  All right.  So by agreement on the
 2   medical records, this is being shown, Exhibit 624.
 3   BY MR. McCOY:
 4        Q    And this was the operative summary of the
 5   procedure to remove the lobe, right?
 6        A    Yes.
 7        Q    Okay.  And in here, it says in the report by
 8   the surgeon, Dr. Palmer, "The thorax was quite
 9   noncompliant because of the asbestosis and benign fibrous
10   plaquing."
11            This -- according to this statement of the
12   report, Dr. Palmer saw asbestosis without even having to
13   use a microscope, right?
14        A    Without even opening the lung.  He removed the
15   lobe in toto; and it went to the pathologist who opened
16   it, sliced it, and examined it.
17        Q    Right.
18            And he didn't need a microscope to find
19   asbestosis, according to his report, right?
20        A    Well, I might find it in somebody without even
21   examining them; but all, all that is is something written
22   on the record.
23        Q    Okay.  And, again, you disagree with that
24   finding for Mr. Kinser, right?
25        A    I don't think it's a finding.
```

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  Okay.  Thank you, Doctor.

2          I have no further questions.

3          MS. EZELL:  I have one clarifying question

4     about that last thing.

5          FURTHER REDIRECT EXAMINATION BY MS. EZELL:

6     Q    And just so we're clear, Doctor, when

7     Dr. Palmer made that note, he had not opened the portion,

8     the lobe up in order to view asbestosis or anything else

9     in the lung, correct?

10    A    I think that that is a statement having to do

11    with the inflatability of the lung as he saw it.

12         Now, if you've got an extensive pleural

13    disease, you may have a problem with it.

14         But I don't think he actually was looking at

15    the interior of the lung where asbestosis occurs.

16    Q    And, in fact, did Dr. Scanlon make observations

17    about that as well?

18    A    I don't remember.

19         MS. EZELL:  All right.  Well, thank you.

20         No further questions.

21         THE COURT:  All right.

22         JUROR:  I have a question.

23         THE COURT:  All right.  Hand it up to the CSO.

24         (Brief pause in proceedings.)

25         THE COURT:  All right, counsel, we'll have a

KINSER v. CBS CORP., Case No. 94-2282

```
 1   sidebar.
 2                   (Brief pause in proceedings; Court and
 3                   counsel confer at the sidebar.)
 4                   THE COURT:  Okay.  Mr. McCoy will ask a
 5   question.
 6                   MR. McCOY:  The question that's been presented
 7   from one of our jurors here is:  Is there anything
 8   else -- let me read the whole thing.  I missed the start
 9   of it.
10                   COURT REPORTER:  Can you speak up, please?
11                   MS. EZELL:  Use the microphone.
12                   MR. McCOY:  Okay.  I missed the start.  It's a
13   little smaller writing.
14                   In your opinion, is there anything else that
15   can cause pleural plaques besides exposure to asbestos?
16                   THE WITNESS:  The answer to that is yes.  There
17   are other fibrous minerals that can cause plaque besides
18   asbestos.
19                   I don't think they figure in the records of
20   this case; but you can get plaques from, for instance,
21   vermiculite and talc ores and from naturally occurring
22   fibrous minerals called zeolites that occur widely and --
23   are occurring in California at least.
24                   So there are, there are other causes of pleural
25   plaques.
```

KINSER v. CBS CORP., Case No. 94-2282

1            Now, we're talking about dust-induced pleural

2       plaques.  A plaque can develop after tuberculosis.  A

3       plaque can develop after trauma.  A plaque can develop

4       after histoplasmosis.  There are lots of non-dust-caused

5       plaque.

6            But they don't have the distinctive appearance.

7       The plaque that I see on the imaging of Mr. Kinser's

8       chest are very highly specific for asbestos causation, so

9       there's no doubt that he had plenty of asbestos exposure.

10      And pipefitters in the old days had that.

11           THE COURT:  Thank you.

12           MS. EZELL:  Nothing further.

13           THE COURT:  All right.  Thank you.  You may

14      step down, Doctor.

15           THE WITNESS:  Thank you.

16           (Witness Jones excused, 10:56 a.m.)

17           *  *  *  *  *  *  *  *  *  *  *

18           REPORTER'S CERTIFICATE

19           I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

20      that the foregoing is a correct transcript from the

21      record of proceedings in the above-entitled matter.

22           Dated this 19th day of January, 2014.

23

24                    s/Lisa Knight Cosimini
                   Lisa Knight Cosimini, RMR-CRR
25                 Illinois License # 084-002998