KINSER v. CBS CORP., Case No. 94-2282

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

              Plaintiffs,          Docket No. 94-2282

    vs.                      Urbana, Illinois
                           January 17, 2014
CBS CORP., successor by       9:00 a.m.
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

              Defendant.

EXCERPT from JURY TRIAL -- Day 8
(Testimony of Thomas Howard)

BEFORE THE HONORABLE HAROLD A. BAKER
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:    ROBERT G. McCOY, ESQUIRE
                        Cascino Vaughan Law Offices, Ltd.
                        220 South Ashland Avenue
                        Chicago, Illinois 60607
                        312-944-0600

For the Defendant:    SANDRA GIANNONE EZELL, ESQUIRE
                        Bowman and Brooke, LLP
                        901 East Byrd Street, Suite 1650
                        Richmond, Virginia 23219
                        804-649-8200

                        PAULA M. BURLISON, ESQUIRE
                        Bowman and Brooke, LLP
                        1441 Main Street, Suite 1200
                        Columbia, South Carolina 29201
                        803-726-7420

                        JACOB DANIEL SAWYER, ESQUIRE
                        Foley & Mansfield, PLLP
                        55 West Monroe, Suite 3430
                        Chicago, Illinois 60603
                        312-254-3800

KINSER v. CBS CORP., Case No. 94-2282                    2

I  N  D  E  X

Page

WITNESS ON BEHALF OF THE DEFENDANT:

THOMAS HOWARD

Direct Examination by Ms. Ezell ................  3

Cross-Examination by Mr. McCoy ................ 35

Redirect Examination by Ms. Ezell ............. 55

KINSER v. CBS CORP., Case No. 94-2282

```
 1                    (In open court, jury present.)

 2                    THOMAS HOWARD, sworn, 9:07 a.m.,

 3                    DIRECT EXAMINATION BY MS. EZELL:

 4          Q    This is a high tech court, so you'll need to

 5     speak into that microphone.

 6          A    Very good.

 7          Q    If you could, sir, start out by telling us your

 8     name and spell your last name for the record.

 9          A    Good morning.  Certainly, I will.  Thomas

10     Howard, H-o-w-a-r-d.

11          Q    All right.  And what do you do?

12          A    I am a pulmonologist, or a lung specialist.

13          Q    Okay.  And where do you do that?

14          A    East Central Florida.  I heard reference to

15     "Melbourne" this morning; and it's actually Melbourne,

16     Florida, not Melbourne, Australia.

17          Q    Okay.  And where do you work?

18          A    I am the chief medical officer at the

19     Department of Veterans Affairs facility, serving the

20     veterans of East Central Florida, so I serve at the VA.

21          Q    Now, do you actually participate in clinical

22     practice at this time?

23          A    Yes.  As a pulmonologist, I'm able to see

24     patients in consultation two days a week, and then I do

25     procedures one day a week; so three days of the five-day
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   week I'm involved with clinical activities.
 2        Q    And in addition to your clinical activities, do
 3   you have other responsibilities as it relates to the
 4   hospital?
 5        A    Yes.
 6        Q    And tell us about those.
 7        A    Well, as the chief medical officer, I am the
 8   clinical head of the facility, so I oversee the delivery
 9   of care of about 65 physicians to our current 16,000
10   veterans that we're serving.
11        Q    And how long have you been with the VA?
12        A    Since August of 1998 in the role of chief
13   medical officer.  Prior to that, I had been with the VA
14   for four years while I was on the teaching faculty of the
15   medical school in Tampa.  So in total, 20 years; but 16
16   as the chief medical officer.
17        Q    All right.  And prior to your work there, what
18   did you do?
19        A    Well, in my 32 or '3 years of practicing as a
20   pulmonologist, I've been on the teaching faculty of the
21   medical school for four; I was in private practice for
22   13, I think, and then the rest with the VA.
23        Q    Okay.  And are you board-certified in any
24   areas?
25        A    Yes.  I've been board-certified in internal
```

KINSER v. CBS CORP., Case No. 94-2282

1  medicine, pulmonary diseases, and critical care medicine;

2  remain board-certified in the first two -- that's

3  internal medicine and pulmonary diseases.  Critical care

4  was a ten-year board certification, which, because I'm no

5  longer practicing critical care, I let expire.

6      Q    Okay.  Now, the jury's heard about the "B"

7  reader as it relates to reading x-rays.  Did you ever sit

8  for that exam?

9      A    I did.

10      Q    And how did you do?

11      A    I passed.

12      Q    Okay.

13      A    I took it one time and passed.

14      Q    Are you still a certified "B" reader?

15      A    No.  That was, I believe, in the early '90s;

16  and if I'm correct, I think it's either a two- or

17  three-year certification.  So, no, I did not recertify.

18      Q    All right, sir.  Now, tell us briefly about

19  your educational background prior to the practice which

20  you've just described.

21      A    My pre-medical training was at Duke University

22  in Durham, North Carolina.  From there, I went to the

23  University of South Florida College of Medicine in Tampa,

24  Florida.  At that institution, I completed medical

25  school, remained on as an intern in internal medicine,

KINSER v. CBS CORP., Case No. 94-2282

1    completed my residency in internal medicine there; and

2    after that, did a subspecialty residency in pulmonary

3    critical care and occupational lung diseases, all at that

4    same institution.

5         Q    All right, sir.  Now, at the VA hospital, which

6    you've described where you work today -- not today

7    because today you're here with us, but where you work

8    currently -- do you see patients who have lung disease?

9         A    Almost exclusively, yes.

10        Q    All right.  Do you see patients who have lung

11   cancer?

12        A    Very often.

13        Q    And does that include non-small cell

14   adenocarcinoma?

15        A    Yes.

16        Q    Do you see patients who have had smoking

17   histories?

18        A    Absolutely.

19        Q    Do you see patients who have been exposed to

20   asbestos in their previous working or otherwise?

21        A    Frequently, yes.

22        Q    Okay.  Do you see patients with pleural

23   plaques?

24        A    Yes.

25        Q    How about asbestosis?

KINSER v. CBS CORP., Case No. 94-2282

1        A     Certainly.

2        Q     All right.  Do you hold any professional

3    memberships, or are you a member of any honorary

4    societies?

5        A     Well, I listed on my CV:  I've been a member of

6    the American Thoracic Society, the American College of

7    Chest Physicians, the Florida Medical Association, the

8    Florida Thoracic Society.  Most of those in the past have

9    been to attend their annual meeting and to receive their

10   monthly journal, all of which I get as part of my VA

11   experience right now, so I have been members of all of

12   those.

13       Q     And have you ever received any awards or

14   special recognitions?

15       A     Yes.

16       Q     Tell us the name.

17       A     Well, the two most noteworthy, I guess -- one

18   was "The Doctor with the Biggest Heart."  That was from

19   the clin-- nonclinical staff at the hospital that I was

20   the ICU director on.  The Laennec Award had to do with

21   outstanding performance in internal medicine during my

22   training.

23       Q     All right.

24       A     So I guess those two.

25       Q     And, in addition, have you also published and

KINSER v. CBS CORP., Case No. 94-2282

1   done articles?

2       A    Yes, I have.

3       Q    All right, sir.  And has that been in the area

4   of pulmonology and lung disease?

5       A    Yes.

6       Q    All right.  Now, did you -- what were you doing

7   yesterday at this time?

8       A    Well, I saw patients in the morning.  I had two

9   committee meetings; and then I flew up here to

10  Indianapolis last night, rather late last night,

11  actually.

12      Q    Plane delays --

13      A    Yes.

14      Q    -- with the weather?

15      A    Yes.

16      Q    And have you ever been -- have you ever

17  testified before?

18      A    Yes.

19      Q    Have you ever testified in cases where there

20  have been defendants and the allegation has, has been

21  related to asbestos exposure?

22      A    Yes.

23      Q    Have you ever testified before where I was the

24  lawyer conducting the examination?

25      A    No.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Are you being paid to testify?

2    A    I expect so.  Yes.

3    Q    All right.  How much do you charge per hour?

4    A    $450 per hour.

5    Q    Okay.  And have you ever referred patients that

6  you've seen at the VA to lawyers like Mr. McCoy because

7  of any kind of exposures?

