```
                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF ILLINOIS


LARRY A. KINSER & DONNA M. KINSER,

                Plaintiffs,           Docket No. 94-2282

    vs.                               Urbana, Illinois
                                      January 21, 2014
                                      9:15 a.m.
CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

                Defendant.


                    JURY TRIAL -- Day 9
        (Testimony of Witnesses Ferriter, Ware & L. Kinser)

            BEFORE THE HONORABLE HAROLD A. BAKER
             SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

 For the Plaintiffs:     ROBERT G. McCOY, ESQUIRE
                         JAMES JOEY, ESQUIRE
                         Cascino Vaughan Law Offices, Ltd.
                         220 South Ashland Avenue
                         Chicago, Illinois 60607
                         312-944-0600


 For the Defendant:      SANDRA GIANNONE EZELL, ESQUIRE
                         Bowman and Brooke, LLP
                         901 East Byrd Street, Suite 1650
                         Richmond, Virginia 23219
                         804-649-8200


                         PAULA M. BURLISON, ESQUIRE
                         Bowman and Brooke, LLP
                         1441 Main Street, Suite 1200
                         Columbia, South Carolina 29201
                         803-726-7420


                         JACOB DANIEL SAWYER, ESQUIRE
                         Foley & Mansfield, PLLP
                         55 West Monroe, Suite 3430
                         Chicago, Illinois 60603
                         312-254-3800
```

KINSER v. CBS CORP., Case No. 94-2282

I N D E X

Page

WITNESS ON BEHALF OF THE PLAINTIFFS:

JOSEPH FERRITER

Direct Examination by Mr. McCoy ................    4

Cross-Examination by Ms. Ezell ................   22

Redirect Examination by Mr. McCoy .............   35

Recross-Examination by Ms. Ezell ..............   36


WITNESS ON BEHALF OF THE DEFENDANT:

DOUGLAS WARE

Direct Examination by Ms. Ezell ...............   40

Cross-Examination by Mr. McCoy ................  120

Redirect Examination by Ms. Ezell .............  197

Recross-Examination by Mr. McCoy ..............  223


WITNESS ON BEHALF OF THE PLAINTIFFS:

LARRY KINSER

Direct Examination by Mr. McCoy ...............  227

Cross-Examination by Ms. Ezell ................  229

```
 1              (In open court, 9:18 a.m.)

 2          THE COURT:  Same appearances.

 3          DEPUTY CLERK:  New appearance, Judge.

 4          THE COURT:  Oh.

 5          MR. McCOY:  James Joey is with me.

 6          THE COURT:  I assume, before we start -- I

 7    assume you've got a witness and we're ready to go.

 8          MR. McCOY:  Yes.

 9          THE COURT:  I'm down to Draft 2 of jury

10    instructions, which I will give you in a moment, with

11    nothing -- no radical change.  I put in a couple of new

12    words, which I think make them more understandable.  It's

13    what I'm striving for.

14              Anyhow -- and then you can look at it over the

15    lunch hour; and, hopefully, we'll be able to have the

16    conference on jury instructions this afternoon and

17    closing arguments tomorrow.  That's what we discussed

18    before.

19              Ready now for the jury?

20          MR. McCOY:  Yes.

21          MS. EZELL:  Yes, sir.

22          MR. McCOY:  I think we're all set now, Judge.

23          THE COURT:  Okay.  Bring the jury, George,

24    please.

25              (Brief pause in proceedings.)
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              (Jury present, 9:20 a.m.)
 2              THE COURT:  Good morning, jurors.  I hope
 3    you-all had a safe trip.  Obviously you're here in one
 4    piece.
 5              Okay.  Further evidence for the defense --
 6    excuse me, for the plaintiff.
 7              MR. McCOY:  Judge, Plaintiffs' witness is going
 8    to be Joseph Ferriter.
 9              JOSEPH FERRITER, sworn, 9:21 a.m.,
10              DIRECT EXAMINATION BY MR. McCOY:
11    Q    Mr. Ferriter, you may need to lean forward a
12    little bit so the jurors hear you good on the microphone.
13    A    Okay.
14    Q    Can you go ahead and introduce yourself to our
15    jurors by giving us your full name and spell your last
16    name for everybody?
17    A    My name is Joseph Ferriter, F-e-r-r-i-t-e-r.
18    Q    And where do you live now, Mr. Ferriter?
19    A    16354 Paxton, Tinley Park, Illinois, 60477.
20    Q    And you're married?
21    A    Yes, sir.
22    Q    Okay.  You're currently retired?
23    A    Yes, sir.
24    Q    Tell us what you did before retirement.
25    A    I was a pipefitter for 50 years.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q      And when did you begin working as a pipefitter?

2      A      I started my apprenticeship in 1953.  I started

3  the five-year apprenticeship.  I got my journeyman's card

4  in 1958.  I retired in 2002.

5      Q      And you were a member of a union?

6      A      I was a member of Local Union 597, out of

7  Chicago, Illinois.

8      Q      And geographical territory of the Local 597

9  included the Zion powerhouse, right?

10      A      That is correct.

11      Q      Okay.  And is it all right if persons from

12  other pipefitter workers -- pipefitter locals sometimes

13  work in the 597 territory?

14      A      Yes.  As long as the 597 pipefitters are

15  gainfully employed, we do allow other unions to send

16  pipefitters in our local to work.

17      Q      And that's what's called the "travel card

18  arrangement"?

19      A      Yes, sir.

20      Q      Okay.  Can you describe for us some of your

21  work experiences at industrial facilities of the, that

22  had the type of piping systems like you'd have at the

23  powerhouses?

24      A      I worked in refineries, steel mills, chemical

25  plants, hospitals, food, food processing plants, numerous

KINSER v. CBS CORP., Case No. 94-2282

1   factories -- just about every facet of pipefitting that

2   we have in the Chicago area.

3       Q    Did you work at powerhouses?

4       A    Yes, I did.

5       Q    Okay.  Were you ever a supervisor, Mr.

6   Ferriter?

7       A    I was a supervisor for probably about

8   95 percent of the time I was a pipefitter.  I was either

9   a general superintendent, superintendent, or general

10  foreman.

11      Q    Can you describe for us some of the larger jobs

12  that you supervised?

13      A    I was at Union Oil.  I was an area

14  superintendent there.  I had 250 pipefitters working for

15  me.

16           I was at Mobil Oil Refinery in Joliet,

17  Illinois.  I was the systems superintendent on the job.

18  We had 1200 pipefitters on that job.

19           I worked for Bechtel Corporation, quite a few

20  international corporations, and big jobs all over the

21  area.

22      Q    As part of your pipefitter work, did you have

23  safety responsibility over crews?

24      A    The safety aspect came from the contractor or

25  the owner, and we handed it down to the people.  It was

KINSER v. CBS CORP., Case No. 94-2282

1   given to me, and I was responsible for putting it out to

2   the personnel.

3        Q    Okay.  When you say that, is it like a chain of

4   command that you're talking about?

5        A    That is correct.  They would give us weekly --

6        Q    Who's the "they"?

7        A    -- safety meetings.

8        Q    Who's the "they"?  Before you use -- don't use

9   the pronoun, if you would.  Who's the "they"?

10       A    The general contractor or the owner would give

11  me the safety sheets.  I would be responsible for passing

12  them out to the foremen, general foremen.  We would have

13  toolbox safety meetings with their crews.  They were

14  responsible for that at least once a week.

15       Q    All right.  And what if the contractor in

16  charge of the job is not called a general contractor but

17  was just in charge of the job?

18       A    Would you rephrase that, Bob?

19       Q    Well, I just -- you mentioned

20  "general contractor."  What if there wasn't a contractor

21  called the "general contractor," but another contractor

22  was in charge of the job, directing the job?

23       A    That -- most of the safety meetings came from

24  the owner to the contractors.

25       Q    Okay.  What about the contractor in charge of

KINSER v. CBS CORP., Case No. 94-2282

1   the work?

2       A    They were usually called a general contractor,

3   and we were subcontractors under them.  Once in a while,

4   a pipefitter contractor would be the general contractor;

5   but most of the time, we were not.

6       Q    Okay.  So the contractor in charge of the

7   job -- called "general contractor" or whatever -- that's

8   where safety information would be passed down?

9       A    Yes.

10          MS. EZELL:  Objection, leading, Your Honor, and

11   misstates prior testimony of this witness.

12          THE COURT:  Well, if it, if it misstated it,

13   tell him.

14       A    Most of the time -- in fact, all of the time --

15   the safety meetings would come through the owner or the

16   general contractor and be handed down to the individual

17   contractors that were on the job.

18       Q    Okay.  And what's your experience at powerhouse

19   work?  Can you describe that for us more, in more detail?

20       A    I worked at Braidwood powerhouse for about

21   three years.  I worked at Dresden powerhouse for six

22   years.  I worked at NIPSCO powerhouses off and on through

23   my time.  I didn't work at too many fossil plants.

24       Q    And did you work in powerhouses and oil

25   refineries?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.  Powerhouses and oil refineries, steel

2   mills -- they all have their own powerhouses in them.

3      Q    Just for clarity here, you did not work at Zion

4   yourself, right?

5      A    No, sir.  I did not.

6      Q    That plant's closed down, right?

7      A    Yes, it is.

8      Q    Okay.  And did you work, though, on

9   powerhouses, nuclear powerhouses built by Westinghouse?

10     A    Yes, sir, I did.  I was at Braidwood.

11     Q    Which one?

12     A    Braidwood.

13     Q    Braidwood's located, roughly, where?

14     A    It's on the southwest side of Joliet.

15     Q    Dresden's located where?

16     A    Dresden is located right on the southwest side

17   of Joliet.  They're both probably about 40 miles from

18   downtown Chicago.

19     Q    Okay.  Those are both Commonwealth Edison

20   facilities, right?

21     A    Yes, sir.

22     Q    So, have you had to work on powerhouse projects

23   where Westinghouse engineers were involved with the

24   turbine systems?

25     A    Yes, I did.  I worked Braidwood Number 1 on a

KINSER v. CBS CORP., Case No. 94-2282

1    shutdown.  I worked nights on a Westinghouse turbine.

2         Q    Can you describe for us what role, if any, the

3    Westinghouse representatives have had in directing the,

4    or controlling the work of the pipefitters at, at

5    Braidwood?

6         A    The --

7              MS. EZELL:  Objection, relevance as to Zion.

8              THE COURT:  Circumstantial evidence.

9    Overruled.

10        A    The Westinghouse representative would instruct

11   us what piping had to be removed, replaced, possibly

12   reinstalled or refabricated, whatever the job might be.

13   It all came from the Westinghouse representative.

14        Q    So based on your experiences at these other

15   powerhouses and industrial facilities, are you able to

16   testify about the customary practices that would be

17   followed in pipefitter work at Zion?

18        A    Yes, sir, because the turbine, or turbine

19   piping is the same, whether it's at Zion or Braidwood or

20   in a smaller powerhouse anyplace.  A turbine is a

21   turbine.

22             MS. EZELL:  Objection, Your Honor.  May I be

23   heard on this?  It's not circumstantial --

24             THE COURT:  No.  It's all right.  He can't --

25   the form of the question is bad.  He can't tell us what

KINSER v. CBS CORP., Case No. 94-2282

1  they did at Zion.  He can tell us what they did at the

2  other Westinghouse plants as circumstantial evidence that

3  they probably did the same thing other places.

4          And he could also tell us what custom and habit

5  is.  I didn't mean to say he could not.

6          MR. McCOY:  All right.

7  BY MR. McCOY:

8      Q    How were job site safety issues handled when

9  there was multiple trades on the same job site back in

10 the, the 1970s?

11     A    In the early '70s, if there was any safety

12 reports to come out, it came from the owner or the

13 general contractor and was handed down to the different

14 trades.

15     Q    And can you tell us what kind of safety

16 measures were taken to control dust from asbestos

17 insulation work back in the first half of the 1970s?

18     A    I don't know of any controls that were taken.

19     Q    When was the use of protective measures to

20 control asbestos insulation dust implemented in this type

21 of work at powerhouses and large industrial settings for

22 pipefitters?

23     A    I would say that would have to be the late

24 '80s.

25     Q    Back in the -- again, the 1970 period, was

KINSER v. CBS CORP., Case No. 94-2282

1   there any of these material safety sheets kept at the job

2   sites?

3       A    I think the first time I seen material safety

4   data sheets probably arose in the '80s.  I never seen

5   them before that.

6       Q    So are you familiar with the practices for

7   ordering materials for large industrial jobs in the late

8   1960s and early 1970s?

9       A    Most of the large industrial jobs like

10  refineries, powerhouses, and stuff like that, those

11  things are planned and engineered up to ten years ahead

12  of time; and a lot of materials are ordered, probably, at

13  least maybe a year -- sometimes two or three years --

14  before the projects even start.  So chances are, some of

15  the materials have been there for a couple years before

16  you even start.

17      Q    How do you know about these practices for

18  materials?

19      A    When I went to Union Oil, that was my job.  The

20  general foreman would come to me and ask me to order

21  certain materials for a certain unit they were in, and I

22  would have to contact the people in Texas where all the

23  materials were sold -- or I should say were stored -- and

24  make arrangements to have the materials shipped up to

25  Lemont, Illinois.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Have you had to supervise the installation of

2  a, of a completed piping system with all the insulation

3  put on it?

4    A    Most jobs, yes, sir.  I have to sign off on

5  them.

6    Q    What do you mean by "sign off"?

7    A    "Sign off" was saying that the job was done

8  properly, and it was ready for the owner to inspect.

9    Q    Did you, did you have to inspect the insulation

10  work yourself for the sign-offs?

11    A    Some jobs I did when the insulator was a

12  subcontractor of mine; but a lot of jobs, the

13  subcontractor -- the insulator was a subcontractor of the

14  general contractor, and that was not my responsibility.

15    Q    What's a change order?

16    A    You have to have a change order on any large

17  job in order to change a, well, possibly a direction of

18  the piping or the usage of the piping.  Any changes at

19  all to the piping system had to have a change order.

20    Q    Would changing the composition of the

21  insulation materials for an entire turbine system involve

22  a change order?

23    A    Yes, it would.

24    Q    How do you know that?

25    A    Well, you have specifications that you get when

1  you start the job; and if there's any changes to those

2  specifications, it has to come in a change order.

3      Q    Is that part of the sign-off process, to, to

4  determine if there's compliance with the specifications?

5      A    Yes, sir.

6      Q    How far in advance of the actual -- well,

7  you've covered that already.

8            So are you familiar, then, with the types of

9  materials that were used for the thermal, like the steam

10 and return line piping system in the powerhouses and

11 large industrial settings before 1975?

12     A    Yes.  Most of it was the black type, the very

13 powdery.

14     Q    How is it that you, you learned about these

15 materials?

16     A    Working on different jobs with different people

17 over the years and talking back and forth with pipe

18 coverers and different trades, you learn it over the

19 years.

20     Q    And what, if anything, did you learn about

21 this, this chalky material, the asbestos content of that?

22     A    Well, we, we know it goes airborne very easily

23 because it's a very powdery substance.  They have to saw

24 it with a saw, and it raises a lot of dust.  And it's --

25 you're very aware that it's in the area because it's

KINSER v. CBS CORP., Case No. 94-2282

1   dusty all around you when you're close to it.

2       Q    My question was, maybe, a little different.

3   My -- it was:  What did you learn about the asbestos

4   content of that type of insulation?

5       A    We learned that the asbestos fibers are what

6   holds that insulation together.  It was an integral part

7   of the insulation.

8       Q    Later on in your career, did you observe the

9   protective measures being applied to that same type of

10  material?

11      A    Yes.  It started in the late '80s.  They would

12  put up shelters where you had to have a signed paper that

13  you were schooled and trained in asbestos abatement in

14  order to enter that area.  If you didn't have any

15  credentials at all you could not go into that area until

16  that area was cleared.

17      Q    When did you work at the Braidwood nuclear

18  powerhouse?

19      A    I started at Braidwood in, I believe, 1982 the

20  first time.

21      Q    Did you do any other work at Braidwood?

22      A    I worked in the containment, doing a lot of the

23  integral piping in the containment.

24      Q    And did you do any outage work at Braidwood

25  later?

KINSER v. CBS CORP., Case No. 94-2282

1      A     I went back in, I believe it was around '87 or

2    '88 for an outage in Unit Number 1 on the turbine.

3      Q     And did you work any -- did you do any turbine

4    area work at Braidwood?

5      A     Yes, for that two weeks.  I was only there for

6    about two weeks.  I was on nights.  And we were tearing

7    out piping, crossover piping, and stuff underneath the

8    turbine.

9      Q     What work -- or what role did Westinghouse have

10   in terms of directing work on the outage at Braidwood?

11     A     A Westinghouse representative was directing us

12   on what piping had to be removed and what our duties were

13   and what we were supposed to take care of.

14     Q     What type of -- based on your experience and so

15   on at Braidwood, what, if any, asbestos insulation

16   materials were used at Braidwood?

17     A     I believe there was lots of it used in the

18   steam tunnels and in the containment.

19     Q     Okay.  If Braidwood wasn't built until 1982,

20   how -- that's ten years after OSHA in 1972 -- how would

21   that still be asbestos?

22           MS. EZELL:  Objection, foundation.

23           THE COURT:  Read me the question.  I don't know

24   if it's within his knowledge.

25           COURT REPORTER:  "If Braidwood wasn't built

KINSER v. CBS CORP., Case No. 94-2282

1    until 1982, how -- that's ten years after OSHA in 1972 --

2    how would that still be asbestos?"

3            THE COURT:  How did that what?

4            COURT REPORTER:  "How would that still be

5    asbestos?"

6            THE COURT:  Sustained to the form of the

7    question.

8            THE WITNESS:  I believe --

9            MS. EZELL:  Excuse me.

10           MR. McCOY:  The judge wants me to ask another

11   question.

12           THE WITNESS:  Excuse me.

13           THE COURT:  I want him to ask a different form

14   of question to you.

15           THE WITNESS:  Okay.  Sorry, sir.

16   BY MR. McCOY:

17       Q    Do you know why asbestos would still be used at

18   Braidwood as late as 1982?

19           MS. EZELL:  Objection, calls for speculation.

20   This witness is not qualified to answer that.

21           MR. McCOY:  I just asked him:  Does he know?

22           THE COURT:  Well, was it being used?

23           MR. McCOY:  He did say -- he did say it was.

24           MS. EZELL:  Objection.  Can we get the witness

25   to testify instead of Mr. McCoy about this, Your Honor?

KINSER v. CBS CORP., Case No. 94-2282

1    That's really my objection.

2         THE COURT:  Ask a question.

3         MR. McCOY:  Okay.  I'll ask it again.

4   BY MR. McCOY:

5        Q    Was asbestos used at Braidwood?

6        A    Yes.

7        Q    Okay.

8         THE COURT:  Now go ahead.

9        Q    Do you know why, ten years after OSHA, there

10   would still be asbestos used at Braidwood?

11       A    The Braidwood job probably went over about 12

12   or 14 years because it was shut down at one time for

13   three or four years.  A lot of the materials and stuff

14   were probably ordered before the ban on asbestos

15   insulation come out because they had a lot of stuff

16   stored in warehouses around the area.

17        MS. EZELL:  Objection, move to strike.  The

18   witness's answer uses the word "probably," indicating

19   that, as I suspected, this was purely speculative in

20   nature.

21        THE COURT:  Overruled.  Motion denied.

22   BY MR. McCOY:

23       Q    When the OSHA regulations came out, in about

24   the 1972 time period, did you -- were you familiar with

25   the practices about the use of asbestos materials after

KINSER v. CBS CORP., Case No. 94-2282

1  those regulations?

2      A    Yes.  I believe when that came out, they told

3  the asbestos companies that they could use their stock

4  up.  It took a long time for that stock to run out.

5      Q    When you say "a long time" --

6      A    We seen a lot of asbestos up into the '80s in a

7  lot of places.

8      Q    On the turbine outages, what -- why is it

9  necessary to make changes to the piping that's, that's

10  part of the turbine system, leading into it coming and

11  going into that high pressure turbine area?

12      A    The piping going to the turbines are very hot,

13  and they're constantly moving because of the thermal

14  expansion.  And it's very possible that the architect,

15  the engineer, Westinghouse, G.E. -- who's ever

16  responsible for the turbine -- might have found a

17  different way that they want to run the piping to ease

18  some of the stresses on the turbine itself.  That was

19  strictly up to the turbine people, how the piping was

20  designed.

21      Q    I'm going to go ahead and put this up, then, on

22  the screen.  It's another drawing, sketch of the Zion

23  turbine house.  No objection on this one.

24          So this -- can you see that okay, Mr. Ferriter,

25  on the screen?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    Yes.

2             THE COURT:  Does it have a number?

3             MR. McCOY:  This is Exhibit 682.  Thank you,

4    Judge.

5             THE COURT:  Thank you.

6    BY MR. McCOY:

7        Q    So this, then, shows the configuration of

8    piping coming into the high pressure system and the low

9    pressure.  This is what you're basically familiar with?

10       A    Yes, sir.

11       Q    Okay.  And the -- underneath the hood of the

12   high pressure, there's, there's a lot of piping systems,

13   right?

14       A    Yes, sir.

15       Q    Okay.  And then these pipes here come up from

16   the reactor area?

17       A    That's correct.

18       Q    Okay.  And there's usually just, like, one or

19   two pipes feeding this, right?

20       A    That's correct.

21       Q    And in terms of changing, like, this piping in

22   this area and so on, why would it be necessary to make

23   those changes to piping during an outage?

24       A    That would be up to the turbine manufacturer if

25   they wanted to make changes, and evidently they might
```

KINSER v. CBS CORP., Case No. 94-2282

1 have reason for stresses or expansion purposes.  I have

2 no idea.

3    Q    "Not on each job, but it might be different" is

4 what you're saying?

5    A    That is correct.

6    Q    What does "expansion" or "stresses" mean as far

7 as the need to -- or why is it necessary for you to

8 have -- if there are expansion and stresses, to change

9 the piping, to take it apart and rebuild it?

10    A    The turbine -- being a stationary, fixed

11 object, we connect to it; and the piping, when it heats

12 up, it will expand and contract as it -- as it heats up,

13 it expands.  As it cools off, it contracts.

14        And what they want to do is keep the

15 movement -- where you tie on to the, the turbine itself,

16 you want to keep that to a minimum so you don't put

17 stresses and throw out the couplings and all that stuff

18 on the turbine.  So you try to have the piping take the

19 stress on, on the downward side, away from the turbine,

20 is what they tried to do.

21    Q    And you've worked with my law firm on other

22 cases, right?

23    A    Yes, sir.

24    Q    And you're being compensated for your time?

25    A    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

1     Q     How much are you getting?

2     A     $50 an hour.

3     Q     One other thing.  Have you seen a video from

4  the -- we can take this off, I think.

5            Have you seen a video from the 1940s time

6  period about pipe insulation work that was for training

7  on ship work?

8     A     Yes, sir, I have.

9     Q     Okay.  And does that video accurately depict

10 the dust from pipe insulation, cutting and sawing?

11    A     No, sir.  It does not.

12    Q     Why not?

13    A     It's very vague because when they're cutting

14 that magnesia-type covering, that dust is all over.  It's

15 very, very pronounced.  It's like a snowstorm, almost, if

16 you're in the area.

17            MR. McCOY:  That's all the questions I have.

18 Thank you.

19            THE COURT:  Cross-examination, --

20            MS. EZELL:  Yes, sir.

21            THE COURT:  -- Ms. Ezell.

22            MS. EZELL:  Thank you.

23              CROSS-EXAMINATION BY MS. EZELL:

24    Q     Good morning, Mr. Ferriter.

25    A     Good morning.

KINSER v. CBS CORP., Case No. 94-2282

1     Q    I'm Sandra Giannone Ezell.  You and I have not

2  met before, correct?

3     A    No, ma'am.  I have never met you.

4     Q    All right.  If I could have the ELMO, I'm going

5  to display previously displayed demonstratives.

6          This morning you were shown Plaintiffs', what

7  was identified as Plaintiffs' Exhibit 682.  Do you recall

8  just discussing this with Mr. McCoy?

9     A    Yes, ma'am.

10    Q    Okay.  And were you -- did you and Mr. McCoy

11 talk about this as being the Zion powerhouse?

12    A    No.  This is a, this is a general, of almost

13 any turbine, sir -- ma'am.

14    Q    Okay.  And do you know why we've been talking

15 about, during this case, Defendant's Demonstrative 8, why

16 the piping got changed between your testimony and the

17 testimony of other witnesses from looking like this to

18 looking like this [displaying different exhibit]?

19    A    Well, first of all, on the other drawing that

20 you have there, ma'am -- if you would remove this for a

21 minute, please.

22    Q    Sure.

23    A    This pink line is actually back here because

24 this piping here shows the integral piping that's right

25 on top of the turbine.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  So you have -- did you draw either of

2    these?

3      A    No, ma'am.  I did not.

4      Q    And you have no idea why, on the 21st of

5    January, the, the new diagram for the Zion powerhouse

6    that we're hearing about for the first time involves

7    piping that looks like this instead of piping that looks

8    like this?

9      A    I believe the second one that you have in your

10   hand is more, more a real actual drawing than the one

11   before that.

12     Q    Okay.

13          MR. McCOY:  Which number are you referring to?

14          MS. EZELL:  682 and Demonstrative 8.

15     A    682, I believe, is a more -- design plan of

16   what the turbine piping looks like.

17     Q    And that's in spite of all the other witnesses

18   that we've had here talking about Demonstrative Number 8?

19   Whoever they may be, you don't know.

20     A    These, these drawings that we have are strictly

21   schematics.  Those are schematics, which -- you can make

22   a schematic look like almost anything and have it look

23   what you want it to look like.

24     Q    Yes, sir.

25          And this is what -- and this is what you

KINSER v. CBS CORP., Case No. 94-2282

1  brought us today that you wanted it to look like, right?

2      A    I didn't bring that, ma'am.

3      Q    Oh, I'm sorry.

4           Mr. McCoy brought that and put that up there

5  when you were testifying?

6      A    That is just another schematic, very similar to

7  the other one that you have in your hand.  It's just

8  drawn a little bit different.  That's all.

9      Q    All right.  Now, part of what you have to do

10 when you testify in court is you have to provide to the

11 other side a copy of your CV, a copy of your report, and

12 a copy of your testimony list, correct?

13     A    I imagine so, ma'am.

14     Q    And you've done that in this case, correct?

15     A    Yes.

16     Q    And I appreciate that I've received a copy --

17          THE COURT:  Keep your voice up, please, Ms.

18 Ezell.

19          MS. EZELL:  Yes, sir.

20 BY MS. EZELL:

21     Q    I've received a copy of your resume, and I've

22 taken a good look at that; and I see that prior to 1972,

23 you did not work at any Commonwealth Edison facilities,

24 correct?

25     A    That's correct, ma'am.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    And prior to 1972, you did not work at any

2  facilities where there were any Westinghouse turbines; is

3  that correct, sir?

4    A    Prior to 1972, yes, ma'am, I did.

5    Q    And prior to 1972 -- oh, I'm sorry.

6         And prior to -- I already asked you about

7  Commonwealth Edison.

8         The other thing that I noticed when I looked at

9  your testimony list is that you have testified -- is it

10  exclusively for Mr. McCoy?  Have you testified for other

11  plaintiffs' lawyers?

12    A    Yes, ma'am, I have.

13    Q    Okay.  So, but you have -- and about how many

14  times have you testified?

15    A    This is my second time, ma'am.

16    Q    In court?

17    A    Yes, ma'am.

18    Q    And in depositions, how many times have you

19  testified?

20    A    Approximately five or six times.

21    Q    But you have been designated -- you understand

22  what that term means?

23    A    Yes, ma'am.

24    Q    You have been designated in almost 900 cases,

25  haven't you, sir?

KINSER v. CBS CORP., Case No. 94-2282

1      A    I imagine so.  I know there's been a lot.  I

2  know that.

3      Q    All right.  And so by being designated, you

4  understand that that means you may be called on to

5  testify in all of those cases, correct, sir?

6      A    Yes, ma'am.

7      Q    All right, sir.

8            Now, do you know what happened in 1972 that I

9  would ask you about that?

10     A    I believe there came out a directive that

11  asbestos was to be -- stop using it.  But in the same

12  bulletin or memo, or whatever you want to call it, I

13  believe they said that they could take and use their

14  stock until it ran out.

15     Q    All right.  And by "they," you mean who?

16     A    I'm talking about the manufacturers of the

17  asbestos products.

18     Q    And, and you remember -- how is your memory?

19     A    It's fairly, fairly well.

20     Q    Yes, sir.

21            And so your recollection, as you sit here

22  today, is that in approximately 1972, the manufacturers

23  of asbestos products came out with a bulletin that said,

24  "Stop using asbestos, but use up anything you've got in

25  stock," correct?

KINSER v. CBS CORP., Case No. 94-2282

1        A      I believe it was the government, I think, that

2    come out and told them, ma'am, not the asbestos --

3        Q      Okay.

4        A      -- people.

5        Q      And who in the government, if you know --

6        A      I imagine that would be part of OSHA.

7        Q      Okay.  And what did those regulations say in

8    particular?

9        A      Ma'am, I could not quote them for you.  I

10   couldn't.  I couldn't do that.

11       Q      All right.  What if you're wrong about what you

12   remember the OSHA regulations in 1972 saying?

13       A      I don't believe I'm wrong on it because it was

14   well known in the construction industry that there was

15   bulletins out about the use of asbestos.

16       Q      Yes, sir.

17              Now, you talked about how -- you talked about

18   this at the very beginning of your discussions with Mr.

19   McCoy -- how the owner of the premises would communicate

20   the safety requirements to you, and then it would be your

21   responsibility as the -- what was your title?

22       A      My name was -- my title on most jobs was

23   "superintendent."

24       Q      Superintendent.

25              And who did you work for?

KINSER v. CBS CORP., Case No. 94-2282

1      A     I worked for different contractors, piping

2  contractors.

3      Q     All right, sir.

4            And it was your job as the superintendent for

5  the piping contractor to pass on safety information to

6  whom?

7      A     To the people that worked for me.

8      Q     All right.  Now, there was somebody else,

9  though, in that mix, I believe, somebody we've heard

10  testified about called the "union steward."  Are you

11  familiar with that title?

12      A     Yes, ma'am.

13      Q     Okay.  And tell the ladies and gentlemen of the

14  jury who a union steward is?

15      A     In Local Pipefitters 597 out of Chicago, the

16  superintendent is the job steward, --

17      Q     All right.

18      A     -- one and the same person.

19      Q     All right.  And what's a union steward's job as

20  it relates to the union?

21      A     That the union regulations are followed.

22      Q     Okay.  Now, union regulations include things

23  like jurisdictional disputes, correct?

24      A     Yes, ma'am.

25      Q     So that means that, as the union steward, your

KINSER v. CBS CORP., Case No. 94-2282

1  job is to make sure that millwrights don't do

2  pipefitters' work, correct?

3       A    That is correct, ma'am.

4       Q    And you're also responsible for making sure

5  that safety regulations involving pipefitters are

6  attended to, correct?

7       A    That is correct, ma'am.

8       Q    All right, sir.

9            And your recollection that you've testified to

10  already today about asbestos and the government

11  regulation was that it wasn't until the '80s that that

12  was something that was highly regulated; is that fair?

13       A    That is correct, ma'am.

14       Q    All right.  Well, let's see what your union had

15  to say about that.

16            If I could have the ELMO, this is Defendants'

17  Exhibit 2284, which has been previously displayed to the

18  jury.

19            This is a journal that has already been shown

20  to the jury.  You recognize this journal?

