```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS

LARRY A. KINSER & DONNA M. KINSER,

                Plaintiffs,            Docket No. 94-2282

    vs.                               Urbana, Illinois
                                       January 22, 2014
                                       8:30 a.m.
CBS CORP., successor by
merger to CBS Corporation,
formerly known as Viacom, Inc.,
formerly known as Westinghouse
Electric Corporation,

                Defendant.

              EXCERPT from JURY TRIAL -- Day 10
        (Jury Instruction Conference & Closing Arguments)

            BEFORE THE HONORABLE HAROLD A. BAKER
             SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

 For the Plaintiffs:        ROBERT G. McCOY, ESQUIRE
                            TED D. HARTMAN, ESQUIRE
                            Cascino Vaughan Law Offices, Ltd.
                            220 South Ashland Avenue
                            Chicago, Illinois 60607
                            312-944-0600

 For the Defendant:         SANDRA GIANNONE EZELL, ESQUIRE
                            Bowman and Brooke, LLP
                            901 East Byrd Street, Suite 1650
                            Richmond, Virginia 23219
                            804-649-8200

                            PAULA M. BURLISON, ESQUIRE
                            Bowman and Brooke, LLP
                            1441 Main Street, Suite 1200
                            Columbia, South Carolina 29201
                            803-726-7420

                            JACOB DANIEL SAWYER, ESQUIRE
                            Foley & Mansfield, PLLP
                            55 West Monroe, Suite 3430
                            Chicago, Illinois 60603
                            312-254-3800
```

KINSER v. CBS CORP., Case No. 94-2282

I N D E X

Page

JURY INSTRUCTION CONFERENCE ...................... 3

PRELIMINARY INSTRUCTIONS TO THE JURY

    By Judge Baker ................................ 68

CLOSING ARGUMENTS

    By Mr. McCoy .................................. 74

    By Ms. Ezell ................................. 127

    Rebuttal by Mr. McCoy ........................ 173

JURY CHARGE

    By Judge Baker ............................... 179

KINSER v. CBS CORP., Case No. 94-2282

```
 1                    (In open court, 8:38 a.m.)

 2                    (Discussion regarding exhibits was reported

 3                    but is not now transcribed; Rule 50 motions

 4                    made, with no argument, also reported but

 5                    not now transcribed.)

 6                    (In open court, 9:47 a.m.)

 7          THE COURT:  Okay.  We ready to start the

 8   conference on jury instructions?

 9          MR. McCOY:  Yes, Judge.

10          MS. EZELL:  Yes, Your Honor.

11          THE COURT:  Now I'll explain to you how we'll

12   proceed.  And so we shall start out.  Are there any

13   objections to Court's proposed -- and I'm reading from

14   Draft 2 of the Court's proposed charge -- to pages 1, 2,

15   and 3?  Plaintiff?  Plaintiffs, plural.

16          MR. McCOY:  I'm sorry.  The question was to

17   any?

18          THE COURT:  Any objection to Court's proposed

19   pages 1, 2, and 3 of Draft 2?

20          MR. McCOY:  No objections to 1, 2, and 3.

21          THE COURT:  Defense?

22          MS. EZELL:  No objections, Your Honor.

23          THE COURT:  All right.

24          Page 4, any objection by the plaintiffs?

25          MR. McCOY:  No objection.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Defense?

 2              MS. BURLISON:  No, sir, no objection.

 3              THE COURT:  Page 5 and 6, --

 4              MR. McCOY:  No objection.

 5              THE COURT:  -- statement of the issues?

 6              MR. McCOY:  No objection.

 7              THE COURT:  Ms. Ezell?

 8              MS. BURLISON:  Your Honor, we do have an

 9    objection.  We would like to request that the instruction

10    be modified to reflect that the plaintiff in the opening

11    statements admitted contributory negligence.  Mr. McCoy

12    conceded that, as to the division of responsibility, the

13    tobacco exposure is 50 percent; and of that 50 percent

14    attributable to tobacco, Mr. Kinser is 10 percent at

15    fault.

16              THE COURT:  Well, you can argue that to the

17    jury, if you want to, but, but I'm not going to make a

18    ruling of law as to that.  That's overruled, that claim.

19              Aside from that, anything about the statement

20    of the issues in 5 and 6?

21              MS. BURLISON:  Your Honor, we have one more

22    item, please.

23              THE COURT:  Yes.

24              MS. BURLISON:  Numbers 1, 3, and 5, we think

25    that those could be combined into one to consolidate the
```

KINSER v. CBS CORP., Case No. 94-2282

1    instruction a little bit that way.

2              LAW CLERK ABRAMS:  1, 3, and 5.

3              MS. BURLISON:  1, 3, and 5.

4              THE COURT:  No, 1 is failed to warn; 3 is

5    failed to instruct; and 5 is failed to direct work

6    safely.  I think they're three different things, so that

7    I won't -- now, remember -- I don't want to lecture you

8    on procedure, but you've got to tender an alternative, or

9    it's going to get lost in the record.

10             MS. BURLISON:  Yes, Your Honor.

11             THE COURT:  Okay.  All right.  So are you going

12   to tender an alternative instruction to me that shows

13   those things?

14             MS. BURLISON:  We did that, Your Honor,

15   pretrial, in our initial submissions.

16             THE COURT:  No.  That doesn't work.  That

17   doesn't work.

18             MS. BURLISON:  Yes, Your Honor.

19             THE COURT:  I mean -- well, don't -- it's not,

20   "Yes, Your Honor."  I'm -- experience.  It's, it's got to

21   be here in the conference on jury instructions.  You've

22   got to tender me an alternative instruction to preserve

23   your record.  I'm, I'm confident I'm right about that, or

24   it certainly always was that way.

25             Do you have the, the instruction you had in the

1  pretrial order with you?

2          MS. BURLISON:  No, Your Honor.

3          THE COURT:  Whatever happened to my white

4  notebook that had all that stuff in it?  Nobody seems to

5  know.

6              (Brief pause in proceedings.)

7          THE COURT:  Ms. Ezell, so we make the record

8  now and not try to do it later, I'm going to print out

9  the pretrial order and give you a copy of it so that you

10  will have the, the things you need to tender into the

11  record to preserve your position.

12          MS. EZELL:  You don't -- it's not necessary,

13  Your Honor.  We've found a copy of our pretrial

14  submission.

15          THE COURT:  Oh, okay.

16          MS. EZELL:  I'm just going through that really

17  quick so we can submit it.

18          THE COURT:  Okay.  All right.  You've got it.

19  I was going to print one out for you.

20          MS. EZELL:  Thank you for that offer, but we've

21  located it.  I'm trying to find the right instruction.

22              May we pass on this and go to other pages while

23  I locate that and come back to this instruction, Your

24  Honor?  Is that -- I don't want to waste the Court's time

25  on finding it.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Well, I want to keep the record

 2    straight --

 3              MS. EZELL:  Okay.

 4              THE COURT:  -- so while we're on it, let's do

 5    it.

 6              (Brief pause in proceedings.)

 7              THE COURT:  All right.  Let the record show

 8    that the defense has presented Defendant's proposed

 9    Instruction Number 28 to the Court.

10              MS. BURLISON:  And, Your Honor, we would tender

11    that in lieu of numbers 1, 3, and 5 on page 5 of your

12    draft instructions.

13              THE COURT:  Wait a minute.  Tell me that again.

14    I'm reading and didn't hear you really.  I didn't --

15              MS. BURLISON:  Sure.

16              THE COURT:  -- didn't comprehend.

17              MS. BURLISON:  We will -- we are tendering that

18    instruction that we just handed you in lieu of numbers 1,

19    3, and 5 on page 5 of your draft instructions, Your

20    Honor.

21              THE COURT:  Very well.  You may be -- have you

22    seen this?

23              MR. McCOY:  The ones that the defense had?

24              THE COURT:  Yeah.  This is Defendant's Proposed

25    Instruction 28.  If you have --
```

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  We saw it in the pretrial report.

2          THE COURT:  All right.  Allow me to read it to

3    myself.

4               (Brief pause in proceedings.)

5          THE COURT:  Defendant's Proposed Instruction

6    Number 28 is refused as an alternative to portions of 5

7    and 6 because, number one, it's a misstatement of the

8    law.  It's argumentative.  It's peremptory.  And it, it

9    plain old is wrong in this case to show "proximate cause

10   as a failure to warn claim," and so forth.  Show it's

11   refused.

12          Okay.  Now, I'm going on to page 7, the

13   definition of "ordinary care."  Plaintiff?

14          MR. McCOY:  No objection.

15          THE COURT:  Defense?

16          MS. EZELL:  No objection, Your Honor.

17          THE COURT:  Page 8:  It was the duty of the

18   defendant to use ordinary care, and it was the duty of

19   the plaintiff to use ordinary care.  Plaintiff?

20          MR. McCOY:  Judge, IPI 10.04 is what we

21   would --

22          THE COURT:  Bring it up.

23          MR. McCOY:  -- follow.

24          THE COURT:  No, I don't know from 10.04

25   nowadays; they've changed all the numberings in them,

KINSER v. CBS CORP., Case No. 94-2282

```
 1   and, and --
 2            MR. HARTMAN:  May I approach?
 3            DEPUTY CLERK:  Yep.
 4            THE COURT:  Yeah.  Bring it up to the clerk.
 5            Let me read it to myself.
 6                (Brief pause in proceedings.)
 7            THE COURT:  All right.  Mr. McCoy.
 8            MR. McCOY:  Plaintiff would add to the
 9   instruction, Your Honor, as the second sentence in that
10   first paragraph, --
11            THE COURT:  "It was the duty of the defendant
12   to be free from negligence"?
13            MR. McCOY:  Yes.
14            MS. EZELL:  I'm sorry, Your Honor.  We
15   didn't -- we don't have a copy of it.
16            THE COURT:  Well, it's really repetitive of the
17   first sentence, saying it in a different way.  "It was
18   the duty of the defendant, before and at the times of the
19   occurrences in question, to use ordinary care for the
20   safety of the plaintiff."
21            And, and Mr. McCoy wants to add to that --
22   which is IPI Instruction, now 10.04 -- add these words:
23   "That means it was the duty of the defendant to be free
24   from negligence," which is saying the same thing twice.
25            Show that this is refused.  It's repetitive.
```

KINSER v. CBS CORP., Case No. 94-2282

1             Now, any objections by the defendant?

2             MS. EZELL:  No, Your Honor, not to page 8 as

3   you have drafted it.

4             THE COURT:  Okay.  Turning, then, to page 9.

5             LAW CLERK ABRAMS:  No, 8.

6             THE COURT:  We have 8.

7             LAW CLERK ABRAMS:  Oh, sorry.  9, you're right.

8             THE COURT:  Show the law clerk withdraws her

9   objection.

10            Okay.  9:  It's okay for a lawyer to talk to a

11  witness.  Any objection, Plaintiff?

12            MR. McCOY:  No.

13            THE COURT:  Defense?

14            MS. EZELL:  No, no objection.

15            THE COURT:  Page 10:  The law does not require

16  the party to call any witness and so forth.  Plaintiff?

17            MR. McCOY:  No, no objection.

18            MS. BURLISON:  No objection.

19            THE COURT:  Page 11:  You heard witnesses give

20  opinions.  Plaintiff?

21            MR. McCOY:  No objection.

22            THE COURT:  Defense?

23            MS. BURLISON:  No objection.

24            THE COURT:  Page 12:  --

25            MR. McCOY:  No objection.

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  -- notes.

2          MS. BURLISON:  No objection.

3          THE COURT:  Page 13:  The weight of the

4  evidence does not depend on the number of witnesses, and

5  so forth.  Plaintiff?

6          MR. McCOY:  No objection.

7          MS. BURLISON:  No objection.

8          THE COURT:  14:  There are two types of

9  evidence, direct and circumstantial.

10         And this is, this is the pattern instruction

11  that the Seventh Circuit has adopted, and I have gone on

12  to add the words about -- no, I'm sorry.  I'm sorry.  I'm

13  talking about something else.

14         This is, this is direct and circumstantial

15  evidence.  Plaintiff?

16         MR. McCOY:  No objection.

17         MS. BURLISON:  No objection.

18         THE COURT:  All right, page 15.

19         Whether any proposition has been proved,

20  consider all the evidence.  Plaintiff?

21         MR. McCOY:  No objection.

22         THE COURT:  Defense?

23         MS. BURLISON:  No objection.

24         THE COURT:  All right.  Now, pages 16 and 17

25  are, "The, the job of the jury is to judge the

KINSER v. CBS CORP., Case No. 94-2282

1   credibility of the witnesses," and I'll tell you where

2   this came from.  It's mine.  It's cribbed together from

3   about three different circuits; and I, I like it because

4   it, it's a better explanation to the jury, in my belief,

5   to give them an understanding about the free rein they

6   have in judging credibility.

7              Any objection, Plaintiff?

8              MR. McCOY:  No objection.

9              THE COURT:  Defense?

10             MS. BURLISON:  No objection.

11             THE COURT:  18:  Certain testimony was by

12   deposition; you've got to give that equal credit.

13   Plaintiff?

14             MR. McCOY:  No objection.

15             THE COURT:  Defense?

16             MS. BURLISON:  No objection.

17             THE COURT:  All right.  19:  The credibility of

18   a witness . . . by showing that they made inconsistent

19   statements.  Plaintiff?

20             MR. McCOY:  No objection.

21             MS. BURLISON:  No objection.

22             THE COURT:  20 -- now, here, expression

23   "proximate cause."  Plaintiff?

24             MR. McCOY:  No --

25             THE COURT:  This is straight IPI.

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  No objection.

2          MS. BURLISON:  No objection.

3          THE COURT:  Okay.  21:  More than one person

4   may be to blame, and so forth.

5          And I changed this from, from the one I first

6   gave to you by putting in the second paragraph, "If you

7   decide that the total proximate cause" -- and I think

8   they had the word "sole" and, and I used, thought about

9   the word "complete," and I think "total" best expresses

10  the idea that "proximate cause" can have a number of

11  causes.  You can have a number of proximate causes

12  bringing about a result; and to express that if the total

13  proximate cause of the injury was caused by somebody

14  else, then, then the defendant -- the verdict should be

15  for the defendant, because they didn't do it.

16          Plaintiff?

17          MR. McCOY:  No objection.

18          THE COURT:  Defense?

19          MS. BURLISON:  No objection.

20          THE COURT:  Now, "When I say" -- this is

21  page 22, definition of the "burden of proof."  And this

22  is the one where I have added the second paragraph

23  because you hear lawyers -- and I think the Seventh

24  Circuit also talks about "preponderance," and so forth,

25  which is accurate.  But I, I am adherent to the idea to

KINSER v. CBS CORP., Case No. 94-2282

1   say that something is "more probably true than not true"

2   is more understandable and also tell them that -- and

3   somewhere in here, I don't know where it is -- I tell

4   them that:  Evenly balanced evidence, the plaintiff

5   loses.

6            LAW CLERK ABRAMS:  Right here.

7            THE COURT:  Is it in this one?

8            LAW CLERK ABRAMS:  Yes.

9            THE COURT:  Okay.  22, Mr. McCoy?

10           MR. McCOY:  No objection.

11           THE COURT:  Plaintiff?  Defendant?  Excuse me.

12           MS. BURLISON:  No objection.

13           THE COURT:  What did you say, Ms. Burlison?

14           MS. BURLISON:  No objection from the defendant.

15           THE COURT:  Okay.  Now we're down to the burden

16   of proof instructions for the, for the, the parties; and

17   that's page 23 and 24.  Plaintiff?

18           MR. McCOY:  No objection.

19           THE COURT:  Defense?

20           MS. EZELL:  No objection.

21           THE COURT:  You guys are no fun.

22           MS. EZELL:  We're getting there.

23           MS. BURLISON:  We're getting there.

24           THE COURT:  Okay.  Page 25:  The verdict is,

25   you know, the considered judgment of each juror.

KINSER v. CBS CORP., Case No. 94-2282

1  Plaintiff?

2          MR. McCOY:  No objection.

3          THE COURT:  Defense?

4          MS. BURLISON:  No objection.

5          THE COURT:  Page 26, and this we need to

6  unbold, too.

7          LAW CLERK ABRAMS:  Done.

8          THE COURT:  I moved this up.  That's why it's

9  in bold.  And, but I don't know that it got in the right

10 position.  I wanted this right before the damage

11 instructions, or right after them.

12         LAW CLERK ABRAMS:  Do you want it before

13 page 29?

14         THE COURT:  I don't know.  I'll talk to them

15 about it.  Anyway, let's look at the instruction that's

16 on page 26.  Any objection, Plaintiffs?

17         MR. McCOY:  No objection.

18         THE COURT:  And defense?

19         MS. BURLISON:  No objection.

20         THE COURT:  Okay.  Now where do you think it

21 should go?  I moved it -- it was way in the back, which

22 didn't make any sense to me, and I wanted to put it

23 following, following the instructions.  I think it should

24 go in after page -- after page 28, Susan.

25         LAW CLERK ABRAMS:  After 28?

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Yes.  After page -- we need to move

2  page 26 so that it goes in after page 28.

3          LAW CLERK ABRAMS:  Okay.

4          THE COURT:  Because you tell them -- in 27 and

5  28 -- if they find in favor of the plaintiffs, how to,

6  how to go about the damages and so forth; and then it

7  makes great sense to say:  If you find for the defendant

8  on liability, you won't have to consider damages.

9          Anybody disagree with that?

10          MR. McCOY:  No objection.

11          MS. BURLISON:  No objection.

12          THE COURT:  Okay.  Make it so.

13          LAW CLERK ABRAMS:  Wait a second.

14          THE COURT:  Okay.  We'll wait for you.

15          LAW CLERK ABRAMS:  Thank you.

16              (Discussion off the record between

17               the Court and the law clerk.)

18          THE COURT:  All right.  Now, we've

19  straightened -- we've rearranged that and, but we're

20  working out of, out of Draft 2 on the record.

21          LAW CLERK ABRAMS:  Right.

22          THE COURT:  And on Draft 2 on the record, are

23  there objections to pages 27 and 28?  Plaintiff?

24          MR. McCOY:  Yes, Judge.  We have some --

25          THE COURT:  Okay.

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  -- maybe not exactly objections,

2     some of these, but it -- the first one is on item number

3     2.  That claim has been withdrawn for aggravation.

4          THE COURT:  Okay.  Strike 2 and move everything

5     up a number.

6          Anything else?

7          MR. McCOY:  The number 3, the, the instruction,

8     IPI, is either "loss of normal life" or, or "disability,"

9     and the term used in the later -- here, it uses

10    "disability."  In the later verdict form, it uses "loss

11    of normal life."  That's --

12         THE COURT:  All right.

13         MR. McCOY:  -- page 30.

14         THE COURT:  So we need to amend what was 3 and

15    will now become 2 to "disability" --

16         MR. McCOY:  Well, I would prefer "loss of

17    normal life."

18         THE COURT:  Instead of "disability."

19         MR. McCOY:  Right.

20         THE COURT:  The "loss of normal" -- all right.

21    So I'm going to do it.  Defense, do you have objections

22    to that?  It's -- in other words, it conforms to the new

23    IPI instruction, I guess.

24         MR. McCOY:  For the record, Judge, that's IPI

25    30.04.01.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Okay.  Here, what we're doing,
 2   Susan, we're at 3 which is now going to be 2.
 3              Strike the word "disability" and substitute for
 4   that "loss of a normal life."
 5              LAW CLERK ABRAMS:  "Of a normal life"?
 6              THE COURT:  Isn't that right?  "Loss of a
 7   normal life"?  Hearing no correction --
 8              LAW CLERK ABRAMS:  Or just "loss of normal
 9   life" without the "a."
10              MR. HARTMAN:  It's without the "a" on the form.
11              LAW CLERK ABRAMS:  Without the "a."
12              MR. McCOY:  We have 30.04.01 if you want to see
13   that.
14              THE COURT:  Well, no, just tell me what it
15   says.
16              MR. McCOY:  It says "loss of a normal life
17   experienced and reasonably certain to be experienced in
18   the future."
19              THE COURT:  Yes.  Bring it up -- bring that
20   language up to here so that I'm sure I get it right.  I
21   agree to substituting that if that's, that's the new
22   version, and I haven't been there in 35 years.
23              MR. McCOY:  It changes every month now.
24              THE COURT:  Give it to Susan; she's the one who
25   needs it.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              LAW CLERK ABRAMS:  Okay.  So it's "loss of a
 2    normal life."
 3              THE COURT:  Okay.  Just like it is there.
 4              LAW CLERK ABRAMS:  And with the parentheses as
 5    well?
 6              THE COURT:  No, no.  We don't --
 7              LAW CLERK ABRAMS:  No?
 8              THE COURT:  What's the parentheses?
 9              LAW CLERK ABRAMS:  "And reasonably certain to
10    be experienced in the future," a parenthetical.
11              THE COURT:  Well, take -- yes.  Take out the
12    parentheses mark and say "and reasonably certain to be
13    experienced in the future" --
14              LAW CLERK ABRAMS:  Okay.
15              THE COURT:  -- since that claim is here.
16              LAW CLERK ABRAMS:  So number 2 now has been
17    changed entirely.
18              THE COURT:  Listen.
19              Go ahead.  Read it.
20              LAW CLERK ABRAMS:  "The loss of a normal life
21    experienced and reasonably certain to be experienced in
22    the future."
23              THE COURT:  Very well.
24              LAW CLERK ABRAMS:  And then --
25              THE COURT:  Any other objections, Plaintiff, to
```

```
 1   27 and 28?
 2           MR. McCOY:  There should be added IPI 30.04.03,
 3   which is about the increased risk of future harm, and
 4   that one --
 5           THE COURT:  Do you have that?
 6           MR. McCOY:  We have -- that's actually in the
 7   one we gave you.
 8           THE COURT:  No.  Jessi --
 9           MR. McCOY:  I can find it there.
10           LAW CLERK ABRAMS:  Sure.  I am looking at it.
11           THE COURT:  Okay.
12           MR. McCOY:  We would propose, as the
13   instruction allows, to list the specific conditions for
14   which we've had testimony; and that is lung cancer and
15   mesothelioma.
16           LAW CLERK ABRAMS:  Where would that be added?
17           THE COURT:  That, that will become -- that will
18   become 3.  It's a new one.
19           MS. BURLISON:  Judge, we would object to
20   including in the list the, the lung cancer and
21   mesothelioma as speculative.  We are fine with the
22   instruction as it is now.  But adding that list, we
23   object to.
24           MR. McCOY:  Two, two doctors at least
25   specifically said that, including his own treating
```

KINSER v. CBS CORP., Case No. 94-2282

 1   physician, Dr. Scanlon.

 2           MS. BURLISON:  And Mr. McCoy can argue that in

 3   closing, but we don't believe it belongs on the jury

 4   instruction.

 5           THE COURT:  I, I -- I didn't get that.  I was

 6   thinking of something else.  Repeat it.  Or else read it

 7   back to me.  I don't care.

 8           COURT REPORTER:  She just said, "Mr. McCoy can

 9   argue that in closing, but we don't believe it belongs on

10   the jury instruction."

11           MR. McCOY:  Judge, this is a different --

12           THE COURT:  No.  I don't need you to respond to

13   that.  I disagree.  Put that in.  Can you, can you read

14   it off of there?

15           LAW CLERK ABRAMS:  Let me put it in first, and

16   then I'll read it off.

17           THE COURT:  Yes.  That's correct.  That's the

18   way to go.

19           LAW CLERK ABRAMS:  And this would be as number

20   3?

21           THE COURT:  Yes.

22           LAW CLERK ABRAMS:  Okay.  "The increased risk

23   of future" --

24           MR. McCOY:  The increased risk of --

25           THE COURT:  Wait, wait.  She's reading it right

KINSER v. CBS CORP., Case No. 94-2282

1    off the page.

2              LAW CLERK ABRAMS:  But there are brackets here

3    where we have to fill in the blank.

4              THE COURT:  Well, tell me what the brackets

5    are.

6              LAW CLERK ABRAMS:  "Specific condition, harm."

7              THE COURT:  What?

8              LAW CLERK ABRAMS:  "Specific condition" and

9    "harm."

10             THE COURT:  Oh, okay.

11             MR. McCOY:  Lung cancer and mesothelioma.

12             THE COURT:  Lung cancer and mesothelioma,

13   m-e-s-o-- and so forth.

14             LAW CLERK ABRAMS:  Okay.  "Resulting from

15   the --"

16             MR. McCOY:  Condition.

17             LAW CLERK ABRAMS:  What condition?

18             MR. McCOY:  From the --

19             MS. EZELL:  Lung cancer.

20             LAW CLERK ABRAMS:  "The increased risk of

21   future lung cancer and mesothelioma resulting from the

22   lung cancer"?

23             MR. McCOY:  Put "the injury."

24             MS. EZELL:  No.  That's not the instruction.

25   Your Honor, this is why this instruction is not being

KINSER v. CBS CORP., Case No. 94-2282

1    properly adhered to, because what we've had is

2    speculative testimony from doctors --

3              THE COURT:  No, no.  Just stop.  You're wasting

4    my time because it starts out, "If you find in favor of

5    the plaintiff, Larry Kinser."  So they've decided that,

6    that there is negligence that was the proximate cause of

7    his injuries; and then they can consider these items, and

8    it's in the now Illinois Pattern Instruction, which is

9    not official law but is, is used in the state as pretty

10   much the same, or accepted as it.

11             MS. EZELL:  Yes, sir.  And for the record,

12   then, I think we could add "fear of getting hit by a

13   bus."  I mean there are -- in all seriousness --

14             THE COURT:  Now, that's great argumentative

15   stuff.

16             MS. EZELL:  No.  And, and right now --

17             THE COURT:  What you're doing -- and you're

18   wasting my time because you're telling me you shouldn't

19   believe the evidence the plaintiff presented, --

20             MS. EZELL:  No, I'm not.

21             THE COURT:  -- and you may be right.

22             MS. EZELL:  No.  I'm not trying to do that.  I

23   appreciate that Your Honor has made a ruling.  I'm trying

24   to make a record about the fact that --

25             THE COURT:  Do it.  Do it.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. EZELL:  -- what you're doing is giving the

2     jury the law; and what you're embracing when you read the

3     jury instructions is you're saying that the law

4     recognizes that they have a right to accept this

5     testimony, which doesn't rise above the level of pure

6     speculation for a man who has been cancer-free and

7     injury-free for 13 years, that somehow he is different

8     than everybody else in the population when it comes to

9     fear of future diseases.

10          And that is appropriate for argument.  I expect

11     Mr. McCoy to argue about that.  I do not believe that's

12     appropriate for the law to say.

13          I think the instruction about --

14          THE COURT:  Now you're repeating yourself.

15          MS. EZELL:  I do not believe that the

16     instruction about fear of future injuries itself is

17     inappropriate.  I believe calling out the exact nature of

18     those future injuries is, is error.

19          THE COURT:  Now, let me read to you the last

20     sentence of the proposed instruction.  "Whether any of

21     these damages has been proved by the evidence is for you

22     to determine."

23          So it's up to the jury to, whether they believe

24     Scanlon or they believe -- what's his name from, from

25     the, from the VA?

 1              MS. EZELL:  Dr. Howard.

 2              THE COURT:  Thank you.  Howard.

 3          Okay.  What do you got?

 4              LAW CLERK ABRAMS:  "The increased risk of

 5      future lung cancer and mesothelioma, resulting from

 6      the" -- and that's where we got hung up.

 7              MR. McCOY:  "Injury" would be the term in the

 8      role --

 9              THE COURT:  Yeah.  That would be --

10              MR. McCOY:  IPI.

11              THE COURT:  -- from the injury.

12              LAW CLERK ABRAMS:  Okay.  So --

13              THE COURT:  We have the objections of the

14      defendant to that, which are overruled for the reasons

15      stated by the Court, and it's, it's a matter for the jury

16      to determine whether those damages have been proved.

17              LAW CLERK ABRAMS:  Okay.  And let me get that

18      here.

19              THE COURT:  And when I get done here, I'm going

20      to print this out so that you can see what page 27 looks

21      like in the final --

22              MS. EZELL:  Yes, sir.  Thank you.

23              MS. BURLISON:  Thank you.

24              THE COURT:  -- version.

25              LAW CLERK ABRAMS:  Okay.  So we still --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Well, it's only fair.

 2              LAW CLERK ABRAMS:  -- have seven paragraphs.

 3              THE COURT:  What?

 4              LAW CLERK ABRAMS:  We still have seven

 5    paragraphs, but number 2 and number 3 have changed.

 6              THE COURT:  I know.  And we're going to, we're

 7    going to have a substitute page we're going to print.

 8              Now, any other Plaintiff objections?

 9              MR. HARTMAN:  Yeah.

10              MR. McCOY:  Judge, just a couple others.  The,

11    the, on number 6, current 6, the -- we're not claiming

12    any future loss of value of time or earnings.

13              THE COURT:  Strike it.

14              MR. McCOY:  So that can be stricken, that part

15    of it, so --

16              THE COURT:  Okay.  Start, Susan, "and the

17    present cash value of such earnings reasonably certain to

18    be" -- so put a period after, after the word "lost" and

19    strike the rest of the sentence.

20              LAW CLERK ABRAMS:  I thought it was the other

21    way around.  We're striking "The value of time and

22    earnings lost and the" --

23              THE COURT:  No.  He's claiming -- you're

24    claiming lost past earnings, right?