8    A    I have.  I think most of my referrals were when

9  I was in private practice.  Within the VA community,

10  there are different methods of compensation that

11  frequently we get involved in, so I think that -- I know

12  that I have, although the majority of the referrals were

13  when I was not with the VA.

14    Q    All right, sir.  And it -- who is your employer

15  at the VA?

16    A    Well, it's -- I'm a federal worker, so the

17  Department of Veterans Affairs is a cabinet-level

18  position and department with the federal government.

19    Q    Okay.  Now, have you testified before and been

20  retained by counsel for Westinghouse or CBS, even though

21  it wasn't me?

22    A    Yes.

23    Q    All right.  Now, have you, at my request, come

24  here today prepared to talk about, with this jury, a

25  number of different topics?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    And if you could, describe just generically --

3    we'll get into them each individually -- what those

4    topics are as you understand them.

5    A    Well, you specifically wanted to tap into my

6    experience and knowledge about the history of smoking in

7    this country, which I'm engaged in at the VA in an

8    educational manner and at the medical school.  So that's

9    number one.

10         I know you wanted me to discuss Mr. Kinser's

11   medical conditions, specifically the pulmonary situation.

12         You had asked me to address the concept of

13   synergy; and also to touch about the federal government's

14   role through OSHA in monitoring the workplace.

15         And then, lastly, as I recall, you wanted me to

16   address the issue of how we determine causation in

17   medical science.

18   Q    Okay.  And in order to be prepared to come here

19   and explain to the ladies and gentlemen of this jury

20   issues associated with those areas, did you read certain

21   documents or depositions or records in order to, to be

22   prepared to come and talk about those subjects?

23   A    Yes, I did.

24   Q    Can you tell us what you read?

25   A    Well, I reviewed Mr. Kinser's medical records;

1    and then I reviewed deposition testimony, not only of Mr.

2    Kinser, but of Dr. Scanlon, his treating physician.  I

3    believe that's it.

4         Q    All right, sir.  Now, you indicated that you --

5    let's -- we'll start with discussing the smoking aspect

6    of your testimony.  And you indicated that you are

7    involved at the VA in working on smoking issues, not just

8    as it relates to treatment but also as it relates to

9    teaching; did you not, just a minute ago?

10        A    Yes.

11        Q    Can you explain that?

12        A    Well, I taught -- I teach at the medical school

13   in Orlando regarding smoking cessation techniques and

14   benefits, and then I teach at the VA.  We have a class of

15   veterans that -- it's a 12-week class involved with

16   smoking cessation efforts; and I teach there about the

17   history of cigarette smoking, how it applies to the

18   veteran population in particular, and then the effects

19   of -- the beneficial effects of stopping smoking.

20        Q    Okay.  And how often do you conduct these types

21   of classes?

22        A    They involve me every three weeks.  It's a

23   12-week class; but it's an alternating class, so I

24   teach -- for each 12-week class, I teach one session.

25        Q    Okay.  And if you could, describe -- and if I

KINSER v. CBS CORP., Case No. 94-2282

1   could have the ELMO, please.

2        This is a demonstrative that's been previously

3   shown to the jury and marked as Demonstrative 2 of the

4   defendant's.

5        Using this demonstrative, which you and I have

6   discussed previously, could you just describe to the

7   ladies and gentlemen of the jury, first, how smoking came

8   to become more prevalent in the United States, and then

9   if lung cancer was associated with that?

10    A   Certainly.  As I tell the group -- and this

11   graph very vividly shows -- it's hard for us to believe,

12   growing up in an era where smoking has been so prevalent

13   and lung cancer is the leading cause of cancer-related

14   death in both men and women during our lifetime, that

15   lung cancer was almost unheard of at the beginning of the

16   20th century.

17        And this graph shows that.  I mean, I read --

18   my first textbook that I read about lung cancer was

19   written in about 1906, and the author in the introduction

20   to the book -- and it was written for a medical audience,

21   and the author apologized to people reading the book that

22   he had written a book about a topic that was so rare that

23   he predicted most doctors would never see a case of it in

24   their entire career.

25        And now I see cases of it every day of my

KINSER v. CBS CORP., Case No. 94-2282

1  practice, and --

2      Q    And let me just -- let me -- can I just stop

3  you there real quick, and let's just talk about how to

4  read this graph.

5          In 1906 -- that might be about right here --

6  how do we tell, based on this graph, how much lung cancer

7  there was in 1906?

8      A    So --

9      Q    Do we go to the -- I guess we go to the red

10  line?  You tell me what we do.

11      A    Okay.  So on each side of the graph, you see

12  numbers.  On the left side, that's the amount of

13  cigarettes smoked per person.  On the right side, you see

14  the lung cancer death rate per 100,000 population.

15      Q    Right here.

16      A    So in order to know what the lung cancer

17  incidence is, you'd look at the red line -- I guess

18  that's red.

19      Q    Yes.

20      A    And you look -- that's not even recorded prior

21  to about 1918, and that number is extremely low.

22      Q    Okay.

23      A    So the point is, from this graph, that

24  cigarette consumption escalated after the turn of the

25  century; and shortly thereafter, about 18 to 20 years

KINSER v. CBS CORP., Case No. 94-2282

1    later, a disease that heretofore had been almost unheard

2    of starts its incline and now reaches the epidemic stage

3    that we see today where 160,000 people a year are dying

4    from that disease.

5        Q    Okay.  And based on this graph and based on

6    your understanding of the history of smoking in the

7    United States, how would you compare the correlation

8    between cigarette consumption and incidence of lung

9    cancer?

10       A    Well, you see it directly.  There is the

11   so-called latency period where it takes several years to

12   see the impact on a disease like cancer.  It doesn't

13   develop overnight.  So you see the parallel rise in the

14   incident rate, correlating directly with the increased

15   cigarette consumption.  So there's a direct relationship.

16   Fifteen to twenty years later, you see the escalation of

17   the disease that is a direct result of the added

18   consumption previously.

19       Q    Now, in addition to looking at this issue of

20   the correlation between lung cancer and smoking, did you

21   also, at my request, come prepared to describe to the

22   jury some of the history of, maybe, milestone events

23   associated with smoking and smoking knowledge in the

24   United States?

25       A    Yes.  And, again, that comes from my

KINSER v. CBS CORP., Case No. 94-2282

1   presentation to the, the class that I'm involved in.

2   There's really two events that I look to that resulted in

3   this marked escalation of cigarette consumption.  One was

4   the development of the automated rolling machine which,

5   for the first time, made cigarettes more readily

6   available.

7           Number two was the very effective advertising

8   campaign that promoted cigarette smoking, not only from

9   physicians like me, but very respected organizations.

10  The World Health Organization -- a variety of agencies

11  had promoted the use of cigarettes.

12          So I think being socially acceptable and being

13  readily available for the first time at that time period

14  was what led to the epidemic we're faced with today.

15      Q    And then at some point in time -- and I'd like

16  to show you what's been previously marked and previously

17  displayed on numerous occasions to the jury, Defendant's

18  Demon-- or Exhibit 2334, which is also a demonstrative.

19          If we just -- I would just like to focus your

20  attention to the bottom part of this timeline, and I'll

21  just represent to you:  This is a timeline we've used

22  with other witnesses.  But at some point in time, after

23  these things that you've described, the advertising and

24  the automatic rolling machine, did -- was there a sea

25  change in the public's awareness and the public's

KINSER v. CBS CORP., Case No. 94-2282

1   feelings and the medical community's thoughts about

2   smoking in the United States?

3       A    Well, absolutely.  And this is not unique to

4   cigarettes.  The sea change that you referred to in some

5   of the publications and polls that we're going to talk

6   about had to do with studies done in medical literature

7   of large groups of cigarette smokers, looking at their

8   disease incidence.  And that's how we establish causation

9   in many diseases, including lung cancer.

10          So both the Reader's Digest and the Gallup Poll

11  in the 1950s were reflective of ongoing studies of people

12  that were smoking and then the reported disease issues

13  that were being noted for the first time.

14      Q    Okay.  And, and, would you say that these, the

15  Reader's Digest and the Gallup Poll in the '50s, were

16  unique; or were they representative of what was happening

17  as regards to reporting of these, of these issues?