21       A    Yes, ma'am.

22       Q    And it's the Pipefitters and Plumbers Union,

23  correct?

24       A    That's correct, ma'am.

25       Q    You read this when you were -- well, do you

KINSER v. CBS CORP., Case No. 94-2282

1  still read it?

2      A    No, ma'am.  I haven't read it in a long time.

3      Q    Okay.  But you read it back in the day?

4      A    Sometimes I did, depended on how busy I was.

5      Q    All right.  And it was a useful tool to

6  communicate both union information and other types of

7  information?

8      A    It was mostly a guideline.

9      Q    All right, sir.

10         And so if we look at page 14, in 1971, this is

11  what your union was communicating to the union workers

12  about the issue of asbestos.  Do you see that?

13     A    Yes, ma'am.

14     Q    And do you recall now; does this refresh your

15  recollection that, in 1971, the union -- which you were

16  the steward of, we now come to find out -- was

17  communicating with the union membership about the dangers

18  associated with asbestos?

19     A    Yes, ma'am.  They would have an article in

20  there once in a while -- very seldom, though.

21     Q    Yes, sir.

22         But it was an issue of interest to the union in

23  1971, as evidenced by it being featured in this journal,

24  correct?

25     A    Like anything else, our union and our UA went

KINSER v. CBS CORP., Case No. 94-2282

1    by the regulations that OSHA sent them; and it depended

2    upon how often OSHA would send something to them that

3    they would publish something.

4         Q    Yes, sir.

5              And, in fact, your union kept up with

6    compliance on OSHA regulations, correct?

7         A    Most of the time, ma'am, yes.

8         Q    Yes, sir.

9              And if we look now at what's been previously

10   shown to the jury as 2285, on page 13, this is a 1972,

11   July, union journal from your union; and this is your

12   union reporting on its keeping track of how the new OSHA

13   regulation is doing.

14             You see that?

15        A    Yes, ma'am.

16        Q    And what they report is that three-quarters of

17   the places that OSHA has inspected during the first ten

18   months of the fiscal year didn't pass inspection

19   completely.  Do you see that?

20        A    Yes, ma'am.

21        Q    And they say here that there's -- more than

22   26,000 inspections were undertaken in those ten months.

23   Do you see that?

24        A    Yes, ma'am.

25        Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

1                Now, does that help refresh your recollection

2     that not only was your union concerned with asbestos

3     issues, but that your union was keeping track of whether

4     or not the OSHA regulations in 1972 were being complied

5     with at the various sites that your union members were

6     working at?

7         A     Yes, ma'am.

8         Q     All right, sir.

9                Now, you've never been to the Zion nuclear

10    power plant, have you?

11        A     No, ma'am.  I have not.

12        Q     Prior to your involvement in this case, you had

13    never met Mr. Kinser, had you, sir?

14        A     That's correct, ma'am.

15        Q     You can't tell us anything about what Mr.

16    Kinser did during his daily work life?

17        A     Personally, no sir -- no, ma'am, I can't.

18        Q     You can't tell us anything about what any other

19    pipefitters did at Zion?

20        A     That's correct, ma'am.

21        Q     You can't tell us about what impact 1970, 1971,

22    or 1972 OSHA had on Zion, can you, sir?

23        A     That's correct, ma'am.

24        Q     Now, when OSHA was passed in 1970, you would

25    agree with me that, that plants were given options,

1  correct?

2      A    That's, that's correct, ma'am.

3      Q    And one of the options that they were given was

4  to buy a bunch of new equipment, to buy monitoring

5  equipment, to buy safety equipment, and to buy signage,

6  and to buy equipment to protect workers if they were

7  going to actually have asbestos on their premises.  You

8  understand that --

9      A    Yeah.

10     Q    -- to be true, --

11     A    Yes, ma'am.

12     Q    -- correct?

13          I'm sorry?

14     A    I said:  Yes, ma'am.

15     Q    Okay.  The other option that they had in 1972

16 was to simply decide to use nonasbestos materials,

17 correct?

18     A    Yes, ma'am.

19     Q    And if they used nonasbestos materials, then

20 they didn't need to spend all that money on all of that

21 monitoring equipment, correct?

22     A    Yes, ma'am.

23     Q    All right, sir.

24          MS. EZELL:  If I could just have a minute, Your

25 Honor.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              (Brief pause in proceedings.)

 2              MS. EZELL:  I don't have anything further.

 3              THE COURT:  Redirect, Mr. McCoy.

 4              MR. McCOY:  Yes.

 5               REDIRECT EXAMINATION BY MR. McCOY:

 6         Q     Did that union journal set absolute regulations

 7    for safety procedures?

 8         A     No, sir.

 9         Q     As between something that might appear in the

10    union journal like that and the chain of command by which

11    the contractor in charge passed down the safety

12    instructions at the job site back in the '70s, which one

13    was, was the one that was followed?

14         A     The one that was followed was the one that you

15    got from the owner or general contractor.

16         Q     And why, why was that?

17         A     That was the practice on the job because if

18    every union had their own safety practices, they might

19    compromise other safety practices.  So they had one

20    general contractor or the owner; he's the one that

21    provided the safety stuff for you.

22         Q     So for the union to get the job and be able to

23    send its people to that job -- to get the work for you

24    guys -- the union had to agree that the safety practices

25    for the job sites set in that chain of command had to be
```

KINSER v. CBS CORP., Case No. 94-2282

1   followed; is that right?

2       A    That's correct.

3            MR. McCOY:  That's all the questions I have.

4   Thank you.

5            THE COURT:  Ms. Ezell.

6            MS. EZELL:  Yes, sir.

7               RECROSS-EXAMINATION BY MS. EZELL:

8       Q    You have no idea, do you, sir, what the

9   owner -- who was Commonwealth Edison at Zion, correct? --

10      A    Correct.

11      Q    -- told the contractor -- who was Westinghouse

12  to build the turbines, correct? --

13      A    Correct.

14      Q    -- at the Zion plant -- which is the plant

15  we're here to talk about, correct? --

16      A    Correct.

17      Q    -- you don't have any idea what that owner told

18  that contractor at that plant to do in 1972 as it related

19  to the use of insulation, do you, sir?

20      A    No, ma'am.  Because that -- by the time it got

21  to me, it was probably watered down.  Who knows when it

22  got to me.

23      Q    Yes, sir.

24           And it's entirely possible that, in 1972,

25  Commonwealth Edison told Westinghouse at Zion to use

1  nonasbestos materials instead of asbestos materials as

2  far as you know?

3      A    That is very possible, ma'am.  Yes.

4           MS. EZELL:  Nothing further, Your Honor.

5           THE COURT:  You through with the witness, Mr.

6  McCoy?

7           MR. McCOY:  Yes, Judge.

8           THE COURT:  All right.  You may step down.

9           THE WITNESS:  Thank you, sir.

10          (Witness Ferriter excused, 10:01 a.m.)

11          THE COURT:  Where are we?  Further evidence for

12  the defendant?

13          MS. EZELL:  Yes, for the defendant.  We have

14  further evidence.

15          THE COURT:  Yeah.

16          MS. EZELL:  I don't think the plaintiff has

17  anything else, Your Honor.

18          THE COURT:  Mr. McCoy, what is your pleasure at

19  this point?  Do you have other evidence to offer?

20          MR. McCOY:  Your Honor, may I be heard on this

21  with you for one moment?

22          THE COURT:  The jury have a recess.  I'm going

23  to have law questions come up, I think.  Enjoy the coffee

24  and rolls.

25          (Jury absent, 10:02 a.m.)

KINSER v. CBS CORP., Case No. 94-2282

1            THE COURT:  Out of the presence and hearing of
2    the jury, Mr. McCoy.
3            MR. McCOY:  I just want to make clear, Judge,
4    the next witness is one that addresses this issue of the
5    asbestos at Zion, and we'll be presenting our testimony
6    on that also.
7            THE COURT:  You mean there is a live witness
8    here?
9            MR. McCOY:  As I understand.
10           MS. EZELL:  For the defense, Your Honor.
11           THE COURT:  Oh, yeah, but it's a defense
12   witness.
13           MR. McCOY:  Right.
14           THE COURT:  Okay.  Now, where are you in the
15   case?  Are you ready to rest?  Have you checked your
16   exhibits with the clerk?
17           MR. McCOY:  No.  We have not done that, Judge.
18           THE COURT:  Have not checked the exhibits?
19           MR. McCOY:  I have my list ready to go, but I
20   need to make sure we get them in.  I know which ones,
21   so --
22           THE COURT:  Well, we better do it.
23           DEPUTY CLERK:  There's quite a few that need to
24   be admitted formally for the Court.
25           THE COURT:  Well, let's -- we have to do that.

KINSER v. CBS CORP., Case No. 94-2282

1  We have --

2          MR. McCOY:  Right.

3          THE COURT:  As much as possible.

4          MR. McCOY:  Yes.  I understand.

5          THE COURT:  What am I talking about?  We have

6  to get back in order.  They get a chance when you rest to

7  move under Rule 50.  Then they come forward and complete,

8  and then they'll rest.  And then the proofs will be

9  closed, and that will be another Rule 50 motion.  And I

10  want to get those set up in order.

11          MS. EZELL:  I think what Mr. McCoy was saying,

12  Your Honor, is that because Mr. Ware is on his witness

13  list as well that we can take Mr. Ware now.

14          THE COURT:  Okay, yes.

15          MS. EZELL:  And then attend to those

16  ministerial tasks.

17          THE COURT:  All right.  I was wondering if you

18  were agreeable to that.  All right.  We will go forward

19  with Mr. Ware.  Do you need a short recess to work on it?

20          MS. EZELL:  Only a very short recess --

21          THE COURT:  All right.

22          MS. EZELL:  -- to set things up.

23          THE COURT:  We'll be in recess, five minutes,

24  ten minutes.

25          MS. EZELL:  Thank you, Your Honor.

KINSER v. CBS CORP., Case No. 94-2282

```
1              (Recess, 10:04 a.m. to 10:16 a.m.)

2              MR. McCOY:  This is the stipulation on the

3    medical bills.  I'm just going to read this right away.

4              THE COURT:  Fine with me.

5              Bring the jury, please.

6              (Brief pause in proceedings.)

7              (Jury present, 10:18 a.m.)

8              THE COURT:  All right.  Mr. McCoy is going to

9    read you a stipulation made by the parties.  Remember, a

10   stipulation is an agreement on facts, and you should

11   accept the stipulation as a proven fact.

12             MR. McCOY:  Ladies and gentlemen of the jury,

13   the plaintiff and defendant stipulate that the past

14   verified medical bills in this case for diagnosis,

15   surgery, and follow-up care associated with Mr. Kinser's

16   2000 lung cancer were $114,636.21.

17             THE COURT:  All right.  And we are now going to

18   have a defense witness.

19             MS. EZELL:  Yes, sir.

20             THE COURT:  You may proceed, Ms. Ezell.

21             MS. EZELL:  Thank you, Your Honor.  The defense

22   would call Doug Ware.

23                DOUGLAS WARE, sworn, 10:19 a.m.,

24             DIRECT EXAMINATION BY MS. EZELL:

25        Q    Good morning.
```

KINSER v. CBS CORP., Case No. 94-2282

1       A    Good morning.

2       Q    That's fresh water there, so that's for you.

3       A    Thank you.

4       Q    Can you start by stating your name and spelling

5    your last name for the record?

6       A    Yeah.  My name is Douglas Ware.  My last name

7    is W-a-r-e.

8       Q    All right.  Now, tell us where you're from.

9       A    I currently live in Winter Park, Florida.

10      Q    Okay.  And do you work now, or are you retired?

11      A    I'm retired.

12      Q    Okay.  Where did you retire from?

13      A    I retired from Siemens Westinghouse Power

14   Corporation.

15      Q    Okay.  Now, the name "Westinghouse" we've heard

16   quite a bit in this trial, but tell me about Siemens.

17   How did you come to retire from a company called Siemens?

18      A    Well, in 1998, the German company Siemens

19   acquired the Westinghouse Power Generation business that

20   was headquartered in Orlando.  So from 1998, the entity I

21   worked for was Siemens Westinghouse.

22      Q    Okay.  All right, sir.

23           And where did you go to school?

24      A    I went to school at the California Maritime

25   Academy in Vallejo, California.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And what degree did you receive?

2      A    Bachelor of science degree in marine

3  engineering.

4      Q    All right, sir.

5           Now, if I could have the ELMO, please.  I'm

6  showing previously displayed Demonstrative Number 9.

7           And do -- I was going to say, "Do you recognize

8  this?"  But you can probably see what I've written at the

9  top.

10          Do you recognize this picture?

11     A    Yes, I do.

12     Q    I'm going to ask you three questions before we

13  go any further.  Okay?  Did you physically ever

14  personally go to Zion nuclear power plant?

15     A    Many times.

16     Q    All right, sir.  Do you have with you evidence

17  today as to whether or not asbestos was used for turbine

18  insulation at the Zion nuclear power plant?

19     A    Yes, I do.

20     Q    All right.  And do you personally have

21  firsthand information about why Zion had a power outage

22  in 1974?

23     A    Yes, I do.

24     Q    Okay.  Now let's go back and talk about your

25  history of working at Westinghouse.  Okay?

KINSER v. CBS CORP., Case No. 94-2282

1              When did you start working at Westinghouse?

2      A     In November of 1962.

3      Q     Okay.  And how old were you when you started

4  working at Westinghouse?

5      A     I was about 21 years old.

6      Q     All right.  What was your first job there?

7      A     When I started working with Westinghouse, we

8  had a division in Sunnyvale, California.  It was the

9  Marine and Defense Division, and I started as a field

10  engineer.

11      Q     Okay.  And tell the ladies and gentlemen what a

12  field engineer does.

13      A     Well, a field engineer basically works at

14  customer sites where you install the, the apparatus that

15  was sold; and you basically are responsible for the

16  installation, supervising the installation and/or

17  maintenance of the Westinghouse equipment that was sold.

18      Q     Okay.  So your first memory test for today is:

19  What was your first project at Westinghouse?

20      A     Well, the Sunnyvale division, Westinghouse had

21  the contract at the time.  The Navy had a missile called

22  a POLARIS missile that was installed on nuclear

23  submarines, --

24      Q     Okay.

25      A     -- and Westinghouse had the contract to design

KINSER v. CBS CORP., Case No. 94-2282

1    and manufacture the launching system that went into the

2    submarine.

3            And my job as a field engineer -- I was

4    assigned to Newport Shipyard and drive to that company in

5    Virginia where they actually built the nuclear

6    submarines, and my job was to supervise the shipyard

7    workers in the installation of the launching systems.

8    There was 12 launching -- 12 missiles on each submarine.

9    My job was to supervise the installation, go on sea

10   trials and testing of the, of the system on the nuclear

11   submarines.

12       Q    Was this during any particular war or

13   engagement period in the, in the history of the United

14   States?

15       A    Yeah.  This is the Cold War period in the '60s

16   and all of -- you know, the Air Force had the Strategic

17   Air Command with the bombers.  The Army had their own

18   miss-- they had the Minuteman missiles, which are

19   land-based.  And the Navy wanted their own systems, so

20   they had the POLARIS system, which was for

21   submarine-launched missiles, --

22       Q    Okay.

23       A    -- nuclear missiles.

24       Q    Now, prior to this, had you served in the

25   military at all?

KINSER v. CBS CORP., Case No. 94-2282

1      A    No.  But I -- when I went to -- I was in the

2   NROTC, and I had a reserve commission as a naval officer.

3      Q    And by this time, had you, you gotten your

4   degree?

5      A    Yes, I had.

6      Q    Okay.  So then after you completed work with

7   the POLARIS project that you just described, what was

8   your next assignment?

9      A    Well, the POLARIS project was ongoing; but in

10  the mid '60s, there was a lot of new power plants being

11  built.  And Westinghouse was, needed field engineers to

12  work on those power plants, so I was transferred from the

13  Sunnyvale Divisions to, to our Steam Turbine Division in

14  Philadelphia --

15     Q    Don't mind me; keep going.

16     A    -- and I became a, to become a field engineer,

17  installing Westinghouse equipment in power plants.

18     Q    Okay.  And how long did you have the position

19  "field engineer"?

20     A    Well, in 1965, I spent a couple months in

21  Philadelphia at our Steam Turbine Division, working with

22  the manufacturing and engineering to get familiarization

23  with the steam turbine generator product; and I was

24  assigned to Chicago.  We had district offices that had

25  field engineers in them, and I was assigned to our

1  Chicago district office; and I worked from 1965 to 1972

2  as a field engineer, installing Westinghouse equipment in

3  power plants in the Midwest.

4      Q    Did you ever work in the Champaign area,

5  Champaign-Urbana?

6      A    Actually, I, I lived in Danville.  The public

7  surge of Indiana had a power plant called Cayuga.  It's

8  halfway between here and Terre Haute, and it's a -- I was

9  the project engineer for the installation of Cayuga 1, in

10  1968 and '69.

11      Q    Okay.  So you've -- you're no longer a field

12  service engineer; you have a different title at this

13  time?

14      A    Well, you started -- it's still -- it's -- they

15  had different -- yeah, I was called a "project engineer,"

16  but I was still in the Field Service Department in, in --

17  working at customer sites.

18      Q    So what did you do -- what was your job at

19  Cayuga?  How long were you there?

20      A    I was there a year and a half.

21      Q    Okay.  So -- did you -- tell me how your, sort

22  of how that worked.  Did you relocate your family every

23  time you went to a different site?  How did that work?

24      A    Yeah.  Well, we -- essentially, we were on a

25  per diem basis; and we'd go to a town, and they would

KINSER v. CBS CORP., Case No. 94-2282

1   give you an allowance.  I rented an apartment.  I just

2   had gotten married.  I had met my wife -- I had -- my

3   prior job was -- we had a project, Wabash River Station,

4   at Terre Haute; and my wife went to Indiana State

5   University.  I met her.  She became a schoolteacher,

6   and -- up in Rockford, and then we ended up in, at

7   Danville was when we got married.

8       Q   Okay.

9       A   And she actually taught high school in Danville

10  as a substitute teacher; and, you know, we lived in a

11  furnished rented apartment during the project.

12      Q   All right.

13      A   And when it was completed, I moved to the next

14  project.

15      Q   Okay.  So after -- did there come to be a time

16  when you were no longer a field service engineer or a

17  project engineer?

18      A   Yes.  Well, my project after Cayuga was the

19  Zion project.

20      Q   Okay.

21      A   And, and --

22      Q   When did that start?

23      A   I left Cayuga in September of 1970, and we

24  relocated to Zion; and I was at the Zion project till,

25  till the end of 1972.  I got promoted to be the district

KINSER v. CBS CORP., Case No. 94-2282

 1  service manager, so --

 2      Q    Okay.  Let me, let me stop you right there.

 3           I'd like to display on the ELMO, previously

 4  displayed, Demonstrative 12.

 5           This is a timeline that you and I worked on

 6  together, correct?

 7      A    Yes.

 8      Q    You recognize this as -- so in September of

 9  1970, this is when you arrived -- I think I'm red right

10  here.  Can you hear me or not?

11           All right.  Is that better?  Okay.

12           In 1970, September, is that when you arrived at

13  Zion nuclear power plant?

14      A    Yes.

15      Q    Okay.  And then you had just told me when you

16  left.  Tell me that again so I can put that on here.  We

17  didn't put that on here when we originally made this.

18      A    Well, the Zion installation was still in

19  progress, construction still in progress; but I got

20  promoted in the fall of 1972, and it was around -- my, my

21  first daughter was born.  She -- my daughter was born in

22  December of 1972, and that's about the time I got

23  promoted.  I still recall that because I was still living

24  in the Zion area.

25      Q    All right.  You got promoted.  Is that '72 --

KINSER v. CBS CORP., Case No. 94-2282

1    did you say '72 or '71?

2        A    '72.

3        Q    Okay.  So you were not still at Zion when the

4    Zion facility actually went online, correct?

5        A    That's correct.

6        Q    Okay.  All right.  So, so let me just make this

7    a good entry.  So Doug Ware promoted; leaves Zion.

8            Okay.  Before we talk about what happened after

9    you left, let's talk about what happened while you were

10   there.

11           Actually, before we do that, before we do that,

12   let's just finish with your, an overview of your career,

13   of your career.  Okay?

14           So did there come to be a time after Zion and,

15   and maybe some other projects where you were promoted --

16   actually, I think you told us -- where you were promoted

17   to a different position?

18       A    Well, my first promotion was, from the field,

19   was the district service manager job in Chicago, and I

20   held that until 1981.

21       Q    So that was from 1972 to 1981?

22       A    That's correct.

23       Q    Okay.  And what was the nature of that job as

24   compared to a field service engineer?

25       A    Well, the district office, we had 32 of them

KINSER v. CBS CORP., Case No. 94-2282

1   around the country; and the Chicago office, you had the

2   customer responsibility -- I did; the office had -- for

3   power generation equipment installed in northern

4   Illinois, northern Indiana, southern Wisconsin.

5        Q    Okay.  So --

6        A    And so, by that, you had a complement -- I had

7   20 field engineers reporting to me that worked on

8   different customer sites.  These are maintenance or

9   installing equipment in that district, and we were

10  basically the -- after equipment was sold, we became the

11  interface with the customer for any engineering questions

12  or any kind of maintenance questions or actually doing

13  the work on the site for the customer, if you --

14       Q    Well, how old were you in 1972 when you got

15  that promotion?

16       A    I was 30 years old.  I was born on March 4,

17  1942.

18       Q    Okay.  And so then after 1981, did you -- what

19  did you do after you were a district manager?

20       A    Well, the next level we had -- we had 32

21  district offices domestically, and we were organized into

22  five regions.  And I got promoted to the western region

23  manager, which the office was San Francisco, which

24  happened to be my hometown, so I was delighted to be

25  promoted and transferred out to San Francisco.  And at

KINSER v. CBS CORP., Case No. 94-2282

```
 1   that time, I had five districts -- no, I really had the

 2   14 west-- responsibility for the power generation service

 3   in the 14 western United States.

 4        Q     So you had gone from being a field service

 5   engineer, correct?

 6        A     Yes.

 7        Q     To being a district manager?

 8        A     Correct.

 9        Q     And then to being a --

10        A     Region--

11        Q     -- regional manager?

12        A     Right, service manager.

13        Q     So when you were a regional manager,

14   approximately how many field service managers reported to

15   you?

16        A     Well, we had five district offices.  Each one

17   had a manager and a staff, and each office had anywhere

18   from 15 to 20 engineers -- so probably 100 engineers.

19        Q     Okay.  All right, sir.

20              And then after you worked as the regional

21   manager in California, did you come to work in the

22   international aspect of Westinghouse's concerns?