25              MR. HARTMAN:  Yes.
```

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  Yes.

2          LAW CLERK ABRAMS:  Okay.  And no present value?

3          THE COURT:  No future -- and future has to

4   be -- that's where you get the present cash value.  You

5   have to reduce future damages to present cash value.  See

6   what you're striking out?

7          LAW CLERK ABRAMS:  Okay.  So --

8          THE COURT:  You get the sense of it?

9          "The value of time and earnings lost,"

10  period.  Strike the rest of the sentence.

11         LAW CLERK ABRAMS:  Okay.  Got it.

12         THE COURT:  Now, anything else, Plaintiff?

13         MR. McCOY:  Yes, Judge.

14         Again, consistency here with 34, page 34,

15  there's the "emotional distress" category, and that

16  should be included here on this, this guideline

17  instruction.  So that would, that would be essentially --

18  34 already takes it into account -- it's IPI --

19         THE COURT:  I'm looking at 34.  Which one are

20  you talking about?

21         MR. McCOY:  The, at the bottom.

22         THE COURT:  It's --

23         MR. McCOY:  Emotional distress.

24         THE COURT:  Okay, the emotional distress.

25         MR. McCOY:  And the matching instruction on

KINSER v. CBS CORP., Case No. 94-2282

1    that is 30.05.01, IPI.

2              THE COURT:  And, and it's reasonably expected

3    in the future?

4              MR. McCOY:  Yes.

5              THE COURT:  All right.  Can you flip to page 34

6    and look at the sentence at the bottom of the page?

7              LAW CLERK ABRAMS:  I did.  Yes.

8              THE COURT:  You got it?  All right.  Put that

9    in as number 8, I guess.

10             LAW CLERK ABRAMS:  As number 8?

11             MS. EZELL:  Is that not cumulative of the new

12   number 3, which has to do with future value of life, of,

13   of -- and I don't have the language because it was just

14   added.

15             THE COURT:  You don't -- you mean paragraph 3

16   on present page 27?

17             MS. EZELL:  Yes, sir.  Didn't we just add a new

18   one about the loss of quality of life --

19             THE COURT:  Yes.

20             MS. EZELL:  -- and the quality of life in the

21   future?  Is that not cumulative of this new emotional

22   distress issue?  Aren't those the same thing, quality of

23   life and emotional distress?

24             THE COURT:  This is, this is the itemization.

25   It's cumulative in that it repeats it; but in this

KINSER v. CBS CORP., Case No. 94-2282

```
1  verdict form, they are to itemize the damage.
2             MS. EZELL:  Right.  So they would be giving --
3  they would be -- if they get there, they would be giving
4  money for the loss of quality of life and the emotional
5  distress, which are the same thing.  And so they would be
6  giving -- that's double-dipping.
7             THE COURT:  No.  It's not, because the
8  instructions are different.  And when we get down to page
9  thirt-- well, present 34 in, in Version 2, that is an
10 itemization of damages; and page, present pages 27 and 28
11 that we're discussing discuss the elements of damage.
12 And, and the amount of money asking that they can
13 consider this -- the reasonable, reasonable amount of
14 money that will compensate him for the nature, extent,
15 and duration of the injury.
16            But when you get down to page 34, it asks the
17 jury to itemize specifically what they're allowing for,
18 if they ever get there.
19            MS. EZELL:  So it's not the Court's intention
20 then -- maybe I just misunderstood -- to --
21            THE COURT:  Slower.
22            MS. EZELL:  -- to conform page 34 -- and I
23 apologize, Your Honor.  I'm not trying to speak fast;
24 but, but when you yell at me, it confuses me as to
25 whether or not --
```

KINSER v. CBS CORP., Case No. 94-2282

1        THE COURT:  I don't mean to yell at you.  And I

2   apologize if I did raise my voice.

3        What I would like you to do, please, Ms. Ezell,

4   is, is not to get ahead of yourself in, in your thoughts

5   with your speech.  Slow down a tad.

6        MS. EZELL:  All right.  And I'm not ahead of

7   myself.  And I apologize for going fast, and I'm just

8   simply asking for a clarification:  When the Court gets

9   to page 34, it is not your intention to conform that

10   page, then, and have a line item for all of the elements

11   of damage that we're discussing on current page 27?  I

12   misunderstood that.

13        THE COURT:  Well, when I get to page 34, we

14   will discuss that.  But right now, I'm on page 27,

15   telling the jury what elements of damage they may

16   consider if those elements have been proved by the

17   evidence.

18        So, anything else, Plaintiff, now before I --

19        MR. McCOY:  No, not on that instruction.

20        THE COURT:  Okay.

21        MR. McCOY:  Nothing else.

22        THE COURT:  Now, I think it, it would only now

23   be fair to the defense to get that printed.  Print it and

24   so we can give them a copy and see how we have changed

25   present page 27, and the record must remember that we are

KINSER v. CBS CORP., Case No. 94-2282

1    dealing with Draft 2 of the Court's proposed charge.

2            LAW CLERK ABRAMS:  Okay.  So let me get --

3            THE COURT:  Right.

4            And I'm pleased:  It's not quite 10:30, and I

5    know we're going to get through all of this before

6    lunchtime and the jury coming back at 1:00.

7            LAW CLERK ABRAMS:  So it's now page 26.

8            THE COURT:  Yes.

9            LAW CLERK ABRAMS:  But it's a revision of 27 in

10   Draft 2.

11           THE COURT:  Right.

12               (Brief pause in proceedings.)

13           THE COURT:  For the record, I've printed out

14   the changes made by the Court at the suggestion of the

15   plaintiffs, and that is now printed and handed to the

16   defendant so that they are not at a disadvantage; they

17   can see what's there.

18           And make sure you have your record made as to

19   what objections, if any, you have to what has now become

20   page 26 but is the revised page 27 of Draft 2.

21               (Brief pause in proceedings.)

22           MS. BURLISON:  Your Honor, we've had a chance

23   to review these revised instructions, and we would object

24   to number 7 because there's been no evidence presented on

25   that issue of the expense of --

KINSER v. CBS CORP., Case No. 94-2282

```
1              THE COURT:  I quite agree.  I agree.  Strike 7.
2              LAW CLERK ABRAMS:  In its entirety?
3              THE COURT:  In its entirety.  So 8 will become
4    7.
5              No, that's -- now that I see that printed out
6    here, I agree with you.
7              MS. BURLISON:  And then apart from the other
8    objections that we've already --
9              THE COURT:  Yes.
10             MS. BURLISON:  -- put on the record, we're okay
11   with this form, --
12             THE COURT:  All right.
13             MS. BURLISON:  -- preserving those objections.
14             LAW CLERK ABRAMS:  Okay.  So number 6 is "the
15   value of time and earnings lost."
16             THE COURT:  Yes.
17             LAW CLERK ABRAMS:  And number 7 is "the
18   emotional distress experienced and reasonably certain to
19   be experienced in the future."
20             And there is no 8.
21             THE COURT:  That's correct.  All right.
22             And when we get it all done, you're going to
23   get the final draft printed and put in your hand to ruin
24   your lunch.
25             Now we're going to turn to page 28, Donna
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1  Kinser.  Plaintiffs?

 2          MR. McCOY:  No objection.

 3          THE COURT.  Defense?

 4          MS. BURLISON:  Your Honor, we object to the

 5  instruction on page 28.  The plaintiff, in the complaint,

 6  in the amended complaint, did not plead loss of society

 7  or loss of consortium, any of those types of claims.

 8          And, further, there was no evidence presented

 9  that Mrs. Kinser's experiencing any sort of loss of

10  society type damages, so we would ask that this

11  instruction not be provided to the jury.

12          THE COURT:  Well, what it comes down to again

13  is to, "Whether this damage has been proved by the

14  evidence is for you to determine," and proved -- the

15  following elements proved by the evidence to have

16  resulted.

17          And with great respect for the plaintiffs, I

18  think it's a stretch to talk about the loss of society

19  because all the evidence is:  There's a lot of society

20  there.  They go on these prayer tours.  They go overseas.

21  They seem to have a great time hanging out together.

22          But that's, that's for the jury to decide, so

23  I, I -- your objection's overruled.  I'm going to leave

24  it there.  Although I think it's a stretch, but that's

25  not up to me to determine at this point.
```

KINSER v. CBS CORP., Case No. 94-2282

1              Okay.  Now, we're, we're back, referring to

2    Draft 2 and what's page 29.  This is the reducing future

3    damages to present cash value.

4              LAW CLERK ABRAMS:  No.

5              THE COURT:  No, it's not.  That's all right.

6    Thank you, Susan.

7              Page 29, you can read it for yourselves, is

8    entitled to damage in the future because of future

9    medical or caretaking, loss of earnings, or loss of

10   society, and so forth.  You determine the amount, which

11   will be in the future.

12             LAW CLERK ABRAMS:  That's now page 30, Judge.

13             THE COURT:  Don't confuse.  We are dealing with

14   Draft 2 -- excuse me -- Draft 2 of the instructions, and

15   it's page 29 of Draft 2.

16             He said, yelling at his clerk.

17             MS. EZELL:  Noted.

18                 (Brief pause in proceedings.)

19             THE COURT:  See, she's accustomed to it.  She

20   yells back.

21             LAW CLERK ABRAMS:  I expect it.

22             MS. EZELL:  That doesn't make it okay.

23             MR. McCOY:  Judge, I can tell you a couple

24   things on 29 that should come out, based on your rulings.

25             THE COURT:  Go ahead.

KINSER v. CBS CORP., Case No. 94-2282

```
 1           MR. McCOY:  The part about the "caretaking
 2   expenses."
 3           THE COURT:  Yeah.  That's got to come out.
 4   There's no evidence for that.
 5           MR. McCOY:  And then the last paragraph, about
 6   the "loss of future earnings" should come out.
 7           LAW CLERK ABRAMS:  Which one?
 8           THE COURT:  Future earnings.
 9           MS. EZELL:  So that's that whole last
10   paragraph.
11           THE COURT:  Just a minute.  I'll give you a
12   heads-up, Susan.
13           LAW CLERK ABRAMS:  Okay.
14               (Brief pause in proceedings.)
15           THE COURT:  You're keeping in "future medical"?
16           MR. McCOY:  He has ongoing care.
17           THE COURT:  It's -- what?
18           MR. McCOY:  He has ongoing medical care.
19           THE COURT:  Yeah, okay.
20           All right.  It's going to read, now, Susan, at
21   this point, "If you find that a plaintiff is entitled to
22   damages arising in the future because of injuries or
23   because of future medical care --"
24           LAW CLERK ABRAMS:  Medical care?
25           THE COURT:  Care, C-a-r-e.
```

KINSER v. CBS CORP., Case No. 94-2282

1              Strike the business about "lost earnings" and

2    "caretaking expenses."  "Caretaking expenses and loss of

3    earnings," that comes out.

4              LAW CLERK ABRAMS:  Okay.  So let's see.

5              THE COURT:  And leave in "or because of loss of

6    society," because that's, that's there.  They believe

7    that.

8              And then "loss of companionship" comes out.

9              LAW CLERK ABRAMS:  Comes out?

10             THE COURT:  Comes out, because the -- we've

11   already said that, that Donna Kinser is entitled to be

12   compensated for loss of society if they believe it; and

13   then, "You must determine the amount of these damages

14   which will arise in the future."

15             LAW CLERK ABRAMS:  Okay.  So let me just read

16   that back.

17             THE COURT:  Sure.

18             LAW CLERK ABRAMS:  "If you find that a

19   plaintiff is entitled to damages arising in the future

20   because of injuries or because of future medical care or

21   because of loss of society, you must determine the

22   amount --"

23             THE COURT:  You've got it.

24             LAW CLERK ABRAMS:  Yes?

25             THE COURT:  Yes.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              LAW CLERK ABRAMS:  Okay.

 2              THE COURT:  You want to see that printed, Ms.

 3   Burlison?

 4              MS. BURLISON:  Did you -- just one question.

 5   Did you take out the very last paragraph that Mr. McCoy

 6   mentioned removing?

 7              THE COURT:  Yeah.

 8              LAW CLERK ABRAMS:  That needs to come out, too?

 9                  (Brief pause in proceedings.)

10              THE COURT:  Absolutely.

11              LAW CLERK ABRAMS:  So it's just two paragraphs?

12              THE COURT:  That's correct.

13              LAW CLERK ABRAMS:  And that page ends with the

14   line "Kinser, and his spouse are likely to live."

15              THE COURT:  Right.  Why don't you print that so

16   Ms. Burlison can look at it, and so can Mr. McCoy.

17                  (Brief pause in proceedings.)

18              MS. BURLISON:  Your Honor, the defense has

19   reviewed the revised page 29, and it conforms to the

20   judge's ruling.

21              THE COURT:  All right.  Now, turning to

22   page 30, and to be consistent, we'll strike in the second

23   line of the first sentence "because of the loss of future

24   earnings," and in the two -- the second line from the

25   bottom of the first paragraph, we'd strike out "and
```

1  earnings" and leave in "paid" -- let me read to you how

2  it will read then.

3          "In computing the damages arising in the future

4  because of future medical caretaking" -- it's "medical

5  expenses."  "Caretaking" is coming out, too.

6          MR. McCOY:  Yes.

7          THE COURT:  "Medical expenses, you must

8  determine their present cash value.  'Present cash value'

9  means the sum of money needed now, which, when added to

10  what that sum may reasonably be expected to earn in the

11  future, will equal the amount of the expenses at the time

12  in the future when the expenses must be paid," period.

13  So strike out "earnings" and strike out "earnings" at the

14  end of that.

15          And then in the end sentence here, "Damages for

16  pain and suffering, disability, loss of a normal life,

17  and loss of society are not reduced to present cash

18  value."

19          You got those, Susan?  You want to read it --

20          LAW CLERK ABRAMS:  I believe so.  I'm just --

21  let me read it again.

22          THE COURT:  Read it out.

23          LAW CLERK ABRAMS:  "In computing the damages

24  arising in the future because of future medical expenses,

25  you must determine their present cash value.  'Present

KINSER v. CBS CORP., Case No. 94-2282

1  cash value' means the sum of money needed now, which,

2  when added to what that sum may reasonably be expected to

3  earn in the future, will equal the amount of the expenses

4  at the time in the future when the expenses must be paid.

5          "Damages for pain and suffering, disability,

6  loss of a normal life, and loss of society and

7  companionship are not reduced --"

8          THE COURT:  Strike "and companionship."

9          LAW CLERK ABRAMS:  All right, then, let's see

10 here.  "Damages for pain and suffering, disability, loss

11 of a normal life and loss of society are not reduced to

12 present cash value."

13         THE COURT:  Print that out and show it to

14 counsel.

15             (Brief pause in proceedings.)

16         THE COURT:  Now, you see, this is what will

17 become 30, I gather.

18         LAW CLERK ABRAMS:  We're back to the regular

19 page numbering.

20         THE COURT:  We're back to regular page

21 numbering.

22         You see that, Mr. McCoy?  Does that comport

23 with what we have discussed so far about 30?

24         MR. McCOY:  Yes, Judge.  No objection to this.

25         THE COURT:  How about Defendants?

KINSER v. CBS CORP., Case No. 94-2282

1          MS. BURLISON:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. BURLISON:  It comports.

4          THE COURT:  All right.  Now, page 31,

5     "According to a table of mortality in evidence, . . . ."

6     Plaintiff?

7          MR. McCOY:  No objection.

8          MS. EZELL:  Yeah.  I'm just not sure, Judge.

9     I'm checking to see if that's what the mortality table

10    says.

11         THE COURT:  Okay.

12         MS. EZELL:  And we don't have a female

13    mortality table in evidence, Your Honor.

14         THE COURT:  Is there a differentiation?  I just

15    accepted this the way the plaintiff tendered it.  I

16    assumed there's something that distinguishes between a

17    male life expectancy, which is normally less than a

18    female.

19         MR. McCOY:  We have the male one.  We did not

20    get the female one.  I, I have no dispute that the female

21    one should be governing hers.  We don't have that one in

22    evidence.

23         THE COURT:  Then I'm going to strike the

24    business about the female --

25         MS. EZELL:  We have no objection to that.

KINSER v. CBS CORP., Case No. 94-2282

1          THE COURT:  -- if there's no evidence to

2    support it.

3          MR. McCOY:  That's fine.  No objection.

4          LAW CLERK ABRAMS:  So then it --

5          THE COURT:  Wait, wait, wait a minute.  Do you

6    agree that I'm striking "female"?

7          MR. McCOY:  No objection.

8          MS. EZELL:  No objection.

9          THE COURT:  Okay.

10          LAW CLERK ABRAMS:  So then --

11          THE COURT:  No, just a minute.

12          LAW CLERK ABRAMS:  Okay.

13          THE COURT:  You'll confuse me, which is easy.

14              (Brief pause in proceedings.)

15          THE COURT:  Okay.  Ready?

16          LAW CLERK ABRAMS:  No.

17          THE COURT:  Okay.

18          LAW CLERK ABRAMS:  Because it caused other

19    changes in the paragraph.

20          THE COURT:  I know it will.  Well, I want to

21    read it to you.  When I say, "Are you ready?", I'm going

22    to tell you what it should look like.

23          "According to a table of mortality in evidence,

24    the life expectancy of a male person aged 79 is

25    8.5 years," period.  And then strike the "and of a female

KINSER v. CBS CORP., Case No. 94-2282

1    person aged 67 is 15" and something.

2              LAW CLERK ABRAMS:  Right.

3              THE COURT:  "These figures are not conclusive.

4    It is the average life expectancy of persons who have

5    reached the age of 79," period.  Strike "or 67."  "It may

6    be considered by you in connection with other evidence

7    regarding the probable life expectancy of the plaintiff,"

8    strike plural, "plaintiff," and then say "the plaintiff,

9    Larry Kinser, in this case, including evidence of

10   occupations, health, other activities, bearing in mind

11   that some persons live longer," and so forth.

12             Why don't you print that one out and give it to

13   them.

14             LAW CLERK ABRAMS:  I made a couple of other

15   changes.

16             THE COURT:  Okay.  Then read it back to me the

17   way you have it.

18             LAW CLERK ABRAMS:  Okay.  "According to a table

19   of mortality in evidence, the life expectancy of a male

20   person aged 79 years is 8.5 years.  This figure is not

21   conclusive."

22             THE COURT:  I agree.

23             LAW CLERK ABRAMS:  "It is the average life

24   expectancy of persons who have reached the age of 79.  It

25   may be considered by you in connection with other

KINSER v. CBS CORP., Case No. 94-2282

1    evidence relating to the probable life expectancy of the

2    plaintiff, Mr. Kinser, in this case, including evidence

3    of his occupation," --

4           THE COURT:  Agree, --

5           LAW CLERK ABRAMS:  -- "health."

6           THE COURT:  -- "his occupation."

7           LAW CLERK ABRAMS:  Yeah, singular -- "health,

8    habits, and other activities, bearing in mind that some

9    persons live longer and some persons less than the

10   average."

11          THE COURT:  Well done.  Okay.

12          MS. BURLISON:  We agree, Your Honor.

13          THE COURT:  You agree to that?

14          MS. BURLISON:  Yes, Your Honor.

15          THE COURT:  We can go on.  No, I can't, because

16   she's going to be gone from the room.  My right arm is

17   leaving for a minute.

18              (Brief pause in proceedings.)

19          THE COURT:  Okay.  Turning then to page 32,

20   this is just:  When you retire to the jury room, pick a

21   presiding juror.

22          Any objection, Plaintiff?

23          MR. McCOY:  No objection.

24          THE COURT:  Defense?

25          MS. EZELL:  Your Honor, this is the instruction

KINSER v. CBS CORP., Case No. 94-2282

```
 1   we spoke of earlier that we would like to tender a
 2   revised instruction to you with additional information,
 3   instruction to the jurors on how to decide which verdict
 4   form to use.
 5            THE COURT:  Oh, okay.  But that wasn't my
 6   question, Ms. Burlison.
 7            MS. BURLISON:  Oh, I apologize.
 8            THE COURT:  You got no squawks -- I know you
 9   don't like that word -- about 32?
10            MS. BURLISON:  No, Your Honor.
11            THE COURT:  Okay.  Now I'm ready to hear about
12   the introductory to the verdict forms.  You want to bring
13   it up to the clerk?
14            MS. BURLISON:  Yes, sir.
15            (Brief pause in proceedings.)
16            THE COURT:  Now this is supposedly IPI B45.
17   You know, this is an aside -- you don't have to put this
18   in the record.
19            (Discussion off the record.)
20            THE COURT:  Okay.  Here, let me, let me read
21   this to myself.
22            This is the straight IPI instruction, Mr.
23   McCoy; I gather this right?
24            MS. BURLISON:  No, Your Honor.  Actually, it's
25   been modified some.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  Okay.

 2              MS. BURLISON:  It's based on the IPI 45.01.

 3              THE COURT:  Okay.  I'll look at it.

 4              MS. BURLISON:  Okay.  Yes, Your Honor.

 5              (Brief pause in proceedings.)

 6              THE COURT:  It doesn't tell them what to do if

 7  they find for the plaintiff, does it, Ms. Burlison?

 8              MS. BURLISON:  It does.  "If you find that

 9  Larry Kinser has met his burden of proof . . . ," the

10  last paragraph.

11              THE COURT:  Wait a minute.  I can't hear you.

12              MS. BURLISON:  The last paragraph:  "If you

13  find that Larry Kinser has met his burden of proof," or

14  "his burden to prove," it instructs them to use --

15              THE COURT:  Oh, here we go, okay.

16              MS. BURLISON:  -- Form B.

17              THE COURT:  Okay.  I, I agree that it would

18  make the, the instructions more understandable for me to

19  give instructions at the beginning as to, as to when to

20  use which verdict form; but I don't like some of the

21  things you've written in here, and I'm going to change

22  it; and we're going to print it out and give it to you as

23  I propose to do it -- and you'll see it, too, Mr.

24  McCoy -- and then we'll discuss whether it's appropriate

25  or not.
```

KINSER v. CBS CORP., Case No. 94-2282

1           MR. McCOY:  Plaintiff had a proposal on that,

2     too, Judge, in our instructions.  It was our Proposed

3     Number 53, which I would tender again.

4           THE COURT:  Bring it up.

5           MR. McCOY:  Okay.

6               (Brief pause in proceedings.)

7           MR. McCOY:  So you're not confused, Judge, this

8     was double-side printed.  I scratched out the

9     instructions that carried over from the double-sided.

10              (Brief pause in proceedings.)

11          THE COURT:  Okay.  We're going to have a recess

12    and I'm going to go and take the new form to my judicial

13    assistant and then present you with the new form.

14    Because I agree with the thoughts you have about an

15    introductory thing, but I disagree with some of the

16    things the way you've phrased it.

17              (Recess, 10:56 a.m. to 11:45 a.m.)

18          THE COURT:  All right.  The Court has

19    considered Defendant's proposed instruction on verdict

20    form, based on IPI B-- what's that?  45.01 -- IPI B, like

21    in Baker, 45.01.

22          This instruction is rejected as repetitive of

23    most of the instructions already agreed upon and that the

24    Court will give.

25          And the Court will give in lieu of what is

KINSER v. CBS CORP., Case No. 94-2282

1   presented to you as page 32 in, in Draft 2, this new

2   page 32, which I am, have given to you, that's -- that

3   reads as follows.

4           "When you retire to the jury room, you must

5   first select one of your members as the presiding juror.

6   He or she will preside during your deliberations.  Your

7   verdicts must be unanimous and signed by each of you,

8   including the presiding juror.  Your answers to the

9   special interrogatories must also be unanimous and signed

10  by each of you, including the presiding juror.  Forms of

11  verdicts and special interrogatories are supplied for

12  your convenience.

13          "If you find from your consideration of all the

14  evidence that Larry Kinser has failed to prove each of

15  the propositions required of him in these instructions,

16  then you should use Verdict Form A.

17          "If you find from your consideration of all the

18  evidence that Larry Kinser has proved each of the

19  propositions required of him in these instructions, then

20  you should use Verdict Form B-1.

21          "If you also find that Donna Kinser has proved

22  each of the propositions required of her in these

23  instructions, then you should use both Verdict Forms B-1

24  and B-2.

25          "You should then proceed to answer the special

KINSER v. CBS CORP., Case No. 94-2282

```
 1    interrogatories.  The forms are as follows."

 2            And then what follows is what you've seen,

 3    Verdict Form A, Verdict Form B-1 -- which I understand we

 4    need to make some changes -- Verdict B-2, and then the

 5    special interrogatories.

 6            All right.  Plaintiff, you may be heard.

 7            MR. McCOY:  Plaintiff has no objection to the

 8    instruction as revised by the Court.

 9            THE COURT:  Defendant?

10            MS. BURLISON:  Your Honor, we would ask that --

11    well, we still stand behind our prior tendered proposed

12    instruction that the Court has rejected.  We have no

13    objections to this form, but we would ask that the Court

14    add some language to the, the second-to-the-last line.

15            Instead of just saying, "You should then

16    proceed to answer the special interrogatories," we would

17    add to the front, to the beginning of that sentence,

18    "Whether you use Verdict Form A, B-1, or B-2, you should

19    then proceed . . . ."

20            THE COURT:  I recognize something that's better

21    than what I wrote immediately.  It's -- yes.  I will do

22    it that way.

23            MS. BURLISON:  Thank you, Your Honor.

24            THE COURT:  All right.  Did you get that,

25    Susan?
```

1          LAW CLERK ABRAMS:  Just a minute.

2          "Whether you use --

3          THE COURT:  "Verdict Form A, B-1, or B-2, you

4    must go and answer the interrogatories."  Did I get it

5    right, Ms. Burlison?

6          MS. BURLISON:  I'm sorry.  Can you repeat it?

7          THE COURT:  Okay.  Wait till we read it to you,

8    and we'll see if we have it the way you said it.

9          MS. BURLISON:  Sure.

10         LAW CLERK ABRAMS:  Okay.  So at the bottom of

11   page -- let's see -- 32, second-to-the-last paragraph:

12   "Whether you use Verdict Form A, B-1, or B-2, you should

13   then proceed to answer the special interrogatories.  The

14   forms are as follows."

15         MS. BURLISON:  Yes, Your Honor.

16         THE COURT:  Okay.  Correct.

17         All right.  Now, Verdict Form A speaks for

18   itself.  And somebody, somebody on the staff asked me

19   why, why I didn't have some-- why I just come out and say

20   "find against both Larry and Donna."  Donna's right to

21   recover anything is totally dependent on Larry Kinser's

22   success.  And if he, if he doesn't succeed, neither does

23   she.

24         Okay.  How about B-1?  Mr. McCoy, you were

25   saying there was some other, something we didn't conform

KINSER v. CBS CORP., Case No. 94-2282

1  in there?

2          MR. McCOY:  Well, B-1 is now, is now conformed

3  to the language, but there's a couple categories that

4  need to be taken out by your rulings.

5          One is the shortened life ex-- actually, Judge,

6  we are not claiming shortened life expectancy.  Maybe we

7  should say that --

8          THE COURT:  I'm going to strike that.

9          MR. McCOY:  -- that's taken out.

10          The other thing is based on your -- let me know

11  when you're ready.

12          THE COURT:  Yeah, okay.

13          I guess, I guess we did -- we did change that.

14          MR. McCOY:  "Shortened life expectancy" should

15  be removed.

16          THE COURT:  Okay.  You get that, Susan?  Strike

17  that out.

18          LAW CLERK ABRAMS:  Yes.

19          MR. McCOY:  And the, the other change to this

20  B-1 will be based on the, the -- we're only claiming the

21  past loss of time and earnings, nothing in the future; so

22  that's the last category on -- it's on page 35 at the

23  top.

24          LAW CLERK ABRAMS:  "The value of benefits

25  lost."

KINSER v. CBS CORP., Case No. 94-2282

1          MR. McCOY:  That's the language we used

2  before --

3          THE COURT:  Yeah, "and reasonably certain to be

4  lost in the future."  "The value of earnings lost,"

5  period.

6          LAW CLERK ABRAMS:  "The value of benefits lost"

7  is the way it reads.

8          THE COURT:  "Benefits," excuse me.

9          MR. McCOY:  Judge, the language we had before

10  was, was "time and earnings," so actually it should

11  conform to that.

12          THE COURT:  "Value of time and earnings lost"?

13          MR. McCOY:  Right.

14          THE COURT:  Okay.  All right.

15          LAW CLERK ABRAMS:  Okay.  And that's at the

16  bottom of page 34, so then --

17          THE COURT:  What?

18          LAW CLERK ABRAMS:  -- the itemized --

19          THE COURT:  Wait a minute.  What are you

20  talking about, the bottom of 34?

21          LAW CLERK ABRAMS:  Page 34 is where I made the

22  change.

23          THE COURT:  Yeah.  But it's up at the top.

24          MR. McCOY:  On the original version, it was at

25  the top.