18      A    No.  I think they were representative.  I think

19  they were somewhat on the early edge of, of this

20  knowledge.  And, and our medical knowledge is not based

21  on these types of things, of course; but I think it's

22  reflective of cohort studies, epidemiologic studies, that

23  were being published in the '50s in the medical

24  literature.

25      Q    Right.  And speaking of medical knowledge, I'll

KINSER v. CBS CORP., Case No. 94-2282

1   go to page 2 of our exhibit.

2           Can we span out just a smidge.  All right.

3           Looking at 1964, can you explain the importance

4   of the January 11, 1964, Surgeon General's report, which

5   we just celebrated the 50th anniversary of, as it relates

6   to the medical knowledge of the dangers of smoking during

7   that time period?

8       A    Yes.  This, basically, reflects what is now

9   being published in the medical literature; and it's

10  noteworthy because the Surgeon General -- obviously, a

11  well respected federal authority -- is coming forth,

12  educating the public in particular about the health

13  effects of this based on the medical literature.

14      Q    Okay.  Now, the second topic which I'd like to

15  visit with you on, that you indicated you were here to

16  talk about, is OSHA.  And so if you could, explain to the

17  ladies and gentlemen of the jury -- and we've had a lot

18  of testimony as it relates to OSHA.  So if you could,

19  just explain the importance of it, of its enactment and

20  its effectiveness as it relates to asbestos exposure in

21  the United States.

22      A    Certainly.  The Occupational Safety and Health

23  Administration came into being as a federal agency in

24  1970.  And through that effort, there were, shortly

25  thereafter, in '71, some emergency standards put into

KINSER v. CBS CORP., Case No. 94-2282

1   place.  And then what you and I have come to know as OSHA

2   regulations really became enacted in 1972.  That outlined

3   a number of things that should be done in the workplace

4   regarding a variety of exposures, including asbestos,

5   that remain in place today.  And, of course, OSHA remains

6   in place today.

7           So I think it represented a major change in

8   that, for the first time, we had a federal agency and a

9   federal effort at not only guiding employers and premises

10  owners on things that could be done to promote safety;

11  but it also involved a method to follow up and survey

12  what was being done.

13      Q    And did OSHA, as, as signed into law in 1970

14  and then enacted in its final form in 1972, did it have

15  inspection and enforcement capabilities?

16      A    Yes.  In fact, inspections were, very early on

17  in this whole effort, very aggressively pursued in terms

18  of number and remain in place today; and there are

19  sanctions, of course, and penalties if people are

20  violating the rules to a certain degree, I think.  As a

21  federal employee, we get federal surveys by OSHA and

22  other agencies frequently; and it's rare for an

23  organization to meet every one of the standards.  There

24  are always minor infringements that are depicted, but --

25  so that began very early on, in the early '70s.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    So you're saying that as -- at the VA where you

2  work, you have OSHA inspections?

3      A    We do, and a number of other federal agencies

4  and organizations that inspect us frequently.

5      Q    Okay.  All right.  I'd like to show you now

6  what has been previously admitted.  It's an -- it's not

7  the entire journal, but it's a Pipefitters and Plumbers

8  Union journal from 1972, and the jury has seen portions

9  of it.  They haven't seen this section yet.

10          Can I focus in on this right here.

11          And this is from 1972, and I'll just read you

12  what this says.  It says -- and you had just mentioned

13  that inspections had taken place early on with this

14  legislation -- "A total of 26,302 inspections were

15  undertaken.  Federal inspectors found only 6,791 (or

16  25 percent) of the companies were in full compliance with

17  appropriate job safety and health standards."

18          Tell me what your thoughts are on what I just

19  read.

20      A    Well, I think I reflected on this in my

21  previous comment.  Number one, I'm, I'm struck by the

22  number of inspections, so we've had 26,000-plus

23  inspections within the first year of this agency being

24  undertaken.

25          Number two, my experience is that rarely are we

KINSER v. CBS CORP., Case No. 94-2282

1   in 100 percent compliance with every rule and regulation.

2   Oftentimes, the rules and regulations, first of all, may

3   have had nothing to do with asbestos.  It might be

4   something else.

5           And oftentimes, the areas of noncompliance are

6   relatively minor.  I know a recent one that we got cited

7   for is we needed to put our exit signs a little bit lower

8   so people could see them more readily.

9       Q    Okay.

10      A    So, obviously, that is not a dramatic finding,

11  but one that would be noted such like this.

12      Q    All right.  Making progress, moving on to our

13  third area of discourse for today.  We have heard some

14  testimony about the concept of smoking synergy.  Could

15  you describe to the jury what "smoking synergy" is?

16      A    I'll certainly try.  "Synergy" by definition

17  has to do with the interaction of various forces that

18  might contribute to the cause of a disease; and the term

19  "synergy," by definition, means that the, the two

20  factors -- their impact is more than additive.

21          So if you have two things that are noted to

22  cause a disease and they're both ongoing, "synergy" means

23  that the effect is more than just the addition of one

24  plus the other.  They work together to increase the

25  disease incidence more than the additive amount.

KINSER v. CBS CORP., Case No. 94-2282

1     Q     Is there a way, if it was important, to tell

2  whether or not there had been synergy between Mr.

3  Kinser's smoking and Mr. Kinser's asbestos exposure to

4  cause his lung cancer?

5     A     Well, and now you've gone to an individual

6  case, so it's important to separate "risk" from "cause."

7  "Synergy" simply refers to the interaction of two

8  forces -- in this case, cigarette smoking and asbestos

9  exposure.

10         What I referred to was two contributing factors

11  that could cause the disease.  What we now know in terms

12  of asbestos is that the amount of exposure that is

13  required to cause the disease has to be enough to have

14  resulted in asbestosis.

15         So if we had in a specific case asbestosis plus

16  heavy smoking -- and it's important to point out:  These

17  are all dose-response relationships -- then there's

18  clearly in the literature been suggestions of a

19  synergistic interaction there.

20         In Mr. Kinser's case, we don't have evidence of

21  asbestosis, so that's an important missing link.

22     Q     Okay.

23     A     Quite honestly, we've all been exposed to

24  asbestos; so if you believe that even that level of

25  exposure contributes to lung cancer, then any lung cancer

KINSER v. CBS CORP., Case No. 94-2282

1    that develops you would conclude was due to that

2    exposure.

3            That's not how medical science sees it.  So

4    with both variables, you have to have enough exposure

5    above a certain threshold to be a contributing factor.

6    But if those thresholds have been met, then they interact

7    and increase the risk of that disease resulting.

8        Q    All right.  Let me make sure that I understand

9    and appreciate what you just said, and I'll just use this

10   for example.  I'm going back to Demonstrative Number 2.

11           So everyone has been exposed to asbestos,

12   correct?

13       A    Yes.

14       Q    And so everyone, at some point on this curve,

15   would have been exposed to asbestos, correct?

16       A    Yes.

17       Q    And so you're saying that if -- unless you

18   apply some different criteria than exposure, then, then

19   everyone on here's lung cancer, you could account for it

20   by asbestos?

21       A    Correct.  And the same thing applies to

22   cigarette consumption.  These are both dose-response

23   relationships, and many diseases are that way.

24           So a trivial exposure to oxygen, like you and I

25   are experiencing right now, is not enough to cause

KINSER v. CBS CORP., Case No. 94-2282

1    disease.  But when I give individuals 100 percent oxygen

2    on a respirator and I leave them on that for more than

3    three days, they have a very good chance of developing

4    scarring in the lung.  So dose-response is a key part of

5    all of these discussions.

6            What I was referring to is if you buy into the

7    theory that every exposure is contributing, then any

8    cancer that anyone gets is related.  That's not how

9    medical science generally sees it.  And we don't see it

10   that way with cigarette smoking either.

11       Q    Okay.

12       A    If you walk by a cigarette smoker, that doesn't

13   raise your significant risk of getting cigarette-related

14   disease, cancer.

15       Q    But it has raised your exposure, to some

16   extent?

17       A    Right.

18            So both of these diseases that we're talking

19   about have a certain threshold that one has to achieve

20   before the synergy issue even becomes pertinent, in my

21   opinion.