23        A     Well, I was there -- the west-- from 1981 to

24   1993, I was the western region manager; but in the

25   interim time, Westinghouse had relocated its power
```

KINSER v. CBS CORP., Case No. 94-2282

1   generation business from Philadelphia to Orlando in the

2   '80s.  And, the -- they did some consolidation.  The

3   business was slacking off, so we actually went from five

4   regions to two.

5       Q    All right.

6       A    So in 1989, I was still a region manager, but I

7   had to relocate to Orlando; and I handled the west, but

8   I -- I handled every office from, like, Cincinnati west,

9   so I had, like, 14 district offices from '89 to '93 on

10  domestic service.

11      Q    Okay.  And then from '93 -- when did you

12  retire?

13      A    2003.

14      Q    From '93 to 2003, did you work in the

15  international divisions of Westinghouse and Westinghouse

16  Siemens?

17      A    Well, in '93, I -- they asked me to overlook

18  our international service operations.  Westinghouse was

19  shrinking at the time, and we were combining some of our

20  industrial service with power generation service.  And we

21  had seven subsidiary or -- wholly owned subsidiary or

22  joint venture service companies internationally; and they

23  asked me to assume that responsibility, which I did.  And

24  part of that -- our biggest operation was in Saudi

25  Arabia, so I did spend a couple, the first couple years

1    in Saudi Arabia because I understand the whole, the whole

2    international scheme.

3         Q    Right.

4         A    And I moved back to Orlando.  In '98, Siemens

5    purchased the business, and Siemens had their own

6    operation.  So my -- from '98 to 2003 when I retired, a

7    lot of it was integrating the Westinghouse and Siemens

8    operations so we, you know, had the same procedures and

9    understanding how we worked, so I was kind of in an

10   integration position there.

11        Q    All right.  Now, let me ask you this.  You had

12   a very expansive work life.  You've just described it to

13   us.  But I would like you today to focus on the time that

14   you spent working at Zion.  Okay?

15        A    [Nodding head up and down.]

16        Q    And are you prepared --

17        A    Yes.

18        Q    -- to do that?

19             And when you testify today, are you going to --

20   well, first of all, you reported to work to Zion; is that

21   correct?

22        A    That's correct.

23        Q    And when, when was that?  From 1970 to when did

24   you go there every day?

25        A    From September 1970 through September/October

KINSER v. CBS CORP., Case No. 94-2282

1   of 1972.

2       Q    Okay.  And the title that you had at Zion was

3   what?

4       A    Project engineer.

5       Q    Okay.  And when you testify today, based on --

6   when you tell the ladies and gentlemen of the jury based

7   on what happened at Zion, is it going to be based on your

8   personal memories and recollections of what you recall

9   happening during that time that you were there?

10      A    Yes.

11      Q    Okay.  Did you also review certain documents in

12  order to be prepared to testify today?

13      A    Yes, I did.

14      Q    Did you review some engineering documents?

15      A    Yes, I did.

16      Q    Some specifications and some drawings?

17      A    Yes.

18      Q    And are you being paid for the time that you

19  are spending preparing and testifying in this case?

20      A    Yes, I am.

21      Q    And how much do you get paid per hour?

22      A    I charge $125 an hour for my time and my cost

23  at expense.

24      Q    Okay.  Now, let's talk about what a typical day

25  was like from 1970 to 1972 at Zion.  Okay?  Where did you

KINSER v. CBS CORP., Case No. 94-2282

1   live relative to the Zion plant?

2       A    I lived in a furnished apartment in Zion.

3   Zion's a little city right north of Waukegan and south of

4   the Wisconsin border.

5       Q    Okay.

6       A    And I rented an apartment that was, like, two

7   miles from the plant.  The plant was located right on

8   Lake Michigan.

9       Q    And what did you -- what did you wear when you

10  went to work every day on the outside?  What was your,

11  like, dress attire for work?

12      A    Casual clothes:  khaki pants, a work shirt, and

13  work shoes and a hard hat and safety glasses.

14      Q    Okay.  And did you have to wear any kind of

15  smock or jacket or coveralls that said "Westinghouse" on

16  them?

17      A    No.

18      Q    Have you ever seen or heard of such a thing?

19      A    There's -- some of our technicians come out

20  with overalls that have a Westinghouse logo on them, --

21      Q    Okay.

22      A    -- from the factory.

23      Q    But as it relates to the engineers on site,

24  would that have been an outfit that they would have worn?

25      A    At that time frame, we didn't really have any

KINSER v. CBS CORP., Case No. 94-2282

1    uniform policy.  Later on, we did adopt a policy with the

2    Westinghouse logo on the shirt.

3        Q     Okay.

4        A     But at that time, it was just presentable wear.

5        Q     Okay.  And you mentioned that you wore a hard

6    hat.

7        A     Yes.

8        Q     What color was it?

9        A     The hard hat I wore, they gave field engineers,

10   were white hard hats with the circle -- the circle with

11   our "W" is the famous Westinghouse logo.  It's a blue

12   logo with the circle of our "W" on the front.

13       Q     Okay.  We've had testimony in this case about

14   green and yellow hard hats.  Who wore green and yellow

15   hard hats at Zion, if you know?

16       A     Well, my recollection was Commonwealth Edison

17   used those colors, a yellow hard hat with -- they had a

18   "CE" for, a script "CE" in green on top of the hard hat.

19             The piping contractor during the construction

20   was a joint venture between Pope and Morrison, two

21   different piping companies, and I recollect they had

22   green or yellow hard hats.  I don't --

23       Q     Okay.  Now, when you got there, the first day

24   in 1970, where did you go?  Did you have an office?

25       A     Well, at that time, the power plant had been in

KINSER v. CBS CORP., Case No. 94-2282

1   construction since 1967; so a lot of the civil work was

2   done, and that means all the groundwork and the, the

3   buildings were, were pretty much erected.  The turbine

4   building and the nuclear containment vessels were

5   erected, and they were starting to hire the equipment

6   contractors.

7           We had a, a -- three engineers preceded me.  I

8   was finishing up Cayuga, so we already had some engineers

9   on site.

10      Q    Okay.

11      A    A gentleman named Joe Deconda -- I think we had

12  people on site since June.

13      Q    All right.

14      A    And they had set up an office trailer, and

15  we're in the turbine building.  On the turbine floor was

16  a 40, 40-foot elevation aboveground; and we had our

17  turbine, Westinghouse office trailer set up on the

18  turbine floor.

19          We had the responsibility to actually install a

20  turbine, so we had to hire the craft labor.  We had a

21  separate change building for the craft labor, and we just

22  had started hiring people; so I, I basically walked up,

23  on site, parked my car, and walked up on the stairway,

24  40 -- you know, 40 feet to get to, to the office.

25      Q    Okay.

KINSER v. CBS CORP., Case No. 94-2282

1           MS. EZELL:  Can I have the ELMO, please?

2           DEPUTY CLERK:  What are you going to display?

3           MS. EZELL:  Oh, I'm sorry.  It's previously

4    displayed Demonstrative Number 9.  It's the same one that

5    was up there before.  I apologize.

6    BY MS. EZELL:

7        Q    Now, this is -- well, let me ask you.  Is this

8    Zion?

9        A    This is Zion.  Yes.

10       Q    Okay.  And what are these?

11       A    Those are the nuclear containment buildings.

12       Q    Okay.  And what's in them?

13       A    Well, each -- this is -- Unit 1 was on the

14   south side.  The lake was on the east side, so that's

15   Unit 1.

16       Q    All right.

17       A    And that's Unit 2.

18       Q    Okay.

19       A    And that's the nuclear, the nuclear steam

20   supply system.  The nuclear plant has the nuclear island

21   and the turbine island, so the nuclear part was in these

22   containment buildings.

23       Q    Okay.

24       A    We technically call it the "BRT," big round

25   thing.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  And what building is this?

2      A     That's the turbine building.

3      Q     Okay.

4      A     And Unit 1 was on, on -- the turbines face

5  north and south.  Unit 1 was on the south part of the

6  building.

7      Q     Is that this side?

8      A     Right.

9      Q     Okay.

10     A     And unit -- and our trailer was -- and Unit 2

11 was on the north side of the building.

12     Q     Okay.  And where was your trailer when you

13 first got there?

14     A     Right on this end of the buildings.

15     Q     Okay.  And I'm trying to see where you're

16 pointing.  Is this where you were pointing?

17     A     Right below that.  Those were -- that's, the

18 building was about 200 feet tall, so that -- you know,

19 there was a roof above the turbine building.

20     Q     Sure.

21     A     You had an overhead crane in there.

22     Q     Is it this end of the building that I'm

23 pointing at?

24     A     This end of the building.  Yes.

25     Q     Okay.  All right.  And, now, you mentioned that

KINSER v. CBS CORP., Case No. 94-2282

1    there were already some engineers on site, correct?

2        A    Correct.

3        Q    And how many, when you -- at some point, did

4    you come to have sort of a full staff there of engineers?

5        A    That's correct.

6        Q    How many engineers, when you were in the

7    process of building Units 1 and Units -- Unit 1 and Unit

8    2, how many engineers was a full staff at Zion?

9        A    Four engineers on the permanent staff, but we

10   had some specialists come in a time; plus, we had young

11   engineers on training that would come on.  So, but there

12   was four engineers assigned full time to the site.

13       Q    Is that including you?

14       A    Plus me.  I'm five.

15       Q    Oh, in addition to you?

16       A    Yes.

17       Q    And what were the different titles of the four

18   engineers you had working there?

19       A    Well, we had one engineer; he was called the

20   "floor man" or "turbine."  He was, responsibility for the

21   mechanical work on the turbine itself.

22            We had a piping engineer, because when you

23   build a turbine, there's, there's -- Westinghouse

24   supplied piping that was involved with the turbine.  We

25   had a piping engineer supervising the installation of the

KINSER v. CBS CORP., Case No. 94-2282

1   turbine piping.

2         I had an electrical engineer who was

3   responsible for the electrical portion of the electrical

4   generator and also the electrical work for -- there was a

5   lot of thermocouples and instrumentation.

6         Then I had a material engineer.  This was a

7   younger engineer that -- this turbine, it shipped over a

8   period of six months.  It shipped disassembled, and so we

9   had a lot of shipments, a lot of parts that had to be

10  identified; and his job was to supervise the unloading of

11  the parts, storing them in categories so, when we needed

12  them during the installation, he would, he would be

13  responsible for getting the parts to the, to the workers.

14      Q    All right.  Now, as you recall it, who, who

15  owned this facility?

16      A    Commonwealth Edison.

17      Q    Did they have offices on site?

18      A    Yes, they did.  Commonwealth Edison was the

19  construction manager.

20      Q    Okay.

21      A    They had a very experienced team there that,

22  that sup-- that basically was responsible for the

23  construction, and they hired various contractors to

24  construct it.

25        But they had a, a separate office building

KINSER v. CBS CORP., Case No. 94-2282

1   outside; it was a temporary office building.  It was

2   located the other side of these containment vessels on

3   the, on the ground floor, and they had their offices

4   there.

5       Q    Okay.  All right.  I'm done with that one.

6   Thank you.

7            And was there anybody else who worked in your

8   office besides the four engineers and the visiting

9   engineers you told us about?

10      A    I had a secretary.

11      Q    Okay.  All right.  And in addition to that, you

12  indicated that you hired a certain number of staff during

13  the building of this, of these turbines, correct?

14      A    We hired craft labor, union craft labor, and we

15  had -- they were basically casual employees.  We had a

16  payroll.  In fact, the clerk -- the secretary did the

17  payroll --

18      Q    Right.

19      A    -- on site.  And so we hired -- we had

20  pipefitters, millwrights for the, for the turbine.  The

21  ironworkers did the rigging for the millwrights.  We had

22  a laborer -- two laborers, actually.

23           On the electrical work, we subcontracted the

24  work to an electrical subcontractor; and later on in the

25  project, we would subcontract the thermal insulation to

KINSER v. CBS CORP., Case No. 94-2282

1  an insulator contractor.

2      Q    Okay.

3      A    So we didn't hire the electricians or the

4  insulators directly.

5      Q    Well, let me ask you this.  How many,

6  approximately -- how many laborers did Westinghouse

7  contract at any one time?  What was the maximum number of

8  laborers you would have had working during any one time

9  at the Zion facility?

10     A    We probably had 40, 40 casual construction

11 workers that, from different crafts.

12     Q    Okay.  And if you consider the entire Zion

13 plant that was being built during that time, the, the --

14 what did you call it?  The big round things, BRT?

15     A    Yeah, the containment --

16     Q    The BRT buildings and the other buildings and

17 the other equipment that was being put into this,

18 approximately how much labor was being employed during

19 the building phase of this project?

20     A    I recall in terms of the, the construction

21 workers, there were seven contractors; and all the

22 contractors had supervisors on the site, so there might

23 have been 100 to 150 different supervisors with

24 Commonwealth Edison and everything.  And the, and the

25 construction labor was probably 15- to 1600 people.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Okay.  And do you recall who the other

2  contractors were on site?

3    A    Every one of them.

4    Q    And tell us who they were.

5    A    Well, Gust Newberg was the civil contractor.

6    Q    Okay.

7    A    He developed --

8    Q    And what does -- what do civil contractors do?

9    A    Pouring the concrete, putting in all the

10  groundwork, and they were pretty much done when I got

11  there.

12    Q    Okay.

13    A    I don't remember who the, who the ironworkers

14  were for building the building.

15    Q    Okay.

16    A    It might have been American Bridge or

17  something.

18          There was -- the piping contractor was a joint

19  venture with Pope-Morrison.

20    Q    All right.

21    A    The electrical contractor was Hatfield

22  Electric.

23    Q    Okay.

24    A    The -- American Boiler & Tank did the

25  mechanical work, the condensers.

KINSER v. CBS CORP., Case No. 94-2282

1          Westinghouse, we had, we had two con-- we

2     supplied both the turbine and the nuclear equipment.

3          Q    Okay.

4          A    But I was only responsible for the turbine

5     equipment, so we had the contractor install the turbine

6     equipment.

7          On the nuclear side, Westinghouse did not

8     install the nuclear equipment.  They, they supplied -- a

9     company called Babcock & Wilcox had the contract for the

10    nuclear steam supply system.

11         Q    Okay.

12         A    Then there was a company called Reliance

13    Trucking, which was a heavy rigging contractor because a

14    lot of the components -- the reactor vessel, the

15    generator for the turbine -- it couldn't be lifted with,

16    with the crane, cranage available, so they had to come in

17    with special rigging equipment.  So they installed all

18    the really heavy equipment.

19         The insulator contractor, I recall, was either

20    M & O or A & M out of Chicago for the, for the plant.

21         Q    Okay.  I would like to now discuss with you --

22    if I could have the ELMO again to show Demonstrative

23    Number 12, some more pages from Demonstrative 12.

24         I would like to discuss with you specifically

25    the building of the turbine system.  Okay?  Now, page 1

KINSER v. CBS CORP., Case No. 94-2282

1  of this demonstrative indicates that there was a bidding

2  process and that Westinghouse was awarded the bid.  And

3  you understand that that -- that to be true, correct?

4       A    That's correct.

5       Q    And then we've already talked about you arrived

6  at Zion.  Now, when you got there, how much, if any, of

7  the turbine componentry had arrived?

8       A    Well, the total turbine was shipped

9  disassembled, and we're talking about -- the total

10 turbine generator, the amount of tonnage, was, like,

11 1,000 tons, or 2 million, or 2 million pounds.  Okay?

12      Q    Right.

13      A    So a lot of components had to be shipped by

14 rail car.  Anything over 40,000 pounds, you couldn't ship

15 by truck unless you had special permits.

16           So, as I recall, it took 40 rail cars to -- and

17 17 cars had arrived at Zion when I, had already arrived

18 when I got to the site.

19      Q    Okay.  So, in addition to 40 rail cars, how

20 many tractor-trailers?

21      A    Probably 75 over the course of six months of,

22 of piping, component parts, the smaller pieces.

23      Q    Okay.  And is that for the, for both turbines

24 or for each turbine?

25      A    That's just for each turbine.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  So --

2      A     Unit 1 -- that was, essentially, Unit 1

3  shipment.

4      Q     Okay.  All right.

5            Then I'm going to our next page.  Well, we were

6  just talking about this.  So is there, is there a date in

7  building turbines where you consider the shipment to be

8  completed?

9      A     Yes.  There's a -- the contract called for a

10  shipment date, and normally that's when the last heavy

11  piece had shipped; and that was, I think, May of '71, and

12  the turbine records show that.  They show a date for

13  shipment, and that's always the, for the last -- the

14  shipment had started in the fall of '70.

15      Q     Okay.

16      A     But that's when the shipment for Unit 1 was

17  completed, and December '71 was, was when the shipment

18  for Unit 2 was completed.

19      Q     Now, let me ask you this.  When these Units 1

20  and 2 were shipped in 1971 -- well, let me back up.  Let

21  me strike that.

22            Do you understand the concept of "bare metal"

23  or "bare iron"?

24      A     Yes.

25      Q     Explain to the ladies and gentlemen of the jury

KINSER v. CBS CORP., Case No. 94-2282

1   what that means.

2       A   Well, "bare," I guess when you're talking, if

3   it was thermally, thermally insulated or not.  The

4   turbine always shipped bare metal.

5       Q   Okay.

6       A   On some really small industrial turbines,

7   sometimes they would be shipped insulated.

8       Q   But --

9       A   We're talking --

10      Q   -- how about these?

11      A   No.  These turbines were shipped bare metal, --

12      Q   And --

13      A   -- insulated in the field.

14      Q   Okay.  And can you tell by looking at them

15  whether or not they're insulated?

16      A   Of course you can.  Yes.  Yeah.

17      Q   I know it seems --

18      A   You're looking at steel.

19      Q   -- like a silly question.

20      A   Right.

21      Q   And how can you tell?

22      A   Well, because it's steel; it's bare metal

23  steel.

24      Q   Okay.  And so when Unit 1 was shipped com--

25  when Unit 1 shipment was complete in May of '71, had

KINSER v. CBS CORP., Case No. 94-2282

1   Turbine Unit 1 received any insulation?

2       A    No.

3       Q    When Turbine Unit 2 shipment was complete in

4   December of '71, had Turbine Unit 2 received any

5   insulation?

6       A    No.

7       Q    All right, sir.

8            Now, why do you need insulation?

9       A    Well, three -- three reasons.  Number one is

10  protection against somebody getting burned.  So,

11  typically, anything over 150, 175 degrees temperature,

12  you, you put some kind of thermal insulation on to

13  prevent people from getting burned.

14           The second reason is for heat retention, for

15  efficiency reasons.  You don't want a loss of heat.  You

16  want to retain it.

17           And what's -- the third reason, this is mostly

18  for the turbine.  The turbine, essentially, is like a

19  watch.  It's got very fine tolerance -- even though it's

20  very big -- very fine tolerances, and it expands when you

21  put heat in it.  It expands and contracts, and you don't

22  want to distort it.  So thermal insulation maintains the,

23  the heating process so it's heating evenly.  It doesn't

24  distort, and you could, you could get cracking of the

25  cylinder.  You could get rubbing of the rotating

KINSER v. CBS CORP., Case No. 94-2282

1   elements.  So thermal insulation is an important part of

2   the turbine to maintain its operation.

3       Q    Approximately how many turbines did you assist

4   in building -- or did you supervise, not assist -- did

5   you supervise in building over the course of your career

6   with Westinghouse?

7       A    Well, I did some maintenance.  At that time

8   frame, there was a lot of installations going on.  I was

9   involved in eight major power plant installations in my,

10  as a field engineer.

11      Q    Okay.  And based on your personal experience

12  with those eight turbines, when was insulation typically

13  installed on turbines during the building process?

14      A    That was the last activity you did.  You

15  completely assembled the turbine and all the piping and

16  all the welding; and that was the last operation that was

17  performed, is installing the thermal insulation.

18      Q    Why?

19      A    Well, first of all, you -- when you build a

20  turbine, you have to worry about, worry about foreign

21  material.  You have an oil system.  You have the

22  bleeding --

23      Q    I'm sorry?  What about -- what kind of

24  material?

25      A    Foreign material, any kind of foreign -- so,

KINSER v. CBS CORP., Case No. 94-2282

1    it's very important you watch for all the foreign

2    material, and dirt.

3         Q    Are you saying "foreign"?

4         A    Well, foreign material to be anything that's

5    not supposed to be in there.

6         Q    Yeah.  Okay, okay.

7         A    Tools.

8         Q    I was just having -- it's my fault.  Go ahead.

9    Watch for any kind of foreign material and --

10        A    Right.

11             So that's, that's one thing.  You wanted the

12   turbine to be completely assembled, like the, the, the

13   rotor has bearings.  Okay?  And you have to install all

14   the oil piping and flush the oil piping, close up all the

15   pedestals; and you have to close the whole turbine

16   cylinder up, do all the piping welding before you put

17   thermal insulation on.

18        Q    All right.  Now, in 1972, do you understand

19   there was certain regulations passed?

20        A    Yes.

21        Q    Tell --

22        A    Well, I think it was '71.

23        Q    Okay.  Good, good.

24             Actually in 1970, were there certain

25   regulations passed covering insula-- insulation that

KINSER v. CBS CORP., Case No. 94-2282

1   we've been discussing?

2       A    Well, there was OSHA -- the federal government

3   had the Occupational Safety and Health Act, and it

4   covered safety hazards and environmental hazards of all

5   types, not just insulation.  And insulation, my

6   understanding was, that's when asbestos -- they put some

7   requirements on asbestos, the use of and how you work

8   around asbestos.

9       Q    Okay.  Now, I need to display a different

10  document that hasn't been admitted yet.

11           Are you familiar with Sargent & Lundy?

12      A    Very much so.

13      Q    Okay.  Can you just -- and we've had testimony

14  about them.  But can you just briefly explain what their

15  role was in the Commonwealth Edison/Westinghouse

16  relationship as it relates to Zion?

17      A    Well, Sargent & Lundy is an architect/engineer

18  firm that's headquartered in Chicago; and they design,

19  among other things, power plants.  And they have many --

20  many facility customers in the Midwest use Sargent &

21  Lundy; and since my career was in the Midwest, I'm very

22  familiar with Sargent & Lundy.  It was the

23  architect/engineer for Public Service of Indiana, for

24  Illinois Power, and for Commonwealth Edison.

25      Q    Okay.  And as it related to the building of the

KINSER v. CBS CORP., Case No. 94-2282

1  Zion plant, did Sargent & Lundy have any sort of

2  specifications that were supplied to Westinghouse?

3      A    Yes.

4      Q    Now, are you familiar with Sargent & Lundy

5  Specification 40?

6      A    Form 40, yes, I am.

7      Q    Form 40, yes, sir.

8           And can you just tell me what Form 40 covered?

9      A    Form 40 was standard with Sargent & Lundy,

10 standard specification for steam turbine generators.

11     Q    All right, sir.  And I'm displaying to you and

12 not the jury Defendant's Exhibit 2298.  Do you see that

13 on your screen?

14     A    Yes.

15     Q    Okay.  And let me just ask you:  What version

16 of Sargent & Lundy -- you know, I don't -- can I not

17 display this until I ask this question?  It was my fault.

18          What version of Sargent & Lundy Form 40 was

19 followed at Zion for insulation of Turbine Unit 1 and

20 Unit 2, if you know?

21     A    Well, when we bid the job, Westinghouse

22 responded to Sargent & Lundy's Form 40-G.

23     Q    Yes, sir.

24     A    And that's what we designed the turbine around,

25 40-G.

KINSER v. CBS CORP., Case No. 94-2282

1              During the course of the installation of Zion,

2      they modified -- they developed Form 40-H for future

3      turbines.

4              Q    Okay.  So when Zion was actually insulated,

5      what form was -- what specification was used?

6              A    Well, for the turbine, Form 40-H was the

7      specification that was, had been up-- the 40-G

8      specification had been updated, and 40-- in 1972, and

9      Westinghouse actually -- we would actually make a

10     drawing.  We had our own standards, but we would make a

11     drawing, saying this is a nonstandard Westinghouse; and

12     we referred to the Sargent & Lundy specification, so we'd

13     actually make a drawing of their specification.  And we

14     did that in 1972, --

15             Q    Okay.

16             A    -- the Form 40-H.

17             COURT REPORTER:  Excuse me; could I have just a

18     minute?

19             MS. EZELL:  Oh, absolutely.

20             COURT REPORTER:  Thank you.

21                 (Brief pause in proceedings to

22                 reconnect computer cables.)

23             COURT REPORTER:  And since we've paused, could

24     I ask you to slow down just a tad, and enunciate, so I

25     can last the whole day?

KINSER v. CBS CORP., Case No. 94-2282

1            THE WITNESS:  Oh, I'm sorry.

2            THE COURT:  All right.  Ask another question.

3  BY MS. EZELL:

4       Q    And so let me just, let me just ask this

5  question:  Was Form 40-H used at Zion for insulation on

6  the turbines?

7       A    Yes.

8       Q    Okay.  If you could look at your screen, do you

9  recognize this document, Defendant's Exhibit 2298?

10      A    Yes.

11      Q    And how do you recognize it?

12      A    Well, I've seen it in the, in the -- when I

13 reviewed the documents for Zion, I, I saw this document.

14      Q    Is it a Westinghouse document?

15      A    Yes, it is.

16           MS. EZELL:  Your Honor, at this time, I would

17 move for the admission of Defendant's Exhibit 2298, which

18 is Sargent & Lundy Form 40-H.

19           THE COURT:  Is it?  I haven't heard the witness

20 say that.

21 BY MS. EZELL:

22      Q    Oh, is this Sargent & Lundy Form 40-H?

23      A    Yes.

24           THE COURT:  Any objection?

25           MR. McCOY:  No objection, Judge.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  It's received.

 2              MS. EZELL:  Thank you, Your Honor.

 3              If I could display it to the jury, please.

 4    BY MS. EZELL:

 5         Q    Now, could you point -- could you join me here?

 6              (Brief pause in proceedings; witness is

 7              relocating at easel in front of the jury.)

 8         Q    I'm having a hard time seeing what you're

 9    pointing at, so if you can --

10              COURT REPORTER:  He needs a microphone.

11              (Brief pause in proceedings.)

12    BY MS. EZELL:

13         Q    All right.  Can you just highlight for the

14    jury, if you can, on this form where the change was made

15    from, as it related to asbestos insulation?

16         A    Well, -- is this on?

17         Q    Yeah.

18         A    Well, first of all, this is Form 40-H up here.

19         Q    Yes, sir.

20         A    And the issue date was --

21         Q    5/23--

22         A    Right.

23         Q    --72?  All right, sir.

24         A    Right.

25              And then there was a change made in December of
```

KINSER v. CBS CORP., Case No. 94-2282

 1    '72.  This is West-- this is when Westinghouse changed

 2    it.  I don't know when Sargent & Lundy --

 3         Q    Right.

 4         A    Westinghouse had it, had got this back, and we

 5    changed our drawings.

 6         Q    Right.

 7              And just where is -- what is the change that

 8    you're talking about?

 9         A    Right here.  They deleted the reference to

10    "asbestos jackets"; was changed to "aluminum jackets."

11    And they changed the Class B blanket description.

12         Q    Okay.  And I'll highlight that for you.  You

13    can go back and sit back down.

14              (Witness is resuming the witness stand.)

15              THE COURT:  He's double-mic'd now, right?

16              MS. EZELL:  He's double-mic'd.

17              THE WITNESS:  Should I take this one off?

18              MS. EZELL:  No.  You're good.

19    BY MS. EZELL:

20         Q    Now, when Westinghouse received any instruction

21    from its client, Commonwealth Edison, what did

22    Westinghouse do?

23         A    Well, this was, was -- this was received from

24    Sargent & Lundy.

25         Q    All right.

KINSER v. CBS CORP., Case No. 94-2282

```
1        A     Okay.

2        Q     But who worked for who?

3        A     Commonwealth Edison.

4        Q     All right.  And what did you do when you were

5  told to do something by your client Westinghouse -- or

6  Commonwealth Edison or Sargent & Lundy?

7        A     We would go back and get a change notice.

8        Q     Okay.  How important to Westinghouse was

9  Commonwealth Edison during this time period?

10       A     They were one of our number one power systems

11 customers at the time in the '70s.  What I was told, that

12 they were -- we were selling all kinds of Westinghouse

13 power plant equipment to Commonwealth Edison, and our

14 average sales were $100 million a year.

15       Q     Okay.  Speaking of that, how much was the

16 contract for the Zion nuclear power plant, the turbine

17 side, for Westinghouse and Commonwealth Edison?

18       A     I, I think each turbine, Unit 1 and Unit --

19 each turbine was sold in the mid-- '66/'67 for -- I think

20 it was $26 million.

21       Q     Okay.  And how much was the cost associated

22 with the insulation?

23       A     I'd estimate in the 100, the $100,000 range.

24 We had -- I had a budget -- because we had the erection.

25 I was given a million dollars in the budget to, for each
```

KINSER v. CBS CORP., Case No. 94-2282

1  turbine to erect it; and part of that budget was to do

2  the insulation installation.  That was a very small part

3  manual-wise, so the labor portion was a part of that

4  million dollars.  The material portion was part of the

5  main contract.  But I would say the thermal insulation

6  was a very small part of the cost-wise of our contract.

7       Q    Okay.  Did Commonwealth Edison and Sargent &

8  Lundy require you to follow their specifications?

9       A    In the specification, we were told that we had

10  to conform to the Sargent & Lundy standard

11  specifications, Form 40, to, when we designed,

12  manufactured, and installed the turbine.

13      Q    All right, sir.

14           Now, did you, at my request, bring with you a

15  model -- I'm sorry, an animation of how a turbine, a

16  nuclear power plant with a turbine operates?

17      A    Yes, I did.

18      Q    Okay.  And we're going to display that -- you

19  can watch it on your TV.  We're going to display that for

20  the jury, and you can just talk them through what's

21  happening.  Okay?

22      A    Yes.

23      Q    And then -- tell me the exhibit number.  It's

24  the next demonstrative.

25           MS. EZELL:  Your Honor, this is Demonstrative

KINSER v. CBS CORP., Case No. 94-2282

```
 1   16 that we're going to be playing for the jury, okay,

 2   with permission?

 3             THE COURT:  I hear no objections.  You may

 4   proceed.

 5             MS. EZELL:  Thank you, Your Honor.

 6             (Exhibit is published in open court.)

 7   BY MS. EZELL:

 8       Q    Okay.  And can you tell us what we're looking

 9   at?

10       A    Yeah.  This is a schematic, animated schematic

11   of a nuclear power plant.

12       Q    Yes, sir.

13       A    And all power plants do the same thing.  They

14   convert fuel into electricity.

15       Q    Will you pause it, please.

16             Actually, would you be comfortable coming down

17   here and pointing to it on this TV?  That might be more

18   helpful.

19             (Brief pause in proceedings; witness is

20              relocating at TV in front of the jury.)

21       Q    And we've learned that --

22       A    On this big -- point?

23       Q    Yeah.

24             -- pointers don't work, so we're going to go

25   old school and just use that pen.
```

KINSER v. CBS CORP., Case No. 94-2282

1          All right.  Go ahead.  I apologize.

2      A    Well, all power plants convert fuel to

3  electricity and fossil power plants -- your fossil fuels

4  are coal and gas.

5          COURT REPORTER:  Excuse me.  The microphone

6  isn't picking up very well.

7          MS. EZELL:  It wasn't on.

8          COURT REPORTER:  Well, that would explain it.

9      A    The nuclear plant, the fuel is enriched

10  uranium.  Okay?  So the nuclear plant has two components

11  we talked about:  the nuclear, the nuclear section,

12  nuclear supply, steam supply system; and the turbine

13  section.

14          And the main components in the nuclear section

15  are the nuclear reactor that contains the nuclear fuel,

16  and a steam generator.  And that's in the nuclear steam

17  supply system.

18          In the turbine building, you have the steam

19  turbine, and you have a generator; and there's a device

20  in there called a condenser in the turbine building.

21          There's three fundamental systems in the

22  nuclear plant.  You have the prim-- the red here is

23  called the primary system.  And that basically is water

24  that's pumped through the reactor vess-- the reactor

25  vessel.  It's a steel vessel, and it contains the nuclear

KINSER v. CBS CORP., Case No. 94-2282

1  fuel.  The nuclear fuel is uranium in pellets, and it's

2  in the, in tubes -- a metal called zirconium.

3          And as the water is circulated through that, it

4  picks up heat from, from the -- you can control the

5  atomic reaction, the fusion reaction in, in the reactor

6  vessel where you have these things called "control rods."

7  And they are separate rods you can insert down, and then

8  they absorb neutrons; and you can control the level of

9  radioactivity by these control rods.

10          So the, the, the heat then is, is given to the

11  water; and you know when you spill -- when you boil

12  water, it boils at atmospheric pressure of 212 degrees,

13  right?  Well, that's called the saturation -- for every

14  pressure -- saturation pressure's where water boils to

15  steam.

16          Well, we don't want -- we don't want the water

17  to boil here on the, on the red.  So we have a thing

18  called a pressurizer; and you maintain the pressure above

19  the saturation pressure so the red water never boils but

20  it heats up.  We maintain the pressure about

21  2,000 pounds; and so that, that leaves you a temperature

22  of the water in the red of about 550 degrees.

23          Now, that water is pumped through the steam

24  generator.  That's the second vessel.  And that steam

25  generator has water in it; but that water, we want it to

KINSER v. CBS CORP., Case No. 94-2282

1  boil to make steam.  So we lower the pressure here to

2  about 1,000; and with that 550-degree water going through

3  tubes, it boils the water in the steam generator.

4          That creates steam, and that's piped over to

5  the turbine building, and it goes through -- there's a

6  couple sections.  There's a high pressure turbine, and

7  there's a low pressure turbine.  So the high pressure

8  steam goes into the high pressure turbine, and the

9  turbine has got a rotating part called, like, a fan

10 blade; and it does its work, and the steam rotates the

11 shaft.

12          And you notice the shaft connects on to the

13 high pressure to the low pressure to the generator.  So

14 the steam goes to the high pressure; and as it goes

15 through there, it loses pressure and temperature and

16 expands.  And we, we, we take the steam out of the high

17 pressure.  We run it through a reheater and separator,

18 moisture separator, and reheat it; and then we run it

19 through the low pressure turbine, and then that, that

20 steam goes to, is exhausted to a condenser.

21          We actually -- a big -- a condenser's a big box

22 that we pull a vacuum in.  And you can see a third system

23 here; this is water from Lake Michigan, and we circulate

24 that water through tubes in the condenser.  That

25 condenses the steam.  So the steam is generated -- the

KINSER v. CBS CORP., Case No. 94-2282

1  steam generator, it goes through a turbine, does its

2  work, comes in the condenser; it gets condensed back to

3  water, which we call condensate, and that's pumped back

4  up to the steam generator.

5         So the first -- the primary system is your, is

6  the red fluid.  The secondary system is the water that

7  turns to steam.  And the tertiary, the third system, is a

8  cooling water.  And some power plants -- you know, when

9  there's no lake, they have these big cooling towers?

10  That's cooling the water because you have to condense the

11  steam.  That turns this generator.

12         Now, the generator -- how you make electricity,

13  you need a magnetic field, motion, rotation, and

14  electrical conductors.  So the generator, the rotating

15  part is your magnet.  That's the rotor, and that's made

16  to -- that creates your magnetic field.  And electricity

17  then comes off the stator part, goes out and is

18  transmitted to the, to the, to your homes.

19     Q    How much wattage, or --

20     A    Okay.

21     Q    -- however you measure, did Zion 1 or Zion 2

22  create in electricity when it was fully functional?

23     A    Each unit created a thousand -- a million

24  kilowatts, a thousand mega or a million kilowatts.

25  That's two million kilowatts.

KINSER v. CBS CORP., Case No. 94-2282

```
1              Now, Commonwealth Edison's system at the

2    time -- they had a lot of power plants -- their total

3    system was probably 12 or 13 million kilowatts, so Zion

4    was a good portion of that.

5              Now, to create that, the amount of steam you're

6    putting through is, is 13 million pounds an hour.  That's

7    the amount of steam in the water that was in the

8    secondary system.  And to put that in context, if --

9    there's 8, 8 gallons of water for every pound; and so if

10   you go to a minute, that's about 27,000 gallons of water

11   a minute that's flowing through this in steam.

12             I got a swimming pool back in Winter Park.

13   It's 27,000 gallons.  It takes me two days to fill that

14   with a hose.  If I had this pump right here, I could fill

15   it in one minute.  So that's the kind of flow you needed

16   to generate that power.

17             If you convert kilowatts to horsepower, one

18   kilowatt's about 1.4 kilo horsepower, so that's putting

19   out about 1,400,000 horsepower per unit.  So it gives you

20   the idea of the -- it's a lot of energy.

21        Q    Right.  Okay.  Thank you very much for that.

22                  (Witness is resuming the witness stand.)

23        Q    Now, let me ask you -- well, go ahead and sit

24   down.

25             Where did this animation come from?
```

KINSER v. CBS CORP., Case No. 94-2282

1    A    Well, I worked with the animator you gave me,

2    and I sat and he put it together.  The guy was an IT man,

3    and --

4    Q    Okay.

5    A    -- we built this together.

6    Q    All right.  Have you testified in court before?

7    A    Twice.

8    Q    Okay.  All right.  Now, you indicated that the

9    turbine components that were used to build these were not

10   built on site.  Where, where were the turbine components

11   built?

12   A    Well, they were manufactured -- we had three

13   factories that manufactured Zion.  The South Philadelphia

14   factory manufactured the high pressure turbine.

15   Q    Okay.

16   A    The low -- the three low pressure turbines were

17   manufactured at a turbine, a nuclear turbine plant in

18   Charlotte.  And the generator was manufactured in East

19   Pittsburgh Works, in Pittsburgh.

20   Q    All right.  And I know you just sat down; but

21   did you also, at my request, bring a model here that will

22   help the jury understand the high pressure turbine and

23   how it works and how it's insulated?

24   A    Yes.

25        MS. EZELL:  And what's our demonstrative number

1    for this?

2           MS. BURLISON:  14.

3           MS. EZELL:  And we'll be substituting a

4    photograph for the record of this demonstrative.  Your

5    Honor, with your permission I'd like to have the witness

6    display this to the jury.

7           THE COURT:  He may.

8           MS. EZELL:  And what was its number?

9           MS. BURLISON:  14.

10          MS. EZELL:  14.

11          Oh, thanks, Jake.

12          All right.  You and I come over here.  It's

13   Demonstrative 14.

14              (Brief pause in proceedings; witness is

15               relocating at model in front of the jury.)

16          MS. EZELL:  All right.  And I'm going to put

17   up, also, a photograph at this time, which is Defendant's

18   Demonstrative 20, with no objection, which I think

19   will -- you've told me will help you explain this turbine

20   unit to the jury.

21          So why don't you, using the photograph and our

22   model here -- and if anybody can't see, Your Honor -- may

23   they just stand up?  If you can see, I reckon they can.

24   BY MS. EZELL:

25     Q    All right.  So tell me what this is.

KINSER v. CBS CORP., Case No. 94-2282

1      A     This is a model of a, of a high pressure

2   turbine.

3      Q     Okay.  And tell us what the different parts

4   are, and tell us which side connects to what.

5      A     Okay.  This is more of a -- this is a little

6   smaller than the Zion.  The Zion nuclear turbine was a

7   bigger, high pressure.  But this -- there's two parts to

8   any turbine.  There's the cylinder stationary parts.

9   This is a cylinder, this round thing here; and there's

10  the rotating part.  You can see in the picture; that's

11  what the inside looks like.

12          And the cylinder is manufactured so it's split

13  at the horizontal joint so that you can install the

14  rotating part and also overhaul it.  And because this is

15  a pressure vessel -- we talked about, at Zion, you know,

16  1,000 pounds of pressure coming in, a high pressure --

17  this has to be held tightly together, leak-proof.  So you

18  have a horizontal joint with some very heavy bolting all

19  around it that bolts it.  Okay?  And the bolting is, is

20  torqued up to about 45,000 PSI.

21      Q     Let me ask you a question.  Are these holes

22  here where those bolts run?

23      A     Yes.

24      Q     Okay.  And now we've heard some testimony about

25  there being some kind of gasket in between here.  I don't

1  ]see those.  Where are those?