KINSER v. CBS CORP., Case No. 94-2282

```
1              LAW CLERK ABRAMS:  Okay.  And now it's at the

2    bottom, so then --

3              THE COURT:  No, no.

4              LAW CLERK ABRAMS:  No?

5              THE COURT:  No, no.  34 goes over to 35.

6              LAW CLERK ABRAMS:  Yes.

7              THE COURT:  And, and it's "the value of time

8    and earnings lost," period.

9              LAW CLERK ABRAMS:  That's on page 34 now.

10             THE COURT:  Oh, it's moved?

11             LAW CLERK ABRAMS:  Yes.

12             THE COURT:  Okay.

13             LAW CLERK ABRAMS:  And "Plaintiff's total

14   damages" is the first line on page 35.

15             THE COURT:  Oh, okay.  All right.

16             And now what about at the bottom?

17             LAW CLERK ABRAMS:  Of which page?

18             THE COURT:  Of 35.

19             LAW CLERK ABRAMS:  The bottom of 35?  Page 35

20   ends with the juror signatures.

21             THE COURT:  I know.  How about the paragraph,

22   what's here as "Third:  After reducing Plaintiffs' total

23   damages . . . ."

24             LAW CLERK ABRAMS:  "From paragraph First."

25             THE COURT:  That stays like it is.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1              LAW CLERK ABRAMS:  Yep.

 2              THE COURT:  Oh, okay.  All right.  And now --

 3              LAW CLERK ABRAMS:  Just a second.  Do you want

 4    "Plaintiff's Total Damages" to be put at the very bottom

 5    of page 34?

 6              THE COURT:  If we could do that, yes.

 7              LAW CLERK ABRAMS:  Okay.  I think I can move

 8    the margin.  Let me see if I can do that.

 9              THE COURT:  Well, you know, it won't make any

10    difference.

11              LAW CLERK ABRAMS:  There, I got it on.

12              THE COURT:  Okay.  Okay.  Now, one of the

13    things we talked among ourselves -- the staff and I --

14    was the special interrogatories.  I am going to tell them

15    orally, "Strike out the inappropriate thing."

16              So, "We, the jury, find that the conduct of

17    Westinghouse was/was not" -- strike out one; either it

18    was or it was not a proximate cause, whatever you have.

19              And the same with was/was not a proximate

20    cause.

21              MS. BURLISON:  Before we move on to the special

22    interrogatories and leave the verdict form, we do have a

23    few issues with the verdict form we'd like to address.

24              THE COURT:  Okay.  You may be heard.

25              MS. BURLISON:  Thank you.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1            I understand the Court's prior ruling with
 2   regard to the line item on page 34, "increased risk of
 3   lung cancer or mesothelioma," --
 4            THE COURT:  Yes.
 5            MS. BURLISON:  -- but we would just renew for
 6   the record our objection to including that.
 7            THE COURT:  Yes.  I understand that you do not
 8   agree with that, and that was put in over your objection.
 9            MS. BURLISON:  Yes, Your Honor.
10            And then on the next page, you've got the line
11   items (a), (b), and (c); and under (c), which is "other,"
12   you have currently "includes asbestos job sites --
13            THE COURT:  Yes.
14            MS. BURLISON:  -- and secondhand smoke."  And
15   we would recommend and request that the Court change the
16   words "asbestos job sites" to "coworkers working with
17   asbestos," because we -- if, if we --
18            THE COURT:  Do you like that, "coworkers
19   working with asbestos," Mr. McCoy?  I'm willing to accept
20   that if he does.  I mean, it expresses the same thing; I
21   mean, "at a job site where they're using asbestos" is
22   what it comes down to.
23            (Brief pause in proceedings.)
24            THE COURT:  Are you there, Susan?
25            MR. McCOY:  I'm thinking one second, Judge.
```

KINSER v. CBS CORP., Case No. 94-2282

1          LAW CLERK ABRAMS:  Are we talking about

2     page 36?

3          THE COURT:  '5.

4          LAW CLERK ABRAMS:  35?

5          THE COURT:  Yes.  Where it says --

6          LAW CLERK ABRAMS:  Oh, okay.

7          THE COURT:  -- "Assuming 100 percent

8     represents . . . ."

9          LAW CLERK ABRAMS:  Okay.

10         THE COURT:  Do you see what, what she's talking

11    about, that "other (includes:  asbestos job sites and

12    secondhand smoke)"?  She wants to change "asbestos job

13    sites" to "coworkers working with asbestos."

14         MS. BURLISON:  Yes, Your Honor.

15         MR. McCOY:  Okay.

16         THE COURT:  I accept that.  I think it's a

17    better expression, --

18         MR. McCOY:  Okay.

19         THE COURT:  -- "coworkers working with

20    asbestos."

21         MR. McCOY:  Agreed.

22         THE COURT:  I think that's more understandable.

23         LAW CLERK ABRAMS:  Okay.  So let's see, we're

24    on page --

25         THE COURT:  35.

KINSER v. CBS CORP., Case No. 94-2282

1          LAW CLERK ABRAMS:  -- 35.

2          THE COURT:  It's in the parentheses.

3          LAW CLERK ABRAMS:  This is under "Second," "(c)

4    other," and in parentheses underneath that, "includes:

5    coworkers working with asbestos, secondhand smoke."

6          THE COURT:  Correct.  Okay.  All right.

7          Now, that concludes, I think, the conference on

8    jury instructions unless you have additional instructions

9    to, to tender.

10          LAW CLERK ABRAMS:  Well, could I just ask:

11    Does that also go for --

12          THE COURT:  The same way --

13          LAW CLERK ABRAMS:  -- Donna Kinser's second

14    paragraph?

15          THE COURT:  Yes.  Make them conform.

16          LAW CLERK ABRAMS:  Where it says "coworkers,"

17    they're not her coworkers.

18          MS. EZELL:  "Mr. Kinser's coworkers."

19          THE COURT:  Who else -- who else is the jury

20    going to think it is?  You know, just leave it

21    "coworkers."

22          Okay.  Now, we'll print out a set and entitle

23    this "Final Form."

24          MS. BURLISON:  Your Honor?

25          THE COURT:  Yes.

KINSER v. CBS CORP., Case No. 94-2282

1          MS. BURLISON:  If we -- we have a few

2     additional issues that we'd like to get on the record

3     with regard to --

4          THE COURT:  You may be heard.

5          MS. BURLISON:  Thank you.

6          -- with regard to the special interrogatories.

7          We object to the use of special interrogatories

8     in general.  Given that the parties have not requested

9     that they be given to the jury and completed by the jury,

10    we would object to their being used.

11         THE COURT:  Isn't it my right to choose?

12         MS. BURLISON:  Yes, Your Honor.  We just want

13    to make our record that we believe it could lead to an

14    inconsistent verdict; and we would, if we had our choice,

15    choose to avoid that.

16         THE COURT:  Let me speak to that and not cut

17    you off from what you're saying, and then you can

18    complete it.

19         MS. BURLISON:  Oh, sure.

20         THE COURT:  That is precisely why I'm going to

21    use special interrogatories in this case so that if -- I

22    believe the rules permit me:  If I get an answer that's

23    inconsistent with the general verdict form, I can enter

24    judgment on the answer to the special interrogatories, or

25    at least send the jury back to reconsider.  That's why

KINSER v. CBS CORP., Case No. 94-2282

```
 1   I'm doing it.
 2            MS. EZELL:  Your Honor, I --
 3            THE COURT:  Plain and simple.
 4            MS. EZELL:  Yes.  And I think we can make a
 5   motion to send the jury back at that time.  We can look
 6   into that.
 7            THE COURT:  Yeah.
 8            MS. EZELL:  But I think we also have some
 9   objections specifically to the language of those --
10            THE COURT:  Very well.  You may be heard.
11            MS. EZELL:  -- in addition to that overall
12   objection.
13            MS. BURLISON:  That's correct.
14            For number one --
15            THE COURT:  I just wanted to explain why I'm
16   using special interrogatories.
17            Yes, Ms. Burlison, you may be heard.
18            MS. BURLISON:  Thank you.
19            Special interrogatory number 1, we notice
20   there's an additional "not."  I think that's a typo.
21            THE COURT:  Oh, yes.  We got that out already.
22            MS. BURLISON:  You got that.
23            THE COURT:  Yeah.  We got the "not not."
24            MS. BURLISON:  Good.  Thank you.
25            And then throughout the special
```

KINSER v. CBS CORP., Case No. 94-2282

1  interrogatories, there's a reference to "Larry Kinser's

2  present lung condition."  We believe that's unclear and

3  would ask that the Court change that to "lung cancer."

4          MR. McCOY:  Judge, that -- he doesn't have

5  cancer anymore, but he's got a lung condition.  I think

6  that's --

7          THE COURT:  I think that is a more accurate

8  description of all the testimony I heard.  He hasn't had

9  a sign of cancer for five years, and the doctors all

10  agree:  That man -- he's cured.  That doesn't mean he

11  still isn't at risk.  But it means that the condition he

12  had was cured; and, quite frankly, that, I find that

13  persuasive of the fact that the lung condition was caused

14  by smoke.  But then, that's me.  I'm not a juror.

15          No.  I'm going to leave it like that.  I think

16  "lung condition" is, is more, a more precise description

17  of what the evidence shows.

18          MS. BURLISON:  Yes, Your Honor.

19          LAW CLERK ABRAMS:  Leaving it as "present lung

20  condition" in each of the four special interrog-- five

21  special interrogatories -- four, I guess -- no, five.

22          THE COURT:  Yeah, his "present lung condition."

23  Leave it alone.

24          LAW CLERK ABRAMS:  Okay.

25          MS. BURLISON:  Your Honor, we would also

KINSER v. CBS CORP., Case No. 94-2282

1    request -- to us it appears that special interrogatory

2    number 2 and number 4, the only -- they're the same thing

3    because the only conduct by Larry Kinser at issue is

4    smoking, and so number four addresses that specifically.

5    Number 2 is a more general statement, so we would request

6    that you remove number 2 and we'll just stick with number

7    4.

8              THE COURT:  Well, now, 1 is what Westinghouse

9    did.  And 2 is what Kinser did himself.  But he -- what

10   he did to himself.  And then 3 is what others may have

11   done to Kinser.  And 4 -- and, and -- you know, the

12   question was, "Was his lifetime smoking a proximate

13   cause?", which doesn't mean that asbestos wasn't also a

14   proximate cause; but certainly it would, it would be

15   necessary to reduce his damages by his own conduct.  So,

16   you know, it gives me that hedge.

17             And then 5 represents 100 percent of the total

18   of the conduct causing the lung condition, how much did

19   Larry, his smoking cause.  How much did secondhand smoke

20   cause.  And how much did CBS cause?

21             LAW CLERK ABRAMS:  Judge --

22             THE COURT:  And how much did others working

23   cause?

24             What?

25             LAW CLERK ABRAMS:  I need to whisper.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              (Brief pause in proceedings; the
 2              Court is conferring with the law clerk.)
 3         THE COURT:  Suppose I take out 2, Mr. McCoy?
 4  I'm persuaded.  Apparently, my law clerk is much swifter
 5  than I am and saw that, that it could be misinterpreted,
 6  his conduct.
 7         MR. McCOY:  That's fine, Judge.  My only
 8  comment, then, on 4 would be that rather than "lifetime"
 9  we could just say "smoking habits."
10         THE COURT:  Yeah, well, it's in the evidence.
11  He started it when he was 15.
12         MR. McCOY:  Okay.  Then I don't have any
13  further comment.
14         THE COURT:  Okay.  Well, I'll take out 2.
15  Thank you, Ms. Burlison.
16         See why I have a law clerk?
17         MS. BURLISON:  I do.  I want one of those.
18         MR. McCOY:  I do have a comment on number 5
19  that --
20         THE COURT:  Okay.  What's that?
21         MR. McCOY:  -- I think is important.
22         5 talks about others, and it talks about the
23  whole 100 percent; and the 100 percent is, in the
24  instructions, not one of causation, but is one of, of
25  legal responsibility.  That's the terminology that's used
```

KINSER v. CBS CORP., Case No. 94-2282

1   in the instructions, so I think it's a safe --

2            THE COURT:  Well, --

3            MR. McCOY:  -- finding of legal responsibility.

4            THE COURT:  -- "proximate cause" is also in

5   there.

6            MR. McCOY:  Well, --

7            THE COURT:  And "proximate cause" is the key,

8   key problem in this case.  What was a proximate cause?

9   You know, what were all the causes combining to bring

10  about the condition that, that Kinser has?  And there's a

11  number of them.  And, and I'm going to leave it that way.

12  I think, I think it accurately reflects --

13           MR. McCOY:  Judge, I just want to point out

14  that --

15           THE COURT:  Oh, here.  This is shown as

16  refused.  I'm sorry.

17           MR. McCOY:  That the -- if you look, if you

18  look at page 35, it says, "100 percent represents the

19  total combined legal responsibility."  It doesn't

20  reference the term "causation" in there.  And in order

21  for, to make the interrogatory consistent with this

22  question and not confuse the jury, I think we should use

23  the same language, "a legal responsibility."  That's the

24  IPI language.

25           THE COURT:  I'm going to use "total proximate

KINSER v. CBS CORP., Case No. 94-2282

1   cause" in this case because it's been hammered so, and

2   there are a number of causes that could be -- each could

3   be a proximate cause.  And I want the jury to, to tell me

4   what they think:  How is proximate cause divided up in

5   this case to bring about the condition?

6           MS. BURLISON:  Your Honor, we've got one more

7   point on special interrogatory number 5, just to make it

8   consistent with the change to the other special

9   interrogatories, to change "others working with asbestos"

10  to "coworkers working with asbestos."

11          THE COURT:  Sustained.  Make it so.

12          LAW CLERK ABRAMS:  Okay.  "Coworkers

13  working --"

14          THE COURT:  Coworkers working with asbestos.

15          Okay.  Are we done?  Go to lunch?

16          MS. BURLISON:  Yes, Your Honor.

17          THE COURT:  Come back and we'll have closing

18  arguments.

19          MS. EZELL:  When will we receive a printout,

20  Your Honor?

21          THE COURT:  In about five minutes.

22          MS. EZELL:  Okay.  We'll wait here.  Thank you.

23          MR. McCOY:  Judge, --

24          THE COURT:  You can stay all through the lunch

25  hour.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MR. McCOY:  -- there's one instruction for sure
 2    that I think we need, and that's 30.04.02, IPI.  That's
 3    "loss of a normal life" definition.  That's not included.
 4              THE COURT:  Tender it.
 5              MS. EZELL:  Do you have a copy for me?
 6              MR. McCOY:  Yeah.  I have a copy.
 7              THE COURT:  I also tell them orally about if
 8    they have questions how to communicate with me.
 9              Did you-all hear that?  I tell them orally at
10    the end.
11              (Brief pause in proceedings.)
12              THE COURT:  Any objection to IPI 30.04,
13    definition of "normal life expectancy"?
14              MS. EZELL:  We're just confirming the language,
15    Your Honor.
16              THE COURT:  Wait a minute.  I can't hear you.
17              MS. EZELL:  We're just confirming the language.
18              THE COURT:  Sure.  I'm waiting for you.  I've
19    got it in my hand, so --
20              MS. EZELL:  Other than our objections that we
21    previously stated with regard to the cumulative nature of
22    the "loss of normal life" instruction, we have no
23    additional objections to this instruction.
24              THE COURT:  Okay.  I'm going to give it.  We'll
25    include it.
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1          LAW CLERK ABRAMS:  Okay.  And where's this
 2   going?
 3          THE COURT:  You pick out the most suitable
 4   place amongst the definitions.  And then we've got to
 5   print them so that they can have it over the lunch hour.
 6          MR. McCOY:  One other instruction, Judge we --
 7   Plaintiff has requested, and that is the one on insurance
 8   benefits.  It's 3.03, IPI; and in particular here, we had
 9   reference in testimony that there was Medicare involved.
10   So I -- this one --
11          THE COURT:  Bring it up.
12          MR. McCOY:  -- I'll tender it.
13          THE COURT:  Let me look at it.
14          MR. McCOY:  Yeah.  I think it's very important
15   here.
16               (Brief pause in proceedings.)
17          THE COURT:  I'm not going to use this.  It
18   really hasn't come up in any sort of way, and I think
19   it's like Rule 403, where something -- yeah, that's
20   accurate and everything else.  But all it's going to do
21   is raise a question in the minds of the jurors that
22   hasn't been there, and there's no reason it should be.
23   Show it refused.
24          MS. EZELL:  The defense has nothing further,
25   Your Honor.
```

KINSER v. CBS CORP., Case No. 94-2282

```
1              THE COURT:  Okay.

2              MR. McCOY:  Plaintiff has nothing further.

3              THE COURT:  Okay.  As soon as you get that

4    done, run them out a final form.

5              And I mentioned to you -- I don't know if it

6    got through -- that I tell the jurors that if they want

7    to communicate with me, the proper way is in writing.

8    Give it to the court security officer.  He'll give it to

9    me.  I will consult with you and then answer it.

10             MS. EZELL:  Yes, sir.

11             THE COURT:  Okay.  All right.  Have a pleasant

12   lunch hour.

13             MS. EZELL:  Thank you, Your Honor; you, too.

14             THE COURT:  You're going to argue total, what,

15   an hour for opening and 15 in rebuttal?

16             MR. McCOY:  Approximately.  It might be an hour

17   five.

18             THE COURT:  Oh, I won't chop you off at that.

19             MR. McCOY:  Okay.

20             THE COURT:  And you need an hour and 15?

21   You've got to get equal time.

22             MS. EZELL:  Yes, sir.  I might use less, but I

23   won't use more.

24             THE COURT:  I know.  I always encourage the

25   lawyers that the greatest closing argument is short, and
```

KINSER v. CBS CORP., Case No. 94-2282

1    you can talk yourself in and talk yourself out.

2              MS. EZELL:  Yes, sir.

3              THE COURT:  Okay.  See you after lunch.

4              MS. EZELL:  Thank you, Your Honor.

5                   (Recess, 12:11 p.m. to 1:05 p.m.)

6                   (Discussion off the record.)

7              THE COURT:  Let me know when you're ready.

8              MR. McCOY:  We're ready.

9              THE COURT:  Bring the jury.

10             MS. EZELL:  Your Honor, did you need us to put

11   on the record that we have read the jury instructions and

12   that we -- they conform with the charge conference?

13             THE COURT:  That's fine with me.  That's what I

14   was told.

15             MS. EZELL:  And that's what we reported.

16             THE COURT:  Yes.

17             No, I understand that's what happened; that

18   everybody's agreed that this was the final version, which

19   you have been given a copy of.

20             MS. EZELL:  True for the defendants, Your

21   Honor.

22             THE COURT:  Yeah.

23                  (Brief pause in proceedings.)

24             MS. EZELL:  Could we get that on the record for

25   the plaintiffs?

KINSER v. CBS CORP., Case No. 94-2282

```
 1          THE COURT:  Do you agree these are the final
 2   instructions that we agreed on at the conference?
 3          MR. McCOY:  Yes, Judge.
 4          THE COURT:  Good.
 5              (Brief pause in proceedings.)
 6              (Jury present, 1:08 p.m.)
 7          THE COURT:  Jurors, this is the final stage of
 8   the case; and in this stage of the case, the lawyers get
 9   to make their closing arguments to you, and I will give
10   you instructions on the record.
11          Let me, let me say about closing arguments,
12   like anything else, arguments, statements, and remarks by
13   counsel are intended to help you understand the case and
14   apply the law.  If an argument, statement, or remark has
15   no basis in the evidence, then you should disregard that
16   argument, statement, or remark.
17          Let me remind you -- I'll read you a couple of
18   the jury instructions of which you will receive.  There's
19   40 pages of them.  Sometimes there's only one sentence on
20   a page.
21          But let me read some of these to you to help
22   you better understand and comprehend the closing
23   argument.  Let me remind you what the issues in the case
24   are.
25          The plaintiffs, Larry Kinser and Donna Kinser,
```

KINSER v. CBS CORP., Case No. 94-2282

1   claim that they were injured and suffered damages and

2   that the defendant, CBS Corp., the legal successor to

3   Westinghouse Corporation, negligently failed at the Zion,

4   Illinois, atomic power plant in one or more of the

5   following ways.

6          One, negligently failed to warn Larry Kinser,

7   his coworkers, or employers adequately of the health

8   hazards of exposure to asbestos.

9          Two, negligently failed to investigate or to

10  test adequately for the health hazards of

11  asbestos-containing products or equipment.

12         Three, negligently failed to instruct Larry

13  Kinser, his coworkers, or employers adequately about

14  precautionary measures necessary to prevent exposure to

15  asbestos.

16         Four, negligently failed to exercise ordinary

17  care in designing, manufacturing, or supplying

18  asbestos-containing products instead of substitute

19  materials.

20         Five, negligently failed to direct work safely

21  for which the defendant retained some measure of control

22  or safety.

23         The plaintiffs further claim that one or more

24  of the foregoing was a proximate cause of the claimed

25  injury or damages.  And I'll tell you what proximate

KINSER v. CBS CORP., Case No. 94-2282

1   cause is in a minute.

2          The defendants deny that it did any -- the

3   defendant denies that it did any of the things claimed by

4   the plaintiffs and denies that it was negligent.  It

5   denies that any claimed act or omission of the defendant

6   was a proximate cause of the claimed injuries and

7   damages.

8          It further denies that the plaintiff has been

9   damaged or injured to the extent claimed.

10         The defendant further claims that the

11  plaintiffs were contributorily negligent and that their

12  contributory negligence was a proximate cause of their

13  claimed injuries and damages.

14         When I use the word "negligence" in these

15  instructions -- these are some definitions I'll give you

16  now -- I mean the failure to do something that a

17  reasonably careful person would do, or the doing of

18  something that a reasonably careful person would not do

19  under circumstances similar to those shown by the

20  evidence.

21         The law does not say how a reasonably careful

22  person would act under those circumstances.  That is for

23  you to decide.

24         When I use the expression "contributory

25  negligence" in these instructions, I mean negligence on

KINSER v. CBS CORP., Case No. 94-2282

1   the part of the plaintiffs that proximately contributed

2   to cause the alleged injuries and damages claimed by the

3   plaintiffs.

4          When I use the term "ordinary care," I mean the

5   care a reasonably careful person would use under the

6   circumstances similar to those shown by the evidence.

7   The law does not say how a reasonably careful person

8   would act under those circumstances.  That is for you to

9   decide.

10         It was the duty of the defendant before and at

11   the times of the occurrences in question to use ordinary

12   care for the safety of the plaintiffs.  It was the duty

13   of the plaintiff, Larry Kinser, to use ordinary care for

14   his own safety.

15         There are two types of evidence:  Direct and

16   circumstantial.  Direct evidence is the testimony of a

17   person who claims to have personal knowledge of the

18   occurrences which are the subject of the case, such as an

19   eyewitness.  An example of direct evidence that it is

20   raining is a person who comes in and says, "I was

21   outside, and I saw it raining."

22         Circumstantial evidence is the proof of a chain

23   of facts and circumstances which tend to show the

24   existence of other relevant facts sought to be proved.

25   An example of circumstantial evidence that it is raining

KINSER v. CBS CORP., Case No. 94-2282

 1   is a person entering a room carrying a wet umbrella.

 2            The law makes no distinction between the weight

 3   to be given either direct or circumstantial evidence.

 4   Therefore, all of the evidence in the case, including the

 5   circumstantial evidence, must be considered by you.

 6            One of the terms in the case that, that will be

 7   central to your interests is "proximate cause."  When I

 8   use the expression "proximate cause," I mean any cause,

 9   which triggers a natural chain of events that ultimately

10   produces the damages or injuries for which the plaintiff

11   seeks to recover in this case.  It need not be the only

12   cause, nor the last or nearest cause.  It is sufficient

13   if it, if it occurs with some other cause or causes

14   acting at the same time which, in combination with it,

15   caused the injuries and damages.

16            More than one person may be to blame for

17   causing an injury.  If you decide that the defendant was

18   negligent and that its negligence was a proximate cause

19   of the injury to the plaintiffs, then it is not a defense

20   that some third person who is not a party to the case may

21   also have been to blame.

22            However, if you decide that the total proximate

23   cause of the injury to the plaintiff was the conduct of a

24   person or persons other than the defendant, then your

25   verdict should be for the defendant.

KINSER v. CBS CORP., Case No. 94-2282

1           When I say that a party has the "burden of

2    proof" on any proposition, or the expression, "if you

3    find" or "if you decide," I mean you must be persuaded,

4    concerning all the evidence in the case, considering all

5    the evidence in the case that the propositions on which

6    that party has the burden of proof are more probably true

7    than not true.

8           Now, what, what are the things that has to be

9    proved?  The plaintiff has the burden of proving each of

10   the following propositions in their claim against the

11   defendant:  First, that the defendant acted or failed to

12   act in one or more of the ways claimed by the plaintiff;

13   second, the plaintiffs were injured and sustained damage;

14   third, that the negligence of the defendant was a

15   proximate cause of the injury and damages to the

16   plaintiff.

17          The defendant, who claims that the plaintiff

18   was contributorily negligent, has the burden of proving

19   the following propositions:  The plaintiff acted or

20   failed -- acted or failed to act in one of the ways

21   claimed by the defendant as stated to you in the

22   instructions; and that in so acting or failing to act,

23   the plaintiff was negligent and, B, that the plaintiffs'

24   negligence was a proximate cause of the plaintiffs'

25   claimed injuries and damaged.

KINSER v. CBS CORP., Case No. 94-2282

```
 1        And I'll tell you more later in the

 2   instructions what, how, what you do with, with those

 3   findings, with your findings if you make them.

 4        I think that's -- that's enough at this point

 5   to, as an introduction to the lawyers who will now argue

 6   to you what facts you should find, how you -- what the

 7   law is that you should apply to the facts.

 8        The jurors -- the lawyers know what I'm going

 9   to tell you the law is, because we had a big conference

10   on jury instructions this morning, and they know -- I

11   told them what I was going to tell you the applicable law

12   was.  So without further ado, we'll have closing argument

13   on behalf of the plaintiffs.

14        MR. McCOY:  I'm still getting the feedback

15   here.

16        DEPUTY CLERK:  I don't know why that is.  Let

17   me trade you microphones.

18            (Brief pause in proceedings.)

19        MR. McCOY:  Been some tough weather conditions.

20   I certainly appreciate -- and the Kinsers do also -- your

21   all spending this kind of time on this case.

22        I put together a -- that works good.

23        I put together a presentation to summarize the

24   evidence.  Of course, you're the ones who are going to be

25   judging it.  So let me give you what I think are the most
```

KINSER v. CBS CORP., Case No. 94-2282

1  important points in this case.  I want to start, first

2  off -- started up?  Okay.

3          This case began back in 1994 when it was filed.

4  It's certainly been a long journey.  You're at the end of

5  it.  And, again, we certainly appreciate having you as

6  jurors here.

7          The juries in America, the constitutional

8  right, enforcement of laws is the key role.  It includes

9  the statutes, includes the common law that Judge Baker

10  will be instructing you in, compliance with those laws.

11  That's the role of the juries.  You-all have that role.

12  Accountability of the companies -- or if it's an

13  individual -- accountability of the people that don't

14  follow the laws.  That's what you're here to decide.

15          I want to start here by talking about -- let me

16  go back to this for a second.  You know, juries are

17  called on to resolve a lot of cases, different types of

18  cases today.  We've got police brutality cases.  We've

19  got eligibility of student athletes to play sports.

20  We've got employment discrimination.  We have race

21  discrimination.  We've got sexual harassment cases.

22  Juries are called on to resolve all those.  The jury

23  system is an integral part of our society.  You're a part

24  of that system here.

25          They're also called on to resolve cases about

KINSER v. CBS CORP., Case No. 94-2282

1  toxic exposures.  That's what we've got here.  What we're

2  talking about in this case is an era -- turning back,

3  there was no Internet.  Information was limited here to

4  what came out at the job site safety meetings.  This was

5  the dawning of OSHA.  It was just getting in formation.

6  A lot of these things we hear about, where they're out

7  there at every moment today.  That didn't happen back

8  then.  They were just getting started.  You don't start

9  some big government agency and have it running perfectly

10  smooth.  I mean, look at what's going on with health care

11  reform right now.  That's how things start.  They're

12  rocky at the beginning.

13          And, finally, this case is about denial by

14  Westinghouse; denial that people working on the job sites

15  were getting exposed to asbestos and getting sick; and at

16  the same time knowing in their own operations, in their

17  own departments, that that was what was going on in the

18  corporate boardroom world but not taking care of the

19  people in the field.  That's denial as to what the

20  reality of the situation is.  This case is about that.

21          I've divided this into four major issues.

22  One's medical exposures.  Westinghouse conduct is a

23  cause -- we've never said it was the only cause; it's a

24  cause -- and damages and accountability.  So we'll get to

25  each of those topics.

KINSER v. CBS CORP., Case No. 94-2282

1          First, on the medical.  The claimed condition

2     here is about lung cancer.  That's been cured; no

3     question about it.  But there's things that happened for

4     which compensation should be awarded that related to that

5     lung cancer.

6          There's the ongoing nonmalignant diseases

7     concerning asbestos.  There's the plaques, and there's

8     the scarring, and there's the lung base scarring or

9     fibrosis that Larry has.  He's got breathing problems

10    that are getting worse from the asbestos.  That hasn't

11    stopped.  So we've got two things going on here, cancer

12    and nonmalignant conditions.

13         The testimony of -- the first witness I want to

14    discuss -- and I've kind of broken this out by witness.

15    So first off, Dr. Scanlon was the treating physician.  He

16    saw Larry for seven years.  He's got board certifications

17    in three areas, a highly qualified physician.  He gave a

18    grand rounds talk on asbestos.  Dr. Scanlon told us the

19    following in his medical records findings and in his

20    deposition.

21         He said Larry had lung cancer.  He called the

22    smoking history remote.  He said he didn't have emphysema

23    or COPD from smoking.  Granted, other doctors found

24    differently.  And we've already said here that smoking is

25    a part of the cause.  We're not contesting that here.

KINSER v. CBS CORP., Case No. 94-2282

1          He characterized the x-rays for asbestos as

2    being dramatic.  He said the lung cancer was caused by

3    both asbestos and smoking.  We agree with that.

4          And he said there was a 20 percent breathing

5    loss just from the lung removal alone.  Maybe back then

6    it didn't have a lot of effect on Larry because he was

7    younger.  But as you get older, you need everything you

8    can in reserve.  He's lost that reserve; that's affecting

9    him more today.

10          Dr. Scanlon said it's his opinion to a

11    reasonable degree of medical certainty that Mr. Kinser's

12    asbestos exposure was a contributory cause of his lung

13    malignancy.  There's no reason to go beyond Dr. Scanlon,

14    a highly qualified physician, independent of any of the

15    parties in this case.  That's his judgment.  Westinghouse

16    does not want to agree with his judgment.

17          Dr. Scanlon also said that if you see chest

18    x-rays and you know that there was a possibility of

19    asbestos exposure in Mr. Kinser's history, when you see

20    the pleural plaques, you think that way.  A medical

21    student even can figure out that these were

22    asbestos-related conditions inside Mr. Kinser.  A medical

23    student could figure it out.  You don't need to bring in

24    a bunch of experts to say Dr. Scanlon's wrong.