22       Q    Okay.  So before we talk and complete our, our

23   conversation about that threshold, let's take a moment,

24   then, and talk about Mr. Kinser; and you and I did not

25   have an opportunity to meet last evening because of

KINSER v. CBS CORP., Case No. 94-2282

1    flight delays, but we got up this morning and met, didn't

2    we, sir?

3        A    I seem to remember that.  Yes.

4        Q    And when we did, we made a list of Mr. -- or

5    I'm sorry, of Dr. Scanlon's findings as it related to Mr.

6    Kinser, correct?

7        A    Correct.

8        Q    All right.  I would like to display, for

9    demonstrative purposes, Demonstrative Number 13.  It's my

10   handwritten notes.  Or I can write them as we go.

11            THE COURT:  No objection.  Go ahead.

12            MR. McCOY:  They look very neat.  Your

13   handwriting's better than mine.

14            MS. EZELL:  All right.  So can we zoom.

15   BY MS. EZELL:

16       Q    So the first one that Dr. Scanlon found was

17   asbestos exposure; he found that, correct?

18       A    Yes.

19       Q    And do you agree with that finding?

20       A    Yes.

21       Q    All right.  The second thing he found was

22   smoking history, and do you agree with that finding?

23       A    Well, I agree that he was a cigarette smoker.

24   There was quite variability in the record, but I referred

25   to his testimony regarding that, and I would agree there

KINSER v. CBS CORP., Case No. 94-2282

1   was a smoking history.

2        Q    We couldn't -- we, we -- we couldn't find a

3   smoking history that was consistent, so we just put

4   "smoking --

5        A    Right.

6        Q    -- history" here.  Okay.

7        A    Right.

8        Q    Okay.  Now, Dr. Scanlon found an

9   adenocarcinoma, --

10       A    Yes.

11       Q    -- correct?

12       A    Correct.

13       Q    And you agree with Dr. Scanlon on that?

14       A    I do.

15       Q    All right.  Dr. Scanlon found pleural plaques

16  that had been calcified, correct?

17       A    Yes.  I agree with that.

18       Q    I've seen -- that doesn't look legible, but

19  that's what that says, correct?

20       A    Correct.

21       Q    And you agree with that?

22       A    I do.

23       Q    He found no asbestosis, correct?

24       A    Correct.

25       Q    And you agree with that?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I do.

2      Q    He found that Mr. Kinser had been cured of his

3  lung cancer diagnosed in the year 2000, correct?

4      A    I agree with that.  Yes.

5      Q    All right.  And he found that exposure to

6  asbestos increases the risk of lung cancer, didn't he?

7      A    He did.

8      Q    And do you agree with that?

9      A    Well, as I've just stated, I agree that that

10  can happen.  I don't agree that every exposure, but I

11  don't believe that he was stating that.  So I agree that

12  exposure to asbestos to a population, a group, can

13  increase the risk.  Correct.

14      Q    He, however, found that exposure to asbestos

15  had a causal link to Mr. Kinser's lung cancer, didn't he?

16      A    I believe so, and I don't agree with that.

17      Q    You don't agree with that.  Okay.

18          Now, now let's talk about why you don't agree

19  with this last finding of Dr. Scanlon.

20      A    Okay.

21      Q    What are pleural plaques?

22      A    Pleural plaques are simply thickening and scar

23  tissue, if you will, that occur in the lining outside the

24  lung.  And most pleural plaques related to asbestos have

25  to do with the inside of the chest wall, not the lung

KINSER v. CBS CORP., Case No. 94-2282

1   itself.  Sometimes they involve the lung.  So that's all
2   "pleural plaque" refers to.
3       Q    All right.  What is asbestosis?
4       A    Asbestosis is a totally distinct and different
5   disease that involves scarring within the interstitium,
6   or the air -- the space between the air sacs and the
7   blood vessels throughout the lung itself.  So it's not a
8   pleural change; it's a lung change.
9       Q    All right.  Why -- if Mr. Kinser has pleural
10  plaques but doesn't have asbestosis, as you say and as
11  his doctor says -- do you say that this was not caused by
12  asbestos exposure?
13      A    Well, we now have well over 35 or 40 studies
14  that have looked at this exact question.  And the vast
15  majority have shown that the key sign or signal of enough
16  exposure to asbestos to go from that risk area to an
17  actual causal area is the development of asbestosis, or
18  scarring within the lung -- not the lining of the lung,
19  but the lung itself.
20      Q    So if, if you were to determine what was going
21  to make it more likely true than not that Mr. Kinser had
22  asbestos-related lung cancer, what would you need to see
23  in Mr. Kinser's medical history?
24      A    So, this is where, as a pulmonologist, one of
25  the things that attracted me to pulmonology was the

KINSER v. CBS CORP., Case No. 94-2282

1  objective tools that we have to be able to really

2  determine the cause of certain symptoms or problems.

3          It shouldn't be based simply on an x-ray, but

4  an x-ray is part of the evaluation.  And I think most

5  agencies, and certainly all physicians, agree that the

6  evaluation of an individual to answer that question

7  typically involves their functional status, their

8  physical findings, and their characteristics findings in

9  the chest when we listen to the lungs in a person who

10 does have asbestosis, and then the objective tools that

11 assess actual pulmonary function and also the

12 radiograph -- so both a chest x-ray and, better yet, a

13 CAT scan.

14         So I wouldn't base the diagnosis, or the lack

15 of diagnosis, on any one piece; but all of those things

16 together can make your answer more accurate.  And that's

17 what Dr. Scanlon and I do.

18     Q    Okay.  And in addition to you and Dr. Scanlon

19 determining that there was no asbestosis in Mr. Kinser,

20 did you also have the opportunity to look at any "B"

21 reader reports as it relates to this issue in the medical

22 files, or any of the files you've looked at?

23     A    I did.  I saw two.  I think Dr. Schonfeld and

24 Dr. Barrett, and both seemed to agree with Dr. Scanlon

25 and I that there was no evidence of any asbestosis.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  So based on the lack of finding of

2    asbestosis, what does that mean as to whether or not Mr.

3    Kinser's lung cancer was more likely than not caused by

4    asbestosis?

5      A     Well, as mentioned, in medical science, at

6    least, that is usually felt to be the signal level of

7    exposure.  If a person has had enough exposure to result

8    in asbestosis -- all of those clinical features, the

9    x-rays or pathology evidence as well -- then we believe

10   that that meets the requirement to jump from that simple

11   exposure to one that would result in an increased risk

12   such that it would cause lung cancer, especially in

13   cigarette smokers.

14     Q     Now, give me a moment.  I'm missing something,

15   but I'll get it.

16           One of the -- this issue of whether or not

17   asbestosis is required to determine the causal connection

18   between asbestos exposure and lung cancer has created

19   some friction and discussion in the medical community.

20   We've heard testimony about that.  Would you agree with

21   that?

22     A     I would.

23     Q     And yesterday we were presented with an

24   article, which we've referred to as "the consensus

25   article" from Chest magazine.  Are you familiar with

1   that?

2        A    I'm familiar with that article.  Yes.

3        Q    Okay.  And I -- what I don't have is the one

4   with --

5             DEPUTY CLERK:  612.

6             MS. EZELL:  612?  Okay.

7             I'm going to show you what has been previously

8   displayed to the jury as Exhibit 612.  And as we were

9   meeting --

10            DEPUTY CLERK:  I'm sorry -- 412.

11            MS. EZELL:  412, what has been previously

12  displayed to the jury as 412.  And that's my fault; I

13  should have had the properly marked one.

14  BY MS. EZELL:

15       Q    And when we were meeting this morning, did you

16  point out certain sections of this article that you

17  thought would aid the jury in understanding this

18  discussion in the medical community about this issue?

19       A    I think so.

20       Q    All right, sir.

21       A    Yes.

22       Q    Then with your help, I will go to those

23  sections which you wanted to point to.

24            Can we zoom in.  This is small even for me now,

25  this first -- I've got my little red mark over here.  The

1   first section that you wanted me to point out was this

2   section -- it's a little bit shaded on my copy -- that

3   says, "Workers who have significant asbestos exposure

4   (but who do not have asbestosis) are at an increased risk

5   of bronchogenic carcinoma."