2       A    There was no gasket.  This is a metal,

3  metal-to-metal joint, and we used Alinco -- it's a triple

4  boiled linseed oil -- for the sealing; and it's very --

5  we actually torque these bolts and measure them.  They

6  actually -- to, to tighten these bolts, you can't use a

7  torque wrench.  You have to -- we put a heating rod in

8  it, an expandable valve, turn the nut down; and then when

9  it's cold, we measure how much it's stretched.  45,000

10  psi is one and a half thousandths per inch of free lance,

11  so it's a 40-inch free lance, so that means this bolt has

12  to expand 60 thousandths because we want this joint to

13  stay clamped because when you're cold and heat up, you

14  know, this steel expands.  So this whole turbine is going

15  to grow about an inch this way and probably half an inch

16  in, in, circumferentially; and we want to do it evenly,

17  without distortion.

18       Q    All right.  And what are these two holes right

19  here?

20       A    That, that's where the steam would come in, the

21  steam that we talked about, the steam unit from the high

22  pressure.  Zion had four steam inlets.  These were

23  22-inch diameter pipes, so four 22-inch diameter pipes

24  inlet.  This is the exhaust.  You notice the exhaust

25  where the steam comes out to go to your low pressure.

KINSER v. CBS CORP., Case No. 94-2282

1   This is a fossil unit that, at Zion, so it only had one

2   exhaust.  Zion had so much flow that we had, we had six

3   of these exhaust.  We had two on the top, and we had four

4   on the bottom.  So we had two crossover pipes, four

5   crossunder pipes, taking the steam out to these reheaters

6   to the, to the -- and that was about 36-inch diameter

7   because as steam goes through the turbine, it comes in

8   at -- at Zion it was 1,000 pounds/500 degrees; it's down

9   to about 150 pounds and about 400 degrees here, so it has

10  to be reheated.

11      Q    And the reason that it -- what did it do while

12  it was in there that it changed?

13      A    Well, it's rotating.  The steam goes through

14  these bladings that -- basically turbo blades, and it

15  rotates the, the -- it creates -- the turbine, the Zion

16  turbine ran at 1800 RPM, so it -- and it turns the

17  generator rotor.

18      Q    And how, and how does that relate to creating

19  the electricity?

20      A    Well, the generator, this is, you know,

21  mechanical energy, rotation; and the generator, that's --

22  the rotating part is a rotating magnet.  It's called the

23  field.

24      Q    Okay.

25      A    And it, it creates a magnetic field in the

KINSER v. CBS CORP., Case No. 94-2282

1  stator, in the stationary part of the generator, and that

2  creates electricity.

3      Q    All right, sir.  Now, what is this gray stuff

4  on top?

5      A    Well, this shows you -- this is the block

6  insulation, the gray part, that you cover the turbine

7  with.  The turbine -- so the way the turbine's designed,

8  we have block insulation; and this is -- Sargent & Lundy

9  specs is to use block, and Westinghouse would use block.

10     Q    And let me just ask you this:  Block can be

11 block with asbestos or without asbestos, correct?

12     A    Correct.  It's calcium silicate or different --

13 we use -- Westinghouse spec used mineral wool.  Our

14 block, our specification at the time was mineral wool,

15 which had no asbestos in it.

16     Q    But, but just keeping with Zion, what was

17 installed was no asbestos --

18     A    That --

19     Q    -- block insulation?

20     A    -- the spec Sargent & Lundy called for was

21 asbestos-free calcium silicate.

22     Q    Calcium silicate, all right, sir.

23         So go ahead and tell us what the gray stuff was

24 on top relative to the turbine.

25     A    Well, the gray stuff represents the block

KINSER v. CBS CORP., Case No. 94-2282

1   insulation, which is permanent.  You don't have to remove

2   that.  Okay?

3        Q    All right.

4        A    So that's why we have a block on the top, the

5   cover, and the base of the turbine.

6        Q    Okay.  Now we've heard a lot about blankets.

7        A    Right.

8        Q    What do we do to show them the blankets?

9        A    Well --

10       Q    Take and coordinate this a little bit.  Okay.

11       A    Well, both Sargent & Lundy and both

12   Westinghouse say that the specification called for

13   removable insulation systems where you have to get to the

14   bolting for maintenance.  So, you know, you have to take

15   this apart.  You have to take those bolts out, so you

16   have to remove insulation to get access to the bolts.

17       Q    All right.

18       A    So we're --

19       Q    Let's remove some insulation here.

20       A    In the Sargent & Lundy specs, they said we want

21   blankets where you have to do turbine maintenance to get

22   access to bolting, so this would be on piping flanges, on

23   the horizontal joint of the turbine.  We want to use

24   blankets.  Okay?  So the blankets are like mattresses,

25   and it was actually two layers of blankets, about two

KINSER v. CBS CORP., Case No. 94-2282

1  inches thick.  And this is a side.  You have to be able

2  to handle it, so these are -- this is probably the number

3  of blankets you'd have on a -- we see one, two, three,

4  four, five, six, seven; and it would be in two, each

5  side.  That would be 14, and there's two layers.  So it

6  would probably be about 28 blankets on the high pressure

7  turbine.

8       Q    All right.  Well, let me -- let me undress it

9  again just a minute.

10       A    All right.

11       Q    And so let me talk to you about the blankets

12  that were at Zion.  Were these blankets cut and, and fit

13  at Zion, or were they manufactured somewhere off site?

14       A    Well, the insulating contractor would have a

15  fab shop where they'd manufacture the blankets.  They'd

16  come on site.  We had drawings.  They gave them

17  approximate dimensions; but to make it fit right, they'd

18  actually come on site and measure.

19       Q    So they measured this?

20       A    Measure this.  They'd take measurements.

21       Q    Okay.

22       A    And they would go back to the shop and

23  fabricate the blankets.

24       Q    Okay.  Now, the blankets at Zion that were

25  actually installed, what were the blankets covered with?

KINSER v. CBS CORP., Case No. 94-2282

1      A      The blankets at Zion used what's called a

2   stainless steel mesh on the covering, and it was filled

3   with either fiberglass or ceramic fill.

4      Q      All right.  And then they had grommets on them.

5   What were those made of?

6      A      They're made -- well, it's like a mattress.

7   You had stainless steel grommets to hold them together

8   and stainless steel wiring so it's attached to the

9   turbine.  We had attachments on the high pressure

10  railing, and we had hooks that you could use stainless

11  steel wire to bolt the blankets on.  So you'd cut -- to

12  remove it for maintenance, you pull the stainless steel;

13  you come down with a crane with a chain fall and just --

14     Q      It wasn't easy to get them off, right?

15     A      No.

16     Q      Okay.  All right.  You can take your seat.

17  I'll take care of this.

18     A      Just to give you another --

19     Q      Oh.

20     A      -- the Zion high pressure turbine, this

21  cylinder was about 20 feet long, about 10 feet in

22  diameter.  But the whole turbine, because you had three

23  low pressure turbines, they were only 40 feet each, the

24  generator -- the total turbine, from the front end to the

25  back end, the total turbine was about 200 feet long.

KINSER v. CBS CORP., Case No. 94-2282

1      Q      All right.  And about how wide?

2      A      It was about 13 or 14 feet wide.

3      Q      All right, sir.  Thank you.

4             (Witness is resuming the witness stand.)

5             (Brief pause in proceedings.)

6  BY MS. EZELL:

7      Q      Approximately how long does it take to build a

8  turbine?

9      A      Well, in the Zion case, it took almost two

10  years for each turbine.

11      Q      Now, how would you -- how would you describe

12  the, the pressure on you as the chief engineer of, of

13  building a turbine system for a nuclear power plant?

14      A      Well, I mean, you go every day, and you do a

15  little more work; but your concern is, when you end up,

16  you want to make sure that -- like I talked about,

17  foreign material, you want to make sure that there's

18  nothing in there that's going to hurt the turbine.  You

19  want to make sure that there's no blank flanges that's

20  going to cut flow of oil.  You want to make sure that all

21  those fasteners are tightened so you don't have leakage.

22  So those are the three things we'd focus on.

23             We had quality programs to make sure those were

24  done; but, you know, I'd go to sleep at nights and worry

25  about, gee, did we leave something in it?  Because you

1  can't know until you start it up, you know.

2      Q    What did you tell me about how stressful this

3  was compared to all of the other jobs that you've

4  described?

5      A    Well, my whole career, I became -- in more

6  upper management jobs; but I was more stressful being a

7  field engineer.  Seemed I couldn't sleep at night

8  worrying -- I'd worry a lot more because you had

9  direct -- I felt direct responsibility for making sure

10  this thing was built right, you know.

11     Q    All right.  Now, when you were working at Zion,

12  do you recall there being unions on site?

13     A    Yes.  It was a construction job, and it came

14  under the -- there was a local, the local unions.  All

15  the unions are international unions, but they have a

16  local, local chapters; and Zion had local chapters of all

17  the, all the crafts.

18     Q    So was it part of your job responsibility, or

19  just the practice of your job, to interface with the

20  unions on a regular basis?

21     A    Well, we had, we had the -- our workers were

22  union workers; and we had a foreman and stewards on the

23  site for each union, and you would work with them daily.

24  Yes.

25     Q    Okay.  And was there a chain of command, so to

KINSER v. CBS CORP., Case No. 94-2282

1    speak, in passing on safety information to the, to the

2    workers?

3         A    Well, all information was passed on to -- you

4    know, every day you'd get, you'd work with the foreman of

5    the craft, and the fore-- our engineers would tell the

6    foremen what had to be done.  And every engineer would

7    talk to all the, you know, workers on site even.

8         Q    Right.

9         A    But safety, we had weekly safety toolbox

10   meetings --

11        Q    Okay.

12        A    -- with the workers.

13        Q    So at Zion, tell me who was included in sort of

14   the, the chain of command as it related to safety.

15        A    Well, Commonwealth Edison had the ultimate

16   responsibility.  They were the owners.  And they had a

17   full-time safety engineer on site.

18        Q    Okay.

19        A    And then all the contractors that reported,

20   they had their -- they were responsible for their area of

21   activity of work.

22        Q    Right.

23        A    So, like, I was responsible for the turbine.

24   But they just went down -- everybody is responsible for

25   safety on a job like this.  Okay?  You see a hazard,

KINSER v. CBS CORP., Case No. 94-2282

1  you -- the three, the three -- the hierarchy of safety

2  is:  If you have a hazard, you get rid of the hazard.  If

3  you can't get rid of the hazard, then you put some kind

4  of administrative ranger in control so it wouldn't impact

5  anybody.  And if the hazard still exists, then you

6  provided personal protective equipment.  Those are the

7  three levels of how you looked at safety on a site.

8       Q    Okay.  And did Commonwealth Edison ever, to

9  your recollection at Zion, come and give you safety

10  advice about any of your practices?

11      A    Several occasions.  They would come by if they

12  saw something.  I remember one occasion we had a man --

13  before we had completed assembly of low pressure turbine,

14  we had a millwright working inside the turbine, in the --

15  didn't have a man outside looking in watching him and

16  they said, "Hey, you need somebody there."  And that was

17  caught by the Commonwealth Edison safety guy, and I --

18  right away, he came to me; and I went to our foreman and

19  said, "Hey, get another man in there."

20      Q    Okay.  Now I would like to discuss with you --

21  I'd like you to fast-forward to 1974.  Okay?  We've been

22  talking about 1970 to 1972.  And what was your job in

23  1974?

24      A    Well, I, you know, I was promoted to the

25  service, district service manager.  So I was working out

KINSER v. CBS CORP., Case No. 94-2282

1    of our Chicago office, had the respon-- you know, the

2    district service responsibility for the Commonwealth

3    Edison fleet and other customers.

4         Q    Okay.  And did that job include any kind of

5    responsibility for the Zion nuclear power plant?

6         A    Yes.  I was, I was the customer contact for

7    Zion; so if they wanted any engineering questions or if

8    they wanted Westinghouse to perform work, they would come

9    to our office, and I was responsible for assigning the

10   engineers to the site and also would visit the customer

11   regularly.  We would plan outages for future -- outage

12   work, that was my job to sit with the customer ahead of

13   time to determine the scope of work and what Westinghouse

14   involvement would be.

15        Q    So part of managing power plants was to plan

16   plant outages, correct?

17        A    That's correct.

18        Q    And they were planned because -- what were they

19   planned around?

20        A    Well, all, all maintenance, all power plants

21   had both corrective and preventive maintenance; and they

22   had overhauls over time.  They'd shut the plant down for

23   overhauls.

24             Our recommendation on the turbine was every

25   five years you should look at the turbine.  On the

KINSER v. CBS CORP., Case No. 94-2282

1    nuclear plant, the added -- they had to shut down for

2    refueling.  Usually 18-month periods they'd shut down to

3    refuel a reactor, and that took anywhere from one to two

4    months.  So all the maintenance at Zion was scheduled to

5    be done during those refueling outages.  Okay?  If you

6    weren't -- otherwise, you wanted the unit running.  So

7    you couldn't go and say we had to work on the turbine.

8    They'd tell you:  This is when we're shutting down for

9    refueling, and that's when you'd plan the outage for the

10   turbine.

11        Q    And how did those outages relate to the usage

12   rate for electricity in the community that those, that

13   those plants served?

14        A    Well, Commonwealth Edison, you know, they

15   had -- we talked about 13/14,000 megawatts capacity at

16   the time.  And it's summertime.  They're a summer-peaking

17   facility because of air conditioning.  So they wanted all

18   the plants available in the summertime, and they also had

19   a winter peak, right now.  They'd want both -- all the

20   plants available to supply electricity during their peak

21   periods.  So all the maintenance and all the refueling

22   outages were planned either in the spring or fall.

23        Q    Okay.  So when you said that you were the guy

24   who was responsible for interfacing with the client in

25   1974, who would be the guy that they called if something

KINSER v. CBS CORP., Case No. 94-2282

1  went wrong at Zion?

2      A    On the turbine?

3      Q    Yes, sir.

4      A    Well, the turbine -- the plant, the plant had a

5  superintendent.  They had a maintenance engineer.  They

6  would call our office, the district office in Chicago, --

7      Q    Uh-huh.

8      A    -- me or -- I had a, a couple of engineers in

9  the office.  They would call our office.

10     Q    Okay.  So in 1974, what went wrong at Zion?

11     A    Well, Unit 1 had, wasn't running, had been

12 started up in mid of '73, and it went into commercial

13 operation in December of '73.  So Unit 1 was running at

14 full power.

15          Unit 2 had started up in December of '73.  And

16 the Nuclear Regulatory Commission, you can't just go to

17 full power with a nuclear plant.  It takes three to four

18 months.  They come up, and they do testing at various

19 power levels.  And Unit 2 was coming up to that

20 100 percent power level.  Before it got to 100 -- when

21 they were going to 100 percent, the generator, the elec--

22 our gen-- electrical generator failed.  It's like a

23 circuit breaker at home.  It tripped out.  And when the

24 customer looked, they, they basically opened the access

25 into the generator, and they saw they had burning and

KINSER v. CBS CORP., Case No. 94-2282

1  carbon in there.  Something had, had failed in the

2  generator.

3      Q    All right.  Now, in approximately what day or

4  month was that, if you recall?

5      A    April or May of '74.

6      Q    Okay.  So in April or May of '74, of all the

7  plants and all of the issues that you had to deal with at

8  that time, how would you rank that on your list of

9  priorities?

10     A    Definitely number one.  This was a nuclear

11 power plant.  Westinghouse was building nuclear power

12 plants and selling them.  And when you have -- obviously,

13 the generator is burned, and it is a major failure.  So

14 that was number one.

15     Q    Where were you when you heard about the failure

16 of the generator at the Zion nuclear power plant?

17     A    I actually was on a Westinghouse management

18 training program in Pittsburgh, and I got a call from my

19 boss in Chicago -- my region manager was in Chicago, too,

20 Harry Brunken, called up and said, "We want you to go to

21 the Allegheny County Airport.  You're going to meet

22 Gordon Hurlbert, the executive vice president of power

23 generation; and because Zion's generator failed, you're

24 going to get on the corporate airplane and fly out to

25 Chicago with him."

KINSER v. CBS CORP., Case No. 94-2282

1          So I went to the Allegheny County Airport,

2     which is that airport, and it's the first time I've

3     ever -- first and last time I've ever been on our

4     corporate jet.  It was a Gulfstream, and we jetted out to

5     Chicago.  And we met the next day at Zion with the top

6     management of, of Commonwealth Edison because they were

7     concerned about what had happened, how long does it take

8     to fix it, and, and Gordon Hurlbert, our executive vice

9     president, met with -- Tom Ayres was the CEO of

10    Commonwealth Edison, and it was a cast of thousands.  So

11    we had a meeting to discuss this problem.

12         Q    And at this meeting with this cast of

13    thousands, who did they say at Westinghouse was going to

14    be the guy to solve the problems?

15         A    Well, obviously, I could solve -- but Gordon

16    Hurlbert -- I still remember this.  Here I was, 32 -- a

17    32-year-old guy.  I had been in management for one year,

18    and I had an executive vice president from my company

19    talk to a Commonwealth Edison chairman of the board,

20    or -- yeah, CEO, and say, "I want you to know that Doug

21    has the full resources of Westinghouse to resolve this

22    problem."

23         So, you know, it was overwhelming.  That's why

24    I remember it so distinctly.  That was probably the most

25    significant thing that had ever happened to me in my

KINSER v. CBS CORP., Case No. 94-2282

1  career at that time, you know.

2      Q    So after that meeting, how would you describe

3  the effort that you put into -- days or, did you have any

4  overtime?  What was the type of effort that you put into

5  solving the Zion outage problem of 1974?

6      A    Well, it wasn't only my effort; it was a

7  Westinghouse effort.  We brought out --

8      Q    Yes.  How would you describe --

9      A    -- the engineering people from, from Pittsburgh

10  that designed the generator --

11     Q    And, Mr. Ware, can you slow down just a little

12  bit.

13     A    Okay.  We brought out engineering people from

14  Pittsburgh.  We brought out our factory technicians.  We

15  disassembled the generator.

16     Q    Oh, you know what?  I can slow you down.  I'll

17  show you pictures.

18          I was going to ask for an agreement.

19              (Brief pause in proceedings;

20              counsel conferring.)

21         MS. EZELL:  Your Honor, by agreement, I have

22  Demonstrative Number 13.

23  BY MS. EZELL:

24     Q    Now, what is that?

25     A    Well, that's, that's not the Zion generator,

KINSER v. CBS CORP., Case No. 94-2282

1    but it's a typical Westinghouse electrical generator; and

2    that shows it assembled.  You can see the bracket on the

3    end, the rotating parts -- installed.

4         Q    Is that?

5         A    Uh-huh.

6         Q    Okay.  And what is this right here?

7         A    Well, that's an access port.

8         Q    So after the generator failed and you indicated

9    that they opened the access port, --

10        A    Right.

11        Q    -- do you remember saying that --

12        A    Right.

13        Q    -- a few minutes ago?

14        A    That was already done.

15        Q    Okay.  Is this where they could see the carbon

16   and smell the burning?

17        A    Yes.

18        Q    Okay.  Now, when you -- after you had the

19   meeting and you went -- did you go to Zion --

20        A    Yes.

21        Q    -- pretty soon after that meeting?

22             Is this what the unit looked like?

23        A    Well, it looked -- yeah.  It was assembled like

24   that.

25        Q    Similar?

KINSER v. CBS CORP., Case No. 94-2282

1     A     Right.

2     Q     In this --

3     A     Right.

4     Q     It hadn't been disassembled or anything done to

5     it?

6     A     That's correct.

7     Q     Okay.  And so then by agreement, I'd like to

8     show Demonstrative Number 17.

9           So explain to the ladies and gentlemen of the

10    jury both what you did and approximately how long each of

11    these steps took, and I'll show these pictures as we, as

12    we make our way through that process.

13    A     But we used -- the millwrights are a craft

14    labor that does work on disassembly and reassembly of

15    turbines; so we hired a millwright crew right away, and

16    we disassembled it.

17          This isn't the Zion generator; but it shows you

18    have to remove the rotating element, the rotor, out of

19    the generator is the first step.

20    Q     All right.  And where did you -- did you repair

21    that on site or what did you do with it?

22    A     No.  The generator rotor weighed about

23    200 tons, so we, we -- we actually could ship it.  We

24    shipped it back to the factory by rail, so that went back

25    to the factory.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  And then I have Demonstrative Number 19.

2  And this is not the Zion generator rotor, but tell us

3  what the lady and gentleman in the photograph are doing.

4      A    Well, this shows you kind of the construction.

5  It's basically a steel forging, and it's got slots in it

6  with, with -- these are carpet coils, and that's how you

7  make it a magnet.  And so all that was burnt in carbon.

8  We had to -- they had to -- back at the factory, they had

9  to completely strip out all the copper, clean it, and

10  reinstall new, new winding.

11      Q    Okay.  And about how long did that process take

12  that was done -- and where in the country did this take

13  place?

14      A    Well, East Pittsburgh -- we had a, a factory

15  there, East Pittsburgh Works, and that's where that was

16  done.  That was in Pittsburgh, Pennsylvania.

17      Q    And approximately how long did that process

18  take once that thing arrived back in, at the East

19  Pittsburgh Works?

20      A    That was two, two to three months for that

21  portion.

22      Q    Okay.  And then while that was back in, at East

23  Pittsburgh Works, the rest of the generator -- we have

24  Demonstrative 18 by agreement -- explain what was going

25  on with the part that was actually left at the Zion

KINSER v. CBS CORP., Case No. 94-2282

1   plant.

2       A    Well, that's the stationary part called a

3   stator, and that actually was assembled in the field.  It

4   was five pieces, and then the electrical core was

5   installed.  So that was just too big to ship back.  You'd

6   have to -- it would have taken a month to take it apart,

7   so that was decided to repair that in the field.  So --

8       Q    And what -- okay, go ahead.

9       A    So we had to actually do a factory type

10  operation, that's normally done in the factory, in the

11  field; and where it's all red in there, that's electrical

12  components.  That was all black and soot.  We had to

13  strip it completely out, and for that work we used -- we

14  brought out our, our factory technicians, called

15  "winders"; and, and they did the stripping and cleaning,

16  and then we had to manufacture all new electrical

17  components and reinstall them.

18      Q    And how long, approximately, did that take?

19      A    The whole project took about, almost four

20  months; and we worked seven days a week, 24 hours a day.

21      Q    Now, was this work covered by the warranty that

22  Westinghouse had provided to Commonwealth Edison?

23      A    Yes, it was.

24      Q    Okay.  And by "covered by the warranty" --

25  well, let me just ask this:  So who was paying for all of

KINSER v. CBS CORP., Case No. 94-2282

1    this work that you've been describing?

2        A    Westinghouse was.

3        Q    Okay.  And who was in charge of keeping track

4    of the money spent during this project and what work was

5    being done?

6        A    Well, I, I was kind of overall overseeing the

7    whole project.  And we had, you know, we -- number one,

8    we had, yeah, we had to track the cost.  Number two, we

9    had to put a schedule together and update it.  We met

10   weekly with Commonwealth Edison management, upper

11   management, updating them on the schedule.

12           We also had to put a quality program --

13   Commonwealth Edison wanted to know why it failed, what we

14   were going to do to prevent another failure; and when we

15   reassembled it, they wanted to make sure that we had a

16   quality program that provided all the documentation to

17   know that it was done right.  So we had to put all that

18   together.  We had -- a major project.

19       Q    Now, while Zion 2 was being disassembled in the

20   manner that you've just described, was Zion 1

21   functioning, the entire -- what did you say? -- four to

22   five months?

23       A    Yeah.  Zion 1 was running.  They were going

24   into their summer load.  Zion 1 was up at full power that

25   whole time.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    Okay.  Now, I'm going to show you what's been
2  previously shown to the jury as Demonstrative Number 8.
3  Okay.  You have not seen this yet, but I'll explain to
4  you what it is.
5           This is a -- this is just a sketch that we've
6  used throughout the case, and I'll just represent to you
7  that this is a drawing that approximates one of the
8  turbine units at Zion.  Okay?
9           And this is supposed to be the high pressure
10  turbine and then the three low pressure turbines and then
11  the generator.  Okay?
12     A    Yes.
13     Q    Does this make sense to you, at least
14  graphically?
15     A    Yes.  It looks like the plan if you're looking
16  down on it.  Right.
17     Q    Okay.  All right, sir.
18           Now, you have just described that the
19  generator -- which is circled in pink, correct? --
20     A    Yes.
21     Q    -- is the part that failed in 1974, correct?
22     A    That's correct.
23     Q    Did any part of the low pressure turbines -- 1,
24  2, or 3 -- fail in connection with the generator failure?
25     A    No.

KINSER v. CBS CORP., Case No. 94-2282

1       Q    Did any part of the reheaters, which are

2   connected to the low pressure turbines, fail in

3   connection with the generator failure?

4       A    No.

5       Q    Did any portion of the high pressure turbine

6   fail in connection with the failure of the generator?

7       A    No.

8       Q    How many days per week on average did you go

9   from downtown Chicago, where you were working at the

10  time, to the Zion plant during this forced outage at Zion

11  in 1974?

12      A    I was at Zion once or twice a week.  I was at

13  their headquarters downtown weekly.

14      Q    And by "their" headquarters, who --

15      A    Commonwealth Edison headquarters.

16           And I also made several trips back to our

17  factory with the customer to see how the rotor was going,

18  so I was pretty much the whole time on top of Zion.

19      Q    All right.  During the time that the generator

20  was out in the manner that you have just described, were

21  any of the -- well, let me just ask you.

22           Was there a total overhaul of the high pressure

23  turbine at Zion?

24      A    No.

25      Q    Was there an overhaul of the high pressure

KINSER v. CBS CORP., Case No. 94-2282

1  turbine at Zion?

2      A    No.

3      Q    Were, were -- can you put the -- can we go back

4  to Ms. Burlison's screen?  Is it still up?

5           Is that on your TV?

6      A    Yes.

7      Q    Was the high pressure turbine open?

8      A    No.

9      Q    Was the low -- were the low pressure turbines

10 open?

11     A    No.

12     Q    So I'm -- I apologize for the squeaking, but

13 you-all remember these bolts.  Were these bolts opened on

14 this turbine at Zion in 1974?

15     A    No.  I mean, the insulation was not removed, so

16 the bolts weren't open.

17     Q    Well, that's my next question.

18          Were these blankets taken off the high pressure

19 turbine in 1974 at Zion?

20     A    No.

21     Q    You didn't need to do anything to the turbine

22 in order to fix the generator?

23     A    That's correct.

24     Q    All right.  Now, who did Westinghouse hire --

25 let me ask a better question.

KINSER v. CBS CORP., Case No. 94-2282

1           Did Westinghouse need to hire any laborers to

2    assist with the generator outage of 1974?

3        A    Yes.

4        Q    What type of laborers did Westinghouse hire?

5        A    We hired millwrights to disassemble the

6    generator.  We hired -- we had to operate the overhead

7    crane, and we hired the elec-- the overhead crane, the

8    jurisdiction went -- there was two overhead cranes, and

9    usually an operating engineer operated one and an

10   electrician.  We hired an electrician to operate the

11   crane.  And we hired two electricians per shift to help

12   our winders, so we have two electricians per shift.  We

13   probably had a crew of millwrights per shift, and the

14   rest of the people were all Westinghouse factory people.

15       Q    Okay.  We can switch the screen out.  Thank

16   you.

17           During the forced outage at Zion, do you recall

18   that because -- well, let me ask you this.

19           Was the entire Turbine 2 shut down if the

20   generator is, is out?

21       A    The whole Unit 2 -- from the nuclear side, the

22   whole Unit 2 side of the plant was shut down.

23       Q    Okay.  Because if the generator doesn't work,

24   then that whole side of the plant is shut down?

25       A    The whole side -- yeah, the whole -- and plus

KINSER v. CBS CORP., Case No. 94-2282

1  the nuclear side because you can't -- you know, you go

2  to -- everything, everything shuts down.

3       Q    Okay.  So during that time, do you recall

4  seeing laborers for other contractors on site doing odd

5  jobs that, that were not associated with the generator

6  repair?

7       A    I don't recall it, but it happens.  I mean,

8  they had a -- you know, there's always a punch list of

9  items to do.  So when a plant shuts down, Commonwealth

10  Edison would take advantage of that, and they would hire

11  some contractors; and they would do preventive work or

12  other work in other parts of the plant, but I don't

13  recall -- I was focused on that generator.  Okay?

14       Q    So if they were there, they weren't working on

15  the Westinghouse Turbine 2 unit, correct?

16       A    Turbine 2 unit, including the whole Turbine 2

17  system, our piping and everything else, --

18       Q    All right.

19       A    -- they weren't working on that.

20       Q    All right, sir.

21            (Brief pause in proceedings.)

22       Q    Now, I have an admitted exhibit.  When I said I

23  was done, I meant I needed it in just a minute.

24            THE COURT:  Are you addressing the Court?

25            MS. EZELL:  No, the deputy.

```
 1              DEPUTY CLERK:  What exhibit is it?

 2              MS. EZELL:  It's 2298.

 3    BY MS. EZELL:

 4         Q    Now, you have explained to the ladies and

 5    gentlemen of the jury that this document, Sargent &

 6    Lundy's Form 40-H, was the specification that was used at

 7    Zion, correct?

 8         A    That's correct.

 9         Q    Now, was there -- and that this document did

10    not call -- or specifically said "nonasbestos," correct?

11         A    That's correct.

12         Q    Now, did Sargent & Lundy previously have a

13    document that called for asbestos insulation at Zion?

14         A    Well, when we bid -- bid the job, their Form

15    40-G was in effect, and that allowed -- yeah, there was,

16    there was asbestos involved in that, that, that -- this

17    document made three changes to, to the G document.

18         Q    Okay.  And you already explained what those

19    changes were earlier today?

20         A    Yes.

21         Q    All right.  But as you sit here today, based on

22    your recollection of your time at Zion, what do you

23    recall about the insulation at Zion?  Asbestos --

24         A    Okay.

25         Q    -- or no asbestos?
```

KINSER v. CBS CORP., Case No. 94-2282

```
1      A     Well, I, I wasn't there when the insulation

2   was -- when the insulation was installed.  I was already

3   in the office when they did -- in '73.  So I don't

4   specifically recall it going on at that time period.

5           But I do know that we were required to follow

6   the Sargent & Lundy specifications; and I know when we

7   went out for bids, we would have used the current

8   specification.  This was an update to see.

9           Number two, I do remember I was at Zion from

10  19-- up to 1981; and I know that the blankets were

11  stainless steel mesh, which I was very familiar with

12  because even with the Sargent & Lundy G on high

13  temperature applications, you used stainless steel mesh,

14  and I've been at a lot of other Sargent & Lundy jobs, so

15  I know what stainless steel blankets looked like.

16          Number two, all the piping had aluminum jackets

17  on, and number H required aluminum jackets rather than

18  asbestos cloth; and I know all the Zion piping, turbine

19  piping, had aluminum jackets on.

20     Q     Well, let me ask you this.  Does aluminum look

21  different than cloth?

22     A     A lot different.

23     Q     Okay.  Now, you mentioned the "OSHA"?

24     A     OSHA [different pronunciation].

25     Q     Yeah.  You said "OSHA" last time.
```

1      A      Okay.

2      Q      I remember how you said it.

3             Do you ever remember, during the time that you

4      were either at Zion or responsible for Zion, knowing that

5      an OSHA or OSHA [varying pronunciations] inspector had

6      been on site?

7      A      Yes.

8      Q      Okay.  And you know, then, that Zion was

9      subject to OSHA inspections?

10     A      Yes.

11     Q      And they were subject to OSHA enforcement?

12     A      Correct.

13     Q      All right, sir.

14            And you're familiar with the OSHA regulations

15     which we talked about earlier, 1970 through 19-- that

16     were finalized in 1972, correct?