25          Larry Kinser's medical records showed, from

KINSER v. CBS CORP., Case No. 94-2282

1  Dr. Scanlon's records and the other treating physicians,

2  they showed pleural plaques -- no question about it --

3  asbestosis.  Some doctors called it asbestosis.  Some

4  didn't call it asbestosis.  But everybody found there was

5  something about his chest x-rays that were different.

6  Dr. Frank explained to us, you know, some doctors have

7  different interpretations of the same work.

8           Lung cancer; no question about that.  He had

9  it.  Thank God he's cured.

10           Lung base fibrosis; he had that.  Nobody

11  contested that.  He's got these findings of lung base

12  fibrosis, scarring at the bottom of the lungs, where you

13  would expect to find it for asbestos.

14           The next witness I'm going to talk about is

15  Dr. Frank.  You probably -- it's so long ago, it's hard

16  to remember that.  But you -- if you relate it to

17  weather, that was the day we had the minus 10 or the six

18  inches of snow or whatever it is.

19           Dr. Frank was the first witness we called in

20  the case.  He was a researcher under Dr. Selikoff in the

21  1960s, Dr. Selikoff being the leading figure in the world

22  of asbestos disease medically.  That's where he got his

23  training.  He's published over a hundred articles; most

24  are about asbestos.  He's an international teacher and

25  consultant on asbestos.  That's why he does a lot of the

1    travels to other countries, to explain these matters.

2    He's a professor of occupational medicine.  And he also

3    works for the companies when they ask him to.  He does

4    that.  He doesn't just work for individual people.

5              Dr. Frank said that asbestos and tobacco caused

6    Larry's lung cancer, just like Dr. Scanlon.  He pointed

7    to the synergistic effect and explained that quite a bit,

8    how that's 30 to 50 times when you combine the two.  So

9    that aspect of things, this synergistic effect, is

10   certainly something that no one was telling Mr. Kinser

11   about back in those days when he was breathing asbestos.

12   Nobody said, "Oh, don't breathe asbestos and smoke

13   cigarettes because that's going to make it so much more

14   dramatically likely.  That's an enormous increase in your

15   risks."

16             Asbestos exposure causes lung cancer.

17   Dr. Frank explained that.

18             Asbestosis -- it's not the exposure -- I mean,

19   it's the exposure, not the asbestosis, that causes the

20   lung cancer.  That's the key here.  You diagnose

21   asbestos-related lung cancer from the exposures.  You

22   don't have to have a diagnosis of asbestosis.  That's a

23   totally different process.

24             Occupational medicine is the concern -- the

25   concern is the prevention of disease.  And that's

KINSER v. CBS CORP., Case No. 94-2282

1   critical here.  Because none of this would have happened

2   had Westinghouse followed its own personnel's knowledge

3   about things in the workplace that were happening because

4   of asbestos and done something in the field.

5           Increased risk of cancer and mesothelioma.  He

6   talked about that increased risk.  Dr. Scanlon mentioned

7   it, too.  There is that risk in Larry.  He might be cured

8   from the first cancer; but because of his asbestos

9   exposures, combined with the cigarette smoking, he's got

10  that increased risk of another one.  And he's got a risk

11  of mesothelioma -- that's a cancer that's got no cure --

12  from asbestos.

13          The risk of lung cancer.  Well, these are the

14  charts that came out of the articles.  There's the

15  article by Dr. Selikoff and one by Dr. Markowitz.  No

16  matter how you look at it, there's this dramatic

17  increase.  These charts don't really even show it because

18  they just go by the, by the, by the 50 times.  They don't

19  really show, you know, one times one times one.  If you'd

20  really look at the increase, it's enormous.  That was

21  never talked about by any of the companies to anybody.

22          Asbestos and tobacco.  And that -- by the way,

23  that synergistic effect -- let me go back to it for a

24  second -- this was documented, actually, back in 1968

25  when it was first explained.  The synergistic effect

KINSER v. CBS CORP., Case No. 94-2282

1    carries over into this because:  Why is asbestos and

2    tobacco together a cause?  If you've got a history of

3    tobacco use, a history of asbestos exposure -- we got

4    those.

5            We got the right latency period, delayed onset.

6    At least about ten years or so is what the doctors have

7    said.

8            You got some other markers which confirm it,

9    fibrosis and scarring.  You've got some findings of

10   emphysema and COPD.

11           You got the classic findings to say that this

12   is related to asbestos and tobacco, but Westinghouse

13   wants to leave out the asbestos.  They don't want to

14   agree with Dr. Scanlon.

15           When you have a number of exposures, Dr. Frank

16   explained, you look at the cumulative exposure.  So, of

17   course, Westinghouse's exposure is only a part of the

18   exposures.  But it's a part of the cumulative; and as

19   Dr. Frank explained, each exposure contributes.  So it's,

20   as we say in these instructions -- and you'll see it --

21   it's a cause, a proximate cause; not the only one, but

22   one of them, from Westinghouse's work.

23           Dr. Frank said:  We looked at a population

24   group, the people working for a month, maybe even less

25   than a month.  That alone doubles the risk of lung

1    cancer.  That's how rapidly these exposures will build

2    up.  And that's, that's the people exposed only to

3    asbestos.  Now, you add the cigarettes in there, and you

4    got 50 times greater risk.  It doesn't take long for

5    asbestos to cause lung cancer.  Mr. Kinser's history is

6    far in excess of what you need to cause lung cancer.

7            Dr. Brody.  He came here, and he's the research

8    scientist.  He's got a hundred and plus publications,

9    mostly about asbestos again.  He gets National Institute

10   of Health grants.  He teaches the medical students.  He

11   teaches them about how this happens, just like he taught

12   you-all.  And he works for companies, too, when they call

13   him.  Same thing.  His testimony for the company on

14   behalf of the companies' lawyers is exactly the same as

15   the testimony that he offered on behalf of the Kinsers in

16   this case.  There's no difference.  The science is a

17   science.

18           What is that science?  Well, first off, you

19   know the asbestos fibers stay in the lungs.  They don't

20   come out.  Then you start getting the buildup and the

21   scarring.

22           And we talked about lung cancer.  Dr. Brody

23   said, once again, it's the exposure that causes the

24   cancer.  The lung cancer results from genetic mutations,

25   and those are made more likely by that synergistic

KINSER v. CBS CORP., Case No. 94-2282

1    effect.  The tobacco carcinogens binding to the asbestos

2    fibers is one of the big reasons for those synergistic

3    effects.  I think he, he said you couldn't even see the

4    carcinogens on the microscope that he was using, the

5    electron microscope.  But that's the process that they've

6    been able to determine, is that that binding effect

7    increases the delivery of the tobacco because of the

8    asbestos fibers and that that creates that synergistic

9    effect.

10            So these mutations -- some come from asbestos;

11   some come from tobacco -- but the tobacco carcinogens are

12   being delivered by the asbestos fibers.  So you really

13   can't separate it out here.  You have to say it's both.

14   Westinghouse, asbestos, delivering the carcinogens from

15   the smoking.  It's that simple.  Nobody questioned that

16   in this case.  There was no doubt from this evidence that

17   that's how it happens.

18            The smoker's lungs get better after quitting.

19   Of course, that's significant here because Mr. Kinser did

20   quit smoking 16 years before this lung cancer.  And

21   importantly, of course, a person can have more than one

22   asbestos disease.

23            So this is the cancer process by which the

24   cells divide and an asbestos fiber in there is causing a

25   mutation, or it could be a tobacco carcinogen.  That's

KINSER v. CBS CORP., Case No. 94-2282

1    the genetic mutation process of lung cancer.  That's very

2    different from the nonmalignant disease process.  Pleural

3    plaques are a form of scarring, or fibrosis of the

4    pleura, the lining of the lung.

5           And the asbestosis, if you want to call these

6    things different, is also a scarring or fibrosis process;

7    but it mostly takes place in the bases of the lung.  Same

8    type of process.  And it doesn't get any better.  These

9    things don't improve because the asbestos doesn't go away

10   like cigarette smoke.

11          But the point of it is -- and these are the

12   pleural plaques, how they might appear, which is that

13   classic appearance -- that a person can have more than

14   one asbestos disease.  You don't have to have one to have

15   the other.  You don't have to have lung cancer to have

16   asbestosis.  You don't have to have asbestosis to have

17   lung cancer.  You don't have to have pleural plaques to

18   have asbestosis.  These are all different diseases,

19   processes.  Scarring and genetic mutations are different.

20   You can't link the two together the way Westinghouse

21   wants to.

22          Dr. Jones, witness for Westinghouse.  Well,

23   they called him, but there was a number of things he said

24   that I believe are very significant to this case in terms

25   of acknowledging what the real science is.  He's

1   board-certified.  He's published a number of articles

2   himself, some on asbestos.

3           But he sat here -- I think he was asked a

4   question by the jury.  I read it, and I remember

5   stumbling over it because the print was a little

6   different on it.  But when that question was read, his

7   answer was, "The plaques I see on the imaging of Mr.

8   Kinser's chest are very highly specific for asbestos

9   causation, so there's no doubt that he had plenty of

10  asbestos exposure."  Mr. Kinser, according to

11  Westinghouse's own witness, was all full of asbestos.

12  That's an exposure that can be used to say the lung

13  cancer is related.  It's all Dr. Scanlon did.  That's

14  basic; 1 and 1 equals 2.  Exposure of a great amount

15  certainly equals a lung cancer causation, in part.  And,

16  again, it's a cause, not the only cause.

17          Then the defense didn't like the testimony of

18  Dr. Jones on that point; so they call in Dr. Howard, who

19  had a report prepared, and he changed his report to talk

20  about something else.  He hasn't published on asbestos.

21  His credential that he touted was getting the Big Heart

22  Award.  He always works for the company attorneys.  But

23  there's one thing he said here that's significant, too,

24  and that is, again:  This asbestosis usually appears in

25  the lung bases.  That's where Mr. Kinser's x-rays in 2011

KINSER v. CBS CORP., Case No. 94-2282

1   show that he had those findings, in the lung bases.

2   That's part of the breathing problems that are ongoing,

3   along with the plaques.

4          The scientific consensus on this question that

5   the defense raises about, "Do you need a diagnosis of

6   asbestosis -- it's a different disease process -- the

7   scarring, in order to have the genetic mutations?", the

8   defense position on that is not supported by the

9   scientific consensus.

10          And in this case, it's a civil case.  It's not

11   beyond a reasonable doubt, but it's:  What's the greater

12   weight of the evidence?  What's more probably true than

13   not?  The scientific consensus on this issue is what

14   should be followed here, because that's what's been more

15   probably true than not, according to science itself.

16          And there was a number of articles we had on

17   that.  But, again, when you look at these scales of

18   justice and which way they tip, more likely than not,

19   Plaintiff has satisfied the burden here about that

20   scientific evidence.  One factor in there was the OSHA

21   statement that Dr. Howard did not agree with, as among

22   many things that he did not agree with, including the

23   doctor he knew down there who he trusted but didn't agree

24   with in this case, the surgeon, Dr. Palmer.  Asbestos

25   exposure contributes to 79.4 percent of the lung cancer

KINSER v. CBS CORP., Case No. 94-2282

1   deaths among the workers who smoke.  That's OSHA's

2   statement.

3           The American College of Chest Physicians,

4   that's their consensus statement.  That's the body that

5   Dr. Scanlon said he participated in and he followed.

6   It's the governing body for the pulmonary physicians.

7   This is their consensus statement, an official statement

8   in their official CHEST publication by Dr. Banks:

9   Workers who have significant asbestos exposure, all full

10  of asbestos, like Dr. Jones said, but who do not have

11  asbestosis -- which, if you accept the defense position

12  on no asbestosis -- are still at risk for increased risk

13  of bronchogenic carcinoma.  Asbestos is more likely to

14  occur even without asbestosis.

15          Once again, though, the bottom line is:  It's

16  the exposure, not the presence of a different disease

17  process, that causes the disease.  Dr. Scanlon is

18  certainly within his professional expertise to say:  I

19  see a lot of asbestos in the guy from the x-rays because

20  of the plaques.  It's a cause of the lung cancer.

21          The defense doesn't believe that, doesn't want

22  you to believe that, doesn't want you to accept that.

23  It's denial.  It's denial by Westinghouse here.

24          More articles.  We showed you six or seven.

25  And the defense didn't publish one of these articles to

1    show what their, what Dr. Howard called the prevailing

2    view.  If the prevailing view was what Dr. Howard says,

3    then why didn't you see any publications?

4            Asbestosis -- I'll tell you why.  It's denial

5    by Westinghouse.

6            "Asbestosis, Asbestos and Lung Cancer," an

7    article by Dr. Hessel in 2005, published, again, in a

8    peer-reviewed journal.  Nine papers on the

9    epidemiological evidence.  Two concluded that asbestosis

10   was necessary and seven that it was not.  Seven to two.

11   More probably true than not; that's the burden of proof

12   here.  Mr. Kinser and Donna Kinser have met that burden

13   in this courtroom.

14           Dr. Cullen, who found, among current or former

15   smokers, occupationally exposed asbestos, risk of lung

16   cancer increases with increased exposure duration -- same

17   thing; exposure is the key -- even in persons without

18   clinical evidence of asbestosis.  Men with radiologically

19   apparent pleural plaques and preexisting obstructive lung

20   disease are at higher risk than men without them.

21           Mr. Kinser fits both of these statements.  He's

22   got the exposure.  If you believe Westinghouse, he

23   doesn't have asbestosis.  Still, according to Dr. Cullen,

24   that would be attributable to -- the lung cancer would be

25   attributable to the asbestos.  But, secondly, he's got

KINSER v. CBS CORP., Case No. 94-2282

1   that second thing, which is he's got radiological pleural

2   plaques.  Those themselves can be indicators.

3           Dr. Finkelstein.  The statement that asbestosis

4   is a prerequisite is logically untenable.  The position

5   of Westinghouse in this courtroom is that; it is

6   logically untenable.  It's nothing more than denial.

7   That's what it is.  "We deny the scientific consensus."

8           Dr. Hillerdal.  Patients with lung cancer

9   showed attributable risk of asbestos, of -- this should

10  be asbestosis -- of 6 to 23 percent, which is much higher

11  than the actual occurrence of asbestosis among these

12  patients.  Thus, there is an increasing body of evidence

13  that even at very low exposure -- but we've got high ones

14  here; we've got more -- asbestos produces a slight

15  increase.  Here, we've got bigger exposures; we've got a

16  greater chance of increase.  Again, this is the

17  scientific consensus.

18          Dr. Wilkinson.  Asbestos is associated with

19  lung cancer even in the absence of radiologically

20  apparent pulmonary fibrosis.

21          Dr. Edge.  The people with pleural plaques have

22  a two and a half times greater risk of developing

23  carcinoma of the bronchus, the lung cancer, compared to

24  people without the plaques.  Plaques alone are

25  significant indicators here.

KINSER v. CBS CORP., Case No. 94-2282

1        Causation and risk.  Okay, the question in this

2   case is about causation.  That's why I keep stressing

3   here that it's the exposure.  And the doctors did, too --

4   that it's exposure, not the presence of some other

5   disease, that really is the basis for finding that you

6   have a lung cancer related to asbestos.

7        Okay.  That's part one.  Part two are the

8   exposures at Zion.  Zion, the powerhouse, you've seen

9   that picture on the lakefront.  Mr. LaPointe, he's a

10  millwright foreman and worked for Westinghouse.  You

11  remember him.  He was in here last week.  Fifty percent

12  of his career was turbine work.  He talked -- the main

13  statement I took away from what he said was:  Dust in

14  these powerhouse jobs on the turbines travels from end to

15  end in the building.  Nobody contested that.

16       The turbine area.  Well, we got the main

17  turbine floor.  This would be the start of the, the

18  turbine system, the piping coming from the containment

19  there, and then the Westinghouse turbine system going on

20  from there.  Underneath the main turbine floor, there's

21  this mezzanine floor where there's, there's lots more

22  piping.

23       Mr. LaPointe reviewed the original construction

24  documents, showed miles of insulated piping in the

25  original Zion turbines, thousands of square foot of block

KINSER v. CBS CORP., Case No. 94-2282

1  insulation, tens of thousand-- I think it's actually tens

2  of thousands of square foot of block insulation and

3  thousands of square foot of blankets.  But the point,

4  point of it all was:  Asbestos was used in those

5  specifications.  The ones that were in the file from the

6  beginning, the ones that Mr. Ware -- and we'll get to

7  that in a moment -- said, "You can just ignore those.

8  We're going to deny those ever existed here."

9          But that's what they showed.  That's how much

10  asbestos was in there of the original specifications.

11  And it took, it took about two years to insulate these

12  jobs.  So a job that was finished in '73, you'd be buying

13  the insulation in the '70/'71 time period, getting it

14  ready.  That's when it was asbestos.  That was before

15  OSHA.

16          Mr. LaPointe explained on the outage work that

17  that takes place annually at the nuclear sites.

18  Westinghouse -- Doug Ware, again, their designated

19  witness, if I heard him correctly, he was, he was saying

20  this -- Larry Kinser's recollection of four and a half

21  months at Zion was a figment of his imagination as far as

22  anything happening on the turbine because the only thing

23  that was done was some generator work.

24          Well, Mr. LaPointe cleared that up, that

25  annually at the nuclear sites, there is an outage.  And

KINSER v. CBS CORP., Case No. 94-2282

1   even after the original installation, Mr. LaPointe

2   explained it's not uncommon that you'd have a much more,

3   quicker overhaul outage where you disassemble the turbine

4   because that's when you'd be doing your work within the

5   warranty period and where the problems would quickly show

6   up.  That's exactly what happened at Zion; the problems

7   quickly showed up.  They performed an outage.

8            But, you know, again, Westinghouse denies

9   Larry's recollection from a four-and-a-half-month period

10   of his life, just like it never happened, Mr. Ware

11   suggests.

12            Over 1,000 feet of insulation were removed on

13   the outages, all these tools, sledgehammers, dry sweeping

14   daily.  Thousands of square foot of blankets were

15   removed.  Asbestos cloth and asbestos fibers were used on

16   those blankets.  Mr. LaPointe reviewed these

17   specifications.  And, importantly, the work on these jobs

18   is directed by the Westinghouse engineers, or their field

19   personnel.  They'd always tell people what to do on these

20   jobs because that turbine is their baby, and they don't

21   want to have anybody else mess up their baby.  It's just

22   like a mother and her child.  You're going to take care

23   of that child and make sure that child grows up right.

24   Westinghouse is going to nurse that turbine along and

25   make sure it's taken care of just right.  Westinghouse

KINSER v. CBS CORP., Case No. 94-2282

1    directs the work on these turbine outage jobs.

2            And Mr. LaPointe also explained how the

3    asbestos in the '70s was just simply reused.  The

4    practice on the Westinghouse jobs was it was asbestos at

5    the beginning.  You'd just put it back on.  So, again, in

6    handling the stuff you took off and putting it back on,

7    there's going to be more dust.

8            Larry.  He worked at Zion for that four and a

9    half months.  He did it on the travel card for the

10   Chicago local.  You don't go up to a place out of town

11   like that for four and a half months and make up a story

12   about what was going on there the way Westinghouse wants

13   you to think he did.

14           He saw what he saw.  He worked on the main

15   turbine floor about 75 percent of the time.  That's where

16   the, Westinghouse has the turbine systems coming in.

17   Underneath, he was there about 25 percent of the time,

18   which is the underneath part of the piping.  There was a

19   complete disassembly of the turbine, removal of the

20   piping.  Essentially, exactly what Mr. LaPointe described

21   customarily happens on outages, that's what Larry Kinser

22   described.  He didn't imagine that; it's just

23   Westinghouse wants you -- wants to deny it ever happened.

24           He personally did asbestos removal at least

25   25 percent of the time -- Larry did -- on that job.

KINSER v. CBS CORP., Case No. 94-2282

1   Others were doing it around him.  There was dust

2   everywhere.  It was like snow when the asbestos work was

3   being done.  There was no asbestos safety practices at

4   Zion.  I don't think we heard any testimony about that

5   ever happening.  Larry explained it first.  The

6   insulators also were present making more dust from their

7   work, too; multiple trades creating the dust.

8          Joseph Ferriter testified.  He was the

9   pipefitter superintendent/foreman.  He had to sign off on

10  piping systems for his work.  He told you about the

11  workplace safety practices, how there's that chain of

12  command that starts up with the owner/contractor, then

13  has to pass it down to the subcontractors.  That's

14  exactly what happened here.  Larry described the same

15  process.  He was the bottom of the totem pole for the

16  pipefitter crews, but the instructions came from up above

17  on the safety practices.  There wasn't any practices on

18  asbestos.  Westinghouse did not direct any practices to

19  protect people.

20         The inventory of asbestos products was still

21  being used after OSHA, Mr. Ferriter explained.  It was

22  there for a long time.  In a job he was on in '82, they

23  still had some of that asbestos that they'd bought years

24  earlier before that job shut down for a while; and then

25  it was still being used at the ComEd jobs.

KINSER v. CBS CORP., Case No. 94-2282

1          Asbestos was never officially banned under

2    OSHA.  They just implemented procedures such that people

3    ultimately decided, well, we better clean things up and

4    stop using it because, otherwise, we're going to be in

5    violation of OSHA laws.  We can't keep the workplace

6    clean enough with all that asbestos in it.  That's what

7    really happened.  So the asbestos was still there.  There

8    wasn't a ban on this stuff.

9          And Joseph Ferriter also explained how change

10   orders are needed for the insulation work.  He signed off

11   on these jobs.  He had to see a written spec or a plan or

12   an order to be able to sign off.  And he also explained

13   the same thing about the dust.  The dust is like snow.

14          It's not like some video that's so old that you

15   can't see anything in it or isn't under working

16   conditions.  Again, that's denial to show a video that

17   doesn't show dust from this kind of asbestos work.

18   That's Westinghouse's denial.

19          Frank Parker, Plaintiffs' witness here, he's an

20   industrial hygiene practitioner.  He works in the

21   trenches a lot.  He's done thousands of asbestos samples,

22   and he's an expert on the OSHA laws by his profession,

23   working a lot with asbestos.  He explained the

24   significance of the exposures at Zion.  His opinions were

25   never contested.  Nobody disputed that.  The block

KINSER v. CBS CORP., Case No. 94-2282

1   exposures, the pipe covering exposures, the gasket

2   exposures, the bystander exposures -- these were all

3   significant in the case of Larry Kinser because he had

4   familiarity with Larry's background.

5           As Dr. Frank said, a month to cause lung

6   cancer, maybe less.

7           Mr. Parker also said visible dust exceeds the

8   limits.  Those are the limits that were required

9   originally under OSHA.  No attention to the need for

10  protection that OSHA set forth in that giant job site

11  outage directed by Westinghouse.  Westinghouse simply

12  closed their eyes as though OSHA didn't even exist back

13  then.  Denial.  Denial of the requirements of OSHA.

14          And there's a lot of fibers in this stuff.

15  Mr. Parker said 10 to the 26th power.  That's how many

16  fibers per cubic centimeter in asbestos.  That's what

17  makes it so toxic.  Maybe 1 percent of them stay in a

18  person, maybe one-thousandth of 1 percent; but it's still

19  millions and millions of fibers that you can't see

20  drifting around these workplaces in every breath of air.

21          Mr. Parker explained the general principles of

22  industrial hygiene.  What he said was that this has been

23  around forever, he said.  If you came onto somebody

24  else's work site or property -- if Westinghouse brought

25  asbestos on there; Westinghouse brought their people on

KINSER v. CBS CORP., Case No. 94-2282

1    there to direct the work that released asbestos -- you

2    had an obligation to make sure that everybody on the site

3    knew about it, and the facility people knew about the

4    materials you brought onto the site.

5           Well, there's no testimony in this case that

6    Westinghouse did anything to advise anybody about this

7    asbestos or implement any measures.  They were denying

8    this basic duty of industrial hygiene; and, yet, they had

9    corporate industrial hygienists who were experts in this

10   area.

11          OSHA noncompliance.  Mr. Parker described this

12   with the different provisions of OSHA:  the labeling

13   requirements, the bagging requirements, the wetting,

14   isolation of trades so you didn't breathe the dust from

15   the insulators, or vice versa, or the ventilation

16   requirements to get the dust out of there from asbestos,

17   or -- if nothing else -- all else failed, you had

18   breathing protection as the last resort.

19          Nothing happened here.  OSHA -- the

20   Westinghouse defense in this case ultimately is, you

21   know, the only way we can explain why we didn't comply

22   with asbestos or with OSHA's regulations here is, if we

23   just simply say, "Hey," you know, "we're going to deny

24   that there was any asbestos at all at Zion."  That,

25   again, is their position.  That's their way out of

KINSER v. CBS CORP., Case No. 94-2282

1   noncompliance.

2           Asbestos at Zion.  Well, we had a lot of

3   evidence about that.  First, we had the Westinghouse

4   specifications.  I'll get to those in a moment.

5   Mr. Kinser recognized asbestos from all his work at --

6   you know, 100 job sites.  Nobody from Westinghouse

7   questioned his knowledge of asbestos being at those other

8   99 job sites.  They only challenged him about what he

9   knew at the Westinghouse site.  But he knew.  They

10  admitted he knew it at the 99 other job sites.  He knew

11  what it was.

12          LaPointe testified it was asbestos.  Ferriter

13  testified it was being used.  Mr. Parker said he looked

14  at the specifications and the materials in that time.

15  Those were asbestos-type.  Barry Castleman said 1993 was

16  the peak year for asbestos being used -- I'm sorry --

17  1973.  You know why?  Because there was a lot of asbestos

18  in the materials in inventory.  When OSHA came out in

19  '72, people knew; we'd better start getting rid of our

20  asbestos.  So all the more reason to use it in '73.

21  That's what happened here.

22          It's denial by Westinghouse to say that the

23  customs and practices of the insulation trade at that

24  time, meaning getting rid of the inventory, weren't being

25  followed.  Westinghouse wants to deny the fundamental

KINSER v. CBS CORP., Case No. 94-2282

1   customs and practices that are being followed on these

2   job sites.

3           Okay.  We had the Westinghouse documents.

4   There's a Sargent & Lundy Form 40-G that resulted in an

5   insulation specification that Westinghouse prepared.

6   Westinghouse accepted it.  Five engineers from

7   Westinghouse all signed off and said, "That's all fine.

8   We're going to use asbestos."  It's not just Sargent &

9   Lundy's idea here.  It's a joint effort.

10          And it was issued in October of -- 13th of

11  1970.  Well, that's when you begin buying your asbestos

12  material, two or three years before the completion of the

13  job.  You give this to your insulation contractor and

14  say, "Here, here's what you need to buy."  So that's what

15  happened here.

16          And the turbine number is the right turbine

17  number; that's the Zion turbine.  And that was the number

18  they gave it, the 401A343 spec, 1970.  Left it in the

19  files.  Zion number 1.  When Mr. Ware got all the

20  documents from the attorneys, that was the first document

21  in the file.  Westinghouse -- again, in denial -- wants

22  to say here that somehow this specification, we're not

23  following it.  The first thing in the book that the

24  attorneys put together.

25          The change orders are consistent with this.

KINSER v. CBS CORP., Case No. 94-2282

1    There's actually documents in the, in the files that say

2    there's a change to follow this 401A343 spec,

3    specification for, that was signed off on some materials

4    in '71.  So, once again, we're seeing what's consistent;

5    and that is when you have a specification adopted, then

6    there's changes that show we're following the

7    specification.  That's the asbestos-containing

8    specification, the natural change order process.

9            And you can look at what that specification

10   has.  Well, it's got heat insulation block suppliers.

11   Asbestos is specified when you get down to the

12   cross-reference to the material cards.  That's April of

13   1969.

14           Can I have the ELMO for a second?  Thanks.

15           And when you take a look at the rest of this

16   401A343 -- this is that same specification here -- it's

17   got the block and pipe insulation that we know from the

18   testimony of the witnesses was asbestos.  It's got

19   references directly in it to asbestos finishing cement

20   and asbestos cement.  And it's got references to process

21   specs that, if you go to there, you'll see the material

22   cards for the asbestos materials.  This is what Mr.

23   LaPointe had looked at.  It's got test-- it's got

24   references to a, Class B blankets that are

25   asbestos-filled amosite and asbestos cloth-made.  That's

KINSER v. CBS CORP., Case No. 94-2282

1   in the specifications.

2          So there is more than one type of blanket, but

3   Mr. LaPointe said a lot of these kinds of blankets were

4   going to be used.  Asbestos was all over Zion.  The

5   specifications required it so.  That was common -- that

6   was the number one customer of the Chicago District

7   Office, was Commonwealth Edison.  You're going to do what

8   their engineering company, Sargent & Lundy, tells you to

9   do.  Otherwise, you're going to lose your customer.

10         Whoop, we're not on the PowerPoint.  My

11   mistake.  Switch it back.

12         Okay.  So this is one of the material cards

13   referenced in there about the asbestos.  Then we had the

14   master drawing list.  Well, this was prepared in 1990,

15   17 years later.  Seventeen years later, it still showed

16   references to this 401A34A specs.  It showed references

17   to this 879 specification that was referenced within the

18   401A34.  That was what Westinghouse's records even in

19   1990 show was being used, was that spec, this 1970 spec.

20         Right here, we have a spec:  879C655.  That was

21   the one in the file.  That references these thousands of

22   feet, ten -- I think it's 27,000 feet of block or so and

23   1,000 feet of blanket, all of which are done pursuant to

24   this 1970 401A343 spec.  This is right in the documents

25   under Zion.  It's got the Zion label for the attorneys

KINSER v. CBS CORP., Case No. 94-2282

1   and the Bates stamp numbers.

2          So here's the -- here's what Westinghouse says

3   happened here.  This is that specification again.