6          And just so we're clear, that is in the table

7   of things that this group reached a consensus about?

8          A    Correct.

9          Q    Okay.  Why is that important for this jury to

10  understand?

11         A    Well, I think for the jury it's important,

12  again, to think about the difference between "risk" and

13  "causation."  And this, I thought, addressed that issue.

14         Q    Okay.

15         A    When we're talking about large populations,

16  let's say we take 1,000 individuals who are exposed

17  occupationally to asbestos in a substantial degree.  That

18  population, I believe, has an elevated risk of developing

19  lung cancer.  So that's a risk statement toward a general

20  population.

21         If a person -- if you investigated this

22  population, you'd find some of them have asbestosis.

23  Most of them did not.  What's been shown in medical

24  science primarily, the vast majority of the studies that

25  have been done in this regard, is that those who had

KINSER v. CBS CORP., Case No. 94-2282

1    developed lung cancer had underlying asbestosis.

2            So the answer to the question that I would

3    agree to as well, "If you look at an occupationally

4    exposed population, is there an increased risk?", the

5    answer is "yes."

6            But that in no way approaches the individual

7    patient and said, "If he does develop cancer, that's the

8    cause."

9        Q    All right, sir.

10           Now, the next thing that you and I discussed --

11   can I have it a little bit broader?  Well, no, actually,

12   I can get it this way -- is this sentence which I'm now

13   highlighting.

14           Okay.  So, "In the second ATS statement, the

15   authors report that the presence of plaques" -- I assume

16   that's pleural plaques? --

17       A    Correct.

18       Q    -- "is associated with a greater risk of lung

19   cancer compared to individuals with similar exposure

20   without such radiographic findings.  In this report,

21   there is strong disagreement with that conclusion."

22           Now, tell me what that means compared to the

23   conversation that we're having?

24       A    So this directly addresses the issue that you

25   and the jury are wrestling with right now.  Yes, there's

KINSER v. CBS CORP., Case No. 94-2282

1   an increased risk.

2          But the tension or the debate that you referred

3   to earlier was in part based on the American Thoracic

4   Society's statement that that group felt that if someone

5   had plaques, like Mr. Kinser, and developed lung cancer,

6   that it was related to the asbestos.

7          This group -- and I believe the majority of

8   medical science -- strongly disagree with that

9   conclusion.

10     Q    Okay.  And then the final thing -- and this was

11  in the statements that they did not agree on; they did

12  not reach consensus on -- was this selection right here.

13         And if you want to read that and then explain

14  how that bears on our conversation, or our debate.

15     A    Yes.  So the statement is, "Workers who smoke

16  cigarettes and have significant asbestos exposure

17  (without asbestosis) have at least double the risk of

18  bronchogenic carcinoma compared to nonexposed smokers."

19         The reason that the language is as such is

20  doubling the risk is what's felt statistically within

21  medical publications to be the benchmark that needs to be

22  met in order to make that causation leap.  So we all

23  admit:  There's risk.  But in order to make the causation

24  leap in an individual patient, you have to have at least

25  double the risk in the population that you're looking at.

KINSER v. CBS CORP., Case No. 94-2282

1          And therein lies the, lies the debate.  In the

2     majority of publications with pleural plaques, we don't

3     meet the doubling of the risk.  There are a few that do.

4     And when you look at those studies, you'll find many

5     flaws.  The diagnosis is based, for example, on the

6     single x-ray, as opposed to what we have in this case.

7     The addition of pulmonary functions, physical findings by

8     multiple examiners, and radiographic findings, which a CT

9     scan is much more sensitive than a chest x-ray, increase

10    the accuracy of our conclusion here that there is not

11    asbestosis present.

12         Q    All right, sir.  Now, let me ask you my

13    official questions.  Do you, to a reasonable degree of

14    medical and pulmonary certainty, have an opinion as to

15    whether or not Mr. Kinser had asbestosis?

16         A    Yes.  I believe he clearly did not -- does not.

17         Q    All right, sir.  And do you believe, to a

18    reasonable degree of medical and pulmonary certainty,

19    have an opinion as to whether or not Mr. Kinser's lung

20    cancer was causally connected to his asbestos exposure?

21         A    I believe that it was not.

22              MS. EZELL:  All right, sir.

23              I have no further questions, Your Honor.

24              THE COURT:  Cross-examination.

25

KINSER v. CBS CORP., Case No. 94-2282

1              CROSS-EXAMINATION BY MR. McCOY:

2       Q    Doctor, you testify for defense counsel in most

3  cases, right?

4       A    I have.  Yes.

5       Q    Okay.  And since the 1991 through '92 period,

6  approximately, you've been hired by the lawyers for the

7  companies to serve as an expert; is that right?

8       A    I've worked for lawyers representing defense

9  firms in those 20-some years.  Yes.

10      Q    Okay.  And, and if you represented plaintiffs

11  in that time period, you were, you were working for the

12  companies, right?

13      A    I'm not sure what you mean.  I --

14      Q    Okay.

15      A    -- I've rendered opinions that were favorable

16  to plaintiffs; but I believe I was asked to be there, in

17  most cases, to talk about the history of the development

18  of knowledge on the part of defense attorneys.

19      Q    Okay.  Working for the defense attorneys in

20  those cases, right?

21      A    Well, I was there at their request.  Yes.

22      Q    Okay.  Your annual compensation -- you have two

23  sources, right?

24      A    Currently, I just have two.  Yes.

25      Q    Yeah.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              One is from the VA hospital practice, right?
 2      A      Correct.
 3      Q      And the other one is from the lawsuit work,
 4  right?
 5      A      From litigation, yes.
 6      Q      And your annual compensation for lawsuit work
 7  in the year 2013 was how much?
 8      A      In 2013, probably around $400,000.
 9      Q      Okay.  And in 2012, it was about how much?
10      A      I think in a similar range.  I think over the
11  past five years, it's probably been on average about
12  $350,000, which is also what I make from the VA.
13      Q      So you work for the VA, what, 40 hours or more
14  a week?
15      A      Oh, it fluctuates.  My so-called tour of duty
16  is listed at 40.  Yes.
17      Q      Okay.  And on the lawsuit work, it's about 15
18  to 20 hours a week; is that right?
19      A      There's no fixed amount, but I think that's
20  probably a reasonable average.  Yes.
21      Q      So about double per hour for the lawsuit work,
22  compared with what the VA pays you, right?
23      A      Oh, definitely.  Yes.
24      Q      All right.  And your compensation rate for the
25  legal work is $450 an hour, right?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A    Currently, it is.  Yes.

 2        Q    Have you testified for Westinghouse, the

 3   Westinghouse lawyers, before?

 4        A    Yes, I have.

 5        Q    How many times?

 6        A    I don't know.  They both seemed to have been

 7   with you, I think, so I think twice; but I'm not sure in

 8   court.  Probably several depositions.  I don't know the,

 9   the number.

10        Q    Do you remember the case of, involving

11   Mr. Thompson?

12        A    No, I don't.  Sorry.  Where was, where was

13   that?

14        Q    Well, I just have your deposition, which was

15   taken in Florida in that case.

16        A    That's where almost all my depositions have

17   been taken.  What year was that?

18        Q    Okay.  I'll show you pages.  Page 5 of the

19   testimony, see if this refreshes your recollection.

20        A    Let me just see here.

21             Okay.  What's the question?  I'm sorry.

22        Q    Does that refresh your recollection, then, that

23   you were working for Westinghouse in this case of Mr.