17     A      Yes, I am.

18     Q      And the jury has already heard that -- but the

19     OSHA requirements in 1972 gave plant owners, like

20     Commonwealth Edison, they gave them options.  You can

21     either purchase a lot of new equipment, protective

22     equipment, signage, monitoring equipment.  You're

23     familiar with that, correct?

24     A      Yes.

25     Q      Or you can change the type of insulation you're

KINSER v. CBS CORP., Case No. 94-2282

1    going to use and not have asbestos, correct?

2        A    That item, I don't know specifically it said

3    that, but I -- yes.

4        Q    All right, sir.

5            And let me ask you this.  You, you do have an

6    understanding of whether or not it was expensive to

7    purchase that protective equipment and that monitoring

8    equipment, correct?

9        A    That's correct.

10       Q    And was it expensive?

11       A    Well, to -- I mean, for, for -- yeah.  You have

12   to have -- I don't know how expensive it was, but you

13   have to buy -- it was personal protective equipment if

14   you're going to work around asbestos.  That was --

15       Q    And it had to be purchased for everyone in the

16   plant, correct?

17       A    No.  Only people working on the -- you could

18   isolate the area.

19       Q    Right.

20           For everyone working in the area --

21       A    Right.

22       Q    -- of asbestos, correct?

23       A    Typically, it would be insulators.  Yes.

24       Q    All right.  And what was the cost associated

25   with changing from nonasbestos -- from asbestos material

KINSER v. CBS CORP., Case No. 94-2282

1    to nonasbestos material?

2         A    I don't know.  But the terms of Zion -- you

3    know, the same quantity of insulation, whether it was

4    asbestos, would go on.  The same amount of labor hours.

5    So the only difference in cost would be if the material

6    cost more than the -- and I don't really know if there

7    would be any difference.

8         Q    And --

9         A    But the scope of work didn't change.  To my, my

10   recollection, there would be no major cost difference

11   because the same amount of insulation was put on, the

12   same thicknesses, the same quantity, the same types --

13   either block or blanket -- and the same amount of labor

14   would be required.  So that's the major costs of the

15   insulation.

16        Q    Okay.  So the labor costs stay the same,

17   correct?

18        A    Right.

19        Q    And so an asbestos-containing block and a

20   nonasbestos-containing block in 1972 -- 1971 cost

21   approximately the same?

22        A    That would be my thinking.  I don't really

23   know.  But, you know, we, we would use -- we used mineral

24   block -- okay? -- which was, had no asbestos in it.  And

25   I think that we, you know, that was nonasbestos.  So why

KINSER v. CBS CORP., Case No. 94-2282

1    would we use that if it would have cost more, right?

2              MS. EZELL:  Fair enough.  Okay.

3              No further questions, Your Honor.

4              THE COURT:  All right.  Jury, I'm going to send

5    you out for lunch.  Be back at 1:00.  Don't discuss the

6    case among yourselves or with anyone else while you're

7    gone.

8              (Jury absent, 11:48 a.m.)

9              THE COURT:  We'll be in recess till 1:00.

10             (Recess, 11:49 a.m. to 1:02 p.m.)

11             THE COURT:  All right.  Are we ready?

12        MR. McCOY:  Yes, Judge.  We're ready.

13             (Brief pause in proceedings.)

14             (Jury present, 1:05 p.m.)

15             THE COURT:  All right.  Cross-examination, Mr.

16   McCoy.

17             MR. McCOY:  Yes, Your Honor.

18             CROSS-EXAMINATION BY MR. McCOY:

19        Q    Mr. Ware, you understand your role as the

20   designated witness for Westinghouse in turbine matters;

21   is that right?

22        A    Yes, sir.

23        Q    Okay.  And by that, it means you've been chosen

24   by the attorneys, right?

25        A    That's correct, sir.

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  When did you first become the designated
2  witness for turbine cases for Westinghouse?
3      A     After I retired, in 2003.
4      Q     Okay.  And the attorneys from Westinghouse,
5  then, contacted you about serving in that capacity as
6  designated witness, right?
7      A     That's correct.
8      Q     Okay.  And approximately when did that happen?
9      A     I think it was July or August of 2003.
10      Q     Okay.  So you've had that role for about ten
11  years now?
12      A     That's correct.
13      Q     Okay.  It means you've testified in quite a
14  number of cases, right?
15      A     Well, I've done depositions in probably over
16  40 cases, and I've been on three trials.
17      Q     Okay.
18      A     This is my third trial.
19      Q     Right.
20            A lot of deposition testimony?
21      A     Yes, sir.
22      Q     That's the same thing, though, because it's
23  under oath, right?
24      A     That's correct, sir.
25      Q     Yeah.

KINSER v. CBS CORP., Case No. 94-2282

1          And you said your compensation was about how

2   much an hour?

3       A    Well, currently it's 125.  I think when I

4   started, I was charging $100 an hour.

5       Q    Okay.  And is it fair to say that over your

6   career as Westinghouse's designated witness you've earned

7   several hundred thousand dollars doing that work, right?

8       A    That's correct, sir.

9       Q    And when you were working for Westinghouse

10  before 2003, your salary was not as much as 125 an hour,

11  right?

12      A    Actually, it was, sir.

13      Q    Okay.  When you retired?

14      A    Yes.

15      Q    Okay.  You retired in, as far as being in

16  charge of international operations, right?

17      A    Yes, an executive of Westinghouse.  Yes.

18      Q    Okay.  So you also get, I'm assuming, a pension

19  from Westinghouse, right?

20      A    I took a lump-sum pension.  Yes.

21      Q    Now, I just want to start here by a couple

22  groundwork things.  First off, there's no question here

23  that the specifications originally prepared by

24  Westinghouse in October of 1970 for Zion called for, in

25  the specifications, asbestos-containing insulation

KINSER v. CBS CORP., Case No. 94-2282

1  material; is that right?

2      A    That's right.  Well, our specification was

3  based on Sargent & Lundy Form 40-G, which had

4  asbestos-containing insulation.

5      Q    Right.  And we can take a look at that

6  specification.  I believe this is Exhibit 100.

7              (Brief pause in proceedings;

8              counsel conferring.)

9      Q    All right.  This is -- we're going to show this

10  document here.

11              DEPUTY CLERK:  Who are we showing that to, Mr.

12  McCoy?

13              MR. McCOY:  I think we can go ahead and show

14  this to everybody.  It's by agreement here; there's no

15  objection on this one.

16              DEPUTY CLERK:  Okay.

17              THE COURT:  I think we've seen it before.  Yes.

18              MR. McCOY:  Right.

19  BY MR. McCOY:

20      Q    Okay.  So Kinser Exhibit 100, this document as

21  it says here, is "Insulation Specification" and prepared

22  by Westinghouse; is that right, Mr. Ware?

23      A    That's correct.  It actually is a copy.  It's a

24  Westinghouse drawing that transfers Sargent & Lundy's

25  Form 40-G into a Westinghouse drawing, but the actual

KINSER v. CBS CORP., Case No. 94-2282

1  wording is all from Sargent & Lundy specifications.

2      Q    Okay.  It's a drawing prepared by Westinghouse,

3  right?

4      A    That's correct.

5      Q    Okay.  And it's called -- in the engineering

6  list for Zion, it's got a number 401A343, right?

7      A    That's correct.

8      Q    Okay.  And we'll mark it here.  So the title on

9  this, as it says, is "Insulation Specification," and it

10 was signed off on by -- maybe we can zoom in a little bit

11 on this part here, Jessica -- it was signed off on by a

12 number of people at Westinghouse, right?

13     A    That's correct.

14     Q    That stands for the draftsman, right?

15     A    Yes, sir.

16     Q    That's Mr. Miller.

17          And then who -- what's this guy right here?

18     A    That's, --

19     Q    Or girl.

20     A    -- I think, checker.  Somebody checked his

21 work, reviewed it.

22     Q    Okay.  These people are in the engineering

23 area, right?

24     A    That's correct.

25     Q    And then this one right here is another

KINSER v. CBS CORP., Case No. 94-2282

1  engineering area person, right?

2      A    That's another draftsman.  Yes, sir.

3      Q    The Zion engineer here signed off, right?

4      A    That's correct.

5      Q    Okay.  And this was issue date of October 13,

6  1970, right?

7      A    That's correct, sir.

8      Q    So it was about two and a half years before the

9  first unit at Zion was completed and about three years

10 before the second unit at Zion was completed, right?

11     A    Yes, sir.

12     Q    Okay.  And it says here for the turbine,

13 13-A-3501.  That's a number that Westinghouse assigned in

14 its records to one of the Zion turbines, right?

15     A    Yeah.  That's called a shop order number, and

16 that was for Zion Unit 1.

17     Q    Okay.  So each turbine had a different number.

18 This is Unit 1, right?

19     A    Yeah.  That normally indicates -- that's the

20 first application of this drawing; so, by contract, that

21 was the first, this first shop order, this drawing was

22 used on.

23     Q    Yes.

24          Okay.  So this started out in, in October of

25 1970 for asbestos specifications, right?

KINSER v. CBS CORP., Case No. 94-2282

1        A    Well, it was Sargent & Lundy specification for

2    insulation, and some asbestos was in there.  Yes, sir.

3        Q    Okay.  And all those Westinghouse engineers

4    approved that specification for Zion, right?

5        A    Our contract required us to follow the Sargent

6    & Lundy specification; so, yes, sir, we did.

7        Q    Okay.  In other words, it was okay with

8    Westinghouse to use asbestos at, at Zion; that's what

9    that document says, right?  That's the specifications

10   agreed to by Westinghouse?

11       A    It agrees -- yes, sir --

12       Q    Okay.

13       A    -- agrees that we, we would use Sargent & Lundy

14   specifications.

15       Q    All right.  So there's no question, then, that

16   Westinghouse supplied the insulation for the Zion

17   turbines; is that, is that also right?

18       A    That's correct, sir.

19       Q    Okay.  And that was done, I believe, by hiring,

20   Westinghouse hiring some subcontractors to fulfill the

21   contract obligations of Westinghouse, right?

22       A    That's correct.

23       Q    Okay.  And those contract obligations then

24   included supplying the insulation to meet the

25   specifications, right?

KINSER v. CBS CORP., Case No. 94-2282

1        A     That's correct, sir.

2        Q     And it's also true that you do not specifically

3    recall the insulation at Zion; is that right?

4        A     Well, I recall -- I wasn't there when it was

5    awarded or who the contractor was for sure.  I don't

6    recall that.  I do -- like I indicated, I was there after

7    the insulation was installed for five years, so I recall

8    seeing the turbine insulated.

9        Q     You just know it was completed, right?

10       A     That's correct.

11       Q     Okay.  Now, am I correct in saying that the

12   position of Westinghouse in this case, through you as the

13   designated witness, is that these 1970 insulation

14   specifications were changed; and there was no asbestos

15   used at Zion for the turbine system?  Is that the

16   position of Westinghouse?

17       A     Yes, sir, it is.

18       Q     Okay.  And I understood from what you said that

19   one reason was because Sargent & Lundy changed the

20   specifications for the Commonwealth Edison work, right?

21       A     Well, they -- that was their standard

22   specification for turbines; so it not only applied to

23   Commonwealth Edison and Westinghouse, but it applied to

24   any, any turbine that was supplied under Commonwealth

25   Edison specifications.

KINSER v. CBS CORP., Case No. 94-2282

1    Q    Okay.  So that's one reason, because of Sargent

2    & Lundy changed specifications, right?

3    A    Yes, sir.

4    Q    Okay.  And another reason, as I understood and

5    I think you said, was Commonwealth Edison stopped using

6    asbestos?

7    A    I, I don't think I said that, sir.

8    Q    Oh, you, you don't know that?

9    A    I don't know that.  No.

10   Q    Okay.  A third reason I thought I heard you say

11   was because OSHA came out with the regulations in June of

12   1972 and that OSHA would basically take care of any

13   asbestos problems?

14   A    Sir, I don't think I said that either.

15   Q    Okay.

16   A    I think I said OSHA came out with regulations

17   in '70 or '71, and one of those regulations involved

18   asbestos.

19   Q    All right.  So it's not really because of

20   Commonwealth Edison or OSHA that there was a change in

21   specifications, but it all boils down to something that

22   Sargent & Lundy did; is that right?

23        MS. EZELL:  Objection, Your Honor.  That

24   misstates his testimony.

25        THE COURT:  He may answer if he can.  Sure.

KINSER v. CBS CORP., Case No. 94-2282

1        A    Well, our contractor -- basically, our, our, we

2    had a contract with Commonwealth Edison; and the contract

3    said that we had to follow the standard specification --

4    conform to the requirements in the Sargent & Lundy

5    standard specifications, and that's what we did.

6        Q    Okay.  So --

7        A    So we were following the Sargent & Lundy

8    specifications because that's what the Commonwealth

9    Edison contract required us to do.

10       Q    So it boils down to:  There was a change in the

11   Sargent & Lundy specifications for Zion, and that's why

12   Westinghouse says no asbestos was used, right?

13       A    That's correct, sir.

14       Q    Okay.  Just wanted to make sure we got it

15   narrowed down here.

16            So, and by the way, Westinghouse is not saying

17   that the turbine gaskets were asbestos-free at Zion; is

18   that right?

19       A    That's correct, sir.

20       Q    Okay.  Those were still asbestos, right?

21       A    Some of the gaskets had asbestos.  Yes, sir.

22       Q    Okay.  So I want to talk briefly about the

23   history of the Westinghouse Turbine Division.  First off,

24   Westinghouse had a, had a Turbine Division, I think you

25   said, based largely in the Pittsburgh area for the

KINSER v. CBS CORP., Case No. 94-2282

```
 1   manufacture and sales of turbines, right?
 2        A    Well, the actual Turbine Division was located
 3   in Philadelphia.
 4        Q    Okay.
 5        A    South Philadelphia Works.  The generator,
 6   electrical portion, was manufactured at the Pittsburgh,
 7   East Pittsburgh Works.
 8        Q    So in the Pittsburgh and, and Philadelphia
 9   area, those were the two primary locations for
10   Westinghouse turbines, manufacturing, right?
11        A    Yes, sir.  But then we had built some
12   additional factories.  At the time of Zion, we also had a
13   factory in Charlotte, North Carolina, for the nuc-- for
14   the low pressure turbines.  They were manufactured in
15   Charlotte.
16        Q    Okay.  So it was a big operation?
17        A    Yes, sir.
18        Q    Very big, okay.
19             There was -- was it called the Large Rotating
20   Apparatus Division?  Was that one of the names it went
21   under?
22        A    Well, that was actually the, the East
23   Pittsburgh Works for the generator.  That also -- Large
24   Rotating Apparatus also included large motors.
25        Q    All right.  And that's --
```

KINSER v. CBS CORP., Case No. 94-2282

1      A      That was refer-- excuse me.  That was referring

2   more to electrical apparatus.

3      Q      All right.  That was all there when you joined

4   Westinghouse, right?

5      A      Yes, sir, it was.

6      Q      And the staff of engineers in the '60s through

7   the 1970s numbered in the, in the thousands; is that

8   right?

9      A      Yes, sir, it did.

10     Q      They did design work, the engineers, right?

11     A      Yes, sir.

12     Q      They did -- they made determinations on

13   materials to be used, right?

14     A      Yes, sir, they did.

15     Q      Specifications for materials issued by

16   engineering, right?

17     A      That's correct, sir.

18     Q      Okay.  Asbestos-containing materials would be

19   an example of that, right?

20     A      Yes, sir.

21     Q      Okay.  Westinghouse had engineers out in the

22   field, didn't it, that supervised the installation and,

23   and repair and maintenance work on the turbines, right?

24     A      That's correct, sir.

25     Q      And there was also the corporate medical and

KINSER v. CBS CORP., Case No. 94-2282

1    industrial hygiene functions of Westinghouse, right?

2         A    Yes, sir, at the manufacturing facilities.

3         Q    All right.  So if somebody wanted to call on

4    the corporate medical or industrial hygiene for a

5    question in the field, they could do that, right, at

6    Westinghouse?

7         A    Yes, sir.  We actually had -- in our service

8    group, we had a separate group of, for safety we would

9    call on.

10         Q    Uh-huh.  A field safety engineer for turbines,

11    right?

12         A    That's correct.  Every region had a field

13    safety engineer, and he reported to a headquarters

14    organization that involved safety.

15         Q    And then finally, finally, we also -- there was

16    also, I think you said, the district offices in the field

17    that handled sales, service, and installing work, right?

18         A    That's correct, sir.

19         Q    Okay.  And that's where you landed in Chicago,

20    I think you said -- or the Chicago office working in that

21    area in 1962; is that right?

22         A    Well, I started there, working out of the

23    office, Chicago office, in 1965 as a field engineer; but

24    then I was promoted -- and that was all working at

25    customer sites, --

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Right.

2      A     -- either on installation or maintenance.  But

3  then in 19-- end of 1972, I was promoted; and I had

4  become the manager in the office.

5      Q     Okay.  And you continued in the Chicago office

6  until approximately when?

7      A     1981.

8      Q     And then you rose up through the ranks to

9  become responsible for the -- was it the

10  international part?

11      A     In the end, the international, yes, sir.

12      Q     Well, I see you had a -- congratulations on

13  your career.

14      A     Thank you.

15      Q     So you were at Zion when the project first got

16  started, the lead engineer for Westinghouse; is that

17  right?

18      A     Yes.  Again, the Zion construction had been

19  ongoing since '67, but I arrived there in 1970; and in

20  1970 when the turbine shipped, then we started the

21  turbine installation.

22      Q     Okay.  And then in '72, you became the district

23  manager for Chicago?

24      A     That's correct, sir.

25      Q     And the Zion project was still under your watch

KINSER v. CBS CORP., Case No. 94-2282

1  as district manager?

2      A    That's correct, sir.

3      Q    So, obviously, Westinghouse was a successful

4  bidder with Commonwealth Edison for the Zion project,

5  right?

6      A    Yes, sir.

7      Q    Got the contract for both units, right?

8      A    That's correct.

9      Q    These turbines weighed over 5 million pounds,

10  right?

11      A    I -- yeah, both turbines, yes, sir.

12      Q    Okay.  And by contract, then, Westinghouse was

13  responsible to supply and install insulation, right?

14      A    Well, by contract, we had the complete

15  installation, and that included supplying and installing

16  the thermal insulation.

17      Q    So what -- in order to build this turbine,

18  there first had to be these drawings and specifications

19  prepared before anything got off the ground, right?

20      A    That's correct, sir.

21      Q    Okay.  And that's where Westinghouse worked

22  with the, with the Sargent & Lundy and Commonwealth

23  Edison people and came up with the drawing we saw for the

24  insulation in 1970, right?

25      A    That's correct.  Actually, that was Sargent &

KINSER v. CBS CORP., Case No. 94-2282

1    Lundy we worked with on that.

2        Q    Right.

3            So Westinghouse presented that drawing as part

4    of the final drawings, and that was originally then part

5    of the, the project, right?

6        A    That's correct.

7        Q    Okay.  And then there also has to be the

8    materials purchased by the contractors to fulfill these

9    specifications, right?

10       A    Yes, sir.

11       Q    So Westinghouse, hiring a subcontractor, would

12   take these specifications, provide to the contract--

13   subcontractor for the insulation what was needed, and

14   then the materials would be purchased to meet the

15   specifications, right?

16       A    That's correct.

17       Q    Okay.  Now, Zion Unit 1 was completed in about

18   June of '73; Unit 2, in about December of '73, right?

19       A    Yes, sir.

20       Q    Okay.  And then there was an outage that

21   happened for the rebuild.  In other words, the turbine

22   was shut down; and there had to be some rebuild work,

23   right?

24       A    Well, we mentioned in 1974, the Zion Number 2

25   electrical generator had failed, and that required us to

KINSER v. CBS CORP., Case No. 94-2282

1    rebuild the electrical generator.

2         Q    Okay.  Now, and that's, that's kind of a brief

3    summary of the history, so I want to turn to another,

4    another area here.

5              The documents that you looked at for this case,

6    you had, you got those from the attorneys for

7    Westinghouse, right?

8         A    That's correct, sir.

9         Q    You did not go out and search for documents

10   yourself, right?

11        A    That's correct.

12        Q    Okay.  And then you used whatever the attorneys

13   gave you to formulate your understanding of matters about

14   Zion, right?

15        A    Well, I used the documents I received from the

16   attorneys, which included contract documents, field

17   reports, and engineering records; and I also used my

18   experience and my memories of, recollections of the Zion

19   project because I, I was on it.

20        Q    Right.

21             So you did not get any documents yourself,

22   right?

23        A    Not directly.  I got, I got the documents from,

24   from the attorneys.

25        Q    Okay.  And going back to -- you had, you had,

KINSER v. CBS CORP., Case No. 94-2282

1    what, five binders of documents, right?

2         A    That's correct, sir.

3         Q    Okay.  Going back to this Exhibit 100 for a

4    moment, the documents that the attorneys gave you were

5    all pre-numbered, right?

6         A    Every document had a, yeah -- I guess it's

7    called a Bates number.

8         Q    Right.  Like, this is the Bates number that the

9    attorneys put on there, "Zion-1," right?

10        A    That's correct.

11        Q    Okay.  And each -- and the next page would then

12   say "Zion-2"?

13        A    That's correct.

14        Q    So all the pages in those five binders were

15   consecutively numbered with this Zion numbering system by

16   the attorneys, right?

17        A    That's correct, sir.  Yes.

18             (Brief pause in proceedings.)

19             MR. McCOY:  This is also Kinser Exhibit

20   Number 100.

21             (Brief pause in proceedings;

22             counsel conferring.)

23             MR. McCOY:  All right.  I think we're going to

24   show this to the witness here, Judge, before -- Ms. Ezell

25   wants me to.

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:
 2        Q    All right.  So this is for you to see, Mr.
 3   Ware.  This is also one of the documents that lawyers for
 4   Westinghouse gave you from Zion; is that right?
 5        A    It -- can I see the Bates number?  Yes.  That
 6   would be one of the documents.  It's Bates number
 7   Zion-196.
 8        Q    Okay.  All right.  So this is, then, from the
 9   Zion files, right?
10        A    Well, it's from the Zion contracts, I think.
11   Yes.
12        Q    Okay.  All right.
13             MR. McCOY:  I'll move for the admission of
14   this.
15             THE COURT:  Was it admitted before?
16             MR. McCOY:  This is new.
17             THE COURT:  This is new.
18             DEPUTY CLERK:  It's numbered similarly to
19   something we've already seen.
20             THE COURT:  All right.  Any objection?
21             MS. EZELL:  I'm not sure what the foundation
22   is, Your Honor.
23             THE COURT:  I can't hear you.
24             MS. EZELL:  Oh, there's not a foundation as --
25             THE COURT:  He says it's -- he says it's a
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   Westinghouse document; it's a Zion document supplied by

 2   you to him.

 3           MS. EZELL:  Right.  I wasn't objecting to the

 4   authentication of it, Your Honor.  I was objecting to the

 5   foundation, as to the purpose for offering the document.

 6           THE COURT:  Well, I guess until I hear the

 7   questions about it I won't know that.  You may proceed.

 8           MR. McCOY:  Thank you.

 9   BY MR. McCOY:

10       Q    Does this show the Zion turbine numbers on it,

11   Mr. Ware?

12       A    Yes, it does, sir.

13           MR. McCOY:  All right.  It's for, being offered

14   to show the turbine numbers at Zion, Judge.  Can I --

15           THE COURT:  Very well.  Proceed.

16           MR. McCOY:  -- proceed and have this admitted?

17           THE COURT:  It's received.

18           MR. McCOY:  All right, I'm going to -- okay.

19   So our jurors can see this now.

20   BY MR. McCOY:

21       Q    This is generated from, by Westinghouse; is

22   that correct?

23       A    That's correct.

24       Q    Okay.  And this is, according to it, somebody

25   from the Graphic Engineering/Printing Division, right?
```

KINSER v. CBS CORP., Case No. 94-2282

1        A    That's correct.

2        Q    All right.  And this is for Zion Units 1 and 2,

3    right?

4        A    That's correct.

5        Q    Okay.  And it shows on here the turbine

6    numbers, right?

7        A    Yes.  It shows the general order number on top,

8    the G.O., and it shows the turbine shop owner numbers.

9        Q    So the Zion turbines are 13-A-3501 and

10   13-A-3601.  Those are the numbers that Westinghouse

11   assigned these and are consistently used throughout the

12   documents, right?

13       A    That's correct.

14       Q    Okay.  Now, I want to turn for a moment to --

15   let's go back to the, this Exhibit 100, which was the

16   original specification.  I'll show this to the jury

17   again.

18            That's the 4101A343 [sic], right, insulation

19   spec?

20       A    Yes, sir.

21       Q    Okay.  That's the asbestos one, right?

22       A    Well, it's the Sargent & Lundy -- it's the

23   Westinghouse drawing, but it's Sargent & Lundy Form 40-G.

24       Q    The one that had asbestos, right?

25       A    The 40-G specification had some asbestos.  Yes.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        Q    Okay.  Thanks.

 2             Now, and in here, this is Exhibit 129 next.

 3             (Brief pause in proceedings;

 4             counsel conferring.)

 5             MR. McCOY:  All right.  So no objection on this

 6  one?

 7             MS. EZELL:  No.

 8             MR. McCOY:  Okay.  All right.  I move for

 9  admission on this Exhibit 129.

10             THE COURT:  Without objection, it's received.

11  BY MR. McCOY:

12        Q    All right.  So this document is for the

13  crossover and crossunder piping on the turbine at Zion,

14  right?

15        A    That's correct.

16        Q    Okay.  And it shows again that it came from

17  these Zion files that's got the attorneys' number 929 on

18  it, right?

19        A    That's correct.

20        Q    Okay.  And it shows in here a reference for

21  the -- this would be the crossover pipe, right?  Right

22  there?

23        A    That's correct.

24        Q    That's what that stands for, "Xver," crossover?

25  Okay.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1            And it shows here block insulation, a total of
 2    about 7,100 feet there, square feet, right?
 3        A    That's correct.
 4        Q    And there's a reference in there to Process
 5    Spec 60043-- Part 1, right?
 6        A    Yes, sir.
 7        Q    Okay.  So that also references us here to Note
 8    7 right here, which is the same thing -- maybe hone in on
 9    this right here; it's the first -- yeah, this area right
10    in here; let's blow that up, okay?
11            So that's Note Number 7, and Note Number 7 here
12    says, "See" -- I don't know if everybody can see this;
13    maybe a little bit bigger.  Okay.
14            So that's got that "401A343 for specifications"
15    drawing, right?
16        A    That's correct.
17        Q    Okay.  And that's a reference, then, to this
18    drawing here, which is the -- zoom back out a little
19    bit -- which is the version of the insulation
20    specifications that had the asbestos, right?
21        A    Sargent & Lundy Form 40-G, yes, sir.
22        Q    Okay.  And that's typical on these engineering
23    drawings, is that one drawing will reference into another
24    drawing to give you more detail, right?
25        A    A lot of times a drawing will reference a
```

KINSER v. CBS CORP., Case No. 94-2282

1    specification or materials.  Yes, sir.

2        Q     Right.

3             So on these drawings that we looked at for the

4    crossover piping, the reference was to the asbestos

5    specifications, right?

6        A     The reference for the material was to the

7    Sargent & Lundy Form 40-G, which had asbestos.  Yes, sir.

8        Q     Okay.  And if we also look at this same

9    document again, 129, there's additional references

10   here -- get this zoomed in a little bit.  There we go.

11            Okay.  So there's additional references here

12   for the block insulation, and this is for the crossunder

13   piping.  That's the part that goes below, on the

14   mezzanine floor area, right?

15       A     Yes, sir.

16       Q     Okay.  And that's 5,000 square feet.

17            And there's also some references here for the

18   moisture separator reheaters, which are part of those low

19   pressure turbines, right?

20       A     It's a separate tank.  Right.  The piping

21   connection to the low pressure, to the low pressure

22   turbine.

23       Q     All right.  And so that, that's another 14,500

24   square feet, right?

25       A     Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

1       Q      Okay.  And these all reference in here to this

2  same Note Number 7, which was the reference back to the

3  401A343 asbestos specifications, right?

4       A      The Sargent & Lundy Form 40-G specification --

5       Q      Okay.

6       A      -- that had asbestos in it.  Yes.

7       Q      All right.  So in total, we were talking there

8  about, about 26/27,000 feet of, square feet of insulation

9  block, right?

10      A      Yes, sir.

11      Q      The thickness of that was anywhere from an inch

12 and a half to two and a half inches, sometimes double

13 layer, right?

14      A      That's correct.

15      Q      Now, if we take a look at that for a moment --

16 I'm going to go back to this Exhibit 129.  This also

17 refers us to using process specifications which are

18 specifications about how you actually do the work, right?

19 It's a process?

20      A      That's correct.  Those are Westinghouse

21 specifications.

22      Q      Right.  These are also prepared by

23 Westinghouse, right, --

24      A      That's correct.

25      Q      -- entirely?

KINSER v. CBS CORP., Case No. 94-2282

1              Okay.  Not prepared by Sargent & Lundy, but

2    Westinghouse, right?

3         A    Yes, sir.

4         Q    Okay.  So these are -- the number here -- I

5    don't know; maybe we have to zoom in a little more -- but

6    it's 600433.  That's the process specification, right?

7         A    That's a Westinghouse process specification.

8         Q    Right.

9         A    Yes.

10        Q    And that's applicable to all these different

11   categories of block on here, right?

12        A    That's correct.  In terms --

13        Q    Okay.

14        A    -- that's applicable in terms of the "how to

15   do" from the Westinghouse point of view.  But the

16   material spec is Number 7, which is the Sargent & Lundy.

17        Q    Well, it's -- the specification that

18   Westinghouse prepared is that Number 7, right?

19        A    That's correct.

20        Q    Okay.  So if we take a look, then, at this

21   exhibit number, which is 104 --

22             MR. McCOY:  Any objection to this one?

23             MS. EZELL:  [Inaudible.]

24             MR. McCOY:  Okay.  I'll lay a foundation,

25   Judge.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              All right.  So we'll show the witness the

 2    document.

 3    BY MR. McCOY:

 4         Q    You see it?

 5         A    Yes, sir.

 6         Q    Okay.  This is the specification 600433 that's

 7    referred to in the specification we were just looking at,

 8    right?

 9         A    That's correct.

10         Q    Okay.  And, again, this is a Westinghouse

11    specification, right, process spec?

12         A    That's correct.

13         Q    It came from the attorneys; it's got the Zion

14    Bates stamp number on it, right?

15         A    That's correct.

16              MR. McCOY:  Okay.  So I'll move for admission

17    of this, Judge.

18              THE COURT:  If there's no objection, it's

19    received.

20              MR. McCOY:  Okay.  All right.  We can show this

21    to everybody, Jessica.