4   Westinghouse says it was changed.  Well, sure, it was

5   changed sometime after OSHA.  Like I said, everybody

6   changed it.  But here's the, here's the actual document

7   that shows where it was changed, right in Westinghouse's

8   files.  It's right on it.  It says right there.  It was

9   changed in 1975.  Again, that's what Westinghouse's

10  documents show.  That's what the attorneys provided.  And

11  this was 1975 after Mr. Kinser worked on that outage,

12  after Zion was built.

13         Here's the signatures from the engineers.  Two

14  or three people signed off on it, just like would be

15  happening customarily.  You don't change these things

16  when you've got five or six engineers that signed off on

17  them in the first place just by, poof, magically doing

18  it.  No.  You've got to get approvals -- again, down the

19  corporate ladder, or up the corporate ladder -- to make

20  these changes.  That's what happened here.  Those things

21  took time.  So they signed off on it in '75.

22         And that -- and with the original

23  specifications, there was at least 27,000 feet.  That's

24  just in these areas right here:  the crossover,

25  crossunder, and reheater areas and blankets in those

KINSER v. CBS CORP., Case No. 94-2282

1    areas.  There was a lot more asbestos than that on that

2    turbine Mr. LaPointe described.  There's miles of piping

3    in there.  That's just one section of the specifications.

4         The changes have to be following the change

5    order process.  Again, you're going to get in trouble if

6    you're working at a corporation by not following

7    procedures.  They're going to be followed.  Changes must

8    be in writing.  All these signatures are required.

9         And what's amazing here is that -- although

10   there was a change showing that 40-G was followed, and it

11   was implemented in '70 -- there's absolutely no written

12   change order document to show what Westinghouse, Mr. Ware

13   said in this case.  And, remember, Mr. Ware speaks for

14   Westinghouse.  He is the designated witness.  The

15   attorneys chose him.  He is Westinghouse.  There's

16   nothing to show what he claims.  There's no written

17   change.

18        What he provided was a document that came from

19   the lawyers that was from another turbine file.  It

20   wasn't even from the Zion files.  And he says,

21   miraculously, somehow that was followed, contrary to all

22   these change order procedures and sign-offs.  All of a

23   sudden, poof, that one's followed -- that one's followed.

24        Well, the documentation simply doesn't support

25   that, and that's what -- again, the preponderance of the

KINSER v. CBS CORP., Case No. 94-2282

1    evidence, more probably true than not, is that:  If there

2    was going to be a change, if there had been a change at

3    that earlier date, it would have shown up in the files.

4    But, no, it didn't happen on the documents because that

5    change showed up the first time in 1975, too late for

6    Mr. Kinser.

7            Mr. Kleinrath from Commonwealth Edison, he

8    testified.  And, again, I put this picture of him up

9    because he's the kind of guy that's -- again, you don't

10   mess around with your, the boss of the construction work

11   for your main customer.  You're going to do what he says.

12   If that's what the Sargent & Lundy specifications said at

13   that time for the asbestos insulation, that's what would

14   have been done.  Mr. Kleinrath himself couldn't tell,

15   couldn't tell us one way or the other what happened

16   because he didn't, he didn't personally have knowledge of

17   it.

18           The knowledge of this material comes from the

19   people who worked at the job site of Mr. Kinser, saw it,

20   and others who knew what they were using at that time

21   were using it on other jobs.  Asbestos was being used.

22   That conforms with the specifications.

23           So these files from the Westinghouse lawyers

24   show that.  This is the chronology of it.  They prepared

25   the spec for Sargent & Lundy for the asbestos, made a

KINSER v. CBS CORP., Case No. 94-2282

1   change to conform to it in '71.  Zion was completed.

2   Mr. Kinser worked there.  And then that 1975 change comes

3   after, after the fact.  It's denial to say that somehow

4   our own documents that our lawyers got aren't the ones

5   you should follow in this case.  Westinghouse is denying

6   what their own documents say.

7           And this, again, confirms it all.  Your number

8   one customer wants the changes in writing.  Substitutions

9   shall be executed under the conditions of the contract

10  and shall be authorized by the owner's formal contract

11  change authorization in writing.  Well, remember, we

12  actually had change order forms that were used that

13  Westinghouse had.  Didn't see one of those for this

14  change that never took place.  The procedures simply did

15  not happen to make a change until '75.

16          Doug Ware was the witness for Westinghouse.

17  He's Mr. Westinghouse.  $125 an hour, testified 43 times.

18  He was there at the site.  You know what's amazing is the

19  guy started out by saying he didn't recall the insulation

20  work; and then somehow, after lunch and the break, all of

21  a sudden he comes up with a lot of statements about it.

22  But that was his first testimony, was that he doesn't

23  recall it.

24          Well, that wasn't the only testimony in this

25  case that changed, that he -- answer that he said.  He

KINSER v. CBS CORP., Case No. 94-2282

1  admitted several times he was changing his answers.  He's

2  there when they call on him to give whatever answer is

3  necessary.

4          He never heard that it was asbestos-free during

5  the job.  This all came about when he started working

6  with the attorneys in 2012.  And he gave these different

7  or changed answers, and he freely admitted it in the

8  courtroom.  The credibility of a witness is yours to

9  judge.  On these points, Mr. Ware is not a credible

10  witness.  He's a witness that Westinghouse attorneys have

11  put forth.

12          The conduct of Westinghouse.  This starts in

13  1936, what Westinghouse did in this case that injured

14  Mr. Kinser.  Hazlett, the medical director, knows to

15  substitute materials, change them.  He knew in '43 that

16  asbestos was a killer; wrote about it in a book.  His own

17  publication here talks about -- and, remember, he was the

18  guy who was the liaison between these two leading

19  organizations of the National Safety Council and the

20  Industrial Hygiene Foundation about information going out

21  in the corporate circles.

22          He was right on point with what he said.  "You

23  need to substitute or isolate, take care of these toxic

24  materials."  He said it in '36.  Westinghouse didn't get

25  around to it, certainly not at Zion or anyplace else

KINSER v. CBS CORP., Case No. 94-2282

1   before Zion.

2        The doctorate in public health policy, Barry

3   Castleman, he testified he wrote the book on the, on the

4   asbestos diseases and companies.  He's testified before

5   Congress.  He's an authority in this area.  He reviewed

6   the Westinghouse documents.  Again, he said asbestos peak

7   year use was '73.  The first ban in place was 1976 on

8   asbestos.  And the dangers of asbestos have been in the

9   literature since 1910, and I won't go through all the,

10  all the things that he used to reference that because you

11  saw them all.

12       But what's important is, I think, what he said

13  about Westinghouse, borne out by their own documents that

14  they had a medical department.  They had a medical

15  director, industrial hygiene staff, a safety staff,

16  corporate and in the field.  And they were members of

17  these key organizations:  IHF and NFC.  Two of the

18  industrial hygienists for Westinghouse, Mr. Barnes and

19  Mr. Speicher, wrote documents that we saw.  These

20  documents showed that they were testing in their own

21  plants, Westinghouse, their own employees, for asbestos

22  in the '30s.  They found excessive levels from the

23  cutting and sawing of insulation, just like what happened

24  at Zion.  They found that in the 1930s.  And they found

25  bystanders were in danger, people who were working near

KINSER v. CBS CORP., Case No. 94-2282

1    others.  They reported that in their own, in the company

2    memos.

3           Mr. Smith became vice president of

4    environmental remediation.  He's, again, a Westinghouse

5    designated witness.  He said that a 1956 Doll Study,

6    Asbestos:  Cause of Lung Cancer," that that's when

7    Westinghouse knew it.  Back in 1956.  That's 17 years

8    before they built Zion.

9           In 1977, though, was the first time they

10   monitored it in the field; Westinghouse did.  So that's

11   47 years, roughly -- or 40 years at least -- after they

12   first did it in their own, in their own workplace and

13   thought it was dangerous there.  They didn't do anything

14   in the field in the interim.  And they never warned about

15   turbine asbestos safety.

16          Mr. Perrieto, director of corporate health and

17   safety for CBS/Westinghouse.  He worked for a number of

18   years on the job.  He said -- they had a document in

19   1948, Westinghouse, he talked about, which said:  Do not

20   breathe asbestos -- again, that's an internal -- working

21   at the Westinghouse factories.  Internally, Westinghouse

22   had all this great information from great qualified

23   people.  They didn't warn -- they didn't warn out in the

24   field.  No.  They didn't institute protective measures.

25          Doug Ware himself conceded that during the time

KINSER v. CBS CORP., Case No. 94-2282

1   that he was in charge of the Chicago District Office that

2   there was no asbestos safety instructions for the field

3   work.

4         It's denial to say that people in the field are

5   not endangered when you know, and your own plant's doing

6   the same cutting and sawing or bystander work that they

7   are.  It's denial to do nothing.

8         Asbestos dust.  This is one of the memos from

9   Mr. Barnes.  "Asbestos dust in excessive concentrations

10   can produce a chronic lung disease known as asbestosis.

11   Considerable care should be utilized to minimize any

12   hazards of this type."  That was Mr. Barnes, their expert

13   in-house.

14         Circular cutting saws, excessive generation --

15   this was that 1957 memo -- causing exposure to

16   surrounding workers.  Those are the bystanders.

17         And, yet, although the industrial hygiene and

18   medical department had this information and it was

19   conveyed at least to their plant managers -- whether they

20   implemented it or not, it was never clear; but it was

21   conveyed to plant managers -- there was nothing to field

22   personnel, nothing to insulation contractors, nothing to

23   pipefitters, nothing to Commonwealth Edison about this,

24   what Westinghouse knew.

25         There's a difference between the boardroom,

KINSER v. CBS CORP., Case No. 94-2282

1  where these corporate offices are, and this field.  The

2  message doesn't go out.  And Dr. Castleman explained why:

3  Because oftentimes in those companies back then, there

4  was no budgetary -- no budget set aside to make that

5  message conveyed.  It's denial, again, to know it here

6  and not tell the people there.

7        Westinghouse knew about the synergistic

8  effects.  They -- remember this National Safety News.

9  They got this through the National Safety Council in '67,

10  reported there.  Dr. Selikoff talked about a 90-fold

11  risk.  That's what was reported.  So the synergistic

12  effect was part of the warnings that didn't get out there

13  either.

14        Westinghouse was clearly responsible for the

15  Zion powerhouse construction.  That's not questioned

16  here.  They supplied it, the turbines.  They supplied the

17  materials.  They manufactured the turbines, designed it;

18  and they installed it, all under their direction.

19        And the Zion construction in '74, this was the

20  outage.  Doug Ware said, "I was in charge," called in the

21  people.  Westinghouse directed the pipefitter crews --

22  it's not questioned here -- and asbestos was torn out.

23  Insulation was torn out.

24        What happened here with Westinghouse at Zion

25  was the basics.  You didn't substitute and use another

KINSER v. CBS CORP., Case No. 94-2282

1    material even though you knew it was toxic in '73.  You

2    didn't protect people on the field.  You didn't warn

3    them -- didn't warn them about asbestos.  Didn't warn

4    them about the synergistic effects.  You didn't test the

5    air quality of the turbine sites until '77, and you

6    didn't safely direct the work of the contractors.  You

7    put the pipefitters right there next to the insulators.

8    You put them right next to other pipefitters removing

9    insulation.  That's a failure to exercise reasonable

10   care, especially given Westinghouse's knowledge that

11   that's what should have been done with all these things.

12          The burden of proof, again, is a cause -- that

13   we have to prove it's a cause, more probably true than

14   not, not beyond a reasonable doubt.  So at a minimum

15   here, we've met that burden of proof to show, more

16   probably true than not, Westinghouse's conduct was a

17   cause.

18          The damages.  Okay.  This is about the

19   accountability.  There are several categories of damages

20   on here.  This has been a long journey.  We're here

21   because of the denial by Westinghouse.  We're here

22   because of what happened to Mr. Kinser.  We're here

23   because these categories of damages can be awarded by

24   you-all as the jurors who have responsibility for

25   applying and enforcing the laws on the parties in the

KINSER v. CBS CORP., Case No. 94-2282

1   case.  These are categories of damages.  You're the ones

2   to judge it.  But like I say, it's your responsibility as

3   jurors to make sure that you take the time to get it

4   right; and I'm sure you will.

5           We know from the stipulation the past medical

6   costs were $114,000.

7           Now I'm going to talk about each of these other

8   categories.  I'm going to give you my assessment of

9   these.  You're the ones who are going to have to actually

10  do the values.  But like I say:  Take your time; discuss

11  it amongst yourself; get it right.

12          The medical procedures that Larry had -- well,

13  there's a bunch of them.  Yeah, granted, he's cured now;

14  but he went through a lot to get cured.  He had several

15  times when they cut him open, cut out his rib, took out

16  the lung area.  It's not cured the breathing problems

17  that remain because you lost part of your lung.  He got

18  the chemotherapy, lost all his hair.  That still has

19  follow-up visits.  That's something to bear in mind here

20  when you think about the damages.

21          We talk about one category there, which is the

22  pain and suffering.  The main thing here is actually

23  breathing.  Okay?  You heard about it.  I think Larry

24  said he first started around 1990 experiencing

25  significant problems.  He had to retire in 1996 from the

KINSER v. CBS CORP., Case No. 94-2282

1  breathing.  It's getting worse.  I think that's the most

2  important thing is it's gotten worse.  And he has trouble

3  just bending over, tying his shoes, taking off socks.  He

4  can only walk, I think he said now, a half a mile.

5          But before he could walk more.  You saw that in

6  the medical records.  But this is what happens when

7  you've got asbestos disease grinding away, scarring

8  building up inside your body.  You get more and more

9  problems.

10          So this is ongoing.  He's had this now -- it

11  started in 1990; it's about 23 years.  He's got eight and

12  a half years to live under the life expectancy tables of

13  the government.  So he's got about 31 years of this.  I

14  put a total on this value: $310,000.  How did I get

15  that?  Well, 31 times 10,000 a year now.  That's what

16  happens when you have something that's progressive is

17  maybe it's not so bad at the very start; but later on,

18  it's going to get worse.  So I've averaged that out, and

19  I've said that for what happened to him, because of what

20  Westinghouse did and the asbestos and the tobacco, that

21  the amount that I believe would be proper here is $10,000

22  a year, on the average.  Maybe it was not very much at

23  the beginning; but now it's very restrictive, and it's

24  going to get worse for the next eight and a half years.

25          He may live longer.  He might live 15 more

KINSER v. CBS CORP., Case No. 94-2282

1   years.  I hope he does.  Then it would be a higher

2   amount.  But that's my number that I put on it for what

3   happens every day in his life, what's happened.

4          "Loss of a normal life" is another category.

5   And I put the number one item on that being health.

6   That's something that we all know is so precious it can't

7   be replaced.  As jurors, your role is to put a value on

8   something.  Like I say, take the time to think about it.

9   Figure it out amongst yourselves.  Health has a value

10  that many people would say you can't even value it; it's

11  so important.

12          I put a value on that because of the things

13  that he can't do, like the household chores, the yard

14  work, cleaning the camper.  Again, his future life

15  expectancy.  He can't drive great distances anymore.  He

16  has trouble with family gatherings he can't participate

17  in.  I think he put down there -- again, my number was

18  $12,000 a year.  Starting again, back earlier, it would

19  have been less.  Today it's more.  It's going to get more

20  in the future.  So, that's how I came up with that number

21  of $372,000.  This is, again, health of a person and what

22  happens because of it.  That's what we're here for.

23          We're not here to say, "Oh, he's cured of his

24  lung cancer."  That's a different category of damages for

25  the lung cancer.  That's the medical bills and what he

KINSER v. CBS CORP., Case No. 94-2282

1   went through in that period of time.  Now we're talking

2   about something that's ongoing and continuing

3   progressively.  And nobody questioned here that he's got

4   ongoing breathing problems.  It's not an issue.  For

5   that, Westinghouse should be accountable.

6          Lost wages.  He had to work -- he stopped

7   having to work as a pipefitter at age 62.  He did do some

8   other work later, but his pipefitter's wages were 35,000

9   a year.  I just put down here:  If he continued to work

10  to age 65, it was 105,000; that's three years.  If he

11  worked to 67, it's $175,000; that's five years' worth.

12  Somewhere in that range of 105 to $175,000, that's where

13  I believe his lost wages are.  So you-all figure that

14  out, again.

15         But there's no question that he was limited in

16  what he could do.  He had to go to the grocery store,

17  pushing carts.  That's all he could do.  He couldn't

18  carry those big wrenches anymore.

19         Loss of society is a claim that Donna has.

20  Now, I'll tell you something.  When you get down to loss

21  of society, there's no question that these are a very

22  close couple still.  And they spend a lot of time

23  together.  But people view these things in different ways

24  because oftentimes it's the quality of what you can do.

25  And Donna made it very clear -- and Larry mentioned some

KINSER v. CBS CORP., Case No. 94-2282

1   of this, too -- she can't do things with Larry like she

2   wants to:  walking on the lakefront, bowling, bike

3   riding, garage sales, grocery shopping.  Larry has to go

4   back to the car.  He can't even go grocery shopping.

5        These are things that are very important to

6   people in their lives.  This is the little things that

7   constitute society -- not little things, but maybe

8   they're the big things.  So when you look at Donna and

9   you think about her, her concerns, she, she and Larry are

10  both people who endured what's happened to them quite

11  well.  They both adjust and adapt.

12        But there's still a significant component

13  that's missing.  They don't come out and say, "Oh, geez,"

14  you know, "I feel very deprived of my husband."  You

15  didn't hear her say that, but you heard her say these

16  things don't happen anymore that they used to do

17  together.  That's what loss of society is about.  These

18  things don't happen anymore.  It's not just about time

19  together; it's about what you can do.

20        I put a value on this to get them through that

21  31-year period of things that have been happening to

22  Larry, and will in the future, of $3,000 a year.  So

23  that's $93,000.  Maybe some of you think it's more.  This

24  is one that could be higher.  It's up to you guys.  It

25  could be less.  But my point of it is:  It's real, and

KINSER v. CBS CORP., Case No. 94-2282

1   take your time to figure it out.

2           Increased risk of lung cancer/mesothelioma.

3   Well, you heard Dr. Scanlon say -- you heard Dr. Frank

4   say; no doctor even denied it -- it's real.  It is real.

5   Once again, Larry doesn't sit there and say, you know,

6   "I'm sitting here thinking every day about it."  He says,

7   "No.  I go to church, and I pray, and I'm grateful when I

8   get that annual result that says, okay, I don't have it

9   again."  But it's real.  You can't -- it doesn't go away.

10  It's in his mind.  That's the compensable element of

11  damages.

12          Fear of cancer.  And let me tell you about the

13  differences in these two a little bit.  If you, if you

14  have it, if you get this again, you're going to have some

15  medical costs.  You've already seen what his medical

16  costs are.  And if those costs are the same, then you're

17  going to have significant more expenses.  That's what

18  this is about, increased risk.

19          So if the risk is about 10 to 30 percent, which

20  I think the evidence shows somewhere in that range based

21  on all the higher risk of asbestos- and smoking-exposed

22  to persons getting a disease -- even though you cured the

23  one, there's that risk of the second -- that's where we

24  come up with that figure of between 11 and 33,000.  That

25  was the 114,000 in medical expenses.  I took 10 percent

KINSER v. CBS CORP., Case No. 94-2282

1   of those; that's about 11,000.  You take 30 percent;

2   that's about 33,000.  That's the range I sought.  It

3   could be more.  Again, you-all are the ones to evaluate

4   this situation.  It's not something the doctors can

5   predict with certainty, but we know it's real, reality.

6          Fear of cancer.  That's the one I was talking

7   about.  Larry has that every day.  And he goes and --

8   fortunately, as I say, he could go to church, and he can

9   say, "Thankfully, I don't have it."  But that fear

10  doesn't go away.  So, again, it's not that he can't

11  endure it and live with it.  It's:  Does he have the

12  fear?  And he's entitled to be compensated by that.

13  Westinghouse should be held accountable for that.  You

14  can't just knock that out simply because Larry's a tough

15  guy.  That's not what's going on here.  You have to

16  evaluate what's really the evidence here about his

17  feelings on that.

18         Future medical for his current condition.  The

19  asbestos ongoing inside of his body, creating additional

20  medical changes.  Well, as it stands right now, it's not

21  a lot because it's basically an annual visit.  If it

22  developed into something else, it will be higher.  I put

23  a figure on this for about 25,000.  It's about 20 percent

24  of what he's had so far in the past.

25         The total damages in this case that we would

KINSER v. CBS CORP., Case No. 94-2282

1   seek -- and this is taking the ranges that I had on the

2   higher range of things -- for Larry, it would be

3   $1,071,000; Donna, $93,000.  Again, you-all stop and go

4   through these numbers.  You'll have each of these things

5   on the verdict form.  Consider the evidence.  But you may

6   come up with a number higher than that.  I don't believe

7   it should be hardly any lower, not for what Westinghouse

8   did here.

9          The allocation of fault, which is another

10  question on this verdict form, we talked about this since

11  the beginning of the case.  We believe there is some

12  fault on Larry.  This is how we see it, based on the

13  evidence here.  It's a little different than what I might

14  have showed you at the opening statement, but that's

15  because I think the evidence came in a little

16  differently.  Westinghouse, clearly on this evidence, was

17  a little more responsive, relatively.

18         Larry Kinser, I put a number on here of about

19  10 percent because he did smoke cigarettes.  He didn't

20  quit right away when the warnings came out.

21         We'll talk about each of these people.

22         Oh, let me first -- I want to talk about the

23  others real quick.  The others are, are things that might

24  be associated with the cigarettes or the asbestos from

25  other places or somebody wants to blame his coworkers for

KINSER v. CBS CORP., Case No. 94-2282

1   exposing him.  We're not saying that there isn't a lot of

2   other factors here.  It's not our position here.  We do

3   believe that the other factors are significant; about

4   75 percent.  That's how we see it.  And that means the

5   tobacco companies, that their fault is in this.  That

6   means other asbestos companies.

7          But the one thing you've got to realize here is

8   the evidence in this case, which is what you judge it on,

9   was only about Westinghouse.  Westinghouse didn't present

10  evidence on these other companies.  So maybe you think

11  that that number 75 percent is too high.  It's somewhat

12  speculative to say that:  What were the warnings at the

13  other job sites, or what did the other asbestos companies

14  do?  Westinghouse didn't present any evidence on that.

15  That's their burden to show these others, but I'll

16  concede it's a significant amount.

17         Let's talk about Larry's conduct and how I got

18  the 10 percent.  And it's really important here.  That

19  number is a low number here.  Because at some level on

20  the verdict form you'll see he doesn't get compensated.

21  So 10 percent, I arrive at it in this way.  First off, if

22  you look at the smoking question while he's addicted at

23  age 14, before there was any warnings on the cigarettes,

24  the peer group, everybody was smoking back then, the vast

25  majority of the people.  The advertising said, "Do it.

KINSER v. CBS CORP., Case No. 94-2282

1    It's good for you."  Physicians were even approving it.

2         And his habit was remote relative to his lung

3    cancer.  He quit 16 years beforehand.  That's what

4    Dr. Scanlon said.  It was remote.  Even Dr. Jones agreed

5    that it was remote.  It wasn't a big factor relatively.

6    And he doesn't have great responsibility as a 14-year-old

7    for getting addicted.

8         And he was never warned about the synergy, had

9    no clue about that, which is the biggest factor of all.

10   That's what makes it 50 times more likely instead of just

11   5 or 10 times more likely if there wasn't a combined

12   effect.

13        So that's one thing that I ask -- I say should

14   be considered in the percentage of Larry's

15   responsibility.

16        Is there any percentage that Larry has for

17   knowing about the dangers of asbestos?  I would say zero

18   here.  The late 1980s was the first time that there was

19   any protective measures on the job site.  That's when he

20   understood and appreciated the dangers of asbestos.  The

21   Savoy Pipefitters Local had meetings.  They didn't talk

22   about it to him.  That's the local.  There were some UA

23   journals that were provided.  It wasn't even clear he got

24   them because his address was wrong.  But the point of it

25   is, again:  The information about knowledge and knowing

1   the dangers comes from the job sites that you work on;

2   and, there, he was told it was -- that he had to do it to

3   do his job. He had to work in that asbestos. And so he

4   did. That's what he did. He didn't do that knowing

5   greatly about the dangers of asbestos; that's for sure.

6   I think, again, it's not something that he appreciated.

7          And what he did do was he followed the job site

8   safety practices. He did what he was told to do. You

9   can't hold a person accountable and responsible as an

10  individual for doing what you're told to do by your

11  bosses and by the companies directing the work. That's

12  not Larry's fault.

13         Joe Ferriter explained how, very specifically,

14  the union members had to follow the job site directives

15  on safety. Otherwise, the unions couldn't get the work.

16  Plain and simple as that. Westinghouse didn't give,

17  didn't give job site directives. Larry did what he was

18  told to do.

19         I want to talk about Westinghouse for a moment

20  and how he got that 15 percent, the percentage of career

21  exposure at Zion. Well, if there was asbestos on the

22  jobs -- Larry thought it was maybe about 80 percent, is

23  what I remember. The difference here is that the

24  intensity of the exposure -- we provided you evidence

25  on -- at Zion was severe. It was very high. It was all

KINSER v. CBS CORP., Case No. 94-2282

1    of the time on that job for that long period of time.

2    Whether it was Larry or somebody else, stuff was coming

3    up through the grating even below that you could see in

4    the air.  Great intensity.

5           Larry's career began in '62 as a pipefitter.

6    Sometime around 1988, there was protective measures

7    implemented; and so that means there wasn't more

8    exposures.  There was about three years in this time

9    period when he was a pipefitter getting exposed that he

10   didn't work because they didn't have work in Florida or

11   he was moving back and forth.  So when you add it up, in

12   terms of the years that he worked in asbestos and

13   percentage of the jobs, I, I came up with about 2 1/2

14   percent of the total time is the time he was at Zion.

15          And then I, I looked at this factor, which was

16   the intensity of the exposure at Zion, and I said:

17   That's a more severe, bigger job, this huge turbine.  And

18   so that means overall, in terms of if you just look at

19   the percentage of fibers that might be in the air, it's

20   about 5 to 7 percent of the time of the total percentage

21   career exposure.  That's the number I came up with at

22   Zion through Westinghouse.

23          Now, further factors for Westinghouse.  How do

24   you get to the 15 percent from there?  Here's how.  First

25   off, you look at the responsibility and the negligence

KINSER v. CBS CORP., Case No. 94-2282

1    here.  And, again, this is the evidence on Westinghouse.

2    They completely disregarded the people in the field and

3    put no safety measures, despite their actual knowledge of

4    how to protect, how to substitute, by their own, by their

5    own personnel and the dangers of asbestos.  What

6    Westinghouse did here was put their head in the sand,

7    didn't even test to see how much asbestos was in the air.

8             And, again, there's just simply not compliance

9    with OSHA or the general duties of industrial hygiene

10   that Mr. Parker talked to you about in which their own

11   personnel, being an industrial hygienist and a medical

12   doctor, were familiar with.

13            That's, these are factors to consider when you

14   evaluate the percentage of fault amongst different

15   companies that might have caused asbestos exposures or

16   have been part of that synergistic effect of their

17   asbestos delivery and tobacco.  So these factors were

18   presented about Westinghouse.  Westinghouse, again,

19   didn't present that evidence about anybody else here,

20   that anybody else had this kind of corporate operations.

21   You're deciding this case based on the evidence in this

22   courtroom.  This is the evidence about Westinghouse.  And

23   there's disregard for safety.  That doesn't exist for

24   anybody else.  That's why I say that 5 to 7 percent

25   should be closer to 15 percent for Westinghouse.  They

KINSER v. CBS CORP., Case No. 94-2282

1    are a highly culpable company on the evidence in this

2    case.

3           And, finally, another factor, again, is the

4    Westinghouse's denial:  denying that asbestos was used at

5    Zion, denying Dr. Scanlon's diagnosis of the cause of the

6    lung cancer, denying that there was dust from the cutting

7    and sawing of asbestos by showing you videos that doesn't

8    have any in there, denying that there was anything going

9    on at this 1974 turbine outage at Zion that caused any

10   asbestos fibers in the air in the face of all the

11   evidence that there's an annual outage at all the nuclear

12   sites, and their denial, Westinghouse's denial, that

13   there's accountability to the Kinsers.

14          And that's what, that's what the end of this

15   journey is about.  That's what your role will be here.

16   You've got a lot of notes and recollections about the

17   evidence.  Use your judgment wisely and carefully.

18          Thank you.

19          THE COURT:  All right.  Jury may have a recess.

20   We'll have about, oh, 10, 15 minutes.  Take the jury out,

21   Richard, please.

22                (Jury absent, 2:39 p.m.)

23                (Recess, 2:39 p.m. to 2:55 p.m.)

24          THE COURT:  Okay.  We ready?

25          MS. EZELL:  Yes, sir.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              THE COURT:  All right.  Bring the jury,

 2    Richard, please.

 3                   (Jury present, 2:56 p.m.)

 4              THE COURT:  All right.  Be seated everybody.

 5              Closing argument for the defendant, --

 6              MS. EZELL:  Thank you, Your Honor.

 7              THE COURT:  -- Ms. Ezell.

 8              MS. EZELL:  Good afternoon, ladies and

 9    gentlemen.

10              You've been working hard.  You've been taking

11    notes and listening, and sometimes you've even had to

12    wait while we worked things out here in the courtroom;

13    and we cannot do our job without you.  We get sued.  We

14    have to be here.  You either have to give in, or you have

15    to stand up.  And if you stand up, then we need you here

16    to sort things out for us.

17              You may notice that when you enter and exit the

18    courtroom, we stand up for you.  And we do that out of

19    respect, both for the time that you have spent here and

20    for the job that you now must perform.