24   Thompson?

25        A    I -- no, not really.  I mean, I, I knew that I
```

KINSER v. CBS CORP., Case No. 94-2282

1  worked for Westinghouse before.  I guess, yeah, I was

2  working for Westinghouse and others in this specific case

3  last year.  Yes.

4       Q    Right.

5            And that's not a case of my law firm, --

6       A    No.

7       Q    -- right?

8       A    No.

9       Q    Okay.

10      A    I thought your earlier question had to do with

11  trial testimony.  I'm sorry.

12      Q    Oh, I'm sorry if you misunderstood that.  I

13  meant to talk about all testimony.

14      A    Okay.  So I mentioned several depositions.

15  Those characteristically did not involve you.

16      Q    Okay.  Did Westinghouse, or the Westinghouse

17  lawyers, provide you files from the industrial hygiene or

18  medical department of Westinghouse?

19      A    No.

20      Q    Okay.  So you're not considering those

21  documents about the exposure findings of the Westinghouse

22  industrial hygiene department in your opinions today; is

23  that right?

24      A    Correct.  The five areas that I was asked to

25  address didn't involve corporate documents.

1    Q    Westinghouse didn't give you anything from its

2  own files, right?

3    A    No.  The issues about medical conditions, of

4  course, they gave me those documents, but nothing from

5  their file because I wasn't asked to investigate that, or

6  address those issues.

7    Q    All right.  You would agree that dust

8  suppression is the key part of prevention in the

9  occupational workplace, right?

10    A    In terms of pneumoconiosis or asbestos, yes, it

11  is.

12    Q    And you also -- you're not an expert on OSHA;

13  is that right?

14    A    No, other than what I spoke of.  I guess I'm

15  clinically knowledgeable about some of the regulations;

16  but I'm not an OSHA expert, no.

17    Q    And you, you don't have any information about

18  what OSHA inspectors did at Zion; is that right?

19    A    No.  I do not.

20    Q    I'm going to hand you a copy of a document.  Is

21  that the report that you prepared in this case,

22  Dr. Scan-- Dr. Howard?

23    A    Yes.

24    Q    Okay.  And that's dated what?

25    A    Well, in this case, I believe this was the

KINSER v. CBS CORP., Case No. 94-2282

1  report that I generated to summarize my state-of-the-art

2  opinions, and it's dated January 5th of 2012.  I don't

3  think this was specifically aimed at this case.  It's

4  pertinent to this case; but I don't believe this was

5  generated, if I recall correctly, specifically for this

6  case.

7      Q    Did you generate a sep-- another report that

8  talked about Dr. Scanlon's findings in this case?

9      A    No.  I just recently reviewed Dr. Scanlon's

10  finding.

11      Q    Okay.  So you have not prepared any written

12  report on Dr. Scanlon's -- your evaluation of Dr.

13  Scanlon's findings or Mr. Kinser; is that right?

14      A    Correct.  I, I just generally agree with most

15  of Dr. Scanlon's findings, but I didn't prepare an

16  additional report regarding them.

17      Q    Well, I'm sorry.  It does put me at a little

18  disadvantage that I didn't know you were going to come in

19  here and talk about that today.

20          MS. EZELL:  Objection, Your Honor.  Can we have

21  a question?

22          THE COURT:  Right.  Ignore the remarks of

23  counsel.

24          MR. McCOY:  All right.  I'll proceed anyway.

25

KINSER v. CBS CORP., Case No. 94-2282

1   BY MR. McCOY:

2       Q    You did not talk to Dr. Scanlon in this case;

3   is that right?

4       A    No.  I did not.

5       Q    Okay.  You and he practice, both, in Florida.

6   I assume you -- do you know him or not?

7       A    No.  I don't know Dr. Scanlon.  I know

8   Dr. Palmer, who did his operation; but I don't know Dr.

9   Scanlon.

10      Q    You know Dr. Palmer?

11      A    Yes, I do.

12      Q    Okay.  Did you talk to Dr. Palmer at all about

13  Mr. Kinser's operation?

14      A    No.

15      Q    Okay.  This is Exhibit 624.  This is by

16  agreement, medical records.

17           I assume, then, you saw this operative summary

18  that Dr. Palmer prepared; that's how you know he was

19  involved, right?

20      A    Correct.

21      Q    And I assume you believe Dr. Palmer is a

22  qualified physician, right?

23      A    He's a qualified thoracic surgeon.

24      Q    Okay.  And he reported that, in the operative

25  report, that, of Mr. Kinser, "The thorax was quite

KINSER v. CBS CORP., Case No. 94-2282

1    noncompliant because of asbestosis and benign fibrous

2    plaquing."

3             So I assume you disagree with that finding of

4    asbestosis by Dr. Palmer; is that right?

5        A    Well, as I've gone through with the jury, I

6    believe the diagnosis, or absence of diagnosis, is based

7    on a variety of tools that Dr. Palmer doesn't typically

8    utilize.

9        Q    Do you --

10       A    I disagree with being able to accurately make a

11   diagnosis of asbestosis based on looking at the outside

12   of the lung, so I would disagree that that is accurate.

13       Q    And did you actually, yourself, look at any of

14   the tissue of Mr. Kinser?

15       A    No.  I looked at the clinical measurements that

16   we talked about earlier that most people believe are the

17   basis for the diagnosis of asbestosis:  pulmonary

18   functions, chest x-ray, CAT scan, physical findings,

19   exercise tests.

20            I'm not a pathologist, and I didn't look at the

21   pathology in this case.

22       Q    Did you actually look at any of the x-ray or CT

23   scans, or try to read those yourself, or did you just

24   look at the reports that others generated?

25       A    No.  I looked at the reports that others

KINSER v. CBS CORP., Case No. 94-2282

1    generated.

2         Q    Okay.  Did you see the report that said he had

3    "bilateral interstitial" -- or "scarring at the lung

4    bases"?

5         A    The only report that I saw referencing that

6    were linear changes that were noted by the radiologist.

7    What I specifically noted in the CAT scan was that they

8    noted there was absolutely no evidence of interstitial

9    fibrosis.  So linear scarring is not asbestosis.

10         Q    It's at the lung bases, right; that's usually

11    where you find asbestosis most commonly, right?

12         A    Well, lung -- asbestosis is a diffuse

13    disease --

14         Q    Right.

15         A    -- involving the entire lung.  You do

16    oftentimes see a predominance at the bases.

17         Q    Okay.  That's --

18         A    Atelectasis, however, is the absence of full

19    expansion of the lung, which you typically will see in a

20    linear, or line fashion, at the base.  So it's totally

21    different than asbestosis.

22         Q    Okay.  So there are findings, though, of linear

23    scarring at the lung bases; you, you're not disputing

24    those, right?

25         A    No.  I am.  I think, if I recall specifically,

KINSER v. CBS CORP., Case No. 94-2282

1    those were based on an x-ray.  The CAT scan is much more

2    sensitive to the, the detection of diffuse interstitial

3    fibrosis, so I believe that those did not reveal

4    significant scarring either way.

5        Q    Exhibit 48, medical records.

6             This was a CT of the chest.  What's that?

7        A    CAT scan.

8        Q    Okay.  I thought you said that the findings,

9    you thought, were based on an x-ray, but --

10       A    I think -- yeah.

11       Q    They're really based on a, on a CAT scan now,

12   right?

13       A    Well, what I think I saw was about five CAT

14   scans in his case, and I think the majority -- in fact,

15   all but this one -- did not report any atelectasis or

16   linear scarring.  So, and even if they -- even if you put

17   significance on this, linear scarring, or subsegmental

18   atelectasis, again, is totally different than asbestosis.

19   It's more scarring in a linear line-like area, --

20       Q    Regardless --

21       A    -- which can come and go.

22       Q    Regardless of how you might interpret these, or

23   other physicians might interpret these, this still is

24   based on a CAT scan, right?

25       A    This line is from a CAT scan.  Yes.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    And you said that's the best way to see things,

2    right?  This type of stuff?

3    A    The CAT scan is the, one of the more sensitive

4    ways of looking for diffuse interstitial fibrosis, which

5    this and the other CAT scans that he had did not show.

6    Q    Well, this one showed scarring at the bases,

7    right?

8    A    Right.

9    Q    All right.  Let's move on here.

10        So is it accurate to say that as far as the

11   level of exposure at which asbestosis is, will usually

12   occur, you don't have any opinion as to what would be the

13   lowest level; you don't have an opinion on that, right?

14   A    Are you talking about cumulative dust level

15   exposure?

16   Q    I'm talking about lowest level of exposure

17   where there would be no asbestos disease; you don't have

18   any opinions on that, right?

19   A    Well, I have many opinions on that.  Yes.

20   Q    Okay.  I --

21   A    If you're asking me:  What is --

22   Q    No.

23        THE COURT:  Don't volunteer, Doctor.

24        THE WITNESS:  Thank you.

25        THE COURT:  Just answer the question.

KINSER v. CBS CORP., Case No. 94-2282