22    BY MR. McCOY:

23         Q    So this one, once again, came out of the Zion

24    files that the attorneys gave you, right?  That's the

25    number, --
```

KINSER v. CBS CORP., Case No. 94-2282

1       A     Yes, sir.

2       Q     -- Zion-17?  Okay.

3             And, again, it's prepared by Westinghouse,

4    Standards Engineering in Lester, right?

5       A     That's correct.

6       Q     Okay.  That's that department that had many

7    hundreds or thousands of engineers, right?

8       A     It's part of the Engineering Department at the

9    Steam Turbine Division.  Yes.

10      Q     Okay.  And this was, this was the number on

11   that process spec that, the reference number, so it's

12   called "Process Specification, Application of Block and

13   Molded Insulation," right?

14      A     That's correct.

15      Q     That's the flat insulation block and the, like,

16   half-round curve, right?

17      A     That's correct.  Part 1, you see, refers to the

18   block.  Part 2 refers to the molded pipe.

19      Q     Right.  And this talks about, in Part 1,

20   application of block, as you, as you just mentioned,

21   right?

22      A     That's correct.

23      Q     Okay.  Maybe zoom in on this a little more,

24   Jessica.  Okay.

25            So it talks about the use of "Over 1050, a

1   double layer consisting of material 46601AA" to be used,

2   right?

3       A    That's correct.

4       Q    Okay.  So that's another reference number

5   within the Westinghouse engineering system, right?

6       A    That's correct.  It refers to a, to a material

7   card at Westinghouse.

8       Q    Okay.  Material card, again, is, is what the

9   engineering department prepares about the kinds of

10  materials that will be suitable, right?

11      A    That's right.  A material card basically tells

12  the characteristics of the material and also lists the

13  qualified suppliers of that material so Purchasing would

14  know how to, where to buy the material from.

15      Q    Right.

16           It tells something about what it's supposed to

17  be made from and who you can get it from, right?

18      A    Exactly.

19      Q    Okay.  So if we go to this document, which is

20  Exhibit 110 -- Jessica, if you could show this to the

21  witness.  Let me know if there's any objection to this.

22  In the meantime, Jessi, if you could show this to the

23  witness.

24           Okay.  You see that up there, Mr. Ware?

25           MR. McCOY:  Any objection on this one, or you

KINSER v. CBS CORP., Case No. 94-2282

```
1   want me to lay a foundation?

2           MS. EZELL:  I need to hear the foundation.

3           MR. McCOY:  Okay.  I'll lay the foundation.

4   BY MR. McCOY:

5       Q    All right.  So, once again, Mr. Ware, this is

6   from the Zion documents from the attorneys at

7   Westinghouse, right?

8       A    That's correct.

9       Q    Okay.  And the, this is that specification

10  46601AA that's referenced in the last process

11  specification for Zion, right?

12      A    That's one of the materials referenced.

13          MR. McCOY:  Okay.  So I'll move for admission

14  of this one, Judge.

15          THE COURT:  Hearing no --

16          MS. EZELL:  Your Honor, I, I'm going to have to

17  say:  Mr. McCoy continues to reference "from the

18  attorneys," "in the Zion file."

19          The questions that's he's asking are

20  insufficient to show that these were actually used at

21  Zion.  This document, it doesn't speak for itself.  He

22  hasn't asked the witness sufficient questions to

23  establish that, and I'm afraid that the picture that he's

24  painting is insufficient.

25          This document, in particular, doesn't say
```

KINSER v. CBS CORP., Case No. 94-2282

1  "Zion" on it anywhere except in the Bates number; and,

2  and I think that he should ask more questions, and better

3  questions, about whether or not this was actually used.

4           THE COURT:  Would Mr. McCoy ask:  Was it used

5  in connection with the Zion construction?

6  BY MR. McCOY:

7      Q    Was this document used in connection with the

8  Zion construction?

9      A    No.  It was not.

10     Q    It comes in, comes from the attorneys in the

11  files, though, right?

12     A    It, if you pulled the Zion documents, the

13  engineer that pulled the documents went to a drawing

14  list; and he pulled all the drawings in the turbine

15  record that had to do with insul-- insulation.  And if

16  you pulled the drawings, the drawings reference the

17  process specs.

18     Q    Well, --

19     A    And if you go to a process spec, it referenced

20  materials, so he pulled all those drawings.

21     Q    Right.

22     A    So there's a lot of drawings here that, that

23  come up drawings; but a lot of the drawings are used for

24  a lot of other units, a lot of other -- you have to go

25  back to the contract at Zion to determine what was

KINSER v. CBS CORP., Case No. 94-2282

1    actually used at Zion.

2         Q    Well, these documents were provided to you by

3    the attorneys as the files for Zion, right?

4              MS. EZELL:  Again, Your Honor, I object.

5              THE COURT:  That's a proper question.

6              MS. EZELL:  I'm --

7              THE COURT:  Wait a minute.  I can only deal

8    with one question at a time.

9              MS. EZELL:  Okay.  And my objection is that

10   that is argumentative, and --

11             THE COURT:  It is not.

12             MS. EZELL:  -- it is --

13             THE COURT:  He may answer.

14        A    Yes.  All these documents were provided to me,

15   but I have the knowledge to go through the documents and

16   go through the contract and determine which of these

17   documents actually apply, because the engineer that

18   pulled all the information went to all the insulation

19   drawings; and to get to the process spec, he had to go to

20   the drawings.

21        Q    Mr. --

22        A    And then after the process specs reference, he

23   pulled everything right in that hierarchy of sequence.

24             My job was to go through the contract and go

25   through everything and determine what was used.

KINSER v. CBS CORP., Case No. 94-2282

1     Q    Mr. Ware, this document, according to the

2   Document 110, which is the 46601AA, was referenced in

3   the, the Document 60433 [sic], which is the Westinghouse

4   process specification.  The Document 60433 was referenced

5   in the document Exhibit 129, which is the drawing for the

6   insulation quantities for the turbine at Zion; is that

7   right?

8     A    That's correct.

9     Q    Okay.  It says right on there, if we can --

10  this is Exhibit 129 -- go to this; focus in on that.

11         It says right in there the Zion turbine number,

12  right?

13    A    That's correct.

14    Q    Okay.  So by referencing one document to the

15  other to the other, this references straight back into a

16  Zion turbine document, right?

17    A    That's correct.

18    Q    Okay.  And your position is somehow these

19  weren't used because Sargent & Lundy changed everything;

20  is that what you're saying to us?

21    A    I'm saying they all --

22    Q    Okay.

23    A    -- that process specification was used because

24  the contractor would have to know how much material was

25  ordered; so they needed that, that last drawing you

1    showed.

2         But the specification refers to the Sargent &

3    Lundy specification, and the Sargent & Lundy

4    specification would have been used for the material.

5         Q    Mr. Ware, if the process specification was used

6    as you said, then the material specification referenced

7    in the process specification would also be what was used,

8    right?

9         A    No.  It would not.

10        Q    What --

11        A    Be--

12        Q    What else could there be if it wasn't the one

13   that's referenced that's got the number on it?  Do you

14   have another document from the Zion files that says, says

15   something else about this specification 4661-- 46601AA?

16        A    No.  That, that is a material specification,

17   but it was not --

18        Q    Okay.

19        A    -- used at Zion.

20        Q    Well, that's -- it's in the files, though,

21   right?

22        A    That's correct.

23        Q    Okay.

24        A    It's not -- when you say "it's in files," it is

25   referenced on the drawing.  There is no, quote, Zion

KINSER v. CBS CORP., Case No. 94-2282

```
 1  file.
 2          MR. McCOY:  Your Honor, Your Honor, I move for
 3  the admission of this based on the testimony.
 4          MS. EZELL:  Objection, Your Honor.  No
 5  foundation from this witness.
 6          THE COURT:  Overruled.  It's received.
 7  BY MR. McCOY:
 8      Q    All right.  So the block insulation referred in
 9  here as this Document 46601AA from the process spec is
10  for heat insulation block and I think you said lists the
11  suppliers there, and then it describes the
12  characteristics of it here; and the characteristics
13  include "heat insulating block, composed of high
14  temperature calcium silicate or diatomaceous earth,
15  asbestos, and other compounds bounded together."  That's
16  what it says, right, Mr. Ware?
17      A    That's what it says.  Yes, sir.
18      Q    Okay.  That material card specification is
19  referenced in the Zion process specifications, right?
20      A    It's referenced -- it's, it's referenced in the
21  process specification.
22      Q    Okay.  Thank you.
23      A    But, also, the Sargent & Lundy is referenced in
24  the process specification, --
25      Q    I understand.  Okay.
```

1     A     -- Note 7.

2     Q     All right.

3           (Brief pause in proceedings.)

4  BY MR. McCOY:

5     Q     All right.  I'm going to go to a little

6  different area here.  You mentioned in, in testimony

7  before that the specifications were a critical part of

8  the turbine; is that right?

9     A     That's correct.

10    Q     And that includes the insulation

11 specifications, right?

12    A     That's correct.

13    Q     So, there's something called a "Master Drawings

14 List"; is that right?

15    A     That's correct.

16    Q     Okay.  And that is, was prepared for Zion,

17 right?

18    A     That's correct.

19    Q     This is Exhibit 118.  Go ahead and show this to

20 the witness.

21          MR. McCOY:  Is there objection on this one?

22          MS. EZELL:  Yes.  This is a 1992 document.  I

23 don't know what its relevance is.

24          MR. McCOY:  Okay.

25          THE COURT:  Was that objection for the record?

```
1              MS. EZELL:  This document --

2              THE COURT:  Because I didn't hear it.  I don't

3    know if Lisa heard it.

4              MS. EZELL:  I'm sorry, Your Honor.

5              This is a document dated 1992, and I don't know

6    what its relevance could possibly be in this case.

7              THE COURT:  Well, I don't know what it is yet.

8              MS. EZELL:  So until I hear a foundation --

9              THE COURT:  Yeah, well, I mean --

10             MS. EZELL:  -- I don't have an objection.

11             THE COURT:  -- it, it --

12             MS. EZELL:  I mean, I have an objection.

13             THE COURT:  Excuse me.

14             You're showing it to the witness.  You're going

15   to ask the witness to identify it if he can, I suppose.

16   And then we'll get to these other questions about whether

17   it should be displayed generally.

18             MR. McCOY:  Judge, --

19             THE COURT:  Go ahead.

20             MR. McCOY:  Okay.

21   BY MR. McCOY:

22        Q    Mr. Ware, the document in front of you,

23   Exhibit 1118 -- 118, this is a document from the Zion

24   files that the attorneys put together for you, right?

25        A    Yes, sir.
```

1      Q    Okay.  And this is the master drawings list for

2   Zion; is that right?

3      A    It's one, one page of the master drawing list.

4   Yes.

5      Q    Okay.  And if we continue on, it's got four

6   pages in total here?

7      A    Well, the total document probably has 50 pages.

8      Q    Okay.  And this is for turbine serial number

9   13-A-3601.  That's Zion Number 2, right?

10      A    That's Zion Number 2; but they were identical

11   units, so --

12      Q    Right.  Same thing on both?

13      A    That's correct.

14      Q    Okay.  And this is dated March 26th of 1992,

15   right?

16      A    That's correct.

17      Q    Okay.  And these master drawings are, show what

18   was actually used on the units at Zion, right?

19      A    This was, this was an update, a computer update

20   of the original drawing list.  Yes, sir.

21      Q    Okay.  So if we take a look at this -- and by

22   the way, this is, this is what -- you called this "a

23   computer update," right?

24      A    That's right.

25      Q    Meaning, Zion was built in 1973; then over the

KINSER v. CBS CORP., Case No. 94-2282

1   years, this list gets updated in the Westinghouse system,

2   right?

3       A    Well, the original list wasn't computerized.

4   It was -- we, we digitized all the computer lists later

5   on, so they updated it.

6       Q    Okay.

7       A    It was an original list that was probably

8   handwritten.

9       Q    All right.  So when it was updated then again,

10  it shows what was actually used at Zion, right?

11      A    It shows the drawings that were part of the

12  design of Zion, not necessarily was actually used; but

13  this, this was the original engineering records of how

14  the turbine was designed, the drawings used to design it

15  and manufacture the turbine.

16              (Brief pause in proceedings.)

17      A    If I may say something, this is the list --

18      Q    Mr. Ware, --

19              THE COURT:  Don't volunteer.

20              THE WITNESS:  Okay.

21              THE COURT:  Ms. Ezell will ask you redirect

22  questions.

23              THE WITNESS:  All right.

24  BY MR. McCOY:

25      Q    Okay.  Mr. Ware, you gave testimony back in May

KINSER v. CBS CORP., Case No. 94-2282

```
 1   of 2013 about the Zion turbine, right?

 2        A    That's correct, sir.

 3        Q    Okay.  And were you asked these questions --

 4             MS. EZELL:  I'm sorry, Your Honor.  What are we

 5   impeaching?

 6             MR. McCOY:  Page 96.

 7             MS. EZELL:  There's nothing -- he hasn't

 8   answered anything.

 9             THE COURT:  I haven't any idea until I hear.

10             MS. EZELL:  All right.  What is the name of the

11   case, please?

12             MR. McCOY:  It's the Wright case.

13             MS. EZELL:  Page?

14             MR. McCOY:  Page 96.

15             MS. EZELL:  I'm not sure how he's impeaching on

16   a foundation objection, but --

17             THE COURT:  You know, I haven't got a question

18   before me yet.

19             MS. EZELL:  And that's --

20             THE COURT:  He asked:  "Was your testimony

21   given?"

22             "Yes, it was."

23             Then he's going to ask him:  "Were you asked

24   this question, and did you give this answer?"

25             And I will then have some idea of, of where
```

KINSER v. CBS CORP., Case No. 94-2282

1    you're going and:  Does it have application here?

2           MS. EZELL:  Right.  But that can only be done,

3    I understand, after a question has been asked to which

4    there is a good faith belief that he has answered

5    differently than he did before.

6           THE COURT:  I haven't any idea now because he

7    said that, that this doesn't necessarily show what went

8    into Zion.  I can't anticipate what Mr. McCoy's going to

9    do.

10          Would you ask -- would you put the question to

11   the witness?

12          MR. McCOY:  Yes.

13   BY MR. McCOY:

14      Q    Mr. Ware, back at that date in May of 2013,

15   were you asked these questions, and did you give these

16   answers?

17          "Question:  I want to start with a couple

18   documents on Zion.  If you need to refer to something

19   else, please let me --

20          THE COURT:  Slower.

21      Q    -- please let me know and do so.

22          "First off, this is Exhibit Number 432,

23   Zion-432, the document number.  And there is something

24   called a 'master drawing,' right?

25          "Answer:  Yes, sir.  The master drawing list,

KINSER v. CBS CORP., Case No. 94-2282

1   uh-huh.

2           "Question: --

3           MS. EZELL:  Excuse me.

4       Q    -- And that's something that tells you what

5   drawings were actually used in the Zion construction,

6   right, in the manufacture?

7           "Yes.

8           "And in the case of Zion, you found, as an

9   example, this would be a master drawing list for serial,

10  turbine number 13-A-3601-1; is that right?

11          "Answer:  That's correct."

12          MS. EZELL:  Excuse me.  I would like to give

13  him a copy.

14          MR. McCOY:  Your Honor, I haven't finished.

15          MS. EZELL:  I just want to give him a copy of

16  it so he can read along.

17          THE COURT:  Why?

18          MS. EZELL:  So he knows whether or not he was

19  asked the questions and gave the answers.

20          THE COURT:  Well, if he can't remember, he can

21  tell you that.  I mean, I see you doing it that way in

22  this case; and I think, "Gee, that's novel."

23          MS. EZELL:  All right.  So we're going to just

24  go on his memory of whether or not --

25          THE COURT:  Well, I have no idea.

1           MS. EZELL:  All right.  I just wanted to make

2    sure that the, the proper procedure was being followed.

3           THE COURT:  If he says he doesn't remember, --

4           MS. EZELL:  Okay.

5           THE COURT:  -- then we may have to do

6    something.  I don't know.

7           MS. EZELL:  All right.

8           THE COURT:  Are you through with your question?

9           MR. McCOY:  No.  I got interrupted.

10          THE COURT:  Proceed.

11   BY MR. McCOY:

12       Q    The last -- I'm still reading from the

13   transcript in May of 2013.

14          "Question:  So for this turbine number, it will

15   tell us specifications and drawings that were actually

16   used?

17          "Answer:  It's a master drawing list.  That's

18   right.  That's correct."

19          Were you asked those questions, and did you

20   give those answers in May of last year?

21       A    If it's in the testimony, I did.

22       Q    Okay.  So, then, this document, Zion-432, is

23   the same document we got here today; and it's Exhibit 118

24   in this case, and this is the document that shows

25   specifications and drawings actually used, right?

KINSER v. CBS CORP., Case No. 94-2282

1      A    Yes.

2      Q    Okay.

3      A    This is as -- this is the A-Level drawing, the

4  high-level drawings, but there's --

5      Q    Right.

6      A    -- other drawings that aren't on the list --

7      Q    Okay.

8      A    -- that you have to reference from here.

9      Q    All right.  Well, let's continue on then.

10         MR. McCOY:  I, I move for admission of this,

11  Judge.

12         THE COURT:  Well, I want to see how you're

13  going to connect it up to this case.

14         MR. McCOY:  Okay.

15         THE COURT:  I mean, I saw you turn some pages,

16  and I saw some more highlighting, so I'm thinking maybe

17  there's going to be some more connected to this document.

18  BY MR. McCOY:

19      Q    All right.  I'm turning to the next page,

20  Zion-433, Exhibit 118.

21         That has down there a reference for "insulation

22  piping steam drain & gland variable features," right?

23      A    Yes, sir.

24      Q    Okay.  And that says Drawing Number 401A343000

25  was the drawing actually used for that part of the

KINSER v. CBS CORP., Case No. 94-2282

1  turbine, right?

2      A    That's correct.

3      Q    Okay.  And that is the same number as the

4  specifications that Westinghouse prepared that had the

5  asbestos, right?

6      A    Can I see that drawing?  I think that refers to

7  the Westinghouse drawing that showed the Sargent & Lundy

8  specification.

9      Q    The one that had the asbestos, right?

10     A    Yes.

11     Q    Okay.  I will --

12     A    Yes.

13     Q    I will ask --

14     A    Yes.

15     Q    -- Jessica to put this back on the screen for

16  you.

17          DEPUTY CLERK:  Can you just make sure to remove

18  the other one because it's showing up on the document

19  camera.

20          MR. McCOY:  Okay.

21          DEPUTY CLERK:  Thank you.

22  BY MR. McCOY:

23     Q    That's the same number, right?

24     A    That's correct.

25     Q    Okay.  So the master drawing list from Zion

1  refers back to the asbestos-containing specifications,

2  right?

3      A    That's correct.

4      Q    Okay.  That shows what was actually used,

5  right?

6      A    Actually, sir, it doesn't.

7      Q    Well, okay.  So it doesn't -- you're saying

8  today it doesn't show it; but in May of 2013, you said it

9  does show what was actually used?

10     A    That's correct.

11     Q    Okay.  So you've changed your answer now?

12     A    Yes, I have.

13     Q    Okay.  All right.  Let's move on.

14          I'm going to page 3 of the Exhibit 118.  This

15  is Zion page, Bates number page 434.

16          MS. EZELL:  I'm sorry.  What's the exhibit

17  number, please?

18     Q    Engineers have more papers than attorneys, I

19  think.

20          Okay.  So this is -- we're still looking at the

21  master drawings list for Zion, right?

22     A    That's correct.

23     Q    Okay.  And this is the insulation crossover

24  piping section, and it refers in here to Drawing Number

25  8790655G01 [sic], right?

KINSER v. CBS CORP., Case No. 94-2282

1      A     That's correct.

2      Q     Okay.  So this drawing number referred to here

3   in the master parts list in -- prepared and updated in

4   1990, right?

5      A     That's correct.

6      Q     Okay.  That drawing number that it refers to is

7   the same one that we had before, which is Kinser

8   Exhibit 129, right?

9      A     That's correct.

10     Q     Okay.  And that's the one that then references

11  back into the same specifications for the 401A343 that

12  were the asbestos-containing that Westinghouse did based

13  on Sargent & Lundy, right?

14     A     That's correct.

15     Q     Okay.  And that's the insulation crossover

16  piping, the insulation crossunder piping; reference in

17  the master parts drawing has the same reference back to

18  the drawing 879C655, right?

19     A     That's correct.

20     Q     Okay.  And, again, that's the drawing that

21  references to the asbestos-containing specifications that

22  Westinghouse had in 1970, right?

23     A     In 1970, yes, sir.

24     Q     Okay.  And in 1990, the update is showing that

25  those are the ones that, that were used at Zion, right?

KINSER v. CBS CORP., Case No. 94-2282

```
 1      A    Those -- that's when the drawing was updated,
 2   so --
 3      Q    Right.  But it's showing --
 4      A    Right.
 5      Q    -- as of that time period, 17 years later,
 6   that's still what it was, right?
 7      A    That drawing still existed.  Yes.
 8      Q    Right.  There's no change made here about what
 9   was used at Zion, is there?
10      A    The drawing is the same.  Yes.
11      Q    Okay.  And the same is true for the insulation
12   moisture separator reheater tanks; they reference back in
13   the master drawing to 879C655, which, again, was the
14   references to the asbestos-containing specifications that
15   Westinghouse had based on Sargent & Lundy, right?
16      A    That's correct, sir.
17           MR. McCOY:  Okay.  Your Honor, I'll move for
18   the admission of this 118, based on --
19           MS. EZELL:  Same objection.
20           THE COURT:  State your objection.
21           MS. EZELL:  This witness has not linked it to
22   this case.  He's repeatedly said that this does not show
23   what actually happened at Zion.
24           THE COURT:  That's your argument.  Denied.
25   It's received.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   BY MR. McCOY:

 2        Q    Mr. Ware, your attorneys in your examination

 3   here today showed you a couple documents.  One was

 4   Exhibit 2287.

 5             Could I just put this up for a moment, Jessica?

 6   Thank you.

 7             This was, this was the number the defendants

 8   had on these.

 9             Okay.  This is that same specification that

10   Westinghouse had prepared, based on something Sargent &

11   Lundy did, right?

12        A    That's correct.

13        Q    Okay.  And that's the one we've been talking

14   about, right?

15        A    Yes, sir.

16        Q    Okay.  And this one has, has the Bates stamp

17   number from the attorneys, right?

18        A    That's correct.

19        Q    Zion-1.

20             Those numbers were put on for your work in the

21   Zion cases, right?

22        A    Yes, sir.

23        Q    Your attorneys also showed you this document,

24   Exhibit 2298, right?

25        A    That's correct.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q     Okay.  And this document, you indicated, was

2  based on some nonasbestos-containing specifications from

3  Sargent & Lundy, right?

4      A     That's correct.  This was the next, the next

5  update to the Form 40, this 40-H, --

6      Q     Right.

7      A     -- the update.

8      Q     Okay.  So these came out in, according to this

9  date here at the bottom, March -- I'm sorry, May 23 of

10  1972, right?

11      A     Well, that's when Westinghouse did the drawing.

12      Q     Okay.

13      A     I don't know when Sargent & Lundy's -- Sargent

14  & Lundy Form 40-H was issued sometime before that because

15  we had to get the drawing and update our -- make the

16  drawing from it, so --

17      Q     Right.

18      A     -- that's when Westinghouse made the drawing.

19  Yes.

20      Q     Okay.  And I -- there's one thing that I didn't

21  see on this document, and that is:  I didn't see a Bates

22  stamp number from the attorneys on this document that was

23  provided for the Zion files.

24          MS. EZELL:  Objection, Your Honor.

25      Q     Do you see --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Objection, Your Honor, 403.  Mr.

 2   McCoy knows that he received a copy of this with a Zion

 3   Bates number.

 4              MR. McCOY:  Judge, I'm just going off of what

 5   they're using in court.  I just want to point out that

 6   that doesn't have the Bates number here.

 7              MS. EZELL:  It's a demonstrative prepared for

 8   court.  That's not why he's using it right now.

 9              THE COURT:  Is it --

10              MR. McCOY:  Now, it's demonstrative, Judge, --

11              THE COURT:  It's your exhibit.

12              MR. McCOY:  -- presented --

13              (Everyone is speaking at the same time;

14              court reporter unable to make the record.)

15              COURT REPORTER:  I can only take one person at

16   a time.

17              THE COURT:  Yeah.  I don't blame you a bit.

18   Thank you.

19              MS. EZELL:  The purpose for which he --

20              THE COURT:  Wait a minute.

21              MS. EZELL:  All right.  I'm sorry.  Go ahead.

22              THE COURT:  Thank you.

23              I see the defendant's exhibit sticker on it.

24   I've seen it used before with witnesses.  How did that

25   come about?  Is it -- did you offer this yet?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  I offered this.

 2              DEPUTY CLERK:  This has been admitted.

 3              THE COURT:  It's in evidence.

 4              MS. EZELL:  Yeah.

 5              THE COURT:  It's in evidence.

 6              MS. EZELL:  Yes, sir.

 7              And Mr. McCoy is intimating to this witness --

 8              THE COURT:  Well, so that's what you're

 9    arguing.  He just asked him a question about why it's not

10    there.  When you get redirect, you can ask him how come

11    it's not.

12              MS. EZELL:  My objection has to do with

13    something outside of this witness's knowledge.  Mr. McCoy

14    knows that he received this document in production with a

15    Zion Bates number, and he's trying to get this witness to

16    say it doesn't --

17              THE COURT:  Don't involve me in some dispute

18    between counsel.  I can only deal with what I see here in

19    court.  I am not privy to what went on between you and

20    Mr. McCoy in discovery.

21              MS. EZELL:  May --

22              THE COURT:  Now, is there a question pending

23    before the witness, Lisa?

24              MS. EZELL:  Maybe you could ask Mr. McCoy --

25              THE COURT:  Excuse me.
```

KINSER v. CBS CORP., Case No. 94-2282

1           MS. EZELL:  Okay.

2           THE COURT:  You're done, because we're getting

3    into extraneous matters.

4           Is there a question, Lisa?

5           MR. McCOY:  Okay.  The question was --

6           THE COURT:  Excuse me.  You're not Lisa.

7           MR. McCOY:  Oh, I'm sorry.

8           COURT REPORTER:  He had just started, "Do you

9    see" -- and then there was all the --

10           THE COURT:  And then there's a big verbal --

11           COURT REPORTER:  Yes, all the colloquy.

12           THE COURT:  Ask a question, Mr. McCoy.

13   BY MR. McCOY:

14      Q    There, there's no number on here that the

15   attorneys put for the Zion documents, is that right, Mr.

16   Ware?

17      A    On the document I'm looking at, I don't see a

18   Bates number.

19      Q    Okay.  And by the way, this document refers to

20   a turbine with the number "13A3971."  Is that right?

21      A    That's correct, sir.

22      Q    Okay.  That's not one of the Zion turbine

23   numbers, right?

24      A    That's correct.

25      Q    That's a different turbine, right?

KINSER v. CBS CORP., Case No. 94-2282

1      A      Yes, sir.

2      Q      Okay.  Mr. Ware, you were asked before about

3  when you knew Sargent & Lundy was changing specifications

4  for the insulation on the turbines to be asbestos-free,

5  right?

6      A      [No response.]

7      Q      Let me ask --

8      A      I don't recall.  If I was, I don't recall it.

9  But, yes.

10      Q      Okay.  Would you say you do recall being asked

11  that or you don't recall?

12      A      I don't specifically recall it, sir.  No.

13      Q      Okay.

14             (Brief pause in proceedings.)

15             MR. McCOY:  Your Honor, I, I can -- I can just

16  show these to the witness through the screen here.

17             MS. EZELL:  Number, please?

18             MR. McCOY:  This is January 17, 2012.

19             MS. EZELL:  Exhibit number?

20             MR. McCOY:  It's not an exhibit number.  It's a

21  transcript.  Okay.

22             THE WITNESS:  Yes, sir.

23  BY MR. McCOY:

24      Q      You gave testimony in Pittsburgh, in about

25  January 17, 2012, right?

KINSER v. CBS CORP., Case No. 94-2282

1      A     Yes, sir, I did.

2      Q     So I want to direct your attention on this

3   transcript to page 161.

4            MR. McCOY:  I'll use this to refresh his

5   recollection, Judge.

6      Q     And I want you to look at page -- lines 3

7   through 6.  All right?

8      A     Yes, sir.

9      Q     Okay.  So you were asked that question about

10  when you learned Sargent & Lundy changed the specs to

11  asbestos-free, right?

12     A     Yes, sir.

13     Q     Okay.  And that's in 2012 testimony.

14            (Brief pause in proceedings.)

15     Q     And you were asked again in May of 2013 --

16            MS. EZELL:  Page, please?

17            MR. McCOY:  On page 126 to 127.

18     Q     -- the same questions about when you learned

19  Sargent & Lundy changed the specifications to

20  asbestos-free.

21            THE COURT:  I'm having trouble reading it,

22  Jessi.

23            (Deputy clerk magnifies the display.)

24            THE COURT:  Okay.

25     Q     Is that right?

KINSER v. CBS CORP., Case No. 94-2282

```
1       A    That's what --

2       Q    You were asked the question twice, right?

3       A    It was the same question.

4       Q    Two different times, right?

5       A    I guess I answered, yeah.

6       Q    Okay.

7       A    I don't know if it was exactly the same

8  question, but --

9       Q    So that refreshes your recollection; you were

10 asked, right?

11      A    Yes, sir.

12      Q    And you gave two different answers, right?

13      A    I don't know if I gave two different answers.

14 I gave -- after the one of the trial testimony, I had

15 looked at the documents for that.  The trial testimony

16 was in '73, and I had a chance to review the documents.

17      Q    Okay.  All right.  You said in one occasion

18 that you learned about the change in the specifications

19 to asbestos-free when you started testifying about the

20 Zion turbines in 2012, right?

21      A    That's correct.

22      Q    That's what you said once?

23      A    Yes.

24      Q    Okay.  So that was your first answer.

25           And then later on, when you were asked the
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   question again at another time, you said that you learned
 2   about it back in 1973, right?
 3        A    Can you put that back up, sir, again?  I want
 4   to see what I actually said.
 5        Q    Well, what's your memory?  Do you remember what
 6   you said?
 7        A    I remember, I remember when I testified, I had
 8   looked -- I had looked at the documents for trial
 9   testimony in more detail, so I don't -- whatever that
10   said there, I said.  Okay?
11        Q    All right.  I'm going to go ahead, Your Honor,
12   and read this then for impeachment purposes.
13             MS. EZELL:  Page, please?
14             THE COURT:  Proceed.
15             MR. McCOY:  Okay.  So you were asked --
16             MS. EZELL:  I'm sorry.  Page?
17             MR. McCOY:  2013, page 126.
18             MS. EZELL:  Thank you.
19   BY MR. McCOY:
20        Q    The question was asked:  "So when did you first
21   learn about Sargent & Lundy having changed some of the
22   specifications to asbestos-free?
23             "Answer:  It had to be right -- the drawing
24   wasn't issued.  The Westinghouse drawing wasn't issued.
25   That had to change until December of 1972, so it had to
```

KINSER v. CBS CORP., Case No. 94-2282

1   be after that time period, early '73.

2           "So you are saying now that you learned about

3   it in early '73 --

4           "That's correct.

5           "Question:  -- that Sargent & Lundy changed the

6   specifications to asbestos-free?

7           "Answer:  That's correct.

8           "Question:  You gave testimony earlier in this

9   case, right?

10          "Answer:  Yes, sir, I did.

11          "Question:  On January 17, 2012, you gave your

12  testimony, right?

13          "Answer:  That was the day I gave it to you, so

14  was that the date?

15          "Question:  That's one of the dates.  Right.

16          "Answer:  Okay.

17          "And were you asked this question on

18  January 17th of 2012:  'When did you first learn about

19  Sargent & Lundy having changed some of its specifications

20  to be asbestos-free?'

21          "'Answer:  Since I started testifying here.'

22          "Was that your answer that you gave in January

23  of 2012?

24          "Answer:  If that's what it says, that's the

25  answer I gave.  I guess, yes.

1              "So when we took your deposition about a year

2       and a few months ago, you said you didn't learn until you

3       started testifying here, meaning for your deposition in

4       2012, right?

5              "Answer:  That's correct.

6              "Question:  Now you're telling us that you

7       really learned earlier.  Is that what you were saying?

8              "Answer:  What I'm saying is the earlier

9       deposition is the first time I had a chance to look at

10      the documentation and refresh my memory.  I'm saying

11      that's when I learned about it.  When I looked at the

12      documentation, that's what the documentation said, so I

13      don't really recall.  I recall we were changing asbestos

14      insulation around that time frame, both Sargent & Lundy

15      and Westinghouse.  But I guess during my testimony I just

16      looked at the documentation, and that refreshed my

17      memory.

18             "Question:  You have basically given two

19      different answers, right?

20             "Answer:  You can interpret it that way."

21             Were you asked that question, and did you give

22      those answers in May of 2013?

23         A    If that's what the testimony said, that's what

24      I gave, sir.  Yes.

25         Q    Okay.  So which answer is it today, 2012 or

KINSER v. CBS CORP., Case No. 94-2282

```
 1   1973?  Do you know?