21              If you remember back a few weeks ago, you'll

22    recall that I said we'd be working hard to bring you

23    evidence that you would need.  And as it turns out, not

24    coincidentally but by design, we brought you evidence

25    focused on answering the questions that the law requires
```

KINSER v. CBS CORP., Case No. 94-2282

1  you to answer.

2          The judge has given you -- can I have this now?

3          The judge has given you some portions of the

4  law, and he'll give you some more law after we're done

5  with our closing arguments.  And you'll recall that I --

6  I just shut off.

7          DEPUTY CLERK:  No, you're fine.

8          MS. EZELL:  Oh, okay.

9          You will recall that I gave you three

10  categories that we would give you evidence of.  I said

11  there would be no insulation at Zion -- "no asbestos

12  insulation at Zion" evidence; and that fits into the

13  category of negligence, or this category right here,

14  failing to act in ways claimed by the plaintiff.

15          These are things -- let me just point this out,

16  and we'll get to this just, in just a minute.  These are

17  things that the plaintiff has the burden of proving, but

18  we brought evidence on that issue.

19          The second thing that we brought issue on was

20  that the lung cancer was not caused by asbestos because

21  there was no asbestosis present; and that actually is the

22  third issue that the plaintiff has the burden of proof

23  on, and that is proximate cause.  And the judge gave you

24  some instructions on that.

25          And then, finally, that the plaintiff actually

KINSER v. CBS CORP., Case No. 94-2282

1  sustained some sort of injury or damages as a result of

2  something that CBS or Westinghouse did.  And those are

3  the third category of, of the issues that we said we'd

4  bring to you, and that is that plaintiff's lung cancer is

5  cured.

6          Now, because the law, the rule of law which

7  will guide your deliberations is so important to what

8  your job is that you now have to do, I'm going to spend

9  my time with you today discussing how the evidence that

10 we've brought to you so far fits into the law that you

11 must now apply.  The law is helpful, and it is good; and

12 if at any time you get stuck in your deliberations, my

13 suggestion is you go to that rule of law, and it will

14 help you move forward.

15         Now, before I get to specific things, like

16 causation, I want to point out some overarching legal

17 principles that I believe that His Honor will give you in

18 just a moment.

19         As you can see right here, I have highlighted a

20 section of the law that you will be instructed on.  This

21 section speaks to a particularly important issue in this

22 case, which is sympathy.  Now, while you may be tempted

23 to say things in your deliberations, like,

24 "Mr. and Mrs. Kinser are very nice people; they are good

25 and faithful people, and they could use my help," you

KINSER v. CBS CORP., Case No. 94-2282

1    cannot do that.  The law says so.

2          Those feelings are natural, and they are human.

3    But once you feel those feelings, you have to set them

4    aside and get back to the work of deciding this case

5    without regard to your feelings, your affinity, your

6    emotions, or any sort of thoughts that you may have about

7    how nice -- and they are very nice -- Mr. and Mrs. Kinser

8    are.  And that's what the law says, and the judge will

9    tell you about that.

10         Now, another area of the law, which I would

11   submit to you, you heard about this issue of denial,

12   while Mr. McCoy was up here.  And I have to say:  I

13   submit that there's been some denial in this case.  Yes,

14   there has.  One thing that I think has been denied is

15   that Mr. McCoy has the burden of proof in this case.  He

16   is the one who is supposed to bring the evidence.  He is

17   the one who is supposed to do the proving.

18         They call it a "burden of proof," not an

19   "invitation to prove," not "show up and prove if you're

20   so inclined."  It is a burden because it is heavy; and it

21   must be done by the plaintiff because, as I indicated,

22   all they have to do to get us to be here is to sue us,

23   and we have to come.  And so we're here, and so they have

24   to prove.  They have to prove.

25         What does the law say?  They have to persuade

KINSER v. CBS CORP., Case No. 94-2282

1  you.  They have to not just bring you evidence to put on

2  the scale -- which I'll tell you:  I think on some of

3  these issues, they didn't even bring you anything to put

4  on this scale -- but they've got to bring you evidence to

5  put on the scale; and then when you compare that to the

6  evidence on the other side of the scale, their evidence

7  has to persuade you.

8          Mr. McCoy did not talk about the law.

9  Mr. McCoy did not appreciate who had that burden.  But

10  the judge will tell you who has it, and I know that you

11  will appreciate that.

12          Now, let's talk about another aspect of the law

13  that is important in this case, and that is:  How do you

14  tell us what your decision is?  Because at the end of the

15  day -- we talked to you all day, right?  We talk and our

16  witnesses talk; and at the end of the day, you talk to us

17  through one piece of paper.  It's called your verdict

18  form.  And in this case, it's a couple pieces of paper,

19  and we're going to talk more about that.

20          So let me tell you what your job is.  And the

21  judge will also tell you this, and the law tells you

22  this; and if I get it wrong in any way, you go by what

23  the judge says.

24          But this is what the instructions are on how to

25  fill out your verdict form.  And I'm going to give you my

KINSER v. CBS CORP., Case No. 94-2282

1  explanation of why I think you're going to be filling out

2  Verdict Form A in this case.  Because it says right here

3  in the law, which the judge will give you:  If you find

4  after you've thought about all the evidence, that Larry

5  Kinser failed to prove his case -- he didn't bring the

6  proof; he didn't tip the scale -- then you will use

7  Verdict Form A.  You'll all sign it.  Your presiding

8  judge will sign the line where it says "Presiding Judge."

9        And then you will go on and answer what we've

10  got called some special interrogatories, some other

11  questions that His Honor wants you to answer.  And we'll

12  talk about those as we go through.  So now you know we've

13  got law, and y'all have questions.

14        So let's talk about what kind of evidence we

15  have seen in this case that compares to the law and the

16  questions that y'all are going to have to answer.  So

17  let's think about what this case has been about.

18        Here she goes again with those timelines.

19        Can we zoom out just a smidge?

20        This is the story of a man who worked as a

21  pipefitter for most of his adult life.  He served his

22  country.  He followed in the craft and the trade that his

23  father worked in.  He told you that he had a good life,

24  and he was a good provider.  His wife told you that

25  they've been blessed with a good family and many

KINSER v. CBS CORP., Case No. 94-2282

1    opportunities; that they've had a good marriage; that

2    they support each other; and that they are a faith-based

3    family.  And he told you that he has faith that he will

4    not have cancer again.

5              So why are we here?  Why are we in this

6    courtroom today?  Well, in 1994 -- in 1994, before

7    Mr. Kinser had lung cancer, years before he had lung

8    cancer -- diagnosed in the year 2000 -- before he retired

9    from work, before he had lung cancer, before he retired

10   from work, he sued my client.  That's why we're here.

11   That's why we're here.

12             He sued them, even though -- even though --

13   over the course of his entire work life, you heard him

14   tell you, he had worked at over a hundred job sites and

15   for other companies and for companies that he knew for a

16   fact had asbestos.  He sued Westinghouse/CBS, even though

17   in his work life, which started in 1952 -- that's when he

18   started working -- he -- and I don't have that part of

19   the timeline up, but you'll remember he told you he went

20   to work as a laborer with his daddy in 1952.  And he

21   retired in 1996.  That is a work life of 44 years.  He

22   worked for 44 years, and he spent four months at the Zion

23   plant.  Even though he spent less than 1 percent of his

24   work life at Zion, he sued my client, before he retired

25   and before he was sick.

KINSER v. CBS CORP., Case No. 94-2282

1          He sued Westinghouse, even though he had no

2     evidence that there was any asbestos insulation at the

3     Zion plant.  He sued them, even though he had no proof

4     once he got sick that his lung cancer was associated with

5     anything that he came into contact with during those four

6     months at Westinghouse -- at Zion.

7          And he sued, and he kept suing; and we're here

8     today, even though his lung cancer is cured and he has

9     been cancer-free for 13 years.  He has been retired since

10    1996, and he has been cancer-free since 2000.

11         He sued for lung cancer, even though he smoked

12    cigarettes for 35 years.  And he sued, even though he had

13    60 years of secondhand smoke exposure.  This case reminds

14    me of a, like a smoke and mirrors.  If we bring enough

15    people in here and we tell you something enough times,

16    maybe we can convince you that it's true.

17         My job, ladies and gentlemen, today is to walk

18    you back through the evidence, to walk you back through

19    the people who have come here to testify, and to get rid

20    of the smoke and to get rid of the mirrors and to take a

21    look at the evidence.

22         If you remember -- I told you I'd have it -- I

23    said we'd bring you three things.  I wrote it down for

24    you on the first day.  And so let's talk about what the

25    evidence has been of these three things that we talked

KINSER v. CBS CORP., Case No. 94-2282

1   about three weeks ago.

2           The law speaks to these issues, because what

3   are we going to do on this first issue? And this is the

4   one we've heard the most evidence about. The most

5   evidence is on this issue of whether or not there was

6   asbestos, and what did Westinghouse do at Zion that

7   caused any harm to Mr. Kinser? That's the first question

8   you've got to think about; and whether or not there's any

9   evidence of that, let's take a look.

10          So what does the law say you need to think

11  about when you're thinking about the people who have come

12  into this courtroom to talk about it? I don't know if

13  you've ever heard this term of art, but have you ever

14  heard "consider the source"? Like if someone tells you

15  something, you need to know where that information came

16  from because you don't know whether or not to believe it.

17          Well, the law agrees with this concept of

18  "consider the source." It says -- this is about expert

19  witnesses, somebody with special knowledge or skill --

20  testimony should be given the -- or I'm sorry. "Give the

21  testimony whatever weight you think it deserves,

22  considering the reasons given for the opinion, the

23  witness's qualifications, and all of the other evidence

24  in the case." That's the law that you-all may look to to

25  decide whether or not you need to believe a word they

KINSER v. CBS CORP., Case No. 94-2282

1    said, or believe everything they said, or something in

2    between.

3            But the law doesn't stop there.  The law also

4    provides you with additional help on how to consider the

5    credibility of witnesses.  And the law -- the law is vast

6    on this issue.  But I have highlighted some things that I

7    think will be helpful to you.  Part of your job as jurors

8    is to decide how credible or believable a witness was.

9    Some things to consider:  If a witness was actually able

10   to see or hear the events clearly -- because even an

11   honest witness, if they can't see or hear what was

12   happening, may make a mistake.

13           We asked -- I asked every witness:  Were you

14   there?  Were you at Zion?  Do you know what you're

15   talking about?

16           The next thing:  How good did that witness's

17   memory appear to be to you?  You're the judge.  You'll

18   get to decide that.

19           Number 5:  Did that witness have any bias or

20   prejudice or reason to testify that might cause the

21   witness to lie or to slant their testimony in favor of

22   one side or the other?

23           Did the witness testify one way one day and

24   then testify a different way another day?

25           Number 6:  Did the witness testify

KINSER v. CBS CORP., Case No. 94-2282

```
1   inconsistently?
2           Well, let's consider this law in light of the
3   evidence we have had in this case.  What have we had?
4   Well, I can remember one witness, the first witness, a
5   Dr. Arthur Frank.  And he came in here, and he had a lot
6   of credentials.  But he also didn't know a darn thing
7   about Mr. Kinser.  And he walked over here; and there was
8   some paper, and he drew the cancer in the lung.  But he
9   didn't draw it in the upper left lobe where it belonged.
10  He drew it in the bottom of the lobe, closest to where he
11  thought asbestos damage would be found.
12          Now, you ask yourselves -- you judge -- is that
13  a slanted testimony by a paid witness?  He said, he
14  acknowledged he -- it was misleading, and he apologized
15  for doing that.
16          What else?  What else have we seen?  Also, from
17  Arthur Frank.  "You were not provided -- you were not
18  provided by Mr. McCoy any information about the family's
19  smoking history?"
20          "I remember" -- this is me talking to him and
21  him talking to me.  "I remember reading about his father,
22  and he lived into his 90s."  I put up a record.  He read
23  the record with me.  And he said, "Well, hold on.  I got
24  the dates wrong.  His father died in his 70s of
25  emphysema."
```

KINSER v. CBS CORP., Case No. 94-2282

1          When he didn't know what the answer was, he

2     made the answer as good as he could get it to favor the

3     person who was paying him to testify.

4          What else about Dr. Frank do we recall from his

5     testimony?  He did not come prepared.  The thing is, if

6     you don't give a witness all of the documents, it's like

7     putting blinders on a horse.  You limit their field of

8     vision so they can get the task done that you want them

9     to get done.

10          These witnesses came with one agenda and

11     blinders on.  He didn't know what he didn't know, but he

12     knew there were more records than he had.  These are

13     Plaintiffs' experts.  They're his experts.  It doesn't

14     matter what your credentials are.  If you don't have all

15     of the medical records, then you don't know the whole

16     story.  It's just the fact of the matter.

17          Next expert.  Credentials are fantastic.

18     Preparation, not so much.  Dr. Arnold Brody.  Have you --

19     "You have not been provided with any depositions?"

20          "That's right."

21          "You have not been provided with any deposition

22     summaries?"

23          "That's true."

24          "You have not been provided with any medical

25     records for Mr. Kinser?"

KINSER v. CBS CORP., Case No. 94-2282

1           "True statement."

2           "Dr. Brody, a biopsy was taken in this case,

3    and that was not provided to you."

4           And you remember Dr. Brody.  He was the -- he

5    was the science guy.  He was the guy who studied cells

6    for a living.  He didn't get the cells.  And I asked him,

7    "Wouldn't you have wanted to look at the science, at the

8    cells?"

9           And he said, "Sure, if I was diagnosing

10   that disease or if I was actually here to study lung

11   tissue" -- I'm sorry, Dr. Brody; I thought that's what we

12   were doing -- "then that's what I would have wanted to

13   see."

14          What else?  What else have we seen in this

15   case?

16          Mr. Castleman.  He didn't know if he was blown

17   up or stuffed.  He didn't know if he had written a report

18   in this case in Federal Court where every other witness

19   told you that you had to write a report to come testify.

20          I said, "Without looking to your left, can you

21   tell me whether you wrote a report?"

22          He didn't even know that.  That's how often he

23   comes to court, points a finger at asbestos or whoever's

24   in the crosshairs, and says, "They did it."

25          What else?

KINSER v. CBS CORP., Case No. 94-2282

1           Mr. LaPointe.  "What broke at Zion?"

2           "I got no wild idea, but something must have

3    broke there.  Let me tell you what I think might have

4    happened."

5           "Do you know what Zion even looks like,

6    Mr. LaPointe?  What's this a picture of?"

7           "Well, isn't that Point Beach?"

8           "No, Mr. LaPointe.  No.  It's not Point Beach.

9    It's Zion."

10          Mr. LaPointe came in here and told you all

11   about his life.  The problem is that Mr. LaPointe's life

12   has had nothing to do with Mr. Kinser's life.

13          Mr. Ferriter, same problem.  Nice guys,

14   interesting lives, maybe nice to have coffee with, not

15   very helpful in the case of Kinser versus Westinghouse.

16          Last witness, Frank Parker.  Mr. Parker, on

17   video forever, many days, he was the air sampling

18   witness.  His job was to tell us the quality of the air.

19          "Mr. Parker, tell us the quality of the air at

20   Zion."

21          "I've got a big stack of papers here, Ms.

22   Ezell, and these are all the papers that I've relied on,"

23   much like Mr. McCoy in his closing argument.  "I've got

24   article after article after article after article."

25          "Well, which one says 'Zion' on it so I can

KINSER v. CBS CORP., Case No. 94-2282

1   please be informed about what was going on in this case?"

2           This is not a book report, ladies and

3   gentlemen.  This is a lawsuit.  And in a lawsuit, we

4   don't really care about research.  We care about

5   Mr. Kinser and what happened on August 1st, August 2nd,

6   August 3rd, the days when he actually worked at the place

7   where he's accusing my client of causing him harm.  And,

8   no, you don't get to bring in a book report.  You've got

9   to bring evidence.  When you sit right there and you

10  stand right here and you try to move money from over

11  there to over there, you've got to bring evidence.  And

12  it's actually got to be about this case.  And we don't

13  have that.

14          Sometimes during this case I have felt as

15  though I have been in the Twilight Zone.  Mr. McCoy has

16  created an alternate universe where a document marked

17  Defendant's Exhibit Demonstrative 21 does not exist.

18  Apparently, the Zion file ends at Zion-924, in

19  Mr. McCoy's universe, because if you don't read to

20  Zion-925, you don't find out that Zion-1 -- which it

21  doesn't surprise me that 40-G is on the first page

22  because that was the first document.  It was created in

23  the beginning.

24          But what is the story of this case, ladies and

25  gentlemen?  It was changed.  Why is Mr. McCoy trying to

KINSER v. CBS CORP., Case No. 94-2282

1  convince you this document doesn't exist?  Why is he

2  telling you this is not in writing?  Why is he telling

3  you it is not -- can I have the zoom? -- why is he

4  telling you it is not in the Zion files?

5          Ask yourselves this as you go to consider the

6  source in this case:  Why did Mr. McCoy -- if he really

7  wanted you to consider all of the evidence in this case,

8  if he wanted you to fairly judge the facts of what he

9  says my client did to his client -- did he not give this

10  document to any of his experts?

11          I gave 40-G, the document that mentioned

12  asbestos, and all of the other documents to Mr. Ware.

13  And I gave him 40-H.  Actually, I didn't give him any of

14  those.  He had them when I met him.  But, nevertheless,

15  he had the full complement of these documents.

16          Mr. McCoy picked and chose which documents to

17  send his doctors, which documents to send his experts,

18  and he never sent anybody this document, because if this

19  document exists, he loses and he knows it.  Because this

20  document says that Zion did not have asbestos insulation.

21  And if his experts read this, then when he comes and asks

22  his questions, they're going to have to say, "But I read

23  one document, and it was dated 1972."

24          Did you ever notice how all Mr. McCoy's

25  documents are dated 1970 or before?  The world didn't

KINSER v. CBS CORP., Case No. 94-2282

1  stop then.  The plant wasn't built then.  It wasn't

2  finished.  All right, so I'm out of the Twilight Zone,

3  and I'm back to the evidence.

4           All right.  Now, there's more law.  There's

5  always more law.  All right.  The weight of the

6  evidence -- I only brought you four witnesses.  I brought

7  you Doug Ware.  I brought you Dr. Howard.  I brought you

8  Dr. Smith.  And I brought you Arthur Kleinrath from

9  Commonwealth Edison.  I did not bring you Dr. Barrett who

10  was the "B" reader that I told you I would bring you

11  because I didn't think I needed to bring him.

12           So the weight of the evidence -- you're not

13  supposed to decide who brought more witnesses and decide

14  based on that; the law says so, so I thought I would put

15  that up there.

16           Here's the other thing.  The law says I can't

17  get in trouble for not bringing Dr. Barrett.  There's no

18  duty to bring any particular witness to a trial.  The

19  duties are to carry the burden of proof.  So I just

20  wanted to let you know.  I remembered I said I would do

21  it in my opening.  I didn't do it.  And I wanted to

22  address it.

23           All right.  Shockingly now, we're at my first

24  theme.  But we've made a lot of progress, trust me.  All

25  right.  So what evidence -- what evidence -- ask yourself

KINSER v. CBS CORP., Case No. 94-2282

1   this; think about this -- what evidence did Plaintiffs

2   actually bring that there was asbestos at the Zion plant?

3   Turbine asbestos at the Zion plant?  What evidence?

4   Because none of their experts, none of their experts

5   addressed this.  None of them.

6           They brought you Mr. Kinser.  Mr. Kinser is the

7   only person who testified for Plaintiff who had actually

8   been to the Zion plant.  He's the only one.  And

9   Mr. Kinser is one of those witnesses that the law says

10  you can take his testimony with a grain of salt.  And

11  this is why:  Because the first time he testified, he and

12  I created this drawing, and he told me -- his lawyer made

13  this drawing.  And he brought it in, and he used it to

14  describe to me where he worked; and I believe he believed

15  it when he said it.  The problem is:  When you work at a

16  hundred jobs, you just don't remember.  But when you've

17  had a lawyer since 1994, you come in and you say what you

18  say.

19          And then, after all the witnesses were done,

20  after Mr. Ware had left, even though he was here every

21  single day, after there was nobody left for the defense

22  to speak to this issue, Mr. Kinser gets up on the stand

23  and says, "Oops.  What I meant to bring in the first time

24  when I told you I was working over here, I actually meant

25  I wasn't beside the turbine," which is, you know,

KINSER v. CBS CORP., Case No. 94-2282

1    effectively 20, 30 feet away.  "I was actually in the

2    turbine.  That's what I meant to say."

3           You decide about his memory.  You decide about

4    his credibility.  But the law says that this right here

5    doesn't mean he's trying to do anything wrong.  It just

6    means you can take his testimony with a grain of salt.

7           He's the one and the only one that they brought

8    that said there was asbestos, and what did he base that

9    on?  Did he bring some kind of OSHA proof?  "Here's a

10   test strip that I had from an OSHA test that was run

11   while I was at Zion"?  No.

12          Did he bring a piece -- "Here's a piece I broke

13   off when I was at Zion; and I brought it, and I had it

14   tested by a lab"?  No.

15          What he said was, "Well, that's what we always

16   did, and so I'm sure it was."  And, in fact, "I

17   specifically recall, even though I was only there for

18   four months in 44 years, I specifically recall that my

19   foreman said, 'Go get me asbestos.'"

20          You decide.  That's what's on this side of the

21   scale.  That's what's on this side of the scale.

22          And nobody else, nobody else that they brought

23   adds anything to that side of the scale.  And so

24   honestly -- okay.  Let me just run through, real quick.

25          Brody.  He was an expert of theirs.  He talked

KINSER v. CBS CORP., Case No. 94-2282

1  about cell mutation.  He said he didn't have anything to

2  say about Zion or asbestos.

3          Castleman.  He said specifically to me, "I'm

4  not here to talk about the plaintiff.  I'm here to talk

5  about the defendant."  He didn't have anything to say

6  about Zion.  He didn't have anything to say about the

7  asbestos there.

8          Arthur Frank.  He said, "I don't know anything

9  specific about the occupational exposure at Zion.  I" --

10  quote -- "took Mr. McCoy's word for the occupational

11  exposure history."

12          Mr. LaPointe.  He was not even a pipefitter.

13  He just came in here and told us about his life.  It

14  wasn't Mr. Kinser's life.  We've already been over that.

15          Same with Mr. Ferriter.

16          Mr. Parker had a bunch of documents, and he

17  said, "These are the documents that I relied on," and not

18  one of them had Zion on them.  And I've already shown you

19  the slide where he said he had no idea what, what was

20  going on at Zion during the relevant time period.

21          Those are all the experts that he brought.  You

22  subtract from them -- there were a lot of people and a

23  lot of testimony.  But if you get rid of them, all you

24  got left is Mr. Kinser.  So honestly, ladies and

25  gentlemen, I could sit down right now because Mr. Kinser,

KINSER v. CBS CORP., Case No. 94-2282

1    with his memory, that's not enough for them to prove

2    there was asbestos at Zion.  That right there, I could

3    sit down and I could say, "Ladies and gentlemen, that's

4    not enough.  The plaintiffs have got to carry a burden.

5    They've got to tip the scale.  That scale hasn't moved.

6    Sign Form A.  Go home."

7            But we didn't stop there, not by any sense of

8    the word.  We did not stop there.  We did not.  So what

9    did we bring?  What did we put on the scale?  We put a

10   lot.  And I'll just start with the most obvious thing

11   that we put on the scale.

12           And I apologize.  I had a PowerPoint, but we

13   didn't get the jury instructions until lunch; and so I

14   couldn't get them in there, so now I've just got the

15   printouts.  The most obvious thing that we put on the

16   scale is the document that doesn't exist in Mr. McCoy's

17   world, Defendant's Exhibit 2298.  You will have this

18   document.  You may read this document from stem to stern.

19   It will be in the jury room with you.  This is

20   Document 40-H.  And what it says is:  We've changed going

21   forward.  We're not using asbestos.  And it's dated 1970.

22           Now, just in case there's any confusion, you

23   may recall, as I do, that it's part of a drawing.  And

24   I've lost all of my little papers.  The copy that you get

25   does not have the Zion sticker on it.  That's because,

KINSER v. CBS CORP., Case No. 94-2282

1   when Mr. Castleman was here, he couldn't read the little

2   print on the drawing that was actually produced in this

3   case that does have the Zion sticker on it.

4          We're going to give you the copy that's

5   legible, more legible as well.  So you'll get that.  But

6   it's the same document, as Mr. Ware told you yesterday,

7   and nobody else has said otherwise.

8          So, Defendant's Exhibit 2298, Form 40-H, you'll

9   have it.  It's a document dated 1972.  And it is

10  completely consistent with all of the evidence, including

11  most importantly, you may recall that I mentioned at the

12  beginning of the case, there was a witness.  And he wore

13  four different shirts when he testified; and he sat like

14  this, and he couldn't get out of that testimony quick

15  enough.  And his name was Mr. Kleinrath.  And he didn't

16  want to be there, and he just answered the questions.  He

17  couldn't care less how this lawsuit ends, couldn't care

18  less.  But he was under oath, and this is what he said

19  under oath.

20         "Mr. Kleinrath, did there come a point in time

21  when there was a conversion from asbestos to

22  nonasbestos?"

23         "Yes."

24         "Do you remember when that was?  Right around

25  OSHA?"

KINSER v. CBS CORP., Case No. 94-2282

1             "I think right after that.  Yes."

2             40-H.

3             What else did Mr. Kleinrath say?  You heard

4    this.  "Mr. Kleinrath, I understand some of the questions

5    have already been asked.  In about 1972, asbestos, at

6    least to your understanding, was not used at Edison

7    facilities anymore for piping and boiler and turbine

8    insulation; is that correct?"

9             "Correct."

10            "That's because the Sargent & Lundy

11   specifications were used for bidding, correct?"

12            "Correct."

13            That is that Sargent & Lundy specification,

14   40-H, starting in 1972, before Zion was insulated.  No

15   question.

16            What else did he say?  You heard this already,

17   but just to refresh your recollection -- you can check

18   your notes -- "When the OSHA regulation came out, Sargent

19   & Lundy came up with specifications very quickly for

20   asbestos-free substitutes, right?"

21            "That's right."

22            And, finally, "If other evidence in this case

23   showed originally Sargent & Lundy in its bid

24   specifications for Zion 1 and 2 identified asbestos

25   material to be used when the contract bids went out in

KINSER v. CBS CORP., Case No. 94-2282

1   '69 and '70, is it consistent with your recollection" --

2   and this is about Zion, specifically about Zion -- "that

3   by the time the turbines were insulated in 1973 that

4   Sargent & Lundy had issued a new specification using

5   asbestos-free insulation?"

6           The question goes on -- and lawyers, this is

7   how they talk -- "Would that be inconsistent with your

8   recollection?"

9           It would be -- "It wouldn't be inconsistent,

10  no," which means that would be consistent.

11          So, looking back at Kleinrath -- and you'll

12  also recall -- and I bring these slides -- he talked

13  about the outage.  He -- this outage in '74 was huge.

14  And he didn't say it was a turbine outage.  He said

15  exactly what Mr. Ware said.  He said that the, that the

16  generator, the turbine generator went down.  It was a

17  huge deal.  Everybody knew about it.  He was involved

18  with it.  And so he, his testimony -- of somebody who,

19  who is not in any way associated with this, who actually

20  wore the green and yellow -- he says:  No asbestos at

21  Zion 1 or 2.

22          But we didn't stop there.  We brought you more.

23  We want you to feel very comfortable with your decision,

24  so we brought you information about the fact that the

25  OSHA had been enacted in 1972.  And not only had OSHA

KINSER v. CBS CORP., Case No. 94-2282

1    been enacted -- or OSHA [different pronunciation], as we

2    heard yesterday -- been enacted, but inspections had

3    taken place.

4            And this is the only evidence we had about

5    inspections, but I submit to you:  Unions don't

6    underestimate the number of inspections for safety that

7    are had.  So this is a -- this is a -- this is a union

8    report about the number of inspections that they're aware

9    of that had already happened on the new OSHA.

10           And what was the evidence -- what was the

11   evidence in this case about whether or not Zion, the

12   plant at issue in this trial, had ever been violated?

13           That evidence would have been brought to you if

14   it existed.  I asked them all.

15           "Mr. Castleman, did you bring any evidence with

16   you about whether or not Zion had gotten violated for any

17   OSHA regulations in '72?"

18           "I don't have anything about that.  No, ma'am.

19   I don't have anything about that."

20           "Okay.  Mr. Castleman, now, you didn't come to

21   this trial and bring any evidence whatsoever about OSHA

22   citing Westinghouse, Commonwealth Edison, or Sargent &

23   Lundy for failure to comply, did you?"

24           "No.  I have nothing about that."

25           "Mr. Parker, you talked to me about OSHA and

KINSER v. CBS CORP., Case No. 94-2282

1  violations.  What about you?  Do you have the proof that

2  somehow Zion is breaking all the rules of OSHA?"

3              "No, ma'am.  I don't have anything about OSHA

4  either."

5              These are Plaintiffs' experts.  If there had

6  been evidence, these are the guys who would have had it.

7  I asked them all.  I asked them all.

8              We also heard OSHA changed the world; it really

9  did.  We had the industrial revolution, and then we had

10  the safety revolution.  And OSHA changed the world.  It

11  was ground-breaking legislation.  And Mr. Parker and Mr.

12  Ferriter, and also Mr. Ware, had explained to us what

13  options manufacturers had in 1972 -- 1970, '71, '72, when

14  OSHA was coming out -- to spend a lot of money -- let me

15  just read to you Ferriter.  This was just yesterday.

16              "Mr. Ferriter, now, you know OSHA passed in

17  1970.  Would you agree with me that plants were given

18  options, correct?"

19              I'm reading right down here.

20              "That's correct, ma'am."

21              "And one of the options that they were given

22  was to buy a bunch of new equipment, buy monitoring

23  equipment, safety equipment, to buy signage, and to buy

24  equipment to protect workers if they were going to

25  actually have asbestos on their premises.  You understand

KINSER v. CBS CORP., Case No. 94-2282

1   that?"

2           "Yeah."

3           "You understand that to be true?"

4           "Yes, ma'am."

5           "The other option" -- skipping down to line

6   10 -- "the other option that they had in 1972 was simply

7   to decide to use nonasbestos materials, correct?"

8           "Yes, ma'am."

9           "And if they used nonasbestos materials, then

10  they didn't need to spend all of that money that this new

11  regulation was going to make them spend?"

12          And that's what happened at Zion, ladies and

13  gentlemen, and this evidence is uncontroverted from

14  Plaintiffs' experts.

15          And what's the last piece of evidence on our

16  side of the scale?  This is Joint Exhibit 1.  It's part

17  of a contract between Westinghouse and -- can you just

18  zoom in on this paragraph?  Thank you -- between

19  Westinghouse and Commonwealth Edison.

20          And what this paragraph says is that

21  Westinghouse is under a legal obligation -- you heard

22  about this when Mr. Kleinrath testified -- Westinghouse

23  is under a legal obligation to follow laws like OSHA.

24  And if they don't and they do anything that's not in

25  compliance with OSHA in working in connection with

KINSER v. CBS CORP., Case No. 94-2282

1   Commonwealth Edison jobs, then they got to pay.  They got

2   to pay all the fines.  They got to pay for everything.

3          So this is the evidence that we've brought you

4   on this issue of whether or not there was asbestos at

5   Zion.  We've got Mr. Kinser saying there was, and we've

6   got everything else that I've just described.  And I

7   submit to you, ladies and gentlemen, that's enough.

8          There's no -- there's no way that the evidence

9   Mr. Kinser has brought you can outweigh the scales as

10  I've just described them.  And that's all you need to

11  feel completely comfortable under the law, as you will

12  read it, in signing Form A, answering the other

13  questions -- which we'll go through -- and being done

14  with this case and feeling good about what you've done.

15         Let's talk about -- let's talk about those

16  other questions.  Well, no.  Let's don't talk about those

17  yet.

18         Okay.  Now, the law actually doesn't stop

19  there.  In addition to proving there's asbestos at Zion,

20  he has to prove -- Mr. McCoy, not CBS -- Mr. McCoy has to

21  prove that Westinghouse did something wrong.  Asbestos

22  isn't wrong.  It wasn't there, but it's not wrong.  So

23  what else -- what else has been the evidence?

24         Well, Mr. Castleman came in and said:  If there

25  was asbestos anywhere in 1972, this sign was there.  This

KINSER v. CBS CORP., Case No. 94-2282

1    was a sign.  Their witness said that.

2             What else do we know about warnings in this

3    case?  What else do we know about warnings in this case?

4             We know that Mr. Kinser -- it's the only

5    other -- the only other evidence we have in this case

6    about warnings -- right?  At the end of the day, what

7    Mr. McCoy is claiming is not that we shouldn't have had

8    asbestos there.  That's not what he's claiming.  He's

9    saying we should have warned about it.  We should have

10   protected from it by warning or providing equipment or

11   something.

12            What do we know about Mr. Kinser and warnings?

13   The only other evidence we have about Mr. Kinser and

14   warnings is that he had these two warnings in his life,

15   and he never did anything about it.  Mr. Kinser didn't

16   respond to warnings.  We don't have any evidence of what

17   he would have done if he'd have seen a warning.

18            So the law will tell you -- and you'll see

19   this; you'll read this -- that you can't just stop at

20   whether or not there was asbestos, but I submit:  You

21   won't get any further.  Because without asbestos, they

22   can't carry their burden of proof on anything.  All of

23   their cause issues are related to proving asbestos.  All

24   of their harm issues are associated with being able to

25   prove asbestos.  All of their damage issues are

KINSER v. CBS CORP., Case No. 94-2282

1    associated with being able to prove asbestos.  And they

2    can't prove asbestos.  That's it for their case.

3              But we didn't stop there.

4              There's been evidence in this case about this

5    issue of the law.  And you've heard about this.  And so

6    this is the law.  This is in your legal section -- and

7    you'll read this -- and it says, "If you decide that the

8    proximate, the total proximate cause of the injury to the

9    plaintiff was the conduct, was the conduct of a person or

10   persons other than the defendant, then your defense" --

11   then -- I'm sorry.  I have these braces, and they make me

12   talk funny.  Hold on.  Let me start over.

13             "However, if you decide that the total

14   proximate cause of the injury to the plaintiffs was the

15   conduct of a person or persons other than the defendant,

16   then your verdict should be for the defendant.

17             So, what has the evidence been about other

18   causes in this case?  We're going to talk about the

19   smoking in a minute.

20             Can I zoom out, please?

21             We've heard about all of the other places that

22   Mr. Kinser worked where his coworkers exposed him to

23   asbestos.  He was on the stand.  We went through this big

24   long list, company after company after company, a hundred

25   job sites.  And, and this is what it turns out to be.

KINSER v. CBS CORP., Case No. 94-2282

1  All of these places that he worked, and then Zion; and

2  when you do the math on the number of months spent at

3  these companies versus Zion, it turns out to be less than

4  1 percent of his work life was spent at Zion.

5          So when you're thinking about cause and who

6  caused what and whether it's more likely true than not

7  that something was caused by Westinghouse, the only

8  Westinghouse time at issue in this case are these months.

9  And there's no way that that turns out to be more likely

10  anything.  It's only four months.

11          Okay.  So the special questions that you have

12  to answer, you can answer two of them based on the

13  analysis that we've just gone through.  The first one is

14  whether or not Westinghouse was a proximate cause of his

15  current lung condition.  And the judge will tell you how

16  to fill out this form, and I suspect he'll tell you to

17  cross out the one you don't agree with so that the

18  sentence reads correctly; but you do whatever he says.

19          But it's our position that you will find, based

20  on the evidence we've just been discussing, that the,

21  that Westinghouse was not a cause, proximate cause of his

22  current lung condition.  And so you would answer that

23  question "not."  Everybody would sign it.

24          Then, "We, the jury, also find that" -- and

25  this just goes to what we were just talking about --

KINSER v. CBS CORP., Case No. 94-2282

1    "that the conduct of others working with asbestos at the

2    job sites where he spent his working life was a cause of

3    his present lung condition."

4          And I've written "was," and I've written here

5    "1962 to 1972" because we know all of those places we

6    discussed with him during his examination from 1962 to

7    1972, pre-OSHA, that he did have asbestos exposure.

8    There's no question about that.  That just wasn't

9    Westinghouse exposure.  It just wasn't.  We know he had

10   it.  It just wasn't Westinghouse.

11         So I submit we've now -- there's four

12   questions, and we've gone through the evidence necessary

13   to do your verdict form and to answer two of the

14   questions.  And the good news is:  We're on the downhill.

15   We're on the downhill side of this closing argument.

16         Now, as you make your way through the jury

17   instructions, you'll see that you only have to answer

18   these other questions if you get past that issue of

19   negligence and conduct and you decide that

20   CBS/Westinghouse has done something wrong; that they did

21   something wrong; that they had asbestos and -- and you

22   find all of those other issues:  that they failed to

23   warn -- and the only evidence has been that there were

24   warnings.

25         Once you get past that, then you have to

KINSER v. CBS CORP., Case No. 94-2282

1    determine whether or not some -- that their conduct

2    caused this lung cancer.  And we've had a lot of

3    testimony about that, and let's consider what the

4    evidence has been on that.

5         Number one, I just said it:  There's no dispute

6    that from 1962 to 1972 -- they don't dispute it; we don't

7    dispute it -- he had, every day -- or every work day --

8    exposure to asbestos, every day, workday exposure to

9    asbestos.

10        So if, if you determine that asbestos is

11   related to his current lung condition, then I submit to

12   you that is the time that he received it.  At least

13   that's uncontested.  There's no, no contest about that.

14        And I've got this demonstrative to refresh your

15   recollection as to all of those places that he and I went

16   over where he worked during those time periods.

17        What else do we have?  What other evidence have

18   we brought you?  This is Defendant's Exhibit 2317.  Now,

19   this is a medical record.  This is an interesting medical

20   record.  We didn't talk about this during the case, but

21   it's in evidence.  You can look at it, 23-- 2317.  This

22   is a Dr. Scanlon medical record.  So Mr. Kinser went to

23   Dr. Scanlon and gave him his medical history.  And

24   Dr. Scanlon wrote this down -- and you see right here

25   where it says, "He says."  "He says."  So this is a

KINSER v. CBS CORP., Case No. 94-2282

1   medical history.

2           What did he say to Dr. Scanlon was his medical

3   history?

4           "He worked for the same company through 1996,

5   though the asbestos exposure was not, not much beyond the

6   mid '60s."  That is consistent -- not with what we're

7   hearing in this courtroom; it is inconsistent with what

8   we're hearing the story is today.  That is not the same

9   story that we've heard in this trial, but it is

10  consistent with the type of exposure that we know he had

11  in the '60s.  It is consistent with that.

12          What else has the evidence been?  The evidence

13  has been -- and you saw this in opening -- that lung

14  cancer is caused by a number of things.  The, the link

15  between asbestos exposure and lung cancer is not a direct

16  one.  We had a number of very important discussions with

17  a number of doctors about:  How do you establish a causal

18  connection between asbestos and lung cancer?  And it's

19  going to come down to:  Who do you believe?  Who do you

20  believe?

21          So we've got Dr. Jones.  We've got Dr. Howard.

22  And what I can tell you about them versus the Plaintiffs'

23  experts:  They were prepared.  Dr. Howard looked at the

24  films.  Dr. Jones looked at the films.  They read all the

25  medical records.  They read the depositions.  They

KINSER v. CBS CORP., Case No. 94-2282

1  actually came into this room; and they sat up there, and

2  they were prepared to talk about this case.

3           They didn't cite a bunch of medical literature

4  and try to convince you that somehow their book report

5  that they deliver in courtroom after courtroom after

6  courtroom should be believed as applying to this man.

7  They came in here to talk about this man on this day in

8  this courtroom.

9           And what did they tell you about him?  Without

10  exception, he's had asbestos exposure.  He's got pleural

11  plaques in his lungs.  Without exception.  It's clear:

12  He's had asbestos exposure.  What do all of the doctors

13  say?  You can't tell whether or not that is -- when that

14  asbestos exposure occurred.  You can't take a piece out

15  of his lung and look at the fiber of -- Dr. Brody told

16  you this, Plaintiffs' own expert -- and figure out:

17  Whose asbestos is this?  We don't know if it comes from

18  Westinghouse.  We don't know -- well, we know it doesn't

19  come from Westinghouse because he never worked at a

20  Westinghouse plant -- or he never worked at a place that

21  had any Westinghouse asbestos.  We don't know whose fiber

22  it is.  You can't tell from looking at it.

23           What else did Dr. Brody tell you?  What else

24  did all the plaintiffs' doctors tell you?  They can't

25  tell what started the mutation that caused the cancer.

KINSER v. CBS CORP., Case No. 94-2282

1  And because they can't tell, they can't rule out

2  asbestos.  Well, that's fascinating for doctors, but

3  that's not what the law requires.

4         Read the law on cause.  Cause isn't about

5  writing a paper for a medical journal.  It's about

6  proving that Larry Kinser actually had lung cancer caused

7  by asbestos.  And in order to do that, you have to prove

8  that he had exposure to enough asbestos.  And, number

9  one, we don't have any proof that four months was enough.

10 And number two, we don't have any proof that he had

11 sufficient exposure because he doesn't have the -- what

12 was it that Dr. Howard said? -- the telltale signal of

13 asbestosis.

14        And you know what?  We don't need it.  We don't

15 need it because we know what causes lung cancer.  We know

16 what caused it, because if you -- if you put aside

17 everything you've heard in this case and you reach back

18 and you find your common sense that you had before you

19 came in here and you put that back in and you say, "I

20 just met a guy who had lung cancer, and he smoked for

21 35 years," you know what caused his lung cancer.  And you

22 don't need a bunch of doctors to come in here.  You know

23 what caused his lung cancer.

24        But we brought you doctors.  We brought you

25 their doctors, and we brought you our doctors.  And all

KINSER v. CBS CORP., Case No. 94-2282

1  of them said, without exception:  If you take him, you

2  put -- I mean, they didn't say it this way.  They said:

3  If you take the asbestos exposure away, the smoking was

4  enough.  You take this same guy; you put him in an office

5  for his whole life and he smokes for 35 years, he gets

6  the same cancer.  It's not the asbestos.  They all said

7  that.  It didn't matter how much they got paid.  The

8  plaintiffs' experts wouldn't deny that the smoking was

9  enough to cause his cancer.  And you know that, and the

10  plaintiffs know that.

11         And the law says:  When you know that, when you

12  know that the cause of the injury was something besides

13  the defendant's conduct -- not even 100 percent; let's

14  just say you, you know that the smoking is 75 percent of

15  it -- the law says:  Form, Verdict Form A; the defense

16  has one won the case.

17         Because the plaintiffs, all they have to do to

18  get us here is sue us, they have to prove stuff.  And

19  they have not proven to you that the smoking is

20  greater -- is less than 50 percent of the cause of this

21  cancer.  There's a -- search your notes.  Search your

22  recollections.  Who said that?  Who said that?  Nobody.

23  Nobody said that.  Nobody said that.

24         In fact, let's think about the relative

25  contribution of toxins to Mr. Kinser.  He worked at Zion

KINSER v. CBS CORP., Case No. 94-2282

1    for four months.  He smoked for 420 months.  I did the

2    math before I got here.  Four months versus 420 months;

3    that's 1 percent.  Four months at Zion; 420 months of

4    smoking.  That's the relative contribution of toxins that

5    we're talking about.

6            And that's only if you believe there was

7    asbestos there.  You only get to this -- and I don't

8    think you will -- but you only get to this if you get

9    past that first question, if you get past that first

10   question.

11           All right.  This is your third special

12   interrogatory; and I think that, based on what we've just

13   discussed, you'll be able to answer this question:  "We,

14   the jury, further find that Larry Kinser's lifetime

15   smoking habits were a proximate cause of his present lung

16   condition."  I don't think we've had any evidence that

17   says anything else.

18           Now, the law is thorough.  The law is helpful,

19   and it is good.  And the law says it will tell you what

20   to do, no matter what you decide in this case.  So -- and

21   I've messed it up.

22           All right.  So the law says -- and the judge

23   will give you instructions on how to award damages, but

24   that doesn't mean that the judge thinks or the law thinks

25   you need to.  In fact, the law tells you, "If you decide

KINSER v. CBS CORP., Case No. 94-2282

 1   for the defendant, you will have no occasion to consider

 2   the question of damages."  So even though you have a

 3   bunch of instructions on how to figure out different

 4   numbers, you may never need those, and I don't think you

 5   will.  But I have to do my job, just like the law has to

 6   do its job; so I'm going to take a minute and I'm going

 7   to talk about those.

 8           You only get here if you decide that

 9   Westinghouse did something wrong; there was asbestos, and

10   they did something wrong with that asbestos and that the

11   lung cancer was caused, more than 50 percent, by that

12   asbestos.  That's the only time you even get to this

13   question.

14           So what has the evidence been on this question?

15   What has the evidence been on the quality of Mr. Kinser's

16   life since his retirement, which he indicated was -- he

17   had to take early retirement.  What has the evidence been

18   on the loss of enjoyment of his life?  What has the

19   evidence been as it relates to how much money Mr. McCoy

20   said you ought to give to Mr. Kinser in this case?

21           Now, first I need to tell you that we, we did

22   reach an agreement on how much the medical bills were.

23   It wasn't because we thought you should award those.

24   That was because we agreed we didn't need a witness to

25   come in here and tell you how much the medical bills

 1   were.  I just want to make that clear.  Our position in

 2   this case is that we are asking for a complete defense

 3   verdict, a Form A verdict, a zero verdict.

 4          So, the evidence has been, as you can tell by

 5   the timeline, that Mr. Kinser has had a good quality of

 6   life.  He had a medical issue.  It resolved very

 7   favorably.  The medical issue, it wasn't caused by

 8   Westinghouse.

 9          Mr. Kinser has also -- his lawyer has said, and

10   I think he changed this today, too -- but he also said

11   that, that he doesn't think that Westinghouse is very

12   responsible if you get to this issue of allocating, of

13   allocating money.  It's a low-stage lung cancer, and he's

14   been cancer-free for 13 years.  He retired at the age of

15   62.  His wife at that time was 50.  He's enjoyed a very

16   active retirement.  I'm not going to talk to you anymore

17   about damages.  You've got the evidence.  You've got the

18   law.  If you get to this point, you'll know what to do.

19          I will tell you, however, that you will have an

20   opportunity to decide a different issue as it relates to

21   damages, and that has to do with allocation.  So who, who

22   has what percentage?  Who has what percentage?  And this

23   is honestly what, I would submit to you, the evidence

24   supports.

25          This is your fourth question.  If you consider

KINSER v. CBS CORP., Case No. 94-2282

1   the total conduct that caused his present lung condition,

2   what caused it?  I would submit a fair reading of the

3   evidence is that 100 percent of his lung cancer was

4   caused by his smoking.  I think you could find that and

5   sign this and feel very comfortable about that.

6          Secondhand smoke, there's been evidence on

7   that.  I can't put a percentage on that.  That's your

8   job.  But there has been evidence on that, and we've had

9   medical testimony on that, and that certainly can be

10  allocated a percentage.

11         I think there's been evidence that would

12  support 100 percent on the pre-'72 asbestos, if that's

13  what you believe.  If you believe that it's an

14  asbestos-related disease, then that would -- there's been

15  evidence that would support that.  I think that's less

16  likely because I don't think it's an asbestos-related

17  disease based on the evidence, so I've dotted that one.

18         But I think that, without exception, there's no

19  evidence to support any conduct causing any lung

20  condition in Mr. Kinser associated with anything that

21  CBS/Westinghouse has done.  And remember, if you get down

22  to trying to decide, he was only at CBS/Westinghouse for

23  less than 1 percent of his work life.

24         So we're coming to the end here, and we've

25  reviewed the evidence, and we've reviewed the verdict

KINSER v. CBS CORP., Case No. 94-2282

1   forms.  And before I sit down, I want to remind you of

2   what the judge has already, already told you.  I, I sit

3   down in a few minutes; and no matter what Mr. McCoy says

4   after I sit down, I don't get to get up.  And that's

5   okay.  Those are the rules, and I believe in rules; and

6   rules about things like that have to do with who has the

7   burden of proof.

8           And because he has to do the proving in this

9   case, not only do they get to go first on everything, but

10  they get to go last because they've got to do the

11  convincing.  They've got to show you -- they've got to

12  show you the evidence.  And I -- when I sit down, I hope

13  you will consider whatever Mr. McCoy says and think about

14  what evidence we've brought you and the comments that

15  I've said today and consider that in light of whatever he

16  has saved for what I call the "no-response zone," the

17  time when he knows I don't get to say anything to defend

18  ourselves with.

19          Now, I also would like, as I sit down, to offer

20  Mr. McCoy a challenge on a couple of things.  And I do

21  this because I -- these are issues that have plagued me

22  throughout the case; and I think that in order for you to

23  fairly and justly try this case, you're entitled to know

24  the answers to these questions.

25          I don't know, and maybe you'd like to know:

KINSER v. CBS CORP., Case No. 94-2282