```
 1  BY MR. McCOY:
 2       Q    The threshold level, that's what I was asking
 3  you about, right?
 4       A    Okay.  Yeah, that's a little different.  The
 5  threshold level that I've indicated I don't know exactly
 6  what it is is for mesothelioma, which is not relevant to
 7  this case.
 8       Q    You were not a participant in the -- or let me
 9  put it this way.  I'm assuming you're a member of the
10  American College of Chest Physicians, right?
11       A    No.  I have been.  I'm not now.  Because of my
12  VA involvement, I get the benefits for free.
13       Q    Okay.  When you say that, you -- you were a
14  member in the past?
15       A    Yes, throughout my private practice --
16       Q    What --
17       A    -- years.
18       Q    Right.  When was the last time you were a
19  member of it?
20       A    So that would have been about 15 years ago.
21       Q    Okay.  And --
22       A    I still get their monthly journal through the
23  VA.
24       Q    The publication that we were, we've talked
25  about before -- I won't bring it out again -- the
```

KINSER v. CBS CORP., Case No. 94-2282

1   publication by Dr. Banks in the official magazine of the

2   American College of Chest Physicians, that's the one that

3   you were talking about earlier, right?

4          A    Correct.  I believe, yeah.  If that's the

5   Delphi study, yes.

6          Q    That's the consensus study, right?

7          A    Well, that's what it's labeled.

8          Q    Okay.

9          A    I'd like --

10         Q    Doctor, Doctor, Doctor, please.  Was that

11  the --

12              MS. EZELL:  Your Honor, he should be permitted

13  to finish.

14              THE COURT:  Excuse me.

15              MS. EZELL:  I'm sorry; that was louder than

16  usual.

17              THE COURT:  Permit the witness to finish the

18  answer.

19              And you wait until the lawyer finishes the

20  question before you go.

21              Now, is there a question pending before the

22  witness?  Read the question to the witness.

23              COURT REPORTER:  I don't think there is.  I

24  have the question --

25              THE COURT:  Very well.  There's the queen of

KINSER v. CBS CORP., Case No. 94-2282

1    the record.

2              Ask another question, Mr. McCoy.

3              MR. McCOY:  Okay.

4    BY MR. McCOY:

5        Q    You were not one of the persons that were

6    surveyed to be a part of that consensus; is that right?

7        A    No.  I was not.  Correct.

8        Q    All right.  But you don't agree with the

9    consensus on whether asbestosis is needed; is that right?

10       A    Well, I think we went through very pointedly

11   where I agreed and disagreed.  I agreed with many of the

12   things.  I think the area that I also agreed with was

13   that there was strong opposition to the belief that

14   plaques represented a significant amount of exposure to

15   cause lung cancer, which is what that -- she had me read

16   that statement.  I totally agree with that, so I can't

17   recall any areas that I disagreed.

18             I think what I agreed to, also, was that there

19   was ongoing debate or discussion about the areas where

20   there was a lack of agreement.

21       Q    Okay.  All right.  Is it, is it your statement

22   that you do agree with the consensus that you don't have

23   to have asbestosis to get lung cancer from asbestos?

24       A    What, what I specifically agreed with was that

25   a population exposed to, occupationally, to asbestos had

KINSER v. CBS CORP., Case No. 94-2282

1    an increased risk of developing lung cancer.

2            What I specifically agreed with was the strong

3    disagreement with the allegation that's pertinent to this

4    case, that if you had pleural plaques that you, you

5    were -- and you got lung cancer, that it was related.

6            So I agree with both of those statements by

7    that email survey.

8        Q    The presence of pleural plaques means that

9    someone's had asbestos exposure, right?  Are you

10   questioning that?

11       A    No.  In this case, I think it means that.

12   Pleural plaques come from other causes, so I wouldn't

13   agree with that in general.  But in this case, I believe

14   it's reflective of occupational exposure to asbestos.

15       Q    Would you agree that Mr. Kinser would have had

16   a significant occupational exposure to asbestos, based on

17   the way those pleural plaques were reported in his case?

18       A    Well, it depends on how you define

19   "significant."  He had enough exposure to cause pleural

20   plaques, which can occur with very trivial occupational

21   exposure.  He didn't have enough exposure to cause

22   asbestosis.

23       Q    According -- you're familiar with the OSHA

24   regulations, at least some of those, right?

25       A    Yes.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              (Brief pause in proceedings;

 2              counsel conferring.)

 3         MS. EZELL:  Your Honor, I object to this

 4   document.  It post-dates our incident.  It's statistics

 5   post-dating the incident, from 1986.

 6              THE COURT:  I don't know what the document is.

 7              MR. McCOY:  Should I put --

 8              THE COURT:  I don't know -- what is it?

 9              MR. McCOY:  This is the doc--

10              THE COURT:  I haven't heard, I don't think.

11              MR. McCOY:  These are regulations of the Occ--

12   OSHA, Judge, OSHA regulations.

13              THE COURT:  All right.  And you're showing them

14   to the witness and asking him if he is familiar with

15   these?

16              MR. McCOY:  Yes.

17              THE COURT:  You may proceed.

18              MR. McCOY:  Okay.

19              THE COURT:  Does it have a number that we can

20   identify it for the record?

21              MR. McCOY:  This is Exhibit 675.

22              (Brief pause in proceedings.)

23              THE WITNESS:  So this is from the Federal

24   Register, 1986, and I have read this document.

25              MR. McCOY:  Okay.  Thank you.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1            Judge, I'll ask to publish this but not go back
 2    to the jury then.
 3            THE COURT:  Well, you can show it to the
 4    witness on the electronic equipment, certainly.
 5            MR. McCOY:  I'd like to publish it to our jury
 6    also.
 7            THE COURT:  Well, I want to hear if he knows
 8    about it and how it's related before we do that.
 9    BY MR. McCOY:
10        Q    Does, does the OSHA publish statistical
11    information concerning the background to support the
12    regulations?
13        A    Oftentimes, they do.  OSHA, of course, is not a
14    clinical entity.  It's an administrative entity.  So
15    that's not -- that type of publication is not what I
16    typically base my opinions on, medically.  But, yes, they
17    do.
18        Q    OSHA has statistical data that can be relied
19    upon by persons in the field, right?
20        A    Well, sometimes.  Again, clinicians typically
21    look to the medical literature to develop their opinions.
22    And, oftentimes, OSHA is based on more
23    administrative-type data, so -- but sometimes that data
24    is valuable.
25        Q    All right.  I'm going to show you this data
```

KINSER v. CBS CORP., Case No. 94-2282

1   that OSHA's summarized on page 22, 625 of this --

2           THE COURT:  He can read it on his screen, can't

3   he?

4           MR. McCOY:  I can put it up there.

5           THE COURT:  And then I can see it, too.

6           MR. McCOY:  Yes, good idea.

7           THE COURT:  But it's not displayed to the jury

8   yet.

9           MR. McCOY:  All right.  Technology amazes me

10  still.

11           (Brief pause in proceedings.)

12  BY MR. McCOY:

13      Q    All right.  So the part that I've highlighted

14  here, Dr. Howard, is -- is this statistical data by OSHA

15  something that someone in your field then could rely

16  upon?

17      A    No.  I think one would look to the clinical

18  data to try to establish that causal relationship.  This

19  might be a risk statement, certainly, if we go back to

20  risk versus causation.

21           But to imply, if that's what you're doing, that

22  80 percent of lung cancers are causally related to

23  asbestos, that clearly conflicts with other federal

24  publications and medical literature.