 2       A    Let's, let's say 2012.

 3       Q    Okay.  2012 now?

 4       A    Right.

 5       Q    When you started testifying?

 6       A    Right.

 7       Q    All right.  Commonwealth Edison had a procedure

 8   for change orders, right?

 9       A    That's correct.

10       Q    Okay.  And the Commonwealth Edison general

11   terms and conditions, which had the change order

12   procedure in it, those were something that Westinghouse

13   followed, right?

14       A    That's something that was a general condition

15   for all contractors, yes, --

16       Q    You mean it was --

17       A    -- including Westinghouse.

18       Q    I think you said it was the Westinghouse's

19   number one customer for the Chicago office, right?

20       A    That's correct.

21       Q    So you wanted to do what that big customer

22   wanted, right?

23       A    Exactly.

24       Q    This is Exhibit Number 316.  This has already

25   been admitted through the testimony of Mr. Kleinrath, the
```

KINSER v. CBS CORP., Case No. 94-2282

1    Commonwealth Edison witness.

2              MS. EZELL:  Excuse me, Your Honor.  This

3    exhibit was not admitted.  This is some abbreviated

4    version of an exhibit that was admitted.  I have a full

5    copy of the exhibit.

6              THE COURT:  Ms. Winkler, is that exhibit

7    admitted?

8              DEPUTY CLERK:  Yes.  Over the objection of the

9    defendants, it was admitted.

10             MS. EZELL:  Not this version though.

11             MR. McCOY:  I'm just -- I'm only using this

12   excerpt with this witness, Judge.  That's all, but --

13             THE COURT:  Well, if it's admitted into

14   evidence, you may display it.

15             MR. McCOY:  Okay.

16   BY MR. McCOY:

17      Q    This copy of the Commonwealth Edison general

18   conditions, which was talked about earlier, has the

19   provision here for changes and work.

20             A little bit smaller.  There we go.

21             So in there, it says, "The Owner reserves the

22   right to change drawings and specifications."  That would

23   be Commonwealth Edison, right?

24      A    That's correct.

25      Q    Okay.  "Additions, omissions, or substitutions

KINSER v. CBS CORP., Case No. 94-2282

1    shall be executed under the conditions of the Contract

2    and shall be authorized by the Owner's formal contract

3    change authorization in writing, except in cases of

4    emergencies as provided in Clause 44 hereof."

5           So the substitution of new materials for

6    insulation, there's no form that specifically says that

7    in the Zion documents that the attorneys gave you; is

8    that right?

9       A    Well, we have an update to a drawing that shows

10   that they went to the next Sargent & Lundy specification,

11   Specification H.

12      Q    Right.

13           And that, that document doesn't say anything

14   happened before 1975, right?

15      A    That's when the drawing was updated.  Yes.

16      Q    Okay.

17      A    Westinghouse --

18      Q    Thank you, Mr. Ware.

19      A    Okay.

20      Q    Appreciate it.

21           (Brief pause in proceedings.)

22      Q    The original specifications that had the

23   asbestos, the 1970 version, had quite a number of

24   Westinghouse engineering people signing off, right?

25      A    Well, you showed me the document, and we showed

KINSER v. CBS CORP., Case No. 94-2282

1  a bunch of draftsmen and the design engineer approving

2  it.  Yes.

3      Q    Okay.  And, likewise, when changes happen, it

4  required a number of people at Westinghouse to sign off,

5  right?

6      A    Well, that was a drawing change, yeah.

7  Somebody had to -- right.

8      Q    Right.

9      A    That's for all drawings though.

10     Q    People, people at -- and also it had to be

11  approved through Sargent & Lundy and Commonwealth Edison,

12  right?

13     A    I don't know.  We got, we got the spec from

14  Sargent & Lundy, so I'm assuming it was approved by

15  Commonwealth Edison.

16     Q    Well, the change order had to be approved by a

17  number of people at Westinghouse -- let's just stay with

18  that for a moment -- right?

19     A    Well, the change order is a contract document.

20     Q    Okay.

21     A    We're talking here about a drawing document,

22  two different things.

23     Q    Well, the substitution of materials is covered

24  by Commonwealth Edison's change order policy, right?

25  That's what it said?

KINSER v. CBS CORP., Case No. 94-2282

1      A    That's what the general conditions say.  Yes.

2      Q    Okay.  So I want to go to a couple other

3   documents here for a moment.

4           This is Exhibit 126.

5           THE COURT:  Whose exhibit?

6           MR. McCOY:  126.

7           THE COURT:  Whose exhibit?

8           MR. McCOY:  This is a Westinghouse Zion

9   document from the attorneys again.

10          I'll ask the witness to be shown this one.

11  BY MR. McCOY:

12     Q    Okay.  Again, Mr. Ware, is this a document

13  that's got that Bates number Zion-992 that the attorneys

14  put on it?

15     A    Yes.

16     Q    922, I should say, right?

17     A    Yes.

18     Q    Okay.  This is Exhibit 126 for this case.

19  Okay.

20          And is this an example of a change that then

21  was made to the turbine at Zion?

22     A    Yes.  There's a Revision 2 and Revision 3 to

23  this drawing.

24          MR. McCOY:  Your Honor, I'll, I'll ask that

25  this then be admitted and shown to the jury.

1            MS. EZELL:  No objection.

2            THE COURT:  Very well.

3    BY MR. McCOY:

4        Q    So this document is dated in 1970, and its --

5    issue date there, and it's changed for -- it's got the

6    Zion turbine number on it, right?

7        A    That's correct.

8        Q    Okay.  And it talks about a change in,

9    actually, ordering of insulation, right?

10       A    That's correct.

11       Q    It says, "Change to 401A343," right?

12       A    Correct.

13       Q    So this is a change to the insulation

14   specification that we talked about earlier that was the

15   one that had the asbestos materials, right?

16       A    That's correct.

17       Q    This one's in writing, right?

18       A    Yes.

19       Q    Signed off on by all the different engineers at

20   Westinghouse, right?

21       A    It's a change to a drawing.  Right.

22       Q    Okay.  Here's another document.  This is

23   Exhibit 146.  I'd ask this be shown to the witness.

24            146, Mr. Ware, this is also a document from the

25   lawyers' files that they gave you, Zion-1157, right?

KINSER v. CBS CORP., Case No. 94-2282

```
 1         A     That's correct.

 2         Q     Okay.  And this one is, is a Westinghouse form,

 3    right?

 4         A     That's correct.

 5         Q     Called a "Change Notice," right?

 6         A     That's correct.

 7         Q     Okay.  And so this is a, a form that

 8    Westinghouse had available that was part of the Zion

 9    files, right?

10         A     That's correct.

11               MR. McCOY:  Okay.  I'll ask this be admitted,

12    Judge.

13               THE COURT:  Any objection?

14               MS. EZELL:  No, sir.

15               THE COURT:  It's received.

16               MR. McCOY:  All right.

17    BY MR. McCOY:

18         Q     And this shows then, as, as we talked about,

19    the number that it came from the attorneys in the Zion

20    files.  It, it's -- zoom in on this a little bit,

21    Jessica -- it's a Westinghouse form for change notices,

22    right?

23         A     That's correct.

24         Q     Okay.  So this, again, was being used during

25    Zion, right?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     It was part of the contract documents.  Yes.

 2        Q     Okay.  And this one's not for insulation, but

 3   it's a form that Westinghouse has, right?

 4        A     It's part of the contract forms.  Yes.

 5        Q     Not for insulation, though, right?

 6        A     No.  It's a contract -- it's basically a change

 7   notice to the contract.

 8        Q     Right.

 9              Okay.  Now, let me go to, back to the document

10   we've had admitted.  This is Exhibit 100, and it's the

11   41-- 401A343 document.  Okay.  And that's the

12   specification from, that Westinghouse prepared with the

13   asbestos, right?

14        A     That's the Westinghouse drawing of the Sargent

15   & Lundy specification.  Yes.

16        Q     Okay.  All right.  So, and this one has the

17   Zion numbers on it from the attorneys, right?

18        A     That's the Bates number.  Yes.

19        Q     In fact, it's the first number, right, number

20   1?

21        A     Yes.

22        Q     Page 1?  Okay.

23              So when you opened up those five binders, this

24   is the first page you found, right?

25        A     Exactly right.
```

1    Q    Okay.  And up here in the corner of this, it's

2  got a column.  I think this, this should say "Change,"

3  where somebody put that three-hole punch through it,

4  right?

5    A    That's correct.

6    Q    That's an area for changes, right?

7    A    That's correct.

8    Q    Okay.  And it says, "Future:  MKD drawing,"

9  right?

10   A    It says, "Future:  Marked," yeah, "drawing."

11   Q    Marked drawing, okay.  "Do not use for new

12 work," right?

13   A    That's correct.

14   Q    It says, "See drawing 822A675."  That would be

15 the, that would be the change, right?

16   A    That's correct.

17   Q    Okay.  And then it's got the signature of the

18 draftsman in -- a little bit closer in on this one,

19 Jessica.

20        The draftsman's signature on that is, is

21 February 10 of 1975, right?

22   A    That's correct.

23   Q    And then there's a checker's signature also in

24 February of 1975, right?

25   A    That's right.

KINSER v. CBS CORP., Case No. 94-2282

1      Q    And the responsible engineer signs off on here.

2   It's a little hard to read his date.

3          So in any event, the only statement about a

4   change that's in writing in these files on this

5   specification for the asbestos shows that that change was

6   signed off on in 1975, right?

7      A    That's correct.

8      Q    Okay.  So that was after Zion was built, right?

9      A    That's correct.

10          (Brief pause in proceedings.)

11          THE COURT:  It's 2:30.  Time for a --

12          MR. McCOY:  I might have a half hour, Your

13   Honor.

14          THE COURT:  -- recess.  Take the jury out.

15          We'll have a ten-minute recess, jurors.

16          (Jury absent, 2:31 p.m.)

17          THE COURT:  Out of the presence and hearing of

18   the jury, Mr. McCoy, how much more cross-examination do

19   you anticipate?

20          MR. McCOY:  Thirty minutes, maybe less.

21          (Recess, 2:31 p.m. to 2:52 p.m.)

22          MR. McCOY:  Your Honor, there is one matter --

23   this will be on the record then.

24          THE COURT:  Yes, very well.

25          Come up and listen.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  I can hear.

 2              MR. McCOY:  One item that I realized I had not

 3    covered in testimony of Mr. Kinser was the amount of

 4    income that he was earning before he had to retire.

 5              THE COURT:  You can recall him.

 6              MR. McCOY:  Okay.

 7              THE COURT:  Your case is still open.

 8              MR. McCOY:  Okay.  I'm going to recall him,

 9    then, for those purposes.

10              THE COURT:  Yeah.  Your case is still open.

11              MR. McCOY:  Okay.

12              THE COURT:  So --

13              MR. McCOY:  I will do that.

14              THE COURT:  All right.  Tell them to bring the

15    jury in.

16                   (Jury present, 2:53 p.m.)

17              THE COURT:  Please be seated, everyone.

18              Ask another question, Mr. McCoy.

19    BY MR. McCOY:

20         Q    Mr. Ware, you mentioned that inspectors from

21    OSHA had been on site at Zion.  Was that during 1973?

22         A    I think it was before that, sir.

23         Q    Earlier?  Okay.

24              And that inspector was out there for some

25    accident, right?
```

1    A    That's correct.

2    Q    Okay.  There -- OSHA did not do any testing for

3    asbestos at Zion; is that right?

4    A    I don't know that, but I never saw them do

5    that.

6    Q    Okay.  And from Westinghouse, there was a

7    gentleman named Art Wellner [phonetic] who was a safety

8    guy that went in the field, right?

9    A    That's correct.

10    Q    Okay.  And he did write a safety report about

11    Zion, right?

12    A    He was our safety, regional safety engineer.

13    I'm sure he wrote a number.  Anytime he visited a job for

14    safety meetings, and also if we had an accident, he would

15    write a report.  Yes.

16    Q    Okay.  And in the files you got from the

17    attorneys about Zion, none of these safety reports of

18    Mr. Wellner were included; is that right?

19    A    I didn't see any, sir.  No.

20    Q    Okay.  If the asbestos specifications then were

21    used at Zion, there would have been asbestos in a number

22    of places, right?

23    A    If the Sargent & Lundy asbestos specification

24    would have been used for the turbine generator?

25    Q    Yes.

KINSER v. CBS CORP., Case No. 94-2282

1        A    Yes.

2        Q    Okay.  They would have included some of the

3   molded insulations, right?

4        A    The molded pipe insulation?

5        Q    Yes.

6        A    Yes.

7        Q    Okay.  Some of the block insulations?

8             MS. EZELL:  Objection, Your Honor.  This is

9   calling for speculation.

10            THE COURT:  No.  It, it --

11            MS. EZELL:  It's a fact witness, Your Honor.

12            THE COURT:  No.  He, he may answer.  This is an

13   engineer, designated witness, firsthand knowledge and

14   experience.  He can answer.

15       A    But you're asking me to say if the Sargent &

16   Lundy spec--

17       Q    Yes.

18       A    Yes.  If this specification was used, yes.

19       Q    Okay.  And some of the cement would be asbestos

20   if the Sergeant -- if the asbestos specifications are

21   used, right?

22       A    That's correct.

23       Q    In 1974, you mentioned the generator had to be

24   rewound, right?

25       A    Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

1          Q    Okay.  There's also an annual refueling outage,

2    inspection outage at the nuclear powerhouses; is that

3    right?

4          A    Well, it's, it's either 12 months or 18 months,

5    but that's after a unit had operated for, for -- at full

6    power.  Zion was still, had been starting up.  Okay?

7          Q    There's, there's an annual refueling outage,

8    right?

9          A    Sir, it's either annual or 18 months.  I -- it

10   depends --

11         Q    All right.

12         A    -- on the customer's preference.  Yes.

13         Q    Mr. Ware, were you asked these questions, and

14   did you give these answers when you testified on

15   November 2, 2011?

16              MS. EZELL:  Page, please.

17              MR. McCOY:  Page 185 and 186.

18              THE WITNESS:  Is there a question, sir?

19              MR. McCOY:  Yeah.  I'm going to read it.  Just,

20   I'm waiting for your, the Westinghouse attorney to get

21   the page.

22              MS. EZELL:  Thank you.

23   BY MR. McCOY:

24         Q    Page 185, the question was asked:  "So what do

25   you remember besides what's in the documents that came

KINSER v. CBS CORP., Case No. 94-2282

```
 1   from the lawyers?
 2           "Answer:  We had some -- we had some, in the
 3   '70s when I was there as direct manager, we had a
 4   generator failure at Zion, too.  We had to rewind the
 5   generator in the field.  That was in 1974.
 6           "Question:  What else do you remember?
 7           "Answer:  I remember, well, we did -- every
 8   year, they did a refueling outage on the nuclear site.  I
 9   remember at every refueling outage, we did a partial
10   inspection.  We did an LP or an HP.  We did partial
11   inspections every year when we did the refueling outage."
12           Were you asked those questions and gave those
13   answers in testimony on November 2, 2011?
14       A   Yes, sir.
15       Q   Okay.  And at that time, you said the outages
16   were every year, right?
17       A   I mentioned refueling outages were every year.
18   Yes.
19       Q   Okay.  The piping at Zion, on the turbine
20   system -- well, let me change the question.
21           The Zion turbine system, that's something that
22   Westinghouse would be responsible for for the life of the
23   unit, right?
24       A   Can you repeat the question, sir?
25       Q   The Zion turbine system, that's something that
```

KINSER v. CBS CORP., Case No. 94-2282

1  Westinghouse would be responsible for for the life of the

2  unit, right?

3      A    Well, the -- Westinghouse wouldn't be respon--

4  we had a contract with Commonwealth Edison where they had

5  the ownership of the turbine, so it was their turbine.

6  We had a warranty contract, a one-year warranty contract.

7  But after that, we, we would not be responsible.  We'd be

8  there to service the customer for the life of the unit.

9  Yes.

10     Q    Okay.  This is Exhibit Number 682.  We had this

11 earlier today.  This is a basic sketch of the Zion

12 turbine powerhouse system.  This shows how the piping

13 comes in to the main floor from the reactor, right?  Is

14 that, is that basically right?

15     A    That's correct.

16     Q    Okay.  Basically, two big feed pipes come in,

17 right?

18     A    That's correct, two main steam pipes.

19     Q    All right.  And then you got the high pressure

20 unit; and then if you take, if you take the cover off the

21 high pressure unit here, then you got more piping

22 underneath there, right?

23     A    That's correct.

24     Q    Okay.  And then you got your low, your low

25 pressure system and your reheaters over here, right?

KINSER v. CBS CORP., Case No. 94-2282

1      A      That's correct.

2      Q      Okay.  And underneath the floor, there's the

3  Westinghouse turbine piping system there between the main

4  floor and the mezzanine, right?

5      A      That's correct.

6      Q      During the period of time that you were the

7  district manager in Chicago, Westinghouse had no safety

8  instructions for asbestos; is that right?

9      A      That's my recollection, sir.  Yes.

10     Q      And I think I heard -- you, you might have said

11 that the turbine area -- I can't remember what number you

12 put on the width of the turbines, turbine area there.

13 But that was about, for the turbines, it was about a

14 50 feet wide area, right?

15     A      The turbines were that wide; but the actual

16 turbine room, I think, was over 100 feet wide --

17     Q      Okay.

18     A      -- and 600 feet long.

19     Q      All right.  And I think you made mention that

20 the insulation, about who you thought might have been the

21 insulation contractor at Zion; and you had made,

22 mentioned a couple names.

23            Would -- Sprinkmann might also have been the

24 insulation contractor, right?

25     A      Sprinkmann, I remember the name, but I recall

KINSER v. CBS CORP., Case No. 94-2282

```
 1    the customer had their own insulation contractor for the
 2    plant.  And I remember a contractor called M & O or A & M
 3    is my recollection --
 4         Q     Uh-huh.
 5         A     -- at Zion.
 6         Q     November 2, 2011; page 179.
 7               MS. EZELL:  I'm sorry.  What was the date?
 8               MR. McCOY:  November 2, 2011; page 179.
 9               MS. EZELL:  Thank you.
10    BY MR. McCOY:
11         Q     Were you asked these questions, and did you
12    give these answers?
13               "Was there an insulation subcontractor for
14    Westinghouse on Zion 1?
15               "Yeah.  I'm trying to think if it was --
16               "Question:  Sprinkmann?
17               "Answer:  -- Sprinkmann.  Sprinkmann could have
18    been.  I know they did Kincaid for us.  I think
19    Sprinkmann bid on Zion, but they weren't -- maybe they
20    were.  It could have been Sprinkmann, or it could have
21    been A & M; I can't remember.  I remember both companies.
22    It could have been Sprinkmann."
23               Were you asked that question, and did you give
24    those answers?
25         A     If it says so, yes, sir.
```

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  One moment.

2              (Brief pause in proceedings.)

3          MR. McCOY:  Thank you, Mr. Ware.  We're done.

4          THE COURT:  Okay.  Ms. Ezell, --

5          MS. EZELL:  Yes.

6          THE COURT:  -- redirect.

7              REDIRECT EXAMINATION BY MS. EZELL:

8      Q    Picking up right where we left off, sir, in

9  November of 2011, continuing on page 181, speaking to

10  this issue of Sprinkmann, did you also, continuing with

11  your answer, say in response to the question:  "What can

12  you tell us, as designated witness of Westinghouse, about

13  the maintenance of inventory of insulation materials such

14  as the block and pipe insulation -- I'm sorry, the molded

15  pipe and block insulation?

16          "Answer:  I really can't tell you -- I really

17  can't tell you anything.  I really don't know what -- we

18  had a subcontractor.  He bid the job and performed the

19  work, and he would have -- he would have the insulation

20  if any was left over."

21          Did you say that?

22      A    If that's what I said, yes, if he -- yes.

23      Q    All right.  Now, do you know, as you sit here

24  today:  Who was the subcontractor who did the insulation

25  at Zion?

KINSER v. CBS CORP., Case No. 94-2282

```
1        A    No, I don't.

2        Q    All right, sir.

3             You were shown Defendant's Exhibit 2298.  Do

4    you remember that?

5        A    You have to refresh my memory of which one that

6    was.

7        Q    All right, sir.  If I could have the ELMO,

8    please.

9             That was -- could you zoom in just a bit?

10            That was Form 40-H.  Do you recall this

11   exhibit?

12       A    Yes, I do.

13       Q    Do you recall discussing with Mr. McCoy

14   numerous things about Form 40-H during your

15   cross-examination?

16       A    Yes.

17       Q    All right.  Now, I have Exhibit 2298 in this

18   format.  Do you see this, how I've got it here?  Why do I

19   have it like this?  Do you know?

20       A    I can't really see --

21       Q    You can't see it from there?

22       A    -- it that well because it's more than one

23   page.  It shows -- there's -- the Sargent & Lundy, to put

24   their whole specification on, it took a number of pages.

25   Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q    All right.  And what is this, actually, this

2   document?  Is it a document?  Or is it a drawing?  Or

3   what is it?

4      A    It's actually a part of a contract document

5   that Sargent & Lundy had that's for their standard

6   specifications for all steam turbines, whether it's

7   Westinghouse, whether it's another contractor, or whether

8   it's a nuclear plant or a fossil plant.  It's a standard

9   specification.  It's very generic.

10            And this part of the 40-G is what they require

11   for the thermal insulation, --

12      Q    All right.

13      A    -- and they list all other components that have

14   to be insulated, and they tell you the type of

15   materials --

16      Q    Okay.

17      A    -- that has to be done.

18      Q    And do you remember looking at the Zion

19   notebooks or binders that you talked about with Mr.

20   McCoy?

21      A    Yes.

22      Q    And do you remember that some of the documents

23   in that notebook were on eight and a half by eleven

24   pieces of paper?

25      A    That's correct.

KINSER v. CBS CORP., Case No. 94-2282

1     Q    And some of the documents in that notebook were

2  actually folded up like this, correct?

3     A    That's correct.

4     Q    You have to pull them out --

5     A    Yes.

6     Q    -- to look at them?

7          All right, sir.  And -- well, let me ask you

8  this.  Do you specifically recall in the Zion notebooks

9  looking at 40-H?

10    A    Yes, I do.

11    Q    And if you would just follow me over here --

12  and if you could zoom in right here -- what is that

13  number right there on this version of Defendant's 2298?

14    A    That's Zion's Bates number 925.

15    Q    And if Mr. McCoy showed you a document that

16  didn't have that Bates number but was also Defendant's

17  Exhibit 2298 -- can we zoom out now? -- are those the

18  same documents?

19    A    Yes, they are.

20    Q    Well, you don't know this, but I'll represent

21  to you that we had a witness here, Mr. Castleman --

22  you've heard that name before?

23    A    I don't believe so.

24    Q    All right.  And he represented to us that he

25  could not read this version, the smaller version.  Okay?

KINSER v. CBS CORP., Case No. 94-2282

1    He couldn't read it.

2            And so you have confirmed, though -- have you

3    not, sir? -- that this Defendant's Exhibit 2298 is simply

4    a blown-up version of Zion-925, correct?

5        A    That's correct.

6        Q    And tell the ladies and gentlemen of the jury

7    what the significance is of having "Zion-925" at the

8    bottom of this document?

9        A    Because when the engineer that was supposed to

10   get the Zion -- go on the Zion drawing list, which Mr.

11   McCoy showed the master drawing list, --

12       Q    Uh-huh.

13       A    -- he pulled --

14       Q    We'll talk about that in a minute.

15       A    Well, he pulled all the drawings -- notice,

16   there's checks marks in there.

17       Q    Uh-huh.

18       A    That's where the engineer -- those are the

19   drawings he pulled.

20       Q    All right.

21       A    Okay?  And one of the drawings was -- Mr. McCoy

22   showed the Zion bill of material --

23       Q    Right.

24       A    -- for insulation.

25            If you go to that bill of material, it gives

KINSER v. CBS CORP., Case No. 94-2282

1    you the next level of drawings down; and when you keep

2    going down, you're going to find this drawing, and that's

3    why -- that's why this drawing was with the Zion

4    documents, because it was -- it was a Zion drawing

5    reference.  A Zion turbine drawing referenced this

6    document.

7         Q    Okay.  So when Zion was originally conceived,

8    the bid was originally sent out, this document,

9    Defendant's Exhibit 2298, or Document 40-H as we've been

10   referring to it -- this was not the document that

11   applied, correct?

12        A    That's correct.

13        Q    Because in 1966 and 1967 and 1970 -- this 1972

14   document -- if we zoom in down here at these dates --

15   this document didn't exist --

16        A    That's right.

17        Q    -- during those times, correct?

18        A    Correct.

19        Q    Now, let me just ask you about this document

20   real quick.  This is a specification, correct?

21        A    That's correct.

22        Q    It was received in -- did Westinghouse get it

23   over the phone?

24        A    No.  Westinghouse basically was doing a lot of

25   work with Commonwealth Edison, with -- and Sargent &

KINSER v. CBS CORP., Case No. 94-2282

1   Lundy.  This document was received, probably, in, in two

2   ways.  It was probably -- it could have been part of a,

3   of a bid specification for another turbine generator.

4        Q    Right.  And that would have --

5        A    Also --

6        Q    And that would have -- and let me ask you this.

7   Let me just stop you right there.

8             Would that have been in writing?

9        A    No.  They would have sent -- the drawing would

10  have been received, probably, in the bid document; or we

11  also had a, we also had monthly meetings with Sargent &

12  Lundy.

13       Q    Right.

14            But this wouldn't have been conveyed orally;

15  they wouldn't have said, "We want you to change that,"

16  and just said it, right?

17       A    Yes.

18       Q    They would have given you something in writing,

19  correct?

20       A    That's correct.

21       Q    All right.  So sometime between 1970 when 40-G

22  was used -- was written and in 1972 when 40-H was

23  created, Sargent & Lundy, who worked for and spoke for

24  Commonwealth Edison, gave Westinghouse something in

25  writing, correct?

1      A     This -- that's right.  The spec-- the new

2  specification.

3      Q     And that's what I wanted to ask you.  What did

4  they give them?

5      A     40-- the new 40-H specification.

6      Q     This document right here, which is reflected in

7  this document right here, Defendant's Exhibit 2298?

8      A     That's correct.

9      Q     All right.  Now, do you remember when you were

10  looking at 40-G with Mr. McCoy and he had you focus in

11  down here on all of these different signatures?

12      A     Yes.

13      Q     Now, if we, if we focus in on 40-H, which --

14  let's look at the date -- is two years later, correct?

15      A     That's correct.

16      Q     It also has all of these signatures, correct?

17      A     That's correct.

18      Q     So Mr. McCoy, I think, asked you, "In 1970,

19  Westinghouse was okay with using asbestos at Zion?"

20            And you said, "Yes."

21      A     Yes.

22      Q     But in 1972, when they were told not to,

23  Westinghouse was okay with not using it, correct?

24      A     That's correct.

25      Q     All right.  And, in fact, did they use it, or

KINSER v. CBS CORP., Case No. 94-2282

1    did they not use it?

2         A    Well, we -- the contract we had with

3    Commonwealth Edison required us to conform to the

4    requirements in the standard specification, Form 40, --

5         Q    Right.

6         A    -- and --

7         Q    And what did that say to use?

8         A    Well, --

9         Q    Asbestos or not?

10        A    Well, Form 40-H said no asbestos.  It was a

11   timing issue.  We'd got that specification, and it not

12   only applied to Zion.  It applied to any unit at

13   Commonwealth Edison.  That same specification went to all

14   the insulators.

15        Q    Right.

16        A    It wasn't just for Zion.  It was a standard,

17   their new standard.  Okay?

18        Q    That's a question I wanted to ask you.

19             So in addition to Sargent & Lundy communicating

20   with Westinghouse, did Sargent & Lundy also communicate

21   with all of the other contractors at Zion --

22        A    Well, --

23        Q    -- for, for any purpose?

24        A    Yes.

25        Q    Because they were in charge of the Zion

1    engineering and design, correct?

2        A    They were in charge of putting the

3    specifications out for the design of the plant.  Yes.

4        Q    Did Sargent & Lundy communicate with the

5    subcontractors?

6        A    Well, the insulation subcontractors were doing

7    insulation on a lot of other turbine works, and they

8    would have also been familiar with this document.

9        Q    So when Sargent & Lundy in 19-- if we could go

10   to the ELMO, I'd like to display previously displayed

11   Defense Demonstrative 72.

12            So in May of 19-- did I say 72?  I meant 12.

13   Sorry.  We haven't been here that long.

14            So in May of 1972, when Sargent & Lundy revised

15   specification 40-G and issued 40-H, based on your

16   experience and your recollection, did they communicate

17   this not just to Westinghouse but to other contractors

18   and subcontractors as well?

19       A    And other manufacturers, yes.

20       Q    All right.  And why would they do that?

21       A    Because that was their new standard.  They were

22   the architect/engineers and they made changes,

23   specification changes at different times for different

24   reasons.  It also was a new law/OSHA requirement.

25       Q    All right, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              Now, we know that, in 1973, that a

 2    subcontractor did the insulation at Zion, correct?

 3        A    Well, on the turbine.

 4        Q    Thank you.

 5              Did the turbine insulation at Zion, correct?

 6        A    Correct.

 7        Q    And you were asked certain questions about the

 8    fact that you were not there in 1973 on a daily basis.

 9    Do you remember talking to Mr. McCoy about that?

10        A    That's correct.

11        Q    Now, you have indicated, though, that you were

12    there on, in a supervisory capacity twice a week in 1974,

13    correct?

14        A    During the generator outage, yes.

15        Q    Yes.

16              And did you have occasion during 1973 to go

17    there in your supervisory capacity as well?

18        A    Yes.

19        Q    All right, sir.  And if you walk in to the Zion

20    plant after it's been insulated and you look at the pipes

21    and they are, as you have described them, silver instead

22    of white, what does that mean?

23        A    It means aluminum jacketing was used to cover

24    the pipe insulation.

25        Q    Okay.  And if you used aluminum jacketing, what
```

KINSER v. CBS CORP., Case No. 94-2282

1  does that mean about the type of insulation that was used

2  on the pipes?

3       A    Well, it occurs to me that specification H was

4  used because that required them to use aluminum jacketing

5  rather than asbestos cloth.

6       Q    All right.  And white pipes would mean?

7       A    Asbestos cloth.

8       Q    What color were the pipes at Zion when you went

9  there in 1974?

10      A    They -- aluminum jacketing is silver colored.

11      Q    All right, sir.

12           Now, in 1974, when you walked into the plant in

13  1973 after the insulation had been completed, did you

14  have occasion to look at the blankets that were on the

15  turbine units?

16      A    Well, there was an enclosure over the turbines.

17  So unless you were taking the enclosure off, I wouldn't

18  look at the blankets; but I had occasion at later dates

19  to see the blankets when we did turbine overhauls.

20      Q    Okay.  So not in '74?

21      A    Correct.

22      Q    Because prior to '74 there was no reason to

23  open the enclosure around the turbine, correct?