```
 1   Why are lawyers filing lawsuits before people have
 2   diseases?
 3           I don't know, and maybe you'd like to know:
 4   Why do you bring so many experts but not give them the
 5   tools that they need to do their work?
 6           I don't know, and maybe you'd like to know:
 7   Why do you bring people who don't have information about
 8   Mr. Kinser and the Zion plant to a lawsuit that's about
 9   Mr. Kinser and the Zion plant?  And by the way, why
10   didn't you bring anybody who knows about Zion or who
11   knows about Mr. Kinser?
12           I don't know, and maybe you'd like to know:
13   When you had the chance to talk to those Westinghouse
14   witnesses that you talked to, why did you ask them about
15   1960s documents instead of asking them about Zion, and
16   about asking them about things that had to do with
17   Mr. Kinser's work life?
18           And, finally, I'd like to know in plain
19   English:  Right here, from this stand, what is the
20   evidence that there is asbestos at Zion?  And I don't
21   want some Venn diagram; connect the dots; this document
22   supports this document.  I would just like a man to stand
23   here and say, "Here's the evidence that we brought you
24   that we put on our scale."
25           At the end of the day, ladies and gentlemen,
```

1  Mr. Kinser had lung cancer because he smoked for

2  35 years.  And he sued because -- well, he never did tell

3  us why he sued, actually, before he got sick, so we don't

4  know that.  We do know he hired a lawyer before he got

5  sick, but we don't know why he sued.

6           He had, he had so many other people that he

7  could have sued, companies he worked for before OSHA,

8  companies who maybe he actually had evidence.  But we're

9  the ones who are here today, and we're the ones you have

10  to think about.

11           He did this -- he, he brought forward this

12  lawsuit with experts that are part of Mr. McCoy's expert

13  mill who testify regularly in these cases.  They march up

14  here, and they sit up there, and they point over there;

15  and they say, "We're not sure, so we say it's asbestos;

16  and we don't know this guy, but I'm sure he's hurt."  And

17  they do it over and over and over again to get you to

18  move money.

19           Demand evidence.  Demand evidence from

20  Mr. McCoy.  That's what the law requires.  Push aside the

21  smoke.  Crash the mirrors.  Find the evidence.  And when

22  you do, look to the law.  Your job will be so easy.  Your

23  job will be so easy.

24           On behalf of myself and Mr. Sawyer and

25  Ms. Burlison -- who, by the way, did conduct her first

KINSER v. CBS CORP., Case No. 94-2282

1   live examination here with you-all -- we appreciate so

2   much the attention and dedication that you have given to

3   this case and the hard work which you've already invested

4   and, honestly, the hard work which lies ahead of you.

5           You've all been here each and every day.

6   You've listened attentively, even when that was very

7   challenging.

8           And so, in addition to the lawyers who have

9   been here, I would like to thank you on behalf of the men

10  and women who bring you, you know, the content for WCIA,

11  as well as the other broadcasting and electrical content

12  and options brought to you by CBS.  They asked me to come

13  here and stand for this turbine and to tell you its side

14  of the story.  And I was happy and proud to do that.  We

15  all were.

16          This company, CBS, it's not in the turbine

17  business anymore.  You know, it's a broadcasting company.

18  But they stand and they defend their products, and they

19  defend their products' histories.  We had witnesses from

20  the department of discontinued operations.  They have to

21  find retirees to come in and tell these stories, and they

22  have to look for documents that are 40 and 50 years old

23  because they get sued.  And they do.

24          And I was happy to be a part of that, and I

25  am -- I am happy to live with whatever your decision is.

KINSER v. CBS CORP., Case No. 94-2282

```
 1              The jury system is a good one.  And the rule of

 2    law is fair, and it is just.  And if, after you've

 3    considered all of the evidence that we've discussed and

 4    everything else that you've heard, you do not feel really

 5    good about where you end up, go back to the law.  It will

 6    help you, and it will guide your deliberations; and

 7    probably you just need to read through the jury

 8    instructions one more time.  And the rule of law will

 9    help with anything that -- anytime you get stuck.

10              And in this case, I submit to you that the

11    evidence and the law, which Judge Baker will give to you,

12    has provided you with -- it will overwhelmingly compel

13    the conclusion that CBS did not cause any harm to

14    Mr. Kinser; that his lung cancer is cured; and it was

15    caused in the first place by smoking.

16              So as you soon get the opportunity to retire

17    and consider your verdict, I ask you to set aside any

18    sympathy that you may have, and do your justice by

19    applying the law and return a complete defense verdict

20    for Westinghouse/CBS.

21              Thank you.

22              THE COURT:  Lisa, do you need a break, or are

23    you good for ten more minutes?

24              COURT REPORTER:  I'm good.

25              THE COURT:  Okay.  Rebuttal argument for the
```

KINSER v. CBS CORP., Case No. 94-2282

1  Plaintiff.

2         MR. McCOY:  There was some suggestion that

3  there had been a lawsuit filed before Mr. Kinser had an

4  asbestos injury.  I didn't see that from, didn't hear

5  that from the evidence.

6         Mr. Kinser explained how the Savoy pipefitters

7  from the local there got x-rays that were arranged

8  through the union, and that was back in the -- before the

9  lawsuit.

10         So this was all a function of having proved

11  about asbestos injury.  More importantly here is that,

12  again, you-all are to decide this case on the evidence

13  about what has happened that's in the medical records and

14  been presented.  That shows asbestos-related injury.

15         THE COURT:  Is your microphone on?  We lost

16  that last phrase.

17         MR. McCOY:  It's on, Judge.  Yes.

18         THE COURT:  Thank you very much.

19         MR. McCOY:  Okay.  I'll turn it this way again.

20         Westinghouse -- CBS is the legal successor to

21  Westinghouse.  That's not disputed here.  The

22  "discontinued operations" being referred to are the ones

23  that exposed people to asbestos in these powerhouse

24  settings.  There is responsibility now as legal successor

25  to Westinghouse for what happened back then.  To say

KINSER v. CBS CORP., Case No. 94-2282

1    otherwise, again, is to deny responsibility here.  That's

2    not a basis for deciding this case.

3           Plaintiff brought, as a witness in this case,

4    Doug Ware from Westinghouse.  He was also the witness for

5    the plaintiff.  It wasn't just Mr. Kinser.  We gave

6    Doug Ware an opportunity to explain the documents about

7    Zion.  Those documents don't have to be subject to any

8    credibility issues.  They are what they are.  They

9    show -- can we have the ELMO?  Thank you.

10          They show that in '70, October '70, Sargent &

11   Lundy form for insulation specification, Westinghouse

12   incorporated that into the Zion turbine files.  That is

13   the Zion turbine number 13A-3501, and they called it

14   drawing 401A343.  Those were used at the time of the

15   bidding by the subcontractors to buy the insulation,

16   which would be put on in the next couple years.  That's

17   what the document shows.

18          It also shows that the change was made -- go a

19   little bit deeper on that one; zoom in on that one -- and

20   signed off on for that same document as a change in 1975

21   by several people from Westinghouse.  That was what --

22   that's when the change occurred.  And it said:  Use it

23   now -- in '75 -- start using drawing 82A675.

24          82A675 is -- can we zoom in on this one here;

25   that's good -- that is the Sargent & Lundy Form 40-H.

KINSER v. CBS CORP., Case No. 94-2282

1    That was the one that was asbestos-free.  What was in --

2    what was placed in the Zion turbine files by the

3    attorneys was a copy of this document that says -- it

4    shows these documents -- these specifications that

5    changed to asbestos-free in 5/23 of '72.

6           And it shows that the document was from the

7    files of another turbine.  That's not the Zion turbine

8    number though.  It's as simple as that.  This is not a

9    Zion turbine document.  But the attorneys got it in the

10   file.  How?  We gave Mr. Ware a chance to explain.  He

11   couldn't explain.

12          So the documents are clear that the only

13   mention in the Zion turbine documents themselves is for

14   the original specifications.  And, again, even if this

15   change was made in some other turbines for Commonwealth

16   Edison that were being built later, like May of '72,

17   that's after.  That's after the Zion construction was

18   long underway and the materials had been bought.

19          So it just doesn't -- the evidence just does

20   not support anything other than a change at Zion being

21   made in '75 to the insulation.  That's what the document

22   for Zion shows.  A document from another turbine can't

23   prove something else without Zion.

24          Now, the other part of this, too, is:  I think

25   Ms. Ezell showed you-all something from Mr. Kleinrath's

KINSER v. CBS CORP., Case No. 94-2282

 1    testimony about how the new specifications were issued

 2    for bidding, for bidding, for new jobs.  So that was

 3    their purpose for the new jobs.  Well, Zion was already

 4    long under way in May of '72.

 5              In any event, the documents, you can look at

 6    them; but I just think there's no question from these

 7    documents that there's asbestos, as Sargent & Lundy

 8    required.  At the time of the bidding for Zion, at the

 9    time of the purchasing, there was asbestos required.

10    That was what was there to please the customer.

11              A couple other points.

12              There was discussion about OSHA not finding

13    violations.  Well, first off, there was no showing that

14    there was an OSHA inspector out there at Zion for any

15    purpose other than for an accident, which happened, I

16    think, in '71 or something like that, Mr. Ware said.  So

17    no showing they did any inspection for O-- for asbestos

18    there.

19              And I keep seeing this document that

20    Westinghouse shows from the Pipefitters Local that says

21    only, only 25 percent of the job sites were found to be

22    complying with OSHA anyway.  So this is one of the vast

23    majority of job sites that was not in compliance with

24    OSHA.  That's what the evidence shows, consistent with

25    even what Westinghouse is showing you in the way of the

KINSER v. CBS CORP., Case No. 94-2282

1  evidence.

2          Finally, I want to get to another point.  And

3  that is:  There is, there is a verdict form, of course --

4  I'll ask this one be displayed -- in the instructions

5  that you'll get for the Kinsers.  "We, the jury, find for

6  Larry Kinser and against CBS/Westinghouse."

7          It lists the categories of the damages.

8  Itemize as follows.  These are the ones we talked about

9  in the first part of my presentation here.

10          There's another verdict form, and it requires

11  that you apportion the responsibility among the different

12  entities here, Westinghouse, Larry Kinser, and the

13  others.

14          There's another Verdict Form, B-2.  This is the

15  one for Donna Kinser's case.  Evaluate them separately.

16          So when you get to those, what Westinghouse has

17  told you, what I heard is that your decision should be

18  based on sympathy for Westinghouse.  Let me explain to

19  you what I'm talking about.  And that's not proper, of

20  course, to base your decision on sympathy for either

21  party.  That's what Ms. Ezell showed you in the

22  instructions.

23          But what she, what Westinghouse has said in

24  this case is that you shouldn't base your decision on the

25  Kinsers' faith and religious convictions.  He --

KINSER v. CBS CORP., Case No. 94-2282

```
 1              MS. EZELL:  Objection, Your Honor.