25      Q    All right.  So you don't agree with that

KINSER v. CBS CORP., Case No. 94-2282

```
 1   statement?
 2        A    Well, I guess I would have to re-read it and
 3   the reference.  But I don't agree that 80 percent of lung
 4   cancer is caused by asbestos, if that's the implication.
 5        Q    And that's what was reported in the Federal
 6   Register?
 7        A    Well, it doesn't say "cause," and that's where
 8   we're unsure.  It says -- I forgot the language, but
 9   that's where if it's risk-related, then maybe we would
10   agree; but it's certainly not true that it causes
11   80 percent of lung cancers.  So, I mean, it's repeatedly
12   been shown that over 90 -- probably 95 percent of lung
13   cancers in men are caused by cigarette smoking.
14        Q    Right.
15        A    And the vast majority of patients that are seen
16   with lung cancer have no occupational asbestos exposure
17   at all.
18        Q    The OSHA statement says "contributes to,"
19   right?
20        A    So, again, if --
21        Q    Is that what it says; it says "contributes"?
22        A    I believe so.  Yes.
23        Q    Okay.
24        A    I'm not sure exactly what that means.  I
25   totally disagree that it would cause 80 percent of lung
```

KINSER v. CBS CORP., Case No. 94-2282

1    cancer.  Correct.

2         Q    All right.  And, and the actual causation

3    process of lung cancer, that's a series of genetic

4    mutations, right?

5         A    In an individual case, correct.

6         Q    Right.

7              Some of the mutations might be caused by

8    asbestos in an asbestos-exposed person; some of them

9    might be caused by smoking.  Is that right?

10        A    Right.  There are a variety of contributing

11   factors -- genetics, other dietary things -- but in terms

12   of an individual case, like we're dealing with here,

13   what's the way that we try to establish what the cause of

14   that cancer was?  It's not based on the large number like

15   that.

16        Q    You have to evaluate and consider both

17   exposures to determine causation; is that correct?

18        A    You have to examine everything in a given

19   patient.  Correct.

20             MR. McCOY:  That's all my questions.  Thank

21   you, Doctor.

22             THE WITNESS:  Okay.

23             THE COURT:  Redirect.

24             MS. EZELL:  Judge, may we just have a -- I just

25   hit my knee.  I'm sorry.  Just give me one second.

KINSER v. CBS CORP., Case No. 94-2282

1              REDIRECT EXAMINATION BY MS. EZELL:

2      Q    Did you need the Westinghouse files in order to

3  render your opinions in this case?

4      A    No.

5      Q    Did you ask for any documents from any of the

6  lawyers for Westinghouse or CBS that you did not receive?

7      A    No.  I did not.

8      Q    You were talking about Dr. Palmer, who you know

9  personally?

10     A    Yes.

11     Q    Do you have an understanding, as you sit there

12  right now, as to what Dr. Scanlon's opinion or statement

13  was with regard to Dr. Palmer's notation about

14  asbestosis?

15     A    Well, thoracic surgeons are physicians that

16  have spent the vast majority of their training focused on

17  how to do a procedure, how to do an operation.

18         Pulmonologists are people that look at the

19  diagnostic tools we've been talking about here today and

20  try to diagnose a condition.

21         So in all respect to Dr. Palmer, who's very

22  similar to many thoracic surgeons that I know, they don't

23  typically diagnose asbestosis.  They don't look at CAT

24  scans and pulmonary functions and listen to lungs like a

25  pulmonologist does.  They're not trained in that area.

KINSER v. CBS CORP., Case No. 94-2282

1   So in all due respect to him, I think Dr. Scanlon and I

2   look at those things that we do as being a, a valuable

3   way of finding out if asbestosis actually exists or not.

4       Q    And you mentioned that you had a different set

5   of tools that you can use in order to evaluate or to make

6   these types of diagnoses than a doctor like Dr. Palmer

7   would have.  What are those?

8       A    So, the clinical exam, not that Dr. Palmer

9   doesn't do a clinical exam, but listening to the lung.

10  We listen for certain sounds that we've been trained to

11  hear.

12          More importantly, things like pulmonary

13  functions.  A pulmonologist interprets pulmonary

14  functions, not a thoracic surgeon or a pathologist.  So a

15  pathologist is trying to look at things under a

16  microscope.  But if you're asking someone to accurately

17  diagnose asbestosis, a pulmonologist is the one who's

18  trained in those tools:  CAT scan, pulmonary functions,

19  physical exam, exercise test.

20      Q    All right, sir.  And you were talking about the

21  Federal Register document from 1986 with Mr. McCoy just a

22  moment ago.  Do you remember that?

23      A    Yes.

24      Q    And you were talking about the fact that it

25  indicated language about "contributing."  Were you -- and

KINSER v. CBS CORP., Case No. 94-2282

1   you were attempting to draw a distinction between

2   contributing to the risk and contributing to the

3   cause, --

4        A    Yes.

5        Q    -- correct?

6        A    Correct.

7        Q    Can you -- I would like to give you an

8   opportunity to finish your explanation as it relates to

9   those two different types of contribution that asbestos

10  exposure can make.

11       A    Yes.  And maybe the best would be through an

12  example.  I remember early on in my training when I was

13  trying to grasp these, these teachings, a professor said

14  to me, "Okay.  Is it true that young people are at risk

15  of getting the measles?"  And the answer is, obviously,

16  yes.

17            "Well, is it therefore true that measles are

18  caused by being young?"  And, obviously, the answer is

19  no.

20            So they're two totally different concepts; and

21  oftentimes, publications or government statements will

22  look at risk statements, but what we are interested in

23  here today -- or me in an individual patient -- it's:

24  What is the cause of this problem in this particular

25  patient?  It's not 79 percent probable.  It's either it

KINSER v. CBS CORP., Case No. 94-2282

1  is, or it isn't.  And the reason -- the reasons we base

2  our opinions have to do with all of those tools and

3  whether or not the exposure has been enough to cause

4  scarring within the lung called asbestosis.

5      Q    And you talked to Mr. McCoy about thresholds.

6      A    Yes.

7      Q    And so the threshold for determining whether or

8  not Mr. Kinser's lung cancer was caused by any asbestos

9  exposure he may have had in his life at all is what?  The

10 presence of what?

11     A    The marker that we in clinical medicine look to

12 to accurately answer the question of causation is

13 asbestosis.

14         If you believe that every exposure contributes

15 to and, therefore, causes a cancer, then it's very simple

16 for you.  Every lung cancer that occurs in this country

17 is contributed to by asbestos.  Or 80 percent -- whatever

18 the number is.

19         But that's clearly not how most medical doctors

20 look at this.  The test that we accurately distinguish as

21 being enough exposure to causally create that link is the

22 presence of asbestosis, either clinically or

23 pathologically.  But the -- you know, the diagnosis has

24 to be there.

25     Q    Okay.  And, and so in Mr. Kinser's case, is

1   there clinical asbestosis?

2        A    No.  We have a good functional state.  We have

3   repeatedly clear breath sounds, none of those crackly

4   sounds that we look for.  We have no digital clubbing.

5   These are physical findings that go along with the

6   diagnosis.  We have normal pulmonary functions.  And we

7   have repeated CAT scans, despite one that shows linear

8   changes, that show no diffuse interstitial fibrosis.

9        I would never base the diagnosis, or rule out

10  the diagnosis, based on any one of those.  But all

11  together, they, I believe, provide credible evidence that

12  there is not asbestosis here.

13       Q    In Mr. Kinser's case, is there any pathological

14  proof of asbestosis?

15       A    No, there isn't.  And we do get a clue from the

16  pathologist who dissected and looked at the micro-- under

17  the microscope and the indications are that there wasn't

18  the presence of asbestosis.

19       But I, I believe that other clinical, other

20  clinical tools are even more compelling in this case.

21            MS. EZELL:  All right.  I have nothing further.

22            THE COURT:  All right.  Anything else of the

23  witness, Mr. McCoy?

24            MR. McCOY:  I have nothing further to ask.

25            THE COURT:  Thank you, Doctor.  You may step

KINSER v. CBS CORP., Case No. 94-2282

1    down.

2              THE WITNESS:  Thank you, sir.

3                   (Witness Howard excused, 10:25 a.m.)

4

5              * * * * * * * * * *

6

7                   REPORTER'S CERTIFICATE

8

9         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

10   that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled matter.

12        Dated this 19th day of January, 2014.

13

14

15              s/Lisa Knight Cosimini
                Lisa Knight Cosimini, RMR-CRR
16              Illinois License # 084-002998

17

18

19

20

21

22

23

24

25