24      A    That's correct.

25      Q    But at a later time you were still supervising

KINSER v. CBS CORP., Case No. 94-2282

1    Zion; and you did, in fact, have an opportunity to

2    personally view the blankets at Zion.  Yes, sir?

3         A    Yes, sir -- yes, ma'am.

4         Q    Okay.  By looking at the blankets, could you

5    tell whether or not they were asbestos blankets or

6    stainless steel blankets?

7         A    They were stainless steel mesh blankets.

8         Q    Do those things look different to the naked

9    eye?

10        A    Yes, they do.

11        Q    And you specifically recall that they were

12   stainless steel and not asbestos?

13        A    Stainless steel mesh, yes.

14        Q    Stainless steel mesh.  Thank you, sir.

15             Do you remember when Mr. McCoy was asking you

16   questions about the document which has been admitted into

17   evidence, document -- Plaintiff's Exhibit 118, and you

18   indicated that this was the master drawing list for Zion,

19   or a portion of the master drawing list for Zion?  Do you

20   recall that?

21        A    Yes, I do.

22        Q    And do you recall that, when you were

23   testifying about this document, Mr. McCoy read you

24   portions of your testimony in another case that Mr. McCoy

25   tried called the "Wright trial"?

KINSER v. CBS CORP., Case No. 94-2282

1      A      Yes.

2      Q      And do you remember he said, "So, you know,

3  you've changed your testimony.  Which is it?", right?  Do

4  you remember him saying that?

5      A      Yes.

6      Q      Do you also recall that during that trial you

7  had an opportunity to revisit that issue about this

8  document and that you were asked these questions and that

9  you gave these answers?

10      "Question:  You were shown computer printouts

11  from 1992 about the master drawing list for the

12  Westinghouse turbine records at Zion, correct?

13          "Answer:  That's correct.

14          "Do you know why they did a printout in 1992?

15          "Answer:  Well, we still had an obligation for

16  service at Zion, and they updated -- I think it was the

17  computer.  It used to be a written drawing list.  We went

18  to computerized digital drawings, and this updated all

19  the standard specs in that format during the years.

20  That's when it was updated.  This was all the original

21  drawings from the design.

22          "Question:  And that reference to 1990, did

23  that simply mean the last time this drawing was updated

24  with a note?

25          "Answer:  No.  That was the last time the

1  drawing list was updated, not the individual drawings,

2  the complete list of all the A-Level drawings.

3         "Question:  Oh, okay.  So it meant that 1992 is

4  when it was printed out and that 1990 was the last time

5  before then that this list was printed out?

6         "Answer:  That's correct."

7         Now, do you remember being asked those

8  questions and giving those answers also at the Wright

9  trial?

10     A    Well, if that's what my testimony says, that's

11 what I said.

12     Q    Okay.  Now, let me ask you this.  When you

13 say -- you used two words in trying to explain to Mr.

14 McCoy what you were talking about, and I would like you

15 to explain those to me.

16         You used the word "design," correct?

17     A    That's correct.

18     Q    And you used the word "manufacture," correct?

19     A    Correct.

20     Q    When in the process for Zion was "design"?

21     A    That was -- design was before the turbine was

22 manufactured, so probably '66, '67, '68.

23     Q    And what is "design"?

24     A    That's when the engineers actually met -- do

25 the drawings that design the turbine so the components

KINSER v. CBS CORP., Case No. 94-2282

1  can be manufactured.

2      Q    And what is "manufacturing" as compared to

3  "design"?

4      A    Well, that's actually when you take the

5  engineering drawings, or blueprints, and the

6  manufacturing people order the material -- the forgings,

7  the castings, the different bolting -- and they order it

8  to, to, as designed.

9      Q    All right, sir.  Do you have experience, aside

10  from this Zion insulation change, where you'll have a

11  change in materials between design and manufacture?

12      A    Yes, I do.  And also change in config-- the

13  shop sometimes makes errors in manufacturing, and you

14  don't go back and change the design drawing.  You put in

15  the turbine records an error -- it's called EAN, Error

16  Appraisal Notice.

17          And if you look in the record, there are some

18  of those EANs.  That means that there was a change made

19  in manufacturing to the design, and you have to look up

20  that record.  That's in the -- that's also in turbine

21  records.  There's lists of changes that were made.

22      Q    All right, sir.

23      A    And configuration changes also.

24      Q    Okay.  Now, you were shown a drawing, a

25  configuration of Zion with some pipes -- this is just

KINSER v. CBS CORP., Case No. 94-2282

```
 1   really not going to work unless I have a picture.
 2                (Brief pause in proceedings.)
 3        Q    This is the Plaintiff's 682, previously
 4   displayed to the jury.  Thank you, Ms. Burlison.
 5             You were shown this document when you were
 6   talking to Mr. McCoy, Plaintiff's Demonstrative 682.  Do
 7   you recall that?
 8        A    It's a sketch, yes.
 9        Q    A sketch, thank you.  Not an engineering
10   drawing like we've been talking about?
11        A    That's correct.
12        Q    And do you remember him asking you:  If you
13   take the cover off this turbine, then there's pipes
14   underneath here?
15        A    That's correct.
16        Q    Yes.
17             During the outage of 1974, was the cover taken
18   off this turbine for any reason?
19        A    No.  Not, not on the 1974.
20        Q    Okay.  Thank you.
21             Now, Mr. McCoy indicated a number of times that
22   you received documents from lawyers.  Do you remember him
23   saying that on a few occasions?
24        A    Yes.
25        Q    Did you, based on your work in this field,
```

KINSER v. CBS CORP., Case No. 94-2282

1   receive the documents that you expected to receive in

2   order to come here and talk to this jury about the Zion

3   nuclear power plant?

4        A    Yes.

5        Q    Was there anything that you asked for that you

6   did not get?

7        A    Well, some of the field reports were missing.

8   The field reports were missing the whole maintenance

9   outages of Zion.

10        Q    All right, sir.

11             And those were not something that was withheld

12   from you; those were just things that could not be found?

13        A    That's correct.

14        Q    All right.  And, in fact, efforts were made,

15   based on your request, to find those, correct?

16        A    That's correct.  I suggested they talk to the

17   different -- the district office.  The Chicago office had

18   been relocated several times.

19        Q    All right, sir.

20             And when you and I first started working on

21   this case, who -- did you teach me about nuclear power

22   plants, or did I teach you?

23        A    I think I taught you.

24        Q    All right, sir.  Now, do you remember Mr. McCoy

25   displaying to you this portion of Plaintiff's

KINSER v. CBS CORP., Case No. 94-2282

1      Exhibit 316, admitted during Mr. Kleinrath's testimony?

2          A     Yes, I do.

3          Q     Do you have any idea why he didn't display to

4      you this, the actual paragraph 14 of that exhibit, which

5      deals with all of the contract provisions regarding

6      changes in work at the Zion nuclear power plant?

7          A     No, I don't.

8          Q     All right.

9          A     And by the way, this is the standard General

10     Conditions document for all contracts, not just Zion.

11     This is Commonwealth Edison's general conditions.

12         Q     Okay.

13         A     So it's very -- it's terms and conditions that

14     all contractors have to agree to.

15         Q     And as it relates to Commonwealth Edison

16     providing -- or Commonwealth Edison or Sargent & Lundy

17     providing written information about changes to

18     Westinghouse, they did that -- did they not, sir? --

19     when they provided Westinghouse with Specification 40-H,

20     which I'm holding in my hand right here?

21         A     That's correct.

22         Q     All right.  Now, paragraph 14 requires

23     Westinghouse from time to time to provide Commonwealth

24     Edison with written notification, correct?

25         A     That's correct.

KINSER v. CBS CORP., Case No. 94-2282

1     Q     What are the -- what are the times in --
2  briefly, what are the two instances in which Westinghouse
3  was required to provide Commonwealth Edison with written
4  notification?
5     A     If there was a scope change that affected
6  pricing, or a schedule change.
7     Q     All right.  And what do you mean by "scope"?
8     A     That Commonwealth Edison would add some extra,
9  some additional components or work; or they would delete
10  some work, which was done with the Zion contract, --
11     Q     Okay.
12     A     -- that would affect the price of the contract.
13     Q     All right.  So they wanted to know if the
14  amount they were going to have to pay was different, and
15  then they wanted to know if the time in which you were
16  going to finish was going to be different?
17     A     That's correct.  This was kind of telling the
18  contractor, "We can make changes.  The owner has the
19  right to make any change we would want."
20     Q     And by "we," you mean who?
21     A     Commonwealth Edison.
22     Q     Okay.
23     A     But we're saying:  If we make the change -- you
24  know, we're not going to pay you for any change unless
25  you come back to us and tell us you, it's costing you

KINSER v. CBS CORP., Case No. 94-2282

1  more money and justify it.  That's what this paragraph

2  says.

3      Q    All right.  Now, I'm showing Exhibit 12,

4  Demonstrative 12, Defendant's, previously displayed.

5  Westinghouse hired the subcontractors to do the Turbine

6  Unit 1 and 2 insulation in this case, correct?

7      A    That's correct.

8      Q    When in the timeline did Westinghouse -- would

9  Westinghouse have put the bid out as it related to that

10  insulation?

11      A    Probably in the late '72/early '73.

12      Q    They didn't do it in 1970 and buy it and store

13  it up somewhere?

14      A    No.

15      Q    Well, why not?

16      A    Because we -- again, insulation for the turbine

17  part of the job was one of the last things we did.

18      Q    Okay.  If we've heard testimony in this case

19  that it was common practice to use insulation that was

20  left over or just sitting around, would that have been

21  what was done at Zion?

22      A    Well, Westinghouse didn't make or supply

23  insulation.  We went to the insulation contractor, --

24      Q    Okay.

25      A    -- and we looked at him to supply what was

KINSER v. CBS CORP., Case No. 94-2282

1   commercially available and also with the specification

2   required.

3        Q    Okay.

4        A    Okay?

5        Q    So the contractor that you looked to was also

6   required to follow Sargent & Lundy Form 40-H?

7        A    Well, Westinghouse -- our contract requirements

8   were to, to conform to the requirements of the Sargent &

9   Lundy specifications.  At the time we did this, the

10  current specification was the Form H.  So when we went

11  out for bids, we would have, number one, given them all

12  the Westinghouse drawings because the Sargent & Lundy

13  specification didn't say how much insulation --

14       Q    Right.

15       A    -- or what, what -- how to install it.  So the,

16  the insulation contractor, to bid the job, would need the

17  scope of work from Westinghouse in terms of where the --

18  how much insulation, where it was put, how to apply it.

19  Okay?  And, and then the Sargent & Lundy specifications

20  would be followed in terms of material.

21       Q    And, in fact, you talked to Mr. McCoy about a

22  number of documents which predate 1972 that, that deal

23  with this issue of insulation, correct?

24            Here's Plaintiff's Exhibit 129, admitted.  Do

25  you remember talking to him about the crossover and

1    crossunder piping?

2         A    That's correct.

3         Q    But this document is dated 1970, correct?

4         A    That's correct.

5         Q    All right.  And, and so would this document

6    apply as it related to the measurements and the

7    specifications?

8         A    That's correct.

9         Q    And so it would be helpful to the insulator to

10   have this type of document if, if they were going to be

11   providing the insulation for the piping, correct?

12        A    That's correct.

13             Maybe I should insert here a little bit about

14   40-years-ago technology.  You know, all the drawings were

15   hand-drawn.  Okay?  And we didn't have computer-aided

16   drafting.  Okay?  So sometimes the drawings were updated

17   at a later date.  Things were done verbally.

18             You don't build a nuclear power plant in seven

19   years to wait on the paper.  Okay?  Sometimes that paper

20   followed, and that's the way we did things back then.

21   Okay?  We talked on the phone, or the engineers came to

22   the site.  Our engineers were in constant contact with

23   Sargent & Lundy.  We had a project engineer and a

24   contract administrator visit the Sargent & Lundy monthly,

25   not only on Zion, for other projects.  Okay?

1                I didn't have email.  I didn't have Federal

2      Express.  I had a telephone and an electronic typewriter,

3      and that's how we operated back then.

4            Q     You didn't have Mr. Sawyer --

5            A     No.

6            Q     -- with his scanner there to change drawings

7      and then --

8            A     In a seven-year period, --

9            Q     -- send them to somebody?

10           A     -- this -- at a nuclear site, there was so many

11     technical changes made just because the industry was

12     learning things.

13           Q     Right.

14           A     So there was all kinds of technical changes

15     made where you didn't initiate a change order to a

16     contract.

17           Q     All right.

18           A     Okay?

19           Q     Now, Mr. McCoy also showed you this document,

20     which is admitted into evidence now as document number

21     104, Plaintiff's 104.  Now, this is called a "Process

22     Specification," correct?

23           A     That's correct.

24           Q     Now, what does this process specification tell

25     anybody about what kind of material they're supposed to

KINSER v. CBS CORP., Case No. 94-2282

1  use?

2      A    Well, the process specification, the way

3  Westinghouse hierarchy is, you start with the drawing

4  that defines what to do, how to -- okay?  Then the

5  process specification kind of tells you how to do it, how

6  to apply it, and also would list the materials that are

7  required.

8      Q    Right.

9      A    So there would be a third document that Mr.

10  McCoy showed; was the material specification.

11      Q    And, in fact, he showed you Plaintiff's

12  Exhibit 110 and asked you if this was the materials

13  specification, dated 1969, and what did you tell him?

14      A    That was the material specification that was

15  referenced on that process specification.

16      Q    Right.

17      A    And the reason it's in the Zion documents is

18  because, when the engineer pulled the drawings, this is

19  one of their references.

20      Q    All right.  Now, was this the process

21  specification that was used at Zion?  I'm sorry.

22      A    No.

23      Q    Was this the materials list that was used at

24  Zion?

25      A    No.  Because we would have used the Sargent &

KINSER v. CBS CORP., Case No. 94-2282

1   Lundy specification.  Even if it was the G specification,

2   we would have used the Sargent & Lundy specification for

3   material.

4         Q    So you would not have gone to this

5   specification, Document 110, to find out what materials

6   to use; instead, you would have gone to Defendant's 2298,

7   specification 40-H, correct?

8         A    That's correct.

9              And if we would have done the job in 1970, we

10  would have used the 40-G specification.  We would have

11  given the insulation contractor the drawing, our process

12  specification, and Sargent & Lundy's Form G, which would

13  have been asbestos.

14             But because we did it after 1972, we used the

15  current specification, which was the H specification.

16        Q    Mr. McCoy asked you a bunch of questions that

17  said:  If Sargent & Lundy Form 40-G had been used, if --

18  then, then the brick would have been made of this.  If

19  Sargent & Lundy 40-G would have been used, then the clay

20  would have been made of this.

21             Do you remember those questions?

22        A    Yes.

23        Q    Okay.  But since you've testified that Form

24  40-H was used, were any of those materials that you

25  discussed with Mr. McCoy made from asbestos-containing

KINSER v. CBS CORP., Case No. 94-2282

1    products?

2         A    If 40-H was used, no.  There was three

3    fundamental changes --

4         Q    Right.

5         A    -- from 40-G to -H.

6         Q    And let me just say:  I'm not asking you if it

7    was used.

8         A    No.

9         Q    You've already told me it was used, right?

10        A    That's correct.

11        Q    Okay.  Since it was used, were any of those

12   products that Mr. McCoy talked to you about, did they

13   contain any asbestos?

14        A    Not on the turbine generator.

15        Q    At Zion?

16        A    At Zion.

17             MS. EZELL:  All right.  No further questions,

18   Your Honor.

19             THE COURT:  Anything else of the witness, Mr.

20   McCoy?

21             MR. McCOY:  A couple questions, Judge.  I'll

22   make it quick.

23                  RECROSS-EXAMINATION BY MR. McCOY:

24        Q    Mr. Ware, this is already in evidence.  It's

25   exhibit, Defendant's 2298, to display this one.

KINSER v. CBS CORP., Case No. 94-2282

1                This document was the one that had the Sargent

2       & Lundy asbestos-free specifications, right?

3           A    Yes, sir.

4           Q    Okay.  And this is the one that was for some

5       turbine other than Zion, right?

6           A    That's correct.

7           Q    This is the one that was found in the Zion

8       files, you say?

9           A    That's correct.

10          Q    Files you got from the attorneys, right?

11          A    That's correct.

12          Q    Okay.  The -- you mentioned something about an

13      engineer or somebody having pulled the files.  You

14      weren't part of that process, right?

15          A    No, sir.  I was not.

16          Q    Right.  You just got whatever the attorneys

17      gave you?

18          A    That's correct.

19          Q    Okay.  So when you got the files, there was

20      this different turbine's specifications in there, right?

21          A    Well, that, that revision was made for that

22      shop order turbine.  Right.  That was not Zion.

23          Q    Not Zion, okay.

24               And you don't know what happened to the, those

25      Zion files that were pulled by the engineer between the

KINSER v. CBS CORP., Case No. 94-2282

1   time that they were pulled and the attorneys gave them to

2   you; you don't know what happened, do you?

3        A    No, sir, I don't.

4        Q    This -- by the way, you said earlier that you

5   first learned about the change to the Sargent & Lundy

6   asbestos-free specs -- or you heard about it, I guess --

7   when you started testifying in 2012, right?

8        A    That's correct.

9        Q    Okay.  So when you started testifying, you

10  didn't know anything about any specific event happening

11  in 1973 or '2 where these specification changes were put

12  into the Zion files; you didn't know about that then, did

13  you?

14       A    No, sir.  I did not.

15       Q    It's something you learned about after the

16  attorneys gave you the documents, right?

17       A    That's correct.

18       Q    Okay.  This document here -- we'll put this up.

19  This is also in evidence.  This is Exhibit 100.

20            Now, these were the asbestos-containing

21  specifications that Westinghouse prepared from Sargent &

22  Lundy, right?

23       A    That's correct, sir.

24       Q    Okay.  And this was the ones that were also

25  found in the Zion files, right?

KINSER v. CBS CORP., Case No. 94-2282

1      A    That's correct.

2      Q    These have the Zion turbine number on it,

3  right?

4      A    That's correct.

5           THE COURT:  This is cumulative.

6           MR. McCOY:  I'm just -- one more thing, Your

7  Honor.

8  BY MR. McCOY:

9      Q    So that this change order here -- which is also

10  for the Zion turbine number, right? --

11      A    That's correct.

12      Q    -- shows the change to those very

13  specifications, the asbestos-containing ones, right?

14      A    That's correct.

15      Q    And that's in writing and in the Zion files,

16  right?

17      A    That's correct.

18      Q    And there's nothing in writing in the Zion

19  files that shows the change to the asbestos-free ones,

20  right?

21      A    Yes, there is, sir, that one drawing you

22  pointed out that was changed in 1975.

23      Q    Right.  In 1975, after Zion was finished,

24  right?

25      A    That's correct.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  No questions further.

 2              THE COURT:  All right.  Jurors, do you have any

 3    questions for this witness that you want to hand up to

 4    me?

 5              (No response.)

 6              THE COURT:  Thank you.

 7              You may step down.  Thank you, sir.

 8              (Witness Ware excused, 3:41 p.m.)

 9              THE COURT:  Okay.  Have you got another

10    witness, Mr. McCoy?

11              MR. McCOY:  Yes, Your Honor.  We're going to

12    briefly recall Mr. Kinser.

13              THE COURT:  All right.  Come up, Mr. Kinser.

14              You're still under oath, Mr. Kinser.  Have a

15    seat on the witness stand, please, sir.

16    LARRY ALLEN KINSER, previously sworn and remaining under

17         oath, resumed the witness stand, 3:41 p.m.,

18              DIRECT EXAMINATION BY MR. McCOY:

19    Q    This will be very brief; but if you need a swig

20    of water, I'll give you some.

21    A    Thank you.

22    Q    Okay.  Mr. Kinser, I just wanted to briefly ask

23    you a question about when -- before you had to retire,

24    what had you been making for the last two or three years,

25    on the average, before your retirement?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Income, he's talking about.

 2        Q     Income, right, from the pipefitting work.

 3        A     Income?

 4        Q     From the pipefitting.

 5        A     Approximately $35,000 a year.

 6        Q     Okay.  I want to show you one document that we

 7   had, which is Exhibit 682.

 8              This, this also shows how things were laid out

 9   at Zion, right?

10        A     It's a sketch.  Yes.

11        Q     Yeah, okay.

12              And in terms of this project, when you were

13   there, this, this shows here this high pressure turbine;

14   and when you were there, was the cover taken off of that

15   turbine already?

16        A     Yes.  It had been.

17        Q     Okay.  So the piping that you're working on is

18   on -- is after the turbine's taken off, right?  The

19   cover's taken off?

20        A     After the cover's taken off.

21        Q     Okay.  So that would be, basically, this area

22   over here, right?

23        A     Yes.

24        Q     Okay.  Your work was -- which, which part of

25   the area in the turbine room were you mostly on, the main
```

KINSER v. CBS CORP., Case No. 94-2282

1    floor or the mezzanine level?

2        A    Mostly, I worked on the main, but I did work on

3    the mezzanine also.

4            MR. McCOY:  Okay.  That's all the questions I

5    have, Your Honor.

6            THE COURT:  Ms. Ezell.

7            MS. EZELL:  Yes, sir.

8                CROSS-EXAMINATION BY MS. EZELL:

9        Q    Hello, Mr. Kinser.

10       A    Hello.

11       Q    I'm showing you what has been -- you were just

12   talking to Mr. McCoy about, which is Plaintiff's 682.  Do

13   you see that?

14       A    Yes, ma'am.

15       Q    And you've just indicated -- and I'll take,

16   turn this now into our defense demonstrative.  You just

17   indicated that, when you were there, you worked in this

18   area right here where I've circled, right?

19       A    Most of that whole turbine there.  It depends

20   on where the piping was.

21       Q    You know what?  I'm going to bring this up

22   here, and why don't you circle it?

23       A    Pardon?

24       Q    You circle where you worked.

25       A    I was working on this whole turbine.

1      Q     All right.  Here, let me give you this pen.  Go

2   ahead.

3      A     Mostly right along in here.

4      Q     All right.  I'll mark this now as Defense

5   Demonstrative 22.  And just so we, we are all recalling

6   what happened here, I circled in blue; and then you

7   circled in pink, and so that's what your testimony is

8   today about where you worked, correct?

9      A     Yes, ma'am.

10     Q     Now, do you recall testifying in this case

11  before?

12     A     Pardon?

13     Q     You recall you testified in this case before?

14     A     Yes.  I testified the same thing.

15     Q     And last time you testified, I showed you what

16  was previously marked and shown to the jury at that time

17  as Defendant's Demonstrative Number 8.  Do you recall

18  that?

19     A     I'm sorry.  I didn't understand your question,

20  ma'am.

21     Q     Do you remember last time you testified -- if

22  you look on your little TV screen there -- I showed you

23  this picture, and you talked about this with me?

24     A     Yes.

25     Q     Do you remember that?

KINSER v. CBS CORP., Case No. 94-2282

1    A    Yes.

2    Q    And you remember I drew this pink line, right

3  here, while you were testifying?

4    A    Yeah.

5    Q    And then when you told me to, I colored in

6  these pipes right here with yellow because that's where

7  you told me you had worked.  Do you remember that?

8    A    Yes.

9    Q    Okay.  And you would agree with me, wouldn't

10  you, sir, that this -- can I get both of them in the

11  picture -- this testimony that you're giving today about

12  where you worked is different than the testimony that you

13  gave last time you testified about where you worked,

14  correct?

15    A    No.

16    Q    The pictures do not look the same, do they,

17  sir?

18    A    Oh, no.

19    Q    If you look on your picture there.

20    A    I've seen them.  I've looked at them.  Yes,

21  ma'am.

22    Q    All right.  So you agree with me that those

23  pictures don't match up, correct?

24    A    Basically, yes, they do.

25    Q    Okay.  And, but as you sit there today, you're

```
 1   still sure you were working at Zion --

 2        A    Yes, ma'am.

 3        Q    -- when you recall working at this turbine,

 4   correct?

 5        A    Yes, ma'am.

 6        Q    And did you hear -- were you here for Mr.

 7   Ware's testimony this morning and into the afternoon?

 8   Did you hear him?

 9        A    I heard him say something.  Yes, ma'am.

10        Q    Yeah.

11             And did you hear him say that, in 1974, the

12   cover never came off of the turbine that you testified

13   you worked on?

14        A    That -- I heard him say that.  Yes, ma'am.

15        Q    All right.  So if the cover never came off of

16   that in 1974, then you weren't working under it, correct?

17        A    I wasn't working under it.  No.  It was already

18   off.

19        Q    Yes, sir.

20             And are you sure you were there in 1974?

21        A    That's what I testified as, ma'am.

22        Q    Yeah.  But do you remember it, as you sit there

23   today, that it was 1974 and not some time before or

24   after?

25        A    No.
```

KINSER v. CBS CORP., Case No. 94-2282

1      Q      Okay.  And in your lifetime, you worked at

2    between 100 or more jobs, correct?

3      A      Probably.  Yes, ma'am.

4      Q      And if that's what you testified to last time,

5    that's still true today?

6      A      Yes, ma'am.

7      Q      And as you sit here, you're absolutely positive

8    that the testimony you've been giving in this case is

9    about the Zion nuclear power plant, located in Zion,

10   Illinois?

11     A      Yes.  I didn't work on that many nuclear

12   powerhouses, --

13     Q      Yes, sir.

14     A      -- so I would remember the ones that I had.

15     Q      But you worked --

16     A      And this is one of them.  Yes, ma'am.

17     Q      And you worked at over 100 sites where your job

18   was to do pipefitting and pipe covering, correct?

19     A      Not pipe covering, --

20     Q      I'm sorry.  Pipefitting, --

21     A      -- pipefitting.

22     Q      -- correct?

23     A      Yes, ma'am.

24     Q      And if you were at Zion, then that's what you

25   were doing there, too?

KINSER v. CBS CORP., Case No. 94-2282

```
 1        A     Pipefitting?

 2        Q     Yes, sir.

 3        A     Yes.

 4              MS. EZELL:  All right.  No further questions,

 5   Your Honor.

 6              THE COURT:  Anything else, Mr. McCoy?

 7              MR. McCOY:  Judge, that concludes the witnesses

 8   for the plaintiff's case.

 9              THE COURT:  All right.  Thank you.

10              Thank you, Mr. Kinser.  You may step down.

11                   (Witness Kinser excused, 3:48 p.m.)

12              THE COURT:  Jury may have a recess.  Take the

13   jury out.

14                   (Jury absent, 3:48 p.m.)

15              THE COURT:  Out of the presence and hearing of

16   the jury.  Logistics?  Where -- be seated everybody,

17   please.

18              MS. EZELL:  Thank you.

19              THE COURT:  What's left for the plaintiffs'

20   case?

21              MR. McCOY:  I -- just, just a matter of getting

22   exhibits admitted --

23              THE COURT:  Okay.

24              MR. McCOY:  -- and deciding which ones are

25   going back to the jury.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Right.

 2              What's left of the defendant's case?

 3              MS. EZELL:  I need the plaintiff to formally

 4   rest so that I will know he is done with his evidence,

 5   and then I --

 6              THE COURT:  Give me your best guess as to what

 7   else it is you have to do.

 8              MS. EZELL:  After that, all I need to do is

 9   make sure my exhibits are properly admitted, which I

10   believe that they are; and then we will rest as well.

11              THE COURT:  Okay.  Why -- is this going to take

12   a long time?

13              MS. EZELL:  I don't think so.

14              MR. McCOY:  Judge, my, my -- my sense of this

15   is if we work with the defense for half hour we'll have

16   all the exhibit issues resolved and that we can just

17   present that to you for ruling if we need to on anything,

18   but I think most of it will be resolved.

19              THE COURT:  Okay.  Now, let me ask this further

20   question:  How long a closing argument do you think

21   you're going to make?

22              MR. McCOY:  Hour and fifteen, including

23   rebuttal.

24              THE COURT:  How long do you think your closing

25   argument will be, Ms. Ezell?
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1          MS. EZELL:  Not any longer than that, Your

 2   Honor.  That sounds fine to me.

 3          THE COURT:  Okay.  I'm going to -- this is a

 4   suggestion.  I will tell the jury to come back at 1:00

 5   tomorrow.  We'll be here part of this yet.  I'll work

 6   till 4:30.  I haven't, and am not going to, worked after

 7   dark for 20 years.

 8          Anyhow, then we can have the conference on jury

 9   instructions, starting at 8:00 a.m. tomorrow, and we'll

10   be finished by noon, I hope.  I don't know.  Have you

11   looked through these?  Are you going to have a lot of

12   squawks about the jury instructions?  Or aren't you?

13          MS. EZELL:  One moment.

14          MR. McCOY:  Not much from the plaintiff.

15          THE COURT:  Not much, okay.

16          MS. BURLISON:  I hope they're not squawks, but

17   we don't have a lot.  No, sir.  But we do have some

18   questions for you.

19          THE COURT:  Excuse my, my vernacular

20   expression.

21          Okay.  Then we'll come back at 9:00.  How's

22   that?  Because then I won't have mutiny here.

23          MR. McCOY:  I agree.

24          THE COURT:  Okay.  I, I'm hoping that we can,

25   we can do that, and then I won't let the jury begin its
```

KINSER v. CBS CORP., Case No. 94-2282

1   deliberations until Thursday morning.  I'll just send

2   them home after the closing arguments, or I'll let them

3   go pick a presiding juror or something.  Sometimes

4   nomination speeches take a long time.

5            Okay.  Bring the jury back.

6            Because I don't want to give the jury a case

7   like this at 5:00 in the afternoon.  I'm past that, too.

8   It's not fair, really, not fair to the jury.

9                 (Brief pause in proceedings.)

10           THE COURT:  You've got your Rule 50 motion all

11  set to launch out of your quiver, I assume?  Okay.

12           MS. BURLISON:  Yes, Your Honor.

13           MS. EZELL:  Are we doing that this afternoon?

14                 (Jury present, 3:53 p.m.)

15           THE COURT:  Okay.  Jurors, here's the plan.  I

16  believe we're at the end of the case where I can have

17  closing arguments and give you the case and so forth.  So

18  be back tomorrow at 1:00.  Okay?  1:00 p.m.

19           Don't discuss the case among yourselves or with

20  anyone else while you're gone.  Don't let them approach

21  you or talk to you about the case.

22           Good night.  It's daylight.  You should be able

23  to get home easy enough today, and I don't think -- we're

24  going to have real cold weather, but I don't think any

25  more storms.

KINSER v. CBS CORP., Case No. 94-2282

1            (Jury dismissed for the day, 3:54 p.m.)

2            THE COURT:  All right.  You think, Mr. McCoy,

3   that you and the defense lawyers can at least come to an

4   agreement that there are a few that, that you want to

5   object to?

6            MR. McCOY:  I believe that will reduce the

7   number greatly.

8            THE COURT:  That's true.  All right, then.

9   Let's change things.  Be back at 8:30 tomorrow, half past

10  8:00.  You, you can't be objecting to that.  All right.

11  We'll start then.  You put in yours.  Then you'll rest.

12            Then we'll put in your exhibits, and, and

13  you'll have a motion.  We'll handle those very quickly.

14            Okay.  Good luck.  Good night.

15            (Trial adjourned, 3:55 p.m.)

16               *  *  *  *  *  *  *  *  *  *

17               REPORTER'S CERTIFICATE

18       I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify
    that the foregoing is a correct transcript from the
19  record of proceedings in the above-entitled matter.

20       Dated this 15th day of February, 2014.

21                 s/Lisa Knight Cosimini
                 _____
                 Lisa Knight Cosimini, RMR-CRR
22               Illinois License # 084-002998

23

24

25