 2              THE COURT:  He may argue.

 3              No.  You didn't ever say those words.  I agree.

 4    But he's implying it.

 5              You may argue.

 6              MR. McCOY:  Right.

 7              THE COURT:  You should finish up.  You've got

 8    about three or four more minutes.

 9              MR. McCOY:  I'm right there, Judge.  Probably

10    less.

11              The position of Westinghouse was:  Don't award

12    the Kinsers damages because of the strength of those

13    religious convictions; that they're so strong

14    religiously, they don't need compensation.  Well, that's

15    not the law.  Okay?

16              The law is that when you have these things

17    going on here that fit these categories of damages, you

18    need to consider each one carefully.  And you shouldn't

19    let sympathy about religious convictions that

20    Westinghouse wants to guide your judgment be a factor in

21    your judgment.

22              It goes back to the same thing.  It's the

23    denial by Westinghouse that there was lung cancer; that

24    Mr. Kinser has failed health; that there's a loss of any

25    joint activities; and that there's some increased risk of
```

KINSER v. CBS CORP., Case No. 94-2282

```
 1   these other diseases.  That's the evidence.

 2            The religious convictions that they have are

 3   not a factor in your thinking as jurors.  That's the law.

 4            And, again, review this evidence carefully.  We

 5   ask that you return a verdict on behalf of Larry and

 6   Donna Kinser.  Thank you.

 7            THE COURT:  All right, jurors.  We'll have a

 8   very short recess, and then I'll give you your jury

 9   instructions.

10            (Jury absent, 4:18 p.m.)

11            THE COURT:  You got all the jury instructions?

12            LAW CLERK ABRAMS:  Right here.

13            THE COURT:  Why don't you stick one on each

14   chair.

15            (Recess, 4:19 p.m. to 4:22 p.m.)

16            (Jury present, 4:23 p.m.)

17            THE COURT:  All right.  Jurors, on your seats,

18   each of you found a set of jury instructions, and I'm

19   going to read them to you; and you read along with me.

20            The law applicable to this case is contained in

21   these instructions, and it is your duty to follow them.

22   You must consider these instructions as a whole, not

23   picking out one instruction and disregarding others.

24            You may not question any rule of law stated by

25   me in these instructions.  Regardless of any opinion you
```

KINSER v. CBS CORP., Case No. 94-2282

1   may have as to what the law ought to be, you must base

2   your verdict upon the law given by me.

3          It is your duty to determine the facts and to

4   determine them from the evidence produced in open court.

5   You are to apply the law to the facts and, in this way,

6   decide the case.  Your verdict must be based on evidence

7   and not upon speculation, guess, or conjecture.

8          The production of evidence in open court is

9   governed by rules of law.  From time to time, it has been

10  my duty as judge to rule on the admissibility of

11  evidence.  You must not concern yourselves with the

12  reasons for these rulings.

13         The evidence consists of the sworn testimony of

14  the witnesses, the exhibits received in evidence, and

15  stipulated facts.

16         You are to consider only the evidence received

17  in this case.  You should consider this evidence in the

18  light of your own observations and experiences in life.

19  You may draw such reasonable inferences as you believe to

20  be justified from proved facts.  Whenever evidence was

21  received for a limited purpose, it should be considered

22  by you for that purpose and no other purpose.

23         You should not do any independent investigation

24  or research on any subject relating to the case.  What

25  you have seen or heard outside the courtroom is not

KINSER v. CBS CORP., Case No. 94-2282

1    evidence.  This includes any press, radio, or television

2    programs; and it also includes any information available

3    on the Internet.  Such programs, reports, and information

4    are not evidence; and your verdict must not be influenced

5    in any way by such material.

6            For example, you must not use the Internet,

7    including Google, Wikipedia, or any other source you

8    might use every day to search for any information about

9    the case or the law which applies to the case or the

10   people involved in the case, including the parties,

11   witnesses, lawyers, and judge.

12           You would be bored if you looked it up about

13   me.

14           You are to disregard any evidence concerning

15   which I have sustained an objection or which I ordered

16   stricken.  Anything you may have seen or heard about the

17   case outside the courtroom is not evidence and must be

18   entirely disregarded.  You should not be influenced by

19   sympathy, prejudice, fear, or public opinion.  You are

20   impartial judges of the facts.

21           Arguments, statements, and remarks of counsel

22   are intended to help you in understanding the evidence

23   and applying the law but are not evidence.  If any

24   argument, statement, or remark has no basis in the

25   evidence, then you should disregard that argument,

KINSER v. CBS CORP., Case No. 94-2282

1    statement, or remark.

2           Neither by these instructions nor by any ruling

3    or remark which I have made do I or have I meant to

4    indicate any opinion as to the facts.

5           The defendant is a corporation and can act only

6    through its officers and employees.  Any act or omission

7    of an officer or employee within the scope of his or her

8    employment is the action or omission of the defendant

9    corporation.

10          The corporate defendant in this case is

11   entitled to the same fair and unprejudiced treatment as

12   an individual would under like circumstances, and you

13   should decide the case with the same impartiality you

14   would use in deciding cases between individuals.

15          The plaintiffs, Larry Kinser and Donna Kinser,

16   claim that they were injured and suffered damages -- they

17   were injured and suffered damages and that the defendant,

18   CBS Corp., legal successor to Westinghouse Corporation,

19   negligently failed at the Zion, Illinois, Atomic Power

20   Plant to act in one or more of the following ways.

21          One:  Negligently failed to warn Larry Kinser,

22   his coworkers, or employers -- employees, adequately --

23   employers, adequately of the health hazards of exposure

24   to asbestos.

25          Two:  Negligently failed to investigate or to

KINSER v. CBS CORP., Case No. 94-2282

1    test adequately for the health hazards of asbestos

2    concerning products or equipment -- containing products

3    or equipment, asbestos-containing products or equipment.

4          Three:  Negligently failed to instruct Larry

5    Kinser, his coworkers, or employers adequately about

6    precautionary measures necessary to prevent exposure to

7    asbestos.

8          Four:  Negligently failed to exercise ordinary

9    care in designing, manufacturing, or supplying

10   asbestos-containing products instead of substitute

11   materials.

12         Five:  Negligently failed to direct work safely

13   over which the defendant -- over which the defendant

14   retained some measure of control over safety.

15         The plaintiffs further claim that one or more

16   of the foregoing was a proximate cause of their claimed

17   injuries and damages.

18         The defendant denies that it did any of the

19   things claimed by the plaintiffs and denies that it was

20   negligent.  It denies that any claimed act or omission of

21   the defendant was a proximate cause of any of the claimed

22   injuries and damages.  It further denies that the

23   plaintiffs have been damaged or injured to the extent

24   claimed by the plaintiffs.  Further, the defendant claims

25   that the plaintiffs were contributorily negligent and

KINSER v. CBS CORP., Case No. 94-2282

1     that the contributory negligence was a proximate cause of

2     their claimed injuries and damages.

3          When I use the word "negligence" in these

4     instructions, I mean -- I mean the failure to do

5     something that a reasonably careful person would do under

6     the -- would do or the doing of something that a

7     reasonably careful person would not do under

8     circumstances similar to those shown by the evidence.

9     The law does not say how a reasonably careful person

10    would act under those circumstances.  That is for you to

11    decide.

12         When I use the expression "contributory

13    negligence" in these instructions, I mean the negligence

14    on the part of the plaintiffs that proximately

15    contributed to cause the alleged injuries and damages

16    claimed by the plaintiffs.

17         When I use the term "ordinary care," I mean the

18    care a reasonably careful person would use under the

19    circumstances similar to those shown by the evidence.

20    The law does not say how a reasonably careful person

21    would act under those circumstances.  That is for you to

22    determine.

23         It was the duty of the defendant, before and at

24    the times of the occurrences in question, to use ordinary

25    care for the safety of the plaintiffs.

KINSER v. CBS CORP., Case No. 94-2282

1              It was the duty of the plaintiff, Larry Kinser,

2    to use ordinary care for his own safety.

3              It is proper for a lawyer to meet with any

4    witness in preparation for trial.

5              The law does not require any party to call as a

6    witness every person who might have knowledge of the

7    facts related to this trial.  Similarly, the law does not

8    require any party to present exhibits and papers and

9    things mentioned during the trial.

10             You have heard witnesses give opinions about

11   matters requiring special knowledge and skill.  You

12   should judge this testimony in the same way that you

13   judge the testimony of any other witness.  The fact that

14   such person has given an opinion does not mean that you

15   are required to accept it.  Give the testimony whatever

16   weight you think it deserves, considering the reasons

17   given for the opinion, the witness's qualifications, and

18   all of the other evidence in the case.

19             Any notes you have taken during this trial are

20   only aids to your memory.  The notes are not evidence.

21   If you have not taken notes, you should rely on your

22   independent recollection of the evidence and not be

23   unduly influenced by the notes of other jurors.  Notes

24   are not entitled to any greater weight than the

25   recollections or impressions of each juror about the

KINSER v. CBS CORP., Case No. 94-2282

1  testimony.

2          The weight of the evidence presented by each

3  side does not necessarily depend on the number of

4  witnesses testifying on one side or the other.  You must

5  consider all the evidence in the case, and you may decide

6  that the testimony of a smaller number of witnesses on

7  one side of an issue has greater weight than that of a

8  larger number on the other side of that issue.

9          There are two types of evidence:  direct and

10  circumstantial.  "Direct evidence" is the testimony of a

11  person who claims to have personal knowledge of the

12  occurrences which are the subject of the case, such as an

13  eyewitness.  An example of direct evidence that it is

14  raining is a person who comes in and says, "I was

15  outside, and I saw it raining."

16          "Circumstantial evidence" is the proof of a

17  chain of facts and circumstances which tend to show the

18  existence of other relevant facts sought to be proved.

19  An example of circumstantial evidence that it is raining

20  is a person entering a room carrying a wet umbrella.

21          The law makes no distinction between the weight

22  to be given either direct or circumstantial evidence.

23  Therefore, all of the evidence in the case, including the

24  circumstantial evidence, should be considered by you in

25  arriving at your verdict.

KINSER v. CBS CORP., Case No. 94-2282

1        In determining whether any proposition has been

2   proved, you should consider all of the evidence bearing

3   on the question, without regard to which party produced

4   it.

5        Part of your job as jurors is to decide how

6   credible or believable each witness was.  This is your

7   job, not mine.  It is up to you to decide if a witness's

8   testimony was believable and how much weight you think it

9   deserves.  You are free to believe everything that a

10  witness said, or only part of it, or none of it at all;

11  but you should act reasonably and carefully in making

12  these decisions.

13        Let me suggest some things for you to consider

14  in evaluating each witness's testimony.

15        One:  Ask yourself if the witness was able to

16  see or hear the events clearly.  Sometimes even an honest

17  witness may not have been able to see or hear what was

18  happening and may make a mistake.

19        Two:  Ask yourself how good the witness's

20  memory -- memory seems to be.  Did the witness seem able

21  to remember accurately what happened?

22        Three:  Ask yourself if there was anything else

23  that may have interfered with the witness's ability to

24  perceive or to remember the events.

25        Four:  Ask yourself how the witness acted while

KINSER v. CBS CORP., Case No. 94-2282

1  testifying.  Did the witness appear honest?  Or did the

2  witness appear to be lying?

3          Five:  Ask yourself if the witness had any

4  relationship to the plaintiffs or the defendant, or

5  anything to gain or lose from the case that might

6  influence the witness's testimony.  Ask yourself if the

7  witness had any bias or prejudice or reason for

8  testifying that might cause the witness to lie or to

9  slant the testimony in favor of one side or the other.

10          Six:  Ask yourself if the witness testified

11  inconsistently while on the witness stand, or if the

12  witness said or did something, or failed to say or do

13  something, at any other time that is inconsistent with

14  what the witness said while testifying.

15          If you believe the witness was inconsistent,

16  ask yourself if this makes the witness's testimony less

17  believable.  Sometimes it may; other times it may not.

18  Consider whether the inconsistency was about something

19  important or about some unimportant detail.  And ask

20  yourself if it seemed like an innocent mistake or if it

21  seemed deliberate.

22          Seven:  And ask yourself how believable the

23  witness's testimony was in light of all the other

24  evidence.  Was the witness's testimony supported or

25  contradicted by other evidence that you found believable?

KINSER v. CBS CORP., Case No. 94-2282

1    If you believe that a witness's testimony was

2    contradicted by other evidence, remember that people

3    sometimes forget things and that even two honest people

4    who witness the same event may not describe it exactly

5    the same way.

6              These are only some of the things that you may

7    consider in deciding whether -- in deciding how

8    believable each witness's testimony was.  You may also

9    consider other things that you think show -- shed light

10   on the witness's credibility.  Use your common sense and

11   your everyday experience in dealing with other people,

12   and then decide what testimony you believe and how much

13   weight you think it deserves.

14             During the trial, certain testimony was

15   presented to you by the reading of depositions and by

16   video.  You should give this testimony the same

17   consideration you would give it had the witness appeared

18   and testified in court.

19             The credibility of a witness may be attacked by

20   introducing evidence that on some former occasion the

21   witness made a statement or acted in a manner

22   inconsistent with the testimony of the witness in this

23   case on a material issue -- on a matter material to the

24   issues.  Evidence of this kind may be considered by you

25   in connection with all the other facts and circumstances

KINSER v. CBS CORP., Case No. 94-2282

1    in evidence in deciding the weight to be given to the

2    testimony of that witness.

3            When I use the expression "proximate cause," I

4    mean any cause which triggers a natural chain of events

5    that ultimately produces the damages or injury for which

6    the plaintiffs seek to recover in this case.  It need not

7    be the only cause, nor the last or nearest cause.  It is

8    sufficient if it occurs with some other cause or causes

9    acting at the same time, which in combination with it,

10   causes the injury or damages.

11           More than one person may be to blame for

12   causing an injury.  If you decide that the defendant was

13   negligent and that its negligence was a proximate cause

14   of the injury to the plaintiffs, then it is not a defense

15   that some third person who is not a party to the case may

16   also have been to blame.

17           However, if you decide that the total proximate

18   cause of the injury to the plaintiffs was the conduct of

19   a person or persons other than the defendant, then your

20   verdict should be for the defendant.

21           When I say that a party has the "burden of

22   proof" on any proposition, or use the expression "if you

23   find" or "if you decide," I mean you must be persuaded,

24   considering all the evidence in the case, that the

25   propositions on which that party has the burden of proof

KINSER v. CBS CORP., Case No. 94-2282

1  are more probably true than not true.

2          In a civil case, lawyers sometimes talk about

3  the "preponderance" or the weight of the evidence.  This

4  is an accurate statement about the definition of "burden

5  of proof," but "what is more probably true than not true"

6  is more understandable.  The evidence to sustain the

7  burden of proof cannot be evenly balanced.  It must

8  persuade you that something is more probably true than

9  not true.

10         The plaintiffs have the burden of proving each

11 of the following propositions in their claim against the

12 defendant:  First, that the defendant acted or failed to

13 act in one or more of the ways claimed by the plaintiff;

14 second, that the plaintiffs were injured and sustained

15 damages; and, third, that the negligence of the defendant

16 was a proximate cause of the injury and damages to the

17 plaintiff.

18         If you find from your consideration of all the

19 evidence that any one of these propositions has not been

20 proved, then your verdict should be for the defendant.

21         On the other hand, if you find from your

22 consideration of all the evidence that each of these

23 propositions has been proved, then you must consider the

24 defendant's claim that the plaintiffs were contributorily

25 negligent.

KINSER v. CBS CORP., Case No. 94-2282

 1          As to that claim, the defendant has the burden

 2     of proving each of the following propositions:  (A) That

 3     Plaintiffs acted or failed to act in one of the ways

 4     claimed by the defendant as stated to you in these

 5     instructions and that, in so acting or failing to act,

 6     the plaintiffs were negligent; (B) the plaintiffs'

 7     negligence was a proximate cause of the plaintiffs'

 8     claimed injuries or damages.

 9          If you find from your consideration of all the

10     evidence that the plaintiffs have proved each of the

11     propositions required of the plaintiffs and that the

12     defendant has not proved both of the propositions

13     required of the defendant, then your verdict should be

14     for the plaintiffs and you shall not reduce the

15     plaintiff's damages.

16          If you find from your consideration of all the

17     evidence that the defendant has proved both of the

18     propositions required of the defendant, and if you find

19     that the plaintiffs' contributory negligence was more

20     than 50 percent of the total proximate cause of the

21     injuries or damage to -- which is -- for which recovery

22     is sought, then your verdict should be for the defendant.

23          If you find from your consideration of all the

24     evidence that the plaintiff has proved all of the

25     propositions required of the plaintiffs and that the

KINSER v. CBS CORP., Case No. 94-2282

1  defendant has proved all of the propositions required of

2  the defendant, and if you find the plaintiffs'

3  contributory negligence was 50 percent or less of the

4  total proximate cause of the damages or injury for which

5  the recovery is sought, then your verdict should be for

6  the plaintiffs, and you shall reduce the plaintiffs'

7  damages in the manner stated to you in these

8  instructions.

9          The verdicts must represent the considered

10  judgment of each juror.  Your verdicts, whether for or

11  against the parties, must be unanimous.

12          You should make every reasonable effort to

13  reach a verdict.  In doing so, you should consult with

14  one another, express your own views, and listen to the

15  opinions of your fellow jurors.  Dismiss -- discuss your

16  differences with an open mind.  Do not hesitate to

17  reexamine your own views and change your opinion if you

18  come to believe it is wrong.  But you should not

19  surrender your honest beliefs about the weight or effect

20  of the evidence solely because of the opinions of other

21  jurors or for the purpose of returning a unanimous

22  verdict.

23          Also, all -- all of you should give fair and

24  equal consideration to all the evidence and deliberate

25  with the goal of reaching an agreement that is consistent

KINSER v. CBS CORP., Case No. 94-2282

1    with the individual judgment of each juror.  You are

2    impartial judges of the facts.

3          If you find in favor of the plaintiff, Larry

4    Kinser, on the question of liability, you must then fix

5    the amount of money that will reasonably and fairly

6    compensate him for any of the following elements of

7    damage proved by the evidence to have resulted from the

8    negligence of the defendant.

9          One:  The nature and extent -- nature, extent

10   and duration of the injury.

11         Two:  The loss of a normal life experienced and

12   reasonably certain to be experienced in the future.

13         Three:  The increased risk of future lung

14   cancer and mesothelioma resulting from the injury.

15         Four:  The pain and suffering experienced and

16   reasonably certain to be experienced in the future as a

17   result of the injuries.

18         Five:  The reasonable expense of necessary

19   medical care, treatment, and services received and the

20   present cash value of the medical care, treatment, and

21   services reasonably certain to be received in the future.

22         Six:  The value of time and earnings lost.

23         Seven:  The emotional distress experienced and

24   reasonably certain to be experienced in the future.

25         Whether any of these damages has been proved by

KINSER v. CBS CORP., Case No. 94-2282

1    the evidence is for you to determine.

2              When I use the expression "loss of a normal

3    life," I mean the temporary or permanent diminished

4    ability to enjoy life.  This includes a person's

5    inability to pursue the pleasurable aspects of life.

6              If you decide for the plaintiff, Donna Kinser,

7    on the question of liability, you must then fix the

8    amount of money that will reasonably and fairly

9    compensate her for any of the following elements of

10   damage proved by the evidence to have resulted from the

11   negligence of the defendant:  One, loss of society.

12             Whether this damage has been proved by the

13   evidence is for you to determine.

14             If you decide for the defendant on the question

15   of liability, you will have no occasion to consider the

16   question of damages.

17             If you find that a plaintiff is entitled to

18   damages arising in the future because of injuries or

19   because of future medical care or because of loss of

20   society, you must determine the amount of these damages

21   which will arise in the future.

22             If these damages are of a continuing nature,

23   you may consider how long they will consider -- how long

24   they will continue.  If these damages are permanent in

25   nature, then in computing the damages, you may consider

1   how long the plaintiff, Larry Kinser, and his spouse are

2   likely to live.

3           In computing the damages arising in the future

4   because of future medical expenses, you must determine

5   their present cash value.  "Present cash value" means the

6   sum of money needed now, which, when added to what that

7   sum may reasonably be expected to earn in the future,

8   will equal the amount of the expenses at the time in the

9   future when the expenses must be paid.

10          Damages for pain and suffering, disability,

11   loss of a normal life, and loss of society are not

12   reduced to present cash value.

13          According to a table of mortality in evidence,

14   the life expectancy of a person aged 79 is 8.5 years.

15   This figure is not conclusive.  It is an average life

16   expectancy of persons who have reached the age of 79.  It

17   may be considered by you in connection with the evidence

18   relating to the probable life expectancy of the

19   plaintiff, Larry Kinser, in this case, including evidence

20   of his occupation, health, habits, and other activities,

21   bearing in mind that some persons live longer and some

22   persons live less than the average.

23          When you retire to the jury room, you must

24   first select one of your members as a presiding juror.

25   He or she will preside during your deliberations.  Your

KINSER v. CBS CORP., Case No. 94-2282

1  verdicts must be unanimous and signed by each of you,

2  including the presiding juror.  Your answers to the

3  special interrogatories must also be unanimous and signed

4  by each of you, including the presiding juror.  Forms of

5  verdicts and special interrogatories are supplied for

6  your convenience.

7        If you find from your consideration of all the

8  evidence that Larry Kinser has failed to prove each of

9  the propositions required of him in these instructions,

10  then you should use Verdict Form A.

11        If you find from your consideration of all the

12  evidence that Larry Kinser has proved each of the

13  propositions of him in these instructions, then you

14  should use Verdict Form B-1.

15        If you also find that Donna Kinser has proved

16  each of the propositions required of her in these

17  instructions, then you should use both Verdict Form B-1

18  and B-2.

19        Whether you use Verdict Form A, B-1 or B-2, you

20  should then proceed to answer the special

21  interrogatories.  The forms are as follows.

22        Verdict Form A:  "We, the jury, find in favor

23  of the defendant, CBS/Westinghouse, and against the

24  plaintiffs, Larry Kinser and Donna Kinser," and there are

25  twelve lines to sign, the words "Presiding Juror" under

KINSER v. CBS CORP., Case No. 94-2282

1 | one of them.

2 |        Verdict Form B-1: "We, the jury, find for

3 | Larry Kinser and against CBS/Westinghouse and further

4 | find the following.

5 |        "First, without taking into consideration the

6 | question of reduction of damages due to the negligence of

7 | Larry Kinser or the legal responsibility of other

8 | entities, we find that the total amount of damages

9 | suffered by Larry Kinser as a proximate result of the

10 | occurrence in question is $_____, itemized as follows.

11 |        "The reasonable expense of medical and

12 | medically related expenses, $_____.

13 |        "The present cash value of the reasonable

14 | expenses of medical care, treatment, and services

15 | reasonably certain to be received in the future," another

16 | blank line.

17 |        "The loss of a normal life experienced and

18 | reasonably certain to be experienced in the future,"

19 | another blank line.

20 |        "Increased risk of lung cancer or

21 | mesothelioma," blank line.

22 |        "The pain and suffering experienced and

23 | reasonably certain to be experienced in the future as a

24 | result of the injuries."

25 |        The next one, "The emotional distress

KINSER v. CBS CORP., Case No. 94-2282

```
 1    experienced and reasonably certain to be experienced in

 2    the future."

 3            And then, "The value of time and earnings

 4    lost."

 5            And the final bottom line, "Plaintiff's total

 6    damages, $_____.

 7            "Second:  Assuming that 100 percent represents

 8    the total combined legal responsibility of all entities

 9    that proximately caused Larry Kinser's injuries, we find

10    the percentage of legal responsibility attributable to

11    each as follows.

12            "(A) Larry Kinser, _____%.

13            "(B) CBS/Westinghouse, _____%.

14            "(C) Other (includes coworkers working with

15    asbestos, secondhand smoke)," blank line.

16            "Third:  After reducing Plaintiff's total

17    damages from paragraph First by the percentage of the

18    negligence attributable, if any, to Larry Kinser in

19    paragraph Second, we award Larry Kinser recoverable

20    damages in the amount of $_____," twelve lines to sign

21    and the presiding juror.

22            Verdict Form B-2:  "We, the jury, find for

23    Donna Kinser and against CBS/Westinghouse and further

24    find the following.

25            "First:  Without taking into consideration the
```

1  question of reduction of damages due to the negligence of

2  Donna Kinser or legal responsibility of other entities,

3  we find that the total amount of damages suffered by

4  Donna Kinser as a proximate result of the occurrence in

5  question is $_____, itemized as follows.

6          "Loss of society, $_____.

7          "Plaintiff's total damages.

8          "Second:  Assuming that 100 percent represents

9  the total combined legal responsibility of entities that

10  proximately caused Donna Kinser's injury, we find the

11  percentage of legal responsibility attributable to each

12  as follows.

13          (A) Donna Kinser, _____%.

14          (B) CBS/Westinghouse, _____%.

15          (C) Other (includes coworkers working with

16  asbestos and secondhand smoke), _____%.

17          Third:  After reducing Plaintiff's total

18  damages from paragraph First by the percentage of

19  negligence attributable, if any, to Donna Kinser in

20  paragraph Second, we award Donna Kinser recoverable

21  damages in the amount of $_____," and there's twelve

22  lines to sign.

23          Now, there's -- these are the special

24  interrogatories.

25          "(1) We, the jury, find that the conduct of

KINSER v. CBS CORP., Case No. 94-2282

1    CBS/Westinghouse was/was not a proximate cause of Larry

2    Kinser's present lung condition."  Answer that question

3    by choosing either "was" or "was not" as your answer, and

4    black out the word or words that do not represent your

5    answer.

6            For instance, if you find that it was the

7    cause, you would black out "was not."  If you find it was

8    not, you would black out "was."

9            Second question:  "We, the jury, also find that

10   the conduct of others working with asbestos at the job

11   sites which Larry Kinser spent his -- where Larry Kinser

12   spent his working life was/was not a proximate cause of

13   his present lung condition."

14           And you pick out the answer you want and black

15   out the word or words that do not represent your answer

16   and then go on to the next one.

17           "We, the jury, find that Larry Kinser's

18   lifetime smoking habits -- the page is crooked --

19   were/were not a proximate cause of his present lung

20   condition."  You answer that just like the others.

21           "(4) Considering that 100 percent represents

22   the total conduct that caused the present lung condition

23   of Larry Kinser -- or stated another way, the total

24   proximate cause of Larry Kinser's present lung

25   condition -- we, the jury, make the following findings of

KINSER v. CBS CORP., Case No. 94-2282

```
 1   causation.

 2            "Larry Kinser's smoking, _____%.

 3            "Secondhand smoke, _____%.

 4            "CBS/Westinghouse, _____%.

 5            "Coworkers working with asbestos, _____%."

 6            And then there are twelve lines to sign.

 7            Now, I do not anticipate that it will be

 8   necessary for you to consult with me or ask me a question

 9   during your deliberations.  But if you want to ask me a

10   question, you may.  And the proper way to do it is:

11   Write the question out.  Have the presiding juror sign

12   it; and if the presiding juror won't sign it, any juror

13   can sign it.  Give it to the court security officer at

14   the door who will bring it to me, and then I will get you

15   an answer in writing after I consult with counsel and so

16   forth.

17            Now, please swear in the court security

18   officer.

19                (Court security officer sworn, 4:58 p.m.)

20            THE COURT:  All right.  Now, I am going to

21   recess until tomorrow morning at 9:00.  Some of you have

22   a hundred miles to go; and it's a cold, winter night.

23   And I want to get you started home.  And it's not fair to

24   ask you to begin deliberations, on a case that's taken

25   this long, at 5:00 in the evening.
```

KINSER v. CBS CORP., Case No. 94-2282

1        While you're gone, don't discuss the case.

2   Don't talk -- let anybody talk to you about it.  It takes

3   all twelve of you together in the jury room to be a jury;

4   so wait until you come back tomorrow morning, and I will

5   put you in the box, and I'll start you out and give you

6   the exhibits that have been received in evidence, and you

7   will start your deliberations and pick a presiding juror

8   and do all the things that I told you in the

9   instructions.

10        If you wish, you can take the instructions home

11   with you and re-read them tonight if you want to.  If you

12   don't want to, leave them here.  If you lose them, I'll

13   give you another copy.

14        Okay.  Good night.

15        (Jury dismissed for the day, 4:59 p.m.)

16        THE COURT:  Out of the presence and hearing of

17   the jury, are there any other objections to the Court's

18   charge other than those raised in the conference on jury

19   instructions?  Plaintiff?

20        MR. McCOY:  No, Judge.

21        THE COURT:  Defense?

22        MS. BURLISON:  No, Your Honor.

23        THE COURT:  Okay.  We will recess in this case

24   till 8:30.  You've got to be back at 8:30, and then we

25   will state the exhibits to be carried from the bar in the

KINSER v. CBS CORP., Case No. 94-2282

1  record.

2          And you don't, still don't have to be here;

3  we'll record it digitally, and --

4          COURT REPORTER:  Okay, thank you.

5          THE COURT:  -- I'll put the jury in the box and

6  launch them on their deliberations.

7          Good night.  And see you tomorrow.

8          MS. EZELL:  Thank you, Your Honor.

9          MR. McCOY:  See you tomorrow, Judge.

10          (Trial adjourned, 5:01 p.m.)

11

12                  * * * * * * * * * *

13

14              REPORTER'S CERTIFICATE

15      I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

16  that the foregoing is a correct transcript from the

17  record of proceedings in the above-entitled matter.

18      Dated this 19th day of February, 2014.

19

20

21              s/Lisa Knight Cosimini
          _____
              Lisa Knight Cosimini, RMR-CRR
22              Illinois License # 084-002998

23

24

25